JUDGE SAND



David N. Mair [DM-8883]
KAISER SAURBORN & MAIR, P.C.
111 Broadway
New York, New York 10006
(212) 338-9100

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

BENJAMIN ASHMORE,

                    Plaintiff,

    -against-

CGI GROUP, INC. and CGI FEDERAL INC.,

                 Defendants.

----------------------------------------------------------------x

**COMPLAINT**

(Jury Trial Demanded)

Plaintiff, Benjamin Ashmore, by his attorneys, Kaiser Saurborn & Mair, P.C., as and for

his complaint against defendants, alleges as follows:

### PARTIES AND VENUE

    1.     Plaintiff, Benjamin Ashmore, is a resident of the State of New Jersey.

    2.     Defendant CGI Group, Inc. is a corporation incorporated under the laws of

Quebec, Canada, with its principal place of business in Montreal, Canada.

    3.     Defendant CGI Federal Inc. is a Delaware corporation.  It is a wholly-owned U.S.

operating subsidiary of CGI Group, Inc.  CGI Group, Inc. and CGI Federal Inc. are hereafter

jointly referred to as "CGI."

    4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because

the claims asserted herein arise under 18 U.S.C. § 1514A.

5. Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a District in which the defendant resides and the District in which plaintiff's employment with defendant was based.

6. This whistleblower action, which arises pursuant to Title VIII of the Sarbanes-Oxley Act of 2002 (18 U.S.C. § 1514A), is brought to recover damages sustained by plaintiff when his employer, CGI, retaliated against him because of his complaints about, and objection to, a fraudulent scheme CGI executives devised and began implementing to evade federal contracting restrictions imposed by the United States Department of Housing and Urban Development on outside contractors that administer its Section 8 affordable housing programs.

## FACTS GIVING RISE TO THE CAUSES OF ACTION

### A. Background of the Parties

7. CGI Group, Inc. is a global consulting company, with 31,000 employees in more than 125 offices worldwide, which provides information technology and business process consulting services. The common stock of CGI Group, Inc. is listed on the New York Stock Exchange.

8. Mr. Ashmore was employed by CGI Federal Inc., a wholly-owned U.S. operating subsidiary of CGI Group, Inc. The financial information of CGI Federal Inc. is included in the consolidated financial statements of CGI Group, Inc.

### B. CGI's Section 8 Contract Administration Work for HUD

9. Beginning in 1999, the U.S. Department of Housing and Urban Development ("HUD") began outsourcing to public housing authorities ("PHAs") the contract administration

2

services for multifamily housing units that receive project-based rental assistance under Section 8 of the United States Housing Act of 1937.  HUD did so through contracts known as annual contributions contracts ("Annual Contributions Contracts").  Many of the PHAs, in turn, subcontract the administration services to private-sector companies ("Section 8 Subcontractors"), such as CGI.  Through this mechanism HUD has outsourced the entire multi-family Section 8 contract administration process.

10.     The Annual Contributions Contracts HUD originally entered into were intended to last for 5-year periods and then be subject to re-bid.  However, as of 2009, HUD had never rebid any of the Annual Contributions Contracts and each of the original PHAs continued to administer the Section 8 contracts in their states under the original fee schedules despite the fact that most PHAs were able to make substantial profits over the amounts they were paying to their Section 8 Subcontractors to perform the work.

11.     As of 2010 CGI administered more Section 8 housing than any other PHA or Section 8 Subcontractor in the country and had responsibility for all Section 8 contract administration in New York, Ohio, Florida, Northern California and Washington, D.C.   Through its subcontracts with PHAs in each of these states CGI administered a total of 267,000 housing units, or approximately 25% of the entire multifamily Section 8 portfolio nationwide.

**C.**     **Mr. Ashmore's Background and Recruitment by CGI**

12.     Mr. Ashmore founded and built a successful business developing and managing multifamily housing in Michigan.  Thereafter, from September 2004 through May 2009, he served as the Senior Program Analyst in the Region II Multifamily Office of HUD.  His duties included supervising the New York Section 8 Annual Contributions Contract.  In December 2005

3

the New York Housing Trust Fund Corporation, which held the New York State Annual

Contributions Contract, changed subcontractors from Quadel to CGI.  Mr. Ashmore was the

HUD official responsible for overseeing the transition to CGI.

