# Exhibit 5

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

BENJAMIN ASHMORE,

        Plaintiff,

       -against-          11 Civ 8611
                           (JMF)
CGI GROUP, INC. AND CGI FEDERAL
INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

        DEPOSITION of LESLIE PIERCE, taken by

Plaintiff, pursuant to Notice, held at the

offices of Kaiser, Saurborn & Mair, P.C., 111

Broadway, New York, New York, on Thursday, July

25, 2013, commencing at 10:30 a.m., before

Margaret M. Harris, a Shorthand (Stenotype)

Reporter and Notary Public within and for the

State of New York.

2

A P P E A R A N C E S:

      KAISER, SAURBORN & MAIR, P.C.
         Attorneys for Plaintiff
         111 Broadway
         New York, New York  10006

    BY:  DAVID N. MAIR, ESQ.


      BOND SCHOENECK & KING
         Attorneys for Defendants
         111 Washington Avenue
         Albany, New York  12210-2211

    BY:  STUART KLEIN, ESQ.


P R E S E N T:

    Marybeth Carragher

    Benjamin Ashmore

3

1

2              IT IS HEREBY STIPULATED AND

3       AGREED that the filing and sealing of

4       the within deposition be, and the same

5       are hereby waived;

6              IT IS FURTHER STIPULATED AND

7       AGREED that all objections, except as

8       to the form of the question, be and

9       the same are hereby reserved to the

10      time of the trial;

11             IT IS FURTHER STIPULATED AND

12      AGREED that the within deposition may

13      be sworn to before any Notary Public

14      with the same force and effect as if

15      sworn to before a Judge of this Court;

16             IT IS FURTHER STIPULATED that

17      the transcript is to be certified by

18      the reporter.

19

20

21

22

23

24

25

4

1

2    L E S L I E   P I E R C E, called as a witness,

3           having been first duly sworn/affirmed by

4           Margaret M. Harris, a Notary Public within

5           and for the State of New York, was examined

6           and testified as follows:

7    EXAMINATION

8    BY MR. MAIR:

9           Q      Good morning, Mr. Pierce.

10          A      Good morning.

11          Q      My name is David Mair.  I am

12   representing Ben Ashmore in a lawsuit that he's

13   brought against CGI.

14                 I'm going to be taking your

15   deposition here this morning.  Essentially it's

16   going to involve me asking you a series of

17   questions which you're going to answer.

18                 If at any point in time you don't

19   hear the question or you don't understand the

20   question, I'd like you to let me know and I'll

21   either repeat it or rephrase it for you.

22                 If you answer the question, then

23   I will assume that you've both heard it and

24   understood it.

25                 Okay?

5

1                            Pierce

2         A       Okay.

3         Q       A couple of other rules, just to

4    make sure we get an accurate transcript.  If you

5    can try to wait for the full question, for me to

6    ask my full question, even if you anticipate

7    what I'm going to say, that way we can get it

8    down on the record and I'll try to do the same

9    with your answer.

10                Also can you verbalize your

11   responses, not simply nod or shake your head or

12   gesture, because, again, we need to take it down

13   on the transcript.

14        A       Yes.

15        Q       What is your full name?

16        A       Leslie Wayne Pierce.

17        Q       And by whom are you currently

18   employed?

19        A       CGI Federal.

20        Q       What is your current title?

21        A       Director, consulting services.

22        Q       And how long have you been

23   employed by CGI or one of its corporate

24   predecessors?

25        A       Thirteen years, approximately.

6

1                          Pierce

2          Q       So the year that you began was

3    what?

4          A       2000.

5          Q       Before I ask you about CGI, I

6    would like to ask you some questions about your

7    background.

8                  Can you tell me what your formal

9    education is?

10         A       As in college?

11         Q       Yes, as in any post high school

12   education that you have.

13         A       My degree is in molecular

14   biology, a bachelor's of science.

15         Q       From where?

16         A       University of Texas in Austin.

17         Q       What year?

18         A       I graduated 1992.

19         Q       Any other degrees or other formal

20   education post high school?

21         A       Yes.  Master's of business

22   administration.

23         Q       From?

24         A       Ohio Dominican.

25         Q       That's a college?

7

1                            Pierce

2          A       Yes, local university in

3    Columbus, Ohio.

4          Q       What year did you get that?

5          A       2007.

6          Q       Any other post high school formal

7    education?

8          A       No.

9          Q       Can you give me an overview of

10   your work history between graduating in 1992 and

11   starting at CGI?

12         A       I will do my best, if I can

13   recall all of it, all the places that I've

14   worked.

15                 So post the University of Texas,

16   I worked in a clinical lab and then I worked for

17   the State of Texas in an environmental lab.

18                 Then I worked for Cendant

19   Corporation, which no longer exists, but that's

20   who I worked for with Jackson Hewitt, and then I

21   left there and came to work for CGI.

22         Q       I want to try to put some time

23   periods onto this.

24                 What was the time period or the

25   years that you worked for the clinical lab?

8

Pierce

1

2      A      I started working for them in

3  '91, so probably '91 to '93 I think is the time

4  period.

5      Q      And where was the clinical lab?

6      A      Austin, Texas.

7      Q      Was it affiliated with the

8  university?

9      A      No.

10     Q      Who ran the lab, what entity?

11     A      It was a group of doctors,

12  pathology doctors, pathology lab.

13     Q      What did you do there?

14     A      I was a cytotech, cytology

15  technologist.

16     Q      Cytology tech?

17     A      Yes.

18     Q      What did that entail?

19     A      I was responsible for receiving

20  various samples from doctors who came in from

21  various parts of the state, and we were

22  responsible for preparing those samples to be

23  evaluated or to be read by the cytotechs to

24  determine if there were malignancies and things

25  like that.

9

                              Pierce

1

2          Q       When you're saying, I don't know

3     if I have the word correct, the techs are what

4     kind of techs?

5          A       Cyto, C-Y-T-O.

6          Q       C-Y-T-O.

7          A       Yes, cytotech.  Yes, cytology,

8     which is the study of cells.

9          Q       Got it, okay.

10                 And then you next worked for the

11    State of Texas in an environmental lab.

12                 What time period was that?

13         A       From '93 to '97.

14         Q       What did you do there?

15         A       There I was originally hired as a

16    lab technician and was responsible for preparing

17    samples for analysis of various pesticides and

18    insecticides and metals from samples that came

19    from around the state.

20         Q       And did you do that the entire

21    time that you worked there?

22         A       No.  I became, was promoted to a

23    chemist, so became an environmental chemist and

24    from there still doing the same analysis,

25    looking at primarily water samples and soil

10

                    Pierce

1    samples for insecticides and pesticides.

2           Q     So you were a chemist when you

3    left there?

4           A     That's correct.

5           Q     And then you went to Cendant

6    Corp.

7                 What was the time period that you

8    were there?

9           A     Cendant, I was there from '97

10   until 2000.

11          Q     What did you do there?

12          A     Cendant was, at the time was the

13   largest franchise holder, so they were the owner

14   of Jackson Hewitt tax service, so I was a

15   general manager for Jackson Hewitt.

16          Q     Jackson Hewitt was what?

17          A     Tax service.

18          Q     Tax service?

19          A     Tax preparation.

20          Q     So a change of field?

21          A     Yeah.

22          Q     And you were the general manager

23   of what there?

24          A     General manager of the entire

11

                              Pierce

1   operation, so I was responsible for the

2   Columbus, developing, opening and developing the

3   Columbus market.

4       Q      So you were the general manager

5   of the Columbus office of Jackson Hewitt?

6       A      It was multiple offices.

7              So I was the general manager of

8   the entire region, the entire city.

9       Q      So for the Columbus city

10  operations?

11      A      Yes.

12      Q      How many offices?

13      A      Initially ten offices.

14      Q      Why did you leave Texas and go to

15  Cendant?

16      A      I was recruited.

17      Q      You were recruited by Cendant?

18      A      Yes, I guess -- which reminds me,

19  because I actually worked for Jackson Hewitt at

20  that time part time, so I had a part-time

21  position while I was working at the Department

22  of Health, and, yeah, while I was working at the

23  Department of Health I worked for Jackson Hewitt

24  part time.

12

1                           Pierce

2            Q        What were you doing?

3            A        Tax preparation.

4            Q        So you were actually doing the

5     tax prep?

6            A        Yes.

7            Q        And then you were recruited by

8     them to come into this general manager position?

9            A        That's correct.

10           Q        And that entailed you relocating

11    to Columbus, Ohio?

12           A        That's correct.

13           Q        Did your position change during

14    the three years that you were doing that?

15           A        As a general manager, no.

16           Q        You remained in the position of

17    general manager?

18           A        That's correct.

19           Q        Did your duties and

20    responsibilities change during that time?

21           A        No.

22           Q        You continued to be responsible

23    for the offices in Columbus?

24           A        From the time I got there until

25    the ending, yes.

13

Pierce

2     Q     And in 2000 you went to work for

3  CGI?

4     A     That's correct.

5     Q     What were the circumstances of

6  you going to work there?

