# Exhibit 6

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -x

BENJAMIN ASHMORE,

        Plaintiff,

        -against-        11 Civ 8611
                          (JMF)
CGI GROUP, INC. AND CGI FEDERAL
INC.,

        Defendants.

- - - - - - - - - - - - - - - - - - - - -x

        DEPOSITION of SHAWN STEEN, taken by

Plaintiff, pursuant to Notice, held at the

offices of Kaiser, Saurborn & Mair, P.C., 111

Broadway, New York, New York, on Thursday, July

25, 2013, commencing at 1:38 p.m., before

Margaret M. Harris, a Shorthand (Stenotype)

Reporter and Notary Public within and for the

State of New York.

2

A P P E A R A N C E S:

      KAISER, SAURBORN & MAIR, P.C.
          Attorneys for Plaintiff
          111 Broadway
          New York, New York  10006

      BY:  DAVID N. MAIR, ESQ.


      BOND SCHOENECK & KING
          Attorneys for Defendants
          111 Washington Avenue
          Albany, New York  12210-2211

      BY:  STUART KLEIN, ESQ.


P R E S E N T:

    Marybeth Carragher

    Benjamin Ashmore

3

1

2                    IT IS HEREBY STIPULATED AND

3          AGREED that the filing and sealing of

4          the within deposition be, and the same

5          are hereby waived;

6                     IT IS FURTHER STIPULATED AND

7          AGREED that all objections, except as

8          to the form of the question, be and

9          the same are hereby reserved to the

10         time of the trial;

11                    IT IS FURTHER STIPULATED AND

12         AGREED that the within deposition may

13         be sworn to before any Notary Public

14         with the same force and effect as if

15         sworn to before a Judge of this Court;

16                    IT IS FURTHER STIPULATED that

17         the transcript is to be certified by

18         the reporter.

19

20

21

22

23

24

25

4

1

2     S H A W N     S T E E N, called as a witness,

3            having been first duly sworn/affirmed by

4            Margaret M. Harris, a Notary Public within

5            and for the State of New York, was examined

6            and testified as follows:

7     EXAMINATION

8     BY MR. MAIR:

9            Q     Good afternoon, Mr. Stein.  My

10    name is David Mair.  I represent Benjamin

11    Ashmore in this lawsuit against CGI.

12                I'm going to be taking your

13    deposition this afternoon, which is essentially

14    going to involve me asking you a series of

15    questions which you're then going to answer.

16           A     Okay.

17           Q     A couple of rules for the

18    deposition.  If at any point in time you don't

19    hear my question properly or you don't

20    understand it, I'd like you to let me know and

21    I'll either repeat it or rephrase it as

22    appropriate.

23                In order to make sure we get an

24    accurate transcript, we need to try to let one

25    another finish.  So I'll try to let you finish

5

                    Steen

1

2      your answer before I ask my next question and

3      even if you anticipate my question halfway

4      through, if you can just wait until the end of

5      it so we can get it down on the record before

6      you answer, that would be helpful.

7                        So if you can try to verbalize

8      all of your answers instead of nodding or

9      shaking your head or gesturing, then that again

10     is going to help us get an accurate transcript

11     here.

12                        What is your full name?

13           A       Shawn Donal Steen.

14           Q       And by whom are you currently

15     employed?

16           A       CGI Federal.

17           Q       How long have you been employed

18     by CGI?

19           A       It will be 13 years in August.

20           Q       So you joined in 2000?

21           A       August of 2000, correct.

22           Q       And am I correct that at that

23     point you joined a predecessor corporate entity

24     of CGI?

25           A       Correct.  It was Orion

6

Steen

1                        Steen

2    Consulting.

3            Q       And Orion then become something

4    else which then became CGI?

5            A       Correct.  It was IMR Global

6    acquired Orion, and CGI acquired IMR Global.

7            Q       But you have been continuously

8    employed by one of those entities since August

9    of 2000?

10           A       Yes.

11           Q       And what is your current title?

12           A       Director of consulting.

13           Q       I'm going to come back to CGI in

14   a minute, but I want to start off with some

15   background questions.

16                   Can you give me an overview of

17   your formal education?

18           A       Yes.

19                   I have an undergraduate degree

20   from The Ohio State University.

21           Q       What was the degree in?

22           A       Sociology, with a minor in

23   criminal justice.

24           Q       And what year did you get that

25   degree?

7

                              Steen

1

2          A       '94, 1994.

3          Q       Any other post high school formal

4   education?

5          A       No.

6          Q       Did you have any significant work

7   experience before graduating from Ohio State?

8          A       I had worked for Huntington Banks

9   while I was going through school.

10         Q       That was a job while you were

11  attending Ohio State?

12         A       While I was in school, correct.

13         Q       After graduating, what was your

14  first job?

15         A       I went to Huntington Banks.

16         Q       In 1994?

17         A       Yes.

18         Q       What was your job there?

19         A       I was an investment assistant.

20         Q       How long did you work for

21  Huntington Bank?

22         A       About three years, that's an

23  estimate, but it was around three years.

24         Q       So approximately '94 to '97?

25         A       Correct.

8

1                    Steen

2         Q      Did you have any other positions

3    while you were there?

4         A      No.  While I was, when I was full

5    time, it was as an investment assistant.

6         Q      Briefly, what were your duties?

7         A      I supported the institutional

8    sales team.  So it was the Huntington Capital

9    Corp.

10              Then I basically helped all the

11   back, processing of the trades, doing research

12   for any kind of customer inquiries on their

13   commercial trade accounts.

14        Q      In '97, after you left

15   Huntington, where did you go to work?

16        A      I opened a health club in

17   conjunction with some family members and

18   investors.

19        Q      Where was the health club?

20        A      Columbus, Ohio.

21        Q      And what was the name of the

22   club?

23        A      Body Life Fitness.

24        Q      Body Life Fitness?

25        A      Uh-hum.  Yes.

9

1                       Steen

2           Q       And now you said you opened that

3     in '97?

4           A       Correct.

5           Q       How long did you continue

6     operating that?

7           A       We had the business about three

8     and a half years.

9           Q       So '97 to sometime in 2000?

10          A       Yes, it was June of 2000.

11          Q       And did you sell it?

12          A       No, we liquidated.

13          Q       During the time you had the

14    health club, what was your role?

15          A       General manager.

16          Q       You had an ownership interest as

17    well?

18          A       Correct, yes.

19          Q       And your next job after that was

20    CGI?

21          A       Orion.

22          Q       Orion?

23          A       Yes.

24          Q       CGI's corporate predecessor?

25          A       Correct.

10

1                          Steen

2          Q      What were the circumstances of

3    you being hired by CGI?

4          A      They were starting the Ohio PBCA

5    operation, had won the contract for the Ohio

6    PBCA.

7          Q      And you were hired to come in and

8    play some role in that?

9          A      Correct, as a consultant.

10         Q      So your first job title was

11   consultant?

12         A      The functional title was central

13   contract specialist.

14         Q      That was your corporate title?

15         A      Yes.

16         Q      And did you have any other

17   titles?

18                    MR. KLEIN:  At the time of

19              hire?

20                    MR. MAIR:  Yes.

21         Q      So, in other words, you said that

22   was your, I think you described it as your

23   functional title.

24                    Was there another title that you

25   had as well?

MCM REPORTING SERVICE
(516) 775-5209

11

1                    Steen

2          A     At that time, I don't think, it

3    was just that one title.

4          Q     Did that title change at some

5    point in time?

6          A     I was promoted.

7          Q     To?

8          A     Quality assurance specialist.

9          Q     When was that promotion?

10         A     That was probably between a year

11   and a year and a half after hire.

12               I don't know the exact date.

13         Q     Sometime in 2001 or 2002?

14         A     Correct.

15               I don't know the exact date.

16         Q     And were you promoted again after

17   that?

18         A     I was.

19               I transferred to the Tampa,

20   Florida office in 2005.  With that transfer, I

21   was promoted to a managerial position, a

22   regional manager position.

23         Q     So your title then was regional

24   manager?

25         A     Correct.

12

1                          Steen

2              Q       And what was your next promotion?

3              A       Next promotion was to state

4      manager.

5              Q       When was that?

6              A       As I said, I don't know the exact

7      date, 2008.  I don't know the exact month.

8              Q       Sometime in 2008?

9              A       Sometime in 2008.

10             Q       Were you promoted again after

11     that?

12             A       Well, I was promoted to director,

13     to the director of consulting.

14             Q       When was that?

15             A       I'm trying to remember.

16                     I don't remember, 2009 or 2010.

17                     I maintained my duties as state

18     manager, but I had the director title, as well.

19             Q       In relation to the period that

20     Benjamin Ashmore worked for the company, can you

21     tell me whether you had been promoted to

22     director as of the time he began working there?

23             A       What was -- like what dates were

24     those?

25             Q       I'm just seeing if that refreshes

13

                              Steen

1

2    your recollection as to the dates.

3         A     I guess I don't know the time

4    frame that Ben worked, I don't know exactly his

5    starting and end date.

6         Q     He was there from 2009 to 2010.

7         A     Okay.

8         Q     Does that help you pin down any

9    more precisely when you were promoted to

10   director?

11        A     No.

12        Q     So, in other words, you don't

13   remember sitting here today when Ben Ashmore was

14   there whether you were a manager as opposed to

15   director?

16        A     No, I don't remember the specific

17   dates.

18        Q     When in relation to the PBCA

19   rebid process did you become director?

20        A     As I said, I don't remember the

21   exact date when I became a director.

22              Part of that was I still

23   supervised the Florida team, as I had before the

24   promotion, so it wasn't a huge change in

25   additional job responsibilities.

14

1                           Steen

2                 I was still doing a lot of the

3      work I had done before.

4           Q     So, in other words, you can't

5      remember with reference to if the promotion was

6      before the rebid process started versus it was

7      around the time that the initial bids were

8      submitted.

9                 Is there anything about the rebid

10     process that you can use to try to pin down when

11     you became director?

12          A     I mean, I believe I was director

13     in the rebid process, but I don't know exactly

14     what date, because the rebid was kind of an

15     extended process with HUD.

16                So I'm not sure at what point

17     those overlapped.

18          Q     So let me go back now and I just

19     want to run through from the beginning what your

20     duties were and how they changed at CGI between

21     2000 to today.

22          A     Okay.

23          Q     You were first hired as a central

24     contract specialist, you said?

25          A     Correct.

15

1                        Steen

2          Q       To whom did you report then?

3          A       A woman named Tony Donner.

4          Q       What were your duties?

5          A       I managed a portfolio of about 50

6     properties.

7          Q       When you say you managed these

8     properties, was that within the PBCA work that

9     was being done by the company?

10         A       Correct, yes.

11         Q       Did your duties change before you

12    became a quality assurance specialist?

