Robert L. Herbst (RLH 8851)
HERBST LAW PLLC
Attorneys for Plaintiff
420 Lexington Avenue
New York, New York
(646) 543-2354
fax (888) 482-4676
*rherbst@herbstlawny.com*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————

BENJAMIN ASHMORE,

                        Plaintiff,                       11-CIV-8611 (AT-JLC)

      v.

CGI GROUP INC. and CGI FEDERAL INC.,

                        Defendants.
———————————————————————


## PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT

Plaintiff Benjamin Ashmore, by his attorneys, Herbst Law PLLC, respectfully submits this response ("P. Resp.") to defendants' Rule 56.1 Statement (¶¶ 1-180).

**I.    BACKGROUND FACTS**

    *A.    CGI's Section 8 Performance Based Contract Administration ("PBCA") Work*

    1.    In 1974, Congress amended the Housing Act of 1937 to create what is known as the Section 8 Housing Program ("Section 8 Program").  See Declaration of Marybeth Carragher ("Carragher Decl."), dated February 12, 2015 at ¶ 3.

    **Admitted.**  But for a more relevant and complete history of the HUD program and federal contracts at issue in this case, we respectfully refer the Court to the March 25,

2014 opinion reported at *CMS et al v United States*, 745 F.3d 1379 (Fed. Cir. 2014). *See Declaration of Robert L. Herbst ("Herbst Decl.") dated March 5, 2015 at Ex. 9, pgs. 4-8, 13.*[1]

> 2.     The Section 8 Program provides federally-subsidized housing to millions of low-income families and individuals through a range of rental assistance programs, which are either tenant or project-based programs.  Id. at ¶ 4.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

> 3.     All Section 8 Programs are implemented through two contracts: the Annual Contributions Contract ("ACC") and the Housing Assistance Payment ("HAP") contract. Id. at ¶ 8.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

> 4.     The ACC is a financial assistance instrument that the U.S. Department of Housing and Urban Development ("HUD") enters into with a public housing agency ("PHA"). Id. at ¶ 9.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

> 5.     In turn, the PHA enters into a HAP contract with project owners, pursuant to which the rental subsidy is paid in exchange for, among other things, the owner's obligation to maintain the subsidized rental units in decent, safe, and sanitary condition and to comply with applicable non-discrimination requirements.  Id.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

---

[1]   At present, this litigation, to which CGI's PHA partners are parties (*see P. Resp. ¶¶ 11-14 below*), remains pending.  *Herbst Decl., Ex. 10.*  (We cite to the declarations submitted on this summary judgment motion by the last name of the declarant).

6.      By law, HUD may only enter into an ACC with a legal entity that qualifies as a PHA.  Id. at ¶ 10.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

7.      In 1997, then-HUD Secretary Andrew Cuomo announced an agency-wide management reform plan called "HUD 2020."  Among the key reforms announced in this plan was a commitment to cut HUD's staff by nearly one-third.  Id. at ¶ 11.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

8.      In March 1998, HUD's Office of Inspector General ("OIG") informed Congress that as part of its reorganization HUD would issue a "Request for Proposals" for outside contractors to administer HUD's portfolio of Section 8 contracts.  Id. at ¶ 12.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

9.      In May 1999 HUD issued a Request for Proposal ("RFP") for "Contract Administrators for Project-Based Section 8 Housing Assistance Payments (HAP) Contracts."  Id. at ¶ 13.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

10.      This nationwide RFP sought proposals to provide contract administration services for most of the project-based Section 8 HAP Contracts that HUD was then administering and further stated that the contract administration duties would be performed pursuant to a performance-based ACC entered into between HUD and a PHA.  Id. at ¶¶ 13-14.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

11.      The PHAs that entered into these "performance-based" ACCs were referred to as a "Performance-Based Contract Administrator" ("PBCA").  Id. at ¶ 14.

**Admitted.**  But *see P. Resp. ¶ 1 above.*

12.     At this time CGI and/or CGI's predecessor companies initially became involved in the PBCA Section 8 Program.  Id. at ¶ 16.

**Admitted.**  But *see P. Resp. ¶ 1 above and P. Resp. ¶ 14 below*.

13.     Once CGI became involved in the PBCA Section 8 Program, it entered into contractual relationships with numerous PHAs where it would agree to be responsible for performing certain core tasks to ensure that the Section 8 Program was being complied with.  Id. at ¶ 17.

**Admitted.**  But *see P. Resp. ¶ 1 above and P. Resp. ¶ 14 below*.

14.     Essentially the PHA would subcontract to CGI the various tasks that the PHA was required to perform pursuant to the ACC that the PHA entered into with HUD.  This subcontracting practice was commonplace in the Section 8 industry.  Id.

**Disputed in part.**  The way CGI subcontracted was not "commonplace" in the industry. At the inception of the PBCA program, CGI's predecessor companies, under Carragher's leadership, created a mechanism to work around the restrictions that required HUD to contract the PBCA program only to PHAs by finding PHA partners willing to bid together with CGI, and to subcontract nearly all PBCA duties – upwards of "90-95%" – to CGI in exchange for sharing in the profits.  *Klein Decl. Ex. 13 (Carragher Tr. 6, 20-25); Klein Decl. Ex. 11 (Ashmore Tr. 245); Ashmore Decl ¶¶ 4-5, 49, 51-53.*   Most PHAs performed most or all of the PBCA tasks in-house.  *Herbst Decl. Ex. 1 (Gorris Tr. 31-32); Herbst Decl. Ex. 12 ( P. Ex. 16, D. Bates 5033, reflecting CGI's "Incumbent Competitors").*  In the 25 additional jurisdictions CGI was planning to seek in 2010 (besides CGI's PHAs in five jurisdictions already under administration), there were only five other jurisdictions in which the PHA had private subcontractors in 2010.  *Id.*  Those

five were relatively small jurisdictions in terms of number of units administered, and

there were only two other significant private subcontractors in those five small

jurisdictions.  *Id.*  Only one other private subcontractor nationwide besides CGI, Quadel,

did most of the work of its PHA partners.  *Ashmore Decl. ¶ 52.*

These PBCA contracts had been scrutinized by the HUD Office of Inspector

General, which, in its Audit Report #2010-LA-0001, issued on November 12, 2009

(updating a 2007 report), specifically noted the excess profits made by PHAs and

subcontractors like CGI in the PBCA program:

> Although not technically required to comply with the Federal Acquisition
> Regulation, HUD stated [in 1999] that it would use a best value trade-off source
> selection process for evaluating offers similar to the one defined in Federal
> Acquisition Regulation 15.101-1.
>
> …
>
> HUD did not obtain the best value for the $291 million spent in 2008 on contract
> administration services …. HUD continues to extend the existing contracts
> beyond the original contract term of five years.
>
> …
>
> In a 1999 memorandum requesting final proposals, HUD further stated, "in
> general, profit margins exceeding 10% are generally considered to be
> unacceptable and contracts of this type usually see rates below that amount."
>
> …
>
> HUD did not include a mechanism to rebid the contracts after a set period to make
> the most of the benefits of competition, lower cost subcontractors, or experience
> gained by the PBCAs.
>
> …
>
> [A]lthough Congress appropriated these funds for contract administration
> services, since the excessive funds were unrestricted, they could be used for any
> purpose.
>
> We observed many examples in which PBCA organizations used these excess
> revenues to fund other activities ….  One state earmarked the proceeds of this
> contract to fund community planning and development projects and improve

handicapped accessibility in single-family and multifamily dwellings.  Another state used the funds to purchase apartments and "leisure time condominiums." In addition, excess revenues were used to repay millions of dollars for violations cited in Office of Inspector General (OIG) audit findings in which HUD-restricted funds were misused.  In this case, the unrestricted revenues from the PBCA were transferred… to resolve prior violations and close audit recommendations.

…

*The contracts produced significantly more profits than those included in the cost proposals.  In turn, these profits provided funding for other activities that were not part of the contract's stated purpose.*

*Herbst Decl. Ex. 11 (at pgs 4, 6, 8-9, 11)(emphasis added).*

B.      *HUD's Announcement Of A Nationwide Rebid*:

15.      In 2009 HUD announced that it would be rebidding all of the ACCs for PBCA Section 8 work that it had previously awarded pursuant to the 1999 RFP.  Id. at ¶ 18.

**Admitted.**

16.      Once the announcement of a nationwide rebid was made known to the housing industry, CGI formed a Rebid Assessment Team.  Id. at ¶ 19.

**Disputed in part**.  CGI formed a team of senior individuals "given the… nickname… of the Rat Pack" who reported directly to Carragher.  *Klein Decl. Ex. 12 (Kyprianou Tr. 205-06).  See P. Resp. ¶ 17 below.*

17.      The **R**ebid **A**ssessment **T**eam, which went by the acronym "Rat Pack" internally within CGI, was tasked with ensuring that CGI retained the contractual relationships that it had with its existing PHA partners, as well as try to expand CGI's presence in certain jurisdictions it did not already provide PBCA Section 8 services.  Id.

**Disputed in part.** The "Rat" in "Rat Pack" was not an acronym for "**R**ebid **A**ssessment **T**eam" but instead was a pop-culture reference that CGI even memorialized in a video they circulated and set to a Frank Sinatra song, captioned "The Rat Pack CGI-style",

created "courtesy of: disloyal productions" and "starring" the CGI "Rebid Action Team" members with their headshots superimposed on an actual photograph of the Hollywood Rat Pack.  Thus, at the same time Ashmore was objecting to the "Rat Pack's" fraudulent scheming and specifically noting that this contemplated fraud could placing the entire company at risk, this group found their "disloyalty" humorous and kept using a pop-culture reference that is generally associated with mobster or criminal-type behavior. *Ashmore Decl. ¶¶ 55-60.*

        18.    <u>The goal of the Rebid Assessment Team was to forge relationships with existing and/or new PHA partners by entering into a contract (either a Memorandum of Understanding or Memorandum of Agreement) with the PHA which would set forth the PBCA services that CGI would provide in the event HUD, as part of the rebid, selected the specific PHA and entered into an ACC with the PHA.  Id. at ¶ 20.</u>

    **Disputed in part.** The actual goal of the "Rat Pack" was to "grow and expand" CGI's business from administering 267,000 units of the nationwide PBCA program to "around 900,000 units" out of approximately 1.2m units total nationwide.  *Klein Decl. Ex. 13 (Carragher Tr. 52-53)*; *Klein Decl. Ex. 12 (Kyprianou Tr. 202-03)*.  At the end of 2009, CGI's 267,000 units under administration were approximately 25% of HUD's PBCA national portfolio, making CGI the largest subcontractor to PHAs, performing over 90% of the PBCA duties in New York, Florida, Ohio, the District of Columbia and northern California, and processing $2 billion in subsidy payments for HUD each year. *Herbst Decl. Ex. 13 (D. Bates 2010031, 2010040)*.  CGI was the only "nationwide player" planning on "making a major run" at increasing their units under administration. *Herbst Decl. Ex. 14 (P. Ex. 27, D Bates 9072)*.

19.     During this process, on many occasions the PHAs were required to issue their own RFPs to which CGI, as well as other subcontractors, responded to.  Id. at ¶ 21.

**Disputed in part.**  In a few instances, because of state procurement laws, the PHAs that CGI approached to solicit partnerships could not select CGI as their subcontractor without doing so through a competitive RFP process.  However, in these isolated instances, the PHAs issued RFPs *after* they had been approached by CGI, and after CGI had helped write the RFPs in such a fashion that the PHA was almost certain to select CGI because no other applicant could be scored better than CGI in an RFP seeking qualifications matched to CGI's expertise.  Thus, while technically CGI was responding to a PHA RFP, and hypothetically the PHA could select any subcontractor, in reality CGI was all but assured it would be selected.  *Ashmore Decl. ¶ 54.*

20.     In those instances where CGI was the successful bidder after going through the RFP process with the PHA, CGI and the PHA would thereafter enter into a Memorandum of Understanding or Memorandum of Agreement.  Id.

**Disputed in part.**  CGI was the successful bidder in every instance where they first identified a PHA in a state they wished to bid on, and where they obtained that PHA's willingness to subcontract the work if awarded that jurisdiction's ACC by HUD.  *Ashmore Decl. ¶ 54.*

21.     Irrespective of whether CGI had to go through a RFP or if the PHA could directly award a contract to CGI, CGI and its PHA partners were merely entering into a Memorandum of Understanding which would memorialize the mutually agreed upon partnership for submitting a proposal to HUD in the event HUD actually awarded the contract to the PHA. Id. at ¶ 23.

**Disputed in part.** The MOUs were not only agreements to submit a proposal to HUD, they were agreements in which the PHA agreed to permit CGI to do practically all of the work. In fact, CGI agreed to prepared the bid and the PHA agreed to transmit CGI's bid (prepared in CGI's template) to HUD and to perform (1) very limited oversight of CGI and (2) a liaison role between HUD and CGI because the ACCs were only awardable to PHAs. *Ashmore Decl. ¶ 52.* All of the MOUs contained the following language concerning CGI's responsibilities in the partnerships (*see e.g. Herbst Decl. Ex. 15*):

- CGI Responsibilities:
  - **Proposal Phase:** Proposal for contract administration services in response to a HUD solicitation.
  - **Start-Up Phase:** Complete start-up of contract administration operation, including Board training, staffing, facilities preparation, technology deployment, file transfer, and all other tasks necessary to successfully complete HUD's Readiness Review for all tasks under the ACC.
  - **Implementation and Operations Phase:** Perform all Performance-Based Contract Administration tasks set forth in the ACC, with the exception of the annual audit and certain quality control and HUD reporting functions.

22. Even if a Memorandum of Understanding was entered into between CGI and a PHA partner, there was absolutely no guarantee that HUD would award the PBCA Section 8 work to the PHA that had partnered with CGI. Id. at ¶ 24.

**Admitted.** But *see P. Resp. ¶¶ 19-21 above*.

23. On January 14, 2010, after Marybeth Carragher, Vice President of Consulting Services and leader of CGI's nationwide PBCA practice, attended the National Council of State Housing Agencies conference ("NCSHA"), CGI was advised for the first time that as part of the rebid HUD would be limiting the number of units that a PHA and/or subcontractor could bid on as part of the previously announced nationwide rebid. Carragher Decl. ¶ 35, Carragher Decl. at Ex. 6.

**Disputed in part.**  On January 14, CGI was advised that HUD was *proposing* to limit the number of units.  *See P. Resp. ¶¶ 139-44 below.*

24.     The number of units, otherwise referred to in the housing industry as the "unit cap," mentioned at the NCSHA conference was 300,000 units.  Prior to this announcement being made, CGI, as a subcontractor, anticipated bidding in excess of 300,000 units.  Carragher Decl. ¶ 35.

**Admitted.**  *See also P. Resp. ¶ 18 above.*

## II.   CGI'S HIRING OF BENJAMIN ASHMORE

*A.     Benjamin Ashmore Commences Employment At CGI*

25.     On April 21, 2009, CGI extended an offer of employment to Benjamin Ashmore ("Ashmore").  Carragher Decl. at Ex. 1.

**Admitted.**

26.     Prior to Ashmore's employment at CGI, from September 2004 – May 2009 Ashmore alleges he was employed by HUD as a Senior Project Manager.  See Deposition Transcript of Benjamin Ashmore ("Ashmore Tr.), a copy of which is attached as Exhibit 11 to the February 12, 2012 Declaration of Stuart F. Klein ("Klein Decl.") at Tr. 51.  Of note, during Ashmore's tenure at HUD, he was compensated by various staffing companies that provided resources to HUD.  Ashmore Tr. at 51-52.  As an alleged Senior Project Manager at HUD, Ashmore maintains he was responsible for such tasks as helping HUD revise the internal organization of the multi-family office; supervising all risk assessment activities; and supervising the traditional contract administrators and PBCAs.  Id. at Tr. 56.

**Disputed in part.**  Previously, Ashmore had been an unconfirmed appointee at the U.S. Department of Housing and Urban Development ("HUD") with the title of "Senior

Program Manager" and the duty to "Manage the Multi-family Asset Management Region II (New York/New Jersey) Hub Portfolio," from September 2004 until hired by CGI. *Ashmore Decl. ¶¶ 6-7.*

In this capacity, Ashmore's duties included managing HUD's performance-based contract administrator ("PBCA") in New York, which included the New York State Housing Trust Fund Corporation ("HTFC"). *Id at ¶¶ 8-10.*

Beginning in December 2005 and continuing through to the present day, HTFC has subcontracted nearly all its PBCA duties to CGI. *Id.* CGI's own December 2, 2005 "NY PBCA Communication Matrix" identifies Ashmore as the HUD official responsible for addressing all New York "statewide policy/procedure issues" with HTFC. *Ashmore Decl. ¶ 11; Herbst Decl. Ex. 16.* CGI Vice President Carragher is identified as the CGI official communicating with Ashmore, *id.*, and in fact Carragher worked closely with Ashmore at HUD. *Klein Decl. Ex. 11 (Ashmore Tr. 64-65), Ashmore Decl. ¶ 11.*

27.     Ashmore testified that at HUD he was actively involved when the New York Housing Trust Fund Corporation (which had an ACC with HUD), switched subcontractors from Quadel Consulting to CGI. According to Ashmore:

I also was the HUD official that was responsible for resolving any statewide policy issues, anything that called for a modification in the processes that CGI used, and all of the individual case-by-case issues were copied to me.

But I also, anything that needed to be elevated to the point that the supervisor had to resolve an issue, I was the person that it was elevated to.

Ashmore Tr. at 62-63.

**Admitted.** But *see P. Resp. ¶ 26 above.*

28.     Ashmore further testified that he was responsible for "managing the transition to make sure that it was a seamless transition from Quadel Consulting to CGI so that

the property owners and tenants in New York would not be disrupted by virtue of this change."
Ashmore Tr. at 64.

> **Admitted.** But *see P. Resp. ¶ 26 above.* CGI recruited Ashmore in part because he had this unique experience. *Ashmore Decl. ¶ 50.* CGI highlighted its transition experience as a unique competitive advantage:
>
> - Only service provider to complete a 90 day transition from a current PBCA provider
> - Experienced staff with extensive knowledge of HUD policies and procedures
>
> *Herbst Decl. at Ex. 13 (D. Bates 2010040). See also P. Resp. ¶ 29 below.*

29. As set forth in Ashmore's resume, produced during discovery, Ashmore described his job responsibilities and duties at HUD as follows:  (1) managed HUD multifamily programs and supervised Hub staff through subordinates to achieve departmental goals, enhance preservation and development, and ensure competent portfolio management. Served as the principal advisor to the Director concerning the management, adequacy and effectiveness of Hub policies, implementation of statutory/regulatory programs, and organizational change management. Independently investigated, provided recommendations, and determined requisite actions in reengineering the Region II organizational structure used to service all HUD multifamily programs; (2) designed new procedures to integrate financial and technical information from all available systems (OPIIS, REMS, M2M, Project Files, etc.) and file information to ensure effectiveness of portfolio management, resolving technical work problems and setting precedents for future use in developing solutions; (3) directed the design, implementation and status of new Federal programs and Presidential and Secretarial directives, including technical assistance to HUD staff and community stakeholders; (4) measured and managed the performance of external multi-million dollar contracts, including the New York

State Housing Trust Fund and the New York State Housing Finance Agency, and the Annual
Compliance Review process; and (5) developed relationships with and communicated HUD
policies and priorities to community activists, project owners and tenants, formulating verbal and
written instructions and procedures, clarifying and explaining programmatic requirements,
including for non-routine and complex assignments.   Klein Decl. Ex. 16.

**Admitted.**  But *see P. Resp. ¶ 30 below.*  In fact, the resume Ashmore provided CGI
when they first began recruiting him in 2005, contained nearly identical language.
*Ashmore Decl. Ex. 3 (resume page 2).*

30.    Finally, Ashmore testified that he "was at the highest point that [he] could
be in [the New York HUD] office" and that he decided to leave HUD and seek alternate
employment because he "had accomplished what [he] wanted to accomplish" and that he "was
looking to move on to a different challenge."  Ashmore Tr. at 179-80.  It is undeniable that
Ashmore was looking for a new job at the time he commenced employment at CGI.  Id. at Tr.
190.

**Disputed in part.**  Defendants omit other reasons for leaving HUD about which
Ashmore testified in the citation above.  However, CGI actively recruited Ashmore for a
number of years prior thereto. *Ashmore Decl. ¶¶ 13-22.*  When Carragher brought
Ashmore on board in April 2009, she professed herself "excited" to have done so after
trying to do so for years. *Herbst Decl. Ex. 17.*  Her CGI paperwork reflects that she (**i**)
had no concerns about Ashmore's "chance for success at CGI"; (**ii**) recommended hiring
Ashmore as a "very good hire"; (**iii**) noted that the "specific role/function" for Ashmore
was "Mgmt Cons and Business Dev"; (**iv**) gave him rankings of "excellent" and "above
average" in all categories in her "Candidate Assessment," and (**v**) requested that CGI

create a position for Ashmore with the "priority code" "critical," targeting him for the title of "Executive Consultant."  *Herbst Decl. Ex. 18.*

31.     When Ashmore commenced employment at CGI in May 2010 he was hired as a "Manager of Consulting Services," though he described himself as a "Manager, Consulting & Government Services Delivery" – his self-proclaimed title.  Carragher Decl. Ex. 1.

