Robert L. Herbst (RLH8851)
HERBST LAW PLLC
420 Lexington Avenue
New York, New York
(646) 543-2354
fax (888) 482-4676
rherbst@herbstlawny.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
───────────────────────────────

BENJAMIN ASHMORE,

                    Plaintiff,

                                       11-CIV-8611 (AT/JC)

   v.

CGI GROUP INC. and CGI FEDERAL INC.,

                    Defendants.

───────────────────────────────

**PLAINTIFF'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    FACTS ................................................................................................................ 4

   1.  CGI's plans to expand its Highly profitable PBCA Business .................................. 4

   2.  CGI's Recruitment and Hiring of Ashmore from HUD and His Positive
       April 15, 2010 Performance Evaluation ....................................................... 7

   3.  CGI's Planning to Evade HUD's Unit Cap ........................................................ 11

   4.  Ashmore's Initial Objections To The Fraudulent Schemes to Evade
       HUD's Unit Cap ......................................................................................... 14

   5.  CGI Hears that HUD May Have Decided to Implement the Unit Cap and
       Takes Steps in Furtherance of its Scheme to Defraud HUD ............................... 16

   6.  Ashmore Objects Again to the Fraudulent Scheme............................................ 17

   7.  HUD Decides to Implement the Unit Cap and CGI Terminates Ashmore While
       Continuing Its Fraudulent Planning to Defraud HUD ....................................... 18

   8.  The Pretextual Nature of CGI's Abrupt Termination of Ashmore ..................... 22

   9.  █████ ████████ █████████ ██████████ ███████ ██ ██
       ████ ███ ███ .......................................................................................... 35

   10. Ashmore's Breach of Contract Claim ...................................................... 40

III.   ARGUMENT ..................................................................................................... 41

   1.  Summary Judgment Legal Standards........................................................... 41

   2.  Summary Judgment on the SOX Claim Should be Denied...................................... 42

      A.  Ashmore Engaged in Protected Activity........................................................ 46

      B.  CGI Knew That Ashmore Engaged in Protected Activity ............................. 52

      C.  CGI's Termination of Ashmore was Pretextual, not Legitimate ................... 54

   3.  Summary Judgment on the Breach of Contract Claim Should be Denied .......... 55

IV.    CONCLUSION.................................................................................................... 59

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 41

*Arrouet v. Brown Brothers Harriman & Co.*, 2005 U.S. Dist. LEXIS 4327 (S.D.N.Y.
   March 17, 2005) .................................................................................................. 58

*Ashmore v. CGI Group Inc.,* 2012 U.S. Dist. LEXIS 82598 (S.D.N.Y. June 12, 2012) ............. 43

*Basic Inc. v. Levinson,* 485 U.S. 224 (1988)........................................................................ 51

*Bechtel v. Administrative Review Bd., United States Dep't of Labor,* 710 F.3d 443
   (2d Cir. 2013) ...................................................................................................... 42

*Buckman v. Calyon Securities (USA) Inc.*, 817 F. Supp.2d 322, 333 (S.D.N.Y. 2011) .............. 58

*Canet v. Gooch Ware Travelstead,* 017 F.Supp. 969 (E.D.N.Y. 1996)........................................ 55

*CMS et al v United States,* 745 F.3d 1379 (Fed. Cir. 2014) ................................................ 4

*Culver v. Merrill Lynch*, 1995 WL 422203 (S.D.N.Y. 1995)..................................................... 56

*Curtis v. Harry Winston, Inc.,* 653 F. Supp. 1504 (S.D.N.Y. 1987)........................................... 56

*Day v. Staples, Inc.,* 555 F.3d 42 (1st Cir. 2009)................................................................... 42

*deCiutiis v. NYNEX Corp.*, 1996 WL 512150 (S.D.N.Y. 1996)................................................. 59

*Fraser v. Fiduciary Trust Co. Intern,* 417 F. Supp. 310 (S.D.N.Y. 2006) .................................. 52

*Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp.2d 379 (S.D.N.Y. 2009).......................................... 58

*Gibson v. American Broadcasting Co., Inc.*, 892 F.2d 1128 (2d Cir. 1989) ............................ 41

*Gorwin v. Local 282, IBT*, 838 F. Supp. 116 (S.D.N.Y. 1993) .............................................. 41

*Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008).......................................................... 43

*Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398 (2014)........................................ 51

*Knox v. U.S. Dept of Labor*, 434 F.3d 721 (4th Cir. 2006)........................................................ 44

*Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000)........................................... 41

*Lam v. American Express Co.*, 265 F.Supp.2d 225 (S.D.N.Y. 2003)........................................... 56

*Lerbs v. Buca Di Beppo, Inc.*, 2004-SOX-8, 2004 DOLSOX LEXIS 65 (U.S.D.O.L.
   June 15, 2004) .................................................................................................... 43

*Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp.2d 432 (S.D.N.Y. 2013) ...................................... 42

*Mahony v. KeySpan Corp.,* No. 04 Civ. 554(SJ), 2007 WL 805813 (E.D.N.Y. Mar. 12, 2007) . 43

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......................................... 41

*Nielsen v. Aecom Technology Corp.*, 762 F.3d 214 (2d Cir. 2014)................................................ 44

*Ohanian  v. Avis Rent A Car System, Inc.,* 779 F.2d 101 (2d Cir. 1985)..................................... 56

*Porter v. Wyeth Pharmaceuticals*, 2007 U.S. Dist. LEXIS 60824 (S.D.N.Y. 2007).................... 52

*Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp.2d 45 (S.D.N.Y. 2011) ................................ 43

*Travellers Int'l A.G. v. TWA*, 41 F.3d 1570 (2d Cir. 1994) ...................................................... 59

*Tsegaye v. Impol Aluminum Corp.*, 2003 WL 221743 (S.D.N.Y. 2003)..................................... 55

*Villanueva v. United States Department of Labor*, 743 F.3d 103 (5th Cir. 2014)....................... 52

*Welch v. Chao*, 536 F.3d 269 (4th Cir. 2008)........................................................................ 43

*Zinn v. Bernic Construction Inc.,* 99 Misc. 2d 510, 416 N.Y.S.2d 725 (Sup. Ct. Queens
   County 1979)...................................................................................................... 56

**Statutes**

15 U.S.C. §§78a et seq. .......................................................................................... 51

18 U.S.C. §1341 ............................................................................................... 47, 49

18 U.S.C. §1343 ............................................................................................... 47, 49

18 U.S.C. §1348 ............................................................................................... 47, 51

18 U.S.C. §§1514A et seq .......................................................................... 3, 42, 47

**Rules**

Fed. R. Civ. P. 56(c) .............................................................................................. 41

SEC Rule 10b-5 (17 CFR 240.10b-5) .................................................................... 51

Robert L. Herbst (RLH 8851)
HERBST LAW PLLC
420 Lexington Avenue
New York, New York
(646) 543-2354
fax (888) 482-4676
rherbst@herbstlawny.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
——————————————————————

BENJAMIN ASHMORE,

                    Plaintiff,                  11-CIV-8611 (AT)

      v.

CGI GROUP INC. and CGI FEDERAL INC.,

                    Defendants.
——————————————————————

**PLAINTIFF'S MEMORANDUM OF LAW**
**IN OPPOSITION TO SUMMARY JUDGMENT**

      Plaintiff Benjamin Ashmore, by his attorneys, Herbst Law PLLC, respectfully submits

this memorandum of law in opposition to the CGI defendants' motion for summary judgment.

**I.**    **INTRODUCTION**

      Plaintiff ("Ashmore"), hired by CGI[1] away from the U.S. Department of Housing and

Urban Development ("HUD") in 2009, made repeated, clear, oral objections to CGI's scheming

---

[1]    CGI Federal Inc. is a wholly-owned subsidiary of CGI Group Inc., the publicly-traded parent corporation.  Ashmore was recruited and employed by CGI Federal.  Because (1) employees of CGI Group as well as CGI Federal were integrally involved in the events giving rise to the Sarbanes-Oxley ("SOX") claims herein, and (2) SOX applies to CGI Federal because it is and was a private subsidiary of public company CGI Group that includes the financial information of the subsidiary in its consolidated financial statements, *Ashmore v. CGI Group, Inc*., 2012 U.S. Dist. LEXIS 82598 *7-12 (S.D.N.Y.  June 12, 2012) (Sand, J.), we do not distinguish between

to defraud HUD by evading its unit cap on the number of Section 8 housing units CGI could help administer nationwide.  When HUD made clear that it was going to implement such unit cap, CGI quickly fired Ashmore in June 2010, just two months after giving him a positive annual performance review, with no warnings or corrective action or performance improvement plan characteristic of CGI's progressive discipline practices.

CGI predicated its firing of Ashmore on false performance criticisms first discussed with him less than one month before his termination and only four days after CGI obtained information that HUD that would implement the unit cap.  Neither of Ashmore's supervisors held even one face-to-face meeting with him to discuss their purported performance criticisms before firing him.  Prior to terminating him, CGI suddenly cut Ashmore off from its strategic discussions about HUD's unit cap almost immediately after CGI received confirmation that HUD was indeed going to put the unit cap in place.

The chronology of events leading to Ashmore's hasty termination makes clear that the false performance deficiencies attributed to him were pretextual, designed to cover the fact that Ashmore was being terminated solely because of his objections to CGI's planning to defraud

---

the two in this brief, for liability purposes or otherwise, referring to both simply as "CGI."  We also note that the hiring documents CGI produced reflecting the "Human Resources Job Acquisition Form" for Ashmore, as well as many other documents produced by CGI in this case, do not distinguish between CGI Federal and CGI Group, indicating instead only CGI.  *Herbst Decl. Ex. 18 (D. Bates 10171 – 3 through 10171 – 12).*  In the first footnote of CGI's brief, at 1, it simply and baldly asserts that the claims against CGI Group should be dismissed, but CGI does not include that contention, or arguments or authority supporting it, as a point in its brief.  CGI does not dispute, for example, that Ashmore may be considered a covered employee of the parent corporation for SOX purposes, or that CGI is liable to Ashmore as the publicly traded parent company with direct and derivative liability for adverse action against Ashmore by its subsidiary for his SOX-protected activity, or that both CGI corporations may be considered an "integrated enterprise" for purposes of SOX liability here.  Accordingly, we do not believe that CGI has properly raised this issue, and we do not further address it.  If the Court chooses to consider it, we would respectfully request that we be afforded leave to submit supplemental briefing on that issue.

HUD, in violation of Title VIII of the Sarbanes-Oxley Act of 2002 ("SOX"), 28 U.S.C. §1514A.

Those objections clearly constituted protected activity, and CGI knew they constituted protected

activity.  Even if, *arguendo*, Ashmore's SOX-protected objections were not the *sole* reason for

his termination – an obviously unfavorable personnel action under SOX – CGI can hardly

dispute, on this factual record, that those objections were a "contributing factor" in getting rid of

him.  For the same reasons, CGI has not come close to establishing as a matter of law, by clear

and convincing evidence, that it would have fired Ashmore had he not made those objections.



With Ashmore out of the way, CGI ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████

██████████████████████      ████████████████████

███████████████████████████████████████

████████.  Plaintiff can prove all the elements of his SOX claim and is entitled to a trial.

Summary judgment on that claim should be denied.

When he was recruited to CGI, Ashmore was promised a bonus of at least equal to his

base salary if he met his performance metrics.  The annual performance review he received two

months before his termination makes clear that he met his performance metrics since it is

undisputed that he was rated "meets expectations" in all categories in his April 15, 2010 annual

performance evaluation.  Because (1) the promised bonus was "discretionary" only in terms of

whether he met those performance metrics, and (2) it is undisputed that he met those metrics,

Ashmore was entitled to such bonus.  Plaintiff can therefore prove his state law breach of contract claim, and summary judgment should be denied on that claim as well.

## II.   FACTS

The facts in the light most favorable to Ashmore are as follows:

### 1.   CGI's PLANS TO EXPAND ITS HIGHLY PROFITABLE PBCA BUSINESS

In January 2010, CGI learned that HUD was weighing several proposed restrictions in the re-compete of its Performance Based Contract Administrator ("PBCA") program,[2] including a 300,000 "unit cap" on the total number of units any PBCA – a Public Housing Authority ("PHA") or PHA subcontractor, like CGI – could administer for HUD.  *D. 56.1 ¶¶ 1-15, 23-24 and P. Responses thereto ("P. Resp.").*

CGI was the largest PBCA in the nation.  It was administering 267,000 units, reaping substantial profits, and anticipating that it could triple its revenue and market share in the re-compete by increasing its five jurisdictions under administration to 30[3] and administering over 900,000 units out of the approximately 1.2 million units nationwide – 75% of the entire PBCA program. *P. Resp. ¶¶14-19, 117; Klein Decl. Ex. 13 (Carragher Tr. 52-53); Klein Decl. Ex. 12 (Kyprianou Tr. 202-03);  Herbst Decl. Ex. 13 (D. Bates 2010031, 2010040); Herbst Decl. Ex. 14 (P. Ex. 27, D Bates 9072).*

---

[2]    The relevant history of HUD's PBCA program, including the re-compete pursuant to which CGI and its Public Housing Authority ("PHA") partners submitted bids to HUD in April 2011, may be found in *CMS et al v United States*, 745 F.3d 1379 (Fed. Cir. 2014).  *Herbst Decl. Ex. 9.* This litigation, where CGI's PHA partners have challenged HUD's decisions on the re-compete which significantly disadvantaged CGI, continues.  *See e.g. January 12, 2015 Order extending time to file response to petition* [for certiorari]*, S. Ct. Dkt. 14-781, P. Resp. ¶157.* The Solicitor General noted that this litigation concerns how HUD utilizes PHAs "to oversee and administer approximately $9 billion in federal housing assistance to low income families[.]" *January 5, 2014 Brief of the United States at 2, S.Ct. Dkt. 14-781. Herbst Decl. Ex. 10.*

[3]    Ultimately, CGI and its PHA partners submitted bids for 25 jurisdictions, having decided not to bid in several states they considered unprofitable.