13.     In 2006, shortly after CGI became the Section 8 Subcontractor for New York,

Marybeth Carragher, then a CGI Director of Consulting Services, began actively recruiting Mr.

Ashmore for a position at CGI in government relations.  Mr. Ashmore declined the offer at that

time.

14.     In early 2008 Carragher, having by then been promoted to Vice President for

Consulting Services, again approached Mr. Ashmore about a position at CGI.  At that time

industry participants were expecting HUD to open up all of the existing Annual Contributions

Contracts for competitive bidding within the near future.

15.     As set forth in more detail below, CGI saw this as an opportunity to significantly

increase the number of Section 8 housing units in its contract administration portfolio.  Carragher

and Leslie Pierce, CGI's Director of Consulting Services for the New York Annual Contributions

Contract, therefore sought to recruit Mr. Ashmore to assist CGI in preparing for the anticipated

rebid and to pursue other contracting opportunities at HUD based on his relationships and

experience.

16.     Mr. Ashmore declined the invitation to join CGI in 2008 but resumed discussions

with Carragher in February 2009.  Based on these discussions he joined CGI as Manager for

Consulting and Government Services Delivery in May 2009.  He worked jointly for CGI's BPS

division and its Federal IT practice, with his time allocated evenly between each of these

divisions.  He was based out of CGI's New York City office but worked closely with the Fairfax,

4

Virginia office, where CGI Federal was based.

17.     Mr. Ashmore reported jointly to Carragher, who heads the BPS division, and her

counterpart Vice President in CGI's Federal practice group – a position held for the last five

months of Mr. Ashmore's employment by Rob Bowell.

**D.**     **CGI's Aggressive Pursuit of an Opportunity to Triple its Revenue From HUD's**
        **Section 8 Work**

18.     In a report dated June 7, 2007, HUD's Office of the Inspector General ("OIG")

recommended that certain changes be made to HUD's Annual Contributions Contracts.  On

November 12, 2009, the OIG issued a second report that was highly critical of HUD for failing to

properly control the costs of Section 8 contract administration and for overpaying for the services

provided by the PHAs and their Section 8 Subcontractors.

19.     As a result of these two OIG reports, HUD announced that it would rebid all of

the Annual Contributions Contracts for Section 8 contract administration.  This presented the

opportunity – which CGI had long anticipated – for CGI to substantially increase the number of

housing units in its contract administration portfolio by increasing the number of states in which

it acted as Section 8 Subcontractor.

20.     Private companies cannot be awarded Annual Contributions Contracts directly.

Rather, legal restrictions require that Annual Contributions Contracts be awarded only to PHAs.

21.     Anticipating HUD's decision to rebid all of the Annual Contributions Contracts,

CGI invested substantial time and millions of dollars in aggressively courting PHAs to form

bidding "partnerships" to pursue Section 8 contract administration in additional geographic areas

during the rebid process.  Under the terms of these partnerships, which were memorialized in

formal written agreements between CGI and the PHAs, each PHA would enter into the primary contract (the Annual Contributions Contract) with HUD and would subcontract all of the contract administration work to CGI. Both CGI and the PHAs anticipated generating substantial profits from these partnerships.

22.     Although it never disclosed this fact to HUD, CGI pursued PHA partners to bid for Annual Contributions Contracts in 26 new states in addition to its existing contracts. If successful in the bidding process, this would bring the total units in CGI's Section 8 contract administration portfolio to approximately 900,000, thereby more than tripling its revenues from Section 8 work.

23.     Moreover, because CGI administered more units of Section 8 housing than any other entity, it expected to have substantial competitive advantages of scale and little real competition in the states it targeted.