7     A     The circumstances of me going to

8  work there were -- well, for the time I worked

9  for Cendant running the Columbus operation,

10  there were, there was a franchisee and corporate

11  had an agreement, so corporate hired me, but I

12  ran both of the operations together

13  collectively, because the franchisee was

14  ultimately going to buy out the entire

15  territories.

16          So I had two different bosses,

17  actually.  And they became partners and when

18  they became partners -- not partners -- yeah, my

19  two bosses became partners in 2000, I had one

20  boss that lived in Virginia Beach, the other one

21  lived in Columbus, when they became partners the

22  Virginia Beach boss who worked directly for

23  Cendant moved to Columbus, and because of his

24  position and experience and so forth, they

25  formed a new corporation and then they laid me

14

1                          Pierce

2      off as a result of that.

3              Q      So your job was eliminated?

4              A      Yes.

5              Q      Because of this restructuring

6      that was going on?

7              A      Because of the restructuring,

8      that's correct.

9              Q      So then you were looking for

10     work?

11             A      That's correct.

12             Q      How did you actually come to be

13     hired at CGI?

14             A      I posted my resume on line and

15     they gave me a call about a potential

16     opportunity they had available and -- or an

17     opportunity they had, and they hired me.

18                         MR. KLEIN:  And just for

19                    clarification, David, I just want

20                    to make sure that when you say

21                    CGI at this time period, you're

22                    referring to CGI and/or its

23                    predecessor corporate entities.

24                         MR. MAIR:  I am.  And

25                    maybe we should just clear that

15

                              Pierce

1
2                    up.
3        BY MR. MAIR:
4              Q      In 2000, was CGI then known as
5        CGI or were you are working for a corporate
6        predecessor?
7              A      A predecessor.
8              Q      And the name of that was?
9              A      Orion.
10             Q      Orion?
11             A      Yes.
12             Q      Do you recall when the changeover
13       from Orion to CGI took place?
14             A      Well, it went from Orion to IMR
15       Global and then from IMR Global to CGI, and I
16       think it was probably about a year after I
17       started working for them, so I think sometime in
18       2001, I think.
19             Q      In 2001 it went to IMR or it went
20       to CGI?
21             A      It went -- unless -- so in 2001
22       it went to IMR Global and then sometime
23       thereafter it went to CGI, but I don't recall
24       the specific time frame.
25             Q      In terms of your employment, have

16

1                         Pierce

2     you had for all intents and purposes a

3     continuous employment with whatever entity you

4     were working for at the time since 2000?

5              A       With respect to, I guess the

6     definition of CGI being its predecessors, yes.

7                       You know, and I don't know if

8     this is considered employment, per se, but at

9     the same time that I applied for CGI, I also

10    developed a franchise myself, a Jackson Hewitt

11    franchise, so I have some interest in that.

12                      So I guess those two things were

13    happening simultaneously, but it was just the

14    ownership interest primarily.

15             Q       I'm going to talk about your

16    franchise operation in a second, but in terms

17    of, what I'm getting at is from your perspective

18    have you been continuously employed by the same

19    company or series of companies since 2000?

20             A       Yes.

21             Q       And that's been CGI and its

22    predecessors?

23             A       Yes.

24             Q       Now, during that period that you

25    have been employed at CGI, have you owned an

17

1                    Pierce

2     ownership interest in any other businesses or

3     franchises?

4              A      Yes.

5              Q      Tell me about that.

6              A      In 2000, before I was hired at

7     CGI, I expressed an interest with Jackson Hewitt

8     to open and develop some territories, some

9     Jackson Hewitt tax preparation offices in Texas.

10             Q      And so you reached an agreement

11    with Jackson Hewitt to open a franchise in

12    Texas?

13             A      That's correct.

14             Q      And you reached that agreement

15    before you went to CGI?

16             A      Yes.

17             Q      But you continued with that

18    franchise afterwards?

19             A      Yes.

20             Q      And do you still own that today?

21             A      Yes.

22             Q      And can you describe for me what

23    offices that franchise has?  Are you just in one

24    location in Texas, are you in multiple

25    locations, do you have multiple offices?

18

1                          Pierce

2          A       I have multiple offices.

3                  I originally started with two

4    offices in Texas.

5                  So initially two offices in, it's

6    one territory, I believe it's what I originally

7    started with.

8          Q       What territory?

9          A       I called it one territory.

10   Jackson Hewitt sells by territories to define

11   your agreement with them.

12         Q       Is your territory Texas or some

13   portion of Texas?

14         A       Portions of Texas, a territory is

15   defined as an area of about 50,000 individuals

16   and by zip codes.

17         Q       So can you describe for me what

18   your initial territory was geographically and

19   how it's changed between then and now, if it has

20   changed?

21         A       The initial territory is south of

22   Houston, about 40 miles south of Houston in an

23   area called Clute, C-L-U-T-E, Clute, Texas.

24                 And then we expanded from

25   where -- it's where our main office is located.

19

                            Pierce

1

2              So from there we purchased, and

3    this is an approximate number of territories,

4    because I don't know the exact number, but from

5    there we expanded into a total of about five

6    territories in Texas, I think five territories

7    there.

8              During that expansion we also

9    expanded into Indiana, bought some territories

10   in Indiana, in Anderson, Indiana, is where we

11   also had some offices there initially.

12        Q     And you still have those today?

13        A     Yes.

14        Q     In terms of the five territories

15   in Texas, what's the approximate geography of

16   those territories?

17              Are they all around Houston or

18   are they spread out more broadly than that?

19        A     When I speak to the territories

20   to individuals, I just usually say south of

21   Houston.

22              I own one territory in Houston,

23   but my operation is primarily outside of Houston

24   or south of Houston.

25        Q     Do you have any partners in this

20

1                    Pierce

2   franchise?

3         A       No.

4         Q       You have 100 percent ownership of

5   it?

6         A       Yes.

7         Q       During the time that you've

8   worked at CGI, have you had any other

9   franchises?

10        A       Yes.

11        Q       Can you list those for me?

12        A       The other franchise I have an

13  ownership interest in is Honey Baked Ham.

14        Q       Is that a single franchise or do

15  you have multiple franchises with them?

16        A       Multiple units.

17        Q       Again, can you give me the

18  locations?

19        A       One location is south of Houston,

20  again in Lake Jackson, and the other is in

21  Corpus Christi, Texas.

22        Q       When did you acquire each of

23  them?

24        A       Initial conversations with Honey

25  Baked was in 2004, so I acquired those in -- or

21

1                         Pierce

2    I signed my franchise agreement with Honey Baked

3    in 2005.

4              Q      For both locations?

5              A      I'm trying to remember if it was

6    both locations.  Give me just a moment.

7                     No, so only one location in 2005

8    and the second location was 2006.

9              Q      Other than the Honey Baked Ham

10   and Jackson Hewitt franchises, have you ever had

11   on ownership interest in any other franchises?

12             A      No.

13             Q      Have you ever had an ownership

14   interest in any other businesses?

15             A      No.

16             Q      Do you have any partners in the

17   Honey Baked Ham franchise?

18             A      No.

19             Q      And you still own those two

20   franchise locations of Honey Baked Ham?

21             A      Yes.

22             Q      Now, when you first were hired at

23   CGI, what was your title?

24             A      Regional manager.

25             Q      Regional manager?

22

```
1                      Pierce

2          A      Uh-hum.

3          Q      Who did you report to?

4          A      Marybeth Carragher.

5          Q      And what were your

6   responsibilities?

7          A      My responsibilities as a regional

8   manager included a portion of the state, the

9   Dayton region, we called it the Dayton region,

10  which included approximately 19 counties that

11  had HUD contracts that we administered.

12         Q      I'm sorry to interrupt.

13                Was that PBCA work?

14         A      Yes.

15         Q      So you basically had

16  responsibility for the Dayton region of the PBCA

17  operations?

18         A      That's correct.

19         Q      And did you have other

20  responsibilities that you were about to go on to

21  tell me about?

22         A      No, just -- that's it, no

23  additional responsibilities.

24         Q      And you reported directly to Ms.

25  Carragher?
```

23

```
1                          Pierce
2          A      Yes.
3          Q      Did other regional managers have
4     responsibility for other parts of the Ohio PBCA
5     territory?
6          A      Yes.
7          Q      Who were the other regional
8     managers at that time?  I'm talking around the
9     time you joined.
10         A      By name?
11         Q      Yes.
12                     MR. KLEIN:  And are you
13                     just referring to the Ohio region
14                     or the State of Ohio?
15                     MR. MAIR:  Yes, the State
16                     of Ohio.
17         A      The ones I can remember are from
18    the Columbus office, because we had two
19    different offices, so the Columbus office
20    included James Ellis, Michele Tally and Tony
21    Donor.
22         Q      Donor?
23         A      D-O-N-O-R.
24         Q      They were other regional
25    managers?
```

24

1                          Pierce

2          A      Yes.

3          Q      How long did you have that

4    position as regional manager?

5          A      From 2000 to 2006.

6          Q      And did your duties stay the same

7    during that period?

8          A      Yes, my duties stayed the same

9    with respect to regional manager, yes.