13         A       No.

14         Q       When you became a quality

15    assurance specialist, did your duties change at

16    that point?

17         A       Yes.

18         Q       And how did they change?

19         A       As a quality assurance

20    specialist, I had responsibility to do quality

21    assurance reviews of work being processed by the

22    other contract specialists.

23         Q       Again, PBCA?

24         A       Correct.

25         Q       And what was your geographic or

16

```
1                       Steen

2      other area of responsibility?

3           A      My primary areas were two parts

4      of the PBCA program.

5                 There was the central portion and

6      then a local portion, the local portion being

7      where we go out and visit properties.

8                 So for the local portion I had

9      Cincinnati and Dayton as my areas of

10     responsibility.

11                That involved just visiting staff

12     and joining them in the field in those two areas

13     and I also did reviews of the central contract

14     work in Columbus and Cleveland.

15          Q      Was that the central call center?

16          A      It included the call center

17     review, as well, yes.

18          Q      While you were quality assurance

19     specialist, did you have any other duties beyond

20     your PBCA duties?

21          A      No.

22                When I was quality assurance

23     specialist, I focused on reviewing, doing

24     quality assurance reviews of the PBCA work.

25          Q      Your next promotion was to
```

17

1                         Steen

2     regional manager for Tampa, Florida; is that

3     right?

4              A      I was regional manager based in

5     Tampa.  I supervised the Miami and southern

6     Florida area.  That was my region.

7              Q      The region was Miami and southern

8     Florida?

9              A      Correct.

10             Q      And was that related to PBCA

11    work?

12             A      Yes.

13             Q      Did it include anything else?

14             A      No.  As a regional manager, it

15    was strictly focused on PBCA work.

16             Q      During the time you were a

17    regional manager, was 100 percent of your time

18    spent on PBCA work?

19             A      Yes.

20             Q      Can you describe generally what

21    your duties were as regional manager?

22             A      Sure.

23                    My duties basically were to

24    ensure that we met all of our, the PBCA

25    contracts, they are all based on timely,

18

                          Steen

 1

 2     accurate completion of the work we're assigned.

 3              So I had to oversee a team of

 4     central and local staff.  I just had to make

 5     sure that all the work was completed timely and

 6     accurately.

 7          Q     Did you have overall operational

 8     responsibility for the PBCA work within your

 9     region?

10          A     Correct.  Yes.  I was responsible

11     to make sure within my region everything was

12     completed on time and accurate.

13          Q     In the quality assurance

14     specialist role, to whom did you report?

15          A     Suzanne Cochran.

16          Q     The entire period?

17          A     Yes.

18          Q     And when you were promoted to

19     regional manager, who did you report to in that

20     role?

21          A     To Michael Kramer.

22          Q     What was Mr. Kramer's position?

23          A     He was the state manager at that

24     time.

25          Q     And do you know if his title was

19

1                           Steen

2      director?

3            A      I don't think it was, but I don't

4      know that for certain.

5            Q      In 2008 you were promoted to the

6      state manager position; is that correct?

7            A      Correct.

8            Q      And that was the position that

9      Mr. Kramer had occupied before?

10           A      Yes.

11           Q      And at the time you were

12     appointed to state manager, I believe that you

13     testified you were not yet a director; is that

14     right?

15           A      Correct.

16           Q      What was your corporate title

17     when you were state manager?

18           A      Manager was my CGI title.

19           Q      And was that your CGI title when

20     you were regional manager, as well?

21           A      Yes.

22           Q      To whom did you report when you

23     became state manager?

24           A      Marybeth Carragher.

25           Q      That was the first time you

20

1                          Steen

2      reported to her directly?

3              A       Yes.

4              Q       And up until that time that you

5      became state manager, had 100 percent of your

6      work with CGI been on the PBCA?

7              A       I'm just thinking.

8                      Yes.

9              Q       Tell me what your

10     responsibilities were upon becoming state

11     manager.

12             A       As the state manager I was

13     responsible for all the day-to-day operations of

14     the Florida PBCA staff, so the regional managers

15     and we also have local managers that report to

16     the state manager.

17             Q       How many regional managers

18     reported in to you?

19             A       At that time three were regional

20     managers that supervised the central contract

21     staff and there were three local managers that

22     supervised the local staff.

23                     So there was a total of six

24     managers who reported to the state manager, to

25     me.

21

1                          Steen

2          Q        Have you remained the state

3     manager for the State of Florida since 2008 up

4     until today?

5          A        No.  That title changed.  Someone

6     was promoted from within the team.  It would

7     have been last summer, July of last year.

8                   So they promoted somebody

9     internally to fulfill the state manager's role.

10         Q        Who was that?

11         A        Cedric Hernandez.

12         Q        That was in July 2012?

13         A        Summer of 2012, I'm pretty sure

14    it was July was the official date, but the

15    summer of last year.

16         Q        So from 2008 until that point in

17    2012 you had the state manager role?

18         A        Correct.

19         Q        And your corporate title changed

20    at some point from manager to director?

21         A        Correct.

22         Q        At some point during that period?

23         A        Yes.

24         Q        So let's take that period up

25    until July of 2012.

22

1                        Steen

2                        Did you at any point have duties

3      beyond PBCA?

4              A       I started having business

5      development responsibilities.

6              Q       Were those business development

7      responsibilities beyond PBCA work or did they

8      relate solely to PBCA work?

9              A       Primarily PBCA work, expanding

10     our role within, you know, acquiring new PBCA

11     contracts when the rebid happened.

12             Q       So you played a role in the CGI

13     efforts to win more work in the PBCA rebid?

14             A       Yes.

15             Q       And you continued as state

16     manager during that period, as well?

17             A       Yes.

18             Q       Operationally running the

19     existing Florida PBCA work?

20             A       Correct.

21             Q       Did there come a point in time at

22     any point when your duties expanded beyond PBCA

23     work either in terms of business development or

24     new opportunities or operationally or in terms

25     of projects that were being performed?

23

```
 1                    Steen
 2              MR. KLEIN:  Object to the
 3         form.
 4              You can answer.
 5    Q      You can answer the question.
 6              MR. KLEIN:  You can
 7         answer.
 8              THE WITNESS:  Can you
 9         repeat that one more time?
10              Sorry.
11              (Whereupon, the record was
12         read back by the reporter.)
13    A      The duties did include primarily
14    PBCA pursuit, but included looking for
15    opportunities with HUD.
16              So I wasn't restricted to just
17    PBCA work.
18              Part of my role was to look for
19    opportunities with HUD, PBCA and non-PBCA.
20    Q      Okay.
21              Did you have any duties beyond
22    HUD?
23    A      No.  My focus was primarily HUD.
24    Q      Have you overseen or worked on
25    any projects for HUD other than PBCA work?
```

24

1                             Steen

2            A       No, not with HUD.

3            Q       Have you been involved in the

4    pursuit of any HUD work in addition to PBCA

5    work?

6            A       I don't think so, no.

7            Q       So am I correct that as of today

8    all of your work at CGI has entailed either your

9    operational role on the existing Florida PBCA

10   work or the pursuit of additional PBCA work

11   through the rebid process?

12           A       Correct.

13                           MR. KLEIN:  Objection.

14                           Short of what he talked

15                   about earlier?

16           Q       I'm trying to find out and I

17   guess I'll make it clear, I'm talking about

18   after you moved to Florida.

19                   So since you moved to Florida

20   with CGI, has all of your work been either

21   operationally overseeing Florida for a portion

22   of the Florida work in the PBCA field or

23   pursuing additional PBCA work?

24           A       I guess recently, and I'm still

25   currently involved with a project in Long Island

25

1                          Steen

2      working with the disaster recovery effort.

3              Q      And that's the only thing outside

4      of PBCA that you've either been involved in

5      pursuing or in operationally?

6              A      Correct.

7              Q      And that's the disaster recovery

8      relating to the Sandy recovery effort?

9              A      Yes.

10                    And just I guess to have this on

11     the record, we also, with the same client, the

12     Tampa Housing Authority, we have the PBCA

13     contract for the U.S. Virgin Islands.

14             Q      At what point in time did CGI and

15     the Tampa Housing Authority obtain the PBCA

16     contract for the Virgin Islands?

17             A      The contract started October 1st

18     of 2012.

19             Q      And how is it that CGI won that

20     business?

21             A      That was part of the 2011

22     invitation for bids.

23             Q      Was that an invitation just for

24     the Virgin Islands?

25             A      No.  It was for all 53 contracts

26

                        Steen

1

2      available.

3              Q       So as part of the rebid process?

4              A       Correct.

5              Q       And that was pursued together

6      with the Tampa -- well, what was the entity that

7      that was pursued with?

8              A       The North Tampa Housing

9      Development Corporation, which is an entity of

10     the Tampa Housing Authority.

11             Q       And the North Tampa Housing

12     Development Corporation, is that also the prime

13     contractor on the Florida work that CGI is

14     working on?

15             A       Yes.

16             Q       Do you use an acronym for that?

17             A       NTHDC.

18             Q       So let's use that acronym.

19                     Have you ever held the position

20     of state manager with the North Tampa Housing

21     Development Corporation?

22             A       State manager is the title I use,

23     yes.

24             Q       And you have a title of a

25     position with the North Tampa Housing

27

                              Steen

1

2    Development Corporation?

3         A     Not necessarily.  I'm not

4    employed by NTHDC, no.

5         Q     Does NTHDC hold you out as being

6    the state manager for NTHDC?

7         A     State manager of the contract,

8    yes, I guess that would be accurate.

9         Q     Well, I'm going to show you a

10   printout from the website for the winter 2011

11   quarterly review that the NTHDC has posted on

12   its website that lists you as "State Manager,

13   NTHDC."

14              And I don't have any copies of

15   the exhibit.

16              MR. MAIR:  Let's mark this

17              first and I'll show this to you.

18              (A one-page document was

19              marked as Plaintiff's Exhibit 42

20              for identification, as of this

21              date.)

22   BY MR. MAIR:

23        Q     I'm showing you Exhibit 42

24   (handing).

25              Do you recognize that as being a

28

                              Steen

1

2    printout from the NTHDC website?

3          A     Yes.

4          Q     And you are listed as the state

5    manager of NTHDC, is that fair to say?

6          A     Yes.

7          Q     So my question is, does NTHDC,

8    regardless of whether you are actually their

9    employee, hold you out as being the state

10   manager?

11                    MR. KLEIN:  And just for

12                    clarification, David, you

13                    referenced the winter 2011

14                    quarterly review, which is when I

15                    think this excerpt is from.

16                         Are you talking about then

17                    or now or both?

18         Q     Let's break it down.

19               The first question is, as of

20   winter of 2011, did NTHDC hold you out as being

21   its state manager for Florida?

22         A     I guess when you say hold me out,

23   promote me as the state manager or --

24         Q     Yes.  Did it list you as being

25   its state manager for Florida?