**Disputed.**  CGI's own production reveals that Ashmore's "CGI Internal Title" was "Manager, Consulting" with the accompanying "Functional Title" of "Government Services Delivery Manager" *Herbst Decl. Ex. 18.*  Ashmore's out-going default email signature contained the title "Manager, Consulting & Government Services Delivery" as reflected in the dozens of Ashmore's emails submitted to this Court in connection with this motion by both sides.  *See e.g. Herbst Decl. Ex. 19 (reflecting one such email April 8, 2010 Ashmore sent to Kyprianou and Carragher).*  During his employment, Ashmore was never informed that this title was inaccurate, and CGI has not produced any documents or emails from CGI staff to Ashmore informing him that the title he used for a year was incorrect, "self-proclaimed" or should be changed.  *Ashmore Decl. ¶ 22.*

32.     Ashmore's manager upon hiring was Marybeth Carragher and his mentor was Panos Kyprianou, Director of Consulting Services.  Defendants' Deposition Id.

**Admitted.**  However, during his CGI employment, Ashmore divided his time between two CGI Divisions, the Cleveland Business Process Services ("BPS)" Division, where he reported to Carragher, and the Fairfax (Va.) Information Services and Information Technology Division ("ISIT"), where he reported to CGI Federal Vice President Rob Bowell, who managed a business unit having nothing to do with the HUD PBCA program.  *Ashmore Decl. ¶¶ 24, 37.*  This division of responsibilities is also reflected in

Carragher's April 15, 2010 Annual performance review of Ashmore.  *See also P. Resp. ¶ 37 below ("his business opps pursuits within Housing BPS and Federal HUD IS IT").*  Such a division was commonplace at CGI.  *See P. Resp. ¶ 54 below.*

33.   <u>As a Manager of Consulting Services, Ashmore was responsible for certain tasks, including but not limited to:  (1) business development in the housing arena; (2) business development in the federal information technology arena; (3) acting as a housing consultant; and (4) assisting with various consulting contracts.  Carragher Decl. ¶ 27.</u>

**Admitted.**  The hiring documents produced by CGI also set forth additional responsibilities; *see e.g. Herbst Decl. Ex. 18.*  See *also P. Resp. ¶ 31* above with respect to Ashmore's title.

B.   *Ashmore's Performance Issues At CGI*

34.   <u>In early April 2010, Ashmore was reassigned from Ms. Carragher to Mr. Kyprianou, Director of Consulting Services.  See February 12, 2015 Declaration of Panos Kyprianou ("Kyprianou Decl.") at Ex. 2.</u>

**Disputed in part.**  While some supervisory responsibility was transferred from Carragher to Kyprianou, Carragher also retained some supervisory responsibility over Ashmore.  It was Carragher, not Kyprianou, who subsequently performed Ashmore's annual performance review on April 15, 2010.  *Klein Decl. Ex. 13 (Carragher Tr. 190).*  CGI's production also reveals that Carragher, not Kyprianou, was the supervisor still responsible for approving and signing off on Ashmore's weekly time sheets through his termination, two months later.  *Herbst Decl. Ex. 20.  Kyprianou Decl. Ex. 2 (D. Ex. BB)* makes clear that Ashmore believed that Carragher retained some supervisory responsibility over him, as do Ashmore's subsequent emails with Kyprianou and

Carragher.  *See also P. Resp. ¶ 38 below (reflecting Ashmore's May 5, 2010 email stating "Not sure about* [Marybeth's] *expectations and our conversations re involvement and communication but want to make sure all the bases are covered.") and Herbst Decl. Ex. 26 (D. Bates 2717, Ashmore's May 4, 2010 email to Carragher asking "Who would you like from our group besides me involved" and Carragher's reply "Just you. Invite Panos please and provide and update once it's done. Thanks.").*

35.     The decision to reassign Ashmore to Mr. Kyprianou was made so Ashmore could be provided with additional oversight, to address certain performance issues that were raised during Ashmore's April 2010 Performance Review, and so that Ashmore could begin working on billable projects for CGI.  Carragher Decl. ¶¶ 28-29; Kyprianou Decl. ¶¶ 3-4.

**Disputed.  W**hen asked, "Why was Mr. Ashmore reassigned to report to you rather than reporting directly to Ms. Carragher?" Kyprianou answered, "Because we were starting a new project [the Oakland Housing Authority project] and we needed resources and to better utilize his time." *Klein Decl. Ex. 12 (Kyprianou Tr. 56-57).*  Kyprianou's sworn answer contained nothing about "providing additional oversight" or about purported "performance issues," and Ashmore was already working on billable projects for CGI. *See P. Resp. ¶¶ 51-52 below.*  Moreover, the reasons proffered by CGI here are not mentioned in any contemporaneous emails or documents produced by CGI at the time of the transfer.

36.     Ashmore was made known of the transfer and was told from that point forward that he would be reporting directly to Mr. Kyprianou.  Kyprianou Decl. Ex. 2.

**Disputed in part.**  *See P. Resp. ¶ 34 above*.  Moreover, from May 5, 2010 through June 12, 2010, Ashmore reported almost exclusively to CGI Vice President Rob Bowell in the

CGI Fairfax, Virginia IT Division.  Ms. Carragher was Mr. Bowell's counterpart in the

CGI Cleveland, Ohio Business Process Services ("BPS") Division.  *Ashmore Decl. ¶¶*

*24, 35-42.*  During his employment at CGI, Ashmore worked in both divisions.  *Id.*

37.   Ashmore has categorized his aforementioned April 2010 Performance

Review as "a very positive annual performance review," a categorization that is far from

accurate.  Complaint ¶ 45.

**Disputed in part.**  Ashmore's categorization is accurate.  There were no performance

deficiencies raised in Carragher's April 15, 2010 Performance Evaluation of Ashmore, in

which she rated Ashmore as meeting expectations in every category and needing

development in none, and in which she heaped the following praise on Ashmore:

> Ben was able to submit proposals within his first few weeks of employment.

> He is very self directed and confident in actively reaching out to potential partners
> and client contacts.

> Was able to be self-directed on OHFA pursuit at very onset of employment.

> Ben is adaptable to quick changing environment and is able to shift attention from
> one project to another.

> We have asked Ben to work on and focus on a few different projects with very
> different deliverables over the past few months.  He is very adaptable and excited
> to make an impact on the business.

> Ben is very willing to take on new initiatives and assignments and is confident in
> his ability to manage the task at hand.

> Ben has shown a strong commitment to the organization.

> Ben shows great interest in CGI's business development goals and is very
> committed to making a contribution to the team and corporation as a whole.

> Ben demonstrates a pride in the organization and works toward the success of the
> Federal [Business Unit] as a whole.

> Ben has shown that he desires to perform quality work and in particular, has
> worked diligently to deliver solid, quality proposals in business development
> efforts.

Ben has worked towards gaining partnerships for the PBCA opportunity. He has demonstrated a desire to partner with the right type of organizations- whether that is in his business opps pursuits within Housing BPS and Federal HUD IS IT efforts.

Ben is able to reach out and share information and thoughts with the team and other stakeholders.

Ben is an independent thinker and enthusiastically states his opinions openly.  He has demonstrated his commitment to CGI and its business strategies.

Ben, in working on business development, has demonstrated his considerations of the financial impact of his proposals.

Ben has been able to, in a short period of time, pursue new business for the team. He is an independent worker that has identified and pursued new business on a number of differing types of engagements.  He is adept at independent follow through.

Ben is dependable and able to follow through on any project given to him with little oversight.

Ben has been able to pursue business, managing the submissions from multiple team members, in order to develop a solid proposal.

From early on, Ben identified and pursued new business independently.

Ben seems to quickly understand and learn new areas.

Ben is certainly a very bright and dedicated member.  He was able to quickly jump in to the business development that the team is concentrating on.  He developed and submitted a number of proposals within his first couple of months being on board and understood the requirements of the proposals easily, even when the information or business was new to him.  He is able to independently pursue projects with little oversight.

*Herbst Decl. Ex. 21 (P. Ex. 3, D. Bates 2697).*

In her oral discussion of her performance review with Ashmore, Carragher repeatedly praised Ashmore's performance and only offered some constructive ideas on things he could improve upon in the coming year, which were also listed in the performance review.  *Klein Decl. Ex. 11 (Ashmore Tr. 418).*

Moreover, Carragher's review and accompanying praise of Ashmore, and

Ashmore's characterization of this review, is consistent with other documentary evidence about how CGI and Carragher viewed Ashmore.  When CGI began a company-wide exercise labeled the "Emerging Talent Initiative", Carragher ranked her senior staff as follows:

> **1. Highly promotable** – significant potential as either a leader or subject matter expert could move into bigger role in next 12 months with minimum development
>
> **2. Promotable** – with appropriate development and/or experience could be promoted in 12-36 months
>
> **3. Limited Promotability** or too soon to tell

Out of 367 employees, Carragher ranked only five as "highly promotable," and Ashmore was one of those five.  *Herbst Decl. Ex. 22.*  Two of the four others had been employees for nine years and two had been employees for several years.  *Id.*

Given (1) the seven-page review itself (and the predominance of its praiseworthy comments over its constructive critical comments), (2) Carragher's own categorization of the review as praiseworthy in her discussion of it with Ashmore, (3) Ashmore's own experiences as a manager at previous jobs, (4) CGI's internal performance review standards and the fact that the review did not identify any areas in which Ashmore needed development, and (5) his fairly new status at CGI, this review represented a "very positive performance review." *Klein Decl. Ex. 11 (Ashmore Tr. 433-44).*

38.    Though Ashmore received an overall "Meets Expectations" review, which is right in the middle of CGI's five-point review range, his Performance Review contained numerous areas of concern that were highlighted in the appropriate category and were addressed by Ms. Carragher when she delivered the review.  Such items were:

> ▪    Ben needs to focus on communication to internal CGI members.

- We have witnessed at times that Ben needs to communicate better with colleagues and ensure that he focuses during meetings.

- Ben needs to ensure that when he is pursuing opportunities, his manager is aware of the activities.

- Ben needs to ensure his manager is aware of his assignments and other logistical information.

- Ben needs to ensure he focuses on one task at a time, multitasking can be a detriment to completing projects.

- Ben needs to respect others professional commitments when working on his own projects.  This is especially important in pursuing new business and getting the schedule of events set and maintained, with all parties involved early on.

- Ben needs to communicate better on a number of levels, as described within the performance highlight section of this review.

- Ben is often very rushed and needs to focus on one thing at a time.  We had a discussion on multitasking and how one may be able to accomplish many things in a short period of time, none of those are necessarily completed with the highest quality.  We have noticed this most with communication, in hearing and listening to what was covered and said.  This can compromise best efforts and plans and we need Ben to slow it down, consider the message and impact, before acting.

Carragher Decl. Ex. 3; Carragher Decl. ¶ 30.

**Disputed in part.**  *See P. Resp. ¶ 37 above.*

39.  Prior to Ashmore's transfer to Mr. Kyprianou, Ashmore engaged in conduct that showed an utter lack of respect for colleagues' time and schedules, which compromised the quality of the CGI work product.  Carragher Decl. ¶¶ 31-33; Kyprianou Decl. ¶ 5.

**Disputed.**  The selective and incomplete excerpts of email chains attached to Carragher's and Kyprianou's Declarations do not demonstrate such lack of respect, nor that Ashmore compromised the quality of CGI's work product.  Other emails establish that (1)

Ashmore repeatedly demonstrated respect for his colleagues' time and schedules.  *See Ashmore Decl. ¶¶ 67-104.*

40.    Ashmore had a practice of not keeping people abreast of what he was working on and did not appreciate or respect CGI's many processes and procedures in place, and so his disrespect of those processes negatively impacted departments' and individuals' schedules and adversely affected numerous colleagues at the last minute.  Id.

**Disputed.**  *See P. Resp. ¶ 39 above*

41.    Ashmore also had a habit of blaming others for the issues arising from business pursuits that he was responsible for, and he did not take any accountability for his own actions.  Id.

**Disputed.**  CGI fails to cite any emails to support the assertion that Ashmore had a habit of blaming others.  There is also evidence that Ashmore accepted responsibility even when in fact he was not to blame. *Klein Decl. Ex. 11 (Ashmore Tr. 457-63).*

42.    Additionally, as set forth in Ashmore's Performance Review, Ashmore routinely failed to keep his manager (Ms. Carragher, and subsequently Mr. Kyprianou) aware of his whereabouts.  Carragher Decl. Ex. 3.

**Disputed.**  Ashmore did not routinely fail to keep his managers aware of his whereabouts, and his Performance Review is not to the contrary.  Again, CGI fails to support this assertion with emails documenting such routine failure.  In fact, CGI has produced many emails demonstrating that Ashmore apprised his managers of his whereabouts.  *See Ashmore Decl. ¶¶ 31-47; Herbst Decl. Ex 28.*

43.    One of Ashmore's most glaring performances issues, which pre-dated and post-dated his reassignment, was the fact that CGI never knew where he was at any point in time,

coupled with the fact that he failed to seek approval regarding alterations to his work schedule.
Carragher Decl. ¶ 33; Kyprianou Decl. ¶ 6.

> **Disputed.**   *See P. Resp. ¶ 42 above.*   Moreover, this factual assertion is fundamentally
> inconsistent with Carragher's April 15, 2010 performance review of Ashmore, which
> praised him (1) for being "dependable and able to follow through on any project given to
> him with little oversight," (2) for being "an independent worker that has identified and
> pursued new business on a number of differing types of engagements," and (3) for being
> "adept at independent follow through."   Carragher did not appear to care very much at all
> where Ashmore and her other direct reports worked as long as the work got done and he
> accomplished what was required of him. *Herbst Decl. Ex. 28 (D. Bates 7232)* (Carragher
> acknowledging that she could not keep up with her direct report's schedules or vacation
> days).   As Carragher well-knew, Ashmore traveled up to 75% of his time, working out of
> client sites, airports, trains, and at home, on weekends and evenings.  *Herbst Decl. Ex. 18
> (reflecting CGI's Human Resource Job Requisition Form, Travel %: 75%), Ex. 29
> (Ashmore's approved billed hours)*; *Ashmore Decl. ¶¶ 31-34.*

> While Carragher and Kyprianou raised these issues at his termination, Ashmore
> was never previously warned about excessive absences, or not keeping his superiors
> informed of his whereabouts.   Nor was he ever warned that he was violating CGI
> attendance policies, or that he was in any way jeopardizing his employment.  *Id.*

> In fact, CGI did not have an attendance policy for managers like Ashmore.  *Klein
> Decl. Ex. 12 (Kyprianou Tr. 179).*   In its February 4, 2011 response to the U.S.
> Department of Labor in this matter, CGI acknowledged that its' "mandatory Attendance

Policy" applied only to "non-management level members."  *See Klein Decl. at Ex. 4 (Letter to Wigger, pg 2, par. 4).*

      44.      For example, on April 8, 2010, after Ashmore was reassigned to Mr. Kyprianou, he told Mr. Kyprianou, without asking permission, that he'd "be taking most of the day off today," the reason being apparently that he had an "8:45 am tee time."  Kyprianou Decl. Ex. 2.

      **Admitted.**  But *see P. Resp. ¶¶ 42-43 above and ¶ 45 below*.

      45.      In response to Ashmore's after the fact request for time off, Mr. Kyprianou informed Ashmore that "advance notice, except for emergencies, is required for time off or working from home requests."  Id.

      **Admitted.**  This arose when Kyprianou, at 7:40 a.m. wanted to move up a meeting time with staff on a California project to 9 a.m., when Ashmore had previously arranged to take the morning off.  *Herbst Decl. Ex. 28 (D. Bates 129).*

      46.      Less than two weeks later, on April 20, 2010 at 8:45 a.m., Ashmore informed Mr. Kyprianou that he would be working from home that morning because his children apparently wanted to make him breakfast in bed.  Ashmore did not seek Mr. Kyprianou's approval for working from home.  Kyprianou Decl. Ex. 3.

      **Admitted.**  However, what CGI omits is that Ashmore specifically informed Kyprianou in this email, that he was delaying his usual 7 a.m. arrival at work because his children had made him breakfast on his birthday, and so that he could take a 9 a.m. conference call from home before commuting into New York City on his motorcycle where, of course, he could not talk on the phone.  Kyprianou responded "Okay – happy birthday!"  He did not

warn Ashmore that this was a problem that might jeopardize his employment.  *Kyprianou Decl. Ex. 3.*

47.     Another example is evidenced by Ashmore's May 26, 2010 email from 7:37 a.m. in which he informed Mr. Kyprianou that he'd be working from home that morning apparently because he had air conditioning issues at his home that arose the night before. Kyprianou Decl. Ex. 4.

**Admitted.**  However, what CGI omits is that Ashmore was working from home because he was waiting for the contractor coming to fix his air conditioning, and that again Kyprianou responded "ok," with no warning, or any statement of concern from Kyprianou.  *Kyprianou Decl. Ex. 3.*

48.     The above are a handful of examples where Ashmore failed to seek Mr. Kyprianou's consent or approval as he required; rather, he chose to act first and inform later. Kyprianou Decl. ¶¶ 6-10.

**Disputed.**    Ashmore did seek Kyprianou's approval on many occasions, including during the period of time cited above. *Ashmore Decl. ¶¶ 32-33.  See also P. Resp. ¶¶ 42-43, 46-47 above*.  In each instance cited by CGI above, Ashmore (1) could not have given any more advance notice, (2) Kyprianou did not contemporaneously complain about the notice Ashmore gave, (3) Ashmore's delayed arrival to work did not adversely impact his job in any way, and (4) CGI does not claim otherwise.

49.     Yet again, on June 15, 2010, Ashmore informed Mr. Kyprianou that he needed to leave the office early, apparently attributable to the need to attend a doctor's appointment with his girlfriend.  Kyprianou Decl. Ex. 5.

**Disputed in part.**  Ashmore's need to leave the office was a lot more serious than reflected in this statement and the actual facts surrounding Ashmore's domestic partner's accident demonstrate Ashmore's dedication and commitment to his job and CGI and how hard he worked to fulfill his responsibilities there.  On May 28, 2010, rather than wait until after the May 31 Memorial Day holiday, Ashmore canceled a scheduled and approved vacation day to come into the office and finish up a proposal which was due on June 2.  *Klein Decl. Ex. 11 (Ashmore Tr. 379, 477); Ashmore Decl. ¶ 47, 98-99.*

On Memorial Day, Ashmore's domestic partner, Stacey Schrager, sustained a life-threatening head injury.[2]  Nevertheless, from the hospital emergency room, Ashmore did what he had to do to reply to urgent work emails on his Blackberry at 11:11 p.m. Ashmore also emailed that he did not know what his availability would be the next day, and that his in-laws were bringing his laptop to the hospital so that he could open an attachment unavailable on his Blackberry and address the work-related issues that had to be addressed that night.  *Herbst Decl. Ex. 30 (P. Bates 19).*  Ashmore found and corrected critical errors in documents that other employees were submitting to him for timely review given the proposal's deadline.  *Id., (P. Bates 24-25).*  After working on the proposal overnight from the emergency room, Ashmore emailed Kyprianou the following morning at 7:15 AM:

> Not sure how available I'll be.  Stacey had a pretty serious accident yesterday afternoon at her parent's house.  65 stitches and 12 staples.  We're still in the ICU and she's finishing up her 2nd pint of blood transfusion.  We have one more to go and hoping to get out of the ICU later today into a regular room after meeting with Neurologist and ENT specialist.  I've copied you on some email

---

[2]   While CGI refers to Ms. Schrager as Ashmore's "girlfriend," Ashmore and Schrager were registered domestic partners from 2008 and married on July 30, 2013.  *Klein Decl. Ex. 11 (Ashmore Tr. 180-182); Ashmore Decl. ¶ 34.*  Ms. Schrager is, and was in 2010, a HUD employee who worked with the CGI staff assigned to the New York PBCA.

traffic with Dotti re the proposal.  Rob & Alisa will cover me in FFX & I'll copy you on everything coming back and forth.  I've been up all night so at some point I'm hoping to get some sleep.  Also should be hearing from RM and Mahdu this afternoon re my call to them on Fri.  I'll have Yolanda deal with anything that comes up today or tomorrow.  I've been able to use my blackberry with some emails.

*Id., (D. Bates 5262).*

When Kyprianou replied an hour later, Ashmore immediately replied and stated "I'll let you know whenever I won't be accessible today [a]t some point I'm going to get some sleep but at least for now I want to stay on top of closing out the TI proposal." *Id.* Kyprianou responded to Ashmore, "I hope that everything goes well. Keep me posted. Thanks." *Id.* Ashmore continued to work on the proposal from the hospital, emailing Kyprianou later that morning, June 1. *Id.* The proposal was submitted on time and subsequent oral presentations to the government – in which Ashmore participated as CGI's corporate representative and project lead – also occurred without a hitch on June 11, 2010, five days before he was fired. *See P. Resp. ¶¶ 67-74, 80, 88; Ashmore Decl. Ex ¶ 104.*

Accordingly, on June 15, 2010, when Ashmore had to leave the office early, it was not just a routine doctor's appointment, but an important appointment with Ms. Schrager's trauma surgeon not long after an extremely serious injury and hospitalization, when she was still "severely anemic," and facing scheduled surgery. *Herbst Decl. Ex. 30 (D. Ex. KK (P. Bates 3)).* That email also reflects that Ashmore emailed Kyprianou at 6:27 a.m. to inform him that "I got into the office an hour early this morning" so that he could leave at 3 p.m. to accompanying Ms. Schrager to the appointment.  He was therefore planning to work more than an eight hour day before doing so.