4

It is hard to overstate the importance and profitability of this program – and its plans to expand it – to CGI.  The program was generating revenues of almost $60 million a year, more than 10% of CGI Federal's business, with profit margins as high as ██ and unweighted average profit margins of ███.[4]  *Herbst Decl. Ex. 60 (CGI Federal Press Release dated Nov. 5, 2009); Ex. 12 (P. Ex. 16, D. Bates 5033).*  Had the program expanded as planned, ████████████████████████████.  *Herbst Decl. Ex. 61 (Consolidated Financial Statements of CGI Group, Inc. for the years ended September 30, 2010 and 2009, p. 34).*

At the inception of the PBCA program in 1999, CGI's predecessor companies, under Marybeth Carragher's leadership, created a mechanism to work around statutory restrictions that required HUD to contract the PBCA program only to PHAs:  CGI and its predecessors

---

[4]  Because many federal contractors have profit margins under 10%, the profitability of CGI's federal government contracting business is unusual and has been scrutinized by financial analysts:

> There are some other oddities in CGI's financials. Its reported profit margins seem high, given the businesses it is in. In its U.S. business, CGI reported an EBITDA (earnings before interest, taxes, and depreciation and amortization) margin of 15 percent in its last fiscal year. But in the past year, 55 percent of CGI's business in the U.S. came from contracts with the federal government and its agencies. Government contracts often operate on a cost-plus basis, meaning that contractors are allowed to earn their costs, plus a little profit. Stanley, which was acquired by CGI in 2010 and which greatly increased the size of CGI's business in the U.S., had an EBITDA margin of 10 percent in the last fiscal year before the acquisition. Since then, there has been pressure on margins, and now, in general, large federal contractors have EBITDA margins below 10 percent. Assume that CGI is more efficient than its peers and has kept a 10 percent margin in the business it does with the U.S. government. Even then, to get to the blended margin of 15 percent that it reports, its nongovernment business would have to have had a 22 percent EBITDA margin, which is sky-high for an information-technology contractor. CGI says that the assumption that its margin on its government work is 10 percent is "incorrect," as is the idea that its government work is predominantly on a cost-plus basis.

*Herbst Decl. Ex. 62* (McLean, Bethany. "*Accounting for Obamacare: Inside the Company That Built Healthcare.gov*", Vanity Fair, December 23, 2013, par. 21.).

found PHA partners willing to bid together with CGI, and to subcontract nearly all PBCA duties – upwards of "90-95%" – to CGI in exchange for sharing in the profits.[5]  *Klein Decl. Ex. 13 (Carragher Tr. 6, 20-25), Ex. 11 (Ashmore Tr. 245); Herbst Decl. Ex. 2 (Rudy Tr. 39-40); Ashmore Decl ¶¶ 4-5, 49.*   These PBCA contracts had been scrutinized by the HUD Inspector General, specifically noting the excess profits made by PHAs and subcontractors like CGI.  *D. 56.1 ¶ 14 and P. Response thereto; Herbst Decl. Ex. 11 at pages 4, 6, 8-9, 11.*

By 2009, CGI had formed a team of senior managers given the nickname "Rat Pack" who reported directly to Carragher, to expand CGI's PCBA business in the rebid.[6]  *Klein Decl. Ex. 12 (Kyprianou Tr. 205-06); Ashmore Decl. ¶¶ 55-60.*   In anticipation of the re-compete, CGI, which was barred from contracting directly with HUD, entered into Memorandums of Understanding ("MOUs") with PHAs that required the PHAs to outsource nearly all PBCA duties to CGI.  *Ashmore Decl. ¶¶ 52-54; Herbst Decl. Ex. 15.* CGI was the only "nationwide player" planning on "making a major run" at increasing its units under administration.  *Id., Ex. 14 (P. Ex. 27, D Bates 9072).*  In the 20 additional jurisdictions CGI ultimately planned to seek in HUD's re-compete, there were only five in which the PHA had private subcontractors in 2010.  *Id., Ex. 12 (P. Ex. 16, D. Bates 5033).*  Those five were relatively small jurisdictions in terms of number of units administered, and there were only two other significant private subcontractors in those five small jurisdictions.  *Id.*  Only one other private subcontractor nationwide besides CGI, Quadel, did most of the work of its PHA partners.  *Ashmore Decl. Ex. 52.*

---

[5] ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████

[6]  We use the terms "rebid" and "re-compete" interchangeably in this brief.

**2. CGI'S RECRUITMENT AND HIRING OF ASHMORE FROM HUD AND HIS POSITIVE APRIL 15, 2010 PERFORMANCE EVALUATION**

Ashmore has a Bachelor of Business Administration degree in Finance, a Bachelor of Arts in Economics degree, a Master's degree in Business Administration and a Master's degree in Public Policy. *Klein Decl. Ex. 11 (Ashmore Tr. 22-24).* While pursuing his education, he also worked for four years in the private sector in property management, where he became familiar with the Section 8 program, and for four years he worked for the National Association of Bond Lawyers. *Id., Tr. 25-36, 41-45.*

In September 2004, he came to HUD as an "unconfirmed appointee" with the title of Senior Program Manager and the formal duty to "Manage the Multi-family Asset Management Region II (New York/New Jersey) Hub Portfolio." *Ashmore Decl. ¶¶ 6-7.* Ashmore's duties included managing HUD's PBCA in New York, CGI and its PHA partner, the New York State Housing Trust Fund Corporation ("HTFC"). *Id., ¶¶ 8-11*

Since December 2005, HTFC has subcontracted nearly all its PBCA duties to CGI. *Id.* CGI's own December 2, 2005 "NY PBCA Communication Matrix" identifies Ashmore as the HUD official responsible for addressing all New York "statewide policy/procedure issues" with HTFC. *Herbst Decl. Ex. 16 (D. Bates 10391).* Carragher is identified as the CGI official communicating with Ashmore, *id.*, and in fact Carragher worked closely with Ashmore when he was at HUD. *Klein Decl. Ex. 11 (Ashmore Tr. 64-65).*

Carragher and CGI actively tried to recruit Ashmore in 2005 and 2008. *Ashmore Decl. ¶¶ 12-22.* Carragher met with Ashmore on February 25, 2009 and the next day recommended hiring Ashmore as a "very good hire," professing no concerns about Ashmore's "chance for success at CGI," indeed, and giving him rankings of "excellent" and "above average" in all rankings in her "Candidate Assessment." *Herbst Decl. Ex. 18 (D. Bates 10171).* On April 3,

2009, Carragher requested that CGI create a position for Ashmore with the "priority code" "critical" as "Ben Ashmore is targeted for this position." *Id.*

On April 21, 2009, CGI extended an offer of employment, and Ashmore accepted. *Id.* Ashmore's direct supervisor was Carragher, his mentor was CGI Director Panos Kyprianou, and Ashmore's "CGI Internal Title" was "Manager, Consulting" with the accompanying "Functional Title" of "Government Services Delivery Manager." *Id.* Kyprianou, like Ashmore, was a direct report of Carragher. *Klein Decl. Ex. 12 (Kyprianou Tr. 51-53).* Ashmore immediately became a member of the Rat Pack. *Id., Tr. 205-10.*

During his employment, Ashmore divided his time between two CGI Divisions, the Cleveland Business Process Services ("BPS") Division, where he reported to Carragher, and the Fairfax (Va.) Information Services Information Technology ("ISIT") Division, where he reported to CGI Federal Vice President Rob Bowell, who managed a business unit having nothing to do with the HUD PBCA program. *Ashmore Decl ¶¶ 24, 30, 35-37.* Such arrangements at CGI, with dual reporting roles in different divisions, were not uncommon. *Herbst Decl. Ex. 12 (Kyprianou Tr. 40-45, 55).*

Carragher, with input from Kyprianou, noted Ashmore's value to CGI very quickly. Four months after his hire, when CGI began a company-wide exercise labeled the "Emerging Talent Initiative," Carragher had to rank her business unit's staff as follows:

1. **Highly promotable** – significant potential as either a leader or subject matter expert could move into bigger role in next 12 months with minimum development

2. **Promotable** – with appropriate development and/or experience could be promoted in 12-36 months

3. **Limited Promotability** or too soon to tell

Out of 367 employees in her unit, Carragher ranked only Ashmore and four others "highly promotable." *Herbst Decl. Ex. 22 (D. Bates 9512).* Two of the others had been employed

for nine years and the other two for several years.  *Id.*  Ashmore had been employed for four

months.  As part of the same talent initiative ranking by Carragher, Ashmore was specifically

flagged for priority in stock option and profit participation awards.  *Id.*

On April 15, 2010, two months before his termination, Carragher gave Ashmore his

annual performance review.  She rated Ashmore as meeting expectations in every category and

needing development in none.  Accordingly, there were no performance deficiencies identified in

Carragher's ratings of Ashmore.  She also heaped the following praise on Ashmore:

Ben was able to submit proposals within his first few weeks of employment.

He is very self directed and confident in actively reaching out to potential partners and client contacts.

Was able to be self-directed on OHFA [Ohio Housing Finance Agency] pursuit at very onset of employment.

Ben is adaptable to quick changing environment and is able to shift attention from one project to another.

We have asked Ben to work on and focus on a few different projects with very different deliverables over the past few months.  He is very adaptable and excited to make an impact on the business.

Ben is very willing to take on new initiatives and assignments and is confident in his ability to manage the task at hand.

Ben has shown a strong commitment to the organization.

Ben shows great interest in CGI's business development goals and is very committed to making a contribution to the team and corporation as a whole.

Ben demonstrates a pride in the organization and works toward the success of the Federal [Business Unit] as a whole.

Ben has shown that he desires to perform quality work and in particular, has worked diligently to deliver solid, quality proposals in business development efforts.

Ben has worked towards gaining partnerships for the PBCA opportunity. He has demonstrated a desire to partner with the right type of organizations- whether that is in his business opps pursuits within Housing BPS and Federal HUD IS IT efforts.

Ben is able to reach out and share information and thoughts with the team and other stakeholders.

Ben is an independent thinker and enthusiastically states his opinions openly.  He has demonstrated his commitment to CGI and its business strategies.

Ben, in working on business development, has demonstrated his considerations of the financial impact of his proposals.

Ben has been able to, in a short period of time, pursue new business for the team.  He is an independent worker that has identified and pursued new business on a number of differing types of engagements.  He is adept at independent follow through.

Ben is dependable and able to follow through on any project given to him with little oversight.

Ben has been able to pursue business, managing the submissions from multiple team members, in order to develop a solid proposal.

From early on, Ben identified and pursued new business independently.

Ben seems to quickly understand and learn new areas.

Ben is certainly a very bright and dedicated member.  He was able to quickly jump in to the business development that the team is concentrating on.  He developed and submitted a number of proposals within his first couple of months being on board and understood the requirements of the proposals easily, even when the information or business was new to him.  He is able to independently pursue projects with little oversight.

*Herbst Decl. Ex. 21 (P. Ex. 3, D. Bates 2697).*

In her oral discussion of her performance review with Ashmore, which included Kyprianou, Carragher repeatedly praised Ashmore's performance and only offered some constructive critical comments on which he could focus in the coming year, primarily pertaining to communication and multi-tasking in managing his dual role working simultaneously in two business units.  *Ashmore Decl. ¶¶ 28-30; Klein Decl. Ex. 11 (Ashmore Tr. 418).*  These suggestions were also contained in the performance review.  The many items of praise clearly predominated over the constructive suggestions in number, significance and tone.  Kyprianou reviewed and did not disagree with Carragher's performance evaluation of Ashmore.  *Klein Decl. Ex. 12 (Kyprianou Tr. 65-71).*  Neither the written review nor Carragher's oral discussion of it would give Ashmore, or any reasonable employee in his shoes, any inkling that he might be fired for "performance deficiencies" only two months later.

**3.  CGI'S PLANNING TO EVADE HUD'S UNIT CAP**

On January 14, 2010, HUD announced at an industry conference, attended by Carragher, that it was considering several new re-compete restrictions, including a unit cap prohibiting PBCA providers, including subcontractors like CGI, from obtaining a portfolio of jurisdictions in excess of 300,000 units.  *P. Resp. ¶¶ 23-24.*

CGI immediately recognized that the proposed unit cap was a huge threat to its expansion plans. Carragher emailed CGI Federal President George Schindler ("Schindler"), CGI Senior Vice President Richard Schmitz ( "Schmitz) and other senior executives right away, stating:

> "I wanted to bring to your attention some disturbing news… HUD stated that they plan on limiting bids to a combined unit count of 300k per agency.  That's bids, not even awards. Somebody… asked if that limit includes subcontractors and HUD said yes.  We have 267k units right now, and we are planning on bidding on over 800k units… I think we should all talk asap… [i]t's quite urgent."

*Herbst Decl. Ex. 14 (P. Ex. 27, D. Bates 9072 (noting, inter alia, that the 267,000 units currently under CGI's administration were less lucrative than those CGI aspired to)).*

Publicly, CGI began lobbying to defeat the unit cap and the other proposed restrictions, and CGI employees initially had confidence that those efforts would prove successful.  *Herbst Decl. Ex. 4 (Ryan Tr. 41-52).*  Ashmore participated in these efforts, including circulating a February 16 email setting forth arguments against the unit cap that could be used in discussions with HUD.  *Herbst Decl. Ex. 63; Klein Decl. Ex. 11 (Ashmore Tr. 354), Ex. 13 (Carragher Tr. 72-77).*

Privately, however, beginning on January 29, 2010, Carragher, Kyprianou and other CGI staff began scheming how CGI could deceive HUD and fraudulently evade the proposed unit cap if HUD ultimately implemented it. *P. Resp. ¶¶ 109, 111; Carragher Decl. Ex. 8 (P. Ex. 13, D. Bates 7233, a January 29, 2010 email Kyprianou to Carragher and two other members of the Rat Pack, proposing several ways to evade HUD's "monopoly restriction" and "unit*

*restrictions"*).  Both proposals were designed to "hide" from HUD that CGI would effectively be administering units in excess of the proposed unit cap.  The first was for CGI to "hide behind" the PHA's instrumentality entity, which would subcontract 90% of the work to CGI, concealing from HUD that it was doing so.  The second was to "create new entities for selected jurisdictions that are a joined venture of PHA and CGI subsidiary.  If this holds then we can get away with the unit restrictions as these entities will be somehow independent from CGI."