24.     Upon his arrival at CGI Mr. Ashmore joined a team of senior members of CGI's BPS division who were tasked with leading CGI's effort to obtain additional Section 8 contract administration work during the rebid process. This group, known within CGI as the "Rat Pack", attended many industry conferences for the purpose of increasing CGI's exposure in markets in which it lacked exposure and identified potential PHA bidding partners. Once partners were identified for a particular state, the Rat Pack members negotiated formal written agreements for a bidding partnership between CGI and the PHA partners.

**E.     CGI's Fraudulent "Shell Company" Scheme and Mr. Ashmore's Opposition to the Scheme**

25.     As HUD prepared for the formal rebid process, a number of disparate

stakeholders, including national housing industry associations and Section 8 Subcontractors, began lobbying HUD to impose various restrictions on the rebid process, including a right of first refusal for existing PHAs and subcontractors and caps on the total number of units any single entity could administer. As the process continued, HUD indicated that it was leaning toward mandating that no PHA prime-contractor or Section 8 Subcontractor (such as CGI) be allowed to grow "too big to fail" by acquiring too large a share of the market.

26. In late 2009, Deborah Lear, the Director of HUD's Office of Housing Assistance Contract Administration Oversight, for the first time communicated to CGI and the other rebid participants that HUD intended to impose a limitation on the total number of units that any PHA or Section 8 Subcontractor would be allowed to administer. Ms. Lear also informed them that HUD had preliminarily decided that the limit would be 300,000 units.

27. Given that CGI already administered 267,000 units, this proposed "cap" on total units would prevent CGI from materially increasing its market share. Before being notified of the cap on units, CGI had internally projected that it could more than triple its annual Section 8 revenue in the rebid process to more than $200 million. CGI had therefore spent millions of dollars in its efforts to partner with PHAs in an additional 26 states.

28. The Rat Pack and other senior CGI managers immediately began aggressively working to prevent these proposed unit restrictions from being implemented through lobbying of senior HUD officials and Congressional committees and staff.

29. However, recognizing that CGI may not be successful in reversing the unit limitations, a core subgroup of the Rat Pack, comprised of Carragher and 10 of her senior direct reports, began holding confidential conference calls to make contingency plans to deal with these

unit restrictions.  Ms. Ashmore was one of the members of this subgroup and was the only

member who did not report solely to Carragher (he reported jointly to Carragher and another

business unit).

30.     As a result of these confidential conference calls, beginning in early 2010

Carragher and her subgroup devised and began executing a "shell company" scheme ("Director

Shell Company Scheme") to fraudulently circumvent HUD's unit limitations.

31.     Under the Director Shell Company Scheme, CGI would withdraw from the formal

agreements it had already entered into with its new partner-PHAs in many of the 26 states it

intended to seek in the rebid process.  Four current CGI Directors would then resign from CGI to

form their own shell companies ("Director Shell Companies") which would enter into new

agreements with the same PHAs with which CGI had just terminated its agreements.  CGI, in

turn, would enter into agreements with the newly-formed Director Shell Companies whereby

CGI would be entitled to subsequently acquire these companies after HUD awarded the rebid

contracts.

32.     Pursuant to the Director Shell Company Scheme, CGI would provide the Director

Shell Companies during the rebid process with full access to all of the proprietary software,

processes and staff, thereby providing the shell companies with an improper competitive

advantage in the rebid process and demonstrating that the new companies were merely the

functional equivalent (or "alter egos") of CGI itself.  In the bids submitted to HUD by the PHAs

and the Director Shell Companies, the shell companies would be falsely presented as

independent companies with no ongoing connection to CGI and the use of CGI software,

processes and staff would be concealed from HUD.  CGI's secret agreement to acquire the shell

companies after HUD awarded the contracts would also be concealed from HUD.

33.    The Director Shell Company Scheme included providing proprietary CGI software known as the Contract Administration Tracking System (or "CATS") to the Director Shell Companies at no charge.