10                You asked me earlier a question

11   did I have any other responsibilities and it

12   just dawned on me that I did do a consulting, a

13   portion of consulting with the housing authority

14   in Baltimore for I guess approximately a year

15   and that -- while still maintaining to some

16   degree my region, the Baltimore Housing

17   Authority.

18         Q      So during the 2000 to 2006

19   period, the Baltimore Housing Authority

20   consulting was the only work you did in addition

21   to your PBCA regional manager work?

22         A      Right, that's correct, as part of

23   CGI, but, yes.

24         Q      And your region stayed the same

25   as the Dayton region?

25

1                        Pierce

2           A       That's correct.

3           Q       2006, what position did you move

4    into?

5           A       2006 I moved into a position of

6    director of special projects.

7           Q       Did you continue reporting to Ms.

8    Carragher?

9           A       Yes.

10          Q       And describe your

11   responsibilities in that position.

12          A       It primarily was to -- for

13   various opportunities that came along, whether

14   it's PBCA related or consulting related, to

15   basically become a part of that and help ensure

16   that that opportunity moved forward.

17          Q       Were you involved at the bidding

18   stage or did you take operational roles in these

19   projects or both?

20          A       Primarily operational roles at

21   that time.

22          Q       Now, can you tell me the projects

23   that you had an operational role in during that

24   period that you were director of special

25   projects?

26

1                        Pierce

2          A      Well, one of those would have

3    been our transition into the New York PBCA.

4          Q      Apart from that, did you have

5    other operational roles in that position?

6          A      No.

7          Q      So that was the work you did the

8    entire time that you were director of special

9    projects?

10         A      Yes.

11         Q      How long did you have that

12   position?

13         A      Until -- probably about a year.

14         Q      2006 to 2007?

15         A      Yes.

16         Q      And did you move on to another

17   position after the transition had taken place in

18   New York?

19         A      Yes.

20         Q      What was your next position?

21         A      Director.

22         Q      So you went from director of

23   special projects to just director?

24         A      Director of consulting services,

25   sorry about that.

27

1                          Pierce

2          Q        And that was in 2007?

3          A        Yes.

4          Q        What were your duties when you

5   first took on the position as director of

6   consulting services?

7          A        Director of consulting services,

8   my responsibility became basically account

9   management for the New York PBCA.

10         Q        You oversaw the operations of

11  that New York PBCA?

12         A        That's correct.

13         Q        You reported to Ms. Carragher?

14         A        That's correct.

15         Q        So initially when you took that

16  position, did you have duties beyond the New

17  York PBCA?

18         A        No.

19         Q        At any time since you took that

20  position on, have you had additional duties?

21         A        Yes.

22                  Really what's on my mind right

23  now is the current one, which is working with

24  our existing project, which is Community

25  Development Block Grant Disaster Recovery.

28

1                          Pierce

2          Q       Can you describe that to me, that

3    project?

4          A       What we are currently executing

5    is, we have some intake centers out on Long

6    Island for individuals who have been impacted by

7    Hurricane Sandy, so we are assisting our client,

8    which is the State of New York, individuals

9    submit the application, helping them with

10   submitting the application and documentation so

11   that it can be evaluated and they can be

12   provided assistance to help them rebuild or

13   mitigate future disaster impacts.

14         Q       At some point in time you had

15   responsibilities connected with the PBCA rebid

16   process; is that correct?

17         A       Yes.

18         Q       I'm going to talk in a lot more

19   detail about that in a minute.

20         A       Okay.

21         Q       So leaving that aside, in

22   addition to the disaster recovery operations

23   post Hurricane Sandy that you just talked about

24   and your operational responsibilities for the

25   New York PBCA, can you tell me about any other

29

1                              Pierce

2      responsibilities or projects you've handled

3      since 2007?

4              A      I worked on another project with

5      Chicago Housing Authority, and being in part

6      responsible for the call center and our team, as

7      one of the project managers of that, and that's

8      where, the wait list purge, so the Chicago

9      Housing Authority was purging their wait list,

10     so we were assisting them with -- or assisting

11     individuals who were calling in who needed help

12     in filling out their application to ensure that

13     they were on the wait list.

14             Q      Any other projects you've had

15     involvement in since 2007?

16             A      Since 2007 I also was assigned to

17     be responsible for our Columbus call center,

18     which takes tenant complaints or concerns,

19     resident concerns for our other PBCA contracts

20     and helps ensure that their complaints are

21     addressed or their concerns are addressed by the

22     management.

23             Q      This is a centralized call center

24     that is used by the various PBCA operations in

25     states around the country that CGI is involved

30

                            Pierce

1   in; is that correct?

3          A      With the exception of New York.

4          Q      So all of the other states in

5   which CGI is the subcontractor for the PBCA

6   utilize this Columbus call center?

7          A      That's correct.

8          Q      And you were operationally

9   responsible for that call center?

10         A      Yes.

11         Q      When did you acquire that

12  responsibility?

13         A      I would say the beginning of

14  2012, I think.

15         Q      Have you had any other

16  responsibilities or handled any other projects

17  since 2007?

18         A      None that I can recall.

19         Q      Have you had business development

20  responsibilities?

21         A      Yes, in that, building

22  relationships with various potential clients and

23  communicating CGI's offerings, so to that

24  extent, yes.

25         Q      Now, in terms of being

31

1                          Pierce

2      responsible for bids or responding to RFPs or

3      submitting specific proposals or bids, have you

4      had responsibilities in that area?

5              A      Not sole responsibility, no, but

6      if I identify a potential opportunity, then we

7      either provide that to Dennis Ryan, who is the

8      business developer, for consideration and for us

9      to have a conversation about, to see whether or

10     not it makes sense, as well as share that

11     information with Marybeth.

12             Q      So you haven't been the person

13     primarily responsible for making any proposals

14     or bids or responding to RFPs; is that fair to

15     say?

16             A      I'd say that's fair to say.

17             Q      Have you, albeit not overall

18     responsibility, but have you had involvement in

19     submitting any specific RFP responses or bids

20     during your time as director for consulting

21     services?

22             A      Yes.

23                        MR. KLEIN:  Object to the

24                 form.

25             Q      What projects?

MCM REPORTING SERVICE
(516) 775-5209

32

                          Pierce

1

2          A       With respect to the rebid, the

3    PBCA rebid, yes.

4          Q       Okay.  All right.  And I'm going

5    to talk about that more generally in a minute.

6                  Outside of the PBCA rebid, have

7    you had involvement in any specific bids or

8    responses to RFPs that were submitted by CGI?

9                  MR. KLEIN:  Object to the

10                 form.

11         A       None that I can recall.

12         Q       So now let's turn to the PBCA

13   rebid.

14         A       Okay.

15         Q       As I understand it, at a certain

16   point in time HUD announced that it was going to

17   rebid all the PBCA work across the country; is

18   that correct?

19         A       That's correct.

20         Q       And am I correct that CGI saw

21   this as an opportunity to try to expand the

22   number of housing units that it was

23   subcontractor for?

24         A       Yes.

25         Q       And was a team of people put

33

1                            Pierce

2     together to try to win that additional work in

3     the rebid?

4            A      Yes.

5            Q      And was that team headed by Ms.

6     Carragher?

7            A      Yes.

8            Q      And the group that reported to

9     her, the senior people that reported to her?

10           A      Yes.

11                         MR. KLEIN:  Object to the

12                  form.

13           Q      Was that group internally known

14    as the rat pack?

15           A      Yes.

16           Q      And were you on the rat pack?

17           A      Yes.

18           Q      And was Mr. Ashmore on the rat

19    pack?

20           A      Not initially, but at a later

21    time he did join the rat pack team, yes.

22           Q      Shortly after he joined CGI?

23           A      I would say shortly after he

24    joined CGI.

25           Q      And he was on the rat pack team

34

1                          Pierce

2    until he was terminated from CGI, approximately?

3          A      Yes, as far as I knew.

4          Q      Did you have any interactions

5    with Mr. Ashmore in connection with the rebid

6    other than just being on group conference calls

7    with him?

8          A      Very limited interaction, but,

9    you know, so very limited interaction.

10         Q      Can you just summarize what that

11   interaction was?

12         A      Well, it's primarily when -- a

13   couple of times when I think he was going to do

14   a presentation or he was going to reach out to

15   some contacts he had, I think in Michigan, he

16   communicated to the team that he had some

17   contacts and he could try to work some of those

18   relationships, so he requested a PowerPoint

19   presentation that I put together so that he

20   could modify and prepare to communicate to, I

21   guess, his contacts there.

22                So that's probably the greatest

23   amount of extent that I can recall having worked

24   with him directly on some potential pursuit,

25   so ...

35

1                          Pierce

2          Q       So am I correct that the

3     interaction you had with him really related to

4     giving him the presentation that you had put

5     together for him to use in making a pitch?

6                          MR. KLEIN:  Object to the

7                   form.

8          A       Yes.

9          Q       Now, during the rebid process,

10    did there come a time when HUD announced that it

11    was considering putting in restrictions on the

12    number of units that any contractor or

13    subcontractor could bid on?