                    MCM REPORTING SERVICE
                       (516) 775-5209

29

                              Steen

1

2          A       Yes.

3          Q       And did it, we see that you were

4     listed on website.

5                  Was that just an anomaly or was

6     that typical of what they would list you as in

7     informational materials or other materials that

8     they gave out to people?

9                       MR. KLEIN:  Object to the

10                      form.

11                      You can answer.

12         A       That would be typical, yes.

13         Q       And beyond written materials,

14    were you represented to be the state manager by

15    NTHDC in discussions with HUD?

16         A       Yes.

17         Q       Now, that was true, we see, as of

18    the winter of 2011?

19         A       Uh-hum.

20         Q       Was that true as of the time you

21    became state manager for Florida with CGI?

22         A       Yes.

23         Q       So from 2008 until you ceased

24    being state manager in July of 2012, is it fair

25    to say that NTHDC continuously held you out

30

                              Steen

1

2      during that period of time to be state manager

3      for the State of Florida?

4              A       Yes, that would be accurate.

5              Q       Let me turn now to the PBCA rebid

6      process.

7              A       Okay.

8              Q       As of the beginning of that

9      process, do you have an approximate recollection

10     of the total number of units under management

11     that CGI had in all of its PBCA work?

12             A       Could you ask me that again?

13             Q       Let's see if we can actually help

14     you out here.

15                     Let's take a look at what was

16     previously marked as Exhibit 27 (handing).

17                          MR. MAIR:  For the record,

18                     Exhibit 27 is an e-mail string

19                     from January 14th to January 15th

20                     of 2010.

21             Q       I'm going to ask you to turn to

22     the second to last page of the document.

23             A       (Perusing document.)

24             Q       And that's the e-mail at the

25     bottom of the page from Ms. Carragher to Richard

31

                            Steen

1

2     Schmitz and has the date January 14, 2010.

3                  Do you see that?

4          A     I do.

5          Q     Can you just read that e-mail to

6     yourself?

7          A     (Perusing document.)

8          Q     Now I understand you were not a

9     recipient of that e-mail.  I assume you haven't

10    seen it before?

11         A     No, I have not seen it.

12         Q     In the e-mail Ms. Carragher is

13    discussing what she characterizes as some

14    disturbing news.

15                 Do you see that?

16         A     Yes.

17         Q     And she talks about HUD

18    presenting at an NCSHA conference in which they

19    said that they planned on limiting bids to a

20    combined 300,000 unit cap.

21                 Do you see that?

22         A     I do.

23         Q     In the next paragraph she says,

24    "We have 267,000 units right now and we are

25    planning to bid on over 800,000 units."

32

```
 1                        Steen

 2                 Do you see that?

 3        A       I do.

 4        Q       As of that point in the rebid, as

 5   of January 2010, is it your recollection that

 6   CGI had approximately 267,000 units in its

 7   existing PBCA contracts?

 8        A       That sounds like an accurate

 9   figure, yes.

10        Q       And you were one of the senior

11   members of Ms. Carragher's team that had

12   responsibility for trying to win additional PBCA

13   work in the rebid; is that fair to say?

14        A       Yes.

15        Q       Was that senior team with

16   Ms. Carragher known internally as the rat pack?

17        A       Yes.

18        Q       And you were a member of the rat

19   pack?

20        A       Yes.

21        Q       Mr. Ashmore was a member of the

22   rat pack?

23        A       Yes.

24        Q       Ms. Carragher's other senior

25   direct reports were also members, correct?
```

33

1                          Steen

2              A       Correct.

3              Q       And am I correct that during the

4      course of the rebid the rat pack had numerous

5      meetings, conference calls, discussions as part

6      of its pursuit of additional PBCA work in the

7      rebid?

8              A       Yes.

9              Q       And looking back at

10     Ms. Carragher's e-mail, is it your recollection

11     that the internal goal at CGI in the rebid was

12     to bid on more than 800,000 units?

13             A       Yes, that sounds accurate.

14             Q       And by that you mean bidding on

15     jurisdictions, states and other jurisdictions

16     within the country that had a combined number of

17     units that exceeded 800,000, correct?

18             A       Correct.

19             Q       Now, at some point in the rebid

20     process, HUD announced that it was considering

21     imposing a unit cap on the total number of units

22     that any one contractor or subcontractor could

23     bid upon; is that correct?

24             A       Yes.

25             Q       And having seen Ms. Carragher's

34

1                        Steen

2    e-mail from January of 2010, does that refresh

3    your recollection that HUD first announced that

4    it was considering a unit cap in January of

5    2010?

6                    I think I may have said '11, but

7    the e-mail is January 2010.

8                    Is that your recollection as to

9    when HUD announced that it was considering this

10   unit cap?

11        A     Yes.

12        Q     And when HUD had first announced

13   that it was considering the unit cap, it gave

14   the number of 300,000 units as being the

15   proposed cap; is that correct?

16        A     Reference in the e-mail, yes.

17        Q     At some point later on HUD

18   increased that number to 400,000, correct?

19        A     I don't recall 400,000, but I

20   know the number was fluid.  It changed and was

21   modified by HUD multiple times during different

22   conferences and comments by HUD staff.

23        Q     After HUD had announced in

24   January 2010 that it was considering imposing

25   the unit cap, did the rat pack in its various

35

1                        Steen

2      conference calls and strategy sessions start

3      talking about what CGI could do to try to

4      dissuade HUD from implementing a unit cap in the

5      final bidding process?

6              A      Yes.

7              Q      And did the rat pack also start

8      having discussions about what bidding strategies

9      CGI could potentially use in the event that HUD

10     did include a unit cap in the final bidding?

11                     MR. KLEIN:  Object to the

12                     form.

13             A      We discussed how we would

14     approach the bid if there was a unit cap.

15             Q      So that the strategy of the rat

16     pack was to talk about ways to try to avoid a

17     unit cap being put in place, but at the same

18     time discuss ways in which CGI could handle the

19     bidding if a unit cap did eventually go into

20     place; is that fair to say?

21             A      I would rephrase it that the rat

22     pack's goal was to pursue new business.

23                     So we looked at ways that we

24     could persue new business in light of the

25     potential HUD parameters as part of their

36

                                Steen

1

2    invitation.

3         Q      But as part of that pursuit of

4    new business, is it fair to say that the rat

5    pack discussed ways to try to avoid HUD imposing

6    a unit cap, but at the same time discussed

7    strategies that could be used if, in fact, HUD

8    did impose a unit cap on the final bidding?

9                   MR. KLEIN:  Object to the

10                  form.

11        A      I would say we discussed ways to

12   accommodate, certainly we talked about finding

13   out why HUD had the cap and questioning HUD on

14   the logic, I guess, or the rationale behind it.

15                  But then on the rat pack side the

16   goal was if there was no unit cap, we would

17   approach it this way, if there was a unit cap,

18   we would have to find other ways to approach the

19   bid.

20        Q      Let me show you what was marked

21   earlier as Exhibit 13 (handing).

22                  MR. MAIR:  For the record,

23                  this is a document Bates stamped

24                  CGI 7233 confidential.  It's an

25                  e-mail exchange between

37

1                        Steen

2                 Mr. Kiprianou and Ms. Carragher

3                 on January 29, 2010.

4          Q     Can you read this document to

5     yourself?

6          A     (Perusing document.) I've read

7     this.

8          Q     I see that you were not cc'd on

9     this, but have you ever seen this before?

10         A     No.

11         Q     Turning to the second page of the

12    document, it's the e-mail from Mr. Kiprianou in

13    the paragraph that he numbered three.

14               And there he says, quote, "I

15    don't know whether this is possible or

16    allowable, but can we create new entities for

17    selected jurisdictions that are a joined venture

18    of a PHA and CGI subsidiary.  If this holds,

19    then we can get away with the unit restrictions

20    as these entities will be somehow independent

21    from CGI," close quote.

22               Do you see that?

23         A     Uh-hum.  Yes.

24         Q     During the rebid process, at any

25    point in time was there a discussion amongst rat

38

1                            Steen

2      pack members about the possibility of setting up

3      one or more outside company that could be used

4      to bid for work in the rebid process in order to

5      get around a single unit cap for CGI?

6                       MR. KLEIN:  Object to the

7                  form.

8           A      I don't remember those

9      discussions, no.

10          Q      You don't remember that ever

11     being discussed at any point in time during the

12     rebid process?

13          A      Setting up separate outside

14     entities?  No.

15          Q      Was there ever a discussion of

16     setting up any new corporate entities, whether

17     they were outside entities or subsidiaries of

18     CGI or affiliates of CGI, for the purposes of

19     getting around a unit cap?

20          A      Jokingly there was a discussion

21     or joke about a Honey Baked Ham division, yes.

22          Q      Tell me about that conversation.

23          A      One of my colleague, Les Pierce,

24     owns Honey Baked Ham franchises.

25                       So in a joking discussion someone

39

1                        Steen

2      proposed opening up a Honey Baked Ham division

3      to pursue the business.

4              Q       That was obviously in jest?

5              A       Correct, that was obviously a

6      joke.

7              Q       Before the Honey Baked Ham joke

8      was stated by somebody, was there any other

9      discussion leading up to that about the

10     possibility of setting up new corporate entities

11     to bid as part of the rebid process if a unit

12     cap was put in place?

13             A       No, I don't remember that being

14     part of the discussion, setting up new entities.

15             Q       So it's your testimony today that

16     the sole discussion at any point in time about

17     creating new corporate entities to bid in the

18     rebid process as a potential strategy, the sole

19     reference to that was in the context of the

20     Honey Baked Ham joke?

21             A       That's my recollection, yes.

22             Q       And that from the very first

23     moment the concept was uttered, it was uttered

24     as a joke with reference to Honey Baked Ham?

25                     MR. KLEIN:  Object to

40

                              Steen

1

2                   form.

3          A       That's the only occurrence that I

4    remember.

5          Q       Was there ever any discussion at

6    any point in time about having a company set up

7    to be headed by one or more of Ms. Carragher's

8    existing direct reports that could bid on some

9    of the PBCA rebid work in conjunction with a PHA

10   partner during the rebid process?

11         A       Separate from the Honey Baked Ham

12   joke?

13         Q       Yes.

14                 Other than what you have said was

15   a reference to Honey Baked Ham that was brought

16   up from the very beginning in jest and was only

17   ever something that was joked about, other than

18   that, was there ever a discussion of a company

19   being set up and headed by a director from CGI

20   in the rebid process?

21         A       No discussions that I was part

22   of, no.

23         Q       Now let me make sure I understand

24   your testimony.

25                 Is it your testimony that you can

41

                              Steen

1

2    definitively state here today that no such

3    conversation was ever had in your presence, or

4    is it your testimony that you do not recall such

5    a conversation sitting here today?