50.    Though CGI has no objections to employees leaving work early for medical appointments or familial needs, Ashmore was advised by Ms. Carragher during his performance review, as well as Mr. Kyprianou following his April 2010 reassignment, that advance notice was a prerequisite for taking time off of work – which Ashmore repeatedly failed to do.  Kyprianou Decl. ¶ 10.

**Disputed.**  *See P. Resp. ¶¶ 43-49 above*.  Ashmore was not taking "time off of work"; he worked more than eight hours that day, arriving an hour early, at 6 a.m., and leaving at 3 p.m.  *See Ashmore Decl. ¶ 34*.

51.    At the time that Ashmore began reporting to Mr. Kyprianou, CGI had just commenced working on a project for the Oakland Housing Authority ("OHA"), more specifically a housing choice voucher program.  Kyprianou Decl. ¶ 12; Kyprianou Tr. 56.

**Disputed in part.**  This project had been commenced several months earlier and Ashmore had been running this project under Kyprianou's guidance since at least January 2010.  *Ashmore Decl. ¶ 82-92*.

52.    Once Ashmore began directly reporting to Mr. Kyprianou, Mr. Kyprianou assigned Ashmore the role of "Project Manager" on the OHA Project, a role that he was to assume under Mr. Kyprianou's supervision and guidance.  Kyprianou Tr. at 58-59.

**Disputed in part.**  Ashmore had assumed the role of project manager, and was running the project under Kyprianou's guidance, before Carragher transferred all or part of Ashmore's supervision to Kyprianou.  *See P. Resp. ¶¶ 35, 51 above*.  Kyprianou formally updated CGI Federal's project management system – CGI's  internal system – to reflect Ashmore's the role as Project Manager for administration purposes on May 25, 2010. *Klein Decl. Ex. 12 (Kyprianou Tr. 166-68)*.

53.     <u>The crux of the OHA Project, in simple terms, was to undertake the annual recertification process to ensure that the recipients of the housing choice vouchers maintained the eligibility requirements to continue to receive such vouchers.  Id. at Tr. 61, 128-129.</u>

**Admitted.**  But CGI expected to process 1,300 recertifications per month through several employees who were to report to Ashmore.  *Herbst Decl. Ex. 24 (P. Ex. 6 (D. Bates 8381), P. Ex. 7); Ashmore Decl. ¶ 83.*

54.     <u>On May 5, 2010, Yolanda Curry, a direct report of Mr. Kyprianou who worked on the OHA Project, inquired of Ashmore as to how he wanted to handle certain recertifications.  In response, Ashmore indicated who the recertifications should be assigned to, and assigned himself five recertifications.  Kyprianou Decl. Ex. 7.</u>

**Disputed in part.**  Although Curry was a direct report of Mr. Kyprianou's in CGI's Human Resources system (as Ashmore was still a direct report of Carragher's (*see P. Resp. ¶¶ 34-35 above*)), Curry directly reported to Ashmore on this project.  *Herbst Decl. Ex. 33 (D. Ex. DD, D. Bates 5004).*  Kyprianou admitted that reporting responsibilities like this changed depending on the project.  *Herbst Decl. Ex. 11 (Kyprianou Tr. 40-45, 55).*  Ashmore assigned himself five recertifications because Kyprianou requested that Ashmore, at some point, test out the recertification file review to familiarize himself with the process that CGI staff would eventually perform for Ashmore as project manager once the project became operational and CGI was processing up to 1,300 recertifications per month.  *Ashmore Decl. ¶¶ 85-92.*  Kyprianou set no deadline for this file review nor did he specify how many files Ashmore should review, leaving both to Ashmore's schedule and discretion.  *Id.*  Kyprianou admitted as much in his deposition.  *Klein Decl. Ex. 12 (Kyprianou Tr. 150-51, 155-62).*

55.    <u>In April 2010, CGI established an OHA Annual Recertification Workflow.</u>
<u>This Workflow, which was an internal CGI created policy and procedure, governed how CGI</u>
<u>would internally handle the recertification process and it set forth the number of calendar days</u>
<u>CGI had provided its staff to perform certain functions.  Kyprianou Decl. Ex. 8.</u>

**Disputed.**  CGI created many versions of the OHA Annual Recertification Workflow, at least as early as February 3, 2010.  *Herbst Decl. Ex. 25 (D. Bates 679).*  This workflow is what Ashmore and his team were testing and revising during the "Phase I" through "Phase II-A (Pilot 50-100 files)" stages of the project implementation.  *Ashmore Decl. ¶¶ 83, 85.*  Thus, *Kyprianou Decl. Ex. 8* is a step-by-step "OHA Annual Recertification Workflow (4/08/2010) that (1) was a work in progress, and (2) does not "set forth the number of calendar days that CGI provided its staff to perform certain functions."  Nor were there any contractual obligations or implications in this document.  Instead this document provides estimated business hours or calendar days for certain possible steps after receiving a "recertification packet" from OHA that was being revised and tested by Ashmore's team; the actual calendar days – 21 days – provided to CGI staff to complete their duties were set forth in the Scope of Services to the OHA project and the actual project proposal, as the contractual obligations.  *Herbst Decl. Ex 24 (P. Ex. 6 (D. Bates 8381), P. Ex. 7); see also P. Resp. ¶ 54 above and ¶ 57 below.*  Kyprianou admitted as much in his deposition.  *Klein Decl. Ex. 12 (Kyprianou Tr. 163-65).*

56.    <u>Ashmore was well aware that CGI operates with stringently followed</u>
<u>documented processes and procedures for either business pursuits or entering into contracts.</u>
<u>Many levels of approvals from management and shared services departments are necessary in</u>

order to pursue potential business, which Ashmore encountered on other projects that he worked

on at CGI.  Kyprianou Decl. ¶ 16.

      **Admitted.**  CGI has different processes and procedures for pursuing business, entering

      into contracts, and performing contract duties.  *See e.g. Ashmore Decl. ¶¶ 25-27, 83-85.*

      57.     On May 17, 2013, twelve days after Ashmore had assigned himself the

above recertifications, Ms. Curry inquired as to the status of Ashmore's cases as he failed to

adhere to CGI's Workflow created for the OHA Project.  Kyprianou Decl. Ex. 9.

      **Disputed in part.**  Ashmore did not fail to adhere to CGI's workflow created for the

      OHA project.  The OHA contract had three distinct phases: "Phase I: 30 days (start-up,

      systems and procedure set-up)", "Phase II: 60-90 days (Section A – pilot 50-100 files |

      Section B Staffing)", and "Phase III: 9-57 months (Ongoing Operations).  *Herbst Decl.*

      *Ex. 24 (P. Ex. 6 (D. Bates 8381), P. Ex. 7).*  Kyprianou admitted that when Ashmore

      reassigned the recertification files – cases – to Curry that he had her previously assigned

      himself, the contract was not operational as CGI did not even have access to all systems,

      thus the workflow created and being tested could not yet be adhered to by Ashmore and

      the testing team.  *Klein Decl. Ex. 12 (Kyprianou Tr. 131-48).*  CGI had not even moved

      into Phase II-B and begun hiring staff, as Ashmore and his team were still testing the

      proposed workflow and information technology systems.  *Ashmore Decl. ¶ 92.*

      58.     In response to Ms. Curry's email, Ashmore requested that she complete

those cases that he previously assigned to himself and attributed the reason for passing the work

off onto her to the fact that he was "swamped" on another matter.  Id.

      **Admitted.**  Ashmore did so because Kyprianou had told Ashmore to seek assistance if

      necessary to prioritize the other matter on which Ashmore was swamped, the HUD

Transformation Initiative proposal on which he was working for the Fairfax IT Division. *Klein Decl. Ex. 12 (Kyprianou Tr. 159-65).* Thus, Ashmore was following Kyprianou's direction when he reassigned the five cases to Curry. *Ashmore Decl. ¶¶ 85-92.*

59.    On the morning of May 5, 2010, before Ashmore assigned himself certain cases as part of the OHA recertification, he inquired as to Mr. Kyprianou's expectations of him and what information Mr. Kyprianou would require him to provide about his daily work activities. Kyprianou Decl. Ex. 11.

**Disputed.** Ashmore's May 5, 2010 email to Kyprianou makes clear that Kyprianou and Ashmore were only discussing how Ashmore would apprise Kyprianou of his daily activities on work assigned by Bowell in the Fairfax IT division, about which Kyprianou was uninformed. *Ashmore Decl. ¶¶ 39-40.* That night, Ashmore sent Kyprianou such an email. *Herbst Decl. Ex. 28 (D. Bates 311 (Ashmore 5.5.10 9:50 p.m. email to Kyprianou "I'm leaving the office now. Most of the past 15 hours have been on the HUD proposal.")).* Beginning the next day, however, Ashmore and Kyprianou were communicating by email daily about this proposal, so it was unnecessary to generate an additional email at the end of each day to inform Kyprianou of Ashmore's daily activities. *See P. Resp. ¶ 61 below.*

60.    Mr. Kyprianou advised Ashmore that he wanted him to "keep me informed" and that as his "supervisor I would like to know what you are working on and who you are meeting with." Id.

**Disputed in part.** *See P. Resp. ¶ 59 above.* Kyprianou wanted to be kept informed on what Ashmore was working on when Ashmore was reporting into Bowell, in a different division. *Ashmore Decl. ¶¶ 46-47.*

61.     <u>It was understood that daily email updates with a synopsis of Ashmore's work activities would be provided by Ashmore to Mr. Kyprianou.  Id.</u>

**Disputed.**  *See P. Resp. ¶¶ 59-60 above.*  Kyprianou was intimately aware of all the work Ashmore did from May 5 on for BPS because Kyprianou worked closely with Ashmore on all that work, *i.e.*, the OHA project.  From May 5 to June 12, Ashmore worked almost exclusively on only one project for Fairfax IT, the HUD Transformation Initiative proposal, about which Ashmore and Kyprianou communicated daily.  Ashmore kept Kyprianou informed about the work he was doing on that project and Kyprianou was intimately involved with that project, Ashmore even providing Kyprianou documents that Kyrianou needed for his own contribution to the project which Kyprianou requested, and which also documented the work Ashmore was performing.  *See e.g. Herbst Decl. Exs. 26, 30-31.*  It was therefore not necessary to provide an email at the end of the day about Ashmore's work because Kyprianou knew what Ashmore was doing.  That is why, from May 5 to May 18, Kyprianou did not send one email to Ashmore requesting daily emails summarizing Ashmore's work; they were exchanging daily emails from before dawn until late at night on both workdays and weekends.  *Ashmore Decl. ¶¶ 40-43.*

62.     <u>Mr. Kyprianou requested these daily updates because he could not trust Ashmore, and his prior verbal reports to Mr. Kyprianou as to what he was allegedly working on were insufficient.  Kyprianou Decl. ¶ 22.</u>

**Disputed.**   Kyprianou never informed Ashmore that he did not trust Ashmore, and Kyprianou had no reason not to trust Ashmore.  In his specific dealings on project work with Kyprianou, Kyprianou never evidenced any distrust of Ashmore.  *Ashmore Decl. ¶¶ 40-47.*  Kyprianou's first request for updates – focused on instances when Kyprianou

would not know what Ashmore was working on – came immediately after Ashmore initiated the inquiry about communication, and the request had nothing to do with trust issues. *See P. Resp. ¶¶ 59-61 above and ¶ 63 below.*

63. On May 18, 2010, Mr. Kyprianou expressed his frustration to Ashmore as to how Ashmore was "handling [his] OHA assignment" and that prior to Ashmore assigning certain cases to himself, Mr. Kyprianou offered to lend him assistance, but he indicated that he had "everything under control." Kyprianou Decl. Ex. 11.

**Disputed in part.** *See P. Resp. ¶¶ 57-59 above.* Because his work on the HUD Transformation Initiation had not yet ratcheted up, Ashmore reasonably believed that he could complete the work he had assigned to himself. *Ashmore Decl. ¶¶ 85-91.* Until this date, less than a month before his termination, Kyprianou had not ventilated any complaints about Ashmore's performance. *See P. Resp. ¶¶ 37, 62 above.* Kyprianou could not recall ever criticizing Ashmore's performance prior to May 18, and although on May 18 Kyprianou said he would give Ashmore a "corrective action plan," he never did so. *Klein Decl. Ex. 12 (Kyprianou Tr. 99).*

Kyprianou commenced this sudden critique of Ashmore on May 18, the day after CGI cut Ashmore out of communications about the PBCA rebid (on May 17), when CGI moved forward with its fraudulent "transfer back" scheme, to which Ashmore had already objected. *See P. Resp. ¶¶ 109, 111, 121, 123, 147, 149 below.* Kyprianou's allegations in this May 18 email about Ashmore's performance with the OHA contract and HUD Transformation Initiative proposal were factually incorrect and pretextual. *Ashmore Decl. ¶¶ 45-48, 82-104.*

CGI had a reason, on May 17, to move forward with its fraudulent scheme because on May 14, 2010, Deb Lear, HUD's Director of the Office of Housing Assistance Contract Administration Oversight, and the person responsible for managing HUD's entire PBCA program, wrote to CGI's Ohio PHA partner about HUD's actually implementing the 300,000 unit cap, noting that "the limitation of 300,000 units allows interested applicants to submit proposals that will cover approximately 25% of the project based section 8 portfolio." *Herbst Decl. ¶ 34.*  HUD's internal documents dated May 14, 2010 were later released to the public on June 8, 2010, making clear that it was on May 14 that HUD decided internally to move forward with the unit cap. *Herbst Decl. ¶ 35.* Within a day or two, Carragher learned from HUD that a decision had been reached to impose the unit cap and that this would soon be publicly announced; that evening, very upset, Carragher conveyed this news to Ashmore and CGI Federal Director Ryan over dinner. *Ashmore Decl. ¶¶ 62-63.*

64.   <u>In this same May 18th email, Mr. Kyprianou reminded Ashmore of his failure to provide him daily work updates, despite his May 5th request for such.  Id.</u>

**Disputed in part.**  *See P. Resp. ¶¶ 59, 61, 63 above.*  In that same email, Kyprianou said that he would set up a call to discuss the matter, and Ashmore said in his responsive email that he would go over with Kyprianou all that he was doing with OHA in that call. *Herbst Decl. Ex. 32 (P. Ex. 4 (D. Bates 393).*  However, Kyprianou did not call until about a week later, and he admits that that was the only call in which he addressed any purported performance concerns with Ashmore before Ashmore's termination. *Klein Decl. Ex. 12 (Kyprianou Tr. 100-104).*

65.     <u>At this time Mr. Kyprianou also questioned the amount of time Ashmore</u>
<u>allegedly worked on the OHA project since he failed to complete any work on the project and</u>
<u>had passed his assignments off on Ms. Curry.  Id.</u>

**Disputed in part.**  While Kyprianou wanted to reconcile "11 hours… since no work on
the cases [had] been completed," Ashmore had completed the 11 hours of work, as his
responsive email shows:

> When we talk on the phone I'll go over all that I have been doing with OHA.
> Attached is the email I sent Yolanda.  There have been other things outside of
> Case reviews that I have been doing.  For example, like today, which I'll bill to, I
> have a conference call with Tim at 2 to discuss the cats work he has been working
> on.

*Herbst Decl. Ex. 32 (P. Ex. 4 (D. Bates 393).*

In fact, Ashmore was "paid" for the 11 hours of work in CGI's internal billing
system, effectively acknowledging that Ashmore did the work.  *Herbst Decl. Ex. 32 (see*
*e.g. D. Bates 2005761).*

66.     <u>Despite Mr. Kyprianou's directions, Ashmore continued to fail to comply</u>
<u>with his simple request of providing daily updates.  For example, on May 28, 2010, less than a</u>
<u>month after Mr. Kyprianou implemented his daily report requirement, Ashmore sent Mr.</u>
<u>Kyprianou an email that contained his services for May 21-23 and 25-28.  Kyprianou Decl. Ex.</u>
<u>12.</u>

**Disputed in part.**  *See P. Resp. ¶¶ 59-61, 64-65 above.*  From May 21-23 and 25-28, as
earlier, Kyprianou knew exactly what Ashmore was doing, and Kyprianou failed to call
Ashmore to discuss the matter with him or otherwise follow up on his request for daily
updates until May 28, at which time, Kyprianou added that he wanted updates for all
activities, not just those relating to his work for Bowell's IT unit.  Ashmore them

complied with the request, providing the emails from what he then recalled of his work on May 21-23 and 25-28.  *Ashmore Decl. ¶¶ 46-47.*

67.   <u>On May 28, 2010, after Ashmore requested last minute approval on an aspect of a project he was working on, Mr. Kyprianou informed Ashmore of his continued failure to keep his colleagues informed and updated on his activities.  Kyprianou Decl. Ex. 13; Kyprianou Decl. ¶ 25.</u>

**Disputed.**  *See P. Resp. ¶¶ 59-61, 64-66 above.*  Ashmore did not request last minute approval and this was an updated from an earlier approval.  *Ashmore Decl. ¶¶ 98-99.*  Although Ashmore sent the email requesting the updated approval (as a formality since he was capture manager), it was Dotti Shields, CGI's Senior Contract Manager, rather than Ashmore, who determined that the Executive Step Review should occur on May 28, rather than June 1, which would have been even more "last minute" since the proposal was due June 2.  *Id.*  In fact, Ashmore cancelled a scheduled and approved day of vacation to accomplish this Step Review.  *Id., see also P. Resp. ¶ 49 above.*

68.   <u>At this time, Mr. Kyprianou also expressed concern about the purported "long hours" Ashmore was allegedly working in light of the lack of "outcome" of any substantive results, and further reminded him of his need to submit "daily updates as previously requested."  Id.</u>

**Disputed in part.**  Kyprianou did express such concern**,** but the concern was unwarranted, as (1) Ashmore had indeed worked long hours on the HUD Transformation Initiative proposal to which Kyprianou was referring, (2) this exceptionally complex proposal was submitted on time,  (3) CGI's partner commended Ashmore and his team on the excellent work they did, and (4) Bowell – the CGI Vice President with authority

over this proposal submission with responsibility to supervise Ashmore's work – never complained about the results of Ashmore's work on this proposal. *Ashmore Decl. ¶ 104.*

69.  Ashmore also repeatedly failed to provide proper notice and/or updates regarding his need for members to assist him on certain projects (*e.g.*, HUD Transformation Initiative ("TI") proposal for ICF) he was working on.  Kyprianou Decl. ¶¶ 27-29.

**Disputed.**  *See P. Resp. ¶¶ 39-40 above.*  Moreover, on this HUD Transformation Initiative proposal, ICF contacted a CGI manager who knew she had been bid as a key person in the proposal.  ICF subsequently scheduled a meeting for all key personnel to discuss HUD's scheduled oral presentation at which this CGI manager was present.  ICF never told Ashmore that ICF was scheduling the meeting, and the CGI manager noted that Ashmore was not copied on the email she received from ICF.  *Ashmore Decl. ¶ 102.*

70.  Rather than inform his fellow colleagues that he may need their assistance on the TI proposal, Ashmore volunteered certain members to the prospective client without their knowledge or an understanding of their work capacity.  Id.

**Disputed.**  *See P. Resp. ¶¶ 39, 69 above.*  Moreover, Ashmore did not volunteer the members involved, who had been involved in the project from inception at the direction of their supervisors and had been providing documents to Ashmore for transmission to ICF.  *Ashmore Decl. ¶¶ 25-27, 95-97, 100-02.*

71.  On multiple occasions ICF International, the prime contractor on the HUD TI proposal, contacted CGI members for information or meetings without them being aware of the nature or reason(s) behind the request.  Id. at ¶ 25.

**Disputed.**  *See P. Resp. ¶¶ 69-70 above.*  That CGI members were contacted by ICF in a quality assurance check to ensure that information the CGI members had provided about

themselves should not have been a surprise or an imposition.  However, (1) Ashmore twice informed Rudy that she should expect such contact from ICF and (2) Rudy never complained about this to Ashmore at the time.  *Ashmore Decl. ¶¶ 96-97, 101-02.*

72.     The reason that these members were contacted by ICF is because they were designated as the appropriate contact person by Ashmore, without their full knowledge or consent.  Id.

**Disputed.**  *See P. Resp. ¶ 69-71.*

73.     Regarding the ICF Project, during Ashmore's absence from work for a personal issue, Mr. Kyprianou informed Ashmore that he was "taking the lead" on the HUD TI proposal with ICF so Ashmore's absence did not impact CGI's efforts.  Kyprianou Decl. Ex. 15.

**Admitted.**  But *see P. Resp. ¶ 49, 69-71 above.*

74.     Ashmore disregarded Mr. Kyprianou's directions and insubordinately continued to communicate directly with ICF and requested that ICF send certain information directly to him, all of which was in contravention of Mr. Kyprianou directions.  Id.