When asked about his January 29 "new entities" proposal in his deposition, Kyprianou admitted that this idea (or scheme) of setting up independent companies to get away with the unit restrictions was explored and discussed among the Rat Pack, and that its core concept had CGI setting up another corporate entity that could be presented to HUD as being independent of CGI. *Klein Decl. Ex. 12 (Kyprianou Tr. 217-18).*  A core concept of the scheme, to which Ashmore objected, was for CGI to falsely represent to HUD that it was only bidding on (and thus performing) a much smaller number of units, compliant with the unit cap, concealing that CGI would actually be controlling and performing the work in a much larger combination of units, exceeding the unit cap, and reaping the revenues and profits that would flow to CGI in contravention of the unit cap.  *See Sections II(4) and (6) below.*

Kyprianou admitted that the more senior members of the Rat Pack talked about the idea of whether or not CGI could set up independent companies and thereby avoid unit cap restrictions by having some of those independent companies partner with PHAs, and that this concept was essentially the concept that Kyprianou had raised in his January 29 email.  *Klein Decl. Ex. 12 (Kyprianou Tr. 219).*

CGI Director and Rat Pack participant Tony Gorris admitted that this concept of setting up multiple corporate entities to get around the unit cap was discussed among the Rat Pack

members. *Herbst Decl. Ex. 1 (Gorris Tr. 49, 51-52).* Gorris also admitted that the discussion

included an element of the director shell company scheme as described by Ashmore – that the

separate, independent corporations would be set up by a CGI director or directors. *Id.*, at 52:

> Q  In that call Ms. Carragher said that a concept had been raised of some of the CGI
> directors setting up outside companies for the rebid process, correct?
>
> A  She indicated that the concept had been raised, that – I don't recall the number of
> people, but where it was, where the idea was that we had a separate company set up by a
> director or directors, I don't recall the numbers.
>
> Q  And that was referring to the directors that reported in to Ms. Carragher?
>
> A  Yes.

Former CGI Director Tracy Rudy, another Rat Pack member, admitted that the idea of

setting up outside companies that could be used to get around the single unit cap was discussed

as a potential strategy. *Herbst Decl. Ex. 2 (Rudy Tr. 48).*

These admissions by these Rat Pack members corroborate Ashmore's description of the

scheme, which he testified was discussed on conference calls and one meeting in Fairfax,

Virginia. *Klein Decl. Ex. 11 (Ashmore Tr. 315-16, 335-36, 341-42, 353-54, 366-83, 397-99).*

According to Ashmore, the scheme's core concept and fundamental purpose was to evade

HUD's unit cap fraudulently, by falsely representing to HUD that CGI was complying with the

unit cap at the bid stage and by concealing from HUD that CGI actually intended to administer

many more units, in excess of the unit cap, after the bids were awarded. *Id., at 341, 352-53.*

The core concept or mechanism by which the director shell company scheme would accomplish

this fraudulent and illegal objective was to have CGI directors leave CGI to form separate

entities – new "shell" companies – which would subcontract with CGI's PHA partners in CGI's

place with access to CGI resources, including, without limitation, its proprietary software system

created for the PBCA program. *Id, at 341-42.* After the bids were awarded, these shell

companies (and their directors) would be folded or transferred back into CGI by seemingly

legitimate mergers or acquisitions, and CGI would quickly be able to reflect on its books the revenue and market share in the existing and new jurisdictions that CGI was pursuing. *Id., at 335-36.*

In addition to the director shell company scheme, CGI's top management were discussing a separate 49/51% split scheme as a mechanism to address HUD's proposed unit cap, as early as February 2010. *P. Resp. ¶ 111.* On February 2, Carragher and Joyce Clause, the CGI manager of the PBCA rebid effort, highlighted in a draft power point presentation the possibility that if CGI performed only 49% of the PBCA duties for their PHA partners, they would escape HUD's scrutiny and not be subject to the unit cap. *Herbst Decl. Ex. 44 (P. Ex. 30, D. Bates 5480).* In her email circulating this document to Patti Duffy, the CGI administrative employee responsible for compiling CGI's re-compete documents, Clause wrote "Since I didn't mention this up front, I want to make sure that you know this contains extremely sensitive information that shouldn't be shared/discussed, even within the RAT Pack team." *Id.*

### 4.  ASHMORE'S INITIAL OBJECTIONS TO THE FRAUDULENT SCHEMES TO EVADE HUD'S UNIT CAP

When Ashmore learned about the director shell company and 49/51% schemes, he objected to both, albeit for different reasons:

> What CGI was looking to do was find a way around the bid restriction, since all HUD had discussed at the beginning was merely a restriction on bidding. And so two distinct methods of getting around that bid cap were discussed. One of those was to do a small enough share of the work in any potential jurisdiction so that when the bid would need to be submitted, CGI would not be required to disclose how many units were being managed. The second strategy was the idea of setting up separate entities where CGI would not disclose that they were controlled by CGI staff, that they were using CGI proprietary IT systems, and that those entities would be the bid entities so that at the time of the bid, a sham, if you would, would be presented to HUD with a preexisting agreement to after submission of the bids and after award, bring all of the contract administration services back under the CGI umbrella through what would appear to be acquisitions.
>
> …

At the beginning of this strategizing to deal with the unit cap, that was a question [whether CGI could use the 49/51% scheme] that remained unanswered in my mind. Because that had not been spelled out in any documents and there was nothing that put in place an exception on this 49/51.  On a number of occasions I contributed my opinion that if we thought this was a potential avenue, that we had to ask it formally of HUD, in the formal question-and-answer process that HUD had set up for the PBCA rebid.  But to recap your question, at the time that it was initially discussed, there was nothing that I saw that definitively one way or the other made that an okay option.   I recall that there was a discussion of the proposed annual contributions contract where it talked about a 49/51 distinction on subcontractors with the business continuity of operations, but I do not recall at any point in time while I was at [CGI] that HUD came out and formally stated that the 49/51 applied or was in any way in play with the unit cap.

…

I voiced my objection to pursuing that avenue [the 49/51% scheme] without clarification from HUD.  I stated that we couldn't go through with that on the presumption that either we wouldn't get caught or somehow, we would be able to get over the bid hurdle.  One of the things that happens in government contracting, because of the time and effort that goes into pursuits, because of how pursuits are evaluated, one of the most valuable processes of government contracting is the ability prior to bid submission to ask questions about the requirements of the bid, because the last thing that any bidder wants to have happen is to have their bid disqualified on a technicality because they didn't understand the requirements of the RFP [Request for Proposal].  So I stated on a number of occasions that we needed to get clarity on the 49/51 before we could consider that to be a viable option.

…

I can't tell you with certainty whether [the 49/51% scheme] is separate [from the director shell company scheme] at the time that I was at CGI.  And at the time that I raised my objections to both of these avenues, they were separate and distinct avenues.

…

[about the director shell company scheme] The level of detail, to my recollection, that was discussed at that conversation was that it would be a separate entity, that the directors, the four directors would leave and work for the entities, that everyone would get financially well off as they were going out the door, and that after successful award, if this had to happen, it would be wrapped in afterwards.

…

On the call, when it was discussed on the call, that's when I realized that the dinner or the evening in Fairfax was more than just back-of-the-envelope ideas being tossed at a table. And I reiterated what I had raised at the Fairfax Hyatt discussion on the PBCA call.  That it is illegal to set up an entity that would be presented to HUD as a separate entity as a sham with a preexisting agreement to fold it back in after the bidding, after the bids were awarded.  Because… it was an attempt to deceive HUD and to evade the regulations. Because it was fraudulent to claim that an entity was separate and apart from CGI if we were providing software without charging the licensing fees, if there was CGI staff that

15

knew they were only separate for a short period of time, and then would be right back on CGI without any loss of time or service or anything like that.  And I also voiced my opinion that it wouldn't even work in the long run because HUD would stop, that HUD's goal in creating the bid restriction was because they didn't want any one entity to become too big.  And so if they were using the bid as the mechanism to stop that from happening, they certainly would not stop caring about that concern after award if there was some huge conglomeration.  And the last thing that I pointed out was that if in a pure legal sense it was just bid and only ever bid and it wasn't an idea of administering in the end, then we needed to ask.  When I say "we," I mean CGI.  CGI needed to get clarification on whether or not there could be mergers and acquisitions afterwards, such as could Quadel be purchased by CGI and CGI pick up all of Quadel's contracts.

*Klein Decl. Ex. 11 (Ashmore Tr. 315-19, 321, 341-42, 353-54).*

### 5. CGI HEARS THAT HUD MAY HAVE DECIDED TO IMPLEMENT THE UNIT CAP AND TAKES STEPS IN FURTHERANCE OF ITS SCHEME TO DEFRAUD HUD

On April 16, the day after Ashmore's performance review, *see 9-10 above,* Carragher heard from Roy Bernardi, a former HUD Deputy Secretary and Acting Secretary employed by CGI, a rumor about the timing of the PBCA bid release that caused Carragher "to believe that HUD has decided that the unit cap will stand." *Herbst Decl. Ex. 4 (Ryan Tr. 46-53), Ex. 49 (P. Ex. 29, D. Bates 5044).*

Carragher and Kyprianou then circulated emails discussing ways to remove Ashmore from the PBCA group.  On April 29-30, after receiving an email from HUD soliciting a director for its "new Office of Strategic Planning and Management", Carragher emailed Kyprianou stating "I was thinking [Ashmore]- could move to DC, be a big guy at hud" and Kyprianou replied "It definitely will be a good fit for Ben but is he going to be good to CGI." *Herbst Decl. Ex. 64 (D. Bates. 5131).*  On May 4, Kyprianou emailed Carragher, stating "Maybe it is better that [Ashmore] transfers to Rob [Bowell, the CGI Vice President managing the Fairfax ISIT division] then.  It looks like they work well together." *Id., (D. Bates 5135).*

On a May 11 Rat Pack call, Ashmore heard the director shell company scheme discussed again, in more concrete terms. *Klein Decl. Ex. 11 (Ashmore Tr. 358-73).*  The discussion

concerned a document which had been prepared before the call in which the national portfolio of units in the states where CGI hoped to bid had been broken down by, and distributed to, the CGI directors who would lead the different shell companies which would each administer less than 300,000 units. *Id.* The plan discussed was that each company would bid for those units with a CGI PHA without disclosing to HUD that such companies would be controlled by CGI, use CGI proprietary systems without licenses, and would be wrapped or folded back into CGI by acquisition after the bids were accepted and the awards were made. *Id.* Moreover, Carragher instructed Gorris to reach out to two CGI PHA's, the Denver Housing Authority and the Chicago Housing Authority, to discuss the plan. *Id.*

### 6. <u>ASHMORE OBJECTS AGAIN TO THE FRAUDULENT SCHEME</u>

Immediately after that call, Ashmore called Carragher and communicated his last and strongest objection to the scheme which she had just directed be ratcheted up, *Klein Decl. Ex. 11 (Ashmore Tr. 373-76)*:

> I told Ms. Carragher that I believed it was an illegal and fraudulent way to evade the HUD regulations. That any attempt to present something to HUD that we knew was completely different was illegal. And that there were other ways that we could deal with this.

> We talked about how it could be protested. We talked about legal avenues.

> But I conveyed to Ms. Carragher very clearly that based on the fact of all of my experience, the time that she and I had worked together, my time with HUD, that this was something that was illegal and fraudulent and it was something that would never, it would never work.

> It would—the risks of going down this illegal path without getting clarification about the idea of acquisitions after the bid, with letting people go to subsidiaries with the preexisting arrangement that they would come right back, that all of it was illegal. I believed CGI could pull it off during the bid phase. One of my objections to Ms. Carragher was that it would never work in the end because, it basically boiled down to the presumption that HUD had a goal, which was to keep any one entity from becoming too big and that HUD wasn't really that bright in coming up with a mechanism to enforce that goal by only placing the bid [restriction]. And that we couldn't think that we were smarter than them by using a technicality that they had only talked about the bid to get around that bid [restriction] and then afterwards say, "Well, you only talked about the

17

bid, we complied with the bid, these were separate companies, now we acquired them and you can't stop it, you can't stop our acquisitions." So I didn't think, I certainly thought that it was plausible that this scheme could be used at the bid stage. I believed that it would have fallen apart afterwards.

…

I talked about the fact that if you run afoul of the far [Federal Acquisition Regulation] it has repercussions on the entire company.

### 7. HUD DECIDES TO IMPLEMENT THE UNIT CAP AND CGI TERMINATES ASHMORE WHILE CONTINUING ITS FRAUDULENT PLANNING TO DEFRAUD HUD

On May 14, three days after Ashmore's May 11 call to Carragher, HUD decided internally to move forward with the unit cap. *Herbst Decl. Ex. 35 (P. Ex. 28, D. Bates 8719).*[7] Within a day or two, Carragher learned from HUD that a decision had been reached to impose the unit cap and that this would soon be publicly announced. *Ashmore Decl. ¶¶ 62-63.* That evening, very upset, Carragher conveyed this news to Ashmore, CGI Federal Director Ryan, and independent consultant Clause over dinner. *Id.*

Three days later, on May 17, CGI cut Ashmore off from discussions concerning strategy relating to the PBCA rebid and HUD's unit cap. *Ashmore Decl. ¶¶ 64-65.* Prior to the May 17 call, at the specific direction of CGI Federal President George Schindler, Ashmore had been included in each Senior Management Committee conference call in which Carragher updated CGI Group and CGI Federal executives about the status of the PBCA rebid. *Id.*

On the May 17 call from which Ashmore was excluded, CGI's senior management received, and discussed on a call, a Senior Management Committee Progress Update," p. 5, explicitly noting, under "Unit Cap Alternatives (Pros/Cons)," that CGI would pursue a "49/51% partner-CGI split (w[ith] partners doing 51% [of the work]" in Ohio and the other states CGI was

---

[7]   Also, on May 14, HUD responded to CGI's PHA partner's March 1 letter, indicating that the unit cap was "implemented." *Herbst Decl. Ex. 34 (D. Bates 2006717).* This private advice was publicly confirmed on June 8-9, 2010. *Id., ¶¶ 35-36.*

pursuing above the 300,000 unit cap; and also noting, as a "Pro" of the plan, that the PHA partner is "*Willing to transfer 5l% [of the work] to CGI after 1st year.*" (*emphasis added*)). *Herbst Decl. Ex. 50 (P. Ex. 14, D. Bates 5043).* In other words, the 49/51% scheme now had the same core fraudulent "transfer back" concept to which Ashmore had objected in the director shell company scheme, but now, instead of transferring back to CGI entire shell companies, CGI was now planning, and discussing with at least one PHA partner, transferring back the 51% of the work that the PHA partner would purportedly do, or represent to HUD that it would be doing (to evade the HUD unit cap), to CGI one year after the contract was awarded to CGI and its PHA partner.