34.    The concept of using the Director Shell Company Scheme to circumvent the unit restrictions was initially conceived by Rat Pack member Leslie Pierce, CGI's Director of Consulting Services, who had responsibility for the New York Section 8 contract administration. Pierce independently owns a number of food and tax-preparation franchises in Texas and Illinois and therefore had extensive experience setting up independent companies and businesses.

35.    As the Director Shell Company Scheme was further developed, it was agreed that, if HUD maintained the proposed cap on units under management, Pierce together with fellow Directors Tony Gorris, Shawn Steen and Tracy Rudy, would each form a separate Director Shell Company and would thereafter resign from CGI pursuant to the scheme. As long-time CGI employees, CGI believed it could rely on these four directors to follow through on the shell company scheme. Moreover, these directors had strong name recognition at HUD and had led CGI's efforts to negotiate the existing agreements with CGI's partner PHAs and therefore would be best positioned to persuade these PHAs to partner with the Director Shell Companies instead of CGI.

36.    Under the Director Shell Company Scheme, Pierce's Director Shell Company would partner with the PHAs in Pennsylvania, Massachusetts, Virginia and Connecticut; Gorris's Director Shell Company would partner with the PHAs in California, Colorado and Illinois; Rudy's Director Shell Company would partner with PHAs in Michigan; and Steen's Director

Shell Company would partner with PHAs in North Carolina.

37.     Carragher repeatedly assured the four shell company directors that they would
receive substantial bonuses before departing CGI.

38.     At the time of Mr. Ashmore's termination, the shell-company directors had begun
the process of approaching the PHAs designated for their shell companies to persuade these
PHAs to participate in the Director Shell Company Scheme.  For example, in early June 2010,
Carragher instructed Gorris to began "off the record" discussions with the PHAs in Denver and
Chicago.

39.     All of the participants in the Director Shell Company Scheme made extensive use
of telephones and email to plan and execute their fraudulent scheme.

**F.     CGI's Termination of Mr. Ashmore in Retaliation for His Whistleblowing**

40.     In discussions with Carragher, Pierce, Kyprianu and others, Mr. Ashmore
consistently argued against using the Director Shell Company Scheme.

41.     Mr. Ashmore also repeatedly made it clear to Carragher that he opposed the
Director Shell Company scheme because it would fraudulently evade HUD and federal
acquisition regulations.

42.     As part of his efforts to persuade Carragher not to continue with the scheme Mr.
Ashmore also argued that CGI would jeopardize all future business with HUD if the scheme
were discovered.  He cited as examples AMS (a company CGI had acquired) and Quadel (CGI's
largest competitor), both of which had suffered substantial losses of business because of
unethical and illegal practices.

43.     However, despite Mr. Ashmore's repeated opposition, Carragher made it clear

10

that she and the others would continue implementing the Director Shell Company Scheme if HUD decided to implement the cap on units under management in the rebid process.

44.     By April 2010, CGI's lobbying efforts against HUD's proposed cap on units were going well and Carragher was confident that HUD would decide against implementing this restriction when it announced the final rules for the rebid process.  If that happened Carragher and her Rat Pack subgroup intended to abandon the Director Shell Company Scheme and Mr. Ashmore's opposition to the scheme would not pose a problem for them.

45.     Confident that the Director Shell Company Scheme would no longer be necessary, Carragher met with Mr. Ashmore on April 16, 2010 and gave him a very positive annual performance review.  Indeed, the written performance appraisal she provided to him rated his performance as "meets expectations" in every category.

46.     However, in May 2010 Deborah Lear (Director of HUD's Office of Housing Assistance Contract Administration Oversight) unexpectedly told Carragher that HUD had reached a final decision to implement the cap on total units for any single PHA or Section 8 Subcontractor and would formally incorporate the cap on total units in the rebid process itself.

47.     On or about May 11, 2010, Mr. Ashmore had a heated telephone call with Carragher in which he strenuously objected to the Director Shell Company Scheme and told Carragher that it was illegal and that they should not pursue it.

48.     Carragher therefore decided to manufacture a false reason to terminate Mr. Ashmore because of his Opposition to the Director Shell Company scheme.