14         A       Yes.

15         Q       And at the same time did HUD also

16    announce that it was considering imposing a

17    limitation on the percentage of profit that any

18    one contractor or subcontractor could make?

19         A       I don't recall that.

20         Q       Do you recall any other potential

21    restrictions being discussed by HUD at the time

22    it announced that it was considering the unit

23    cap restriction?

24         A       The other restriction, if memory

25    serves correct, is limitation on the percentage

36

1                          Pierce

2     that you could bid, the maximum percent.

3           Q        Of units?

4           A        No, the maximum percent bid.

5           Q        The maximum percentage of what is

6     I guess my question?

7           A        The maximum percentage of the

8     overall value of the contract or to determine

9     the amount of payment that the company could

10    receive.

11          Q        I don't understand that last

12    answer.

13                   So if you can just describe for

14    me your recollection of what the other

15    restriction was, in addition to a discussion

16    about potential restrictions on the number of

17    units that could be applied for.

18          A        So initially HUD, the maximum

19    percentage, the compensation, so to speak, of

20    each contract is based on the fair market rent

21    in the area.

22                   So initially the maximum that HUD

23    was willing to pay out was up to 3 percent per

24    month for the execution of the entire contract.

25                   Later on they concluded, well,

37

1                          Pierce

2      how can we reduce that and that came down to a

3      maximum percentage, I think at the time it was

4      two and a half percent.

5           Q      And was that ultimately imposed

6      as part of the rebid process?

7           A      Yes.

8           Q      Let me turn back to the unit cap

9      restriction that was being proposed.

10                 After HUD announced that it was

11     considering imposing a unit cap, did the rat

12     pack have discussions about how HUD might be

13     persuaded not to include the unit cap in its

14     final bidding documents?

15                     MR. KLEIN:  Object to the

16                     form.

17          A      Yes.

18          Q      So there were discussions about

19     how might we persuade HUD, either together or,

20     either individually or together with others in

21     the industry that it would be a bad idea to

22     impose the unit cap; is that correct?

23          A      Yes.

24          Q      Did the rat pack also have

25     discussions about what bidding strategies CGI

38

```
1                        Pierce
2    might be able to use in the event the unit cap
3    was included in the final bid documents?
4                        MR. KLEIN:  Object to the
5                form.
6         A     Could you rephrase that?
7         Q     Let me step back a minute.
8                Is it fair to say that the unit
9    cap that was initially proposed by HUD as being
10   under consideration would have substantially
11   limited CGI in going after the number of units
12   that it wanted to go after in the rebid?
13                       MR. KLEIN:  Object to the
14               form.
15        A     Yes.
16        Q     Let's take a look at an exhibit
17   that we previously marked.
18                       Exhibit 27 (handing).
19                       I'm showing you what was
20   previously marked as Exhibit 27.  It's an e-mail
21   string on January 14th and January 15th of 2010.
22                       I'm going to ask you just to turn
23   to the second to last page of the document, to
24   an e-mail, the e-mail at the bottom of that page
25   from Ms. Carragher to Richard Schmitz and others
```

39

                              Pierce

1      on January 14th.

2                    Do you see that one?

3           A      Yes.

4           Q      Can you read that e-mail to

5      yourself?

6           A      (Perusing document.)  Okay.  So I

7      have read this e-mail.

8           Q      Now, I understand the e-mail

9      wasn't sent to you.  I assume you have never

10     seen the e-mail before?

11          A      No, I've never seen this e-mail.

12          Q      In any event, you see that Ms.

13     Carragher says that as of that point in time,

14     January 14th, CGI has 267,000 units?

15          A      I do see that's written in the

16     e-mail.

17          Q      Is that your recollection as to

18     the approximate number of units that CGI had

19     under management in the PBCA contracts prior to

20     the rebid?

21          A      Approximately.

22          Q      And you see that Ms. Carragher

23     indicates that CGI was planning on bidding on

24     over 800,000 units at that point in time, do you

40

1                        Pierce

2    see that?

3            A       I do see that in the e-mail.

4            Q       And is that also your

5    recollection of what the goal of CGI had been

6    prior to the announcement of a potential unit

7    cap?

8            A       No, that's not my recollection.

9            Q       What is your recollection?

10           A       My recollection is and, of

11   course, perhaps that is limited to my scope of

12   what I was doing at the time, but maybe about

13   550,000 units.

14           Q       Let me see if I understand your

15   answer.

16                   Are you saying that it's your

17   recollection that the total number of units that

18   CGI had targeted to try to go after in the rebid

19   was 550,000, or are you saying that it's your

20   recollection that that was the number of units

21   within the areas that you were primarily

22   responsible for going after?

23           A       What I'm trying to communicate is

24   that from the e-mail that Marybeth sent, she may

25   have had a broader scope or perception of what

41

1                          Pierce

2    CGI was going after.

3                  My limited scope with what I was

4    working on and the individuals that I was

5    working with in basic conversation was about

6    550.

7                  So all I'm saying is she may have

8    had some other understanding or because she's

9    responsible for the entire group, so...

10         Q      Well, each of the operational

11   directors reporting in to Ms. Carragher were

12   responsible for going after or primarily

13   responsible for going after different

14   jurisdictions in the rebid, correct?

15         A      Correct.

16         Q      You had certain jurisdictions

17   that you were primarily responsible for, right?

18         A      That's correct.

19         Q      Mr. Gorris had areas that he was

20   responsible for, right?

21         A      Correct.

22         Q      Mr. Steen had areas he was

23   responsible for, right?

24         A      Correct.

25         Q      Ms. Rudy had areas she was

42

1                         Pierce

2     responsible for?

3             A       Correct.

4             Q       And I may have missed somebody,

5     but what I'm trying to find out is the 550,000

6     number that you recall today as being the

7     target, was that the number that you recall the

8     entire group targeting to go after, or is that

9     just the area that you recall being within your

10    geographic scope within the rebid?

11            A       It's not the area that, from my

12    group, I know that because it wasn't 550,000

13    units.

14                    And I don't recall what the total

15    collective number was, but I don't recall it

16    being 800,000.

17            Q       You recall it being less than

18    that collectively that had been targeted?

19            A       Yes.

20            Q       Do you have any reason to

21    believe, looking at Ms. Carragher's e-mail, that

22    what she is saying is untrue in terms of what

23    CGI as a company had targeted to go after, and

24    that is her statement that they were planning on

25    bidding on over 800,000 units?

43

1                         Pierce

2          A      If this is her statement then,

3    maybe I'm misinterpreting, but if it's her

4    statement that's what she believed that she

5    wanted to communicate that our company had the

6    potential to go after.

7          Q      So you might not have been aware

8    of the entire picture; is that correct?

9          A      Not of the 800,000 units, only

10   that the opportunity for the rebid existed and

11   we wanted to expand and if those opportunities

12   come along and they make sense, then let's

13   pursue them.

14         Q      Your recollection of the number

15   of 550,000 units, was that the number of new

16   units that CGI was trying to add to its

17   portfolio over and above the existing number of

18   267,000?

19         A      Not to my recollection, no.

20         Q      In any event, is it fair to say

21   that in January of 2010 when HUD announced that

22   it was considering a unit cap, that unit cap was

23   substantially lower than the total number of

24   units that CGI had targeted to bid upon at that

25   point in time?

44

1                          Pierce

2                    MR. KLEIN:  Object to the

3          form.

4          A      Yes.

5          Q      Now to go back to the rat pack

6    calls.

7                    You told me a few minutes ago

8    that the rat pack in their regular calls

9    discussed strategies to try to persuade HUD not

10   to ultimately impose the unit cap that it said

11   it was considering; is that correct?

12         A      I think I asked you to rephrase

13   that, then you moved on from that, so I don't

14   think I confirmed that, that we had necessarily

15   done that.

16                  But if you're asking me, if your

17   question is whether or not we evaluated the

18   opportunity and how could we, you know, seize

19   the opportunity, yeah, we talked about that.

20         Q      Well, my question is a little

21   more specific.

22                  So regardless of what you

23   testified to earlier, we don't need to debate

24   that.

25         A      Okay.

45

1                        Pierce

2          Q      Let me ask you a new question.

3          A      Okay.

4          Q      The rat pack had regular strategy

5   conference calls during the rebid process,

6   correct?

7          A      Yes.

8          Q      And you were a participant in

9   those calls?

10         A      Yes.

11         Q      After the unit cap proposal was

12  announced by HUD, on some of those rat pack

13  calls, did the rat pack discuss what CGI was

14  doing by way of lobbying efforts or discussions

15  with HUD or other methods to try to persuade HUD

16  not to impose a unit cap when it came out with

17  the final bidding documents?

18                In other words, was there a

19  discussion of what CGI was trying to do to

20  dissuade HUD from making a final decision that

21  there would be a unit cap?

22         A      Yes.

23         Q      In addition to that, were there

24  also discussions during the rat pack calls of

25  what CGI could do if HUD was not dissuaded from

46

1                         Pierce

2     imposing a unit cap and there was, in fact, a

3     unit cap in the final bidding?