6         A    I would say there's no discussion

7    that happened in my presence.

8         Q    So your testimony is

9    categorically it never happened in your

10   presence?

11        A    I feel confident that, yes, there

12   was no discussion that happened in my presence

13   discussing that.

14        Q    Now, with reference to the Honey

15   Baked Ham joke, who raised that?

16        A    I don't remember.

17        Q    Well, you said Mr. Pierce was the

18   one who owned the Honey Baked Ham franchise.

19             Was he the one who raised this

20   joke?

21        A    I don't remember.

22             He was --

23        Q    Is -- I'm sorry, finish your

24   answer.

25        A    I was going to say, he was often

42

                    Steen

1

2      kidded about Honey Baked Ham, so this wasn't an

3      isolated incident of kind of joking with him

4      about his Honey Baked Ham franchise.

5              Q       So he was present when this joke

6      was made?

7              A       Yes.

8              Q       He was, if you like, he was the

9      butt of the joke?

10             A       Correct, that's safe to say.

11             Q       And how long was the discussion

12     surrounding this Honey Baked Ham joke?

13             A       I guess I don't remember exact

14     time frame.

15                     I think it was just a small part

16     of a meeting.

17                     As I said, the jokes were not,

18     you know, we would joke with him on different

19     occasions about his Honey Baked Ham activity or

20     ownership.

21             Q       On how many occasions did

22     somebody joke about having a Honey Baked Ham

23     entity bid in the PBCA rebid?  Was that on a

24     single occasion or was it joked about multiple

25     times?

43

1                          Steen

2          A       I don't recall.  It may have

3    happened more than once, as I said, just in a

4    joking fashion.

5          Q       Are you able to tell me

6    definitively whether it was only once or more

7    than once?

8          A       I'm not able to tell you

9    definitively, no.

10         Q       And you recall it being raised on

11   one occasion at least?

12         A       Correct, at least once.

13         Q       And when it was raised, was the

14   joke made, people laughed, and then the meeting

15   moved on?

16         A       Correct.

17         Q       And so the sole discussion of the

18   this joke was 60 seconds or less?

19         A       I mean, I don't recall an exact

20   time frame.

21                 It may have lasted a little

22   longer between input and jokes from other

23   people, but, I mean, it was a small part of a

24   long meeting.

25         Q       Two or three minutes at most?

44

1                          Steen

2          A       Yeah, maybe a few minutes.

3          Q       And sitting here today you can

4    only definitively recall it on one occasion; is

5    that correct?

6          A       Correct, definitely, yes.

7          Q       Now, was there ever a discussion

8    in your presence amongst any rat pack members

9    about the concept of using existing, multiple

10   existing CGI corporate entities in order to get

11   around a single unit cap if one were imposed in

12   the bidding?

13                         THE WITNESS:  Can you

14                 repeat that question?

15                         (Whereupon, the record was

16                 read back by the reporter.)

17                         MR. KLEIN:  Object to the

18                 form.

19                         Shawn, you can answer it.

20         A       No.  There were no discussions to

21   use CGI entities to get around the unit cap.

22                 I do remember discussions about

23   using CGI entities that had existing

24   relationships with potential clients, clients

25   being housing authorities that we were looking

45

1                          Steen

2     to partner with.

3          Q     Can you tell me what you mean by

4     that?

5          A     CGI corporate obviously had a

6     large presence with certain, in certain states

7     or with certain clients that we were looking to

8     partner with on the PBCA program.

9               So I remember discussions of, you

10    know, if we would use those CGI entities and

11    staff since we already had an existing

12    relationship.

13         Q     Which CGI entities are you

14    talking about?

15               Can you tell me specifically?

16                    THE WITNESS:  I'm not

17               sure.

18                    MR. KLEIN:  Well --

19         A     I believe it was CGI Technology

20    and Solutions or CGI Corporate.  I guess I'm not

21    sure what the corporate entity name was.

22         Q     So let me see if I understand

23    your testimony.

24               Was there any discussion at any

25    point in time about whether or not CGI could use

46

1                          Steen

2      more than one of its existing corporate entities

3      in the rebid, and thereby avoid being subject to

4      a single unit cap collectively for all of CGI if

5      HUD decided to impose the unit cap?

6              A      No, my understanding of the

7      conversations that I was part of, the intent of

8      the discussion was not to avoid the unit cap, it

9      was rather to use existing CGI relationships to

10     find partners.

11                    That was the crux of why we were

12     looking at using some of our existing CGI

13     corporate entities.

14             Q      So it was never discussed even as

15     a potential idea of how to be able to bid on

16     units above the unit cap?

17             A      No, not in any conversations I

18     was part of.

19             Q      Just to summarize and see if I

20     understand it correctly then, is it your

21     testimony sitting here today that other than a

22     two or three-minute discussion solely in jest

23     about using Honey Baked Ham in the bidding,

24     which everybody understood from the moment it

25     was mentioned to be a joke, other than that,

47

1                        Steen

2      there was never a discussion at any point in

3      time amongst any rat pack members in your

4      presence about the possibility of using more

5      than one corporate entity, whether an existing

6      corporate entity or a new entity, whether a

7      subsidiary of CGI or a separate company, in

8      order to be able to bid in the PBCA rebid for

9      units in excess of a unit cap, if one were to be

10     imposed?

11                     MR. KLEIN:  Object to the

12               form.

13                     You can answer.

14          A     Actually, that was a very long

15     statement.  Can you repeat that before I answer

16     it?

17                     (Whereupon, the record was

18               read back by the reporter.)

19          A     Yes, that's an accurate summation

20     of my deposition or statement or whatever.

21          Q     That is your testimony sitting

22     here today?

23          A     Yes.  That's a good summary of my

24     testimony.

25          Q     Let's take a look at what was

48

1                    Steen

2     previously marked as Exhibit 14, stamped CGI

3     5043 confidential.  It's a May 17, 2010 e-mail

4     together with a PowerPoint attachment entitled

5     "Senior Management Committee Progress Update"

6     (handing.)

7                    Can you take a look at this

8     document and tell me whether you have ever seen

9     it before?

10               A      (Perusing document.)

11                    I don't recall having seen it,

12     but it's a PowerPoint.

13               Q      Regardless of whether you have

14     seen this specific PowerPoint, have you seen

15     PowerPoint presentations that were put together

16     to update senior management on the progress of

17     the rebid?

18               A      Yes.

19               Q      So it's fair to say you have seen

20     this type of presentation before, you just don't

21     recall seeing this specific one?

22               A      I don't recall if I've seen this

23     specific one, but, yes, I'm familiar with some

24     of the slides and the information.

25               Q      So you don't recall whether it

49

                              Steen

1

2      was this specific one, but you have seen this

3      type?

4              A      Yes.

5              Q      If you can turn to page -- well,

6      before you do that, what is your understanding

7      as to what this presentation is, this type of

8      presentation?

9              A      This was, my understanding is it

10     was a briefing provided to the senior CGI

11     executive staff on the pursuit, you know, where

12     we were in the process.

13             Q      Were you ever present for any of

14     those briefings?

15             A      I don't recall.  It's possible.

16     I don't know how often they happened, but it's

17     possible that I may have at least been invited

18     to attend, but I never presented to the senior

19     staff, no.

20             Q      And you don't recall whether or

21     not you were ever in attendance?

22             A      Correct.

23                    I may have been, but I don't

24     recall for certain if I ever was invited to

25     actually participate in one of the senior

50

1                           Steen

2     management briefings.

3          Q      Take a look in the PowerPoint

4     presentation at page No. 5.

5          A      (Perusing document.)

6          Q      Now, the first bullet point lays

7     out a strategy that CGI was considering using at

8     that point in time in the event HUD imposed a

9     unit cap in the final bidding documents,

10    correct?

11         A      Correct.

12         Q      And the strategy that was being

13    discussed was a strategy where CGI could bid on

14    a certain number of states together with its

15    partners that cumulatively fell within the unit

16    cap, right?

17         A      Correct.

18         Q      And then CGI could also bid on a

19    number of other states under a 49/51 percent

20    bidding relationship with the prime contractor,

21    correct?

22         A      Correct.

23         Q      And the 49/51 bidding

24    relationship referred to an allocation of who

25    employed the full-time equivalent or FTE

51

1                          Steen

2    employees, correct?

3          A       Correct, yes.

4          Q       And the 49/51 bidding scenario

5    was a scenario in which the bid was submitted on

6    the basis that the prime PHA partner would

7    employ at least 51 percent of the FTEs for the

8    operational tasks under the ACC contract,

9    correct?

10         A       Yes, correct.

11         Q       And that the bid that was being

12   submitted would represent that CGI would employ

13   49 percent or fewer of the FTEs?

14         A       Correct.

15         Q       And that was something that was

16   discussed regularly on rat pack conference

17   calls?

18         A       Yes.

19         Q       And it's fair to say that it was

20   a strategy that was discussed before the unit

21   cap was finalized by HUD as being a strategy

22   that could be used if HUD did decide to proceed

23   with the unit cap?

24         A       Yes.  This provided a way to

25   pursue the PBCA contracts if there was a unit

52

                              Steen

1

2    cap.

3          Q      It was a way to pursue PBCA work

4    in states that added up collectively to more

5    than the unit cap, correct?

6          A      Correct.

7          Q      Now, if you look at the second

8    part of this page, there's a table which

9    discusses the options for who CGI could partner

10   with as the 51-percent partner.

11                Do you see that?

12         A      Yes.

13         Q      And the two options discussed

14   here are either a PHA or a private-sector

15   partner, right?

16         A      Yes.

17         Q      And the pros that are listed, one

18   of the pros listed for a PHA partner being a

19   51-percent partner is, quote, "Willing to

20   transfer 51 percent to CGI after first year,"

21   close quote.

22                Do you see that?

23         A      I do see that.

24         Q      During any rat pack conference

25   calls or discussions that you participated in,

53

1                            Steen

2       was there a discussion about the possibility of

3       submitting a bid under a 49/51 bidding scenario,

4       but having the PHA transfer back or transfer

5       some of the FTE employees to CGI at some point

6       after the contract was awarded?

7              A      I don't remember that being

8       specifically discussed, but we did discuss how

9       HUD would monitor, if they would only monitor at

10      the initial bid stage or if there would be an

11      annual reporting or some kind of annual

12      monitoring by HUD.

13             Q      So you recall discussions between

14      rat pack members as to what, if anything, HUD

15      would do after the contract was awarded on an

16      ongoing basis to monitor who employed the

17      employees performing the work?

18             A      Correct.

19             Q      For contracts that were awarded

20      on a 49/51 percent bidding basis?

21             A      For any contracts, I guess, how

22      they would determine somebody didn't exceed that

23      cap or if those relationships changed between

24      contractor and subcontractor, how HUD was going

25      to monitor that on an ongoing basis.