**Disputed.**  Ashmore was not insubordinate, did not continue to communicate with ICF or request that ICF send information directly to him, nor did he disregard Kyprianou's directions.  Kyprianou emailed Ashmore on June 3 to inform him that that ICF had contacted a CGI member (without first informing Ashmore), and Kyprianou directed Ashmore to contact ICF to let them know that Kyprianou would be working with ICF because Ashmore was in the hospital attending to his partner.  Ashmore did not immediately get that email because it was sent to his company rather than personal Blackberry after Ashmore told Kyprianou that his company Blackberry was out of power and that any communications should be sent to his personal Blackberry.  *Herbst Decl. Ex.*

*30 (D. Bates 5161).*  On June 4 at 9:45 a.m., after returning home from the hospital, Ashmore forwarded Kyprianou an email he had just sent asking ICF to make sure that any future requests come to Ashmore so that all CGI members know the expectations, and asking if ICF had a set schedule regarding oral reviews & staff members.  *Herbst Decl. Ex. 26 (D. Bates. 5098, 3066).*  Kyprianou replied to Ashmore asking him to look at the email Kyprianou had sent to the wrong Blackberry which he had not reviewed, advising Ashmore that Kyprianou had taken the lead in Ashmore's absence, and directed Ashmore not to submit any further requests to ICF so that ICF would not be confused as to whom they should communicate with.  *Id.*  After Kyprianou resent that email to Ashmore, Ashmore did not initiate contact with ICF again.

75.   Following a June 4, 2010 email to Ashmore where Mr. Kyprianou questioned Ashmore's failure to follow directions regarding the ICF project, Ashmore proceeded to berate Mr. Kyprianou by email, stating in part:

> I don't know if I am experiencing your general management style but it does not work with me.  You repeatedly send me accusatory emails challenging my expenses; time reporting, and how I handle my workload; and in nearly every case, you have been mistaken or outright wrong.  You challenged me on my emails to you about the step review without even knowing we had a step review.
>
> ***
>
> I understand your desire to understand what and how I do, what I do, given that you are now responsible; but this confrontationally manner does not nor will work with me.  I have worked as long as you, am as experienced as you, and am as educated as you.  I have no problem complying with your requests as my new manager and addressing the change in your management style from Marybeth's, however I need a modicum of respect as a professional who does deliver and not be subjected to this tone and temerity of accusations.  You do not have the experience or relationships I have.

Kyprianou Decl. Ex. 15.  Of note, Ashmore documented the aforementioned in an email.

**Disputed in part.** Defendants quote selectively from this email, which first advised Kyprianou that he was repeatedly requesting materials that Ashmore had already provided him. The email was a response to a series of emails in which Kyprianou had suggested, falsely, that Ashmore had not complied with his instructions, and mistakenly criticized his work, time reporting and expenses, often not having the requisite knowledge. Rather than "berate" Kyprianou, Ashmore was pointing out Kyprianou's failure to treat him with the respect he deserved, and asking for "a clearing of the air." Indeed, Ashmore told Kyprianou in this email that "I have no problem complying with your requests as my new manager and addressing the change in your management style from [Carragher's (who was also Kyprianou's supervisor)], however I need a modicum of respect as a professional who does deliver[.]" Ashmore, who was based in New York, also offered to sit with Kyprianou, based in Cleveland, in person to go through his emails, and to provide post-proposal summaries to Kyprianou if Kyprianou thought the detailed emails he was getting from Ashmore were not sufficient. *Herbst Decl. Ex. 26 (D. Bates 3066).* Shortly thereafter, Ashmore requested that Carragher be included in the conversation he was seeking with Kyprianou. *Id., (P. Bates 89).* Both Kyprianou and Carragher declined to speak to Ashmore about this. *See P. Resp. ¶ 82 below.*

76.    In response, Mr. Kyprianou stated that "I disagree with what you are stating below and as I pointed out to you I am not happy with your performance thus far." Id.

**Admitted.**

77.    On June 7, 2010, after Mr. Kyprianou was put on notice that Ashmore may need additional time off of work because of his girlfriend's doctor's appointments, Mr.

Kyprianou advised Ashmore to "[p]lease submit" to me the dates and times he needs to take off the week of June 7th.  Kyprianou Decl. Ex. 16.

> **Admitted.**  But *see P. Resp. 49 above.*

78.   Ashmore thereafter cryptically responded to Mr. Kyprianou's June 6th email on the evening of June 7th (Monday) advising him that he did not come into the office on June 7th and that he would only be in for certain parts of the days during the remainder of the week.  Id.

> **Disputed.**  There was nothing "cryptic" about Ashmore's response to Kyprianou's email,
> which advised Ashmore that if he needed more time off (to care for his domestic partner),
> Kyprianou would understand.  *Herbst Decl. Ex. 26 (P. Bates 89).*  Ashmore's response
> noted that he had a number of phone calls from home and Ms. Schrager's doctor's office
> and detailed the dates and times of Ms. Schrager's future scheduled appointments with
> her physicians.  *See P. Resp. ¶ 49 above.*  Furthermore, Ashmore continued to work from
> home on June 7, and report hours which CGI approved without question.  *Herbst Decl.
> Ex. 29.*

79.   The following morning, June 8, 2010, Mr. Kyprianou responded to Ashmore's email and re-advised him that he "need[s] approval for working from home so please make sure that you let me know if you will not be in the office."  Id.

> **Admitted.**  But s*ee P. Resp. ¶¶ 59, 61, 78 above.*  Furthermore, Ashmore had routinely
> received approval for working from home.  *Ashmore Decl. ¶ 33.*

80.   Mr. Kyprianou further advised Ashmore he should "not make any travel arrangements [for the TI Proposal] until you receive my approval."  At this time, Mr. Kyprianou

also advised Ashmore that "I want to have a call with you to express my concerns and reiterate my expectations."  Id.

> **Admitted.**  Although Kyprianou advised Ashmore that he wanted a call, Kyprianou never did call or arrange to call Ashmore.  *See P. Resp. ¶ 64 above; Ashmore Decl. ¶ 103.*  Regarding the travel to Washington, D.C. in connection with the HUD Transformation Initiative oral presentation to GSA, Ashmore explained to Kyprianou that CGI was obligated by its teaming agreement with ICF to send two individuals, and ultimately GSA and ICF required Ashmore to attend as the key, named, CGI corporate representative and project leader.  However, again Kyprianou left ICF and Ashmore in limbo, never telling Ashmore whether he was approved to travel, until finally Fairfax IT Vice President Bowell advised Ashmore that he was working for Bowell, not Kyprianou, on this project, and that Ashmore was going to Washington.  *Id.*

81.    Similar to Ashmore's June 4, 2010 email, apparently displeased with Mr. Kyprianou' response, Ashmore stated in a June 8 e-mail, composed at 11:11 am:

> That's fine but I am going to reiterate that this is incredibly frustrating and I find it unprofessional.
>
> ***
>
> At this point, I'm not sure if we need to rope MB for a discussion but I am embarrassed that you are babysitting me regarding this proposal.  You have had little to do with this proposal from the inception
>
> ***
>
> And you have not been responsive on a number of occasions to ICF (or my) inquiries where I have had to step in.  You continuing to manage this process when I am available makes it look like I am not competent to our partners and I believe it reflects poorly on me, especially when you were not in this role from the inception.
>
> ***
>
> I am working from home this morning . . .

Id. Once again, Ashmore documented the aforementioned in an email.

**Admitted.**

C.    *CGI's Decision to Terminate Ashmore For Performance Reasons*

82.    Based upon Ashmore's highlighted performance deficiencies, continuing failure to disregard his colleagues, and continued insubordination and repeated failure to adhere to the most basic of directions, Mr. Kyprianou consulted with the Human Resources Consultant assigned to his Practice Group, Sophia Youngbauer, regarding his issues with Ashmore and his ultimate recommendation that Ashmore be terminated. Kyprianou Decl. ¶ 36.

**Disputed.** Ashmore was terminated not because of these pretextual "performance deficiencies," but because (1) HUD finally determined to implement the unit cap, (2) prior thereto, Ashmore had opposed and objected to what he reasonably believed were CGI's fraudulent and unlawful plans to circumvent the unit cap if implemented, and (3) once HUD implemented the unit cap, CGI desired to terminate Ashmore because of his opposition and objections. *See P. Resp. ¶¶ 37, 39-80 above and ¶¶ 109, 111, 113, 115-117, 121-123, 129-132, 134-147, 152-154 below.*

In an email dated June 8, 2010 and a conference call on June 9, HUD made clear that it had considered all proposed restrictions in the PBCA rebid and was formally announcing to the PBCA industry that it had decided to implement the unit cap restriction and CGI's notes of this call reflect that this was HUD's announcement of the "final changes." *Herbst Decl. ¶¶ 35-36.* On June 10, the next day, Carragher canceled her next scheduled management meeting (June 11) where the Rat Pack would have been dialing in and discussing HUD's announcement. *Herbst Decl. Ex. 38 (D. Bates 2765).*

On June 14, Carragher sent an email captioned "Rat Pack File and Call in number" marked "Importance: High" to Joyce Clause about the next weekly "Rat Pack" meeting scheduled for June 15 stating:

> Just left you a vm. <u>We need to make sure no RAT Pack files get sent to Ashmore for tomorrow's call.</u> In addition, would you please send out a new call in number. Michael Ashbrook's would be good….
>
> <u>Ashmore needs to be removed from the invite- of utmost importance</u>….
>
> Michael Ashbrook will be calling in and using his leader code from here on out to ensure we know exactly who is on the call.

*Herbst Decl. Ex. 38 (P. Ex. 35, D. Bates 35)* (<u>emphasis in original</u>).

Less than an hour later, at 4:37 p.m., Kyprianou emailed Ashmore stating:

> I tried your office number but it looks like you left for the day. I wanted to talk to you about PBCA. Since you haven't had any PBCA assignments for some time now, there is no need for you to call in for the PBCA RAT pack meetings. If anything changes I will let you know. Thanks.

*Herbst Decl. Ex. 39 (D. Bates 8379).*

Ashmore responded at 6:40 p.m. to both Kyprianou and Carragher, asking for a call or meeting with both, pointing out that he did have current PBCA assignments, and could not understand why he was being cut off from communications about the PBCA rebid. *Id.* Ashmore acknowledged in that email that he was notified that the weekly Rat Pack call was cancelled. *Id.* But the call was not cancelled; a new invite went out to everyone except Ashmore shortly thereafter, followed by the materials "for this morning's meeting," *i.e.*, for the conference call on June 15 at 8:21 a.m. *Herbst Decl. Ex. 40 (D. Bates 8377).*

In their haste to fire Ashmore, neither Kyprianou nor Carragher responded to Ashmore's request for a call or meeting with him. Nor did they invoke any elements of CGI's progressive discipline procedures. Instead, they began moving to terminate

Ashmore immediately.  Late that night, at 11:35 p.m., Kyprianou sent the one and only email to Human Resources which, for the first time, noted "some performance issues with Ben." *Klein Decl. Ex. 12 (Kyprianou Tr. 94-95, 121-22); Herbst Decl. Ex. 38 (P. Ex. 5, D. Bates 8381).*  Defendants have produced no other emails to or from HR discussing or documenting any Ashmore performance issues.

Early the next morning, June 15, at 8:56 a.m., without contacting Ashmore, or exploring the alleged "performance issues," CGI HR forwarded Kyprianou's email to Senior Vice President Rick Schmitz and Vice President Carragher, requesting "approval for the termination of Ben Ashmore." *Id.*

In every other instance in which Kyprianou fired other managers or senior consultants during his decade-plus-long tenure with CGI and its predecessor companies (of which he could recall three in great detail), Kyprianou's termination included documented elements of progressive discipline (e.g. lengthy history of poor performance, discussions with the employee, warnings, performance improvement plans, corrective action plans), and he had conferred with HR for months before the eventual termination. *Klein Decl. Ex. 12 (Kyprianou Tr. 16, 72-93, 116-19).*  Kyprianou admitted that termination at CGI was usually a "process" in which HR was integrally involved. *Id., at 80.  See also*, as an example of the progressive discipline and termination practices at CGI, and in Carragher's BPS Division, *Herbst Decl. Ex. 43 (D. Bates 9378 including 18 separate attachments* (documenting the extensive discussions of poor performance with the employee, a poor annual performance review, written warnings both before and after that performance review, a corrective action plan reviewed and signed by the employee

and sent to HR, and a termination one month after the corrective action plan when the performance deficiencies were not corrected).

The contrast with, and disparate treatment of, Ashmore is stark. With him, there were no warnings or performance improvement or corrective action plans, no discussions between Kyprianou and HR or Carragher and HR, no face-to-face meetings or discussions with Ashmore between May 18 (when Kyprianou admits he made made his first complaint about Ashmore, *see P. Resp. ¶ 63 above*) and June 16 (when Ashmore was terminated, *see Kyprianou Decl. Ex. 18*), and only one telephone call with Ashmore in late May. *Klein Decl. Ex. 12 (Kyprianou Tr. 94-95, 103); see also P. Resp. ¶ 68 above.* The haste to fire Ashmore without any prior warning or process – only two months after Carragher gave him a performance evaluation with significant written and oral comments praising Ashmore for his performance – is completely disproportionate to the alleged pretextual "performance deficiencies" and cannot be explained by them.

Rather, the hasty firing clearly reflects CGI's knowledge and concern about (1) the unit caps that HUD had just implemented, (2) their plans fraudulently and unlawfully to evade those caps, and (3) Ashmore's opposition and objection to those plans. Frankly, there is no other plausible explanation for Ashmore's termination and the chronology of events that led up to it. Just to take a few examples, how else can one explain that (1) Kyprianou admitted that he first raised his criticisms of Ashmore's performance on May 18, less than one month before termination, (2) Kyprianou mentioned giving him a "corrective action plan" but never did so, (3) Kyprianou's testimony that he could only recall having one telephone call with Ashmore between May 18 and termination on June 16 to discuss Kyprianou's purported performance concerns, without a single "face-to-

face" meeting, (4) Carragher's never discussing any performance issues with Ashmore before his termination, notwithstanding that she recruited and brought him to CGI, had been his direct supervisor and was still supervising him in at least some respects, and (5) Ashmore being completely cut off from all communications, meetings and discussions about CGI's plans to deal with the unit caps so that he could not further ventilate the objections he had made earlier to Carragher to what he reasonably believed was the fraudulent and illegal nature of those plans.  *Klein Decl. Ex. 12 (Kyprianou Tr. 97-104); Ashmore Decl. ¶¶ 64-66.*

83.    At the request of Ms. Youngbauer, Mr. Kyprianou sent to her a summary email highlighting various performance-based issues that he experienced with Ashmore that justified his recommendation for Ashmore's termination.  Id. at ¶ 37; Kyprianou Decl. Ex. 17.

**Disputed.**  *See P. Resp. ¶ 82 above.*

84.    Prior to communicating with Ms. Youngbauer, Mr. Kyprianou had communicated over a number of months his aforementioned concerns with Ms. Carragher about Ashmore's poor job performance.  Kyprianou Decl. ¶ 38.

**Disputed.**  *See P. Resp. ¶ 82 above.*  Furthermore, Kyprianou admitted that he agreed with all aspects of Ashmore's "meets expectations" performance review on April 15, 2010.  *Klein Decl. Ex. 12 (Kyprianou Tr. 65-71).*  The Human Resources file CGI produced in discovery contains no evidence that Kyprianou ever documented these alleged "concerns" "over a number of months" in emails to Carragher (or anyone else), as CGI managers did in other instances.  *See e.g. Herbst Decl. Ex. 43.*

85.    At the time Ashmore was terminated, if Mr. Kyprianou recommended that one of his direct reports needed to be terminated, it was his practice group's protocol that a

Director's supervisor, in this case Ms. Carragher, and her supervisor (Richard Schmitz), needed to approve the recommendation.  Kyprianou Decl. ¶ 39.

> **Disputed.**  No written protocols, documentation or sworn testimony is provided to support this statement.  However, we do not doubt that Ashmore would not have been terminated without Carragher's impetus, as she recruited and hired Ashmore, had the prior working relationship with him at HUD, was his direct supervisor for most of his tenure at CGI, was Kyprianou's direct supervisor, and headed CGI's PBCA rebid program.  *See P. Resp. ¶ 82 above.*

86.     Mr. Kyprianou's recommendation to terminate Ashmore was ultimately approved by Ms. Carragher and Mr. Schmitz.  Carragher Decl. ¶¶ 75-76.

**Admitted.**

87.     On June 16, 2010, Mr. Kyprianou informed Ashmore that he was being terminated, effective immediately.  Kyprianou Decl. Ex. 18.

**Admitted.**

88.     Immediately after being notified of his termination, Ashmore forwarded numerous CGI emails from his CGI issued email address (Benjamin.Ashmore@cgifederal.com) to his personal email address (ben-sr@benashmore.com).  Ashmore Tr. 411.

**Admitted.**

D.      *Ashmore's Post-Termination Communications With CGI*

89.     After Mr. Kyprianou informed Ashmore that he was terminated, a lengthy telephone discussion took place between Ashmore and Mr. Kyprianou.  Also participating in the phone call was Ms. Youngbauer (via phone) and Dennis Ryan,  a Director at CGI who worked in

New York and was physically present with Ashmore at the time of the call.  Kyprianou Decl. ¶ 41.

**Admitted.**

90.    During this lengthy conversation, Ashmore never mentioned any of the allegations that form the basis of this case.  Id. at ¶ 42.

**Admitted.**

91.    The crux of Ashmore's conversation with Mr. Kyprianou was Ashmore's apparent disagreement with Mr. Kyprianou's assessment of his performance as the basis for his termination.  Id.

**Admitted.**

92.    During this conversation, Ashmore demanded a severance package, and even went so far to threaten that "this will get really, really ugly."  Id.

**Admitted.** But *see P. Resp. ¶¶ 30, 80, 90-91 above.*  CGI HR's own notes of this June 16 call reflect that "Ben asked for examples of poor performance" and that "[Kyprianou] said that he wasn't going to get into the details at this time" and that Ashmore said "if this is not working… if this is done and he has no place at CGI, then we need to talk severance package." *Herbst Decl. Ex. 42 (P. Ex. 12, D. Bates 5003).*

93.    Thereafter, at approximately 4:09 p.m. on June 16, 2010, Ashmore sent an e-mail, with an attached self-described "Termination Letter" to Roy Bernardi (Vice President), Rob Bowell (Vice President), Donna Ryan (Senior Vice President) and George Schindler (President).  Ashmore also provided an electronic carbon copy to Dennis Ryan, Alisa Bearfield (Director) and Ms. Carragher.  Carragher Decl. Ex. 13.

**Admitted.**

94.     <u>Nowhere within either Ashmore's e-mail or the two-page, single spaced letter, did he mention, reference or even allude to the allegations that form the basis of this case. Id.</u>

> **Disputed.** Ashmore characterized his termination as "wrongful" and he disputed the pre-textual poor performance allegations in this letter, noting his belief that his termination "has nothing to do with my performance" and that he had "a number of emails between [Kyprianou] and me available for review which shows this."The "wrongful" termination and the pretextual poor performance termination are part of and references to the allegations in this case.

95.     <u>On June 17, 2010, the day after Ashmore's termination, he contacted Ms. Carragher and requested to discuss his termination with her.  Carragher Decl. ¶ 81.</u>

> **Disputed in part.** Ashmore texted and emailed Carragher the day of his termination and she contacted him the day after.

96.     <u>Ms. Carragher obliged Ashmore's request and spoke with him on June 17, 2010.  Ms. Youngbauer was present for this conversation as well.  Id.</u>

> **Admitted.** But Carragher's February 12, 2015 declaration asserts that she had a "June 16th conversation with Ashmore" at ¶¶ *82-83.*  This is a typographical error as Ashmore and Carragher did not speak on June 16.

97.     <u>During this call Ashmore once again did not mention any of the allegations that form the basis of this case or that he was terminated for the reasons alleged in this case.   Id.</u>

> **Disputed in part.** *See P. Resp. ¶ 88, 93-94 above and ¶ 121 below.*  Ashmore (1) explained why he did not have opportunity to directly confront Carragher about his belief that he was

fired for his objections to CGI's schemes to evade HUD's unit cap restrictions and (2) did

mention that Kyprianou's accusations against Ashmore were mistaken and uninformed, and

that the distinct change in Kyprianou's attitude and conduct toward Ashmore in the last few

days before his termination was incomprehensible to Ashmore.  *Klein Decl. Ex. 11 (Ashmore*

*Tr. 413); see also Response ¶ 98 below.*

        98.    <u>During Ms. Carragher June 17th conversation with Ashmore, he merely</u>

<u>disagreed with the reasons why he should be terminated, demanded a severance package, and</u>

<u>threateningly told Ms. Carragher and Ms. Youngbauer that "I am not going to go quietly into the</u>

<u>night on this."  Id. at ¶ 82.</u>

**Disputed in part.**  *See P. Resp. ¶ 97 above.*   Ashmore did not demand a severance

package in this call.  After rebutting the reasons that Kyprianou had given for his

termination, Ashmore stated the following to Carragher:

> I reported to you until this change, and actually started reporting to my mentor,
> didn't have any issues—I mean you told me the opposite.
>
> …
>
> So I'm just surprised that in a matter of a couple months—not even, a couple
> weeks—I go from everything's okay, here's some constructive pointers to you're
> terminated, poor performance, put a contract in jeopardy when I don't see it from
> that perspective.  I know I have been talking for a while but I am curious for
> feedback with respect to those things that I am talking about.