Rudy has admitted that the Rat Pack discussed this transfer back mechanism on more than one occasion in the context of the 49/51% plan – where CGI would submit a 49/51 bid with a PHA partner where, at the bidding stage, the partner would be designated to employ 50% or more of the staff performing the work in administering the units, but that at some point after being awarded the contract, the partner would transfer those staff or those positions back to CGI. *Herbst Decl. Ex. 12 (Rudy Tr. 65-69).*

Rudy also had discussions about this 49/51% transfer back scheme with CGI's Ohio PHA partner because the "ideal was for CGI to do all the work, as it always had." *Id., at 69-70.* CGI's Ohio PHA partner was "amenable" to the approach. *Id., at 70-74.* Rudy also admitted that CGI's Ohio partner agreed to this arrangement prior to the submission of the rebids in 2011. *Id., at 74-75.*[8]

---

[8]   In July 2010, just after Ashmore's termination, this 49/51% transfer back scheme was set forth in a CGI Executive Step Review. *Herbst Decl. Ex. 53 (P. Ex. 15, D. Bates 5603 at 22-29 ("Prime for PHA Partnership (Sub during HUD re-compete)").* When asked about this document and language, Gorris admitted that it refers to the concept that had been discussed by the Rat Pack of having CGI be a 49-percent subcontractor during the bidding process and having

At 4:28 p.m., a half hour after the May 17 Senior Management Committee conference call ended, and for the first time, Kyprianou, to whom Carragher had in early April 2010 transferred at least part of Ashmore's supervision, uncharacteristically demanded that Ashmore produce all materials on which he had been working for the Fairfax ISIT Division project – a project on which Ashmore was then reporting directly to Fairfax ISIT Vice President Rob Bowell, and on which Kyprianou had no supervisory authority. *Herbst Decl. Ex. 31 (D. Bates 2823); Ashmore Decl. ¶¶ 24, 35-36, 93-104.*

The next day, in a May 18 email, Kyprianou suddenly began to criticize Ashmore. *P. Resp. ¶¶ 59-85.* Kyprianou alleged that Ashmore had failed to give "daily email updates" of his activities on work assigned by Bowell and Fairfax ISIT – the other division in which Ashmore worked. *Ashmore Decl. ¶¶ 36-40.* But Ashmore had indeed sent Kyprianou such an email on May 5. *Herbst Decl. Ex. 28 (D. Bates 311 (Ashmore 5.5.10 9:50 p.m. email to Kyprianou "I'm leaving the office now. Most of the past 15 hours have been on the HUD proposal.")).* And beginning the next day, Ashmore and Kyprianou had been communicating by email daily about this proposal. *Ashmore Decl. ¶¶ 37-48.* Indeed, from May 5 to June 12, Ashmore worked almost exclusively on only one project for Fairfax ISIT, the HUD Transformation Initiative proposal, about which Ashmore and Kyprianou communicated daily. *Herbst Decl. Ex. 31.* Thus, Ashmore had kept Kyprianou informed on a daily basis about the work he was doing on that project and Kyprianou was intimately involved with that project, Ashmore even providing

---

the other 51 percent transferred back by the [PHA] after the award of the contract. *Herbst Decl. Ex. 1 (Gorris Tr. 109-12).* While CGI has denied that the director shell company scheme's fraudulent core concept was ever seriously discussed or pursued, it appears to have been seriously discussed and pursued in the 49/51% scheme. ███████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████

Kyprianou documents that Kyrianou needed for his own contribution to the project which Kyprianou requested, and which also documented the work Ashmore was performing. *Id.* It was therefore not necessary to provide a separate email at the end of the day about Ashmore's work because Kyprianou knew precisely what Ashmore was doing. From May 5 to May 18, Kyprianou did not send one email to Ashmore requesting daily emails summarizing Ashmore's work; they were exchanging daily emails from before dawn until late at night on both workdays and weekends. *Ashmore Decl. ¶¶ 38-39, 46-47.*

Kyprianou admitted in deposition that he could not recall ever criticizing Ashmore's performance prior to May 18. *Klein Decl. Ex. 12 (Kyprianou Tr. 99).* In his May 18 email, Kyprianou stated he would give Ashmore a "corrective action plan," but he never did. *Id.* Kyprianou also said that he would set up a call to discuss the matter, and Ashmore said in his responsive email that he would go over with Kyprianou in that call all that he was doing. *Herbst Decl. Ex. 32 (P. Ex. 4, D. Bates 393).* However, Kyprianou did not call until at least a week later, on May 28, and he admits that that was the only call before Ashmore's termination in which Kyprianou discussed any performance concerns with Ashmore. *Klein Decl. Ex. 12 (Kyprianou Tr. 100-04); Ashmore Decl. ¶¶ 47.*

By email on June 8, and on a June 9 conference call, HUD publicly confirmed that unit caps were being implemented in the re-compete. *P. Resp. ¶ 142.* CGI Federal Director Bill Durivage's notes of the call circulated to the Rat Pack make clear that CGI knew that HUD was now committed to the unit caps. *Herbst Decl. ¶ 36.*

On June 10, Carragher cancelled her June 11 management meeting, which Ashmore was scheduled to attend. *Herbst Decl. Ex. 38 (D. Bates 2765).* On June 14, Carragher sent an email

captioned "Rat Pack File and Call in number" marked "Importance: High" about the next weekly

"Rat Pack" meeting scheduled for June 15, stating:

> Just left you a vm.  <u>We need to make sure no RAT Pack files get sent to Ashmore for</u>
> <u>tomorrow's call.</u>  In addition, would you please send out a new call in number.  Michael
> Ashbrook's would be good….
>
> <u>Ashmore needs to be removed from the invite</u>- of utmost importance….
>
> Michael Ashbrook will be calling in and using his leader code from here on out to ensure
> we know exactly who is on the call.

*Id., (P. Ex. 35, D. Bates 35).* (<u>emphasis</u> *in original*).

Less than an hour later, at 4:37 p.m., Kyprianou emailed Ashmore stating:

> I tried your office number but it looks like you left for the day.  I wanted to talk to you
> about PBCA.  Since you haven't had any PBCA assignments for some time now, there is
> no need for you to call in for the PBCA RAT pack meetings.  If anything changes I will
> let you know.  Thanks.

*Herbst Decl. Ex. 39 (D. Bates 8379).*

Ashmore responded at 6:40 p.m. to both Kyprianou and Carragher, asking for a call or

meeting with both, pointing out that he did have PBCA assignments, and could not understand

why he was being cut off from communications about the PBCA rebid.  *Id.*

Although Ashmore was notified that the weekly Rat Pack call was cancelled, *id.*,

unbeknownst to him, it was not cancelled; a new invite went out to everyone except Ashmore

shortly thereafter, followed by the materials "for this morning's meeting," *i.e.*, for the conference

call on June 15 at 8:21 a.m.  *Herbst Decl. ¶ 40.*

On June 16, the day after that call, Ashmore was terminated.  *Kyprianou Decl. Ex. 18.*

**8.  THE PRETEXTUAL NATURE OF CGI'S ABRUPT TERMINATION OF ASHMORE**

In their haste to fire Ashmore, neither Kyprianou nor Carragher responded to Ashmore's

June 8 and 14 requests for a call or meeting.  Nor did they invoke any elements of CGI's

progressive discipline procedures.  Late on the night of June 14, at 11:35 p.m., Kyprianou sent

an email to Human Resources ("HR") which, for the first time, noted "some performance issues with Ben." *Klein Decl. Ex. 12 (Kyprianou Tr. 94-95, 121-22); Herbst Decl. Ex. 41 (P. Ex. 5, D. Bates 8381).* From CGI's document production in this case, it appears that there were no other emails or memoranda to or from HR discussing or purporting to document any Ashmore performance issues.

Early the next morning, June 15, at 8:56 a.m., without contacting Ashmore, or exploring the alleged "performance issues," CGI HR forwarded Kyprianou's email to Senior Vice President Rick Schmitz and Vice President Carragher, requesting "approval for the termination of Ben Ashmore." *Id.*

In every instance in which Kyprianou fired other managers or senior consultants during his decade-plus-long tenure with CGI and its predecessor companies – he testified he could recall three such terminations in great detail – Kyprianou's terminations included documented elements of progressive discipline (e.g. a lengthy history of poor performance, discussions with the employee, warnings, performance improvement plans, and corrective action plans), and he had conferred with HR for months before the eventual termination. *Klein Decl. Ex. 12 (Kyprianou Tr. 16, 72-93, 116-19).*

In Ashmore's case, however, there were no warnings or performance improvement or corrective action plans, no discussions between Kyprianou and HR or Carragher and HR, no face-to-face meetings or discussions with Ashmore, just one telephone call with Kyprianou in late May. *Id., at 94-95, 103.*

The haste to fire Ashmore without any prior warning or process – only two months after Carragher gave him a performance evaluation with significant written and oral comments praising Ashmore for his performance – fatally undermines CGI's contention here that it fired

Ashmore solely because of "performance deficiencies." As set forth herein, those alleged

deficiencies do not survive scrutiny. Even if, *arguendo*, they did, they would not explain the

haste and circumstances of the termination, especially its inter-relationship with both Ashmore's

objections and the news that HUD would indeed implement its unit restrictions.

Kyprianou identified four performance deficiencies purporting to support Ashmore's

termination in his late-night June 14, 2010 email to HR:

1. Failure to follow established procedure for the OHA performance based contract. Assigned 5 cases on or about 5/5. Failed to review his cases within the required time frame (3 calendar days). Myself and Yolanda Curry contacted Ben a couple of times to offer assistance but he stated that he had everything under control and that he would complete his assignment. Finally on day 12 Ben reassigned his 5 cases to Yolanda Curry. Under this performance based contract we have 21 days to complete a case. Processing times above 21 days result in disincentives.
2. Failure to provide prior notice/update to CGI colleagues for the HUD TI proposal. Failed to keep CGI members informed despite of [sic] repeated request to respect colleagues time and other assignments. On multiple occasions ICF, the prime on this proposal, contacted CGI members for information or meetings without them being aware of the nature or reason(s) behind the request. Some examples of such cases are:
    a. Ben giving ICF Tracey Rudy's contact info for a CMHA reference without letting Tracey know about the upcoming call.
    b. ICF contacting Nancy Dowdy for oral meetings without her being informed of such possibility.
3. Failure to follow [Kyprianou] instructions to provide daily report of his activities at the end of each day. Often Ben did not submit his daily report. He was days behind and had to receive a reminder to comply with my request.
4. Failure to adhere on CGI's attendance policy despite repeated requests from his manager. He did not request prior approval for time off during business hours and he did not receive approval for working from home.

*Herbst Decl. Ex. 41 (P. Ex. 5, D. Bates 8381)*, *Ex. 42 (P. Ex 12, D. Bates 5003)*. At his

termination meeting on June 16, Ashmore disputed all these reasons, asking for examples of poor

performance, but Kyprianou said that "he wasn't going to get into the details at this time." *Id*.

With respect to the first alleged performance deficiency, Ashmore did not fail to follow

procedure. In late April 2010, Kyprianou asked Ashmore to review a few of the test files

personally, so that he could familiarize himself with the work involved in the project and be better informed about the work that the staff on this project would ultimately be performing. *Ashmore Decl. ¶ 85.* (1) Kyprianou placed no deadline to accomplish this, (2) nor did he specify how many files should be reviewed, (3) he asked Ashmore to review these files when Ashmore's work schedule provided available flexibility, and (4) he delegated authority to Ashmore to assign the files. *Id.; Klein Decl. Ex. 12 (Kyprianou Tr. 150-51, 155).*

On May 5, 2010, Ashmore, following Kyprianou's direction, assigned the files:

> Please assign them as follows: five to Roxanna, five to me, and the rest split between Nora and Robert. Besides the five that I will be doing, you and I will do a 100% QA on the ones that are done by everyone else. We'll split that up evenly. I exchanged emails with Tim earlier – he promised to have all the reports ready to run by tomorrow morning. I'm getting ready for a Step review tomorrow and a kick-off meeting Friday but my weekend and next week are wide open on this.

*Herbst Decl. Ex. 33 (D. Ex. DD, D. Prod. Bates 5004).* The "Step review" referenced in this email was CGI's formal review process where senior executives would determine whether to pursue the HUD Transformation Initiative.

The next day, on May 6, CGI executives decided to move forward with the pursuit of the HUD Transformation Initiative. Given the extensive work involved with assembling a team within CGI, interacting with the team of companies joining together to bid for this project, and preparing a proposal, that pursuit required almost all of Ashmore's immediate attention. *Ashmore Decl. ¶ 89.* Kyprianou was intimately involved in the HUD Transformation Initiative and therefore knew of Ashmore's obligations. Kyprianou admitted he told Ashmore to seek assistance if necessary, because of the HUD Transformation Initiative. *Klein Decl. Ex. 12 (Kyprianou Tr. 159-65).* Ashmore's transfer of the five files neither violated CGI's contractual requirements with OHA (because the 21-day clause was not yet in effect); nor, as Kyprianou admitted, did it result in any harm to CGI. *Id., at 163-65; Herbst Decl. Ex. 24 (P. Ex. 7,*

*excluding the 21-day disincentives from the "Transition Phase" that was to be "At least the first three (3) months of the contract [to] consist of about 50 to 100 files only in order to 'pilot' the project and workout any issues.").*  While CGI now alleges that Ashmore did not adhere to an OHA Annual Recertification Workflow revised in April 2010, there was in fact no three-day requirement in that workflow in the test phase, and the "workflow" was what Ashmore's team was testing and revising from April 2010 through Ashmore's termination.  *Ashmore Decl. ¶¶ 85, 92.*

Concerning the second alleged performance deficiency above, Ashmore did not fail to provide notice or updates, or otherwise fail to keep his colleagues informed on the HUD TI proposal.  As to the first specific example alleged in 2(a) of Kyprianou's email above, Ashmore and Rudy exchanged 10 emails on May 24, 2010 in which Ashmore identified in detail the information Rudy needed to provide to submit the upcoming bid on June 2, information which concerned a reference about CGI's past performance. *Ashmore Decl. ¶¶ 96-97.*  Ashmore initiated the email chain by writing "if you need anything else, let me know I'm in a meeting but can step out for a call."  In the end, Rudy replied without any complaints about the timing or nature of Ashmore's request, writing "OK," and Ashmore specifically informed Rudy by email on May 26 that "you may be receiving a call from ICF"[9] when her contact information was provided to ICF so that they could make a quality-assurance check, if necessary, which was commonplace at CGI.  *Ashmore Decl. ¶ 97.*  In fact, Ashmore even copied Rudy on his reply email to ICF when ICF asked for the "POC" ("point of contact") on CGI's past performance

---

[9]   ICF International was CGI's partner on this bid, and the prime partner in this partnership. Ashmore was responsible for transmitting CGI's documents to ICF, and ICF submitted the final bid proposal to GSA. *Ashmore Decl. ¶ 27.*  ICF therefore had the responsibility to confirm that everything submitted in the bid, including documents from CGI, was accurate.

reference using her project.  *Kyprianou Decl. Ex. 14 (May 26 2010 email without bates numbering).*[10]

As to the second specific example alleged in 2(b) above, ICF's contacting Dowdy had nothing to do with Ashmore, Dowdy did not have any complaints about this contact, and Dowdy was contacted because she was specified as a key person in the bid, and knew she was being bid as such.  *Ashmore Decl. ¶¶ 101-02.*

Concerning the third alleged performance deficiency above, Ashmore did not fail to update Kyprianou daily, as set forth above, at 20-21.