49.     Panos Kyprianou, a trusted deputy of Carragher's and a member of her Rat Pack subgroup, had become Mr. Ashmore's direct manager in April.

50.     At the end of May 2010, Kyprianou, suddenly began a series of baseless and trivial criticisms of Mr. Ashmore.  These criticisms were intended to establish a false paper trail as a purported justification for the termination of Mr. Ashmore's employment.

51.     On June 9, 2010, during HUD's monthly Contract Administration Oversight Monitor conference call which was open to the entire industry, Ms. Lear formally confirmed to the industry that HUD had decided to include the cap on the number of units that any PHA or Section 8 Subcontractor could administer and that the maximum number of units would be set at 400,000.  Moreover, Ms. Lear confirmed that this maximum would apply to the number of units any PHA or subcontractor could <u>bid</u> on, thereby preventing any entity from bidding on more than the maximum to protect against being unsuccessful in some of the states it bid.

52.     Five days later, by email dated June 14, 2010, Kyprianou informed Mr. Ashmore without prior warning that he would no longer be included in the Rat Pack conference calls and that he would not have further involvement in the HUD Annual Contributions Contract rebid process.

53.     Two days after that, on June 16, Mr. Ashmore's employment was abruptly terminated without warning. In the termination meeting that day, Kyprianou provided two false reasons for the termination – both of which were utterly baseless.

54.     The first baseless reason provided by Kyprianou was that Mr. Ashmore had supposedly placed CGI's Oakland Housing Choice voucher processing engagement "at risk" by reassigning the review of five files on that project to another team member whom Mr. Ashmore supervised.  However, as Kyprianou was well aware, Mr. Ashmore reassigned the files because Carragher and Bowell had asked him to prioritize an effort Mr. Ashmore was leading to win

12

another HUD project that could be worth as much as $50 million in consulting fees to CGI. Moreover, the voucher processing project was merely in the "set up" phase with no timing restrictions on any file review and file reassignment was routine. In fact, Kyprianou himself had previously told Mr. Ashmore to reassign any files necessary to prioritize the HUD proposal.

55.     The second false reason provided by Kyprianou for Mr. Ashmore's termination was that Mr. Ashmore had notified Kyprianou he would be required to leave mid-afternoon the following day for medical treatment his long-term domestic partner was receiving as a result of a serious head injury sustained two weeks earlier. However, Kyprianou was well aware of the reason for this absence and in fact approved the absence. Kyprianou also knew Mr. Ashmore routinely worked 50-plus-hour weeks – including weekends and evenings.

56.     In an email he sent to Rob Bowell and other senior managers the same day as his termination, Mr. Ashmore refuted the two false and baseless justifications.

57.     The false and baseless nature of the purported reasons provided by Kyprianou demonstrates that they were a pretext and that the real reason for the termination was to prevent Mr. Ashmore from continuing to oppose the Director Shell Company Scheme.

58.     The pretextual nature of the termination was further confirmed the following day when Carragher provided an entirely different – but equally false – purported justification. In that conversation, Carragher claimed that the termination was based on Mr. Ashmore's failure to address the "communications issues" that were noted two months earlier in his performance review as being merely "areas for development" in an otherwise very positive review. However, Carragher was unable to provide any rationale for how Mr. Ashmore's performance in this area had suddenly deteriorated to the extent it warranted his summary termination or why there had

13

been no formal warnings or corrective action plans to address the alleged sudden deterioration of his performance.

59.     Moreover, Rob Bowell, whom Mr. Ashmore reported to for his work in the Federal practice group, had in March 2010 asked Mr. Ashmore whether he would be interested in a promotion to a new position that would be created to coordinate all of CGI's work for HUD across the entire company.

**G.     CGI's Failure to Pay Plaintiff the Bonus to Which he Was Entitled**

60.     In its formal offer letter to Mr. Ashmore, dated April 21, 2009, CGI set forth certain terms of his compensation.  The offer letter provided that he "will be eligible to be a participant in the CGI Profit Participation Program" pursuant to which he would earn an annual bonus based on the success of the company, his business unit and his own performance.