4             A     I don't recall.

5             Q     Let's take a look at some other

6     documents.

7                   I'm going to show you what was

8     previously marked as Exhibit 14 (handing).

9                   Can you just take a look at this

10    document, take a look through it and see if

11    you're familiar with what's there?

12            A     Okay.

13                        MR. MAIR:  For the record,

14                        Exhibit 14 is a document produced

15                        by CGI as CGI 5043 confidential,

16                        a May 17, 2010 e-mail from

17                        Patricia Duffy together with a

18                        senior management committee

19                        progress update PowerPoint

20                        presentation.

21            A     (Perusing document.)  Okay.

22            Q     I understand you are not listed

23    on the cover e-mail here.

24            A     Uh-hum.

25            Q     But regardless of that, have you

47

                              Pierce

1

2    ever seen either this PowerPoint presentation or

3    a similar PowerPoint presentation updating

4    senior management on the PBCA rebid?

5            A       I don't recall seeing that.

6            Q       You don't recall seeing this one?

7            A       I don't recall seeing this one

8    and I don't recall seeing a PowerPoint to update

9    senior management.

10           Q       So with the understanding that

11   you haven't seen this document before, let me

12   ask you to turn to Page 4, which is headed,

13   "HUD/GR Update," and do you understand "GR" to

14   mean government relations?

15           A       Yes.

16           Q       Now, when you said that on the

17   rat pack calls you discussed some of what CGI

18   was doing to try to dissuade HUD from finally

19   implementing the unit cap, were some of these

20   things on this page discussed during rat pack

21   calls that you were on?

22           A       Yes, in a general sense, I think

23   the Nixon Peabody portion and meeting with

24   Gallante, the specifics of the, the specifics of

25   maybe to offset the potential appropriations

48

1                          Pierce

2    language for HFA priority, that may have been

3    discussed, but I don't recall the specifics of

4    these.

5          Q      Turn to the next page, which is

6    Page 5.

7                 And you see that the first bullet

8    point here is headed, "If unit cap."

9                 Do you see that?

10         A      Yes.

11         Q      And this discusses a possibility

12   of pursuing a certain number of states under the

13   unit cap or within the unit cap.

14                Do you see that?

15         A      Yes.

16         Q      And then pursuing other states

17   under a 49/51 percent partner split with the

18   partner.

19                Do you see that?

20         A      Yes.

21         Q      And did you understand that

22   option to be known as the 49/51 scenario?

23         A      Yes.

24         Q      So let me go back to the rat pack

25   calls now.

49

```
 1                      Pierce

 2          A      Okay.

 3          Q      During the rat pack calls, did

 4     the rat pack discuss various potential

 5     strategies that could be used by CGI to be able

 6     to ultimately bid on units above the unit cap if

 7     a unit cap were ultimately put in place by HUD?

 8                      MR. KLEIN:  Object to the

 9                      form.

10          A      Yes.

11          Q      And was one of those strategies

12     that was discussed by the rat pack the 49/51

13     strategy?

14          A      49/51 percent split, yes.

15          Q      So the bidding under a 49/51

16     split with the PHA partner, that was discussed

17     by the rat pack?

18          A      Yes.

19          Q      On multiple phone calls?

20          A      Yes.

21          Q      Now, if you look down to the next

22     part of the page here when it discusses in this

23     PowerPoint presentation options for the

24     51 percent partner.

25                      Do you see that?
```

50

1                        Pierce

2          A      Yes.

3          Q      And there is a table that

4   discusses the pros and cons of partnering with a

5   PHA versus what they call private sector.

6                 Do you see that?

7          A      Yes.

8          Q      And under the pros for a PHA

9   partner, the PowerPoint says, quote, "Willing to

10  transfer 51 percent to CGI after first year,"

11  close quote.

12                Do you see that?

13         A      Yes.

14         Q      Now, during the rat pack

15  conference calls, was there a discussion of the

16  potential that if CGI bid under a 49/51 bidding

17  strategy, the PHA may be able to transfer back

18  to CGI some or all of the 51 percent after the

19  first year or after the bid was awarded?

20         A      I don't recall that.

21         Q      Let me make sure I understand.

22                Your testimony is that sitting

23  here today you don't recall that topic ever

24  being discussed during a rat pack conference

25  call?

51

1                          Pierce

2          A      The willingness to transfer 51

3    percent back to CGI after the first year, it

4    doesn't pop up in my head as part of a

5    conversation.

6                 I'm not saying it never happened,

7    but I just don't recall that.

8          Q      You don't recall whether or not

9    it happened?

10         A      Yes, I don't recall the 51

11   percent transfer to CGI.

12         Q      Let me just delve into that topic

13   a little bit more.

14         A      Okay.

15         Q      Was it your understanding that

16   the 49/51 bidding strategy would be a strategy

17   under which CGI and the PHA would bid and tell

18   HUD that the PHA would have at least 51 percent

19   of the FTE, full-time equivalent employees,

20   doing the operational work, and CGI would have

21   49 percent or less of those employees?

22         A      Yes.

23         Q      So that the 49/51 referred to who

24   was going to employ the employees doing the

25   operational work; is that correct?

52
1                          Pierce

2          A      Yes.

3          Q      At any time during any of the rat

4    pack discussions, whether on a conference call

5    or in person, was there ever a discussion

6    amongst rat pack members of the possibility that

7    CGI and a PHA partner could bid under a 49/51

8    bidding strategy, but then have the PHA transfer

9    back some of its employees in the 51 percent to

10   CGI at some time after the bid was awarded?

11                      MR. KLEIN:  Object to the

12               form.

13         A      I don't recall that.  Again,

14   maybe I wasn't listening in detail, but I don't

15   recall that.

16         Q      So just to be clear, sitting here

17   today you have no recollection of that being

18   discussed?

19         A      I have a recollection of the

20   49/51 percent split being discussed, and as you

21   have described, that the PHA would handle 51

22   percent of the FTEs and CGI would do the

23   49 percent, I recall that.

24                      I don't recall the conversation

25   of transferring, you know, 51 percent to CGI.

53
Pierce

1  That doesn't rest in my memory, unfortunately,

2  if it was said.

3         Q      So you don't recall sitting here

4  today any discussion at any time about the

5  possibility that the bidding could be under

6  49/51, but at some point after the award of the

7  contract, the PHA could transfer some of the

8  FTEs to CGI?

9         A      I don't recall that.

10        Q      We are going to take a look now

11 at what was previously marked as Exhibit 13

12 (handing).

13             I'm showing you Exhibit 13, which

14 was produced by CGI as CGI 7233 confidential.

15 It's an e-mail exchanged between Mr. Kyprianou

16 and others on January 29, 2010.

17             Can you read that to yourself?

18        A      (Perusing document.)  Okay.

19        Q      You have read Exhibit 13?

20        A      Yes.

21        Q      Now, I see that you are not

22 indicated as being a recipient of this on the

23 document.

24             Have you ever seen it before?

54

1                         Pierce

2          A        I've never seen this document.

3          Q        And let me ask you a more general

4     question.

5                   Did you review any documents at

6     any point in time in preparation for your

7     deposition today?

8          A        No.  I guess, no.

9          Q        You look uncertain.

10         A        Yeah, I'm trying to figure out

11    what you mean did I review any documents.

12                  I mean, I haven't seen any of

13    these documents or anything.  The only thing we

14    did was provide the requested information by

15    counsel.  It was some months ago.

16         Q        Some number of months ago you

17    were asked by counsel to locate and gather up

18    certain documents relating to this case, right?

19         A        Uh-hum.

20         Q        And you did that and forwarded

21    them to counsel?

22         A        Yes.

23         Q        And did you read any of the

24    documents at the time?

25         A        No.  I primarily searched for the

55

1                           Pierce

2      information that was requested and created the

3      file and uploaded it accordingly.

4             Q      Then at some point you were told

5      that you were going to have a deposition in this

6      case, right?

7             A      Yes.

8             Q      And there was coordination to

9      figure out the logistics of it, right?

10            A      Yes.

11            Q      Did you do anything to actually

12     prepare to be able to testify today, anything to

13     refresh your memory about events?

14                   Did you review any documents?

15     Did you talk to anybody in order to try to

16     refresh your memory about what happened several

17     years ago in the events that are at issue in

18     this case?

19                         MR. KLEIN:  I presume you

20                   mean short of conversations with

21                   counsel.

22            Q      I'm including that now in terms

23     of just, if that is one of the things you did,

24     then tell me, but don't go into any details

25     about what was discussed with counsel.

56

Pierce

1
2          MR. KLEIN:  Fair enough.

3      A     Yes.

4      Q     By "yes," what did you do, again,

5  without going into details about discussions,

6  what did you do to try to prepare for this

7  deposition?

8      A     Speak with counsel, "Hey, Les,

9  there's a deposition coming up."

10     Q     Don't tell me about the details

11 that you spoke to counsel about.

12           You spoke to counsel?

13     A     Yes.

14     Q     So you had a meeting, an

15 in-person meeting or was it by phone?