54

1                        Steen

2          Q       Relative to the unit cap if one

3     were imposed?

4          A       I mean, not specifically.  I

5     guess it was just general discussion of how is

6     HUD going to watch this, you know, as entities

7     change or if a contractor decides to switch

8     subcontractors, I guess, what method or way

9     would HUD monitor that on an ongoing basis.

10         Q       Well, was there a discussion at

11    some point during the rat pack conference calls

12    about what would happen if CGI or any other

13    subcontractor were to acquire another company

14    that had its own contracts under the PBCA where

15    after the merger collectively the new entity

16    would have contracts in excess of the unit cap,

17    was there a discussion along those lines?

18         A       I don't remember discussion about

19    acquisition.

20                 I do remember some discussions

21    were about if you had a PBCA that failed to

22    perform.

23                 So if they failed to perform, HUD

24    would obviously need to find another PBCA, but

25    how would they handle that, you know, would they

55

1                          Steen

2    allow someone to bid on that work if they're

3    already above the cap or at the cap level.

4                    So it was kind of a broad

5    discussion because there were a lot of

6    components that HUD would have to consider that

7    were ongoing, because it is a fluid situation

8    that a contractor may not perform or may not

9    want to do the work and turn the work back if

10   they for whatever reason couldn't fulfill the

11   work.

12        Q     Let me go back to what you said

13   was discussed relative to the 49/51 FTE split.

14                    Did I understand your testimony

15   correctly that there were discussions amongst

16   rat pack members about what HUD would do after

17   contracts were awarded to monitor whether or not

18   a subcontractor was employing 49 percent or

19   fewer of the FTEs?

20                    MR. KLEIN:  Object to the

21              form.

22        A     Yes, that is correct.

23                    There were discussions on how HUD

24   would monitor on an ongoing basis, yes.

25        Q     And did those discussions involve

56

1                          Steen

2      discussions about whether or not HUD would

3      require reporting from the PHAs and their

4      subcontractors?

5            A      The discussion was how would HUD

6      monitor, would it be a reporting function, would

7      it be some kind of audit?

8                   What HUD would do to make sure

9      the caps were followed, if that was their intent

10     ongoing.

11           Q      Or whether HUD would monitor it

12     at all?

13           A      Correct.  The invitation wasn't

14     really clear.  It would only address the point

15     at which you bid on the work.

16                  It never really addressed what

17     would happen after that point.  So it was pretty

18     unclear from HUD.

19                  So a lot of discussions were just

20     trying to parse out what HUD meant or what they

21     intended the cap to do on a functional basis.

22           Q      It's fair to say that when you

23     had these discussions, the final bidding

24     documents hadn't been issued yet; is that

25     correct?

57

                                    Steen

1

2          A       Correct.

3          Q       This is during the process when

4   HUD is considering a unit cap and the rat pack

5   is discussing various options of what bidding

6   strategies could be followed if a unit cap was

7   ultimately imposed?

8          A       Correct, or if there was no unit

9   cap imposed, either scenario was still a

10  possibility.

11         Q       Right.

12                 So these discussions were at the

13  stage where it was unknown as to whether there

14  would ultimately be a unit cap?

15         A       Correct.

16         Q       You already testified based on

17  the Carragher e-mail that in January 2010 HUD

18  announced that it was considering a unit cap,

19  correct?

20         A       Correct.

21         Q       And do you recall when the actual

22  final bidding documents were issued by HUD?

23         A       I believe it was the spring of

24  2011.

25         Q       So it was more than a year after

58

1                    Steen

2      they initially announced that they were

3      considering a unit cap, correct?

4           A      Correct.

5           Q      During that period, is it fair to

6      say that CGI was trying to obtain whatever

7      information it could to assess how likely it was

8      that the unit cap was actually going to be

9      imposed in the final documents?

10          A      I was not directly involved in

11     obtaining that information, but I would assume,

12     yes, that we were trying to find out as much

13     information as we could.

14          Q      Regardless of who obtained the

15     information, that was a topic that was discussed

16     during the rat pack conference calls, correct?

17          A      Correct.

18          Q      In these regular strategy

19     sessions by the team in charge of pursuing this

20     rebid, there was an ongoing discussion trying to

21     evaluate how likely it was that the unit caps

22     were ultimately going to be imposed, correct?

23                    MR. KLEIN:  Object to the

24                    form.

25          A      Correct, I would say that's

59

1                         Steen

2      correct, because the HUD numbers did change.

3      They initially had one percentage or number and

4      then it changed to something else.

5                    I mean, it was a moving target,

6      so it wasn't -- through that period it wasn't

7      clear if there was going to be a cap, and if

8      there was a cap, what that number would be,

9      because it was fluctuating and HUD wasn't real

10     certain how they were going to determine what

11     the final number would be if there was one.

12          Q    It's fair to say that the level

13     of optimism within the rat pack discussions

14     about the likelihood that HUD would decide

15     against the unit cap fluctuated, it went up and

16     down over time, correct?

17          A    I mean, I can't speak for the rat

18     pack.  I guess just for me personally, I mean,

19     it was definitely not known.

20                    I mean, like I said, on one HUD

21     call they would have one number and on another

22     call they would have a different number.  They

23     may be questioned and not have a good response

24     as to why they were even instituting the cap.

25                    So for me, I guess, I don't know

60

1                          Steen

2      about my optimism, but just any assurance that

3      there was going to be a cap or what that number

4      would be fluctuated, because HUD was constantly

5      revising and changing what that number would be

6      if there was one.

7              Q       And you guys were talking about

8      this during these rat pack conference calls,

9      correct?

10             A       Correct.

11             Q       And is it fair to say that

12     collectively that the level of optimism that you

13     were going to avoid any cap and HUD was going to

14     change its mind went up and down during the

15     rebid process?

16             A       I mean, I guess I can't speak for

17     the team or individuals other than me.  I can

18     speak for myself, but I guess I wouldn't want to

19     project and assume that everybody else had the

20     same understanding or the team had the same

21     optimism or pessimism about how it was going to

22     eventually fall out.

23             Q       I don't want you to pretend to

24     look inside their minds, because I don't think

25     any of us can do that.

61

                              Steen

1

2              My question is based on what

3    people were saying.

4              Maybe they were saying something

5    other than what they were thinking.

6              But isn't it fair to say that in

7    the discussions amongst rat pack members, the

8    collective statements indicated that the level

9    of optimism as to whether or not the unit caps

10   could be prevented ultimately went up and down

11   during the course of the rebid process?

12                   MR. KLEIN:  Object to the

13                   form.

14                   You can answer.

15        A     I guess I'm still not comfortable

16   speaking -- I mean, I just -- I don't want to

17   speak for the group.

18              I don't know if there were any

19   comments that were overwhelmingly optimistic or

20   pessimistic.  I think a lot of it was just

21   planning of if this happens, this is what we can

22   do, if this happens this is what we can do.

23              It was more, I guess, kind of

24   preparing ourselves for either option rather

25   than spending too much time, you know, I guess

62

1                          Steen

2    being pessimistic or optimistic one way or the

3    other.

4            Q      Well, you focused on what

5    Ms. Carragher stated during these calls.  She

6    was a participant in these calls?

7            A      Yes.

8            Q      Did she ever indicate at any

9    point in time whether based on the information

10   that she was getting she believed that it was

11   either likely or unlikely that the unit caps

12   were going to be part of the final bidding

13   procedure?

14           A      I don't recall any specific

15   comments one way or the other.

16           Q      She never expressed an opinion

17   one way or the other during all of these rat

18   pack conference calls?

19           A      Not that I recall.

20           Q      Same with every other member of

21   the rat pack, other than you, because you know

22   what you were thinking.

23                  Any other member of the rat pack

24   at any point during all of these rat pack calls,

25   did they ever express on a call or in a meeting

63

                              Steen

1

2       their opinion as to how likely or unlikely they

3       thought it was that there was going to

4       ultimately be a unit cap?

5              A      I don't recall.

6                     I mean, I remember discussions of

7       just trying, I guess, to understand why HUD was

8       implementing the cap and what methodology it

9       would use to come up with the magic number, but

10      I don't remember comments one way or the other

11      how likely it would be to happen or not happen.

12             Q      What states were you responsible

13      for in the PBCA rebid process?

14             A      As far as pursuit states?

15             Q      Yes.

16             A      Florida, which was an existing

17      client, the U.S. Virgin Islands, Mississippi,

18      Alabama, Georgia and Massachusetts.

19             Q      Who was the PHA partner for

20      Florida?

21             A      Our existing client, the Tampa

22      Housing Authority, using their entity the North

23      Tampa Housing Development Corporation.

24             Q      That was the entity that we

25      talked about earlier?

64

1                        Steen

2          A        Correct.

3          Q        NTHDC?

4          A        That is correct, a wholly-owned

5   subsidiary of the Tampa Housing Authority.

6          Q        And that was also the bidding

7   partner for the Virgin Islands?

8          A        Correct.

9          Q        Was it the bidding partner for

10  any other states?

11         A        For everything but Massachusetts.

12                  So geographically it was all the

13  southeastern pursuit states.

14         Q        And you were the primary CGI

15  contact with NTHDC?

16         A        Correct.

17         Q        In negotiating with NTHDC, the

18  relationship for the bidding, who on the NTHDC

19  side did you deal with?

20         A        Don Shea, S-H-E-A.

21         Q        What was his title?

22         A        His title is contract

23  administrator.

24         Q        Where does he fit in the

25  hierarchy of the organization?

65

1                         Steen

2          A      He is, because NTHDC holds the

3     contract, essentially it's their contract and

4     he's the contract administrator, he oversees all

5     of the work that they subcontract to CGI.

6          Q      So he heads the NTHDC?

7          A      He does.

8          Q      Were your negotiations only with

9     him or did you also negotiate with somebody at

10    the Tampa Housing Authority?

11         A      I mean, primarily with him, but

12    it wasn't unusual for him to include Andrew

13    Libby, who is the CFO, his direct supervisor,

14    and he may have had other people at THA involved

15    in reviewing documents, but as far as meetings

16    and conversations, it was typically Don or Don

17    and Andy.

18         Q      Which of those states were bid,

19    if any, under a 49/51 scenario?

20         A      As best as I can recall, we

21    didn't use the 49/51 split with NTHDC.

22         Q      Focusing on Alabama, is it your

23    testimony that sitting here today you think

24    Alabama was not submitted as a 49/51 bid?

25         A      As best as I can remember, yes,

66

                    Steen

1        but I'm not 100 percent certain.

2            Q     And did you have any

3        responsibility for Virginia at any point in

4        time?

5            A     Yes, I did attend at least one

6        meeting, one bid meeting with -- I'm trying to

7        remember the entity it was -- it was group in

8        Richmond.

9                  I'm sorry, I'm blanking out on

10       which entity.