*P. Bates 104 (digital recording of the call).*[3]

      When Carragher gave new reasons for the termination that Kyprianou had not

discussed, and claimed there were "a lot of emails" to document "where the performance

was sub par"; Ashmore responded by asking Carragher, "Have you reviewed those

emails because I don't, I never got emails like that?  I mean, where are these emails?"  *Id.*

---

[3] While we have not attached a copy of this recording as an exhibit, we will make it immediately
available to the Court upon request.

When Carragher stated to Ashmore, "so, um, anyway, you know, just to reiterate that it was a corporate decision to terminate the employment and of course there was a review of documentation and emails and communication prior to that decision and approval which needed to go up to the senior vice president level.  And I'm sorry it didn't work out"; Ashmore responded:

> Okay, well I'm sorry that it has to end on this tone.  But I hope you understand, and I'm sure it'd be the same thing in reverse.  I'm not going to go quietly into the night on this.  I mean, there's… What you are telling me here—there's just not documentation to support it.  And I left a position a year ago ….  And now, I'm terminated, I mean there wasn't even talk of a severance package, there wasn't… It's just… It's abrupt.  And, as far as I'm concerned, there's enough documentation and there's enough evidence out there that paints a different picture than the one that you're painting.  And if --

*Id.*

At this point Carragher, abruptly cut Ashmore off, stating, "Right. Well, I need to also reiterate that you did sign a code of ethics form and we expect you to comply with those expectations and at this point I don't see any reason to continue the call so thanks for your time."  She then ended the call.  *Id.*

99.    Following the commencement of this lawsuit, in discovery, CGI learned that Ashmore surreptitiously tape recorded his June 17, 2010 conversation with Ms. Carragher and Ms. Youngbauer, a conversation that lasted nearly sixteen (16) minutes.  Id. at ¶ 83.

**Admitted.**  But *see P. Resp. ¶ 98 above.*

## III.    ASHMORE'S AFTER THE FACT WHISTLEBLOWER ALLEGATIONS

### A.    *Ashmore's Initial Demand Letter*

100.    On August 30, 2010, Ashmore's then counsel, David Mair, wrote to CGI advising CGI of Ashmore's contention that his June 16, 2010 termination was "in retaliation for his opposition to a fraudulent scheme devised by senior CGI managers to circumvent restrictions

on the number of housing units any single contractor or subcontractor is permitted to administer under the U.S. Department of Housing and Urban Development's Section 8 affordable housing program."  Klein Decl. Ex. 1.

> **Admitted.**

> 101.    By letter dated September 10, 2010, CGI responded to Ashmore's demand letter.  CGI's response, in addition to stating that this "is the very first time that [Ashmore] has ever raised Sarbanes-Oxley or fraud to anyone at CGI," stated in part:

> ▪    Mr. Ashmore did not engage in any protected conduct under the Sarbanes-Oxley Act.  More important to any claim, he absolutely will not be able to show any evidence that he engaged in protected conduct or 'blew the whistle.'

> ▪    CGI has confirmed that Mr. Ashmore never opposed any such alleged scheme. He never complained to Ms. Carragher or his colleagues about any such scheme; he never complained to any of the three levels of management above Ms. Carragher of such scheme; he never complained through the anonymous ethics hotline; and he never complained to any of the non-PBCA Vice Presidents he reached out to multiple times in writing upon his termination to implore them to intercede on his behalf to save his job.  There is absolutely no record of any complaint by Mr. Ashmore about an alleged scheme involving HUD.

> ▪     [T]here is absolutely no record of such a scheme being communicated via telephone, email or regular mail.

Klein Decl. Ex. 2.

> **Admitted** that CGI asserted as much, falsely, as reflected in much of these Responses.

> *B.*    Ashmore's OSHA Complaint

> 102.    Thereafter, on December 10, 2010, Ashmore filed a whistleblower complaint with the Occupational Safety & Health Administration ("OSHA") in which he repeated the same allegations as set forth in his August 30, 2010 letter to CGI.  Klein Decl. Ex. 3.

> **Admitted.**

103.    On February 4, 2011, CGI filed a detailed response with OSHA setting forth the basis for its opposition to Ashmore's Complaint and requesting that Ashmore's OSHA Complaint be dismissed in its entirety.  In addition to providing OSHA numerous documents illustrating that Ashmore was terminated for legitimate performance reasons, CGI in its answering papers stated in part:

- CGI denies the conclusory and unsubstantiated allegations contained within Ashmore's Complaint.  First and foremost, the alleged 'fraudulent scheme' that Ashmore describes never existed.  Second, as set forth more fully herein, Ashmore did not engage in any 'protected activity' covered under the Sarbanes-Oxley Act. Additionally, as illustrated by the numerous exhibits produced herewith, Ashmore was terminated for legitimate performance reasons.

- Ashmore, in his Complaint, alleges that CGI devised a fraudulent scheme to circumvent potential restrictions on the number of housing units any single contractor or subcontractor is permitted to administer under the U.S. Department of Housing and Urban Development's (HUD) Section 8 affordable housing program. Specifically, Ashmore alleges that his manager (Marybeth Carragher) and his colleagues (Directors on Carragher's team) conceptualized and discussed a 'fraudulent shell company scheme.'  He also claims that he was terminated as a result of his opposition to this alleged scheme.  There was no scheme and none of this ever occurred.

- Ashmore does not reference any dates or times when these alleged [whistleblowing] communications took place, does not provide any specific details about these alleged communications, nor does he reference any documents, whether letter, note, memo or e-mail, that would corroborate the conclusory, and non-specific assertions that he states in his Complaint.

- One would expect that if the scheme described by Ashmore actually existed, and it was such a concern of his, there would be some documentary evidence to support his allegations.  Furthermore, one would also expect that contemporaneous with Ashmore's termination, or shortly thereafter, he would have brought this issue to CGI's attention.  However, this is simply not the case.  Rather, all of Ashmore's post-termination communications were merely a last ditch attempt to implore CGI senior management to intercede on his behalf to save his job.

Klein Decl. Ex. 4.

**Admitted** that CGI so asserted in its response to Ashmore's OSHA complaint, again, falsely.

104.    OSHA did not inquire of CGI following CGI's submission of its February 4, 2014 response.  Klein Decl. ¶ 7.

**Unknown and irrelevant.**

105.    On September 9, 2011, Ashmore's counsel provided to the OSHA certain information regarding Ashmore's claims. In this submission, Ashmore's counsel advised OSHA that Deborah Lear, Joyce Clause, Patty Duffy, Ismael Guerrero and Lewis Jordan were witnesses that "Ashmore believes may be more likely to provide truthful information relevant to his claims."   However, in the instant action, Ashmore chose not to conduct these witnesses' depositions.  Klein Decl. ¶ 8.

**Admitted and irrelevant.**  This information provided to OSHA occurred prior to any discovery, before plaintiff and predecessor counsel could assess which depositions should be taken based on the evidentiary record.

106.    By letter dated October 12, 2011, which was prior to any OSHA adjudication, Mr. Mair advised OSHA that Ashmore intended to file an action for *de novo* review in district court.  As a result of Ashmore's election to proceed with his case in federal court, Ashmore's Complaint before OSHA was dismissed.  Klein Decl. Ex. 6.

**Admitted** and irrelevant**.**

C.    *Ashmore's District Court Complaint*

i.    *Sarbanes-Oxley Whistleblower Cause of Action*

107.    On or about November 18, 2011 Ashmore commenced the instant action. A copy of Ashmore's District Court Complaint ("Complaint") is Exhibit 7 to the Klein Decl.

**Admitted.**

108.    Ashmore alleges in his District Court Complaint that "in early 2010 Carragher and her subgroup devised and began executing a 'shell company' scheme ('Director Shell Company Scheme') to fraudulently circumvent HUD's unit limitations."  Complaint ¶ 30.

> **Admitted** that the complaint so alleged, in part.  But it is the evidentiary record rather than the allegations of the complaint that are relevant on this motion for leave to file a motion for summary judgment.

109.    The Director Shell Company Scheme as alleged by Ashmore in his Complaint did not exist.  See February 12, 2015 Declaration of Michael Ashbrook ("Ashbrook Decl.") at ¶ 9; February 12, 2015 Declaration of Dennis Ryan ("Ryan Decl.") at ¶ 8; February 12, 2015 Declaration of Shawn Steen ("Steen Decl.") at ¶ 9; February 12, 2015 Declaration of Leslie Pierce ("Pierce Decl.") at ¶ 9; February 11, 2015 Declaration of Tony Gorris ("Gorris Decl.") at ¶ 8; February 12, 2015 Declaration of Tracey Rudy ("Rudy Decl.") at ¶ 9; Kyprianou Decl. ¶ 47; Carragher Decl. ¶ 37.

> **Disputed.**  The declarations cited above are inconsistent in material respects with the sworn deposition testimony of the declarants and the documentary evidence in the case.
>
> On January 29, 2010, Kyprianou wrote an email to Carragher and other members of the Rat Pack in which he conceptualized and proposed several ways that CGI could evade the unit cap, which he characterized as the "monopoly restriction" and "unit restrictions."[4]  *Carragher Decl. Ex. 8 (P. Ex. 13, D. Bates 7233).*  Both of his proposals

---

[4]    On January 17, HUD had sent an email to many PBCA stakeholders, including CGI, announcing the proposed 300,000 unit cap limitation.  At that time, CGI had already entered into Memorandums of Understanding (MOUs) with existing PHA partners, and new PHA partners in new jurisdictions, to submit bids to HUD where CGI intended to perform nearly all of the work in a portfolio of states that greatly exceeded the 300,000 unit cap.  *See P. Resp. ¶¶ 19-21 above.*

were explicitly designed to "hide" from HUD that CGI would effectively be administering units in excess of the proposed unit cap. *Id.* The first proposal was for CGI to "hide behind" the PHA's instrumentality entity, *see P. Resp. ¶ 14,* which would subcontract 90% of the work to CGI, concealing from HUD that it was doing so, in contravention of the unit cap. *Id.*, ¶ 2. Kyprianou's second proposal was

> [T]o create new entities for selected jurisdictions that are a joined venture of PHA and CGI subsidiary. If this holds then we can get away with the unit restrictions as these entities will be somehow independent from CGI.

This second suggestion was preceded by the comment, "I don't know whether this is possible or allowable." *Id.*, ¶ 3.

When asked about this second proposal in his deposition, Kyprianou admitted that this idea (or scheme) of setting up independent companies to get away with the unit restrictions was explored and discussed among the Rat Pack, and that its core concept had CGI setting up another corporate entity that could be presented [to HUD] as being independent of CGI. *Klein Decl. Ex. 12 (Kyprianou Tr. 217-218).* CGI's setting up companies to do most of the work that HUD would think were independent of CGI but which in fact were CGI-related entities whose work and revenues would ultimately flow to CGI, concealed from HUD, was a core concept of the scheme, to which Ashmore was opposed and to which he objected. *See P. Resp. ¶¶ 119-123 below.*

---

HUD's January 17 email followed its January 14 announcement of the unit cap at a conference. *See P. Resp. ¶¶ 23-24 above.* CGI recognized the proposed unit cap as a huge threat to their expansion plans. *Herbst Decl. Ex. 14 (P. Ex. 27, D. Bates 9072 (noting, inter alia, that the 267,000 units currently under CGI's administration were less lucrative than those they aspired to)).* Upon announcement of the proposed unit cap, CGI began lobbying to defeat these proposed restrictions and CGI employees had initial confidence that those efforts would prove successful. *Herbst Decl. Ex. 4 (Ryan Tr. pgs 41-52).*

Kyprianou admitted that amongst at least the more senior members of the rat pack, they talked about the idea of whether or not CGI could set up independent companies and thereby avoid unit cap restrictions by having some of those independent companies partner with PHAs, that this scheme was discussed on at least one rat pack call, and that this concept was essentially the concept that Kyprianou had raised in his January 29 email, *Carragher Decl. Ex. 8 (P.Ex. 13, D. Bates 7233); Klein Decl. Ex. 12 (Kyprianou Tr. 219).*

Gorris admitted that this concept of setting up multiple corporate entities to get around the unit cap was discussed among all of the Rat Pack members. *Herbst Decl. Ex. 1 (Gorris Tr. 49, 51-52).*

Gorris also admitted that the discussion included an element of the DSCS as described by Ashmore – that the separate, independent corporations would be set up by a CGI director or directors. *Id.*, at 52:

Q  In that call Ms. Carragher said that a concept had been raised of some of the CGI directors setting up outside companies for the rebid process, correct?

A  She indicated that the concept had been raised, that – I don't recall the number of people, but where it was, where the idea was that we had a separate company set up by a director or directors, I don't recall the numbers.

Q  And that was referring to the directors that reported in to Ms. Carragher?

A  Yes.

Rudy, another Rat Pack member, admitted that the idea of setting up outside companies that could be used to get around the single unit cap was discussed as a potential strategy. *Herbst Decl. Ex. 2 (Rudy Tr. 48).*

These admissions by these Rat Pack members corroborate Ashmore's description of the scheme, which was discussed on conference calls and one meeting in Fairfax,

Virginia. *Klein Decl. Ex. 11 (Ashmore Tr. 315-16, 335-36, 341-42, 353-54, 366, 373-83, 397-99).* The scheme's core concept and fundamental purpose was to evade HUD's unit cap fraudulently, by falsely representing to HUD that CGI was complying with the unit cap at the bid stage and by concealing from HUD that CGI actually intended to administer many more units after the bids were awarded.

The core concept or mechanism by which the DSCS would accomplish this fraudulent and illegal objective was to have CGI directors leave CGI to form separate entities – new "shell" companies – which would subcontract with CGI's PHA partners in CGI's place with access to CGI resources, including without limitation its proprietary software system created for the PBCA program. *Id., at 341-42.* After the bids were awarded, these shell companies (and their directors) would be folded or transferred back into CGI by seemingly legitimate mergers or acquisitions, and CGI would quickly be able to reflect on its books the revenue and market share in the 30 jurisdictions that CGI was pursuing. *Id., at 335-36.*

110.   Ashmore further alleges in his District Court Complaint:

Under the Director Shell Company Scheme, CGI would withdraw from the formal agreements it had already entered into with its new partner-PHAs in many of the 26 states it intended to seek in the rebid process. Four current CGI Directors would then resign from CGI to form their own shell companies ('Director Shell Companies') which would enter into new agreements with the same PHAs with which CGI had just terminated its agreements. CGI, in turn, would enter into agreements with the newly-formed Director Shell Companies whereby CGI would be entitled to subsequently acquire these companies after HUD awarded the rebid contracts.

Complaint ¶ 31.

**Admitted.** But *see P. Resp. ¶ 108 above.*

111.   At no point during any of the Rebid Assessment Team meetings was anything discussed along the lines of what Ashmore alleges in Paragraph 31 of his Complaint.

Carragher Decl. ¶ 39; Kyprianou Decl. ¶ 49; Ashbrook Decl. ¶ 11; Ryan Decl. ¶ 10; Steen Decl. ¶ 11; Pierce Decl. ¶ 11; Gorris Decl. ¶ 10; and Rudy Decl. ¶ 11.

**Disputed.**  *See P. Resp. ¶ 109 above* (including, but not limited to, Rat Pack member Gorris's admission that an unspecified number of CGI directors would be the ones to set up the separate, independent corporations to evade the unit caps).  Implicit in that admission, and discussion, is the concept that these CGI directors would have to at least temporarily withdraw from CGI to set up these new "shell" companies to evade the unit cap by concealing the relationship of these shell companies from HUD.  It is also obvious that there would be no financial advantage to CGI in having its senior staff members leaving CGI and setting up independent shell companies unless there were also a plan or scheme to transfer these shell companies back into CGI – by merger, acquisition or otherwise – after the bids were awarded, so that CGI could then administer units in excess of the cap, and reap the enormous revenue and profits.  The details in ¶31 of the Complaint refer to the mechanism by which CGI could accomplish this fraudulent "transfer back" to CGI of units in excess of HUD's unit cap.

Paragraph 31 of the Complaint alleges in part that CGI would create new agreements with its PHA partners to accomplish this fraudulent "transfer back" scheme to evade the HUD unit cap.  Documentation produced by CGI in this case demonstrates that, rather than proceed further with the DSCS after Ashmore's termination, CGI did in fact create new agreements in an effort to accomplish the same fraudulent "transfer back" scheme to evade the HUD unit cap in a different way.

On February 2, 2010, Carragher and Joyce Clause, the CGI manager of the PBCA rebid effort, highlighted in a power point presentation the possibility that if CGI

performed only 49% of the PBCA duties for their PHA partners, they would escape

HUD's scrutiny and not be subject to the unit cap. *Herbst Decl. Ex. 44 (D. Bates 5480).*

On February 26, 2010, Schmitz emailed Carragher and stated

> After yesterday's update, [CGI Federal President] George [Schindler] came back
> to me and asked that we create some alternative models and plans in case HUD
> keeps the cap in place… Analyze and determine how we might structure a
> different model with our new partners that has the partner doing 51% (or some
> other %) of the work so we are not capped out by the unit issue… [w]e may not
> achieve our goal of ███████ in bookings, however, at 49% we could still win and
> book upwards of ██████.

*Herbst Decl. Ex. 45 (D. Bates 9229).* Thus, as early as February 2010, CGI's top

management were discussing what plaintiff refers to as the 49/51% concept. As set forth

in this Response below, CGI later incorporated the fraudulent and illegal "transfer back"

element of the director shell company scheme into the 49/51% concept.

By April 8, 2010, CGI's "49%" strategy had evolved into a plan to perform nearly

all the PBCA work in a combination of states totaling 294,968 units and then less than

49% of the work in a combination of states equaling 567,785 units, producing █████ in

revenue to CGI. *Herbst Decl. Ex. 46 (D. Bates 5229).* Carragher noted that this was

significantly less than would be produced if CGI followed a "no limitations" strategy in

which CGI would perform nearly all the work in a combination of states equaling

862,726 units. *Id.*

As the Rat Pack discussed and considered both the Director Shell Company

Scheme ("DSCS") and the 49/51% concept, Ashmore opposed and objected to pursuing

each for different reasons. About the DSCS, Ashmore repeatedly objected "that it is

illegal to set up an entity that would be presented to HUD as a separate entity… with a

preexisting agreement to fold it back in after the bidding, after the bids were awarded."

*Klein Decl. Ex. 11 (Ashmore Tr. 352-54).*

In addition to objecting to the illegality of the DSCS as "the sham of transferring employees to a shell company and then wrapping it back in," Ashmore told Carragher on or about May 11, 2010 "that it wouldn't even work in the long run."  Ashmore also told Carragher that, based on all his experience, his time at HUD, the time he and Carragher had worked together both at CGI and when he was at HUD, the risks of going down that path without seeking clarification from HUD – about the idea of making acquisitions and returning to CGI the separate entities and transferring back their administered units above the unit cap  after the bids were submitted and awarded – was too high as it could expose the entire company to debarment or suspension from government contracting under the Federal Acquisition Regulation.  *Id., at 353, 359-60, 373-83, 425-26.*

About the "49/51 split" plan, Ashmore objected "because that had not been spelled out in any [HUD] documents and there was nothing that put in place an exception [to the unit cap] on this 49/51." Ashmore further objected that if CGI "thought this was a potential avenue, that we had to ask it formally of HUD, in the formal question-and-answer process that HUD had set up for the PBCA rebid" instead of going "through with [the 49/51% plan] on the presumption that either we wouldn't get caught or somehow we would be able to get over the bid hurdle." *Id., at 316-22.*

CGI formally submitted questions to HUD on February 25, June 3 and July 9, 2010.  *Herbst Decl. Ex. 48, Ex. 4 (Ryan Tr. 38).*  CGI therefore obviously knew that HUD provided opportunities to obtain the clarifications Ashmore said were required before going further with any plans to administer units as a PBCA subcontractor in excess of 300,000 units.  CGI never sought such clarification nor asked HUD the questions

necessary to ensure that the strategies being discussed were permissible. *Klein Decl. Ex. 12 (Kyprianou Tr. 286-87); Herbst Decl. Ex. 48.*

On or about April 16, 2010, (one day after Ashmore's performance review by Carragher, *see P. Resp. ¶ 37 above*) CGI received word of a HUD rumor about the timing of the PBCA bid release that caused Carragher to email CGI Director Dennis Ryan that if the rumor were true, then "I would have to believe that HUD has decided that the unit cap will stand." *Herbst Decl. Ex. 49, Ex. 4 (Ryan Tr. 46-53).* On May 11, 2010, Ashmore communicated to Carragher his last and firmest objection to the DSCS scheme, after making earlier objections during weekly Rat Pack strategy meetings. *Klein Decl. Ex. 11 (Ashmore Tr. 351-59, 367-68, 371).*

The evidentiary record in this case makes clear that, unbeknownst to Ashmore and shortly after his final May 11 objection to the DSCS scheme, CGI moved away from the DSCS scheme and grafted its "transfer back" element to the 49/51% concept to accomplish the same fraudulent and  illegal objective of evading HUD's unit cap without HUD's knowledge. *Herbst Decl. Ex. 50 (P. Ex. 14* (May 17, 2010 "HUD/PBCA Opportunities Senior Management Committee Progress Update," p. 5, explicitly noting, under "Unit Cap Alternatives (Pros/Cons)," that CGI would pursue a "49/51% partner-CGI split (w[ith] partners doing 51% [of the work]" in Ohio and the other states CGI was pursuing above the 300,000 unit cap; and also noting, as a "Pro" of the plan, that the PHA partner is "*Willing to transfer 5l% [of the work] to CGI after 1st year.*") (*emphasis added*).[5]

---

[5]    Until May 17, six days after Ashmore told Carragher the DSCS was illegal and would not work, CGI's documents concerning the 49/51% strategy did not have a "transfer back" concept associated with it.