Concerning the fourth alleged performance deficiency above, Ashmore did not fail to follow applicable CGI attendance policies.  CGI did not have an attendance policy for managers like Ashmore.  *Klein Decl. Ex. 12 (Kyprianou Tr. 179).*  In its February 4, 2011 response to the U.S. Department of Labor, CGI acknowledged that its' "mandatory Attendance Policy" applied only to "non-management level members" *Id., at Ex. 4 (Letter to Wigger, pg 2, par. 4).*  Moreover, CGI has produced many documents showing that Ashmore proactively informed his managers about his schedule and time off.  *Herbst Decl. Ex. 28.* While Carragher and Kyprianou raised these attendance issues at his termination, Ashmore was never previously warned about excessive absences, or not keeping his superiors informed of his whereabouts.  Nor was he ever warned that he was violating CGI attendance policies, or that he was in any way jeopardizing his employment.  *Ashmore Decl. ¶¶ 31-48.*

CGI's brief, at 47, argues that new allegations about Ashmore – not contained in Kyprianou's June 14 email to HR, and not discussed with Ashmore at his termination meeting –

---

[10]   CGI did not produce this email in response to plaintiff's demand for (1) emails related to the ICF proposal or (2) Ashmore and Rudy's emails.  CGI does not explain why this email was not produced, and why they are citing to evidence that should have been produced but was not.

were justifications for his firing: "repeat absences, failure to seek supervisor approval prior to taking time off, disregard of his colleagues, insubordination, and failure to follow internal company policy and procedure, and general poor performance."  While the failure to mention them at the time evidences pretext, these allegations are as meritless as those addressed above.

With respect to repeat absences and failure to seek supervisor approval, this alleged "deficiency" was never mentioned in Carragher's April 15, 2010 performance evaluation of Ashmore, and is in fact fundamentally inconsistent with it, and particularly with her praise of him (1) for being "dependable and able to follow through on any project given to him with little oversight," (2) for being "an independent worker that has identified and pursued new business on a number of differing types of engagements," and (3) for being "adept at independent follow through."  Carragher did not appear to care very much at all where Ashmore and her other direct reports worked as long as the work got done and he accomplished what was required of him. *Herbst Decl. Ex. 28 (D. Bates 7232,* Carragher acknowledging that she could not keep up with her direct report's schedules or vacation days).

In fact, on one occasion when Ashmore was unable to make one of Carragher's weekly calls – before Ashmore made his SOX-protected objections – Carragher joked about his missing the call.  When Clause emailed him the notes and action items from the missed call, and jokingly added that Ashmore would have to follow up with someone to get "the info on billboards and cocktail parties" Carragher jokingly added, "Free booze party at L'Enfant Plaza DC [HUD headquarters] every Thursday was the idea."  *Herbst Decl. Ex. 28 (D. Bates  2009395).*  It is clear that the suggestion that Ashmore's "absences" and failure to obtain supervisory approval for such "absences," is utterly pretextual, especially in light of the huge number of hours Ashmore was working for CGI.  *Herbst Decl. Ex. 29; Ashmore Decl. ¶¶ 31, 33.*

CGI cites Ashmore's Friday, February 26, 2010, 12:37 p.m. email to Joyce Changery, Carragher's executive assistant, six weeks before the April 15, 2010 performance evaluation, noting that Ashmore was going sledding with his kids after a 30-inch snowfall, and after an extension of a deadline removed some of the deadline pressure from the Housing Choice Voucher Administrative Fee Cost Study.  However, Ashmore's emails and time sheets that CGI approved show that Ashmore began working by at least 5:12 a.m. and worked seven hours that day, February 26 (*Carragher Decl. Ex. 4 (D. Bates 7990)*, when a snow-storm prevented his travel to the office, and that he had worked at least 76 hours during that week.  *Herbst Decl. Ex. 29.*  In response to that email, Changery replied "Happy sledding to you," making clear that Ashmore's taking the rest of the day off was of absolutely no concern to Carragher, who never mentioned anything about it to Ashmore.  *Carragher Decl. Ex. 5 (D. Bates 3086); Herbst Decl. Ex. 29*.

CGI next claims that Ashmore worked "abbreviated hours," leaving around lunch each day during the week of March 15, 2010 because he was sitting shiva.  However, Ashmore did not sit shiva the entire week, only Thursday and Friday of that week, after the mother of his daughter's twin best friends passed away after a long and brutal bout with cancer, and came back to work after lunch on Thursday, reporting to Carragher that he would not be returning after lunch on Friday.  Carragher acknowledged that day that she knew Ashmore had been working a lot of hours in the previous weeks, did not order him to come back after lunch on Friday, and told him to "Try to enjoy your weekend."  (*Carragher Decl. Ex. 5, D. Bates 8062*).  Ashmore had actually billed 63 and 73 hours respectively in the previous two weeks.  *Herbst Decl. Ex. 29 (D. Bates 2005759-60)*.

CGI's claim that Ashmore took the weeks of March 14, April 22 and May 3, 2010 off for court appearances in his matrimonial/custody proceedings, and did so without informing CGI is similarly meritless.  Ashmore never attended court for an entire week, or even most of a week, at any time during his employment.  *Ashmore Decl. ¶ 32.*  The scheduled April 22, 2010 appearance was adjourned, and on April 24, Ashmore emailed Kyprianou to inform him that Ashmore was scheduled for court hearings on the afternoons of May 3 to 6 and all day on May 7.  *Herbst Decl. Ex. 28 (D. Bates 3025).*  CGI's document production contains no reply from Kyprianou.  On May 6, Ashmore emailed Kyprianou containing a screen shot of the court's website reflecting that the May 3-5 hearings had been adjourned but that he would most likely appear on May 6 and May 7.  *Id. (D. Bates 314)* Ashmore concluded his email by saying, "I wanted to give you a heads up."  *Id.*  Again, Kyprianou did not care enough to reply.  Ashmore appeared briefly on the afternoon of May 6 to find that that appearance had also been adjourned.[11]  *Id.*

---

[11]   The other allegations of "unexplained absences" are explained in our Rule 56.1 Responses, which summarizes the factual record on these and all the other points raised by CGI in their Rule 56.1 Statement.  Thus, for example, on April 8, 2010, when Ashmore informed Kyprianou he was taking most of the day off for an 8:45 a.m. tee time, he had previously arranged to take that time off, in a week where he billed more than 55 hours of work.  *P. Resp. ¶¶ 44-45, Herbst Decl., Ex. 28 (D. Bates 129), Ex. 29 (D. Bates 2005760).*  On April 20, 2010, Ashmore delayed his usual 7 a.m. arrival at work, not just because his children had made him breakfast in bed, but also so that he could take a 9 a.m. conference call from home before commuting into New York City on his motorcycle where, of course, he could not talk on the phone.  Ashmore informed Kyprianou of this early that morning, and Kyprianou responded, "Okay – Happy Birthday!"  He did not warn Ashmore that this – or any of the other pretextual performance deficiencies now cited by CGI – as a serious problem that might jeopardize his employment.  *Kyprianou Decl. Ex. 3.*  The same can be said of (1) Kyprianou's innocuous response, "ok," to Ashmore's advice that he had to work from home on May 26, 2010 because of air conditioning issues, *id., P. Resp. ¶ 47,* and (2) Ashmore's need to leave the office to attend to the accident and serious injury of his domestic partner on June 15, 2010, when he had already worked more than eight hours.  *P. Resp. ¶¶ 49-50.*

The allegation that Ashmore did not respect his colleagues' time and schedules, compromising the quality of CGI's work product, is also unsupported and meritless. CGI produced many emails (often copied to his managers) reflecting his respect for his colleagues' time and their other assignments:

*Herbst Decl. Ex. 23:*

D. Bates 2009860, Ashmore email stating "I want to confirm that this will work with all your schedules before FFX [Fairfax] does the final cost proposal with all our costs."

*Herbst Decl. Ex. 25:*

D. Bates 703, Ashmore email stating "Do you have a few minutes tomorrow to discuss an outsourcing project I'm about to begin. Panos mentioned that you would be a good resource for some of the documents/information I need."

D. Bates 8003, Ashmore email stating "Do you both have a few minutes to discuss before the 3:00 p.m. call? I want to fill you in on all that has transpired today."

D. Bates 744, Ashmore emails stating "We're going to be onsite next week at OHA and would like to use Robert in the start-up phase if that's okay with you… Is that okay with you? And if so, is it [okay] if I email him (I'll copy you of course)."

*Herbst Decl. Ex. 26:*

D. Bates 7664, Ashmore email stating "Just to make sure you're okay with this (I think you are… … But the FFX folks are taking over the HUD IT and moving it all onto their pipeline. I remember conversations we had about how you had all HUD. With the PBCA work are you okay with this transition?"

D. Bates 158, Ashmore email stating "I know you're all in the midst of PBCA, but I have meetings next week (Wednesday) at HUD HQ with David Vargas and his staff and still waiting to hear back from Milan Ozdinec…. As these are our deals, do any of you want to come and is there anything related to the PBCA that you would like brought up and/or avoided. They are senior folks so who knows what discussions they are part of regarding [multifamily housing]."

D. Bates 2717, Ashmore email stating "Who would you like from our group besides me involved in the ICF call tomorrow?"

D. Bates 8317, Ashmore email asking "Should I send out the Step C deck for email approval today or wait until Tuesday"

D. Bates 5220, Ashmore email stating "A couple of our people have been contacted [by ICF International] regarding Orals. Will you make sure that any future requests come to me and then I can forward them out? I want to make sure that anyone on my end knows the expectations."

*Herbst Decl. Ex. 27:*

D. Bates 2009831, Ashmore email stating "What are your early Septembers like? Looks like with vacation schedules and all the players it will be difficult to plan for August. I'd rather be patient and get everyone on board than rush through this—especially given that I'm calling in some favors."

*Herbst Decl. Ex. 28:*

D. Bates 2568, Ashmore email stating "Can I schedule something on the 10th for Panos, Mike A, Prook and Egut in Cleveland re the IT proposals? Diane thinks it would be helpful to have a session there with our iREMS/TRACS people before the Step A and I agree. I was thinking that since we'll all be there, it might be good to piggy-back onto this, but I don't want to take any focus away from PBCA."

D. Bates 277, Ashmore email stating, *inter alia*, "Please let me know what you want me to do differently on any of this…. [Senior Vice President] Donna [Ryan] told me to be on the 9:30 call with [ICF International Senior Vice President] David [Selden]. Being the bottom guy on the totem pole in all these calls I sometimes don't know what I should or shouldn't do and hope what I am doing isn't upsetting or inappropriate."

*P. Ex. 11*, D. Bates 3039, Ashmore email stating "I'm getting quite busy with calls between FFX, partners, etc., on this proposal. Do you want to be looped in on all the calls or should I loop in anyone else?"

*Herbst Decl. Ex. 30:*

P. Bates 19, Ashmore email stating "My wife had a pretty serious accident this afternoon & is spending the night in the hospital…. I'm not sure what my availability will be tomorrow--I just replied to your last email: all eight positions need to be in the sealed cost proposal. My in-laws are bringing me up my laptop later tonight so I'll get a chance to open the attachment in your other email later tonight."

D. Bates 5262, Ashmore email stating "Orals have been tentatively scheduled for next week as an FYI--6/10. How do you feel about Dowdy speaking?"

*Herbst Decl. Ex. 31:*

D. Bates 8185, Ashmore email stating "Do you have a few minutes to chat today or tomorrow. I am wondering if you could be this key person on the HUD Transformation Initiative. Panos suggested you might be the candidate."

D. Bates 5397, Ashmore email stating "Thanks for the time this morning. These are the two positions we discussed…. If you or either of them would like to speak to me further… I'll be available any time on my cell."

D. Bates 359, (1) Ashmore email stating "Without getting her in trouble or anything, I wasn't quite sure how to handle this. As you can see in her capabilities chart she indicated experience in all of the methodologies…. Any advice?" and (2) his subsequent email stating "I was just concerned that I not look like I was challenging her background or accusing her of padding her resume. I know people get sensitive about this."

D. Bates 2823, Ashmore email stating "Can we set up a time to discuss tomorrow? We need to resolve staff availability before we confirm resources, especially as the

DC question is unresolved.  Noon looks like the only open time for all of you.  Does that work?"

CGI's also suggests that Ashmore's role in the "Admin Fee Study proposal" evidenced Ashmore's disrespect of his colleagues' time and schedules, because (1) Rudy did not know that she was bid on this project (*Carragher Decl. Ex. 5 (D. Ex. Z, D. Bates 7964)*), (2) Senior Vice President Rick Schmitz sent one email to Ashmore in on February 26, 2010 complaining that Schmitz did not know who owned the initial delivery of the proposal because there had been no Step A review, and the Step B and C reviews had been combined (*id. (D. Ex. AA, D. Bates 7990)*); and (3) Carragher sent an email the same day to Ashmore asking why the delivery was not ready and would have to be driven from Cleveland to Chicago when the weather was inclement.