61.     Mr. Ashmore completed 13 months of employment with CGI and was employed for the entire 2009/2010 bonus year.

62.     Mr. Ashmore's performance met or exceeded expectations in every respect other than his refusal to go along with the Director Shell Company Scheme.

63.     Indeed, as set forth above, on April 16, 2010 Carragher gave Mr. Ashmore a very positive annual performance review in which she rated his performance as "meets expectations" in every category.

64.     CGI failed to pay Mr. Ashmore any bonus despite the fact that he worked for the company for more than 13 months.

65.     However, CGI had internally allocated a bonus for Mr. Ashmore's first year of employment in the amount of approximately $220,000.

14

66.     CGI's internal bonus allocation of $220,000 was reflected in the billing rate CGI utilized for Mr. Ashmore's services in connection with the proposal it submitted on or about June 4, 2010 for business consulting services for HUD's Transformation Initiative.

67.     CGI's failure to pay Mr. Ashmore a bonus for his first year of service was undertaken as an additional act of retaliation for his opposition to the Director Shell Company Scheme.

## FIRST CAUSE OF ACTION

### (18 U.S.C. § 1514A)

68.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "67" as if repeated and incorporated herein.

69.     Plaintiff reasonably believed that CGI was violating, and would likely continue violating, the United States mail and wire fraud statutes by using telephone lines and emails in furtherance of the fraudulent Director Shell Company Scheme.

70.     CGI terminated plaintiff's employment because of his complaints about, and opposition to, its fraudulent Director Shell Company Scheme.

71.     By reason thereof, defendants have violated 18 U.S.C. § 1514A.

72.     Defendant's unlawful termination of plaintiff's employment has caused him to suffer substantial lost earnings as well as substantial damage to his reputation that will diminish his future earnings and earnings capacity.

73.     Plaintiff has suffered damages in an amount to be determined at trial, but not less than $1 million.

## SECOND CAUSE OF ACTION

15

(Breach of Contract)

74.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every

allegation contained in paragraphs "1" through "67" as if repeated and incorporated herein.

75.     Defendant breached its contractual obligation to plaintiff to pay him a bonus.

76.     By reason thereof, plaintiff has suffered damages in an amount to be determined at

trial, but not less than $220,000.

### THIRD CAUSE OF ACTION

(Promissory Estoppel)

77.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every

allegation contained in paragraphs "1" through "67" as if repeated and incorporated herein.

78.     At the time of his hire, Carragher offered Mr. Ashmore the option of either: (1)

being paid a base salary equal to his salary at HUD together with a bonus that would be at least

the same amount of his base salary; or (b) receiving a higher base salary but lower bonus.

79.     Mr. Ashmore agreed to accept a base salary equal to the $126,000 he received at

HUD in reliance on the express representations by Carragher that, as long as he met CGI's

performance expectations, he would receive an annual bonus that was at least the same amount

of his base salary.

**WHEREFORE,** plaintiff hereby demands judgment against defendants as follows:

(i)     On his first cause of action, awarding damages in an amount to be determined at

trial but not less than $1 million;

(ii)    On his second cause of action, awarding damages in an amount to be determined

at trial but not less than $220,000;

16

(iii)    On his third cause of action, awarding damages in an amount to be determined at trial but not less than $220,000;

(iv)    Awarding plaintiff the costs and disbursements of this action;

(v)    Awarding plaintiff interest on the foregoing amounts;

(vi)    Pursuant to 18 U.S.C. § 1514A(c)(2)(C), awarding plaintiff his reasonable attorneys fees in this action and the prior proceeding before the Department of Labor; and

(vii)    For such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a trial by jury.

Dated: New York, New York
          November 28, 2011

                                        KAISER SAURBORN & MAIR, P.C.
                                        Attorneys for plaintiff

By:    _____
                              David N. Mair [DM-8883]
                              111 Broadway
                              New York, New York 10006
                              (212) 338-9100

17