16     A     By phone.

17     Q     You had a phone call with

18 Mr. Klein?

19     A     Yes.

20     Q     Was anybody else on the call?

21     A     Yes.

22     Q     Who else?

23     A     Marybeth Carragher.

24     Q     Was anybody else on the call?

25     A     No.

57

1                          Pierce

2          Q      How long did the call last,

3    approximately, your best recollection?

4                 I see you're looking at counsel,

5    but I just want to know your best recollection.

6          A      Maybe an hour.

7          Q      And how long ago was that?

8          A      A couple of weeks ago, I think.

9          Q      Apart from that approximately

10   one-hour call, did you speak to anyone at any

11   other point in time, either counsel or Ms.

12   Carragher or anybody else, to try to prepare for

13   this deposition?

14         A      No.

15         Q      Did you at any point in time

16   review or look at any documents to try to

17   refresh your recollection as to what happened?

18         A      No.

19         Q      So you didn't look at any

20   documents at all for purposes of preparing to be

21   able to testify here today?

22         A      No.

23         Q      Okay.

24                After that digression, let's go

25   back to Exhibit 13.

58

1                    Pierce

2          A       Okay.

3          Q       If you take a look at the last

4    page of this e-mail exchange.

5          A       The last page, okay.

6          Q       Do you see that Mr. Kyprianou

7    states as follows, quote, "I don't know whether

8    this is possible or allowable, but can we create

9    new entities for selected jurisdictions that are

10   a joined venture of a PHA and CGI subsidiary.

11   If this holds, then we can get away with the

12   unit restrictions as these entities will somehow

13   be independent from CGI," close quote.

14               Do you see that?

15         A       Yes.

16         Q       Now, let me ask you, in terms of

17   discussions amongst rat pack members either on

18   the conference calls or in person regarding what

19   potential strategies CGI could use in the event

20   that a unit cap was included in the rebid, was

21   there ever any discussion about the possibility

22   of setting up one or more new corporate entities

23   in order to bid on units above the unit cap?

24         A       No, not that I recall.

25         Q       Let me make sure I understand.

59

                              Pierce

1

2          A      Okay.

3          Q      At any time during any of the

4    discussions leading up to submission of the

5    rebid, did any of the rat pack members ever

6    discuss the possibility that one or more new

7    corporate entities could be set up as part of a

8    bidding strategy by CGI?

9                      MR. KLEIN:  Object to the

10                 form.

11         A      No.

12         Q      Was there ever any discussion at

13   all at any point in time about setting up either

14   subsidiaries or affiliates or separate corporate

15   entities to bid on the rebid?

16                     MR. KLEIN:  Object to the

17                 form.

18         A      There was discussion about CGI's

19   existing subsidiaries maybe bidding, but I don't

20   recall conversation about setting up new ones.

21         Q      Tell me what you recall about the

22   discussion of existing CGI subsidiaries bidding

23   in the rebid.

24         A      Well, I mean, there's a couple of

25   different groups.

60

1                          Pierce

2                     One is CGI Technologies and

3      Solutions, and I can't remember what our other

4      ones are, but I guess CGI has several

5      subsidiaries, CGI Federal and CGI Technologies

6      and Solutions.

7                     Whether or not that particular

8      entity, being that it's a separate entity, so to

9      speak, could it partner with PHAs to pursue the

10     opportunity.

11                    But that was probably about as

12     much as I recall with respect to the existing

13     entities doing so, but I don't recall a

14     conversation on new entities being created or

15     set up.

16          Q     So just to make sure I

17     understand, you have a recollection of there

18     being a discussion about using more than one

19     existing CGI corporate entity in the rebid; is

20     that correct?

21                    MR. KLEIN:  Object to the

22                    form.

23          A     Yes.

24          Q     And was there a discussion that

25     by using more than one CGI entity in the rebid,

61

1                        Pierce

2    CGI may possibly be able to get around a single

3    unit cap if the unit cap was imposed?

4                        MR. KLEIN:  Object to the

5              form.

6         A    Yes.

7         Q    So the context of the discussion

8    of using more than one CGI corporate entity was

9    doing that in order to have more than one unit

10   cap applied to CGI collectively; is that

11   correct?

12                       MR. KLEIN:  Object to the

13             form.

14        A    Yes.

15        Q    On how many calls was that

16   concept discussed?

17        A    I don't recall that.

18        Q    More than one call?

19        A    Yeah, definitely more than one

20   call.

21        Q    More than three calls?

22        A    I don't recall that.

23             I know the conversation happened.

24   On how many calls, I don't recall.

25        Q    These were full rat pack calls?

62

1                        Pierce

2           A       Yes.

3           Q       Amongst Ms. Carragher and her

4    senior employees?

5           A       Yes.

6           Q       Was Mr. Ashmore on these calls?

7           A       I don't recall specifically

8    whether or not he was on the call, but if we had

9    a rat pack meeting, he had the invite, so

10   whether or not he actually made that call, I

11   don't know.

12          Q       What was ultimately decided with

13   respect to the possibility of bidding through

14   more than one CGI corporate entity in order to

15   have more than one unit cap applicable to CGI

16   collectively?

17          A       Well, ultimately we did not bid

18   differently under different entities.

19                  So the decision was we bid as CGI

20   with our partners and we did the 49/51 split.

21          Q       You answered a slightly different

22   question.

23          A       Okay.

24          Q       You told me what CGI actually

25   did.

63

```
 1                      Pierce

 2               My question is, going back to

 3      these rat pack strategy conference calls, you

 4      said that on more than one occasion the concept

 5      of bidding through more than one CGI corporate

 6      entity in the rebid was discussed.

 7                      My question is --

 8          A       What was the outcome of that?

 9          Q       -- what was the outcome of those

10      discussions amongst the rat pack members?

11                      MR. KLEIN:  Object to the

12               form.

13          A       To not do it or it wasn't, I

14      mean, I don't know if it's not to do it, but the

15      ultimate decision was we didn't do it, I mean,

16      we didn't use any other subsidiaries, CGI

17      subsidiaries.

18          Q       Let me try to ask a more specific

19      question.

20          A       Okay.

21          Q       Do you recall there being a

22      specific decision made on those rat pack calls

23      or was the subject just dropped at a certain

24      point in time or did something else happen?

25          A       From my perspective, you know,
```

64

1                        Pierce

2      assuming that decision, and I don't know if

3      assuming is the right word, but --

4              Q      Well, I don't want you to assume.

5              A      Yes, and I don't want to assume.

6              Q      So just to be clear, the

7      question, my question is asking you for your

8      recollection of discussions on rat pack

9      conference calls.

10                    And my question is, the topic of

11     bidding through more than one CGI corporate

12     entity was discussed, you said, on more than one

13     rat pack call.

14                    Based on your recollection today,

15     do you recall if at a certain point in time a

16     decision was made on the rat pack call, "No,

17     we're not going to do that," or was the topic

18     just dropped and not addressed again on the

19     calls without there being a decision being made

20     amongst the rat pack members?

21             A      Let me see if I can answer your

22     question.

23                    I don't recall a specific

24     decision being made.

25                    However, it was an understanding

65

Pierce

1   it wasn't going to be pursued.

2              But how that, you know, whether

3   that was because a decision had been made that

4   we are not going to use any other CGI

5   subsidiaries, but it was an understanding that

6   the pursuit of using other CGI subsidiaries was

7   not going to be used.

8         Q    Now, am I correct that sitting

9   here today you have absolutely no recollection

10  of there ever being a discussion amongst any rat

11  pack members of the possibility of setting up

12  any new companies, whether they be new

13  subsidiaries or outside companies, in order to

14  bid through those companies and try to get

15  around a single unit cap?

16        A    I don't recall that.

17             THE WITNESS:  Can we take

18             a break?

19             MR. MAIR:  Yes.

20             (Whereupon, at 11:54 a.m., a

21             recess was taken.)

22             (Whereupon, at 12:12 p.m.,

23             the deposition resumed with all

24             parties present.)

25

66

                              Pierce

1                              Pierce

2                              MR. MAIR:  Back on the

3                    record.

4       BY MR. MAIR:

5            Q     Let me go back to the rat pack

6       discussions of a 49/51 bidding scenario.

7                    Were there any discussions at any

8       point in time amongst rat pack members of the

9       question of what HUD might do to monitor the

10      number of FTEs being employed by the PHA as

11      opposed to the subcontractor following the

12      successful award of a contract?

13           A     Could you rephrase the question

14      or repeat the question?  I want to make sure I

15      understand.

16           Q     Yes.

17                    Were there any discussions

18      amongst any rat pack members of what HUD would

19      do to monitor or require reporting of the

20      allocation of FTEs between the PHA prime

21      contractor and its subcontractor after HUD

22      awarded a contract for a 49/51 bidding

23      relationship?

24           A     I don't recall that conversation.

25           Q     You don't recall that ever being

67

                              Pierce

1

2    discussed?

3         A     No.  The only thing I recall is

4    during your, the bidding process, you lay out

5    the FTE and you lay out for the 49/51 percent

6    split or who was going to do what, maybe not

7    laying them out, but I just know we did an

8    analysis on the 49/51 percent split and, you

9    know, what would be their FTE, which ones would

10   be their FTEs, which ones would be our FTEs.