11           Q     Let's take a look at what was

12       previously marked as Exhibit 22 (handing).

13           A     Okay.  (Perusing document.)

14           Q     Just ignore the date at the

15       bottom of the document in the middle, which is,

16       it has been agreed, is the date it was printed

17       and not the date that bears any relationship to

18       the document itself.

19           A     Okay.

20           Q     Have you ever seen this or a

21       similar document?

22           A     Yes.

23           Q     Can you tell me what it is?

24           A     I think this is basically a

67

1                        Steen

2    dashboard or spreadsheet of who are the primary

3    leads on pursuing business and the value of that

4    business.

5           Q      And this essentially breaks down,

6    one of the things it does is to break down the

7    various states and other jurisdictions in the

8    rebids between Ms. Carragher's directors who

9    were responsible for them?

10          A      Correct.

11          Q      And so let's look at your section

12   of the dashboard.

13                 NTHDC is the first column there,

14   right?

15          A      Yes.

16          Q      And that indicates that there

17   were four states that were being bid on

18   collectively between CGI and NTHDC, right?

19          A      Correct.  Based on this dashboard

20   at this time.

21          Q      Right.

22                 Now, that was going to be my next

23   question.

24                 Were all of those states

25   ultimately bid on?

68

1                        Steen

2          A        Yes.

3          Q        With NTHDC?

4          A        Yes.

5          Q        The next column is Massachusetts,

6     right?

7          A        Correct.

8          Q        You said that was being bid on

9     by -- with a different partner?

10          A        Yes.

11          Q        Who was that partner?

12          A        The Cambridge Housing Authority.

13          Q        I see Mr. Ashmore's name is

14     listed there.

15                   Was he working on that with you?

16          A        He assisted.  The structure was

17     you had a primary lead, the director was the

18     lead, and then normally we had an account

19     support or an L-2 person.

20                   The dashboard shows the director

21     who is the lead for the pursuit and then each

22     lead is given a support person, which was

23     referred to as an L-2.

24                   The director was the L-1 or Level

25     1 person.

69

                              Steen

1

2          Q        And was Mr. Ashmore the L-2 on

3    that for Massachusetts at that point in time?

4          A        Yeah, based on this, yes.

5                   I know he was my L-2, so I'm just

6    assuming this is correct and it was for

7    Massachusetts.

8          Q        You recall him being your L-2 for

9    something, is that your recollection?

10         A        Yes.

11         Q        You just don't remember which

12   state?

13         A        Correct.

14         Q        Now, was Massachusetts submitted

15   as a 49/51 bid?

16         A        I believe that one was, that we

17   had discussed with them doing the 49/51 split.

18         Q        Do you recall definitively one

19   way or the other?

20         A        Not definitely, but I believe it

21   was a split state.

22         Q        Did you personally have

23   discussions with anyone at the Cambridge Housing

24   Authority as to how the 49/51 employee split was

25   going to work?

70

Steen

1

2          A        Yes, I believe it was discussed.

3          Q        My question is, did you discuss

4     it with them?

5          A        I believe I did.

6          Q        You don't have a definitive

7     recollection?

8          A        I'm not 100 percent certain, but

9     I believe that I did, yes.

10         Q        Tell me about the discussions.

11                  What did you say and what this

12    they say?

13         A        I think the discussion was

14    approached if they would be interested in

15    pursuing the work, if they had to have

16    51 percent of the staff, would that be something

17    they would still want to pursue.

18                  And then obviously if they were

19    interested how that would be, you know, who

20    would have which staff, what task their staff

21    would do versus our staff.

22         Q        So the first part of that, did

23    you have a conversation in which they said,

24    "Yes, we'd be interested in pursuing a 49/51

25    bid"?

71

1                          Steen

2          A      We did pursue with them, so I'm

3   certain they must have been comfortable with it.

4          Q      You're answering a different

5   question.

6          A      Okay.

7          Q      I understand that your

8   recollection is you submit you pursued a 49/51

9   bid.

10          Do you have any recollection

11   sitting here today about having any specific

12   conversations with the Cambridge Housing

13   Authority in which they agreed that they wanted

14   to submit a 49/51 bid?

15          A      I'm not sure I was involved in

16   the discussion where they agreed, but I was

17   involved in discussions where we talked about

18   the format, structure, how the staff would be

19   assigned.

20          Q      And you recall those discussions?

21          A      Correct.

22          I just don't know if I had the

23   initial discussion, if that was with me that we

24   initially proposed the idea to them.

25          Q      Were you the primary contract

72

                    Steen

1

2    with the Cambridge Housing Authority?

3           A     I was.

4           Q     If you weren't the one who

5    discussed it with them, who would have been?

6           A     Marybeth Carragher was involved

7    in at least one or two of the initial meetings

8    with the client, along with me and Dennis Ryan.

9           Q     Now, is it your testimony that

10   you recall having specific discussions with

11   someone at the Cambridge Housing Authority about

12   how the specific employee tasks would be

13   allocated under a 49/51 structure?

14          A     Correct.

15          Q     Who would employ the employees

16   doing what tasks?

17          A     Yes.

18          Q     And did you reach agreement with

19   the Cambridge Housing Authority on how that

20   would work?

21          A     I believe we did, yes.

22          Q     When you say you believe that you

23   did, do you have a definitive recollection

24   sitting here today?

25          A     Of the structure or that they

73

                              Steen

1

2      agreed to the structure?

3           Q       That they agreed to a structure

4      for a 49/51 employee allocation?

5           A       Yes, I would definitively say

6      they agreed to the 49/51 structure.

7           Q       You were the one who had that

8      discussion with them?

9                   And, again, I'm now talking about

10     the specifics as to how these staff were going

11     to be allocated.

12          A       I guess I'm not certain that I

13     had the final discussion.

14                  I know I was involved in multiple

15     discussions, it was an ongoing, you know, we

16     would speak regularly on how to structure the

17     pursuit, obviously bid pricing and percentages.

18                  If I was the one that had that

19     final meeting with them where they signed on the

20     dotted line, I don't remember.

21          Q       Tell me, what you do remember

22     about the discussions as to who would employ

23     what staff in a 49/51 bidding structure?

24          A       Sure.

25                  And I think a lot of the

74

1                           Steen

2      structures were going to delineate between the

3      local specialist, which had to be located in

4      that state, so they would travel to the

5      properties, so they physically needed to be in

6      that state, having that assigned to one group

7      and have the central task assigned to another

8      group, which is a clean way to divide the

9      operational tasks.

10            Q      So who was going to employ the

11     local staff?

12            A      My recollection of that would

13     have been the Cambridge Housing Authority or the

14     PHA partner.

15            Q      And you recall specifically

16     having that discussion with somebody at the

17     Cambridge Housing Authority?

18            A      The meeting was three years ago,

19     but --

20                   MR. KLEIN:  If you recall,

21            you recall.

22            A      I don't recall definitively, but

23     I would assume we had a meeting where that was

24     discussed and decided who would allocate which

25     staff.

75

1                          Steen

2                   And I know that that was one of

3      the models we were looking at, was dividing

4      local and central tasks.

5           Q     So am I correct that sitting here

6      today while you assume you must have had such a

7      discussion with somebody at the Cambridge

8      Housing Authority, you don't remember any

9      specific discussions sitting here today?

10          A     I don't remember the date or

11     specific conversation where each point was

12     discussed, no.

13          Q     Well, I'm asking you generally,

14     do you remember on the phone or in person having

15     a conversation with one or more people at the

16     Cambridge Housing Authority where it was

17     discussed, "Okay, you guys, you'll employ the

18     local people, we'll employ some central people.

19     Here's how the tasks will be allocated between

20     them.  Here's the nuts and bolts about how 49/51

21     will work"?

22          A     I mean, I remember general

23     conversations, but I guess I couldn't draw you a

24     map and say this is what we decided with them,

25     that we were going to do it exactly this way.

76

1                          Steen

2               I mean, that was the general

3      model that we had proposed.

4               I don't know if that's the final

5      exact model that Cambridge agreed to.

6          Q      And are you not able to tell me

7      that because, A, you were not the one who had

8      that final discussion with them where the final

9      agreement was reached, or, B, you just don't

10     remember sitting here today what the nuts and

11     bolts of that final agreement were, but it was a

12     conversation that you personally had?

13                        THE WITNESS:  Could you

14                   repeat that again?

15                        (Whereupon, the record was

16                   read back by the reporter.)

17         A      I don't remember having the final

18     conversation.

19         Q      Do you know who did have that

20     final conversation?

21         A      I don't.

22         Q      Do you know if any document

23     exists in which that final allocation that was

24     agreed to by the Cambridge Housing Authority is

25     reflected, that is the final agreement as to who

77

1                           Steen

2      would employ which specific staff in a 49/51

3      arrangement?

4           A      I mean, if it was finalized there

5      should be a document, yes.

6           Q      Have you ever seen that document?

7           A      I'm sure I did, but I couldn't

8      recreate it for you without seeing the document

9      again.

10          Q      I'm not asking you to recreate

11     it.

12                 I'm asking you sitting here today

13     do you definitively recall that you have seen

14     such a document, even if you don't remember the

15     details of how it was allocated?

16          A      I can't definitively recall now.

17          Q      As part of the rebid process, did

18     you play any role in gathering pricing

19     information about what the cost of any local

20     office space would be that would be required at

21     each of these jurisdictions?

22          A      Yes.

23          Q      Describe what your role was in

24     that.

25          A      I visited -- CGI engaged, I

78

                    Steen

1

2      forget which, an outside firm, and I don't

3      recall which firm it was, to help us locate

4      office space, but I did some of the physical

5      site visits to look at the office space to see

6      if it would be adequate for what we needed,

7      where it was located within the different

8      regions.

9              Q      How did you determine how much,

10     how big an office would be needed?

11             A      Based on the number of staff that

12     we were using for our projections.

13             Q      Were the office needs based on

14     the number of staff that CGI was going to

15     employ?

16             A      I believe we looked at combined

17     space with the client staff.

18             Q      That's your recollection sitting

19     here today?

20             A      That's my recollection, yes.

21             Q      So you were looking for a single

22     office that would be big enough to house staff

23     employed both by CGI and by the PHA partner?

24             A      Correct.

25             Q      In each jurisdiction?

79

1                          Steen

2          A      As far as I recall for my

3     jurisdictions, that's my recollection.

4          Q      Well, let's take Massachusetts.

5                 The Cambridge Housing Authority

6     had offices in Massachusetts, correct?

7          A      They have, yes, they have an

8     office, the housing authority has an office.

9          Q      They're based in Cambridge,

10    Massachusetts?

11         A      Correct.

12         Q      CGI didn't have an office in

13    Cambridge, Massachusetts?

14         A      No.

15         Q      So in the rebid process, one of

16    your tasks was to go out and figure out what

17    were the costs going to be of office space that

18    CGI would need to get if they were successful in

19    a bid, correct?