Significantly, May 17 is the same date that Ashmore was first cut out of Senior Management Committee communications concerning the PBCA rebid and the unit cap, and May 17 was also the day before Kyprianou commenced his sudden and baseless critique of Ashmore.[6] *See P. Resp. ¶¶ 63-64, 82 above.* Prior thereto, at the specific direction of President Schindler, Ashmore had been included in each Senior Management Committee conference call where Carragher updated CGI Group and CGI Federal executives about the status of the PBCA rebid. *Herbst Decl. Ex. 51; Ashmore Decl. ¶¶ 64-65.* Furthermore, all this – Ashmore being cut out of the May 17 Senior Management Committee conference call and his then being subjected to Kyprianou's criticism beginning May 18 – occurred only a few days after Carragher obtained reliable information from HUD on May 14 that the unit cap would be included in the rebid. *See P. Resp. ¶ 63 above.*

When asked at her deposition about P. Ex. 14, the document reflecting for the first time the incorporation into the 49/51% plan of the "transfer back" concept at the core of the DSCS, Rudy, a CGI director and member of the Rat Pack, admitted that the Rat Pack discussed this transfer back mechanism to evade the HUD unit cap on more than one occasion in the context of the 49/51% plan -- where CGI would "submit a "49/51 bid with a PHA partner where, at the bidding stage, the partner would be designated to employ 50% or more of" the staff performing the work in administering the units, "but

---

[6]   At 4:28 p.m., a half hour after the May 17 Senior Management Committee conference call ended, and for the first time, Kyprianou uncharacteristically demanded that Ashmore produce all materials that he had been working on for the Fairfax IT Division project on which Ashmore was then reporting directly to Fairfax IT Vice President Bowell, and on which Kyprianou had no supervisory authority.  *Herbst Decl. Ex. 26 (D. Bates 2823); Ashmore Decl. ¶¶ 93, 99, 103-04.*

that at some point after being awarded the contract, the partner would transfer those staff or those positions back to CGI." *Herbst Decl. Ex. 2 (Rudy Tr. 65-69).*

Rudy further testified that she had discussions about this 49/51% transfer back scheme with CGI's Ohio PHA partner "because the ideal was for CGI to do all the work, as it always had been." *Id., at 69-70.* Rudy further testified that CGI's Ohio PHA partner was "amenable" to the approach. *Id., at 70-74.* Rudy also admitted that CGI's Ohio partner agreed to this arrangement prior to the submission of the rebids in 2011. *Id., at 74-75.*

In July 2010, after Ashmore's termination, this 49/51% transfer back scheme was set forth in a CGI Executive Step Review. *Herbst Decl. Ex. 53 (P. Ex. 15, at 22-29* ("Prime for PHA Partnership (Sub during HUD re-compete)"). When asked about this document and language, Gorris admitted that it refers to the concept that had been discussed by the Rat Pack "of having CGI be a 49-percent subcontractor during the bidding process and having the other 51 percent transferred back by the [PHA] after the award of the contract." *Herbst Decl. Ex. 1 (Gorris Tr. 109-12).*

In fact, in the 2011 rebids, CGI certified to HUD that CGI would provide only



. *Herbst Decl. ¶ 55.*

When CGI initially planned to ████████████████████████ before HUD's implementation of the unit cap limitation (or subsequently changing some states to 49/51% bid states), ███████████████████████████ ██████████ CGI's plan to manage 862,726 units ██████ ██████ █████████████ ████████████████████████. *Herbst Decl. ¶ 54.* CGI's

employees admitted that, as a result of the implementation of the unit cap, their cost

models would have had to change in states where CGI changed its initial plan from

providing virtually all the staff to providing 49% or less of the staff.  *Klein Decl. Ex. 12*

*(Kyprianou Tr. 275-85), Ex. 13 (Carragher Tr. 162-67).*  Carragher could not recall how

the financial information changed but she admitted that CGI's models had to change:

> Q  For jurisdictions where there was a revised MOU reflecting a 49/51 split of the work, was there also a revision to the split of what the revenues would be between CGI and the PHA partner?
>
> A  Yes.
>
> Q  Explain to me what the change was that took place in that regard.
>
> A  Well, at first we would have to, at first clearly we had a, we would have financial models where say, for example, CGI was performing 85 percent of the work and then in the, for the 49/51 jurisdictional splits, because the PHA was taking on additional personnel and tasks and potentially real estate, we would have to revise the budgets for the expenses that they would require or that they had along with CGI's expenses, and that would become the revised budget for the 49/51 split.
>
> Q  When there was a financial model for a state under a scenario of CGI doing most of the work, did that include a modeling out of what the profit would be for CGI and what the profit would be for the PHA?
>
> A  Yes.
>
> Q  And when the new financial models were modeled for a 49/51 split, did those also reflect what the profit would be for CGI versus the PHA?
>
> A  Yes.
>
> …
>
> Q  Did the profit split in dollar amounts between CGI and the PHA partner change between the original model and the 49/51 model?
>
> A  I'm certain it would have changed.

*Id.*



. *See P. Resp. ¶ 147 below.*



In fact, in October 2011, after CGI submitted its rebids in 2011, Rudy, one of the

four CGI directors whom Ashmore identified as planning to resign to set up the

independent shell companies as part of the DCSC scheme, actually did resign her position

as a CGI director to take the Chief Operating Officer role with CGI's Ohio PHA partner,

---

[7]   Plaintiff demanded that CGI produce any evidence which demonstrated that CGI and its PHA partners communicated about and planned for a legitimate 49/51 work split, including all documents related to staffing, performance of the tasks of the PBCA, revenues and profits.  After a lengthy discovery dispute in this case, Magistrate Judge Cott ordered:

> Plaintiff also seeks to compel production of the PHA proposed split documents, encapsulated by Document Request 9 of his second set of requests for production.
>
> …
>
> Defendants represent that they are "in the process of attempting to locate similar types of documents in response to the Court's prior order to produce limited 49/51% documents" and will produce them.  Defendants are directed to make that production (in unredacted form) **not later than August 15, 2014** and, at that time, Plaintiff may review the documents in question to determine if they are consistent with this document request and the Court's prior order.

*Docket #101.*



[8]   Because plaintiff was not aware, prior to his termination, that CGI had grafted the "transfer back" element of the DCSC to the 49/51SS in the month before his termination (because CGI cut Ashmore off from all Rat Pack and Senior Management discussions after CGI learned that units cap would be part of the rebid), and

where she could be both responsible for managing CGI's PBCA work (as subcontractor, using virtually all CGI staff paid for by CGI and who formerly worked for her when she was CGI's Ohio director), *Herbst Decl. Ex 2 (Rudy Tr. 5-6, 28-29),* and in a position to facilitate the transfer back of the PHA partner's 51% share of the work.

After some hemming and hawing, Ryan, another Rat Pack member, admitted that the Rat Pack repeatedly discussed the issue of whether the 49/51% split of the work between CGI and its PHA partners would remain the same throughout the period of the contracts*, Herbst Decl. Ex. 4 (Ryan Tr. 69-74), i.e.*, whether the PHAs would transfer back some or all of their staff and work to CGI after they were awarded the contracts. Ryan also admitted that, although the Rat Pack discussed whether HUD would require reporting of how CGI and its PHA partners were actually splitting the staff and work, and whether HUD would enforce the 49/51% split of the work on which the bids were based, no one from CGI asked those questions or obtained answers from HUD, *id., at 73-75,* preferring to conceal their intentions from HUD.  There is thus plenty of evidence of CGI's planning how to fraudulently evade HUD's unit caps by both "transfer back" DCSC and 49/51SS mechanisms.

> 112.    Ashmore also alleges in his District Court Complaint:
>
> Pursuant to the Director Shell Company Scheme, CGI would provide the Director Shell Companies during the rebid process with full access to all of the proprietary software, processes and staff, thereby providing the shell companies with an improper competitive advantage in the rebid process and demonstrating that the new companies were merely the functional equivalent (or 'alter egos') of CGI itself.  In the bids submitted to HUD by the PHAs and the Director Shell Companies, the shell companies would be falsely presented as independent companies with no ongoing connection to CGI and the use of CGI software, processes and staff would be concealed from HUD.  CGI's secret agreement to acquire the shell companies after HUD awarded the contracts would also be concealed from HUD.

Complaint ¶ 32.

**Admitted.** But *see P. Resp. ¶ 108 above.*

113.    At no point during any of the Rebid Assessment Team meetings was anything discussed along the lines of what Ashmore alleges in Paragraph 32 of his Complaint. Carragher Decl. ¶ 41; Kyprianou Decl. ¶ 51; Ashbrook Decl. ¶ 13; Ryan Decl. ¶ 12; Steen Decl. ¶ 13; Pierce Decl. ¶ 13; Gorris Decl. ¶ 12; and Rudy Decl. ¶ 13.

**Disputed.**  *See P. Resp. ¶¶ 109, 111.*  It is clear that CGI's scheme and discussions involved whether bids submitted by companies appearing to be "independent" from CGI, but under the control of CGI, would escape HUD's scrutiny.  Moreover, the very nature of CGI's fraud hinged upon concealing from HUD CGI's intention to manage units in excess of the unit cap through the fraudulent "transfer back" mechanism.

114.    Ashmore takes his story even further in his Complaint by alleging that:

As the Director Shell Company Scheme was further developed, it was agreed that, if HUD maintained the proposed cap on units under management, Pierce together with fellow Directors Tony Gorris, Shawn Steen and Tracy Rudy, would each form a separate Director Shell Company and would thereafter resign from CGI pursuant to the scheme.  As long-time CGI employees, CGI believed it could rely on these four directors to follow through on the shell company scheme. Moreover, these directors had strong name recognition at HUD and had led CGI's efforts to negotiate the existing agreements with CGI's partner PHAs and therefore would be best positioned to persuade these PHAs to partner with the Director Shell Companies instead of CGI.

Complaint ¶ 35.

**Admitted** that the complaint so alleged**.** *See P. Resp. ¶ 108 above.*

115.    At no point during any of the rebid meetings was anything discussed along the lines of what Ashmore alleges in Paragraph 35 of his Complaint.  Carragher Decl. ¶ 43; Kyprianou Decl. ¶ 53; Ashbrook Decl. ¶ 15; Ryan Decl. ¶ 14; Steen Decl. ¶ 15; Pierce Decl. ¶ 15; Gorris Decl. ¶ 14; and Rudy Decl. ¶ 15.

**Disputed.** *See P. Resp. ¶¶ 109, 111, 113 above.*

116.     Furthermore, at no point in time was the concept of Les Pierce, Tony Gorris, Shawn Steen or Tracy Rudy forming a separate company, resigning from CGI, or receiving a "substantial bonus" to perpetuate Ashmore's "scheme," ever contemplated, mentioned or discussed.  Steen Decl. ¶ 17; Pierce Decl. ¶ 17; Gorris ¶¶ 15-17; and Rudy Decl. ¶ 17.

**Disputed.**  *See P. Resp. ¶¶ 109, 111, 113 above.*

117.     As set forth in detail in CGI's opposition to Ashmore's previously filed OSHA Complaint, Ashmore's conjured up scheme is implausible on numerous levels:

i.     First, in order for this alleged scheme to work, somehow Carragher would have to get three levels of management above her to approve it, including the substantial bonuses referenced by Ashmore.

ii.     Second, all four directors for CGI's entire PBCA operations would simultaneously need to resign at the same time to create these shell companies, without raising any suspicion by HUD.

iii.     Third, in order for this scheme to be plausible, these directors would then have to be willing to end successful long-standing careers and risk the loss of their reputation within the industry.

iv.     Fourth, these directors would then have to be able to convince a number of PHAs across the country to agree to this insanely transparent, ineffective, and unnecessary approach, notwithstanding the fact that they already had entered into contracts with CGI.

v.     Fifth and equally implausible is that CGI would also agree to provide its proprietary industry software at no charge to these shell companies.

vi.     Most implausibly, all of the aforementioned events, including resignations from members of high ranking positions would need to occur on the "hope" that the bids would be successful.

Klein Decl. Ex. 4.

**Disputed.**  *See P. Resp. ¶¶ 109, 111, 113 above and ¶ 147 below.*  ████████████

████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████  *Herbst Decl. ¶ 13.*  Moreover,

defendants "transfer back" scheme did not ultimately depend on all four directors

simultaneously resigning.  Nor would the scheme have entailed those directors ending

their careers, as they would soon be back working for CGI.  And as Rudy admitted, CGI

did have conversations with their PHA partners in which they indicated that they were

amenable to an approach in which the staffing and work would be transferred back to

CGI after the contracts were awarded.

Defendants' suggestion of implausibility omits the huge profitability to CGI of its

plan to increase its Section 8 administration duties from 25% to 75% of the nationwide

market.  In 2009, CGI Federal's revenue from its Section 8 program was $58.1 million.

*Herbst Decl. Ex. 60 (CGI Press Release dated Nov. 5, 2009).*  Had CGI succeeded in

cornering more than 900,000 units, the expected revenue would have amounted to

approximately ███ million over four years, or about ███ million a year.  *Herbst Decl.*

*Ex. 45* (reflecting a discussion between BPS Senior Vice President Rick Schmitz and CGI

Federal President George Schindler of anticipated revenues).  In 2010, CGI Federal's

total revenues, which derived most if not all of its revenues from contracts with the U.S.

federal government and its various agencies, amounted to $510,786,000.  *Herbst Decl.*

*Ex. 61 (see Consolidated Financial Statements of CGI Group, Inc. for the years ended*

*September 30, 2010 and 2009, p. 34).*  The additional ███ million in annual revenue

would have increased CGI Federal's annual revenue more than ███.

Even more significant than the sheer size of this business to CGI was the

enormous profitability of these PBCA contracts, which generated profit margins as high

as █████; with unweighted average profit margins of █████. *Herbst Decl. Ex. 12.* In █████

█████, for example, in 2010, ███████████████████ ███████ ███████



██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████. *Id.* While CGI's ███████████,

█████████████████████ ███████████████████████████

– █████, ██████████████████████████████████████

██████████████████████████ ████ █████████████████████

█████████████. █████████████▪ ████████████████████████████████

████████████████████ ████████████████████████████

████████████████." ██████████████████████████ During the rebid, HUD

identified a 10% profit target for the new contracts, which is consistent with HUD's

Inspector General's complaints about excess profits. *P. Resp. ¶ 14 above.* Many federal

contractors, however, have profits under 10%, and the profitability of CGI's federal

government contracting business is unusual, to say the least:

> There are some other oddities in CGI's financials. Its reported profit margins
> seem high, given the businesses it is in. In its U.S. business, CGI reported an
> EBITDA (earnings before interest, taxes, and depreciation and amortization)
> margin of 15 percent in its last fiscal year. But in the past year, 55 percent of
> CGI's business in the U.S. came from contracts with the federal government and
> its agencies. Government contracts often operate on a cost-plus basis, meaning
> that contractors are allowed to earn their costs, plus a little profit. Stanley, which
> was acquired by CGI in 2010 and which greatly increased the size of CGI's
> business in the U.S., had an EBITDA margin of 10 percent in the last fiscal year
> before the acquisition. Since then, there has been pressure on margins, and now,

---

[9] ████████████████████████████████████████ ▪ ████████████████████

███████████████████████████████████

████████████████████████████████

in general, large federal contractors have EBITDA margins below 10 percent. Assume that CGI is more efficient than its peers and has kept a 10 percent margin in the business it does with the U.S. government. Even then, to get to the blended margin of 15 percent that it reports, its nongovernment business would have to have had a 22 percent EBITDA margin, which is sky-high for an information-technology contractor. CGI says that the assumption that its margin on its government work is 10 percent is "incorrect," as is the idea that its government work is predominantly on a cost-plus basis.

*Herbst Decl. Ex. 62* (McLean, Bethany. "*Accounting for Obamacare: Inside the Company That Built Healthcare.gov*", Vanity Fair, December 23, 2013, par. 21).

Plaintiff's strong testimonial and documentary evidence of defendants' fraudulent and illegal "transfer back" scheme is set forth above and below is entirely plausible and more than sufficient to require a trial.  The powerful evidence of plaintiff's hasty and pretextual poor-performance termination buttresses plaintiff's evidence of the existence of the scheme and his opposition and objection thereto, because there is no other plausible explanation for that termination under the circumstances in this record, including but not limited to the chronology of events detailed herein.  Accordingly, the elements of "implausibility" raised by defendants pale in comparison to the implausibility of defendants' defense in this case that Ashmore was really fired for poor performance. In any event, implausibility is an issue that goes to the weight of plaintiff's and defendants' evidence at trial, not to the sole issue here at this summary judgment stage – whether there are material issues of disputed facts that, in the light most favorable to plaintiff, require a trial.

118.   Regarding Ashmore's alleged opposition to this non-existent scheme, Ashmore's Complaint merely states the following:

- In discussions with Carragher, Pierce, Kyprianou and others, Mr. Ashmore consistently argued against using the Director Shell Company Scheme. Complaint ¶ 40.

- ▪ <u>Mr. Ashmore also repeatedly made it clear to Carragher that he opposed the Director Shell Company scheme because it would fraudulently evade HUD and federal acquisition regulations.  Id. at ¶ 41.</u>

- ▪ <u>On or about May 11, 2010, Mr. Ashmore had a heated telephone call with Carragher in which he strenuously objected to the Director Shell Company Scheme and told Carragher that it was illegal and that they should not pursue it. Id. at ¶ 47.</u>

**Admitted.**  But *see P. Resp. ¶ 108 above.*

119.   <u>Absent Ashmore's conclusory allegations in his Complaint that he either "argued against," "opposed" or "objected" to this non-existent scheme, Ashmore testified that he has no documentary evidence to support his allegations that he "argued against," "opposed" or "objected" to anyone at CGI.  Ashmore Tr. 339, 349, 350, 354, 360, 361, 388-81, 384.</u>

**Admitted.**  But *see P. Resp. ¶¶ 109, 111, 113, 115-17 above,* which summarizes the testimonial and documentary evidence which plaintiff has adduced since the filing of the complaint.  Ashmore's sworn testimony, which details his arguments against and opposition and objections to this scheme, is itself sufficient to deny defendants leave to move for summary judgment.  *Klein Decl. Ex. 11 (Ashmore Tr. 315-16, 335-36, 341-42, 353-54, 366, 367-68, 371, 373-83, 397-99).*

120.   <u>During Ashmore's deposition he was asked the following question and provided the following answer:</u>

Q:    <u>So the answer is, no, you have no documentation of any of these conversations that took place where you voiced objections to the shell company scheme.</u>

A:    <u>That's correct.</u>

<u>Ashmore Tr. 384.</u>

**Admitted.**  But *see P. Resp. ¶ 121 below.*

121.   <u>Ashmore has failed to a produce a single e-mail, letter, note, memo or audio recording that would corroborate his allegation that he "argued against," "opposed" or "objected" to anyone at CGI.  Ashmore Tr. 339, 349, 350, 354, 360, 361, 388-81, 384.</u>

**Admitted.**  But Ashmore explained why:

> [D]uring my employment with CGI, the unit caps were proposed, they weren't finalized.  So this scheme was a potential eventuality if the unit caps became firm.  While I was at CGI, I did not know the unit caps had become firm.  Additionally, at the same time, during my, just a few days before my objection to Ms. Carragher and then continuing through my termination, I was deeply immersed in that HUD transformation initiative pursuit.
>
> …
>
> I was busy on the HUD transformation initiative.  That proposal was submitted on that transformation initiative on June 2nd and oral arguments were I believe June 11th, which was a Friday.  And then I was terminated that next week.  So I didn't have occasion to become intimately involved in the PBCA or even any execution of this during that period of the end of May, very beginning of June.
>
> …
>
> At the time I didn't see this as something that needed documentation.  I saw this as colleagues who I had worked with for a very long period who I respected, who I thought respected me, and I saw this as my chance to convince them not to pursue something that was illegal.  I didn't see it as a point in time where I had to begin a documentation of an activity because my job was in jeopardy.  In fact, at the point in time that this [May 11] call occurred, while I did see those two concrete actions, I was under the impression, based on everything that was going on, that we were going to be successful in having the unit caps removed.  So if we're successful in defeating what I believe to be bad regs, then there is no issue, we got what we wanted in the long run.  So there wasn't, this was not the type of thing that I needed to document or formally send a warning to Ms. Carragher.  I was trying to convince her based on my knowledge and she didn't, when we had that conversation, there wasn't any, "No, Ben, you're wrong, this is completely," you know, "We can do this. This is legal."  She was dismissive, "Well, we are going to win on the unit caps, it's not a big deal".  I recall her being very, you don't have to worry about this, this is not an issue, we are just trying to cover all our bases and see what is available.  It was not anything that I felt had gotten to the point where there had to be documentation.  I was trying to help my colleagues and contribute to a team where I was a member of a senior team at CGI.  So, no, I didn't document it.