Here, again, a purported performance problem in February 2010 was never mentioned to Ashmore, either at his April 15 performance evaluation or at his termination meeting, so it could not have been a legitimate performance deficiency justifying Ashmore's termination.[12]  Indeed, the evidence reflects that (1) the delivery was delayed because HUD had not responded to questions to which CGI needed clarification, (2) HUD granted an extension to provide it time to answer those questions, thereby obviating the need to drive the proposal to Chicago; (3) that Ashmore did not select Rudy (nor did she complain about her selection) (*Carragher Decl. Ex. 5 (D. Ex. Z, D. Bates 7964)*), and (4) Ashmore fully addressed Schmitz's concerns in a responsive email, explaining that CGI's PMO [Project Management Office], not Ashmore, wanted to schedule the Step B and C review without scheduling the Step A review because there was such

---

[12]   We do not address here emails and alleged incidents that are mentioned briefly and conclusorily in defendants' Declarations but that CGI did not consider significant enough to include in its brief or Rule 56.1 Statement.  These issues are addressed in the Ashmore Declaration, but since they, too, were never cited in the Kyprianou email purporting to support Ashmore's termination or mentioned to Ashmore at his termination meeting, they are also clearly pretextual.

little time to respond to HUD's proposal solicitation.  (*Herbst Decl. Ex. 23 (D. Bates 7994)*).
Now properly informed, Schmitz emailed his thanks to Ashmore and copied Carragher and
Kyprianou, asking who would actually own delivery.  *Id.*  That was a question directed to
Carragher and Kyprianou, who could answer it, not Ashmore.  *Id.*  CGI's apparent notification –
after Ashmore's termination – that it had not won this opportunity was therefore not attributable
to any deficiency in Ashmore's performance. *Ashmore Decl. ¶¶ 71-81.*

CGI also claims that Ashmore insubordinately continued to communicate with ICF on the
HUD Transformation Initiative proposal.  This "insubordination," too, was not mentioned in
Kyprianou's email to HR as a reason purportedly justifying Ashmore's termination.  In fact,
Ashmore did not insubordinately continue to communicate with ICF, or request that ICF send
information directly to him, nor did he disregard Kyprianou's directions.  *See P. Resp. ¶ 74.*
Kyprianou emailed Ashmore on June 3 to inform him that that ICF had contacted a CGI member
(without first informing Ashmore), and Kyprianou directed Ashmore to contact ICF to tell them
that Kyprianou would now be working with ICF because Ashmore was in the hospital attending
to his domestic partner.  Ashmore did not immediately get that email because it was sent to his
company rather than personal Blackberry after Ashmore told Kyprianou that his company
Blackberry was out of power and that any communications should be sent to his personal
Blackberry.  *Herbst Decl. Ex. 30 (D. Bates 5161).*  On June 4, at 9:45 a.m., after returning home
from the hospital, Ashmore forwarded Kyprianou an email he had just sent asking ICF to make
sure that any future requests come to Ashmore so that all CGI members know the expectations,
and asking if ICF had a set schedule regarding oral reviews and staff members.  *Herbst Decl. Ex.
26 (D. Bates 5098, 3066).*  Kyprianou replied to Ashmore asking him to look at the email
Kyprianou had sent to the wrong Blackberry which he had not reviewed, advising Ashmore that

Kyprianou had taken the lead in Ashmore's absence, and directed Ashmore not to submit any further requests to ICF so that ICF would not be confused as to whom they should communicate with.  *Id.*  After Kyprianou resent that email to Ashmore, Ashmore did not initiate contact with ICF again.  *Ashmore Decl. ¶ 102; P. Resp. ¶ 74.*  This was just another example of Kyprianou's baseless and pretextual criticism of Ashmore, in which Kyprianou repeatedly (1) requested materials that Ashmore had already provided him, (2) suggested, falsely, that Ashmore had not complied with his instructions, and (3) mistakenly criticized his work, time reporting and expenses.  *P. Resp. ¶ 75.*  Ashmore, who was based in New York, offered to sit with Kyprianou, based in Cleveland, in person to go through his emails, and to provide post-proposal summaries to Kyprianou if Kyprianou thought the detailed emails he was getting from Ashmore were not sufficient.  *Herbst Decl. Ex. 26 (D. Bates 3066).*   Neither Kyprianou nor Carragher were willing to speak to Ashmore in response to this offer, *Ashmore Decl., ¶ 103,* another reason to conclude that all these alleged performance deficiencies were pretextual.  *See P. Resp. ¶ 82.*

9. ███████████████████████████████████████████████████
████████████

As set forth above, at 18-20, the 49/51% variant of CGI's plans to evade HUD's unit restrictions was characterized by the same fraudulent intent to deceive HUD that characterized the director shell company scheme. ████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████

██████████████████████

█████████████████████████████████

█████████████████████████████████

---

**13**   Prior to submission of the final bids, HUD had raised the unit cap from the initial 300,000 to 407,265 units in the end.  *See P. Resp. ¶ 142.*



[15] and PHAs



**10. ASHMORE'S BREACH OF CONTRACT CLAIM**

Prior to Ashmore's hire, after meeting with Carragher on February 26, 2009 (*see above, at 7-8*), Ashmore emailed Carragher stating, *inter alia*, "of course contingent upon the incentive portion, I would need to make a base equivalent to what I make now [$126,000]… As I mentioned yesterday, I also certainly am very comfortable with a significant performance-based/incentive component (after all, you know how I feel about [performance-based] structures)." *Ashmore Decl. ¶¶ 18-19; Klein Decl. Ex. 13 (Carragher Tr. 224-33).* Carragher responded "thanks for the information." *Id.* On April 15, 2009, CGI Recruiter Jeff Kniess noted that "we are working out the specifics of the incentive plan and will get back to [Ashmore] as soon as that occurs." *Id, at 228-30.*

At his deposition, Ashmore testified about these conversations about compensation. *Klein Decl. Ex. 11 (Ashmore Tr. 193-96, 385).* About his bonus, Ashmore testified that "it was discretionary insofar as whether or not I met my performance metrics" and that "Ms. Carragher flat out informed me that based on the base that I wanted, and [if] I met all my performance metrics, I would get a bonus equal to my base and I could have a much higher upside." *Id., Ashmore Tr. 195-96, 385.*

CGI paid Ashmore an annual base compensation of $126,000. *Herbst Decl. Ex. 18 (D. Bates 10171).*

During 2009 and 2010 CGI did pay, and had the ability to pay, Carragher's managers and directors several types of bonuses and stock options, in addition to profit participation awards which could be awarded to those employed for at least 90 days. *Herbst Decl. Ex. 66 (D. Bates 2008463-69).* Ashmore had been employed for more than 90 days during CGI's 2009 fiscal year. *See e.g. Herbst Decl. Ex. 18 (reflecting Ashmore's start date of May 18, 2009) and Herbst Decl. Ex. 61 (reflecting that CGI's Fiscal Year ended on September 30, 2009).* As set forth

above, at 8-9, Carragher had marked Ashmore for "priority" in both profit participation and stock option awards.

The documentary record also includes CGI's internal budgeted direct labor rate for Ashmore, on February 25, 2010, of $275,000, or $125 per hour (*Herbst Decl. Ex. 65 (P. Ex. 17)*), and an external, certified, fully-burdened rate, on May 21, 2010, of $426,294. *Id.,* (*P. Ex. 18*).[16]

In short, the evidentiary record in this case permits a reasonable jury to infer that CGI agreed to pay, and expected to pay, Ashmore a substantial profit participation award, bonus and stock options if he met his performance metrics, which his April 15, 2010 annual performance review reflects he did.

## III.   ARGUMENT

### 1. SUMMARY JUDGMENT LEGAL STANDARDS

Defendants bear the "heavy burden" of establishing that no genuine issues of material fact exist and that the undisputed facts show that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *Gorwin v. Local 282, IBT*, 838 F. Supp. 116, 118 (S.D.N.Y. 1993) (Sotomayer, J.). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law[,]' [while] [a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000), *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The evidence must be viewed in the light most favorable to plaintiff, and all ambiguities must be resolved against defendants. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If there is any uncertainty as to the true state of any material

---

[16]   The figures are calculated by multiplying the hourly rate by 2,200 hours per year, which was the hours-per-year calculation that CGI used. *Herbst Decl. Ex. 7 (Bryson Tr. 60).*

fact, the motion cannot be granted. *Gibson v. American Broadcasting Co., Inc.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

### 2.   SUMMARY JUDGMENT ON THE SOX CLAIM SHOULD BE DENIED

"Under [the] burden-shifting framework [of Section 806], the employee bears the initial burden of making a prima facie showing of retaliatory discrimination because of a specific act." *Day v. Staples, Inc.,* 555 F.3d 42, 53 (1st Cir. 2009). To succeed in making a *prima facie* case, "an employee must prove by a preponderance of the evidence that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Bechtel v. Administrative Review Bd., United States Dep't of Labor,* 710 F.3d 443, 447 (2d Cir. 2013) (citation omitted). Once a plaintiff has made its *prima facie* case, a defendant employer prevails only if "it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Id.* (citation and internal quotation marks omitted).

Pursuant to 18 U.S.C. § 1514A(a)(1), a plaintiff's activity is "protected" if he (1) "provide[s] information," (2) "regarding any conduct which the employee reasonably believes constitutes a violation of section 1341 [mail fraud], 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities and commodities fraud], any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders," to (3) a federal agency, Congress, or "a person with supervisory authority over the employee."

It is now well accepted that courts should construe Section 806 broadly. *See Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp.2d 432, 440-46 (S.D.N.Y. 2013) (rejecting argument that it was not objectively reasonable for plaintiff to believe that scheme was in progress and could possibly come to fruition, noting that"[i]t is now well accepted that courts should construe Section 806

broadly" because of legislative purposes (1) "to nip corporate wrongdoing in the bud" and (2) to help rectify a culture that discourages employees from reporting fraudulent behavior internally as well as to proper authorities; a complainant fulfills his duty under Sarbanes-Oxley when he "identif[ies] conduct that falls within the ample bounds of the anti-fraud laws"; (citations omitted)); *Mahony v. KeySpan Corp.,* 2007 WL 805813 *5 (E.D.N.Y. Mar. 12, 2007) ("The law was intentionally written to sweep broadly," protecting any employee who took reasonable action to try to protect investors and the market." (citing 149 Cong. Rec. S1725-01, S1725, 2003 WL 193278 (Jan. 29, 2003)).

In his cogent opinion denying defendants' motion to dismiss, Judge Sand held that Ashmore could establish that he engaged in the requisite protected activity without demonstrating that CGI's conduct which he opposed and to which he objected actually violated the law. *Ashmore v. CGI Group Inc.,* 2012 U.S. Dist. LEXIS 82598 *14 (S.D.N.Y. June 12, 2012). *See also Guyden v. Aetna, Inc.*, 544 F.3d 376, 384 (2d Cir. 2008) ("whistleblower need not show that the corporate defendant committed fraud"; statute only requires proof of reasonable belief that defendant's conduct violated federal law); *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp.2d 45, 55 (S.D.N.Y. 2011) (plaintiff need not show an actual violation of the law, "nor must a plaintiff cite a particular statute" or "code section he believes was being violated in his communication to his employer" provided that "the employee's communications identify the specific conduct that the employee believes to be illegal."),[17] *citing Welch v. Chao*, 536 F.3d 269, 276 (4th Cir. 2008).

The only "specificity" required is to "state particular concerns which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." *Id.,* at

---

[17] Judge Sweet's later grant of summary judgment in *Sharkey* was recently reversed and remanded. 2014 U.S. App. LEXIS 19251 (2d Cir., Oct. 9, 2014).

*15, (citing Lerbs v. Buca Di Beppo, Inc., 2004-SOX-8, 2004 DOLSOX LEXIS 65, *33-34

(U.S.D.O.L. June 15, 2004)).  See Nielsen v. Aecom Technology Corp., 762 F.3d 214, 221 (2d

Cir. 2014) (abrogating the "definitely and specifically" requirement as inconsistent with "the

centrality of the belief of the whistleblower that her employer has engaged in wrongdoing"),

adopting as persuasive and entitled to deference the decision of the Department of Labor's

Administrative Review Board ["ARB"] in Sylvester v. Parexel International LLC, ARB No. 07-

123, ALJ Nos. 2007-SOX-039, 042, 2011 DOL Ad. Rev. Bd. LEXIS 47, 2011 WL 2165854, at

*14-15 (ARB May 25, 2011) (en banc).

> As the ARB held in Sylvester:
>
> In assessing the reasonableness of a plaintiff's belief regarding the illegality of the
> particular conduct at issue, courts look to the basis of knowledge available to a
> reasonable person in the circumstances with the employee's training and
> experience.  The legislative history of SOX provides that the reasonableness test
> "is intended to impose the normal reasonable person standard used and interpreted
> in a wide variety of legal contexts.  The threshold is intended to include all good
> faith and reasonable reporting of fraud, and there should be no presumption that
> reporting is otherwise, absent specific evidence.

(internal quotations and citations omitted).  Moreover, ""[o]ften the issue of 'objective

reasonableness' involves factual issues and cannot be decided in the absence of an

adjudicatory hearing."  Id., at *12.

"The reasonable belief standard requires an examination of the reasonableness of a

complainant's beliefs, but not whether the complainant actually communicated the

reasonableness of those beliefs to management[.]"  Id. (emphasis in original); Knox v. U.S. Dept

of Labor, 434 F.3d 721, 725 (4th Cir. 2006).

A complaint need not prove all of the elements of one of the laws enumerated in Section

806:

[R]equiring a complainant to prove or approximate the specific elements of a securities law violation contradicts the statute's requirement that an employee have a reasonable belief of a violation of the enumerated statutes. . . . [B]ecause a complainant need not prove a violation of the substantive laws, we feel a complainant can have an objectively reasonable belief of a violation of the laws in Section 806, *i.e.*, engage in protected activity under Section 806, even if the complainant fails to allege, prove, or approximate specific elements of fraud, which would be required under a fraud claim against the defrauder directly.  In other words, a complainant can engage in protected activity under Section 806 even if he or she fails to allege or prove materiality, scienter, reliance, economic loss, or loss causation.

*Id.*, at *18.