11             So I don't recall any

12   conversation about monitoring them at a later

13   time or anything like that.

14        Q     So what you're saying is you, at

15   CGI you did an allocation of FTEs between CGI

16   and the PHA bidding partner for those bids that

17   were submitted under a 49/51 scenario, right?

18        A     Yes.  We did the analysis so that

19   we could communicate to our partners so they'll

20   understand, you are responsible for these

21   specific positions and these specific tasks, and

22   this is what CGI is going to do, and to lay that

23   out to them, so, yes, in order to, you know, get

24   them to agree to that, they had to know what

25   they were going to be responsible for.

68

1                          Pierce

2          Q       My question is was there ever a

3    discussion amongst rat pack members of the

4    question of what, if anything, HUD was going to

5    do to monitor or enforce the 49/51 split between

6    PHA and subcontractor after the contract was

7    awarded?

8          A       I don't recall a conversation.

9          Q       Now let me talk for a few minutes

10   about what your responsibilities were in the

11   rebid process.

12         A       Okay.

13         Q       Were there certain jurisdictions

14   that were allocated to you in the pursuit of the

15   rebid?

16         A       Yes.

17         Q       What jurisdictions were those?

18         A       I was responsible for New York,

19   Pennsylvania, Connecticut, Louisiana, and Texas.

20         Q       What about Massachusetts?

21         A       Massachusetts was not my

22   responsibility.

23         Q       Oklahoma?

24         A       Oklahoma was a no-bid state.

25                 I don't recall me having

69

1                        Pierce

2    responsibility to connect with anybody in

3    Oklahoma.

4              So it's not imprinted on the

5    memory.  So I don't recall Oklahoma, or I'll say

6    no, because we didn't do Oklahoma.

7         Q    Well, I understand that

8    ultimately a decision was made not to bid in a

9    small number of jurisdictions.

10             My question, though, is not

11   really related to what CGI ultimately did.

12             My question is at any point

13   during the rebid process when jurisdictions were

14   being allocated amongst Ms. Carragher's

15   directors for somebody to have the primary

16   responsibility for trying to partner with a PHA

17   in that jurisdiction, I want to know which

18   jurisdictions at any point in the process you

19   had some responsibility for.

20             And you've listed New York,

21   Pennsylvania, Connecticut, Louisiana and Texas.

22             Were there any others?

23        A    I don't recall any others.

24        Q    Regardless of whether they were

25   bid upon?

70

1                          Pierce

2          A       I don't recall any others.

3                  That's what I got married to, is

4     that list right there.

5          Q       And were all of those states

6     actually bid upon by CGI, that is New York,

7     Pennsylvania, Connecticut, Louisiana and Texas?

8          A       Yes.

9          Q       Bids were submitted for all of

10    those states?

11         A       Yes.

12         Q       Together with partner PHAs?

13         A       That's correct.

14         Q       Now, were any of those states

15    actually bid under a 49/51 scenario?

16         A       Yes.

17         Q       Which ones were bid under 49/51?

18         A       All except New York.

19         Q       Pennsylvania, Connecticut,

20    Louisiana and Texas?

21         A       Yes.

22         Q       Now, who was the PHA partner for

23    Pennsylvania?

24         A       It was a consortium of housing

25    authorities, so there were five housing

71

1                          Pierce

2      authorities, collective, in a consortium and

3      they formed a group called, I just know the

4      acronym, AHI, but I can't think of the name,

5      what that stood for.

6              Q       Who are the housing authorities

7      that are a part of that consortium?

8              A       Chester Housing Authority,

9      Allentown Housing Authority, Alleghany County

10     was a part of that at that time.

11                      I can't remember the small one.

12     I want to say Mercer County, but I'm not 100

13     percent sure that's the name of that county, and

14     Harrisburg Housing Authority.

15             Q       Was the name of the consortium

16     for the Pennsylvania bid Affordable Housing

17     Innovators, Inc.?

18             A       Yes.

19             Q       And that entity was owned by the

20     five housing authorities you just listed?

21             A       That's correct.

22             Q       And that was CGI's PHA partner

23     for the bid as the prime contractor on the bid

24     for Pennsylvania?

25             A       That's correct.

72

1                         Pierce

2         Q      Was that bid successful -- and

3    let me clarify that.

4         A      Yes.

5         Q      I understand that the rebid

6    process, that the results of the initial rebid

7    were later overturned.

8                But in terms of what was awarded

9    in the initial round of the rebid, was the

10   Pennsylvania bid successful?

11        A      No.

12        Q      Were any of the bids for any of

13   your states successful?

14        A      No.

15        Q      Not even New York, which was your

16   existing state?

17        A      That's correct.

18                    MR. MAIR:  Off the record.

19                    (Discussion off the record.)

20                    MR. MAIR:  I'm going to

21               mark as Exhibit 41, I'm going to

22               mark a document that was produced

23               by CGI under the Bates number CGI

24               10882 -- off the record.

25                    (Discussion off the record.)

73

1                          Pierce

2                          MR. MAIR:  Back on the

3                  record.

4                          -- confidential.

5                          So we're marking this as

6                  Exhibit 41.  It's a memorandum of

7                  understanding between CGI and

8                  Affordable Housing Innovators,

9                  Inc.

10                          (A memorandum of

11                  understanding between CGI and

12                  Affordable Housing Innovators,

13                  Inc., was marked as Plaintiffs'

14                  Exhibit 41 for identification, as

15                  of this date.)

16     BY MR. MAIR:

17          Q     I'm showing you what's been

18     marked as Exhibit 41 (handing).

19                  Is this the memorandum of

20     understanding that was entered into between CGI

21     and Affordable Housing Innovators, Inc., which

22     is AHI (handing)?

23          A     (Perusing document.)  Yes.

24          Q     And did you play the primary role

25     in negotiating this with AHI?

74

Pierce

A        Yes.  In that, you know, we
provided it to them.  If they had any issues or
concerns they communicated back to us and we
forwarded it off to our legal team, and they
worked out any concerns between those two
parties.

So I was just basically a conduit
for information.

Q        On the business side you were the
person on the part of CGI that negotiated the
deal with AHI; is that fair to say?

A        Yes.

Q        And the lawyers behind the
scenes, they may have had discussions, but on
the business side it was you?

A        Yes.

Q        And who did you deal with at AHI?

A        Steve Fischer.

Q        What was his title?

A        He's the executive director of
Chester Housing Authority.

I don't know what his title of
this consortium was, because they didn't really
identify a president, but he was the main

75

1                          Pierce

2       representative for them.

3              Q       If you look at the last page of

4       this document, was he the acting chair?

5              A       (Perusing document.)   Is that

6       what it says?

7                      Yeah, that would be Steve.

8              Q       And this was entered into

9       December 24, 2009, correct?

10             A       Yes.

11             Q       So this was entered into before

12      HUD announced that it was considering a unit cap

13      in January of 2010; is that correct?

14             A       Yes.

15             Q       The MOU with AHI was entered into

16      before the unit cap, before HUD announced that

17      it was considering a unit cap, correct?

18             A       Yes.

19             Q       Did CGI ever enter into a new MOU

20      or any new written agreement with AHI after the

21      unit cap was announced by HUD?

22             A       Yes, based on the 49/51 percent

23      split.

24             Q       So it's your recollection that a

25      new MOU was entered into that reflected the

76

                           Pierce

1   49/51 split?

3          A      Yes.

4          Q      You recall that definitively?

5          A      I recall the conversation, and we

6   had to -- my conversation with Steve and crew,

7   yes, we would have entered a new MOU.

8          Q      You had discussions with

9   Mr. Fischer about entering into a new MOU to

10  reflect the 49/51 work allocation?

11         A      We had conversations, I had

12  conversations with him and his team or him and

13  the other partners on the 49/51 percent split,

14  and as a result of that, you know, we would have

15  issued a new MOU.

16                So I'm almost certain we had a

17  new MOU for that.

18         Q      I want to be very clear here,

19  just because of the language you used.

20                You said "we would have," and I

21  think you said you were almost certain.

22         A      Yes.

23         Q      I just want to find out sitting

24  here today, let's break it into two pieces.

25                Do you recall sitting here today

77

1                            Pierce

2      having discussions with Mr. Fischer about

3      entering into a new MOU to reflect the 49/51

4      split regardless, I'm breaking this into two.

5                     First of all, I'm going to ask

6      you about discussions and then about whether a

7      document was actually signed.

8                     And I want to find out how strong

9      your recollection is.

10            A      Yes.

11            Q      So in terms of the discussions,

12     did you have discussions with Mr. Fischer about

13     entering into a new MOU to reflect the 49/51

14     split?

15            A      So yes, yes, we did have a

16     conversation about a new MOU.

17            Q      Now, did CGI and AHI ever

18     actually sign a new MOU after the December 2009

19     MOU that's marked as Exhibit 41?

20            A      If we discussed the 49/51 split,

21     we would have revised an MOU and so we would not

22     have submitted a bid without the MOU.

23            Q      Okay.  This is what I want to

24     differentiate with you.