20         A      Correct.

21         Q      Is it your testimony that the

22    office space that you were pricing out was

23    office space that was designed to be able to

24    accommodate both the CGI staff and Cambridge

25    Housing Authority staff who were going to work

80

1                               Steen

2      on the PBCA contract if it was awarded to them?

3            A       That is my recollection, yes.

4            Q       And is that true from day one,

5      even before the concept of 49/51 bidding was put

6      in place?

7            A       Prior to 49/51, it would have

8      been all CGI staff.

9            Q       Right, and then at some point you

10     reached a deal, an agreement with Cambridge to

11     bid 49/51, correct?

12           A       Correct.

13           Q       So at that point in time the CGI

14     employees that were going to be working on that

15     project were almost cut in half, correct?

16           A       Correct.

17           Q       And correspondingly the Cambridge

18     Housing Authority employees were substantially

19     increased, correct?

20           A       Correct.

21           Q       Is it your testimony that the

22     agreement you had with the Cambridge Housing

23     Authority was that their 51 percent employees

24     were all going to be based in the office space

25     that CGI was going to locate and lease?

81

1                          Steen

2          A       That was my recollection, that we

3     would house the staff together.

4          Q       And was that a discussion that

5     you personally had with the Cambridge Housing

6     Authority?

7          A       I remember visiting office space

8     with my contact at the Cambridge Housing

9     Authority, with the understanding that we were

10    looking for office space for the entire team.

11         Q       And who is that that you looked

12    with?

13         A       Greg Russ.  He's the executive

14    director of Cambridge Housing Authority.

15         Q       If you look back at the

16    dashboard, you also have Virginia listed as one

17    of your states.

18                 Do you see that?

19         A       (Perusing document.)  I do see

20    that.

21         Q       Does that refresh your

22    recollection that at a certain point in time

23    Virginia was allocated to you?

24         A       It does refresh my memory, yes,

25    it was at one time, but then it was shifted to,

82

                    Steen

1

2    I believe Tony Gorris.  I'm not 100 percent

3    certain, but it was shifted to someone else.

4           Q       Then if you look at the last

5    column, South Carolina is allocated to you in

6    this dashboard.

7                   Do you see that?

8           A       I do.

9           Q       Did that remain one of your

10   states throughout the rebid process?

11          A       It did.

12          Q       And who was the partner in that?

13          A       The Columbia Housing Authority.

14          Q       So that's one you didn't recall

15   before when you listed the states for me?

16          A       Correct.  I left that off

17   inadvertently.

18          Q       And then North Carolina is also

19   listed as one of your states, correct?

20          A       Correct.

21          Q       Did that remain your state?

22          A       We eventually made that a no bid.

23          Q       Up until the point that you

24   decided not to bid on it, did that remain your

25   state?

83

1                          Steen

2          A      It did.

3          Q      Was South Carolina bid under a

4    49/51 split?

5          A      I don't recall with South

6    Carolina what the structure was.

7          Q      Let me show you what we

8    previously marked as Exhibit 6.

9                          MR. MAIR:  Just for the

10                         record, this is a CGI document

11                         entitled, "Subcontractor

12                         Certification For Chicago Housing

13                         Consulting Services, Inc."

14         Q      And I'm going to represent to you

15   that this was produced by CGI as part of the

16   bidding documents for a bid that was submitted

17   together with the Chicago Housing Consulting

18   Services, Inc. partner.

19         A      Okay.

20         Q      And it contains a list of states

21   that CGI certified that it was bidding within

22   the unit cap as a 100 percent or greater than

23   49 percent subcontractor.

24                Looking at that list, does that

25   refresh your recollection as to any states

84

1                              Steen

2      within your portfolio that were bid under 49/51

3      in addition to Massachusetts?

4              A       I mean, it does refresh my

5      memory, yes.

6              Q       So then having refreshed your

7      memory with this document, can you tell me, in

8      addition to Massachusetts, which we just talked

9      about, what other states within your portfolio

10     were ultimately bid under a 49/51 bidding

11     scenario?

12             A       Well, based on this, it would

13     have been everything other than Florida or the

14     Virgin Islands.

15             Q       And therefore can you just list

16     the states that were bid under 49/51 in

17     partnership with NTHDC?

18             A       Okay.

19                     Georgia -- NTHDC?

20             Q       Yes.

21             A       Georgia, Alabama and Mississippi.

22             Q       And having seen that document

23     now, it refreshes your recollection that those

24     three states were bid 49/51?

25             A       Based on this document, I will

85

1                         Steen

2     assume that's true, yes.

3          Q     So it doesn't trigger an

4     independent memory of that?  You're just going

5     by what the document says?

6          A     Correct.  I don't remember

7     conversations with NTHDC about this split.

8          Q     Well, that was going to be my

9     next question.

10                Sitting here today, do you recall

11    ever having any discussions with anyone at NTHDC

12    or at the Tampa Housing Authority about bidding

13    a 49/51 split?

14         A     Yeah.  I don't recall any

15    conversations.

16         Q     Do you have any knowledge of

17    anyone else at CGI having those conversations

18    with one of those two entities?

19         A     I do not have any knowledge, no.

20         Q     Now, South Carolina was a state

21    that you partnered with the Columbia Housing

22    Authority on --

23         A     Correct.

24         Q     And that was 49/51?

25         A     Based on this document, yes.

86

1                          Steen

2          Q       Do you recall having any

3    discussions with the Columbia Housing Authority

4    about a 49/51 split?

5          A       I don't.

6          Q       Who was your primary contact

7    there?

8          A       Gilbert Walker.  He's the

9    executive director of the housing authority.

10                          THE WITNESS:  Can we take

11                   a quick break?

12                          MR. MAIR:  We're very

13                   close to being done, but by all

14                   means, take a break.

15                          (Whereupon, at 3:12 p.m., a

16                   recess was taken.)

17                          (Whereupon, at 3:17 p.m.,

18                   the deposition resumed with all

19                   parties present.)

20                          MR. MAIR:  Back on the

21                   record.

22   BY MR. MAIR:

23          Q       Let me go back for a second to

24   your testimony about the office space that you

25   were looking for in Massachusetts.

87

1                    Steen

2                    Was that in Cambridge?

3          A      No.  I think it was in Quincy.

4     It was somewhere -- an outlying area, maybe 15

5     or 20 miles of Cambridge, Boston.

6          Q      In the greater Boston area?

7          A      Correct.

8          Q      And were you going to look at

9     that office space before or after the decision

10    to bid on a 49/51 split with Cambridge?

11         A      I can't remember if it was before

12    or after.

13                It was an existing CGI office

14    that had additional space available.

15         Q      CGI had an office in Quincy?

16         A      They did, yes.  I believe it was

17    Quincy.  I'm not 100 percent sure it was Quincy.

18                I know it was a suburb of Boston.

19         Q      So the office space that you were

20    looking at was a portion of an existing CGI

21    office?

22         A      Correct.

23         Q      Was that the only office space

24    that you looked at in Massachusetts?

25         A      I'm trying to remember.  I

88

1                           Steen

2    believe I did look at additional other office

3    space.  I don't think that was the only space

4    that I looked at.

5            Q      When you looked at the other

6    space, was someone from the Cambridge Housing

7    Authority with you, as well?

8            A      He was not.  I know there was one

9    office that I looked at alone.

10           Q      And you don't remember if that

11   was when CGI was still intending on providing

12   100 percent or almost 100 percent of the

13   operational staff?

14           A      I don't remember the time frames

15   of when I looked at what office space and what

16   was occurring with the split scenario.

17           Q      Did you ever go back and revisit

18   the amount of office space that was required at

19   any point in time for the Massachusetts bid?

20           A      I don't believe so.  I believe

21   the staffing numbers did not change.  Who they

22   were being allocated to might have changed, but

23   the total staffing numbers and the spacing needs

24   would have been the same.

25           Q      Was CGI intending on using any of

89

1                           Steen

2      its central staff for the Massachusetts PBCA

3      work if it were successful?

4            A      I mean, that was -- my

5      recollection is that most of the models that I

6      believe I had looked at were the local staff

7      would be PHA staff and then the central task

8      would be, the functional would fall to the CGI

9      staff.

10           Q      So that your recollection is that

11     all or virtually all of the CGI staff were going

12     to be centralized staff?

13           A      Focused on, I guess when you say

14     "centralized staff," what do you mean by

15     "centralized staff"?

16           Q      I mean, for instance, working out

17     of the Columbus call center.

18           A      Oh, no.

19                  I guess when I was referring to

20     central staff, I was talking about the central

21     tasks that are part of what we call the central

22     tasks that are part of the PBCA contract.

23           Q      So you were talking about staff

24     that would be physically located in

25     Massachusetts, when you were talking about

90

                              Steen

1

2   centralized staff?

3          A      Right.  The staff doing

4   centralized, the central duties would still be

5   located in Massachusetts, for the most part,

6   yes.

7          Q      Some staff that are required for

8   PBCA work spend most of their time out in the

9   field reviewing and inspecting things on site;

10  is that fair to say?

11         A      Yes.

12         Q      And other staff work solely or

13  primarily out of an office somewhere, correct?

14         A      Correct.

15         Q      Let me take Florida, which is

16  obviously the state that you have overseen

17  existing PBCA work in.

18                Can you tell me how the staffing

19  there is handled between staff that are

20  physically located in Florida and staff that are

21  located in some other state, such as the

22  Columbus call center?

23         A      Okay.

24                The majority of the Florida staff

25  is located in Florida.  We have support staff,

91

1                       Steen

2       some IT support, our accounting support staff

3       that are located either into Cleveland or

4       Columbus or elsewhere, but the large majority of

5       our Florida staff is located in Florida.

6              Q      Do you utilize the Columbus call

7       center for the Florida PBCA work?

8              A      We do.

9              Q      So there's staff there that work

10      on the Florida PBCA?

11             A      Correct.  They'll take calls from

12      Florida residents, yes.

13             Q      Of the staff that are physically

14      located in Florida, how many of them work in an

15      office and how many of them work from home

16      visiting sites and only rarely report to the

17      office?

18             A      And I guess I'll clarify, because

19      the contract, in the current state of our

20      contract in Florida, we no longer do management

21      reviews, so that number is much lower than it

22      would have been when we were doing fully,

23      basically doing all components of the contract.

24                    So do you mean now or back then?

25             Q      Yes.  Let's go back to the point

92

1                           Steen

2    in time when you were doing all the components

3    of the operational contract.

4              A      Okay.

5                     I have to count, so give me a

6    second.

7                     So when we were fully staffed, we

8    would have had approximately 30 staff, about 11

9    of those would have been assigned to the local

10   duties, going out visiting properties, doing

11   management reviews.

12             Q      And of the other 29, can you tell

13   me where they were located and what type of

14   duties they performed?