*Klein Decl. Ex. 11 (Ashmore Tr. 379-83).*

122.    Because the alleged scheme set forth in Ashmore's Complaint never existed, Ashmore never objected to anyone at CGI about its purported existence.  Carragher Decl. ¶¶ 45-49; Kyprianou Decl. ¶¶ 54-56; Ashbrook Decl. ¶¶ 16-18; Ryan Decl. ¶¶ 15-17; Steen Decl. ¶¶ 18-20; Pierce Decl. ¶¶ 18-20; Gorris Decl. ¶¶ 18-20; and Rudy Decl. ¶¶ 18-19.

**Disputed.**  *See P. Resp. ¶ 109, 111, 113, 115-119 above*.  Ashmore repeatedly made his objections – albeit oral rather than written – clear to Carragher and other members of the Rat Pack **and** the scheme existed.  *Klein Decl. Ex. 11 (Ashmore Tr. 352-83)*.

123.    When Ashmore was questioned in detail as to what his purported objections were, he stated as follows:

> A:    I told Ms. Carragher that I believed it was an illegal and fraudulent way to evade the HUD regulations.  That any attempt to present something to HUD that we knew was completely different was illegal.  And that there were no other ways that we could deal with this.
>
> We talked about how it could be protested.  We talked about legal avenues.
>
> But I conveyed to Ms. Carragher very clearly that based on the fact of all of my experience, the time that she and I had worked together, my time with HUD, that this was something that was illegal and fraudulent and it was something that would never, it would never work.
>
> It would—the risks of going down this illegal path without getting clarification about the idea of acquisitions after the bid, with letting people go to subsidiaries with the preexisting arrangement that they would come right back, that all of it was illegal.

Ashmore Tr. 373-374.

**Disputed in part.**  CGI inaccurately inserts the word "no" between "were" and "other" in the above citation.  The actual transcript reads "And that there were other ways that we could deal with this."  See also *Klein Decl. Ex. 11 (Ashmore Tr. 315-16, 335-36, 341-42, 353-54, 366, 367-68, 371, 373-83, 397-99)* for a fuller rendition of what Ashmore's objections and opposition were.

124.    Furthermore, though Ashmore alleges in his Complaint, which CGI denies, that CGI "made extensive use of telephones and email to plan and execute their fraudulent scheme," Ashmore's Complaint is void of any allegations that when he "argued against," "opposed" or "objected" to Ms. Carragher he raised any concerns about CGI's use of telephone or email.  Complaint ¶ 39.

**Admitted but irrelevant.**  Significantly, defendants do not specifically state or contend that Ashmore lacked this belief, nor can they, since the Rat Pack members were located in different states and conducted their meetings and discussions by interstate phone and email.

125.    During Ashmore's deposition he was also asked the following questions and provided the following answers:

Q:    And my question to you is do you recall having audio files saved to your CGI computer?

A:    Yes.

*****

Q.    Was the purpose of recording those conversations to document things that you may use in your ongoing divorce and/or custody proceeding?

A:    Somewhat.

Q:    What's the other part of the somewhat?

A:    They were used in case my ex-wife made allegations about either the telephone calls or the exchanges so that I would have a record to use in rebuttal.

Q:    So essentially you would go to the audiotape if there was a dispute as to something that you had tape recorded?

A:    Correct.

Q:    Did you ever have to do that?

A:    It was done substantially in the first trial.

*** 

Q:      How did you go about taping all these conversations?

A:      I had a small Sony digital recorder that, for example, would be in my pocket at an exchange, turned on.

        With telephone calls, if my ex-wife contacted me, I would put the call on speaker phone and turn the digital recorder on.

***

Q:      Is that something that you would kind of keep on you because you never know when you would be in dispute with Kelly?

A:      That never left my possession during the trials.

Q:      So it never left your possession from 20 -- what did you say 2007 through 2011?

A:      No.  That would have been about 2008 through 2011.

Q:      So it was one of those situations where every morning you make sure you've got your phone, your keys, your tape recorder and you're good to go?

A:      My wallet was one of those things in that category.

Q:      But like a never leave home without it?

A:      Correct.

Ashmore Tr. 219-222.

**Admitted.**

126.    Despite Ashmore's testimony that he always had his digital recorder with him and that he previously and regularly surreptitiously tape recorded conversations for his matrimonial proceeding, as well as a conversation with Ms. Carragher and Human Resources, Ashmore has not produced a single audio recording that corroborates the allegations set forth in the instant action.

**Disputed.**  *See P. Resp. ¶¶ 97-98, 121.*

- 78 -

ii.   *What Actually Transpired At CGI Post Unit Cap Announcement*

127.    Following CGI becoming aware of the potential imposition of a unit cap in the rebid process, members of CGI's Rebid Assessment Team conducted numerous brainstorming sessions where various ideas were presented as to how CGI could proceed if the proposed unit cap was actually implemented.  Carragher Decl. ¶ 50.

**Admitted.**

128.    It appears that Ashmore is now relying upon a January 27, 2010 email that was sent to Ms. Carragher by Mr. Kyprianou as the purported documentary support for his allegations in the instant action.  Carragher Decl. ¶ 51.

**Disputed.**  This exhibit (actually a January 29 email) is just one out of many documents and emails and deposition admissions which support the allegations in this case.  *See P. Resp. ¶¶ 109, 111, 113, 115, 117, 119 above.*

129.    Regarding Mr. Kyprianou's aforementioned January 27, 2010 email, which he sent as part of a brainstorming session shortly after the unit cap was announced, he stated in part, "I don't know whether this is possible or allowable, but can we create new entities for selected jurisdictions that are a joined [sic] venture of a PHA and CGI subsidiary." Kyprianou Decl. Ex. 19.

**Admitted.**  But *see P. Resp. ¶¶ 109, 111, 113 above.*

130.    This email, which Ashmore was not a recipient of, but only obtained during discovery in this case, came at the preliminary stages of CGI's brainstorming efforts focused on discussing possible ways CGI may proceed during the rebid if the unit cap was ever implemented.  Carragher Decl . ¶ 52; Kyprianou ¶ 59.

**Admitted.**  But *see P. Resp. ¶¶ 109, 111, 113, 119 above.*  This email reflects the inception of the "transfer back" scheme that was subsequently discussed on Rat Pack calls, and to which Ashmore objected.

131.  Mr. Kyprianou's reference to the aforementioned "CGI subsidiary" concept neither involved setting up shell companies separate and apart from CGI nor did members of the Rebid Assessment Team discuss the possibility of setting up outside corporate entities for purposes of bidding in excess of the unit cap.  Carragher Decl. ¶ 53; Kyprianou Decl. ¶ 60.

**Disputed.**  *See P. Resp. ¶¶ 109, 111 above.*  If the "new entities" Kyprianou were referring to were only legitimate, transparent CGI "subsidiaries," there would have been no occasion for him to refer to "hid[ing]" behind those entities to "get away" or evade "the unit restrictions," or emphasize that those entities would be "independent from CGI." *Carragher Decl. Ex. 8 (P. Ex. 13).*  Moreover, as noted above in *P. Resp. ¶¶ 109, 111,* several Rat Pack members admitted that this reference was to separate, independent entities, which Ashmore has referred to as "shell companies."

132.  The "subsidiary" concept was something one of CGI's competitors (Quadel Consulting Corporation) historically employed when they pursued PBCA contracts and other related housing work.  Carragher Decl. ¶ 54; Kyprianou Decl. ¶ 61.

**Disputed.**  *See P. Resp. ¶109, 111 above.*  Unlike the independent companies that CGI discussed creating, concealed from HUD to evade the unit cap, Quadel's subsidiaries contained the name Quadel so that HUD and everyone else in the industry would be aware of the subsidiaries' connection to the Quadel.  CGI did not discuss a concept of transparent subsidiaries like Quadel, that would be clearly identified as CGI's

- 80 -

subsidiaries, but instead "independent" entities that CGI could "hide behind" and thus "get away with the unit restrictions" because HUD would not realize that these entities were actually CGI.  *Carragher Decl. Ex. 8 (P. Ex. 13).*

133.    Quadel has formed corporate subsidiaries, such as Indiana Quadel Consulting Corporation and Metropolitan Baltimore Quadel Consulting, LLC, and such subsidiaries are the entities that would enter into the subcontracts with their PHA partners to perform certain performance based tasks under the ACC and/or other services for their PHA clients.  Id.

**Admitted.**  But *see P. Resp. ¶ 132 above.*

134.    During one of CGI's early brainstorming sessions, members of the Rebid Assessment Team threw out the idea, in jest, of CGI possibly forming another company and then someone said in response it could be called the "Honey Baked Ham" PBCA, to which everyone laughed.  Kyprianou Decl. ¶ 63; Carragher Decl. ¶ 56; Steen Decl. ¶ 24; Pierce Decl. ¶ 25; Rudy Decl. ¶ 23; Ashbrook Decl. ¶ 23; Ryan Decl. ¶ 22.

**Disputed in part.**  *See P. Resp. ¶ 109, 111 above.*  The record evidence in this case makes clear that the "transfer back" scheme to defraud HUD by evading its unit caps was not a "joke."  Because Rat Pack member Les Pierce, who explained and argued for the "transfer back" scheme using shell companies, also owned a Honey Baked Ham franchise, there was one occasion in which a Rat Pack member jokingly suggested that Pierce's shell company could have "Honey Baked Ham" in its name.  *Ashmore Decl. ¶ 61.*  But the shell company scheme was definitely no joke. *Id.*

135.    The reference to "Honey Baked Ham" was a running joke amongst members of the Rebid Assessment Team as one of the members of the Rebid Assessment Team,

Leslie Pierce, owns a Honey Baked Ham franchise, and the team frequently joked with him about his franchise.  Kyprianou Decl. ¶ 64; Carragher Decl. ¶ 57; Steen Decl. ¶ 24; Pierce Decl. ¶ 25; Rudy Decl. ¶ 23; Ashbrook Decl. ¶ 23; Ryan Decl. ¶ 22.

**Disputed.**  *See P. Resp. ¶ 134 above.*

136.    This passing reference to "Honey Baked Ham," which was known by all members of the Rebid Assessment Team (which included Ashmore) to be a joke, was never discussed in any detail or with any specificity.  Kyprianou Decl. ¶ 65; Carragher Decl. ¶ 58; Steen Decl.¶ 24; Rudy Decl. ¶ 23; Ashbrook Decl. ¶ 23; Ryan Decl. ¶ 22.

**Disputed.**  *See P. Resp. ¶¶ 109, 111, 113, 115, 128-134 above.*

137.    Other than the aforementioned Honey Baked Ham PBCA joke, CGI is unaware of any conversations about the setting up of outside companies as a way to address the unit cap as alleged by Ashmore.  Kyprianou Decl. ¶ 66; Carragher Decl. ¶ 59.

**Disputed.**  *See P. Resp. ¶¶ 109, 111, 113, 115, 128-134 above.*

138.    From the inception of Ashmore's claim, CGI has repeatedly denied Ashmore's allegations whether it was in CGI's response to Ashmore's August 2010 demand letter, CGI's answer to Ashmore's OSHA Complaint or CGI's Answer in the instant action.  A constant argument that CGI has repeatedly made is that Ashmore has no documentary evidence to corroborate his baseless allegations.  Klein Decl. Exs. 2, 4 and 8.

**Admitted**, again falsely.

139.    Once the unit cap was announced in January 2010 (¶ 23, *supra*), CGI began lobbying HUD in hopes that the unit cap would not be adopted when the final Invitation for Submissions was issued.  Though CGI had hoped that the unit cap would not be included in the final Invitation for Submissions, CGI proceeded as if the unit cap was going to be

implemented and focused on ascertaining exactly what HUD actually meant by the unit cap and how CGI would proceed in light of the unit cap.  Carragher Decl. ¶ 60.

> **Disputed in part.**  When HUD announced the unit cap in January 2010, it was a "proposed" restriction.  *Herbst Decl. Ex. 4 (Ryan Tr. 32-33).*  Because CGI was optimistic that their lobbying efforts would succeed in persuading HUD not to implement the proposed unit cap in the end, there were times when CGI was not actively planning as if the unit cap was going to be implemented.  *Klein Decl. Ex. 11 (Ashmore Tr. 382).*  It was not until June 8, 2010 that HUD announced that it had decided to implement the unit cap.  *See P. Resp. ¶¶ 63, 82 above and ¶ 140 below.*  Finally, CGI cites no evidence that it tried to ascertain what HUD meant by the unit cap by asking any questions of HUD.  *See P. Resp. ¶ 111.*

140.    Ashmore alleges in his Complaint that following a June 9, 2010 HUD monthly Contract Administration Oversight Monitor conference call, it was "confirmed" that the unit cap would be implemented and that the "maximum number of units would be set at 400,000."  Complaint ¶ 51.

> **Admitted.**  This conference call concerned and followed HUD's release, by email on June 8, of the formal documents implementing the unit cap.  *Herbst Decl. Ex. 35 (P. Ex. 28, D. Bates 8719).*  The conference call confirmed that the unit cap would be implemented.

141.    Ashmore's allegations as to the "timing" of the final unit cap announcement is belied by the fact that in a July 9, 2010 "PBCA Rebid: Questions and Comments" posted by CGI on the HUD website, CGI was still lobbying for the removal of the unit cap, as evidenced by the following "Suggested Remedy / Recommendation:"

> We recommend that HUD remove the proposed unit count limit on submission of
> proposals to the Invitation for Application.  The Unit cap limitation is
> counterproductive and does not help meet the goals of HUD or the Inspector
> General.  The removal of this cap will encourage full and fair competition and
> will ultimately benefit the program by identifying the strongest provider for each
> contract.

Carragher Decl. Ex. 9.

**Disputed.**  *See P. Resp. ¶¶ 139-40 above.*  That CGI continued to argue against the unit-

cap restriction, after it was implemented by HUD, is irrelevant to whether or not on June

8-9, 2010, the unit cap restriction moved from being "proposed" to "implemented."

142.    It was not until February 25, 2011 when HUD released the "Invitation for

Submission of Applications:  Contract Administrators for Project-Based Section 8 Housing

Assistance (HAP) Contracts" ("2011 Invitation") that CGI had final clarity as to what the "unit

cap" was.  Carragher Decl. Ex. 10.

**Disputed.**  *See P. Resp. ¶¶ 139-41 above.*  In January 2010, HUD proposed a unit cap of

300,000 units.  *See P. Resp. ¶ 24 above.*  When HUD implemented the unit cap on June

8, 2010, HUD raised the cap to 400,000 units.  On March 24, 2011, after HUD had

released the Invitation for the submission of bids, HUD raised the unit cap to 407,265

units (equaling exactly 33% of the national Section 8 program inventory).  *Herbst Decl.*

*Ex. 57 (D. Bates 2006674).*  Thus, the unit cap did not significantly change from June 8,

2010 to March 24, 2011 nor did HUD indicate that it might rescind the unit cap after June

8.  The important point is that CGI learned on June 8, 2010 that HUD would implement

the unit cap, thereby precluding CGI from enormously growing its business to more than

900,000 units if CGI complied with rather than evade HUD's unit cap.

143.    This 2011 Invitation was issued eight months after Ashmore's termination.

Id.

**Admitted.**

144.   Pursuant to the 2011 Invitation, CGI learned that HUD defined the unit cap as not to "exceed thirty-three (33) percent of the total number of units in the Portfolio of All Active Project-Based Section 8 Contracts as published by HUD."  Id. at pgs. 9-10.

**Admitted.** But *see P. Resp. ¶¶ 139-142 above.*  The 400,000 unit cap announced on June 8, 2010 was effectively 33% of the Section 8 units nationwide.

145.   Furthermore, in the 2011 Invitation, CGI learned that as a subcontractor, if it is "engaged by PHAs to perform services under separate Applications to this Invitation where the sub-contractor provided fifty (50) percent or more of the full-time equivalent (FTE) employees required to perform PBT numbers one (1) through six (6) as specified in Exhibit A, Section 3, of the ACC," that would count towards the unit cap.  Id. at pg 10.

**Admitted.**  But *see P. Resp. ¶ 111 above*, which reflects that, as early as February 2010, CGI began to plan for a possible 49% exception which could be exploited to evade the unit cap limitation, and that CGI never sought clarification nor asked HUD the questions necessary to determine HUD would accept the 49/51SS.

146.   As a result of the unit cap, CGI and its PHA partners had to discuss how to delegate those tasks that needed to be performed under the ACC.  Carragher Decl. ¶ 65.

**Admitted.**

147.   In some jurisdictions it was agreed between CGI and its PHA partner that CGI would retain the responsibility for in excess of 50% of the work, while in other jurisdictions it was agreed that CGI would perform less than 50% of the work and the PHA partner would perform the majority of the work.  This work split was referred to internally within CGI as the "49/51% split."  Id.

**Disputed.**  *See P. Resp. ¶ 111 above.* ███████████████████

████████████████████████████████████████

████████████████████████████

       148.    Ashmore has attempted to associate the 49/51% split with his whistleblower cause of action but it is undeniable that his pleadings herein, or before OSHA, are void of any reference to the 49/51% split or that he even voiced any objections to the 49/51% split.

      **Admitted.**  While Ashmore's pleadings are devoid of any reference to the 49/51% split Ashmore did voice objections to the 49/51% split concept (before the fraudulent and illegal transfer back mechanism was grafted onto it).  *See P. Resp. ¶¶ 109, 111, 113, 115, 121, 147 above and ¶ 149 below.*

      149.    Regarding the aforementioned 49/51% split, Ashmore provided the following testimony during his June 2013 deposition:

      Q:    The allegations set forth in your complaint in this action, do they have anything to do with the 49/51 percent split?

      A:    They do not.

Ashmore Tr. 319.

      **Disputed in part.**  Ashmore also testified:

      Q   Mr. Ashmore, in your complaint and various other documents that have been submitted in this case, there are allegations that you maintain you were terminated for allegedly blowing the whistle on some alleged shell company scheme; is that correct?

      A   Correct.

      Q   Is the 49/51 percent split part of that shell company scheme?

      A   At the time that I was at CGI, that is a distinct event from the director shell scheme.

      …

Q   The 49/51 percent split is separate and distinct from the shell company scheme?

A   I can't tell you with certainty whether it is separate at the time that I was at CGI.  At the time that I raised my objections to both of avenues, they were separate and distinct avenues.

*Klein Decl. Ex. 11 (Ashmore Tr. 320-321).*

The reason why, as Ashmore testified, he did not state that the 49/51SS was illegal in the same clear way he stated that the DSCS was illegal is that, before his termination, he was unaware that the fraudulent, concealed "transfer back" element of the DSCS had been grafted onto the 49/51%SS after HUD informally communicated to CGI in mid-May 2010 that the unit cap was going to be implemented.  Ashmore was unaware of that because he was cut out of all communications about it beginning on May 17, 2010.  *See P. Resp. ¶¶ 82, 109, 111, 121, 147; Ashmore Decl. ¶¶ 64-66.*

150.   In addition to testifying that the 49/51% split has nothing to do with the allegations in his District Court Complaint, there is not a single reference the 49/51% split in either Ashmore's August 2010 demand letter or December 2010 OSHA Complaint or the instant District Court Complaint.  Klein Decl. Exs. 1, 3 and 7.

**Disputed in part.**  *See P. Resp. ¶¶ 147-49 above.*

151.   Additionally, the 2011 Invitation called for complete transparency between HUD, the PHAs and their subcontractors.   Carragher Decl. Ex. 10.

**Disputed.**  HUD did not require complete transparency because HUD only required written summary certifications showing the staffing breakdown between the CGI and its PHA partners.  HUD did not require CGI or its PHA partners to submit "budget or cost estimates or overhead and profit calculations" that would have created complete transparency, provided HUD with the ability to verify that the written certifications were

accurate, and prevented the submission of fraudulent certifications ██████

███████  ████████████████████████████████████████████████

███████.  *Herbst Decl. Ex. 57 (D. Bates 2006561).*

        152.   <u>The 2011 Invitation required the PHA to submit a full-time equivalent</u>
<u>certification identifying what tasks were being performed and whether they were to be performed</u>
<u>by the PHA or its subcontractor.  Id.</u>

     **Admitted.** But *see P. Resp. ¶¶ 147-49, 151.*

        153.   <u>In those instances where the subcontractor was to perform more than 50%</u>
<u>of those identified performance based tasks, the subcontractor needed to provide HUD a stand</u>
<u>alone certification.  Id.; Carragher Decl. Exs. 11 and 12.</u>

     **Admitted.** But *see P. Resp. ¶¶ 147-49, 151-52.*

        154.   <u>Ultimately, the 2011 Invitation was cancelled in its entirety by HUD.</u>
<u>Carragher Decl. ¶ 62.</u>

     **Admitted.**  However, HUD resolicited the PBCA rebids in 2012 through a different

procurement process; CGI's PHA partners have brought litigation concerning both

HUD's 2011 and 2012 attempts to make new PBCA awards that significantly

disadvantaged CGI.  *See P. Resp. ¶ 1.* This extant litigation remains pending and as a

consequence, CGI is still performing the PBCA duties in its original five incumbent

jurisdictions.  *See e.g.* DePhillis, Lydia "***CGI Federal landed the Healthcare.gov***

***contract. Here's how it fights for the ones it loses.***"  The Washington Post, 10.23.13.

*Ashmore's Breach of Contract Cause of Action*

155.   Ashmore alleges in his Complaint that CGI "breached its contractual obligation" to "pay him a bonus" and he's been damaged in the amount of $220,000.  Complaint ¶¶ 75-76.