Finally, the legal violation need not have already occurred at the time of the

protected whistleblower objection or complaint:

A whistleblower complaint concerning a violation about to be committed is protected as long as the employee reasonably believes that the violation is likely to happen.  Such a belief must be grounded in facts known to the employee, but the employee need not wait until a law has actually been broken to safely register his or her concern.
. . .
The purpose of Section 806, and the SOX in general, is to protect and encourage greater disclosure. Section 806 exists not only to expose existing fraud, i.e. conduct satisfying the elements of a fraud claim, but also to prevent potential fraud in its earliest stages. We feel the purposes of the whistleblower protection provision will be thwarted if a complainant must, to engage in protected activity, allege, prove, or approximate that the reported irregularity or misstatement satisfies securities law "materiality" standards, was done intentionally, was relied upon by shareholders, and that the shareholders suffered a loss because of the irregularity.

*Id.*, at **13, 18.

In their motion to dismiss, defendants argued that (1) Ashmore's complaint failed to

establish the objective reasonableness of his belief that CGI's plan to evade HUD's unit cap was

a fraud, and particularly a mail or wire fraud, and (2) Ashmore's oral objections to Carragher

about CGI's fraudulent plans to evade HUD's unit cap failed to specify that such plans

45

constituted mail or wire fraud.  *Id.*, at *16.  Judge Sand correctly rejected both arguments on

legal grounds:

> Objective reasonableness is evaluated, in other words, based on "the knowledge
> available to a reasonable person in the circumstances with the employee's training
> and experience."  We see no reason to conclude, under this standard, that Ashmore's
> belief that the Director Shell Company Scheme, and actions taken in furtherance of
> it, constituted mail or wire fraud was unreasonable. While Ashmore may or may not
> have known what is required to prevail on a claim of mail or wire fraud under 18
> U.S.C. § 441, it is not unreasonable for someone with his background and
> experience to believe—perhaps correctly—that the use of the telephone lines and
> email to further a scheme that, as described in the complaint, was explicitly intended
> to defraud HUD, constituted mail and/or wire fraud under federal law.
>
> Similarly, the fact that Ashmore did not specifically inform Carragher or anyone else
> at CGI Federal of his belief that the scheme involved mail or wire fraud, or his
> reasons for thinking so, does not mean that the information he communicated was
> insufficiently specific to count as activity protected by § 806 or to alert the
> defendants to the fact that the company was potentially violating federal law.
> Whistleblowers do not have to "cite a code section [they] believe[] was violated" in
> order to satisfy the specificity requirement of § 806.  What the specificity
> requirement instead demands is that "employees' communications . . . identify the
> specific conduct that the employee believes to be illegal." Defendants do not dispute
> that, in his phone conversations with Carragher and other CGI Federal employees,
> Ashmore specifically identified the conduct that he believed to be illegal—namely,
> the Director Shell Company Scheme. Nor do they suggest that Carragher, and the
> other CGI Federal employees to whom Ashmore complained did not understand to
> what Ashmore was referring when he told them that the Director Shell Company
> Scheme represented an illegal attempt to evade federal and HUD acquisition
> regulations. They merely contest the specificity with which Ashmore
> described *how* the behavior was illegal. Specificity of this kind is not required for
> whistleblowers to receive the protection of § 806.

*Id.*, *17-19 (*citations omitted*).

There is no doubt from the factual recitation in Section II of this brief that the evidentiary

record in this case is sufficient to prove each element of his SOX claim under the applicable

principles reviewed above.

### A.  Ashmore Engaged in Protected Activity

The evidence of Ashmore's objections, set forth in detail above, make clear that they

constituted SOX-protected activity.  He clearly and repeatedly objected to CGI's fraudulent

scheme to evade HUD's unit cap by setting up separate entities, to be led by CGI directors, each of which would bid on units less than the 300,000 unit cap, which would be represented falsely to HUD as independent of CGI but which in reality would be controlled by CGI and acquired by CGI after the awards were made. *See Section II(3) and (5), above.* Ashmore's last and strongest objection immediately followed a Rat Pack call in which (1) Carragher instructed Gorris to reach out to two CGI PHAs to discuss the plan and (2) both the scheme and documentation created and transmitted to Rat Pack members in different states in furtherance of the scheme were discussed over the interstate wires. *See Section II(5), above.*

In objecting to the fraudulent scheme to deceive HUD, Ashmore told Carragher that he believed it to be an illegal and fraudulent way to evade the HUD unit cap regulations, which were designed to prevent any subcontractor like CGI from becoming too big. Ashmore also told Carragher that it was fraudulent to represent to HUD that an entity was separate from CGI when it was not, and when CGI planned to acquire such entity after the bid. Ashmore also told Carragher that the scheme ran afoul of the Federal Acquisition Regulation, which would have repercussions for the entire company. *See Section II(4) and (6), above.*

Ashmore's objections (1) "provided information" (2) "regarding [CGI's] conduct which the employee [Ashmore] reasonably believe[d] constitute[d] a violation of section 1341 [mail fraud], 1343 [wire fraud], 1348 [securities fraud], a rule or regulation of the Securities and Exchange Commission, and other provisions of Federal law relating to fraud against shareholders," (3) "to . . . a person with supervisory authority over the employee." Accordingly, his objections constituted SOX-protected activity. *18 U.S.C. §1514A(a)(1).*

Ashmore had been a Senior Program Manager at HUD managing the New York PBCA. *Ashmore Decl. ¶¶ 6-11.* CGI recruited and hired him from HUD specifically because of his

expertise about the PBCA program and HUD.  He knew that the scheme was designed to deceive HUD and was therefore fraudulent and illegal.  At the time he made his objections, he obviously knew very well the implications of HUD's consideration and implementation of the unit cap on CGI's expansion plans.  He also knew very well how the scheme to deceive HUD and evade the unit CAP, to which he was objecting, would be perceived by HUD if it were discovered.

In view of Ashmore's academic and professional background, training and experience, it is frankly frivolous for CGI to suggest that Ashmore's belief was neither objectively or subjectively reasonable.  His undergraduate and graduate course work included advanced accounting, securities and business law and ethics, government laws and policy, and case studies of corporate and government fraud.  *Ashmore Decl. ¶¶ 121-22.*  At both HUD and CGI, Ashmore took employer-mandated ethics courses that covered many kinds of fraud, including shareholder, wire and mail fraud, as well as applicable requirements of the Federal Acquisition Regulation and various whistleblower laws. *Id.*  At HUD, Ashmore did annual compliance reviews and managed HUD programs that were subcontracted to private companies.  *Klein Decl. Ex. 11 (Ashmore Tr. 62-66).*  This entailed work with other senior HUD officials and private-sector attorneys, colleagues who provided legal and policy advice to him from time-to-time about HUD's many programs.  *Id., at 306-14.*  Ashmore also worked with staff from HUD's Office of General Counsel and Office of the Inspector General on fraud-related investigations. *Ashmore Decl. ¶ 122.*

In light of this factual record, defendants' contentions on this summary judgment motion are utterly meritless.  Defendants cannot and do not dispute that the scheme Ashmore described and objected to would constitute fraud on HUD in violation of the mail or wire fraud statutes. *See 18 U.S.C. §§ 1341, 1343 (criminalizing "devis[ing] or intending to devise any scheme or*

*artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises" by means of the mail or interstate wires).* Defendants just claim the scheme never existed, was never discussed and was never objected to. But those are all disputed issues of fact that must be resolved at trial, not on summary judgment. Ashmore's evidence that he objected to the fraudulent scheme discussed by members of the Rat Pack does not rely solely on his own sworn testimony. His evidence includes (1) the testimony of Kyprianou, Rudy and Gorris set forth above*, Section II(3)*, (2) the timing and chronology of events surrounding CGI's hasty, disparately-treated and pretextual termination of Ashmore which can only be explained by his objections to the scheme, and (3) ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. Indeed, the pretextual poor-performance termination itself is powerful corroboration of Ashmore's testimony because there is no other plausible explanation for, *inter alia*, terminating him only two months after giving him a positive performance evaluation. All this evidence is far more than "mere conclusory statements, conjecture, or speculation," or "unsupported allegations," suggested by CGI's brief. On this record, there is plenty of evidence from which a jury could reasonably find for plaintiff.

Since the Rat Pack members were located in different states and conducted their meetings and discussions by interstate phone and email, it is readily apparent that both Ashmore and CGI appreciated, and "reasonably believed," both objectively and subjectively, that the scheme to defraud HUD had already and would inevitably involve the interstate wires, the mails or both. *Ashmore Decl. ¶ 116.* The fact that Ashmore did not mention the mail or wire fraud statutes in his objections is immaterial under the applicable case law cited above. He objected to the fraud

scheme reasonably and in good faith, identified the specific conduct he believed to be illegal, and

both he and Carragher knew exactly what he was talking about.  As Judge Sand correctly held

earlier in this case, it was not necessary for Ashmore specifically to mention mail or wire fraud

in his objections, or to identify any or all of the specific elements of those statutes.  His May 11

objection followed an interstate Rat Pack telephone call in which Carragher had instructed Gorris

to take steps to further the scheme in conversations outside CGI, a clear violation of the wire

fraud statute.  Ashmore's objection was indisputably SOX-protected activity.  Because SOX

protection extends to objections to "potential fraud in its earliest stages," *Sylvester,* Ashmore's

earlier objections were also SOX protected activity.

    Although not pleaded in Ashmore's complaint,[18] Ashmore's reference to the "FAR" in

his objection to Carragher, referred to potential debarment and suspension proceedings from all

of CGI's federal contracts under §§9.406-2 and 9.407-2 of the Federal Acquisition Regulation, if

CGI were convicted or civilly judged to have committed "fraud or a criminal offense in

connection with obtaining, attempting to obtain or perform a public contract or subcontract."

The reference was based upon Ashmore's reasonable belief that such debarment and suspension

could so negatively impact the financial condition of CGI – because so much of its business was

based on federal government contracts – that it was and would be a securities fraud and a fraud

on shareholders.  *Ashmore Decl. ¶ 120.*  Ashmore's objections to the fraudulent scheme were

also based on his reasonable belief that setting up shell companies that (1) have no disclosed

connection to CGI, (2) use CGI resources for free, and (3) have secret financial agreements to be

---

[18]   We recognize that these theories of the case were not pleaded in Ashmore's complaint, but we respectfully submit they are cognizable at this summary judgment stage of the case as valid, supported by the evidence and not prejudicial to defendants, who argue the issue in their brief, at 40 (contending that the Federal Acquisition Regulations are not SOX- enumerated offenses).  An amendment of the complaint to plead these additional theories would therefore be appropriate prior to trial.

purchased by CGI was, and would be, an accounting and financial fraud which, in a public company, would constitute securities fraud and a fraud on shareholders. *Ashmore Decl. ¶ 119.* SEC rules and regulations and a number of criminal and civil provisions of federal law proscribe such fraud. *See, e.g., 18 U.S.C. § 1348,* the securities fraud statute, and *SEC Rule 10b-5 (17 CFR 240.10b-5); 15 U.S.C. §§78a et seq.; Basic Inc. v. Levinson,* 485 U.S. 224 (1988) (holding that an omitted fact was material if a reasonable shareholder would consider it important in making his or her vote, or a reasonable purchaser or seller would consider it important in buying or selling that company's stock, and applying this standard to all § 10b and Rule 10b-5 actions); *Halliburton Co. v. Erica P. John Fund, Inc.,* 134 S. Ct. 2398 (2014) (holding that 15 U.S.C. §78j(b) and Rule 10b-5 prohibit making any material misstatement or omission in connection with the purchase or sale of any security, and declining to abrogate the *Basic* standard). Thus, Ashmore's beliefs were both objectively and subjectively reasonable, and Carragher and CGI knew it.

Most of CGI's other arguments on the SOX claim go to credibility and the weight rather than the admissibility of Ashmore's evidence and are thus not appropriate on summary judgment. While Ashmore made his objections orally rather than in writing or in email, there is no legal requirement that an employee communicate his objections in writing or email in order to constitute protected activity under SOX, and defendants do not actually contend, let alone cite any authority, to the contrary. Similarly, that Ashmore put CGI on notice of his SOX claims two months after his termination, did not use CGI's hotline to make his objections, or refer

specifically to his claims in earlier post-termination communications are all credibility arguments that should be reserved for trial.[19]

None of the cases cited by defendants after Judge Sand's decision changed any of these applicable legal principles, and defendants do not suggest otherwise. *Villanueva v. United States Department of Labor*, 743 F.3d 103, 110 (5th Cir. 2014), is clearly distinguishable, as the plaintiff there only objected to the violation of Columbian tax law, not United States tax law. Here, Ashmore's objections were clearly directed toward CGI's fraudulent scheme in violation of federal law, and Carragher clearly knew it.[20] *Porter v. Wyeth Pharmaceuticals*, 2007 U.S. Dist. LEXIS 60824 (S.D.N.Y. 2007), and *Fraser v. Fiduciary Trust Co. Intern,* 417 F. Supp. 310, 322 (S.D.N.Y. 2006) are also distinguishable because the employees did not complain about a violation or potential violation of any SOX-enumerated offense.

## B.  CGI Knew That Ashmore Engaged in Protected Activity

For the same reasons just discussed, it is obvious from this evidentiary record that CGI knew Ashmore had engaged in protected activity both when CGI began pretextually to build a case of poor performance against him after his May 11 objection to Carragher, and when it fired him a month later, only two months after giving him a clearly positive performance evaluation. Ashmore's objections to the scheme to evade the unit cap, which presented such a huge

---

[19]  Where they can and will be answered. *See, e.g., Ashmore Tr. 380-83,* cited at D. Br. 44-45, explaining why he did not feel it necessary either to document his objections, or to make them to others besides Carragher, with whom he had worked for years, whom he respected, and who did not dismiss his objections out of hand at the time.  Carragher also concealed her intention to get rid of him, and abruptly terminated their post-termination conversation when she perceived that Ashmore might be about to mention the fraudulent scheme.  *See P. Resp. ¶¶ 97-98.*

[20]  *Villanueva* was also a case that never got past the OSHA complaint stage, and is therefore far different from this case, where defendants' motion to dismiss on the same grounds here were denied, and an extensive factual record fully supports Ashmore's claims.  Accordingly, the fact that the complaint here contains only a single reference to CGI's use of the telephone lines and emails, D. Br. 46, is entirely irrelevant.

challenge to CGI's expansion of its profitable PBCA business, were clear and unequivocal from their inception, noting that the scheme was fraudulent and illegal, and that Ashmore was firmly opposed to defrauding HUD, from which he had come.  It was clear to Kyprianou, Carragher and CGI that they would be unable to continue to scheme to defraud HUD unless they got rid of him, evidenced by how they cut Ashmore out of discussions about the scheme after his final May 11 objection.  Carragher, Kyprianou and CGI obviously knew that Ashmore's objections constituted SOX-protected activity,[21] and CGI's suggestion otherwise is without merit.