25                     You sound like you are making an

78

1                          Pierce

2     assumption.

3             A       Okay.

4             Q       Sitting here today, do you have a

5     actual recollection of a new MOU being signed

6     with AHI to reflect the 49/51 percent split?

7             A       I don't recall.  Maybe I'm mixing

8     up various MOUs.

9                     So I'll rest with that.

10            Q       But Pennsylvania, the

11    Pennsylvania bid with AHI was submitted as a

12    49/51 bid, correct?

13            A       Yes.

14            Q       Now, with respect to Connecticut,

15    who was the PHA partner that you submitted the

16    bid with there?

17            A       Norwalk Housing Foundation, which

18    is the subsidiary of Norwalk Housing Authority,

19    or their nonprofit arm.

20            Q       Who is the PHA partner who you

21    submitted the bid together with for Louisiana?

22            A       East Baton Rouge Parish Housing

23    Authority.

24            Q       East Baton Rouge?

25            A       Parish Housing Authority.

79

1                          Pierce

2          Q        And who was the PHA partner that

3    you submitted the bid with for Texas?

4          A        Houston Housing Authority.

5          Q        And Connecticut, Louisiana and

6    Texas were all submitted as 49/51 bids, correct?

7          A        Yes.

8          Q        Did you enter into new MOUs with

9    any of the three of those bidding partners, that

10   is for Connecticut, Louisiana and Texas, that

11   reflected a 49/51 split between the two?

12         A        I'll go back to yes.

13         Q        You recall that sitting here

14   today?

15         A        I can't see the document in my

16   mind.

17                  And I can't recall, so I can't

18   recall.

19         Q        If you look at Exhibit 41, we are

20   going back to Pennsylvania right now, Exhibit 41

21   is the MOU for Pennsylvania from December of

22   2009.

23                  If you look at Page 2, which

24   differentiates CGI's responsibilities, the last

25   bullet point talks about implementation and

80

1                           Pierce

2    operations phase.

3                    Do you see that?

4           A      Yes.

5           Q      And the MOU states there, quote,

6    that CGI, quote, "Will perform all

7    performance-based contract administration tasks

8    set forth in the ACC with the exception of the

9    annual audit and certain quality control and HUD

10   reporting functions," close quote.

11                   Do you see that?

12          A      Yes.

13          Q      It's fair to say that that does

14   not accurately reflect a 49/51 split, correct?

15          A      That's correct.  At this time,

16   yes.

17          Q      It's correct in terms of what

18   this document says?

19          A      Yes.

20          Q      I'm going to show you what was

21   previously marked as Exhibit 22 (handing).

22                   Now, let me, this is for the

23   record, produced by CGI with the Bates numbers

24   CGI 4447 confidential.

25                   First of all, I want to point out

81

                              Pierce

1

2     what counsel have previously agreed to, and that

3     is that the date on this document down at the

4     bottom is not an accurate date.

5            A     Okay.

6            Q     It's something that presumably

7     was automatically populated the date it was

8     printed.

9                  So it bears no relation to the

10    actual document.

11           A     Okay.

12           Q     Do you recognize this document?

13           A     (Perusing document.)  Yes, I've

14    seen the dashboard before, yes.

15           Q     Can you tell me what the

16    dashboard is?

17           A     Just simply communicated what was

18    the status or what was, you know, just generic

19    information about a specific PHA partner and the

20    pursuit for the groups that we were responsible

21    for.

22           Q     So is it fair to say that this

23    dashboard represents a snapshot at a certain

24    point in time during the rebid process; is that

25    fair to say?

82

1                        Pierce

2          A       Yes.

3          Q       And as of whatever point in time

4    that was, does this dashboard reflect the

5    allocation of the responsibility for pursuing

6    certain jurisdictions allocated as between the

7    four, actually the five directors?

8          A       Yes.

9          Q       Now, if you look under your

10   section here on the dashboard, you see that

11   Oklahoma is listed under your area of the

12   dashboard?

13         A       No.

14         Q       Under Erica Owens, do you see

15   that?

16         A       Yes, I do see that.

17         Q       So my question is, does that

18   refresh your recollection that at some point in

19   time you had responsibility for Oklahoma in the

20   rebid pursuit?

21         A       No, it does not call me to

22   recollect it.

23         Q       Regardless of whether you recall

24   it today, do you have any reason to believe that

25   this dashboard is inaccurate in terms of the

83

1                          Pierce

2    allocation of that state to you at some point in

3    the rebid process?

4          A     I have no reason to believe that

5    it's not accurate.

6          Q     So you --

7          A     I just don't recall it.

8          Q     Now, you listed four states that

9    you were responsible for the bids on under a

10   49/51 scenario.

11         A     Uh-hum.

12         Q     That's Pennsylvania, Connecticut,

13   Louisiana and Texas, right?

14         A     Yes, that's correct.

15         Q     Did you have discussions with the

16   PHA partner, the bidding partner, on any of

17   those four state bids about the possibility of

18   transferring back some FTEs in the 51 percent to

19   CGI at some point after the bid of the contract

20   was awarded?

21         A     I don't recall that.  I don't

22   recall any conversation about transferring back.

23         Q     I just want to make sure I

24   understand.

25               Sitting here today, can you

84

1                           Pierce

2     categorically state that you never had such a

3     conversation or is it your testimony that you

4     just don't recall it taking place?

5                      MR. KLEIN:  You mean about

6                 transferring back?

7          Q     Yes, on transferring back the

8     51 percent.

9          A     I'd say I didn't have any

10    conversation on transferring back.

11         Q     So your testimony today is that

12    you can state categorically that you never had

13    such a conversation?

14         A     Yes, that's my testimony today.

15         Q     With any of those state PHA

16    partners?

17         A     As I'm reflecting on the

18    conversation regarding the 49/51 percent split,

19    it meant more money for them, so they all were

20    pretty excited.

21                 So I don't recall a conversation

22    of considering transferring people back, so

23    that's not something that I remember.

24         Q     49/51 bidding provided more money

25    to the PHA partner than the original bidding

85

1                         Pierce

2      procedure that was being discussed, correct?

3            A      Yes.

4            Q      And correspondingly less money to

5      CGI, correct?

6            A      True.

7            Q      CGI made less money in a 49/51

8      scenario than they did in an original bidding

9      scenario with the PHA where CGI was going to do

10     most or all of the work?

11           A      Yes.

12           Q      So was there ever a discussion at

13     any point in time amongst anyone in the rat pack

14     about whether or not it could be possible to

15     move some of the 51 percent FTEs over to CGI

16     after a contract was awarded?

17                        MR. KLEIN:  Object to the

18                  form.

19           A      No, I -- if there was

20     conversation had, I wasn't there.

21                  I don't recall that conversation.

22                  It was, you know, deliver for the

23     client what the clients needed and win a

24     contract.

25           Q      Let me ask you to differentiate.

86

                              Pierce

1

2          A      Okay.

3          Q      Is it your testimony sitting here

4    today categorically that you never were present

5    for any such conversation, or is it your

6    testimony today that you do not recall being

7    present for any such conversation?

8          A      To the best of my memory, I would

9    say I was not present for such conversation.

10                So that's my testimony.

11                It's not registering.

12                So I would say, no, I wasn't

13   present for that conversation.

14         Q      It's your testimony today

15   categorically that you were never present for

16   such a conversation?

17         A      It's my testimony that I was not

18   involved or I don't -- I definitely don't recall

19   it, but if you rested on me today, no, I wasn't

20   there for that conversation.

21                     MR. MAIR:  I don't have

22                any further questions.

23                     (Whereupon, at 12:41 p.m.,

24                the deposition was concluded.)

25

87

1                            Pierce

2                    _____
                     LESLIE PIERCE
3

4     Subscribed and sworn to

5     before me

6     this ▮▮ day of ▮▮, 2013.

7     _____
                  NOTARY PUBLIC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

88

INDEX   PAGE

| Witness | Examination By | Page |
|---|---|---|
| Leslie Pierce | Mr. Mair | 4 |

EXHIBITS

| Plaintiff's Exhibits | Description | Page |
|---|---|---|
| 41 | A memorandum of understanding between CGI and Affordable Housing Innovators, Inc. | 73 |

MCM REPORTING SERVICE
(516) 775-5209

89

1

2

3                    C E R T I F I C A T E

4    STATE OF NEW YORK  )

5                       ) ss.

6    COUNTY OF NEW YORK )

7                I, MARGARET M. HARRIS, a Shorthand

8           (Stenotype) Reporter and Notary Public of

9           the State of New York, do hereby certify

10          that the foregoing Deposition, of the

11          witness, LESLIE PIERCE, taken at the time

12          and place aforesaid, is a true and correct

13          transcription of my shorthand notes.

14               I further certify that I am neither

15          counsel for nor related to any party to

16          said action, nor in any wise interested in

17          the result or outcome thereof.

18               IN WITNESS WHEREOF, I have hereunto

19          set my hand this 29th day of July, 2013.

20

21          _____

22          MARGARET M. HARRIS

23

24

25

                      MCM REPORTING SERVICE
                        (516) 775-5209