15             A      Most of those, they would have

16   been in Tampa.  We have three quality assurance

17   specialists.  We have a full-time trainer, who

18   would be included in that number.

19                    We had two IT, we had a business

20   operations analyst and also an IT specialist

21   that I would contribute some of their time to

22   the Florida contract.

23                    And then we would have about a

24   mirror staff of the local staff operating on

25   central functions, about 12, between CCSs and

93

                              Steen

1

2    their supervisors.

3         Q     And all 29 of those staff you

4    just talked about were physically in a Florida

5    office somewhere?

6         A     Yes, in Florida.

7               Now, the local staff were

8    somewhere based in offices, some were based from

9    home offices throughout Florida.

10        Q     By "the local staff," you are

11   referring to those 11 that you said went out and

12   visited properties?

13        A     Correct.

14        Q     And some of those worked from

15   home and some were based in the office?

16        A     Correct.

17              We had a small satellite office

18   in Jacksonville, Florida, and a small satellite

19   office in Miami, Florida.

20              MR. KLEIN:  Going back in

21              the record, David, I think you

22              said 29 in addition to 11, so I

23              think that's 40.

24              I think it's 19, just to

25              clarify.

94

1                        Steen

2          A        Thank you.  I didn't pick up on

3     that.

4          Q        So it's 11 local and then 19 were

5     the office staff?

6          A        Correct.

7          Q        And can you approximate for me

8     how many people employed by CGI worked on

9     Florida from out of state?

10          A        I mean, full time or part time?

11          Q        Well, let's take FTEs.

12                   How many full time equivalents?

13          A        I guess the number would vary,

14     but, for example, the call center, they're

15     taking calls from multiple states.

16                   So the call volume may be higher

17     one month than the next month.  So I guess I

18     really don't know how much, like to come up with

19     an FTE number of how many calls they would

20     typically take from Florida versus Ohio or

21     versus California, because they service all of

22     our states but New York.

23          Q        Well, for purposes of how you

24     split the revenues with NTHDC, does CGI come up

25     with a number of FTEs that are assigned to the

95

1                      Steen

2     Florida contract from amongst its out-of-state

3     staff?

4            A      For NTHDC, I mean, it's a fixed

5     fee contract.  So they pay us a fixed fee and

6     our costs within that are probably basically

7     irrelevant to the Tampa Housing Authority.

8            Q      For purposes of bidding in the

9     rebid, was any allocation made of FTEs in the

10    Columbus call center or other out-of-state FTEs

11    that were assigned to any of the states under

12    your jurisdiction?

13           A      Yes.

14           Q      So numbers were allocated for

15    those out-of-state employees in terms of the

16    FTEs that they performed for each one of your

17    jurisdictions, correct?

18           A      Correct.

19           Q      That would be done as part of the

20    rebid process?

21           A      Part of the pricing for the rebid

22    process, yes.

23           Q      And do you recall approximately

24    how many out-of-state FTEs were assigned to

25    Florida?

96

1                          Steen

2          A       I don't recall the specific

3     number.

4                  I mean, there is a number, but,

5     as I sit here today, I can't recall what the

6     specific number of FTEs would have been.

7          Q       What categories of work were

8     those FTEs in?

9          A       Outside of Florida?

10         Q       Yes.

11         A       We would have IT support staff,

12    the call center staff, we have some accounting

13    staff located outside of Florida that support

14    our team, we have a full-time trainer, but I

15    don't know if there's any additional training

16    resources allocated to Florida beyond the

17    full-time FTE that we have within our office.

18                 I think that would be it as far

19    as support staff.

20         Q       In connection with the rebid, did

21    CGI enter into MOUs or memorandums of

22    understanding with each of its PHA bidding

23    partners?

24         A       Yes.

25         Q       And one MOU for each state that

97

1                        Steen

2     it bid upon?

3           A       Correct.

4           Q       Were you responsible for

5     negotiating the MOU with the states within your

6     jurisdiction?

7           A       Yes, in conjunction with

8     Marybeth.

9           Q       And so with the NTHDC, am I

10    correct that you had a memorandum of

11    understanding for each of the states that you

12    bid on together with them?

13          A       Yes.

14          Q       At any point in time, did you

15    renegotiate the MOU after one was first signed?

16          A       For the split or just in general?

17          Q       Well, including the split, I am

18    including that within the renegotiation.

19                  So at some point you signed these

20    MOUs for each of the states.

21                  Does a new MOU ever get signed

22    for any of the states that you're bidding on

23    with NTHDC?

24          A       Yes.  If anything would have

25    changed, any substantive change to the original

98

1                             Steen

2    MOU, we would have had to execute a new MOU.

3              Q      Now, you just said "would have

4    had to."

5              I want to make sure I'm

6    understanding your testimony.

7              Are you saying that you

8    specifically recall that new MOUs were entered

9    into with NTHDC for one or more of the states

10   that were bid upon?

11             A      I don't recall, but if, based on

12   this information that those were bid as split

13   states, then we would have -- if the state had

14   switched to a split state, then, yes, we would

15   have done a revised MOU to account for that.

16             Q      You're saying you would have done

17   because the work allocation would have been

18   wrong from the original MOU if you went to a

19   49/51 split scenario?

20             A      Correct.  As part of our internal

21   corporate procedures, we would have had to

22   execute a new MOU to account for any changes.

23             Q      So you're telling me what the

24   procedure, the required internal CGI procedure

25   was, correct?

99

1                         Steen

2          A       Yes.

3          Q       Now leave that aside.

4                  And now I'm asking you sitting

5     here today, do you recall entering into new MOUs

6     for any of your states with any of your PHA

7     partners after the original MOU was signed?

8          A       I don't specifically recall, no,

9     but I'm confident we would have done that as

10    part of our normal process.

11         Q       I understand that you are sitting

12    here today telling me, "If we had gone from 100

13    percent bidding subcontractor to 49/51

14    subcontractor our internal procedures would have

15    required that we get a new MOU," correct?

16         A       Correct.

17         Q       And, therefore, if that was done

18    with any of your states, you're assuming that a

19    new MOU was entered into?

20         A       Confidently assuming, yes.

21         Q       But sitting here today from

22    memory you don't have a recollection of that

23    happening; is that correct?

24         A       Right.  I don't recall sitting

25    down and signing that document with the client,

100

1                       Steen

2      no.

3            Q      And you don't recall having a

4      discussion with any of the PHA partners in which

5      you said, "Hey, we need to get a new MOU because

6      we have gone from 100 percent subcontractor

7      bidding to 49/51 bidding"?

8            A      I don't remember a specific

9      conversation, no.

10                  And with our -- with our Tampa

11     client, the client sits next to my office and we

12     talk basically daily.

13                  So just because I don't -- I

14     guess -- we have lots of conversations.  So I

15     guess I don't recall if we specifically sat down

16     and talked about the split, but our daily

17     conversations, it would have been very easy just

18     to have that come up as just a normal part of

19     our morning conversation.

20           Q      I think you might be giving me

21     some explanation as to why you might not recall.

22                  And I just want to make sure the

23     record is clear that the question is sitting

24     here today is it fair to say that you don't have

25     a recollection of having any conversation with

101
1                          Steen

2      any of the PHA partners, including Tampa, in

3      which you discussed signing a new MOU to replace

4      the old one after you switched from a 100

5      percent subcontractor bidding to 49/51 bidding;

6      is that fair to say?

7              A      That's fair to say.

8                     I don't recall a specific

9      conversation, but we have daily conversations.

10             Q      In other words, sitting here

11     today you don't recall having that conversation;

12     is that correct?

13             A      Right.  Correct.

14             Q      Now, let me ask the same thing

15     with respect to Massachusetts.

16                    Is it your understanding that CGI

17     corporate procedures would require that the

18     original MOU that was entered into when CGI was

19     going to be a 100 percent contractor should have

20     been replaced by a new MOU when the decision was

21     made to submit a bid with Massachusetts on a

22     49/51 split?

23                    MR. KLEIN:  Object to

24             form.

25                    You can answer.

102

1                          Steen

2          A       Correct.

3          Q       Sitting here today do you have

4    any recollection, a specific recollection of

5    whether or not that was done with respect to the

6    Massachusetts bid?

7          A       I don't have a specific

8    recollection, no.

9          Q       And sitting here today you don't

10   have any recollection of actually having a

11   conversation with somebody at the Cambridge

12   Housing Authority about that; is that fair to

13   say?

14         A       Can you repeat that?

15         Q       Sitting here today you don't have

16   a recollection of actual having a conversation

17   with anybody at the Cambridge Housing Authority

18   about entering into a new MOU?

19         A       No.

20         Q       That is a correct statement?

21         A       That's a correct statement.

22         Q       With respect to South Carolina,

23   do you have any recollection sitting here today

24   of entering into a new MOU with South Carolina

25   after the original one was executed?

103

1                        Steen

2          A      Not a specific recollection, no.

3          Q      And sitting here today do you

4     have a specific recollection of ever having a

5     conversation with anyone at the Columbia Housing

6     Authority about entering into a new MOU with

7     Columbia Housing Authority?

8          A      I don't have a specific

9     recollection, no.

10                     MR. MAIR:  Let's take a

11               two-minute break.

12                     I think she may be done.

13                     (Whereupon, at 3:33 p.m., a

14               recess was taken.)

15                     (Whereupon, at 3:36 p.m.,

16               the deposition resumed with all

17               parties present.)

18                     (Continued on the next page.)

19

20

21

22

23

24

25

104

1                              Steen

2                     MR. MAIR:  Back on the

3              record.

4                     We are done.

5                     (Whereupon, at 3:36 p.m.,

6              the deposition was concluded.)

7

8                     _____

9                       SHAWN STEEN

10   Subscribed and sworn to

11   before me

12   this ▮ day of ▮, 2013.

13   _____

14          NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

105

I N D E X   P A G E

Witness                 Examination By          Page

Shawn Steen             Mr. Mair                 4


                              EXHIBITS

Plaintiff's
Exhibits              Description              Page

   42      A one-page document                  27

106

1

2                     C E R T I F I C A T E

3    STATE OF NEW YORK  )

4                       ) ss.

5    COUNTY OF NEW YORK )

6              I, MARGARET M. HARRIS, a Shorthand

7         (Stenotype) Reporter and Notary Public of

8         the State of New York, do hereby certify

9         that the foregoing Deposition, of the

10        witness, SHAWN STEEN, taken at the time

11        and place aforesaid, is a true and correct

12        transcription of my shorthand notes.

13             I further certify that I am neither

14        counsel for nor related to any party to

15        said action, nor in any wise interested in

16        the result or outcome thereof.

17             IN WITNESS WHEREOF, I have hereunto

18        set my hand this 29th day of July, 2013.

19

20        _____

21             MARGARET M. HARRIS

22

23

24

25