**Admitted.**  But *see P. Resp. ¶ 108.*  Obviously those were the alleged estimated damages at the time Ashmore was fired.  The damages are significantly higher now.

156.   CGI's fiscal year runs from October 1st through September 30th. Carragher Decl. ¶ 95.

**Admitted.**

157.   It was the policy of Ms. Carragher's group, which Ashmore was aware of, that in order for a CGI employee to be eligible for a profit participation award, which was the only type of bonus that an employee such as Ashmore was eligible for, the employee had to be employed by CGI for 6 months during the applicable fiscal year.  Carragher Decl. ¶¶ 93-95; Carragher Decl. Ex. 15.

**Disputed.**  When asked "why was no bonus paid to Mr. Ashmore for the 2009 fiscal year," Carragher testified that "we don't pay bonuses."  Carragher also testified that Ashmore was not paid profit participation because he had worked a full six months within the fiscal year. *Klein Decl. Ex. 13 (Carragher Tr. 218).*  However, the documentary evidence reveals that (1) during 2009 and 2010, CGI (including Carragher's BPS Division) paid bonuses, profit participation awards, and stock options, and (2) in internal planning documents, Ashmore was specifically earmarked for increased profit participation awards and stock options, together with internal budgeting to pay him the amount of bonus he had been promised. *Herbst Decl. Ex. 65-66.*  Included in this

evidence is an email to Carragher from Human Resources concerning the 2009 fiscal year, expressly noting that "[w]e have highlighted those in the [business unit] for less than 90 days as historically, they have not been eligible for PPP – if you want to allocate PPP to any of those members, you will need to justify the decision."  *Id., D. Bates 2007362-73.*  Accordingly, Carragher and CGI could have paid Ashmore the promised additional "bonus" compensation, whether denominated as profit participation, bonus and/or options.

158.    Ashmore commenced employment with CGI in May 2009, thus he only worked for CGI for five (5) months during said fiscal year.

**Admitted.**

159.    Ashmore's offer letter stated that his base salary would be "$126,000.00 USD per year" and that he would "be eligible to be a participant in the CGI Profit Participation Program" and that his receipt of Profit Participation was "based on the achievement of certain financial results, client satisfaction, member satisfaction and other measures tied to your performance.  This program is dependent upon the success of the company, your business unit and your own performance."  Carragher Decl. Ex. 1.

**Admitted.**

160.    Regarding Ashmore's potential receipt of a bonus, Ashmore testified, "that my supervisors, would have discretion to award me a bonus based upon my performance with the company."  Ashmore Tr. 195.  Ashmore further testified that it was his understanding that bonuses at CGI were discretionary.  Id.

**Disputed.**  Ashmore also testified about his understanding of what "discretionary" means:

It was discretionary insofar as whether or not I met my performance metrics.

…

[W]hen I was hired, Ms. Carragher flat out informed me that based on the base that I wanted, and [if] I met all my performance metrics, I would get a bonus equal to my base and I could have a much higher upside. So yes, I completely believe that Ms. Carragher as the vice president of this division had the ability to set bonuses and make compensation.

*Klein Decl. Ex. 11 (Ashmore Tr. 195-96, 385).*

    161.    <u>Ashmore never received any documents indicating that bonuses at CGI were mandatory or that all employees at CGI were to receive bonuses on an annual basis. Ashmore Tr. 196.</u>

    **Admitted.**

    162.    <u>Ashmore alleges that "CGI had internally allocated a bonus" for him "in the amount of approximately $220,000." Complaint ¶ 65.</u>

    **Admitted.** But *see P. Resp. ¶ 108.*

    163.    <u>CGI members in Ms. Carragher's business unit who were "Managers," the same title as Ashmore, and were eligible and their performance qualified them for Profit Participation, received Profit Participation awards for the 2009 – 2010 Fiscal Year in the range of $0 to $7,770. Carragher Decl. ¶ 96.</u>

    **Disputed in part.** Ashmore was promised substantially more in additional compensation when he was recruited to CGI by Carragher, and Carragher and CGI had the capacity to fulfill that promise. *See P. Resp. ¶¶ 155-62 above.* Ashmore's pre-offer emails with Carragher reflect his belief that he was accepting a low base salary matched to a higher incentive component, and Carragher testified that she could not recall responding to Ashmore to tell him his belief was incorrect. *Klein Decl. Ex. 13 (Carragher Tr. 224-28); Ashmore Decl. ¶¶ 18-23.*

Furthermore, in response to questions about similarity in titles within Carragher's unit, including with respect to whether certain titles were "higher in terms of pay," Kyprianou testified that "I just want to point out the size of the company and these roles can mean different things for different units… [and] ["within the BPS unit"] in my experience, pay is not always similar… pay is not a good way to figure out who is higher than another on the scale."  *Klein Decl. Ex. 12 (Kyprianou Tr. 33-34).*

## IV.  ASHMORE'S HIGHLY QUESTIONABLE CREDIBILITY[10]

164.  As stated throughout this Rule 56.1 Statement, as well as the numerous Declarations submitted in support of CGI's motion for summary judgment, Ashmore's allegations regarding the existence of a "shell company scheme" are completely fictitious.

**Disputed.**  *See, e.g., P. Resp. ¶¶ 88, 109, 111, 115, 115-117, 121-123, 139-132, 134, 147-54 above.*

165.  Following Ashmore's termination of employment from CGI, CGI retained Ashmore's CGI-issued laptop computer which was to be used exclusively for work related purposes.  Carragher Decl. ¶ 85.

**Disputed.**  Ashmore fully complied with the CGI "IS-IT Use Policy" that was provided to him upon hire.  *Ashmore Decl. ¶¶ 109-110.*  Although the Carragher cite above now claims that CGI learned, after Ashmore's termination, that he had violated computer policies, Ashmore's testimony is to the contrary:

> There came a point in time when I was traveling and I asked Marybeth [Carragher] if, I asked who would have access to the computer in the IT department from updating it, because I wanted to load some old divorce documents onto my computer in case anything came up while I was on the road, such as a telephone conference with the judge.  So to the extent that you are

---

[10]  Since credibility is not be an issue on summary judgment, we respectfully submit that this section of defendants' Rule 56.1 Statement should be disregarded by the Court.

asking whether it was to be used for personal use, it certainly could not be used to run a business off of their laptop.  But if I wanted to surf the internet, access my bank accounts, those types of things, that's not beyond the scope of what was permitted to be done with that laptop… I was never given any indication that that was not permissible.

…

I was given permission for ["saving all those divorce documents to the hard drive"].

…

[by] Marybeth Carragher.

…

I don't recall that I went into detail with Ms. Carragher, but I had an external hard drive that I used to transfer the pictures and the pleadings that were relevant to my divorce.

...

When I transferred to my work computer, I didn't go through the folder on my home computer, and I just transferred everything at once.  So whatever was in that folder was pulled over, it wasn't something that I went through and discriminated between, I would need this pleading, but not the other pleading or this picture, not the other picture.

*Klein Decl. Ex. 11 (Ashmore Tr. 212-19).*

166.   Archived on Ashmore's CGI-issued laptop computer were presumably all of his work-related emails in addition to thousands of his personal files, including but not limited to, thousands of photographs, hundreds of audio files of various telephone conversations between Ashmore and his ex-wife, as well as a complete document repository of the entirety of Ashmore's protracted matrimonial and custody proceedings.  In fact, located on Ashmore's CGI issued computer were numerous references to court appearances that Ashmore attended during his employment at CGI which he did not advise CGI of or seek CGI's consent to attend.  Furthermore, located on Ashmore's CGI issued computer were numerous detailed and lengthy correspondence drafted by Ashmore related to his matrimonial proceeding that appear to have been drafted and sent during normal business hours.  Id. at ¶ 86; Klein Decl. ¶ 44.

**Disputed in part.**  Ashmore testified that he advised his supervisors of his court

appearances and was told that they were not a problem:

> Q   But for the times that you were out of work related to your personal matrimonial
> matter, did you inform the folks at CGI?
>
> A   I did.
>
> Q   Who did you tell?
>
> A   Initially I told Marybeth Carragher and then I also told Panos Kyprianou.
>
> Q   Did you tell them the specific days that you would be in trial?
>
> A   Yes.
>
> Q   Do you have any records of that?
>
> A   I've seen in your production my emails to them and then their replies.
>
> Q   And what were the sum and substance of their replies?
>
> A   Not to worry about it, it wasn't an issue.

*Klein Decl. Ex. 11 (Ashmore Tr. 139); Herbst Decl. Ex. 28.*

There is also record evidence that CGI knew of Ashmore's matrimonial

proceedings, and that he apprised his managers of his obligations to appear in court,

including repeated adjournments of his matrimonial proceeding.  *Herbst Decl. Ex. 17, 28.*

As these emails demonstrate, Ashmore was never warned that his obligations concerning

his matrimonial proceedings were jeopardizing his employment, and it was not until after

his termination that CGI subsequently raised these false claims.

167.   While employed by CGI, for a period of four months from January 2010 –

April 2010, Ashmore conjured up another completely fictitious story apparently designed to gain

him access to a  house in New Jersey.  Ashmore Tr. 204-210.

**Disputed in part and irrelevant.**  Ashmore sent a real estate agent an email which, in

addition to containing his office address in his email signature, also showed CGI's offices

in Montreal and India.

168.   In these e-mails, which CGI obtained during discovery, Ashmore stated:

- He was "General Manager, Consulting & Government Services Delivery North America & India."  This title was a complete fabrication.  Furthermore, Ashmore manipulated the signature block on his CGI email to contain this false title and create the impression that he worked at CGI's various offices in the United States, Canada and India.

- Ashmore advised the unsuspecting real estate agent that, "I need a minimum of seven bedrooms; eight would be preferable for a guest."

- Regarding Ashmore's price range, he informs the real estate agent "[m]y price range has gone up to $5.5[M] but like most buyers, it depends on the house."

- After a period of inactivity from stringing the real estate agent along, Ashmore advises her, "[s]orry for the delay in responding.  I have been in my Bangalore office all week . . . ."  Ashmore never set foot in CGI's Bangalore office.

- Finally Ashmore states, "Wow.  I was expecting it higher which is where my thoughts are although I need the base finished and a pool.  Oh, and not nearly exotic.  Central part of southern India where I have a large office.  I've been trying to pawn off my Indian division on another GM for some time to no avail."

Carragher Decl. Ex. 14.

**Admitted and irrelevant.**

169.   When questioned about the aforementioned communications, Ashmore

testified as follows:

Q:      . . . There is a reference to you being the general manager, consulting in government services delivery North America and India.

Is that accurate?

A:      It is not.

***

Q:      Is that a fictitious position that you created for yourself?

A:      Well, it's my manager consulting in government services delivery, but it certainly was not in North America and India.

Q:      So you were never the North America and India general manager for consulting and government services delivery; is that correct?

- 95 -

A:      That's correct.

Q:      So that position is entirely fictitious?

A:      Correct.

***

Q:      You misrepresented what your job was in hopes that that would expedite your ability to look at a house?

A:      I misrepresented the offices and the location, but I – I misrepresented the offices and the location, which leads to an inference about the scope of my duties.

***

Q:      Did you ever set foot in the India office during your employment at CGI?

A:      Never did.

***

Q:      So the communications with Jeanine Stroud were all essentially a sham to get in to look at a house?

A:      Can you refer to what you mean by "sham"?

Q:      Sure.

        Your willingness to actually buy a multi-million dollar house, there was no truth in that?

A:      Correct.  We were not able to afford at that present time a home of that value.

Ashmore Tr. 204-210.

**Admitted and irrelevant.**

        170.    Following Ashmore's termination from CGI, he was only employed by his next employer, CleanEdison Inc., for approximately five (5) months.  Thereafter, Ashmore commenced a civil action in New York State Supreme Court, New York County (Index No. 652972/2010), against CleanEdison Inc., challenging the basis for his separation of employment from the company.  Carragher Decl. ¶ 90.

- 96 -

**Disputed in part and irrelevant.** Ashmore was one of five members of a senior executive team of this start-up vocational education firm in clean-energy technologies. *Ashmore Decl. ¶ 105.* After the CEO misappropriated company funds for his personal use, which caused the Company to lose its accreditation and be unable to pay employees, instructors and vendors, three of the executive team members resigned and Ashmore placed the company on notice that these actions constituted constructive termination under the terms of his employment agreement. *Id.* Ashmore then commenced a civil suit to prevent further harm to come to the employees Company, which was almost immediately settled.

171. In addition to Ashmore's aforementioned matrimonial action and his lawsuit against CleanEdison Inc., both of which he appeared *pro se*, since 2009 Ashmore has also commenced the following additional actions against those who he views as taking adverse action against him:

(i.) Benjamin Ashmore v. Hon. Eric Prus (New York State Supreme Court, Kings County, Index No. 3860 – 2009) (action commenced against trial judge in his matrimonial proceeding, case was dismissed);

(ii.) Benjamin Ashmore v. Wilma Lewis Cohen (New York State Supreme Court, New York County, Index No. 108248 – 2011) (action commenced against the court-ordered forensic evaluator in his matrimonial proceeding, case was dismissed);

(iii.) Benjamin Ashmore v. Brian Ashmore, Cathy Ashmore, Jeffrey Ashmore, Patti Ashmore, Anne Shepard, Jan Wagner, and Thomas Wagner (United States District Court, District of New Jersey, Index No. 11-CV-5708) (defamation commenced against immediate family members, including parents, stemming from alleged statements made during matrimonial proceeding, case was dismissed);

(iv.) Benjamin Ashmore v. State of New York, Eric I. Prus, Randall T. Eng, Reinaldo Rivera, L. Priscilla Hall, Sandra L. Sgroi, and Jonathan Lippman (United States District Court, Eastern District of New York, Index No. 12-CV-3032) (action commenced against numerous New York judges

alleging that procedures used in his custody hearing violated his
constitutional rights, case dismissed as frivolous); and

(v.)    Ashmore v. Commissioner of Internal Revenue, Docket No. 1146-12
(proceeding commenced by Ashmore challenging the IRS's contention
that Ashmore failed to report certain earing for various tax years)

(vi.)   Benjamin Ashmore v. Eric I. Prus, Kelly Ashmore, The Presiding Justices
of the First, Second, Third and Fourth Departments of the Appellate
Division of the Supreme Court of the State of New York and the Chief
Judge of the State of New York.  (United States District Court, Eastern
District of New York, Index No. 13-CV-2796) (another action
commenced against numerous New York judges alleged that procedures
used in his custody hearing violated his constitutional rights, case
dismissed as frivolous).

Klein Decl. ¶¶ 57-65.

**Admitted and irrelevant.** All but one of these actions relate to Ashmore's lengthy and

complex matrimonial and custodial litigation, and evidence of alleged "litigiousness" is

not relevant or admissible.

172.    In April 2013, while the instant action was pending, Ashmore filed for

Personal Bankruptcy in the United States Bankruptcy Court for the District of New Jersey.  In Re

Benjamin Jeffrey Ashmore, Case No.: 13-17450-MS (U.S. Bankruptcy Court, D.N.J.).  Klein

Decl. Ex. 9.

**Admitted.**

173.    Of note, in the aforementioned Tax Court Proceeding (¶ 171(v), *supra*),

pursuant to a May 30, 2013 Memorandum Findings of Fact and Opinion, the Tax Court stated in

part:

Moreover, petitioner overstated the amount of his Federal income tax
withholdings on his 2009 tax return.  Upon due consideration of petitioner's
education, which includes a master's degree in business administration and
experience as a senior policy analyst for HUD, where he regularly encounters
numbers, formulas, and details, we conclude that petitioner did not make a good-
faith effort to assess his proper tax liability for his 2009 tax year.

Klein Decl. Ex. 17.  In June 2013, the Tax Court became aware of Ashmore's aforementioned bankruptcy filing.

> **Admitted** That the Memorandum Order cited above contained that statement, but CGI omits to state that the Memorandum Order was withdrawn by order of the Tax Court. *Ashmore Decl. ¶ 106.*  It was the IRS, not Ashmore, that informed the Tax Court of Ashmore's bankruptcy.  *Id.*

174.     Despite the Tax Court's awareness in June 2013 of Ashmore's bankruptcy filing, neither CGI nor this Court were advised of Ashmore's bankruptcy filing until September 9, 2013, approximately five months after his bankruptcy filing.  Docket No. 50.

> **Admitted and irrelevant.**   *See P. Resp. ¶ 173.*

175.     Immediately upon the bankruptcy filing becoming known to CGI, in September 2013, Ashmore's then counsel in the instant action, David Mair, Esq., sought permission of this Court to withdraw as counsel for Ashmore due to certain grounds that arose during the course of his representation of Ashmore.  Docket No. 58.

> **Admitted and irrelevant.**

176.     During briefing on Mr. Mair's motion to withdraw as counsel, in response to Ashmore's request to make an unauthorized court filing, Mr. Mair stated in an October 14, 2013 email to the Court that such a filing was "nothing more than a blatant and improper attempt to have the 'final word' on all issues before the Court.  It also makes a host of improper and untrue allegations by Mr. Ashmore."  Docket No. 63.

> **Admitted and irrelevant** that Mair so alleged**.**

177.     In November 2013 Ashmore gave an interview to Newsweek magazine about the instant action and the article explicitly referenced documents produced by CGI in this

action and expressly designated by CGI as "Confidential" pursuant to the terms and conditions of

the Stipulation & Limited Protective Order Governing the Production and Exchange of

Confidential Information.

http://www.newsweek.com/2013/11/29/inside-company-bungled-obamacare-244032.html.

Carragher Decl. Ex. 7.

> **Disputed in part.**  Ashmore's limited involvement in the article consisted of a quote that
>
> had nothing to do with CGI's document production, did not reveal any confidential
>
> information and did not violate the limited protective order.  On February 27, 2014,
>
> Magistrate Judge Cott's denied CGI's application alleging such violation.

178.   In this article, Ashmore provided the following quotes:

- The idea was to use shell companies to do the bidding, get the award and them fold them into CGI.

- Our business model was going to be screwed unless we used sleight of hand.

- Ashmore was "impressed with CGI and excited to join the company.  It was like being dazzled by the Emerald City from afar."

- Being at CGI was like peering behind the curtain and realizing that the Wizard of Oz was just a charlatan . . . .  Behind the curtain, greed, deception, and profits replaced by common sense and ethical obligations to clients.

Id.

> **Disputed in part.**  Only the last two bulleted quotes are attributable to Ashmore.  He did
>
> not provide the first two.  *Ashmore Decl. ¶ 111.  See P. Resp. ¶ 177.*

179.   Thereafter, Ashmore on his publicly available Facebook page, posted:

> Y'all know me as Ben.  Newsweek is calling me 'A Man Called HUD.'
> Who would have thought back in the days at 26 Federal Plaza, that I
> would be linked to a bigger headache for CGI Federal than the current
> Obamacare website fiasco?

Klein Decl. Ex. 18.

**Admitted and irrelevant.**

180.    As stated herein, as well as in the accompanying Declarations and deposition testimony: (1) Ashmore's "shell company scheme" did not exist; (2) Ashmore did not engage in any protected activity; (3) Ashmore has offered no documentary proof that the "shell company scheme" existed; (4) Ashmore has offered no documentary proof that he objected to the alleged "shell company scheme;" (5) Ashmore was terminated for legitimate performance reasons; and (6) as an employee of CGI Ashmore's eligibility for a bonus, in the form of Profit Participation; was completely discretionary.  See Klein Decl. Exs. 2, 4 and 8, Carragher Decl.; Kyprianou Decl.; Rudy Decl.; Pierce Decl.; Steen Decl.; Gorris Decl.; Ryan Decl.; and Ashbrook Decl.

**Disputed.**  *See, e.g., P. Resp. ¶¶ 37, 39-80, 82, 88, 97-98, 109, 111, 113, 115-117, 121-123, 129-132, 134, 147-63 above.*


Dated:  March 12, 2015                    **HERBST LAW PLLC**

By: /s/ Robert L. Herbst_____
      Robert L. Herbst (RLH 8851)

Attorneys for Plaintiff
420 Lexington Avenue
New York, New York
(646) 543-2354
fax (888) 482-4676
*rherbst@herbstlawny.com*