Indeed, there is documentary evidence that Carragher and Kyprianou discussed getting rid of Ashmore in emails in late April 2010, after Carragher had come to believe that HUD "has decided that the unit cap will stand[,]" only two weeks after giving Ashmore his positive performance review.  *See Section II(5) above* (considering transferring Ashmore to Bowell's division because they work well together, and thinking that he could take a big job at HUD in Washington that had just become available).  Carragher's and Kyprianou's use of CGI's interstate email system – to plan to get rid of Ashmore and thereby further the fraudulent scheme – could itself be considered a violation of the wire fraud statute.  Indeed, all of Carragher's and Kyprianou's communications and actions to pretextually terminate Ashmore were in furtherance

---

[21]   They also knew as well as Ashmore that they and the other members of the Rat Pack were using the interstate wires when they discussed their scheme to defraud HUD in their telephone meetings, since the Rat Pack members were located in different states.  *Ashmore Decl. ¶¶ 116*. They also must have known from Ashmore's objection to the use of shell companies that would be acquired back into CGI after the bid awards, and from his reference to the repercussions to the entire company that would result from violating the Federal Acquisition Regulations, that Ashmore believed that CGI's fraudulent scheme would constitute accounting, financial, and securities fraud, and a fraud on shareholders as well as HUD.

of the fraudulent scheme and may also be considered wire fraud violations, ██████████
████████████████████████████████████████████████████████████████.[22]

## C.  CGI's Termination of Ashmore was Pretextual, not Legitimate

Defendants' suggestion that they have established by clear and convincing evidence, as a matter of law, that they would have fired Ashmore in the absence of his opposition to CGI's fraudulent plans, is also utterly meritless.  The record of this case makes exceedingly clear that (1) CGI's plan to terminate Ashmore coincided almost entirely with its being informed in May 2010 that HUD was actually going to implement the proposed unit cap (after Ashmore had made clear his objections to any fraudulent scheme(s) to evade that cap), and (2) the allegations of repeated absences, failure to seek supervisor approval prior to taking time off, disregard of his colleagues, insubordination and the failure to follow internal company policy and procedure were all false and pretextually fabricated because CGI knew that Ashmore objected to its fraudulent plans to evade HUD's unit cap and wanted him out of the way so that CGI could move forward with such plans.

Frankly, there is no other plausible explanation for the haste and chronology of events that led to Ashmore's termination, including, without limitation, (1) Carragher's quite positive performance evaluation and oral comments – which clearly anticipated that Ashmore would continue to be employed in the next year – only two months before the termination and two weeks before Carragher came to believe that HUD would implement the unit cap, (2) Kyprianou's admission that he first raised his criticisms of Ashmore's performance on May 18, less than one month before termination and only days after Carragher obtained reliable information from HUD on May 14 that the unit cap would be included in the rebid, (3)

---

[22]    To the extent that CGI used the mails to plan ████████████████ fraudulent bids to HUD, their communications and actions also violated the mail fraud statute.

Kyprianou's failure to give Ashmore a corrective action plan, (4) Kyprianou's testimony that there were no face to face meetings and only one telephone call with Ashmore between May 18 and the June 16 termination to discuss Kyprianou's purported performance concerns, (5) Carragher's failure to discuss any performance issues with Ashmore before his termination, notwithstanding that she recruited and brought him to CGI, had been his direct supervisor and was still supervising him in at least some respects, and (6) Ashmore's suddenly being completely cut off from meetings and discussions about CGI's plans to deal with the unit caps when CGI received confirmation that HUD was indeed going to put the unit cap in place.

 CGI devotes only one page of its brief to this frivolous contention, for good reason.

  **3.** **S**UMMARY **J**UDGMENT ON THE **B**REACH OF **C**ONTRACT **C**LAIM **S**HOULD BE **D**ENIED

 Under New York law, "employees in this state may enforce an agreement to pay an annual bonus made at the outset of the employment relationship where such bonus constitutes an integral part of plaintiff's compensation package." *Canet v. Gooch Ware Travelstead,* 017 F.Supp. 969, 985 (E.D.N.Y. 1996), *quoting Mirchel v. RMJ Securities Corp.*, 205 A.D.2d 388, 389, 613 N.Y.S.2d 876, 878 91st Dept. 1994) (*internal quotation marks omitted*); *Tsegaye v. Impol Aluminum Corp.*, 2003 WL 221743 *8 (S.D.N.Y. 2003).

 Here, CGI agreed in its written employment offer letter to pay Ashmore a bonus as one of the "conditions" of his employment.  *See Declaration of Mary Beth Carragher, dated December 19, 2011, at Ex. A (submitted in support of CGI's earlier motion to dismiss).*

 The only exception to the general rule that employees may enforce agreements to pay bonuses is "where contractual provisions assign the employer *absolute discretion* to grant and

pay bonuses[.]"  *Canet*, 917 F.Supp. at 984-85 (*emphasis added*).[23]  However, courts in this

District have repeatedly held:

> Discretion to modify or cancel an incentive must . . . be explicit; it will not be
> assigned if there exists no explicit contractual provisions assigning the employer
> absolute discretion to pay such compensation.  Furthermore, the rule in New York
> is that such absolute discretion must be retained unambiguously.

*Lam v. American Express Co.*, 265 F.Supp.2d 225, 237 (S.D.N.Y. 2003); *Canet*, 917 F.Supp. at

985-86 ("discretion will not be implied when such language is absent").  *See also Culver v.*

*Merrill Lynch*, 1995 WL 422203 (S.D.N.Y. 1995), in which Judge Sand held that a bonus pool

plan stating that distribution "will be determined by the Division Director and group Manager,

with input from Trading Desk Managers," did not reserve the "absolute discretion" required to

avoid paying the plaintiff, because it did not specifically use the word "discretion," and lacked

language which "makes it absolutely clear that Merrill Lynch was to have complete discretion in

determining whether to award any compensation to Culver for services rendered."

　　　　Here, as in *Culver*, CGI elected not to use language that reserved discretion (let alone

absolute discretion) in awarding Ashmore's bonus.  To the contrary, its offer letter to plaintiff

stated:

> Profit Participation Program.  You *will be eligible* to be a participant in the CGI
> Profit Participation Program.  Through this program, you can earn an annual

---

[23]   In a brief footnote, CGI's brief, at 51 n. 6, baldly suggests that Carragher's agreement to pay
Ashmore a bonus equal to his base salary is unenforceable because of the Statute of Frauds.  That
suggestion is at odds with the holding in *Canet* (enforcement of oral promise to at will employee
to pay annual bonuses not barred by Statute of Frauds, which "does not apply to employment
contracts that are terminable at will, as termination may occur within one year."), *citing
Ohanian  v. Avis Rent A Car System, Inc.,* 779 F.2d 101, 108 (2d Cir. 1985); *Curtis v. Harry
Winston, Inc.,* 653 F. Supp. 1504, 1510 (S.D.N.Y. 1987) (Broderick, J.); *Zinn v. Bernic
Construction Inc.,* 99 Misc. 2d 510, 416 N.Y.S.2d 725 (Sup. Ct. Queens County 1979).  CGI
does not further articulate its argument, cites two cases having nothing to do with agreements to
pay bonuses, and fails to cite *Canet* or *Ohanian* to the Court or address the applicable law
contained therein directly contrary to CGI's suggestion.  Accordingly, we do not further address
it here.

>*bonus based on the achievement of* certain financial results, client satisfaction,
>member satisfaction *and other measures tied to your performance*.  This program
>is dependent on the success of the company, your business unit and your own
>performance.

*Declaration of Mary Beth Carragher, dated December 19, 2011, at Ex. A (submitted in support of CGI's earlier motion to dismiss) (emphasis added)*.  Rather than unambiguously reserving absolute discretion to pay or not pay him a bonus, CGI contractually agreed that Ashmore "will be eligible" for the bonus.  *See Bravia Capital Partners, Inc. v. Fike*, 2011 WL 6081345 *4 (S.D.N.Y. 2011) ("the words 'will be entitled to a bonus' do not vest complete discretion on bonus distribution" in management); *Tsegaye, supra* (employee entitled to bonus where "although [employer] had the discretion to determine the amount of the bonus, a bonus was part of" employee's letter agreement).  Indeed, CGI's offer letter to Ashmore specified the criteria which CGI would use in calculating the bonus, which were "measures tied to your performance."[24]  Thus, CGI agreed that the bonus would be dependent upon objective factors tied to Ashmore's performance metrics, rather than on management's "absolute discretion."  Moreover, CGI, through Carragher, verbally guaranteed Ashmore a minimum bonus of $126,000 – equal to his base salary – in return for, and as a condition of, Ashmore's acceptance of a lower base salary.  He is therefore entitled to maintain a contractual claim for that bonus payment.

---

[24]   Defendants contend that Ashmore's eligibility for a bonus was contingent upon "certain financial results, client satisfaction, and member satisfaction," which they contend are factors other than measures of his performance.  D. Br. 52.  But the language of the offer letter quoted above – "you can earn an annual bonus based on the achievement of certain financial results, client satisfaction, member satisfaction *and other measures tied to your performance*" – makes clear that the financial results, client satisfaction and member satisfaction were considered by CGI to be "measures tied to [Ashmore's] performance," *i.e.*, Ashmore's performance metrics.

In denying defendants' motion to dismiss this breach of contract claim, Judge Sand

disposed of all of the arguments and authorities which defendants rehash here.[25]   He held that the

contractual documents, including the very language upon which defendants rely in their

December 18 letter, "do not make unambiguously clear that the employer enjoyed absolute

discretion over these decisions."  *Ashmore v. CGI Group, Inc.*, at *24.   Ashmore testified that he

was promised a bonus at least equal to his base salary if he met his performance metrics and that

such bonus was "discretionary" only in terms of whether he met those performance metrics.

*Ashmore Tr. 195-96, 385.*[26]   It is undisputed that Ashmore met his performance metrics.   *P.*

*Response ¶ 37; Herbst Decl. Ex. 21 (P. Ex. 3, D. Bates 2697).*   Ashmore has also adduced

evidence that CGI had the capacity to pay him the promised additional "bonus" compensation,

and that CGI's internal budgeted direct labor rate for Ashmore in February 2010 was $275,000,

which reflects additional compensation of $149,000 on top of his base salary of $126,000; and

---

[25]   CGI relies on virtually the same cases here that it cited unsuccessfully to Judge Sand.
*Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp.2d 379, 388 (S.D.N.Y. 2009), did not involve a
contract claim for unpaid bonus and did not hold that an at will employee cannot bring such a
contract claim; rather, it holds that an employee cannot bring a contract claim *for being
terminated* unless "an employee relies to his detriment on an employer's express written policy
limiting its right of discharge."  *Geldzahler* thus has nothing to do with this contract claim for
unpaid bonus.  All the other cases cited by defendants are in accord with those cited here and
Judge Sand's ruling permitting such a claim unless the employer's discretion was absolute and
clearly and unambiguously reflect such absolute discretion.  That is precisely what is missing
here.  The cases teach that this principle of law applies to employees who received and accepted
offer letters rather than signed employment agreements, like Ashmore here, as well as to at will
employees.  Defendants' cases are not to the contrary.  *Cf. Buckman v. Calyon Securities (USA)
Inc.*, 817 F. Supp.2d 322, 333 n. 94 (S.D.N.Y. 2011) (granting summary judgment against
plaintiff with offer letter because employer had "sole" discretion); *Arrouet v. Brown Brothers
Harriman & Co.*, 2005 U.S. Dist. LEXIS 4327 *9 (S.D.N.Y. March 17, 2005) (same re
employee with no written employment agreement or offer letter).

[26]   At 52 of their brief, defendants selectively quote Ashmore's testimony, leaving out his
critical testimony that the bonus "was discretionary insofar as whether or not I met my
performance metrics."  *See Section II(10) above; Ashmore Tr. 195-96.*  Accordingly, defendants'
contention that Ashmore acknowledged that his promised bonus was absolutely "discretionary,"
*D. Br. 52-53,* is belied by the record and in fact based upon a critical omission of fact from that
record.

that his external, certified fully-burdened labor rate in May 2010 was $426,294, reflecting additional compensation of $300,294 on top of his base salary.  *P. Response ¶ 160.*  Ashmore has therefore offered more than sufficient evidence that he was entitled to the claimed bonus.

Even if, *arguendo*, CGI had reserved absolute discretion in paying plaintiff's bonus, it is obvious from this factual record that it failed to exercise that discretion in good faith in firing him without payment of any bonus, and violated the "implied covenant of good faith and fair dealing [which] inheres in every contract." *deCiutiis v. NYNEX Corp.*, 1996 WL 512150 (S.D.N.Y. 1996), *citing Travellers Int'l A.G. v. TWA*, 41 F.3d 1570, 1575 (2d Cir. 1994) (applying New York law to hold that "[e]ven when a contract confers decision-making power on a single party, the resulting discretion is nevertheless subject to an obligation that it be exercised in good faith.").

In light of the evidence in this record of CGI's bad faith, pretextual and retaliatory termination of Ashmore because of his SOX-protected activity, the failure to pay Ashmore his agreed bonus was also a violation of the implied covenant of good faith and fair dealing.

For all these reasons, summary judgment on this state law claim should be denied.

**IV.    CONCLUSION**

CGI's motion for summary judgment should be denied in its entirety.


Dated:  New York, New York                            HERBST LAW PLLC
        March 12, 2015

                                                      /s/ Robert L. Herbst
                                                      Robert L. Herbst (RH-8851)
                                                      Attorneys for Plaintiff
                                                      420 Lexington Avenue
                                                      New York, New York
                                                      (646) 543-2354
                                                      fax (888) 482-4676
                                                      *rherbst@herbstlawny.com*