# Exhibit 7

# In The Matter Of:

*BENJAMIN ASHMORE*

*v.*

*CGI GROUP, INC. and CGI FEDERAL INC.*

———————————————————————

*KELLY L. BRYSON - Vol. 1*

*August 28, 2014*

———————————————————————

**MERRILL CORPORATION**

**LegaLink, Inc.**

1345 Avenue of the Americas
17th Floor
New York, NY 10105
Phone: 212.557.7400
Fax: 212.367.6178

KELLY L. BRYSON - 8/28/2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------x
BENJAMIN ASHMORE,

       Plaintiff,

   -against-        11 CIV 8611 (AT)

CGI GROUP, INC. and CGI FEDERAL INC.,

       Defendants.
----------------------------------x


      August 28, 2014

      11:15 a.m.


     Deposition of KELLY L. BRYSON,

pursuant to notice, held at the offices

of Bond Schoeneck & King, PLLC, 600 Third

Avenue, New York, New York, before Gail

F. Schorr, a Certified Shorthand

Reporter, Certified Realtime Reporter and

Notary Public within and for the State of

New York.

KELLY L. BRYSON - 8/28/2014

```
 1

 2     A P P E A R A N C E S:

 3     HERBST LAW PLLC
       Attorneys for Plaintiff
 4           420 Lexington Avenue
             New York, NY 10170
 5
       BY:    ROBERT L. HERBST, ESQ.
 6            (rherbst@herbstlawny.com)

 7

       BOND, SCHOENECK & KING, PLLC
 8     Attorneys for Defendants
             111 Washington Avenue
 9           Albany, NY 12210-2280

10     BY:   STUART F. KLEIN, ESQ.
             (sklein@bsk.com)
11

12     ALSO PRESENT:

13     BENJAMIN ASHMORE

14

15

16

17

18

19

20

21

22

23

24

25
```

KELLY L. BRYSON - 8/28/2014

```
 1

 2                KELLY L. BRYSON,

 3         called as a witness, having been

 4         first duly sworn by the Notary

 5         Public (Gail F. Schorr), was

 6         examined and testified as follows:

 7              EXAMINATION BY MR. HERBST:          11:15:01

 8      Q.    Good morning, Ms. Bryson.            11:15:01

 9      A.    Good morning.                        11:16:17

10      Q.    My name is Herbst, and I             11:16:18

11   represent Mr. Ashmore who's here.  Do you     11:16:19

12   recognize him?                                11:16:23

13      A.    No.                                  11:16:23

14      Q.    You never met him?                   11:16:24

15      A.    I don't think so.                    11:16:25

16      Q.    So I'm going to ask you a            11:16:26

17   series of questions today.  If at any         11:16:30

18   time you haven't heard the question fully     11:16:32

19   just ask me to repeat it.                     11:16:35

20      A.    Okay.                                11:16:36

21      Q.    If at any time you haven't           11:16:37

22   understood the question, let me know,         11:16:39

23   I'll try to repeat it or restate it.          11:16:40

24   Okay?                                         11:16:43

25      A.    Yes.                                 11:16:44
```

KELLY L. BRYSON - 8/28/2014

Page 4

```
 1                    KELLY L. BRYSON
 2          Q.    If you don't, then we will        11:16:44
 3    assume that you have heard and understood     11:16:52
 4    the question.                                 11:16:55
 5          A.    Okay.                             11:16:55
 6              MR. KLEIN:  Before, I just          11:16:59
 7          want to put on the record, before       11:17:00
 8          Mr. Herbst gets into his                11:17:02
 9          questioning, Ms. Bryson is being        11:17:04
10          produced as -- excuse me.               11:17:07
11              MR. HERBST:  We'll state on         11:17:35
12          the record, we're going to              11:17:36
13          interrupt Ms. Bryson's deposition       11:17:37
14          to take Mr. Yashchin's deposition.      11:17:40
15              (Recess taken:  11:18 a.m.)         11:18:07
16              (Whereupon the deposition           11:57:29
17          resumed at 12:15 p.m.)                  11:57:35
18              KELLY L. BRYSON,
19          resumed, having been previously
20          duly sworn, was examined and
21          testified further as follows:
22              CONTINUED EXAMINATION
23              BY MR. HERBST:                      12:15:06
24          Q.    Ms. Bryson, you recognize         12:15:06
25    you're still under oath?                      12:16:25
```

KELLY L. BRYSON - 8/28/2014

Page 5

```
 1                  KELLY L. BRYSON
 2        A.    Okay.                                    12:16:26
 3        Q.    Now, what's your date of                 12:16:27
 4    birth?                                             12:16:32
 5        A.    April 26th, 1980.                        12:16:32
 6              MR. KLEIN:  Just before we               12:16:36
 7        started, and I think this is where             12:16:37
 8        I got cut off when the other                   12:16:39
 9        witness arrived, I just want to put            12:16:40
10        on the record that Ms. Bryson is               12:16:42
11        here pursuant to a very limited                12:16:44
12        30(b)(6) deposition notice and that            12:16:46
13        it is CGI's position that Judge                12:16:49
14        Cott specifically laid out the                 12:16:53
15        scope of what is and is not                     12:16:54
16        permissible during Ms. Bryson's                12:16:57
17        deposition.                                    12:17:00
18              MR. HERBST:  That is CGI's               12:17:09
19        position and I'm not going to waste            12:17:11
20        time commenting further.                       12:17:13
21        Q.    How far did you go in school?            12:17:15
22        A.    I have a Bachelor's degree and           12:17:24
23    some additional graduate course work.             12:17:27
24        Q.    And a Bachelor's degree in               12:17:29
25    what?                                              12:17:32
```

```
 1                 KELLY L. BRYSON
 2         A.   Environmental and business                12:17:32
 3    economics.                                          12:17:33
 4         Q.   What year did you get that?               12:17:34
 5         A.   2002.                                     12:17:44
 6         Q.   Just in terms of the work                 12:17:45
 7    history after you got that degree, did              12:17:46
 8    you go to work?                                     12:17:48
 9         A.   Yes.                                       12:17:48
10         Q.   Where?                                    12:17:49
11         A.   My first employment was                   12:17:50
12    through a temp agency at -- well, through           12:17:53
13    a temp agency, but I worked for                     12:17:56
14    PricewaterhouseCoopers.                             12:17:59
15         Q.   In what part of that company?             12:17:59
16         A.   What was their consulting                 12:18:02
17    practice at the time, their government              12:18:04
18    consulting practice at the time.                    12:18:11
19         Q.   And where did you get your                12:18:12
20    degree?  Where did you go to college?               12:18:16
21         A.   Rutgers.                                  12:18:17
22         Q.   Just briefly, where were you              12:18:23
23    born and raised?                                    12:18:25
24         A.   Cumberland County, New Jersey.            12:18:26
25         Q.   How long did you work in the              12:18:30
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2    consulting practice as a temp at              12:18:32
 3    Pricewaterhouse?                              12:18:37
 4             MR. KLEIN:  Object to the            12:18:39
 5          form.  I don't think she testified      12:18:41
 6          she was a temp.                         12:18:41
 7          A.    I was ultimately there for        12:18:41
 8    about a year.                                 12:18:46
 9          Q.    And then what?                    12:18:47
10          A.    Then I worked for a few months    12:18:49
11    at America Online.  I worked two years at     12:18:51
12    Accenture.  I worked a year at Booz-Allen     12:18:54
13    & Hamilton.  And then in 2006 I was hired     12:19:00
14    at CGI and I have been there since.           12:19:03
15          Q.    At AOL in the few months you      12:19:04
16    were there what did you do?                   12:19:14
17          A.    Just kind of generic financial    12:19:15
18    analysis, trend analysis.                     12:19:16
19          Q.    And at Accenture what did you     12:19:19
20    do?                                           12:19:27
21          A.    More government consulting.       12:19:27
22          Q.    What was your compensation at     12:19:30
23    Accenture, approximately?                     12:19:32
24          A.    I think I started in the low      12:19:34
25    forties and left there in the low             12:19:40
```

KELLY L. BRYSON - 8/28/2014

Page 8

```
 1              KELLY L. BRYSON
 2    sixties.                              12:19:42
 3         Q.   And Booz Allen, how long did 12:19:44
 4    you work there?                       12:19:49
 5         A.   One year.                   12:19:49
 6         Q.   And what was your compensation 12:19:50
 7    there?                                12:19:52
 8         A.   In the mid-sixties.         12:19:52
 9         Q.   And what did you do there?  12:19:58
10         A.   Consulting, government      12:19:59
11    consulting.                           12:20:01
12         Q.   Then you went to work for   12:20:04
13    whom?                                 12:20:07
14         A.   CGI.                        12:20:08
15         Q.   As what?                    12:20:08
16         A.   I started as a, I guess you 12:20:09
17    would call it a project controller.  12:20:14
18         Q.   In what part of the company? 12:20:19
19         A.   The government consulting   12:20:21
20    practice.                             12:20:22
21         Q.   Where were you based?       12:20:26
22         A.   Fairfax, Virginia.          12:20:27
23         Q.   And do you continue to be   12:20:28
24    based in Fairfax?                     12:20:30
25         A.   I was based in Fairfax,     12:20:31
```

KELLY L. BRYSON - 8/28/2014

Page 9

```
 1                  KELLY L. BRYSON
 2    Virginia, up until the summer of 2011      12:20:32
 3    when I relocated to Baltimore.  Now I      12:20:36
 4    primarily work from home, but I guess I'm  12:20:43
 5    still technically based in Fairfax.        12:20:45
 6         Q.    When you say Baltimore, was     12:20:49
 7    that in the CGI offices in Baltimore?      12:20:58
 8         A.    No.                             12:21:02
 9         Q.    It was at home?                 12:21:02
10         A.    Yes.                            12:21:03
11         Q.    I forgot to ask you.  What's    12:21:03
12    your home address?                         12:21:06
13         A.    12 Meridian Lane and that's     12:21:07
14    Towson, Maryland 21286.                    12:21:19
15         Q.    And how long did you stay in    12:21:23
16    the government consulting practice at      12:21:30
17    CGI?  Are we talking CGI Federal at that   12:21:33
18    point?                                     12:21:36
19         A.    Yes.                            12:21:36
20         Q.    How long?                       12:21:37
21         A.    I probably stayed in that role  12:21:38
22    for two or three years before I moved      12:21:40
23    into doing financial and management        12:21:43
24    planning full time, pricing.               12:21:46
25         Q.    You said something about        12:22:04
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    pricing?                                    12:22:06
 3        A.    Right, pricing has pretty much    12:22:07
 4    always been a part of my job and then I     12:22:10
 5    think in 2011 I became a pricing manager    12:22:13
 6    at which point that became my full time     12:22:17
 7    position.                                   12:22:20
 8        Q.    So what was your title, what      12:22:30
 9    was your position in 2009/2010?             12:22:32
10        A.    We don't -- we're not a very      12:22:37
11    position title oriented company.  But my    12:22:39
12    official CGI title was consultant and       12:22:43
13    then senior consultant.                     12:22:46
14        Q.    What was your compensation in     12:22:55
15    -- so you went from consultant to senior    12:22:57
16    consultant in that period of '09 and '10?   12:23:01
17        A.    Yes, it might have been '09,      12:23:05
18    2010.                                       12:23:07
19        Q.    So what was your compensation     12:23:08
20    as a consultant?                            12:23:10
21        A.    75-ish.                           12:23:13
22        Q.    And as a senior consultant?       12:23:15
23        A.    Well, you don't -- we don't       12:23:17
24    get raises based on title promotion, but    12:23:19
25    I would assume at that point I was making   12:23:22
```

KELLY L. BRYSON - 8/28/2014

Page 11

```
 1              KELLY L. BRYSON
 2    mid-eighties.                                    12:23:24
 3         Q.    So what accounted for the            12:23:26
 4    raise if it wasn't the promotion?               12:23:32
 5         A.    Annual merit.                         12:23:33
 6         Q.    You went from senior                  12:23:44
 7    consultant to pricing manager?                   12:23:45
 8         A.    Yes, and I received a title,          12:23:48
 9    an actual title promotion I guess it was         12:23:50
10    the beginning of 2013.                           12:23:55
11         Q.    Oh.  So you became pricing            12:23:59
12    manager in 2011 but you didn't receive a        12:24:01
13    title promotion raise until 2013?               12:24:04
14         A.    Well title promotion, title          12:24:07
15    promotion till 2013.  I mean you get            12:24:11
16    generally a raise every year in the part        12:24:13
17    of the annual process.  But they're not,        12:24:17
18    they're not tied together.                       12:24:19
19         Q.    So in 2011 what was your             12:24:20
20    compensation, approximately?                     12:24:27
21         A.    90, 98, 100, right around            12:24:30
22    there.                                           12:24:35
23         Q.    And in 2012?                          12:24:35
24         A.    105.                                  12:24:40
25         Q.    And 2013?                             12:24:45
```

KELLY L. BRYSON - 8/28/2014

Page 12

```
 1              KELLY L. BRYSON
 2         (Instruction not to answer.)        12:24:48
 3         MR. KLEIN:  I'm going to have        12:24:48
 4    her refuse to answer questions           12:24:50
 5    about her further compensation.          12:24:53
 6         MR. HERBST:  Why is that?           12:24:55
 7    It's relevant.                           12:24:57
 8         MR. KLEIN:  No, it's not            12:24:57
 9    relevant.  The scope of her              12:24:59
10    deposition is to how the bids in         12:25:00
11    Exhibit 18 or the prices in Exhibit      12:25:02
12    18 were derived.  What Ms. Bryson's      12:25:03
13    compensation was in 2013, two years      12:25:06
14    after Mr. Ashmore, actually three        12:25:09
15    years after Mr. Ashmore was              12:25:13
16    terminated is not relevant,              12:25:15
17    especially in light of the fact          12:25:17
18    that the judge was very careful as       12:25:18
19    requiring what, if any,                  12:25:22
20    compensation information CGI was         12:25:24
21    required to produce.                     12:25:26
22         Therefore, I'm going to direct      12:25:26
23    Ms. Bryson not to answer any             12:25:29
24    further questions regarding her          12:25:30
25    salary.                                  12:25:31
```

KELLY L. BRYSON - 8/28/2014

Page 13

```
 1              KELLY L. BRYSON
 2          MR. HERBST:  I think it goes          12:25:32
 3      to potential bias and credibility.        12:25:33
 4      She's a witness testifying today.         12:25:36
 5      I think I'm entitled to know what         12:25:38
 6      her current compensation is.              12:25:40
 7      Q.    What is your current               12:25:42
 8   compensation?                                12:25:43
 9          (Instruction not to answer.)          12:25:44
10          MR. KLEIN:  I direct you not          12:25:44
11      to answer that question.                  12:25:45
12          MR. HERBST:  Will you mark            12:25:52
13      those two questions for a ruling,         12:25:53
14      please.                                   12:25:55
15      Q.    In 2009 and 2010, when your        12:26:18
16   salary was 75,000, or -- was it your         12:26:22
17   salary or compensation 75,000?               12:26:25
18          MR. KLEIN:  Object to the            12:26:29
19      form.  You can answer if you can          12:26:30
20      understand.                               12:26:31
21      A.    I don't recall exactly when my      12:26:33
22   salary was 75,000.  It was in the 2008 to    12:26:36
23   2009 range.  I would sometimes receive       12:26:42
24   additional compensation, but that was        12:26:49
25   variable year to year.                       12:26:51
```

KELLY L. BRYSON - 8/28/2014

Page 14

```
 1                    KELLY L. BRYSON
 2          Q.    And what form would that        12:26:53
 3    additional compensation be when you got     12:26:55
 4    it?                                          12:26:57
 5          A.    In the -- since I have been at   12:26:57
 6    CGI I have received both profit             12:27:00
 7    participation and commission.               12:27:02
 8          Q.    How was your profit              12:27:09
 9    participation calculated?                    12:27:11
10          A.    It's calculated based on the     12:27:12
11    business unit you reside in upon their       12:27:14
12    business results.                            12:27:17
13          Q.    And how is your commission       12:27:17
14    calculated?                                  12:27:23
15          A.    It's at management discretion.   12:27:24
16          Q.    Is there a percentage            12:27:26
17    commission?                                  12:27:28
18          A.    It's all management              12:27:29
19    discretion.  I don't -- I believe there's   12:27:33
20    a percentage set aside and then             12:27:37
21    management decides how that percentage is    12:27:40
22    allocated amongst the team that they were    12:27:44
23    deciding to give commission to.              12:27:48
24          Q.    So in the year 2009 did you      12:27:51
25    get a profit participation?                  12:27:52
```

KELLY L. BRYSON - 8/28/2014

Page 15

```
 1                   KELLY L. BRYSON
 2        A.    I believe so.                        12:27:54
 3        Q.    Approximately how much?              12:28:00
 4        A.    I want to say in the $3,000          12:28:02
 5   range, but I'm not certain.                     12:28:08
 6        Q.    And commission, did you get a        12:28:10
 7   commission?                                     12:28:11
 8        A.    No.                                  12:28:14
 9        Q.    How about 2010, did you get          12:28:14
10   profit participation?                           12:28:16
11        A.    Yes.                                 12:28:17
12        Q.    Approximately how much?              12:28:17
13        A.    I don't recall.  Likely in the      12:28:18
14   same neighborhood.                              12:28:21
15        Q.    And commission?                      12:28:22
16        A.    I received some commission in        12:28:24
17   2010.  Actually, it was probably 2011 and       12:28:27
18   2012.                                           12:28:31
19        Q.    How much?                            12:28:32
20              (Instruction not to answer.)         12:28:34
21              MR. KLEIN:  I'm going to, once       12:28:34
22        again, going to object to anything         12:28:35
23        that goes to the 2010 time period          12:28:38
24        for anything related to Ms.                12:28:39
25        Bryson's salary consistent with the        12:28:41
```

KELLY L. BRYSON - 8/28/2014

Page 16

```
 1                  KELLY L. BRYSON
 2       court order.  And my further          12:28:43
 3       recollection is is that the salary    12:28:45
 4       information that CGI was required      12:28:46
 5       to produce was only in the            12:28:47
 6       2009/2010 time period.                12:28:51
 7            MR. HERBST:  Again, this is       12:28:52
 8       the witness testifying.  She's        12:28:53
 9       already testified to her              12:28:55
10       compensation in 2011 and 2012.  So    12:28:56
11       I think I'm entitled to ask.          12:28:58
12            MR. KLEIN:  I'm going to          12:29:01
13       direct her not to answer.             12:29:02
14            MR. HERBST:  Mark that for a      12:29:04
15       ruling.                               12:29:05
16       Q.   Whenever it was you testified    12:29:06
17  you -- withdrawn.                          12:29:13
18            Was your commission tied to      12:29:22
19  sales when you got it?                     12:29:23
20       A.   It was tied to a winning         12:29:24
21  opportunity, yes.                          12:29:32
22       Q.   To a what opportunity?           12:29:33
23       A.   A winning opportunity.           12:29:34
24       Q.   A winning opportunity?           12:29:35
25       A.   Yes.                             12:29:37
```

KELLY L. BRYSON - 8/28/2014

Page 17

```
 1                    KELLY L. BRYSON
 2        Q.    That you participated in?          12:29:37
 3        A.    Yes.                               12:29:38
 4        Q.    And it came about because of       12:29:39
 5   your efforts?                                 12:29:40
 6        A.    Yes.                               12:29:41
 7        Q.    What opportunity was that?         12:29:41
 8        A.    There were several.  The only      12:29:42
 9   two that I can remember the name of was       12:29:54
10   there was a US courts opportunity and         12:29:56
11   there was an opportunity at the U.S.          12:29:58
12   Treasury Department.                          12:30:01
13             MR. HERBST:  Let the record         12:30:17
14        reflect that Mr. Klein whispered         12:30:18
15        something to the witness.                12:30:28
16             MR. KLEIN:  Let the record          12:30:29
17        reflect throughout the deposition        12:30:30
18        Mr. Ashmore is whispering things to      12:30:31
19        Mr. Herbst as well.                      12:30:35
20        Q.    How much did the US courts         12:30:46
21   opportunity produce for CGI?                  12:30:48
22        A.    I don't know.                      12:30:50
23             MR. KLEIN:  I'm going to            12:30:51
24        object, and once again, I'm going        12:30:52
25        to have anything unrelated to the        12:30:53
```

KELLY L. BRYSON - 8/28/2014

Page 18

```
 1                KELLY L. BRYSON
 2       scope of this deposition Ms. Bryson          12:30:55
 3       is not going to answer.  I don't             12:30:58
 4       see what this has to do with the             12:30:59
 5       limited scope of the 30(b)(6)                12:31:01
 6       deposition that Judge Cott ordered           12:31:02
 7       remember.                                    12:31:08
 8            MR. HERBST:  Did you get the            12:31:09
 9       answer?                                      12:31:10
10            THE REPORTER:  She said I              12:31:11
11       don't know.                                  12:31:12
12       Q.    Do you know how much the US            12:31:12
13   Treasury opportunity produced?                   12:31:14
14            (Instruction not to answer.)           12:31:16
15            MR. KLEIN:  Same objection,            12:31:16
16       I'm going to direct the witness not          12:31:17
17       to answer the question.                      12:31:19
18            MR. HERBST:  Mark that for a           12:31:21
19       ruling.                                      12:31:22
20       Q.    When did you learn that you            12:31:41
21   would be asked to testify in this case?          12:31:43
22       A.    Earlier in the calendar year.          12:31:45
23   I don't recall the exact date.                   12:31:50
24       Q.    Can you tell us approximately          12:31:51
25   what month?                                      12:31:53
```

KELLY L. BRYSON - 8/28/2014

Page 19

```
 1                    KELLY L. BRYSON
 2         A.    April-ish.                          12:31:53
 3         Q.    Since April who have you            12:31:57
 4    consulted about your testimony or with         12:32:00
 5    respect to your testimony?                     12:32:05
 6         A.    Mr. Klein and Ms., is it Ms.        12:32:06
 7    Homes?                                         12:32:10
 8              MR. KLEIN:  Helms.                   12:32:11
 9         A.    Helms.                              12:32:13
10              MR. KLEIN:  Once again, the          12:32:13
11         conversations that you've had with        12:32:15
12         me and Ms. Helms are privileged           12:32:15
13         communications.                           12:32:17
14              MR. HERBST:  Why don't you           12:32:18
15         wait for the question.                    12:32:19
16         Q.    Approximately how many              12:32:20
17    conversations have you had with Mr. Klein      12:32:21
18    about this?                                    12:32:24
19         A.    Maybe a half dozen.                 12:32:26
20         Q.    How many with Ms. Helms?            12:32:28
21         A.    Fewer.  They were all -- she        12:32:32
22    was either joining Mr. Klein and I or not      12:32:35
23    present.  So less than, I don't know,          12:32:38
24    maybe three or four, maybe not even that       12:32:41
25    many.                                          12:32:43
```

KELLY L. BRYSON - 8/28/2014

Page 20

```
 1                KELLY L. BRYSON
 2        Q.    Other than Mr. Klein and Ms.        12:32:44
 3   Helms, have you talked to anyone else          12:32:57
 4   about your testimony?                          12:32:59
 5        A.    No.                                 12:33:00
 6        Q.    Approximately how long was the      12:33:00
 7   first of the six meetings that you had?        12:33:07
 8   Was it a meeting or a telephone                12:33:09
 9   conversation?                                  12:33:11
10        A.    Telephone conversation.            12:33:11
11        Q.    How long was the first one?         12:33:12
12        A.    Maybe 30 minutes.                   12:33:15
13        Q.    And the second, was it a            12:33:21
14   telephone conversation or a meeting?           12:33:23
15        A.    Telephone conversation.            12:33:24
16        Q.    How long?                           12:33:25
17        A.    Probably in the same range, 30      12:33:27
18   minutes.                                       12:33:29
19        Q.    And the third conversation,         12:33:35
20   telephone or in person?                        12:33:36
21        A.    Telephone.  I would say             12:33:37
22   approximately 30 minutes.  I'm also not        12:33:40
23   sure about the six meetings.  I know we        12:33:43
24   had one meeting that was about an hour,        12:33:45
25   an hour and a half, but in general our        12:33:48
```

```
 1                 KELLY L. BRYSON
 2      meetings have been 30 minutes or less.        12:33:50
 3               MR. KLEIN:  Let the record           12:33:55
 4           reflect today was the first time I       12:33:56
 5           met Ms. Bryson in person.                12:33:58
 6               MR. HERBST:  Would you read          12:34:16
 7           back the answer.                         12:34:17
 8               (Record read as requested.)          12:34:18
 9           Q.   Approximately when was that         12:34:18
10      meeting for the hour, hour and a half?        12:34:20
11           A.   Early summer, maybe May, June.      12:34:22
12      It was prior to when we thought I would       12:34:30
13      be here originally.                           12:34:34
14           Q.   And where was that meeting?         12:34:36
15           A.   It was a telecon.  I mean I         12:34:40
16      took it from my home.                         12:34:43
17           Q.   Did you take all of these           12:34:46
18      meetings from your home?                      12:34:47
19           A.   Yes.                                12:34:48
20           Q.   And after that hour and a half      12:34:53
21      meeting what additional meetings did you      12:35:05
22      have, or telecons?                            12:35:08
23           A.   I think we've talked maybe          12:35:10
24      twice more and just to let me know that       12:35:12
25      it was still happening.                       12:35:16
```

```
 1                KELLY L. BRYSON
 2        Q.    Did you have a substantive        12:35:19
 3   discussion?                                   12:35:21
 4        A.    I would say two 30 minute         12:35:24
 5   meetings.                                     12:35:27
 6        Q.    When was the last one?            12:35:29
 7        A.    Yesterday.                         12:35:31
 8        Q.    And when was the one before       12:35:32
 9   that?                                         12:35:33
10        A.    Last week.                         12:35:33
11        Q.    And the one before that?          12:35:38
12        A.    I don't recall.                    12:35:39
13        Q.    Have you reviewed any             12:35:42
14   documents in preparation?                     12:35:54
15        A.    Yes.                               12:35:57
16        Q.    What documents have you looked    12:35:57
17   at?                                           12:35:59
18        A.    The proposal files, some of       12:36:00
19   the email correspondence I believe you       12:36:04
20   have hard copies of, and the rate            12:36:07
21   worksheets.                                   12:36:09
22        Q.    Anything else?                     12:36:12
23        A.    Also indirect rate calculation   12:36:18
24   workbook.  I believe that's it.              12:36:23
25        Q.    What are the document proposal   12:36:38
```

KELLY L. BRYSON - 8/28/2014

Page 23

```
 1                    KELLY L. BRYSON
 2     files?  What are they?                      12:36:39
 3          A.    Those would be the files that    12:36:41
 4     we shared with our prime and/or that they   12:36:43
 5     shared with us.                             12:36:48
 6          Q.    How extensive are those files?   12:36:59
 7          A.    Not very.                        12:37:02
 8          Q.    Are they on the computer?        12:37:03
 9          A.    Yes.                             12:37:04
10          Q.    When you say not very?           12:37:11
11          A.    I would say less than 20 pages   12:37:13
12     total.                                      12:37:17
13          Q.    Was that with respect to a       12:37:25
14     particular proposal or proposals?           12:37:29
15               MR. KLEIN:   Object to the        12:37:32
16          form.                                  12:37:33
17          A.    It was with respect to the       12:37:33
18     opportunity that this deposition is         12:37:37
19     referencing, the HUD opportunity.           12:37:40
20          Q.    And the email correspondence,    12:37:46
21     what email correspondence did you review?   12:37:52
22          A.    It was the email                 12:37:54
23     correspondence that was tying up and        12:37:56
24     receiving internal approval for this        12:37:59
25     opportunity.                                12:38:02
```

KELLY L. BRYSON - 8/28/2014

Page 24

```
 1                  KELLY L. BRYSON
 2          Q.    And how extensive -- was that          12:38:09
 3      all in a file?                                   12:38:21
 4                  MR. KLEIN:  Object to the            12:38:23
 5          form.                                        12:38:24
 6          Q.    An electronic file that you            12:38:25
 7      consulted?                                       12:38:27
 8                  MR. KLEIN:  Object to the            12:38:27
 9          form.                                        12:38:28
10          A.    Yes.                                   12:38:29
11          Q.    How extensive was that file?           12:38:29
12          A.    Three to four pages.                   12:38:31
13          Q.    All right.  And what are the           12:38:34
14      rate worksheets?                                 12:38:37
15          A.    Those are the worksheets that          12:38:38
16      I used to calculate the rates for the HUD        12:38:40
17      opportunity.                                     12:38:45
18          Q.    How many pages approximately           12:39:09
19      was that?                                        12:39:10
20          A.    Well it's two tabs in an Excel         12:39:11
21      workbook.  You could print it out in             12:39:16
22      probably as many or few pages as your ICE        12:39:18
23      could tolerate.                                  12:39:21
24                  MR. HERBST:  Could you read          12:39:29
25          that back.                                   12:39:30
```

```
 1              KELLY L. BRYSON
 2         (Record read as requested.)            12:39:31
 3    Q.    The indirect rate calculation         12:39:37
 4    workbook, what is that workbook, indirect   12:39:54
 5    rate calculation workbook?                  12:39:58
 6    A.    That's a workbook that we used        12:40:00
 7    to calculate indirect rates for that        12:40:02
 8    fiscal year for submission to the           12:40:05
 9    government.                                 12:40:07
10         MR. HERBST:  Repeat that.              12:40:23
11         (Record read as requested.)            12:40:25
12    Q.    And how extensive was that            12:40:36
13    workbook?                                   12:40:38
14    A.    There are many tabs in it.  I         12:40:38
15    would -- greater than a dozen tabs.  How    12:40:41
16    many pages it may print out to I have no    12:40:46
17    idea.                                       12:40:48
18    Q.    Can you give us an estimate?          12:40:48
19    I won't hold you to it, but approximately   12:40:51
20    how many pages?                             12:40:53
21    A.    Gosh, if you printed it out in        12:40:54
22    its entirety, maybe 30, 40 pages.           12:41:00
23    Q.    And that was also for the same        12:41:08
24    opportunity, this HUD opportunity?          12:41:13
25    A.    Yes.                                  12:41:14
```

KELLY L. BRYSON - 8/28/2014

Page 26

```
 1                 KELLY L. BRYSON
 2        Q.    Now, which HUD opportunity was          12:41:15
 3    it?                                               12:41:17
 4        A.    My files call it eBuy.  It may          12:41:18
 5    go by different names.                            12:41:24
 6        Q.    Spell that, please.                     12:41:26
 7        A.    Little E, capital B-u-y.                12:41:27
 8        Q.    Sorry, E capital B?                     12:41:32
 9        A.    u-y.                                    12:41:35
10        Q.    eBuy?                                   12:41:36
11        A.    Yes.                                    12:41:39
12        Q.    Were you aware that there were          12:41:39
13    two HUD opportunities at that time?               12:41:41
14             MR. KLEIN:  Object to the                12:41:43
15        form.                                         12:41:44
16        A.    I don't recall that now if I            12:41:44
17    was.                                              12:41:48
18        Q.    But if there were two HUD               12:41:48
19    opportunities would you have been the             12:41:50
20    person involved in preparing these                12:41:51
21    sheets?                                           12:41:55
22        A.    Most likely, yes.                       12:41:55
23        Q.    What are your duties -- what            12:41:56
24    were your duties and responsibilities in          12:41:59
25    2009 and 2010 with respect to                     12:42:02
```

KELLY L. BRYSON - 8/28/2014

Page 27

```
 1                KELLY L. BRYSON
 2    opportunities like this HUD opportunity?        12:42:05
 3         A.    Primarily development of             12:42:08
 4    rates, participation in cost narratives,        12:42:13
 5    and generation of profit and loss               12:42:17
 6    statements or estimates.                        12:42:21
 7         Q.    What is a cost narrative or           12:42:52
 8    narratives?                                      12:42:55
 9         A.    Cost narrative?                       12:42:56
10         Q.    Yes.                                  12:42:58
11         A.    That's the document that             12:42:58
12    describes our method -- well, it                 12:43:00
13    describes our methodology for developing         12:43:04
14    our rates and it contains price or cost          12:43:06
15    information, but they're highly variable         12:43:12
16    depending on the requirement of the             12:43:15
17    specific solicitation.                           12:43:18
18         Q.    Now, all the documents you            12:43:32
19    consulted, did you turn them over to Mr.         12:43:33
20    Klein or Ms. Helms?                              12:43:35
21         A.    He has them, yes.                     12:43:37
22         Q.    He does, okay.                        12:43:38
23              MR. HERBST:  Have they all             12:43:42
24         been produced, everything she               12:43:43
25         testified she consulted?                    12:43:44
```

KELLY L. BRYSON - 8/28/2014

Page 28

```
 1              KELLY L. BRYSON
 2          MR. KLEIN:  I don't know all        12:43:46
 3      the tabs that she's referring to.       12:43:49
 4      We produced the documents that          12:43:50
 5      assist in providing answers to the      12:43:52
 6      questions that we maintain are          12:43:54
 7      within the scope of the 30(b)(6)        12:43:57
 8      deposition.                             12:43:58
 9          MR. HERBST:  I will request         12:44:00
10      the documents that she says she         12:44:02
11      consulted for the deposition and if     12:44:04
12      you'd mark that as a request,           12:44:10
13      that's our first request.               12:44:11
14          (Request made.)                     12:44:11
15      Q.   Other than these documents you     12:44:29
16  just described to us, have you reviewed,    12:44:30
17  looked at or consulted any other            12:44:33
18  documentation in preparation for your       12:44:35
19  testimony?                                  12:44:36
20      A.   I don't believe so.                12:44:36
21          (Plaintiff's Exhibit 17,
22      previously marked and shown to
23      witness.)
24          (Plaintiff's Exhibit 18,
25      previously marked and shown to
```

```
 1                KELLY L. BRYSON
 2        witness.)                              12:45:15
 3        Q.    So I'd like to show you what     12:45:15
 4   has been marked as plaintiffs's Exhibit     12:45:17
 5   17, dated 11/12/13, which is probably the   12:45:20
 6   date of the deposition in which it was      12:45:24
 7   marked.  And Plaintiffs' Exhibit 18 which   12:45:26
 8   bears -- I'm sorry, that's 6/12/13 is the   12:45:29
 9   date, not 11 or 12.                         12:45:33
10             So the first question is have     12:46:21
11   you -- let's take 17.  Have you seen that   12:46:22
12   document before?                            12:46:27
13        A.    I don't believe so.  In          12:46:27
14   looking at page 2, it looks like I was      12:46:31
15   not involved in the opportunity.            12:46:37
16        Q.    So your answer is you don't      12:46:54
17   believe you've seen that document before?   12:46:56
18        A.    I don't recognize this, no.      12:46:57
19        Q.    Now, just looking at the         12:47:15
20   document can you tell us what it is, what   12:47:16
21   that document is?                           12:47:19
22        A.    This is a template that we       12:47:21
23   used at the time for our executive          12:47:25
24   briefing process to receive approval to    12:47:29
25   submit opportunity to the government, our  12:47:33
```

KELLY L. BRYSON - 8/28/2014

Page 30

```
 1                  KELLY L. BRYSON
 2      proposal to the government.                    12:47:39
 3              MR. KLEIN:  Mr. Herbst, I'm             12:47:42
 4         just going to put on the record I'm         12:47:44
 5         going to give you very limited              12:47:45
 6         leeway with this document.  I               12:47:47
 7         maintain, as Judge Cott said in his         12:47:49
 8         August 26th, 2014 order, that the           12:47:51
 9         court ruled at the April hearing            12:47:52
10         that plaintiff could take a, quote,         12:47:54
11         unquote, very limited 30(b)(6)              12:47:57
12         deposition in order to unpack what          12:47:58
13         Exhibit 18 really means.  We're             12:47:59
14         talking about Exhibit 17, but I'll          12:48:01
15         give you a little bit of leeway             12:48:03
16         especially since Ms. Bryson said            12:48:05
17         she doesn't believe she was even on         12:48:06
18         this opportunity.                           12:48:09
19              MR. HERBST:  I don't agree             12:48:11
20         with the characterization, but I'm          12:48:13
21         not going to debate it here.  We            12:48:16
22         all know who lost that motion.              12:48:18
23         Q.    Now you mentioned this was            12:48:20
24      used in the executive briefing process;       12:48:41
25      is that right?                                 12:48:44
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2        A.    Yes.                              12:48:44
 3        Q.    Is that also called an           12:48:46
 4   executive step review process?              12:48:49
 5        A.    Yes.                              12:48:49
 6        Q.    What is the purpose of the        12:49:00
 7   document?                                   12:49:01
 8        A.    The purpose of the document,     12:49:01
 9   to my understanding, is to provide a        12:49:04
10   briefing to the executive team of what      12:49:09
11   the opportunity is, any risks that we may   12:49:11
12   need to be aware of, overview of the        12:49:18
13   profit and loss.  It's generally           12:49:23
14   considered to be the, a gate review, if     12:49:28
15   you will, before submitting a proposal to   12:49:31
16   the government to receive approval to       12:49:33
17   submit.                                     12:49:36
18            MR. KLEIN:  Mr. Herbst, you're     12:49:38
19         running close to that line where      12:49:40
20         I'm going to ask the witness not to   12:49:42
21         answer, I want to give you the        12:49:43
22         heads up.                             12:49:46
23        Q.    Is the pricing function that     12:49:47
24   you testified is a part of your duties      12:49:50
25   and responsibilities, is that involved in   12:49:53
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2      this executive step review process?          12:49:56
 3           A.    Yes, we have a portion of it.     12:49:59
 4           Q.    So would you please explain       12:50:01
 5      how the process works?                       12:50:02
 6                 MR. KLEIN:  Object to the         12:50:06
 7           form.  You can answer.  You're          12:50:07
 8           talking generally?                      12:50:09
 9                 MR. HERBST:  Yes.                  12:50:10
10                 THE WITNESS:  You said I can      12:50:12
11           answer?                                 12:50:13
12                 MR. KLEIN:  You can answer.       12:50:13
13           He said generally how -- what's the     12:50:14
14           question?                               12:50:16
15           Q.    Generally how the process         12:50:17
16      works?                                       12:50:19
17           A.    Generally how the process         12:50:19
18      works is an opportunity team will receive    12:50:21
19      a request for proposal from the              12:50:26
20      government.  They will work on a             12:50:28
21      solution.  They will pull in other groups    12:50:30
22      within CGI as necessary, such as pricing,    12:50:33
23      legal, HR.  Several days to a week before    12:50:37
24      the due date of the proposal they will       12:50:43
25      hold this executive step review or step C    12:50:46
```

KELLY L. BRYSON - 8/28/2014

Page 33

```
 1                   KELLY L. BRYSON
 2    review, to brief the executives and        12:50:50
 3    receive final approval to submit.          12:50:54
 4         Q.    Is it true that essentially     12:50:59
 5    there were five steps to this process?     12:51:01
 6              (Instruction not to answer.)     12:51:03
 7              MR. KLEIN:  I'm going to         12:51:03
 8         object and direct her not to          12:51:05
 9         answer.  This is not a deposition     12:51:07
10         about the step review process.        12:51:08
11         This is about how rates were          12:51:10
12         calculated.                           12:51:11
13              MR. HERBST:  But this is in my   12:51:12
14         view a necessary predicate to how     12:51:14
15         the rates are calculated.  And 3, 4   12:51:16
16         and 5 are the documents that you,     12:51:41
17         the topics that you agreed to which   12:51:44
18         includes all information contained    12:51:46
19         in Plaintiff's Exhibit 17 and 18      12:51:48
20         and the specific components of that   12:51:51
21         information.                          12:51:53
22              MR. KLEIN:  I disagree with      12:52:00
23         your characterization as to what      12:52:02
24         CGI agreed to produce and not         12:52:04
25         produce.  This issue was subject to   12:52:06
```

```
 1                 KELLY L. BRYSON
 2        recent briefing in letter briefs to          12:52:08
 3        the judge, Judge Cott, and Judge             12:52:10
 4        Cott in his decision on page 5              12:52:13
 5        said, the court ruled at the April          12:52:16
 6        hearing that plaintiff could take           12:52:18
 7        a, quote, unquote, very limited,            12:52:19
 8        end quote, 30(b)(6) deposition in           12:52:22
 9        order to unpack what Exhibit 18             12:52:24
10        really means and how the numbers            12:52:26
11        represented therein are calculated.         12:52:28
12             MR. HERBST:  You're missing            12:52:32
13        the line where he says, Plaintiff's         12:52:33
14        application regarding the scope of          12:52:35
15        the deposition is except as to              12:52:37
16        topics to 3, 4 and 5 to which you           12:52:42
17        did not object.  And 5 says only            12:52:44
18        information contained in                    12:52:47
19        Plaintiff's Exhibit 17 and 18 and           12:52:48
20        the specific components of that             12:52:49
21        information, how such information           12:52:51
22        component is and was generated and          12:52:53
23        calculated, including, without              12:52:54
24        limitation, the categories of               12:52:56
25        direct, indirect labor costs,               12:52:58
```

KELLY L. BRYSON - 8/28/2014

Page 35

```
1              KELLY L. BRYSON
2        overhead, profit or other metric in        12:53:00
3        the hourly rates listed in                 12:53:03
4        Plaintiff's Exhibit 17 and 18 and          12:53:05
5        it goes on, and it goes on.                12:53:08
6             So you are in our view                12:53:10
7        unwarrantedly taking a too narrow          12:53:19
8        view of the ruling.                        12:53:26
9             MR. KLEIN:  I will give you           12:53:28
10       limited leeway to ask Ms. Bryson           12:53:29
11       some questions, but the focus of           12:53:31
12       her deposition is how the essential        12:53:33
13       rates in Exhibit 18 were derived.          12:53:35
14       To the extent you're talking about         12:53:39
15       generic step review information, I         12:53:40
16       have no clue that the witness has          12:53:42
17       knowledge of these questions, but          12:53:46
18       to the extent that the focus and           12:53:48
19       the purpose behind your questions          12:53:49
20       is to understand how the prices are        12:53:51
21       derived, I will allow that.  But to        12:53:53
22       the extent it's a fishing                  12:53:54
23       expedition to ask about step               12:53:56
24       reviews which we opposed and which         12:53:57
25       the court agreed with, we refuse to        12:53:59
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    allow her to answer those          12:54:02
 3    questions.                         12:54:03
 4         MR. HERBST:  I'll just        12:54:04
 5    indicate to you that at page 57 of 12:54:06
 6    the hearing transcript before Judge 12:54:10
 7    Cott he also said that with respect 12:54:13
 8    to Exhibit 17 there must be someone 12:54:16
 9    who could articulate that, whether  12:54:20
10    it's driven by a deposition and so  12:54:24
11    forth, we can explain it in the     12:54:26
12    form of Exhibit 17.                 12:54:28
13         So I intend to ask the        12:54:29
14    questions and if you, you know, you 12:54:33
15    can instruct the witness not to     12:54:37
16    answer, but I don't -- but I will   12:54:38
17    follow up and get these questions   12:54:41
18    answered with respect to number 5.  12:54:46
19         MR. KLEIN:  Just to read      12:54:49
20    further, if we're going to be       12:54:51
21    reading transcripts, later in the   12:54:52
22    transcript on that same day, Judge  12:54:55
23    Cott at page 66 said "Here is what  12:54:57
24    we are going to do, gentlemen, I am  12:55:00
25    going to allow Mr. Herbst if he     12:55:03
```

KELLY L. BRYSON - 8/28/2014

Page 37

```
 1              KELLY L. BRYSON
 2       wishes to take a 30(b)(6)           12:55:04
 3       deposition so that he can unpack    12:55:06
 4       what this chart in Exhibit 18       12:55:07
 5       really means and how these numbers  12:55:09
 6       are calculated from CGI's           12:55:11
 7       perspective."                       12:55:14
 8           MR. HERBST:  That's fine.  But  12:55:14
 9       we're entitled to pursue topic 5,   12:55:16
10       all the information contained in    12:55:18
11       Exhibit 17.  So what was the last   12:55:21
12       question?                           12:55:24
13           (Record read as requested.)    12:55:25
14           MR. KLEIN:   To the extent that 12:55:39
15       you know I'm going to give you a    12:55:41
16       limited leeway.                     12:55:42
17           A.    Yes, there are steps A through  12:55:43
18    E.                                     12:55:45
19           Q.    And what is A?            12:55:45
20           A.    That is a bid/no bid review.  12:55:49
21    Actually, sorry, I take that back.  That    12:55:54
22    is a -- is a -- that is the review at  12:55:57
23    which we've identified an opportunity and  12:56:06
24    we put initial resources toward vetting   12:56:09
25    the opportunity.  It's an opportunity of   12:56:14
```

```
 1              KELLY L. BRYSON
 2   vetting review.                        12:56:16
 3       Q.    So basically it's the        12:56:17
 4   beginning of the pursuit of a potential 12:56:19
 5   opportunity, right?                    12:56:21
 6       A.    Yes, yes.                     12:56:22
 7       Q.    And B?                        12:56:22
 8       A.    B is typically held once an  12:56:23
 9   RFP or other solicitation is received  12:56:26
10   from the government and that is the point 12:56:29
11   at which we decide definitively to commit 12:56:31
12   resources to pursue the opportunity.   12:56:34
13       Q.    And C?                        12:56:36
14       A.    Is the point at which we've  12:56:38
15   done the solutioning, we are imminently 12:56:40
16   prepared to submit the proposal and it's 12:56:44
17   a final gate check before submission.  12:56:46
18       Q.    Of the bid?                   12:56:49
19       A.    Yes.                          12:56:49
20       Q.    And D?                        12:56:50
21       A.    D is honestly not held very  12:56:51
22   often.  It's considered a negotiation  12:56:56
23   step if necessary.  A lot of times it's 12:56:59
24   not applicable.                         12:57:03
25       Q.    Is it fair to say that that's 12:57:03
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2    a step that considers whether to enter          12:57:05
 3    into negotiations with the client after         12:57:07
 4    the bid is submitted?                           12:57:09
 5         A.   Yes.                                   12:57:10
 6         Q.   And E?                                 12:57:10
 7         A.   E is contract signing.                 12:57:11
 8         Q.   Now what role do you have in           12:57:13
 9    each of those five steps?  Let me ask you        12:57:17
10    something just so we can get the                 12:57:22
11    groundrules straight.                            12:57:24
12              Did the role that you have in          12:57:26
13    this process in 2009 and 2010, is it any         12:57:28
14    different than the role you have today in        12:57:33
15    substance?                                       12:57:35
16         A.   Not substantively.                     12:57:36
17         Q.   Because sometimes, you know,           12:57:39
18    I'll ask a question in the present tense.        12:57:41
19    As long as you understand I'm primarily          12:57:44
20    interested in the process in 2009 and            12:57:47
21    2010.                                            12:57:51
22         A.   Sure.                                  12:57:51
23         Q.   But if it hasn't changed we're         12:57:52
24    on solid ground.                                 12:57:54
25              MR. KLEIN:  I just want to             12:57:56
```

KELLY L. BRYSON - 8/28/2014

Page 40

```
 1                 KELLY L. BRYSON
 2      clarify, the intent of Mr. Herbst's          12:57:58
 3      questions if I understand it is to           12:58:00
 4      find out about what transpired at            12:58:02
 5      the time period that Mr. Ashmore             12:58:07
 6      was employed at CGI?                         12:58:08
 7           MR. HERBST:  Yes, but you know          12:58:10
 8      something, this is my deposition,            12:58:12
 9      Mr. Klein, so I would be most                12:58:13
10      grateful if you have an objection            12:58:14
11      you can state it, but I'd                    12:58:16
12      appreciate if you let me ask my              12:58:19
13      questions.                                   12:58:20
14           MR. KLEIN:  That's fine, you            12:58:21
15      can ask your questions, I just want          12:58:22
16      to make sure I understood what you           12:58:23
17      were saying.                                 12:58:25
18           Q.    All right.  What role do you      12:58:26
19   have in step A, if any?                         12:58:30
20           A.    If a meeting is held I am         12:58:32
21   sometimes invited, but as far as                12:58:36
22   preparing materials or being an active          12:58:39
23   participant, I'm generally just learning        12:58:43
24   about the opportunity at that point.            12:58:46
25           Q.    And how about in B, committing    12:58:48
```

KELLY L. BRYSON - 8/28/2014

Page 41

```
 1              KELLY L. BRYSON
 2    financial resources to the pursuit?        12:58:54
 3         A.    Generally the same as step A.   12:58:55
 4    If it's a particularly large opportunity   12:59:02
 5    we may have done some preparatory          12:59:05
 6    financial analysis, but I would say        12:59:09
 7    that's the exception.                      12:59:12
 8         Q.    What about the pursuit budget   12:59:13
 9    preparation in step B, are you involved    12:59:31
10    in that?                                   12:59:32
11         A.    That was never a part of my     12:59:33
12    official responsibilities, but I have      12:59:35
13    often been asked to participate as part    12:59:37
14    of that process.  But it was -- it was     12:59:39
15    never something that I was officially      12:59:44
16    responsible for.  It's something that I    12:59:46
17    would provide help if I was able to.       12:59:48
18         Q.    And when you were asked, you    12:59:52
19    are asked, what specific tasks or help do  12:59:54
20    you do?                                    12:59:59
21         A.    Generally I just help them do   12:59:59
22    the math.  They would provide me a list    13:00:01
23    of resources, a list of hours, and I       13:00:03
24    would sometimes provide rate information,  13:00:06
25    but generally help them with the math.     13:00:11
```

KELLY L. BRYSON - 8/28/2014

Page 42

```
1                 KELLY L. BRYSON
2          Q.    What math is involved?              13:00:12
3          A.    Really just rates times hours       13:00:31
4    equals estimated budget.  We have plug          13:00:34
5    numbers to use for most resources, but if       13:00:43
6    it was an opportunity where we knew             13:00:45
7    specific personnel then I could pull that       13:00:47
8    information.                                     13:00:49
9          Q.    What's your role in step C,         13:00:57
10   the process to submit the bid?                  13:01:00
11         A.    That is where I would review        13:01:02
12   any of the financial documents that were        13:01:07
13   applicable to that solicitation.                13:01:10
14   Sometimes it's a profit and loss                13:01:13
15   statement.  Sometimes it's a list of            13:01:15
16   rates.  It varies from opportunity to           13:01:18
17   opportunity, but generally consists of          13:01:24
18   explaining what financially we are              13:01:26
19   committing the company to.                      13:01:29
20         Q.    You mean what financial             13:01:31
21   investment, what amounts of money you're        13:01:37
22   committing the company to?                      13:01:38
23         A.    I wouldn't say necessarily          13:01:40
24   investment, but what we're looking at in        13:01:42
25   terms of, again, profit, loss.                  13:01:46
```

KELLY L. BRYSON - 8/28/2014

```
 1                KELLY L. BRYSON
 2       Q.    But when you say committing          13:01:49
 3    the company to some financial thing that      13:01:51
 4    you're committing the company to, what?       13:01:54
 5       A.    Well, for example, if we             13:01:55
 6    submit -- again, it depends on the bid.       13:01:57
 7    If we're submitting a fixed price bid,        13:02:01
 8    then we would be committing the company       13:02:04
 9    likely to some kind of investment.  If        13:02:06
10    we're just submitting a list of rates,        13:02:08
11    then we're only committing to selling X       13:02:10
12    person at Y dollars.  I mean it's --          13:02:13
13       Q.    And in the cost and materials        13:02:16
14    contract that's what you'd be doing, the      13:02:19
15    latter?                                       13:02:21
16       A.    Yes.                                 13:02:22
17       Q.    What is a cost and materials         13:02:26
18    contract?                                     13:02:27
19       A.    I'm not familiar specifically        13:02:27
20    with that specific term.  Typically we        13:02:29
21    call it time and materials.                   13:02:32
22       Q.    Time and materials.  What's          13:02:33
23    involved in a time and materials             13:02:37
24    contract?                                     13:02:39
25       A.    Time and materials contract          13:02:39
```

KELLY L. BRYSON - 8/28/2014

Page 44

```
 1              KELLY L. BRYSON
 2    generally consists of labor hour -- a        13:02:42
 3    labor rate for labor hours and any           13:02:45
 4    materials or other direct costs that are     13:02:48
 5    necessary for the completion of that         13:02:49
 6    project.  It could be software, travel,      13:02:52
 7    notebooks, any of a number of things.        13:02:56
 8         Q.   What role do you have in the       13:03:07
 9    D, step D, enter negotiations with the       13:03:10
10    client post bid submission?                  13:03:12
11         A.   It really depends.  If they        13:03:14
12    are asking us questions about our pricing    13:03:16
13    or we need to change, if we're -- if we      13:03:19
14    receive a request for a best and final       13:03:26
15    offer or proposal revisions that has a       13:03:29
16    cost impact, then I would participate.       13:03:33
17    If they're just asking clarification         13:03:35
18    questions, then I would not participate      13:03:37
19    in that.                                     13:03:38
20         Q.   How about step E, the              13:03:44
21    execution of the contract?                   13:03:46
22         A.   I'm generally not involved in      13:03:47
23    that.                                        13:03:48
24         Q.   Now if you would just look at      13:03:57
25    17, on the second page there's a list of     13:04:03
```

KELLY L. BRYSON - 8/28/2014

Page 45

```
 1                   KELLY L. BRYSON
 2    people involved on page 2, right, those      13:04:13
 3    are the people involved in the              13:04:17
 4    opportunity?                                 13:04:18
 5         A.   Yes.                               13:04:19
 6         Q.   And they're generally listed       13:04:19
 7    in this part of this kind of document,       13:04:21
 8    this executive step review, right?           13:04:26
 9              MR. KLEIN:   Object to the         13:04:28
10         form.                                   13:04:29
11         A.   Yes.                               13:04:29
12         Q.   Now, do you have -- I take it      13:04:30
13    you don't have any role in selecting the    13:04:36
14    people who are involved in an               13:04:38
15    opportunity, or do you?                      13:04:40
16         A.   No.                                13:04:41
17         Q.   But when you are given a list      13:04:41
18    of employees like this, do you generally    13:04:44
19    know the business, you know, the division   13:04:46
20    or business unit in which they are, in      13:04:48
21    which they are primarily working?           13:04:52
22              MR. KLEIN:   Object to form.       13:04:55
23         A.   Yes.                               13:04:56
24         Q.   I see here that the business       13:05:00
25    unit is listed along with their roles,      13:05:02
```

KELLY L. BRYSON - 8/28/2014

Page 46

```
 1                  KELLY L. BRYSON
 2    right?                                          13:05:04
 3         A.    Yes.                                 13:05:04
 4         Q.    Is that typical?                     13:05:04
 5         A.    Yes, for the time, yes.              13:05:06
 6         Q.    For that time period you're          13:05:08
 7    saying that's typical?                          13:05:11
 8         A.    Yes.                                 13:05:12
 9         Q.    Has that changed?                    13:05:13
10         A.    I'm not sure.                        13:05:14
11         Q.    Okay.  Now the next page is          13:05:16
12    called client profile.  That's a typical        13:05:49
13    part of this executive step review?             13:05:51
14         A.    Yes.                                 13:05:54
15         Q.    And does it generally list the       13:05:54
16    government agency that is looking for the        13:05:57
17    opportunity that the company is trying to        13:06:04
18    bid on?                                          13:06:06
19         A.    Yes.                                 13:06:07
20         Q.    If you look at this one, it          13:06:07
21    says key relationships -- this is a HUD          13:06:26
22    contract, right?                                 13:06:28
23         A.    Yes.                                 13:06:29
24         Q.    Under key relationships there        13:06:31
25    are three people listed?                         13:06:33
```

```
 1              KELLY L. BRYSON
 2        A.   Yes.                          13:06:35
 3        Q.   Do you know any of these      13:06:35
 4   people?                                 13:06:36
 5        A.   No.                           13:06:36
 6        Q.   What's the purpose of this    13:06:37
 7   box?  What does key relationships mean? 13:06:41
 8        A.   Those are the government      13:06:44
 9   personnel with whom CGI has a           13:06:51
10   relationship, but I'm not -- I'm not    13:06:53
11   involved in preparing these documents so 13:06:56
12   I can't, I can't really get to -- I can't 13:06:59
13   answer any further than that.           13:07:04
14        Q.   Okay, that's fine.  Now, one  13:07:05
15   of the persons listed is Deb Lear, do you 13:07:07
16   see that?                               13:07:10
17        A.   Yes.                          13:07:11
18        Q.   Second person?                13:07:11
19        A.   Yes.                          13:07:12
20        Q.   I know you haven't met her    13:07:12
21   according to the testimony you just gave, 13:07:14
22   right?                                  13:07:16
23        A.   Yes.                          13:07:18
24        Q.   But have you seen her name on 13:07:18
25   pursuits in executive step reviews before 13:07:26
```

```
 1                    KELLY L. BRYSON
 2    as someone having a key relationship with        13:07:29
 3    HUD?                                              13:07:32
 4                  MR. KLEIN:  Object to the           13:07:33
 5        form.                                         13:07:34
 6        A.    I don't recall her name                13:07:34
 7    specifically, but I also have not worked         13:07:35
 8    a lot of HUD proposals.                          13:07:37
 9        Q.    Fair enough.  Well does your           13:07:41
10    work involve pursuits for only certain           13:07:49
11    governmental agencies and not others, or,        13:07:56
12    you know, is there some distinguishing           13:08:00
13    fact among government agencies that you          13:08:03
14    could articulate where, you know, you do         13:08:05
15    more of one agency than another?                 13:08:08
16                  MR. KLEIN:  Object to the           13:08:11
17        form.                                         13:08:12
18        A.    At the time, I would say at            13:08:13
19    the time there weren't specific sectors          13:08:17
20    that we were aligned to, but that has            13:08:20
21    since changed and I do have a sector now         13:08:23
22    that I'm aligned to and I primarily only         13:08:25
23    work that sector's proposals.                    13:08:28
24                  But a HUD was never somewhere       13:08:30
25    that we on the Federal side did a lot of         13:08:34
```

KELLY L. BRYSON - 8/28/2014

Page 49

```
 1              KELLY L. BRYSON
 2    work anyway, so there just weren't that        13:08:37
 3    many HUD opportunities.  A lot of the HUD       13:08:40
 4    work was bid out of a different part of         13:08:44
 5    the business.                                   13:08:47
 6         Q.    What part of the business was        13:08:48
 7    it?                                             13:08:49
 8         A.    The BPS business, the BPS            13:08:49
 9    business unit.                                  13:08:53
10         Q.    What does BPS stand for?             13:08:54
11         A.    Business process services.           13:09:01
12         Q.    And what distinguished BPS           13:09:03
13    from CGI Federal?                               13:09:06
14         A.    BPS was a business unit within       13:09:07
15    CGI Federal.                                    13:09:11
16         Q.    So what would be the analog          13:09:12
17    within CGI Federal for BPS that --              13:09:14
18         A.    I worked in what was called          13:09:17
19    the ISIT part of the business, which is         13:09:19
20    more technology, solution driven,               13:09:23
21    software driven, transformation driven,         13:09:27
22    where the BPS is business process               13:09:30
23    services, so performing inspections or          13:09:32
24    really outsourcing type work and a lot of       13:09:35
25    that is not done at the Federal level,          13:09:38
```

KELLY L. BRYSON - 8/28/2014

Page 50

```
 1                    KELLY L. BRYSON
 2     it's done at the state and local or the          13:09:39
 3     commercial level.                                13:09:41
 4          Q.    You said inspections and what         13:09:43
 5     else that BPS did?                               13:09:45
 6          A.    Generally outsourcing type            13:09:47
 7     services.                                        13:09:51
 8          Q.    So these were two different           13:09:51
 9     business units within CGI?                       13:09:59
10          A.    Yes.                                  13:10:01
11          Q.    And can you tell with respect         13:10:01
12     to Plaintiff's 17 whether this was coming        13:10:04
13     out of Federal -- whether it was coming          13:10:07
14     out of BPS or ISIT?                              13:10:10
15          A.    I can't be certain.                   13:10:17
16          Q.    Take a look at the next page.         13:10:20
17     I see there is an answer.  There seems to        13:10:24
18     be an answer on the top of the next page?        13:10:26
19          A.    Okay, yes.                            13:10:28
20               MR. KLEIN:  Object to the form         13:10:29
21          of the question.                            13:10:31
22               MR. HERBST:  I'll fix that up.         13:10:32
23          Q.    Labeled opportunity profile,          13:10:33
24     do you see that?                                 13:10:35
25          A.    Yes.                                  13:10:35
```

KELLY L. BRYSON - 8/28/2014

```
 1                   KELLY L. BRYSON
 2          Q.    So the lead business unit at        13:10:36
 3     least is BPS, right?                           13:10:38
 4          A.    Yes.                                 13:10:39
 5          Q.    Now, are there ever                 13:10:39
 6     opportunities where both BPS and ISIT are      13:10:41
 7     involved?                                       13:10:45
 8          A.    Yes.                                 13:10:45
 9          Q.    What would those be?                13:10:45
10          A.    Those would typically happen        13:10:47
11     if, as I mentioned a lot of the typical        13:10:52
12     BPS work is state and local or commercial      13:10:59
13     in nature.  If Federal HUD, for example,       13:11:01
14     had an opportunity that's usually when         13:11:07
15     ISIT would get involved because the            13:11:10
16     majority of our work is with the federal       13:11:13
17     government and we're the ones that have        13:11:17
18     the understanding of how to respond to a       13:11:18
19     government RFP and what that means versus      13:11:21
20     a majority of the BPS folks are more used      13:11:25
21     to responding to state and local RFPs,         13:11:28
22     so.                                             13:11:34
23               MR. KLEIN:  I'm just going to        13:11:34
24          put my objection on THE record that       13:11:36
25          once again I think you're drifting        13:11:37
```

```
 1                    KELLY L. BRYSON
 2          from the scope of even if Exhibit 5        13:11:39
 3          is something that CGI agreed to or         13:11:41
 4          category 5 is something CGI agreed,        13:11:43
 5          I think we are getting close to            13:11:46
 6          that fine line of deviating beyond         13:11:48
 7          the scope of the deposition.               13:11:50
 8               MR. HERBST:  I don't, but             13:11:56
 9          again, I don't want to debate with         13:11:57
10          you.                                       13:12:03
11          Q.   I just want to understand.  In        13:12:03
12   2009/2010 you were in the ISIT part of            13:12:06
13   the organization, or did your duties              13:12:09
14   encompass both BPS and ISIT?                      13:12:10
15          A.   I was aligned to ISIT.  I             13:12:14
16   would say 90 plus percent of my work was          13:12:16
17   ISIT.                                             13:12:19
18          Q.   Do you know who your same             13:12:20
19   number, the same person doing your duties         13:12:22
20   for the BPS unit within CGI would be, the         13:12:25
21   pricing manager for those opportunities?          13:12:30
22               MR. KLEIN:  Object to form.           13:12:32
23          A.   It's my understanding they            13:12:33
24   don't -- they don't have a pricing                13:12:34
25   function the way that ISIT did.  They             13:12:38
```

KELLY L. BRYSON - 8/28/2014

Page 53

```
 1               KELLY L. BRYSON
 2    rely more on their finance department in        13:12:42
 3    general to do their pricing.  They don't        13:12:46
 4    have pricing specialists, to my                 13:12:49
 5    knowledge.                                       13:12:51
 6         Q.    Is there any reason for that?        13:12:52
 7         A.    I don't know.  I think they're       13:12:53
 8    just more cross functional.  I don't -- I       13:12:55
 9    can't -- I don't know.                           13:12:59
10         Q.    Now, the next line under the         13:12:59
11    BPS says HCV programmatic consulting            13:13:19
12    services.  Do you know what HCV stands          13:13:25
13    for?                                             13:13:27
14         A.    No.                                   13:13:27
15         Q.    Do you know what the                 13:13:28
16    opportunity was?                                 13:13:28
17         A.    No.                                   13:13:29
18         Q.    Nothing in this document would       13:13:29
19    be able to tell you what it was?                 13:13:32
20         A.    I mean not, not any more than        13:13:35
21    what's just written here.                        13:13:39
22         Q.    It says account manager             13:13:40
23    Benjamin Ashmore?                                13:13:48
24         A.    Yes.                                  13:13:49
25         Q.    What would the account              13:13:49
```

```
 1                KELLY L. BRYSON
 2   manager's duties be, generally?              13:13:51
 3        A.    Generally, they're the person     13:13:53
 4   that has the relationship with the client    13:13:55
 5   executives, but I would say that those       13:13:59
 6   duties would often vary depending on the     13:14:03
 7   size of the account.  If it's a very         13:14:06
 8   large account their duties would be          13:14:08
 9   different, if it was a very small account    13:14:10
10   like HUD.                                    13:14:13
11        Q.    When you say if it's a very       13:14:13
12   small account like HUD, then what?           13:14:15
13        A.    Then it would, in my              13:14:18
14   experience it's typical that an account      13:14:20
15   manager of a very small account would be     13:14:22
16   more actively involved in delivery,          13:14:25
17   actual labor hours versus someone in a       13:14:29
18   very large account is probably more          13:14:33
19   involved in strategy and less doing the      13:14:36
20   actual work work.                            13:14:41
21        Q.    And it says BU executive          13:14:43
22   owner, business unit executive owner, is     13:14:47
23   that what that means?                        13:14:49
24        A.    Yes.                              13:14:49
25        Q.    Richard Schmitz.  What is the     13:14:50
```

KELLY L. BRYSON - 8/28/2014

Page 55

```
 1                 KELLY L. BRYSON
 2    business unit executive owner?  What's        13:14:54
 3    that person's role or what does that          13:14:56
 4    mean?                                          13:14:59
 5         A.   I'm really not sure what that       13:14:59
 6    means in this context.  That's typically      13:15:03
 7    a vice president that was responsible for     13:15:06
 8    -- under whom the subject opportunity's       13:15:11
 9    umbrella fell under.  But their               13:15:17
10    involvement or how active they were I         13:15:20
11    don't know.                                    13:15:23
12         Q.   On the right-hand side it says      13:15:23
13    TCV, term.  What does that stand for?         13:15:27
14         A.   Total contract value.              13:15:30
15         Q.   So this was anticipated to be      13:15:32
16    an $8.6 million, or $8.7 million              13:15:34
17    contract?                                      13:15:39
18         A.   Yes.  For the, over the total      13:15:39
19    of the four years.                            13:15:42
20         Q.   Then the next sheet under          13:15:43
21    pursuit team lists the team who were         13:15:52
22    assigned to that, right?                      13:15:54
23         A.   Yes.                               13:15:55
24         Q.   To the opportunity?               13:15:55
25         A.   Yes.                               13:15:56
```

KELLY L. BRYSON - 8/28/2014

Page 56

```
 1                 KELLY L. BRYSON
 2         Q.    And then the next page is          13:15:57
 3    pursuit budget, right?                        13:16:02
 4         A.    Yes.                               13:16:04
 5         Q.    What's the purpose of that         13:16:04
 6    page?                                         13:16:06
 7         A.    That page provides an estimate     13:16:07
 8    of the amount of money that we at CGI are     13:16:11
 9    expecting to spend in pursuit of this         13:16:17
10    opportunity in sales activities, whether      13:16:20
11    that's preparing the proposal, it could       13:16:24
12    be printing costs, there could be travel.     13:16:26
13         Q.    Are you involved in generating     13:16:31
14    pursuit budgets in --                         13:16:34
15         A.    Not typically.                     13:16:36
16         Q.    Not typically?                     13:16:37
17         A.    No.                                13:16:37
18         Q.    Do you have some knowledge         13:16:38
19    about how it's done, what the process is?     13:16:41
20         A.    Again, it's what we were           13:16:43
21    referring to earlier.  I would                13:16:46
22    occasionally help with the rates or the       13:16:48
23    math, but in terms of determining who was     13:16:49
24    on the team or their level of commitment      13:16:52
25    or how many hours that they were expected     13:16:55
```

```
 1              KELLY L. BRYSON
 2   to spend, no, I was not involved in that.      13:16:57
 3       Q.   Let's just talk about the            13:17:00
 4   rates and the math, all right, on this        13:17:02
 5   page.                                          13:17:04
 6       A.   Okay.                                 13:17:04
 7       Q.   So let's take Mr. Ashmore, the       13:17:04
 8   first one.  He's the first one of four        13:17:07
 9   people listed, right?                          13:17:09
10       A.   Yes.                                  13:17:11
11       Q.   Can you tell me why the four         13:17:11
12   people listed on that page do not really      13:17:23
13   correspond to the people listed on the        13:17:27
14   pursuit team on the previous page?            13:17:29
15       A.   I don't recognize two of the        13:17:34
16   four names here, so no, I can't, I can't      13:17:37
17   answer that definitively.                      13:17:44
18       Q.   And the two that you do not         13:17:45
19   recognize, would that be Laura Lampe and      13:17:46
20   Joyce Changery?                                13:17:49
21       A.   Yes.                                  13:17:51
22       Q.   You don't know what business        13:17:51
23   units they were from?                          13:17:53
24       A.   No.                                   13:17:54
25       Q.   All right, so let's just talk       13:17:55
```

KELLY L. BRYSON - 8/28/2014

Page 58

```
 1                    KELLY L. BRYSON
 2      about Mr. Ashmore primarily first.  It       13:17:58
 3      says -- what's supposed to be in the          13:18:03
 4      hours column where it says 20?               13:18:05
 5           A.    The hours that they're             13:18:08
 6      expected to work, or their estimated          13:18:09
 7      hours for that part of the pursuit            13:18:12
 8      process.                                      13:18:14
 9           Q.    Is that a total hour number        13:18:15
10      for the entire pursuit process?              13:18:17
11           A.    Well there's four different        13:18:19
12      swim lanes here.                             13:18:25
13           Q.    Four different columns along       13:18:26
14      the top you mean?                            13:18:27
15           A.    Yes.                               13:18:28
16           Q.    So in other words, he's            13:18:29
17      supposed to, he's expected or anticipated    13:18:30
18      to spend 20 hours managing the sale?         13:18:33
19           A.    Yes.                               13:18:35
20           Q.    60 hours in solution and           13:18:36
21      proposal development?                        13:18:37
22           A.    Yes.                               13:18:39
23           Q.    Is that 60 or 80?                  13:18:40
24           A.    It's 60.                           13:18:41
25           Q.    20 hours in other, right?          13:18:44
```

KELLY L. BRYSON - 8/28/2014

Page 59

```
 1                    KELLY L. BRYSON
 2         A.    Yes.                              13:18:47
 3         Q.    And then 20 hours in close,       13:18:47
 4    due diligence, right?                        13:18:49
 5         A.    Yes.                              13:18:50
 6         Q.    So that takes care of the         13:18:50
 7    hours.  Now the rate listed is 125 an        13:18:52
 8    hour for him?                                13:19:00
 9         A.    Yes.                              13:19:01
10         Q.    How is that rate calculated?      13:19:01
11         A.    I'm not sure.  In that            13:19:03
12    circumstance I can't be sure.                13:19:08
13         Q.    Well how is it generally          13:19:10
14    calculated?  You say you usually help        13:19:11
15    with rates on stuff like this?               13:19:13
16         A.    I occasionally help with          13:19:15
17    rates.                                       13:19:16
18         Q.    Occasionally, right.  So when     13:19:16
19    you do help with the rates, how do you       13:19:18
20    calculate or help calculate the rates        13:19:20
21    that go into this?                           13:19:23
22              MR. KLEIN:  I just want to         13:19:25
23         clarify because I'm a little            13:19:27
24         confused.  Are you talking about at     13:19:27
25         the pursuit budget stage?               13:19:30
```

KELLY L. BRYSON - 8/28/2014

Page 60

```
 1              KELLY L. BRYSON
 2         MR. HERBST:  I don't know, but        13:19:45
 3     the witness can help us clarify if        13:19:45
 4     that is something that you need to        13:19:48
 5     clarify in order to answer the           13:19:50
 6     question.  I would normally              13:19:52
 7     consider that a speaking objection,      13:19:57
 8     but I believe in good faith that         13:19:58
 9     you were attempting to clarify.  So      13:19:59
10     let me hear the answer, or the           13:20:02
11     question again, please.                  13:20:06
12          (Record read as requested.)         13:20:07
13     Q.    When I say this, I'm talking        13:20:13
14  about the rates in this pursuit budget.     13:20:15
15     A.    If the request is made of me       13:20:18
16  to use the specific people that are         13:20:21
17  listed and their actual rates, then I       13:20:25
18  would look up their salaries and I would    13:20:28
19  divide by 2200 hours per year and I would   13:20:31
20  add an amount for fringe that would --      13:20:36
21  and the sum of those numbers would total    13:20:39
22  their internal cost rate.                   13:20:41
23          But often for this purpose,         13:20:45
24  for opportunity budget purposes they        13:20:51
25  would use kind of generic rates which are   13:20:53
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2    what I suspect is what you're seeing          13:20:57
 3    here.  Because a lot of that information      13:21:00
 4    is obviously proprietary, you don't want      13:21:02
 5    to show up to a step review and have          13:21:05
 6    everybody see what your salary is and         13:21:08
 7    that's why the rates were genericized.        13:21:10
 8          Q.    Let's unpack that answer a        13:21:18
 9    little bit.  If you were asked, if you        13:21:19
10    were going to go the specific person's        13:21:25
11    salary route, you would look up their         13:21:30
12    salaries.  Where would you go to look up      13:21:33
13    their salaries?                               13:21:35
14          A.    HR database.                      13:21:35
15          Q.    The HR database?                  13:21:37
16          A.    Yes.                              13:21:38
17          Q.    And that has everybody's          13:21:39
18    salary in it?                                 13:21:41
19          A.    Yes.                              13:21:41
20          Q.    You divide by 2200 which is       13:21:41
21    the number of hours, right?                   13:21:56
22          A.    Yes.                              13:21:57
23          Q.    Then you said you would add       13:21:57
24    fringe?                                       13:22:00
25          A.    Yes.                              13:22:01
```

KELLY L. BRYSON - 8/28/2014

Page 62

```
 1                KELLY L. BRYSON
 2        Q.    What is fringe?                        13:22:01
 3        A.    Fringe is a percentage that we         13:22:03
 4   add on to salary costs that is intended           13:22:08
 5   to account for things such as vacation,           13:22:12
 6   holiday, medical insurance.                       13:22:17
 7        Q.    Vacation, holiday, medical             13:22:24
 8   insurance.  Anything else?                        13:22:25
 9        A.    There's a component of it for          13:22:32
10   profit participation.                             13:22:34
11        Q.    I just want to make sure I             13:22:38
12   understand you.  The profit participation         13:22:40
13   component is included in fringe?                  13:22:42
14        A.    An estimate is included in             13:22:44
15   fringe.  We never know the actual profit          13:22:46
16   participation amount until we know and            13:22:48
17   that's -- we're a year behind so we have          13:22:54
18   to do -- we generally did an adjustment.          13:22:58
19            But in general, at the time we           13:23:00
20   used a 33 percent fringe factor.                  13:23:03
21        Q.    That's the only factor you've          13:23:12
22   ever used during those years, 2009/2010?          13:23:17
23        A.    When estimating fringe at the          13:23:20
24   time for ISIT work, yes, that's what we           13:23:22
25   used.                                             13:23:24
```

KELLY L. BRYSON - 8/28/2014

Page 63

```
  1                 KELLY L. BRYSON
  2         Q.    How about for CGI Federal        13:23:25
  3    work?                                        13:23:28
  4         A.    That's the same.  It would        13:23:28
  5    have been the same.                          13:23:30
  6         Q.    It would be the same?             13:23:31
  7         A.    Yes.                              13:23:32
  8         Q.    How about BPS work?               13:23:32
  9         A.    I'm not sure.                     13:23:35
 10         Q.    So the ISIT fringe percentage    13:23:36
 11    would be the same whether it was a HUD       13:23:38
 12    contract or an HHS contract, it wouldn't     13:23:44
 13    matter; is that right?                       13:23:48
 14              MR. KLEIN:  Object to the          13:23:51
 15         form.                                   13:23:52
 16         A.    Yes, at that time if we were      13:23:52
 17    calculating something that was looking at    13:23:54
 18    fringe, yes, that was a generic number       13:23:56
 19    that we used.  We didn't calculate fringe    13:23:58
 20    specifically as a separate component at      13:24:01
 21    the time.                                    13:24:05
 22         Q.    So are you fairly confident       13:24:05
 23    that with respect to this $125 rate --       13:24:14
 24    well, withdrawn.                             13:24:19
 25              Can you tell whether or not        13:24:20
```

KELLY L. BRYSON - 8/28/2014

Page 64

```
 1                KELLY L. BRYSON
 2     this $125 rate would include the          13:24:21
 3     person's, Mr. Ashmore's fringe including  13:24:27
 4     all those components or whether it         13:24:30
 5     wouldn't?                                  13:24:31
 6           MR. KLEIN:  Object to the            13:24:32
 7        form.                                   13:24:33
 8        A.    The intention is that these       13:24:34
 9     should be fringe loaded rates.  Again,     13:24:35
10     these are generic rates, so yes, my        13:24:37
11     understanding is that these would be       13:24:40
12     fully fringe loaded rates.                 13:24:41
13        Q.    Now, you said that you think      13:24:42
14     these are generic rates, so we've sort of  13:24:46
15     departed from the set of questions I was   13:24:50
16     asking you earlier which is if you were    13:24:55
17     using actual rates?                        13:24:56
18        A.    Right.  Then yes, I would use     13:24:57
19     fringe.                                     13:25:01
20        Q.    You would use fringe, but         13:25:01
21     would the actual rate also be 33 percent   13:25:03
22     or would you try to ascertain how much     13:25:05
23     vacation, holiday, medical insurance and   13:25:11
24     an estimate of profit participation?       13:25:15
25           MR. KLEIN:  Object to the            13:25:18
```

KELLY L. BRYSON - 8/28/2014

Page 65

```
 1                    KELLY L. BRYSON
 2        form.  You can answer.                      13:25:19
 3        A.    I'm not sure I understand your        13:25:21
 4    question.  We just use 33 percent.  That        13:25:22
 5    was estimate of fringe that we used at          13:25:24
 6    the time.                                        13:25:29
 7        Q.    Okay.  Whether it's actual            13:25:29
 8    salaries that you were looking up or            13:25:34
 9    whether you were using generic rates?           13:25:36
10             MR. KLEIN:  Object to the              13:25:38
11        form.                                        13:25:40
12        A.    Yes, if I were using a generic        13:25:40
13    salary or a salary estimate, I would            13:25:42
14    still use the same fringe amount                13:25:43
15    regardless of if I was using an estimated       13:25:46
16    salary versus an actual salary.                 13:25:48
17        Q.    Because I thought when you            13:25:49
18    were testifying earlier you said if you         13:25:51
19    wanted to get an estimate of profit            13:25:53
20    participation you would consult last            13:25:54
21    year's profit participation of that             13:25:56
22    particular employee as an estimate?             13:26:00
23             MR. KLEIN:  Object to the              13:26:02
24        form.                                        13:26:03
25        A.    No.  No.  I'm sorry if that           13:26:03
```

KELLY L. BRYSON - 8/28/2014

Page 66

```
 1               KELLY L. BRYSON
 2   was not clear.                           13:26:05
 3        Q.   That's not true?               13:26:06
 4        A.   No.  The --                    13:26:07
 5             MR. KLEIN:  She answered.      13:26:12
 6        A.   I'm sorry.  I'm good.          13:26:13
 7        Q.   I thought you were --          13:26:15
 8        A.   I'm good.                      13:26:16
 9        Q.   Now would the compensation     13:26:17
10   other than profit participation be      13:26:27
11   included in fringe, such as commission if 13:26:30
12   a person were on commission, as well as  13:26:35
13   profit participation?                    13:26:37
14             MR. KLEIN:  Object to the      13:26:38
15        form.                               13:26:40
16        A.   There are a number of          13:26:43
17   non-salary compensation tools, some bonus 13:26:47
18   items may live in fringe.  I'm not sure   13:26:53
19   exactly where commission lives.  I don't  13:26:56
20   know if that lives in fringe or if it     13:26:58
21   lives in a sales budget.                  13:27:00
22        Q.   What other non-salaried        13:27:14
23   elements of compensation on occasion live 13:27:17
24   in fringe?                               13:27:20
25        A.   Things like a hiring bonus or  13:27:21
```

KELLY L. BRYSON - 8/28/2014

Page 67

```
 1              KELLY L. BRYSON
 2    retention bonus, one time bonus.  I mean        13:27:24
 3    there are a million different probably          13:27:30
 4    types of bonuses a person could receive         13:27:32
 5    for any different number of reasons, and        13:27:34
 6    those could live in fringe.  They could         13:27:36
 7    live elsewhere.                                 13:27:39
 8         Q.    Besides bonus and commission         13:27:43
 9    which you've already said might be in           13:27:46
10    fringe or might be in the sales budget,         13:27:48
11    what else, anything?                            13:27:50
12         A.    I don't know.                        13:27:51
13         Q.    You can't think of anything          13:27:56
14    right now?                                      13:27:57
15         A.    I can't think of anything            13:27:58
16    else.                                           13:27:59
17         Q.    What about stock options,            13:27:59
18    would that live in fringe?                      13:28:01
19         A.    I'm not sure.                        13:28:03
20         Q.    Who would know that?                 13:28:07
21         A.    Who would know that?  I would        13:28:08
22    probably direct you to the CGI Federal          13:28:17
23    controller.                                     13:28:20
24         Q.    Who would that be?                   13:28:21
25         A.    Scott Pfost.                         13:28:22
```

```
 1              KELLY L. BRYSON
 2        Q.    Now, since you testified these        13:28:31
 3   could either be actual rates or generic          13:28:39
 4   rates but you think they're generic              13:28:41
 5   rates, how do you, if you were going to          13:28:42
 6   decide to use a generic rate, how would          13:28:44
 7   you calculate the generic rate, where            13:28:46
 8   would you go to look to find it?                 13:28:48
 9        A.    I wouldn't do that.  They were        13:28:49
10   rates that were already in the template          13:28:51
11   and you just dropped down and it would           13:28:52
12   say if this, if you're representing a            13:28:55
13   vice president then this is a reasonable         13:28:58
14   rate, if you're representing a senior            13:29:00
15   manager.  I mean it's been a very long           13:29:02
16   time since I've been involved in anything        13:29:05
17   like this.  I don't recall with any              13:29:08
18   specificity more than what I've already          13:29:11
19   said.                                            13:29:14
20        Q.    Well, in 2009/2010, besides           13:29:14
21   you, would there have been anybody else          13:29:18
22   who would be able to answer that question        13:29:21
23   with more specificity?                           13:29:23
24           MR. KLEIN:  I'm going to                 13:29:27
25        object to the form.  Are you                13:29:28
```

KELLY L. BRYSON - 8/28/2014

Page 69

```
 1                  KELLY L. BRYSON
 2       talking about this specific              13:29:29
 3       document, or are you talking about       13:29:31
 4       what she did because I think             13:29:32
 5       there's some confusion here?             13:29:34
 6            MR. HERBST:  No, I don't think       13:29:35
 7       there's any confusion, but you are,      13:29:37
 8       again, you're interrupting the           13:29:39
 9       witness when she's trying to answer      13:29:40
10       the question.  You're attempting to      13:29:42
11       guide her.                               13:29:44
12            MR. KLEIN:  No, because you're       13:29:45
13       asking a question about a document       13:29:46
14       that she testified that she did not      13:29:48
15       prepare.                                 13:29:50
16            MR. HERBST:  I'm asking her          13:29:51
17       when she uses generic rates.             13:29:55
18            MR. KLEIN:  And she said she         13:29:57
19       doesn't do that.  You can ask your       13:29:59
20       next question.  Or whatever the          13:30:01
21       question is.                             13:30:03
22            MR. HERBST:  I'm going to go         13:30:04
23       back and I'm going to ask that the       13:30:05
24       question be reread to the witness.       13:30:06
25            (Record read as requested.)         13:30:08
```

KELLY L. BRYSON - 8/28/2014

Page 70

```
 1                   KELLY L. BRYSON
 2        A.    What is the question exactly?          13:30:21
 3              MR. HERBST:  Would you read            13:30:26
 4        back the previous question.                  13:30:27
 5              (Record read as requested.)            13:30:28
 6        A.    So the question is, in terms           13:30:51
 7   of this opportunity pursuit budget                13:30:55
 8   worksheet who determined what the generic         13:30:59
 9   rates were?                                        13:31:01
10        Q.    Yes.                                    13:31:01
11        A.    I don't know the answer to             13:31:02
12   that.  I would refer you to the PMO,              13:31:04
13   they're the ones in charge of this                13:31:10
14   template.                                          13:31:11
15        Q.    PMO, what does that stand for?         13:31:12
16        A.    Program or project management          13:31:14
17   office.                                            13:31:19
18        Q.    And in 2009, 2010, who ran             13:31:19
19   that?                                              13:31:27
20        A.    Kathleen Landers.                       13:31:31
21        Q.    Is she still employed?                  13:31:32
22        A.    As far as I know.                        13:31:34
23        Q.    At CGI?                                  13:31:35
24        A.    As far as I know.                        13:31:36
25        Q.    What is her position now?              13:31:37
```

KELLY L. BRYSON - 8/28/2014

Page 71

```
 1                KELLY L. BRYSON
 2        A.    I don't -- I don't know.  I --          13:31:39
 3        Q.    Is she still involved in                13:31:41
 4   program or project management?                     13:31:44
 5        A.    I don't know.                            13:31:47
 6              MR. HERBST:  I will request,            13:31:54
 7        Mr. Klein, if you identify her and           13:31:55
 8        what her duties are.  Just so that           13:31:56
 9        we can list that as a request.               13:32:01
10              (Request made.)                         13:32:01
11        Q.    Okay.  Now I think you                  13:32:04
12   testified that generic rates would               13:32:20
13   involve titles and templates like vice           13:32:30
14   president or senior manager, right?              13:32:33
15              MR. KLEIN:  Object to the              13:32:35
16        form.                                         13:32:36
17        A.    Right.                                  13:32:36
18        Q.    Now this page doesn't seem to          13:32:37
19   identify what their title or template            13:32:39
20   would be, so how would anybody fill in           13:32:43
21   the generic, would use generic rates as          13:32:49
22   opposed to actual rates?                          13:32:52
23        A.    Typically the person that              13:32:54
24   completes this is the opportunity pursuit        13:32:58
25   leader, and they should have the                 13:33:02
```

KELLY L. BRYSON - 8/28/2014

Page 72

```
 1                  KELLY L. BRYSON
 2    knowledge of what it is everyone is doing        13:33:05
 3    and what their approximate seniority or          13:33:07
 4    level is.  And since they don't have             13:33:10
 5    access to salary information, that's why         13:33:13
 6    the generic rates are there.  So they can        13:33:16
 7    say I know Joe is a senior subject matter        13:33:19
 8    expert, I may not know his salary, but I         13:33:30
 9    know generally he's a senior SME, so I'm         13:33:33
10    going to plug in $125 an hour.                   13:33:36
11            And again, that's why this               13:33:41
12    template, to my understanding, is written       13:33:44
13    to be generic because the person                 13:33:46
14    responsible for filling this out isn't           13:33:49
15    going to know salary information.                13:33:52
16        Q.    Except in Mr. Ashmore's case,          13:33:55
17    he was the project manager, right?               13:33:58
18            MR. KLEIN:  Object to the                 13:34:02
19        form.                                         13:34:03
20        A.    Yeah, I believe he was the             13:34:03
21    pursuit manager on this opportunity.             13:34:06
22        Q.    Account manager, that's the            13:34:08
23    same as pursuit manager, right?                  13:34:10
24        A.    Not necessarily.                        13:34:12
25        Q.    Where would the pursuit               13:34:13
```

KELLY L. BRYSON - 8/28/2014

Page 73

```
 1                    KELLY L. BRYSON
 2    manager be listed here?                        13:34:15
 3         A.    Opportunity pursuit leader is       13:34:26
 4    on slide -- the fourth slide on the            13:34:29
 5    right-hand side.                               13:34:32
 6         Q.    Do you see a page number on         13:34:33
 7    the bottom where it says 4 confidential,       13:34:35
 8    for example?                                   13:34:40
 9         A.    No, it's cut off.                   13:34:40
10         Q.    Okay, I see it, on the page         13:34:41
11    headed opportunity profile?                    13:34:43
12         A.    Correct.                            13:34:45
13         Q.    So he might know his own            13:34:45
14    salary rate, right?                            13:34:48
15         A.    Right.                              13:34:49
16         Q.    But he wouldn't necessarily         13:34:50
17    know what fringe to put in, right, and         13:34:52
18    all that stuff?                                13:34:55
19         A.    He may not know what fringe to      13:34:55
20    put in.  He may not know -- you know, he       13:34:57
21    will likely be working with a number of        13:35:00
22    people that don't work for him, for            13:35:02
23    example, a technical writer or a desktop       13:35:04
24    publisher, which he would likely not know      13:35:07
25    their salary information.  So that's           13:35:09
```

```
 1                   KELLY L. BRYSON
 2    where the generic rates are helpful.              13:35:11
 3         Q.    And he might or might not know         13:35:13
 4    what Panos Kyprianou makes, right, his            13:35:18
 5    salary?                                           13:35:22
 6         A.    Right.                                 13:35:22
 7         Q.    So he would have to call you           13:35:22
 8    or someone else to ask?                           13:35:24
 9         A.    Or he could use a generic              13:35:25
10    rate.                                             13:35:27
11         Q.    Where would he go to get a             13:35:27
12    generic rate?                                     13:35:28
13         A.    Again, I'm not certain.  I             13:35:29
14    believe that they were built into the            13:35:30
15    template, but I'm not certain.                    13:35:32
16         Q.    All right.                             13:35:32
17         A.    I mean and there is a footnote         13:35:42
18    down here that says estimated hourly rate         13:35:44
19    based on role.                                    13:35:46
20              MR. KLEIN:  Let's take a two            13:36:08
21         minute bathroom break.                       13:36:09
22              (A recess was taken.)                   13:36:12
23         Q.    You know you're still under            13:44:31
24    oath?                                             13:44:32
25         A.    Yes, sir.                              13:44:32
```

```
 1                    KELLY L. BRYSON
 2         Q.     Now I want to ask you about,          13:44:34
 3    right, Plaintiff's Exhibit 18 marked in a         13:44:40
 4    previous deposition.  And I want to              13:44:44
 5    direct your attention to the second page         13:44:51
 6    of that.  Do you see it's an email from          13:44:55
 7    Mr. Ashmore on May 21st, 2010 at 11:17           13:45:03
 8    a.m. to Scott Pfost and Rob Bowell,              13:45:07
 9    right?                                            13:45:11
10         A.     Yes.                                  13:45:11
11         Q.     Pfost being the controller?          13:45:11
12         A.     Yes.                                  13:45:14
13         Q.     And Rob Bowell who is who?  He       13:45:15
14    was who?                                          13:45:18
15         A.     He was one of the vice               13:45:19
16    presidents.                                       13:45:21
17         Q.     Why was he on this email?            13:45:21
18         A.     For approval purposes.               13:45:23
19         Q.     What role did he have that his       13:45:25
20    approval was required for an opportunity         13:45:28
21    like this?                                        13:45:30
22         A.     He was one of the account or         13:45:30
23    sector VPs that could approve --                  13:45:33
24         Q.     You say he was one of the            13:45:36
25    what?                                             13:45:38
```

KELLY L. BRYSON - 8/28/2014

Page 76

```
 1                  KELLY L. BRYSON
 2        A.     Account or sector VPs who          13:45:38
 3    would approve.                                13:45:41
 4        Q.     When you say account, you          13:45:43
 5    mean, what account?                           13:45:48
 6        A.     He would have been -- I'm not      13:45:49
 7    sure of his exact role.  I just know that     13:45:53
 8    he was a vice president at the time that      13:45:59
 9    lived in this account.                        13:46:02
10        Q.     What is an account vice            13:46:03
11    president or account manager?  What does      13:46:05
12    he do?                                        13:46:07
13        A.     Well like I said earlier, it       13:46:08
14    really depends on the size of the account.    13:46:10
15    A very large account could have several       13:46:14
16    VPs with varying responsibilities.  And       13:46:16
17    likewise, there could be one VP in charge     13:46:18
18    of a number of smaller accounts.  There's     13:46:23
19    not a specific.                               13:46:25
20        Q.     What's a sector VP as opposed      13:46:26
21    to an account VP?                             13:46:29
22        A.     They would typically be in         13:46:30
23    charge of a business unit.  So, for           13:46:34
24    example, there was, there was a sector VP     13:46:38
25    in charge of BPS or a sector VP in charge     13:46:44
```

KELLY L. BRYSON - 8/28/2014

Page 77

```
 1              KELLY L. BRYSON
 2   of ISIT.                                    13:46:47
 3        Q.    Have you seen this exhibit       13:46:49
 4   before?                                     13:46:50
 5        A.    Yes.                             13:46:50
 6        Q.    And when did you first see it?   13:46:51
 7        A.    It looks like 11/17 on Friday,   13:46:54
 8   May 21st, 2010.                             13:46:58
 9        Q.    Why was it sent to you?  Why     13:47:00
10   were you included as a cc on it?            13:47:03
11        A.    Typically pricing is included    13:47:05
12   as a courtesy to let us know that OMF       13:47:06
13   approval has been requested and so if       13:47:13
14   there are any questions that the            13:47:15
15   approvers have that we're copied on them    13:47:18
16   directly instead of getting it third hand   13:47:21
17   later.  It's easier just to keep            13:47:25
18   everybody that has a role in the pursuit    13:47:29
19   on the email chain.                         13:47:31
20        Q.    What does OMF stand for?         13:47:32
21        A.    Operation management             13:47:34
22   framework.                                  13:47:36
23        Q.    What does that mean?             13:47:37
24        A.    That's just another word for    13:47:38
25   -- I mean that's shorthand and often       13:47:42
```

KELLY L. BRYSON - 8/28/2014

Page 78

```
 1              KELLY L. BRYSON
 2    interchanged for the executive step        13:47:46
 3    review process or step C approval.         13:47:49
 4         MR. KLEIN:  Rob, we did this a        13:47:58
 5         year ago with some of these           13:48:01
 6         documents, but it's our understanding 13:48:02
 7         that some of the funky characters and 13:48:04
 8         question marks and things of that     13:48:07
 9         nature that may appear on this        13:48:08
10         document were not on the document     13:48:10
11         when Mr. Ashmore sent the email.      13:48:12
12         Rather, in some printing that's where 13:48:15
13         those characters appeared.            13:48:18
14         Q.   Did you review this document     13:48:37
15    again in preparation for your testimony?   13:48:39
16         A.   Yes.                             13:48:40
17         Q.   When?                            13:48:40
18         A.   Back when we were initially      13:48:41
19    preparing for the deposition, which        13:48:47
20    again, I'm not sure, but I believe was     13:48:50
21    somewhere in the April/May time frame.     13:48:52
22         Q.   And then again?                  13:48:55
23         A.   More recently in preparation     13:48:56
24    for today.                                 13:48:58
25         Q.   How recently?                    13:49:00
```

```
 1                  KELLY L. BRYSON

 2         A.    Within the last two weeks.          13:49:01

 3         Q.    What determines the labor           13:49:13

 4   category into which employees are placed        13:49:14

 5   when CGI is pursuing an opportunity?            13:49:17

 6              MR. KLEIN:  Could you read           13:49:30

 7         that back.                                13:49:30

 8              (Record read as requested.)          13:49:31

 9              MR. KLEIN:  Object to the            13:49:32

10         form.                                     13:49:33

11         A.    The description and any             13:49:33

12   associated qualifications for the labor         13:49:38

13   category are what determines who may be         13:49:41

14   eligible.  As far as placing specific           13:49:44

15   members into a labor category, that is          13:49:48

16   often the responsibility of the project         13:49:50

17   or account team.                                13:49:53

18         Q.    Do you have any role in that?       13:49:56

19         A.    No.                                 13:49:57

20         Q.    So once they're placed in the       13:49:58

21   category then you helped provide the            13:50:01

22   rates and the math?                             13:50:02

23         A.    Correct.                            13:50:03

24         Q.    What determines the labor           13:50:08

25   category into which employees are placed        13:50:10
```

KELLY L. BRYSON - 8/28/2014

Page 80

```
 1                  KELLY L. BRYSON
 2      once CGI Federal has won an opportunity          13:50:12
 3      and is performing the work of the                13:50:15
 4      contract and invoicing the client?              13:50:16
 5           A.   It's the same process.  There         13:50:17
 6      may be a client or a prime vetting               13:50:21
 7      process also where we propose a resource         13:50:24
 8      and a category, the prime may say no, I          13:50:29
 9      don't like that person, but the process         13:50:32
10      doesn't change.                                  13:50:35
11           Q.   Are there any procedures at            13:50:36
12      CGI Federal to ensure that the employees        13:50:38
13      identified in labor categories at the bid       13:50:41
14      stage are the same as when they're              13:50:44
15      invoicing the client after the bid is,          13:50:46
16      the opportunity is won?                          13:50:49
17                MR. KLEIN:  Object to the              13:50:52
18           form.                                       13:50:53
19           A.   What I would -- I would answer        13:50:53
20      that to say that there are often                 13:50:59
21      requirements for what are called key             13:51:04
22      personnel that have a time commitment or        13:51:06
23      a length of service commitment that when         13:51:11
24      we are bidding an opportunity, if we are         13:51:14
25      proposing someone as key, it's expected         13:51:17
```

KELLY L. BRYSON - 8/28/2014

Page 81

```
1                    KELLY L. BRYSON
2      that they show up, that they are the          13:51:19
3      person that we are delivering.                13:51:22
4            If a person is not proposed as          13:51:23
5      key, then no, we have no responsibility       13:51:25
6      to deliver that particular person.            13:51:28
7            Q.   And where in the documentation     13:51:30
8      would we find the designation of a person     13:51:38
9      as key?                                        13:51:42
10               MR. KLEIN:  Object to the           13:51:43
11          form.                                     13:51:44
12           A.   Typically, that would be           13:51:44
13      included as part of our proposal             13:51:47
14      submission in an org chart or something      13:51:49
15      like that.                                    13:51:54
16           Q.   Now, with respect to the           13:51:56
17      second page of Plaintiff's Exhibit 18,       13:52:01
18      you see there are names of specific          13:52:04
19      individuals listed on the right-hand side    13:52:06
20      for certain categories?                       13:52:09
21           A.   Yes.                                13:52:10
22           Q.   Is that an indication that         13:52:11
23      those are the people who were expected to    13:52:13
24      perform the work if the bid is won?          13:52:17
25               MR. KLEIN:  Object to the           13:52:22
```

KELLY L. BRYSON - 8/28/2014

Page 82

```
 1                 KELLY L. BRYSON
 2        form.                                    13:52:23
 3        A.    My understanding and               13:52:23
 4   recollection is that these are                13:52:24
 5   representative names of people who could      13:52:25
 6   perform the work, but not that we would       13:52:27
 7   necessarily be delivering.                    13:52:31
 8        Q.    What makes you think that as       13:52:34
 9   you sit here now?                             13:52:39
10        A.    Just my recollection of this       13:52:40
11   particular deal.  Also, you'll notice in      13:52:43
12   the document it says we are providing a       13:52:47
13   rate card.                                    13:52:50
14        Q.    Where is that?                      13:52:53
15        A.    The highlighted section in the     13:52:53
16   bold area.                                     13:52:56
17        Q.    The preliminary rate card?          13:52:56
18        A.    Preliminary rate card.  And so     13:52:58
19   we've not -- that says to me that we have      13:53:01
20   not negotiated any specific scope of work      13:53:04
21   or specific tasking.  So these people may      13:53:07
22   not be appropriate for the ultimate scope      13:53:11
23   that we end up with.                           13:53:14
24             MR. HERBST:  Let's have this         13:53:53
25        one marked as Bryson Exhibit 7.           13:53:55
```

KELLY L. BRYSON - 8/28/2014

Page 83

```
 1              KELLY L. BRYSON
 2         (Bryson Exhibit 7 for                    13:53:57
 3      identification, document titled
 4      Part III - Oral technical quote
 5      presentation, business consulting
 6      services blanket purchase agreement
 7      in support of: The Department of
 8      Housing and Urban Development's
 9      (HUD's) Transformative Initiative.)       13:54:38
10         MR. HERBST:  Would you mark            13:54:38
11      this as Bryson Exhibit 8.                 13:54:39
12         (Bryson Exhibit 8 for                  13:54:43
13      identification, document titled           13:54:43
14      Sample Task Order 4: Housing Choice       13:54:43
15      Voucher Program Phase III,                13:54:43
16      Recommended Solution Analysis.)           13:54:44
17         MR. KLEIN:  Before you ask any         13:54:44
18      questions, Mr. Herbst, would you          13:54:45
19      happen to be aware of the Bates           13:54:47
20      numbers, where in the production          13:54:48
21      the documents came?                       13:54:50
22         MR. HERBST:  I am not, I'm not         13:54:51
23      even aware, I'm not aware of that         13:54:53
24      so I cannot help you.  But                13:54:56
25      afterwards I will endeavor to find        13:54:58
```

```
 1                  KELLY L. BRYSON
 2         out, if you prompt me because I may      13:55:00
 3         forget.                                  13:55:10
 4              MR. KLEIN:  The next question       13:55:11
 5         is do you know if these documents        13:55:12
 6         came from the CGI production?            13:55:13
 7              MR. HERBST:  I don't, but I'm        13:55:15
 8         happy to try to answer that             13:55:16
 9         question as well.                        13:55:18
10              Q.    Let's look at Bryson 7 first. 13:55:22
11     Are you familiar with this?                  13:55:25
12              A.    No.                            13:55:26
13              Q.    You've never seen this        13:55:26
14     document before?                             13:55:27
15              A.    Not that I recall.            13:55:28
16              Q.    How about Bryson 8?           13:55:28
17              A.    No.                            13:55:31
18              Q.    Since you do have a           13:55:33
19     recollection of this opportunity and        13:55:38
20     you've looked at documents relating to      13:55:41
21     this opportunity, can you by looking at     13:55:43
22     the documents attest to the fact that       13:55:48
23     these documents relate to that             13:55:50
24     opportunity?                                 13:55:52
25              A.    Yes.  I mean the titles are   13:55:53
```

KELLY L. BRYSON - 8/28/2014

Page 85

```
 1                KELLY L. BRYSON
 2   the same.                                    13:55:57
 3        Q.    Do you have a recollection if     13:55:57
 4   these involved, this was a HUD               13:56:02
 5   opportunity?                                 13:56:04
 6        A.    Yes.                              13:56:04
 7        Q.    And do you have a recollection    13:56:04
 8   it involved a transformation initiative      13:56:07
 9   for HUD?                                     13:56:10
10        A.    Yes, again, I mean that's the     13:56:11
11   title of the opportunity.                    13:56:13
12        Q.    I mean you testified before       13:56:14
13   about transformation opportunities and       13:56:16
14   initiatives.  Since you have some            13:56:20
15   recollection apart from documents about      13:56:21
16   the opportunity, do you remember that        13:56:23
17   that's what this opportunity involved?       13:56:25
18            MR. KLEIN:  Object to the           13:56:28
19        form.                                   13:56:29
20        A.    I mean I often don't get          13:56:29
21   involved specifically in the detailed        13:56:31
22   scope.                                       13:56:37
23        Q.    I understand.  I'm just asking    13:56:38
24   whether you have a recollection that this    13:56:39
25   opportunity did involve a transformation     13:56:41
```

KELLY L. BRYSON - 8/28/2014

Page 86

```
 1                   KELLY L. BRYSON
 2    initiative?                                13:56:46
 3         A.    Yes.                            13:56:46
 4         Q.    And do you have a recollection  13:56:47
 5    that there was a recommended solution      13:56:51
 6    analysis for Housing Choice Voucher        13:56:56
 7    Program Phase III?  Take a look at Bryson  13:57:02
 8    8.                                         13:57:04
 9         A.    I don't recall that             13:57:08
10    specifically, no.                          13:57:09
11         Q.    Now, take a look at page 89 of  13:57:09
12    Exhibit 8.  The number is in the lower     13:57:32
13    right-hand corner.                         13:57:35
14         A.    Yes.                            13:57:37
15         Q.    You moved right to that one.    13:57:37
16    All right.  So you see Nancy Dowdy at the  13:57:39
17    bottom, right?                             13:57:42
18         A.    Yes.                            13:57:42
19         Q.    And this page is headed, or     13:57:44
20    the slide is headed rationale for          13:57:46
21    choosing key personnel, right?             13:57:49
22         A.    Yes.                            13:57:51
23         Q.    It says key personnel, right?   13:57:52
24         A.    Yes.                            13:57:54
25         Q.    Is it fair to assume that by    13:57:54
```

```
 1              KELLY L. BRYSON
 2   designating these people key personnel      13:57:56
 3   that CGI was basically saying these were    13:57:59
 4   the folks that were going to perform the    13:58:01
 5   work?                                        13:58:03
 6           MR. KLEIN:  Object to the           13:58:04
 7       form.                                    13:58:05
 8       A.   CGI was not.  ICF was saying       13:58:05
 9   it.                                          13:58:07
10       Q.   ICF was saying it?                 13:58:07
11       A.   Yes.                                13:58:08
12       Q.   ICF was the prime, right?          13:58:09
13       A.   Yes.                                13:58:11
14       Q.   And CGI was the secondary?         13:58:11
15       A.   Yes.                                13:58:14
16       Q.   Is it fair to say ICF would        13:58:14
17   not be representing to HUD that these        13:58:17
18   people were key personnel unless CGI had     13:58:19
19   identified them as such?                     13:58:22
20       A.   Correct.                            13:58:23
21           MR. KLEIN:  Object to the           13:58:23
22       form.                                    13:58:24
23       Q.   Okay.  So these were the           13:58:25
24   people that CGI and ICF were promising or    13:58:28
25   promised to HUD were going to do the         13:58:32
```

KELLY L. BRYSON - 8/28/2014

Page 88

```
 1                  KELLY L. BRYSON
 2    work, right?                                    13:58:35
 3              MR. KLEIN:  Object to the             13:58:36
 4        form.                                       13:58:37
 5        A.    We were promising that they           13:58:37
 6    would be part of the overall solution           13:58:38
 7    team, but I can also say that key               13:58:41
 8    personnel requirements vary.  Sometimes         13:58:45
 9    they're quarter personnel.  Like there's        13:58:50
10    not a consistent definition of key             13:58:52
11    personnel.  Some are very strict that you       13:58:54
12    must be full time on a project for a year       13:58:56
13    unless you have client permission to            13:58:59
14    change.  Some are, you promise to deliver       13:59:01
15    one hour of this person at some point in        13:59:03
16    that project.  And I don't know the             13:59:06
17    requirements for this particular               13:59:08
18    opportunity, what this meant in terms           13:59:09
19    of...                                           13:59:15
20        Q.    Take a look at Nancy Dowdy in         13:59:15
21    the last.  She's the same person that's         13:59:17
22    listed as the second person under senior        13:59:20
23    business analyst, correct?                      13:59:22
24        A.    Correct.                              13:59:23
25        Q.    All right.  So my question is         13:59:24
```

KELLY L. BRYSON - 8/28/2014

Page 89

```
 1                KELLY L. BRYSON
 2    is it fair to say that in terms of this        13:59:34
 3    calculation that was being done or the         13:59:38
 4    rates that were being generated in             13:59:40
 5    Plaintiff's Exhibit 18, that these rates       13:59:44
 6    were specifically for Dowdy as well as         13:59:46
 7    Conklin?                                        13:59:50
 8             MR. KLEIN:  Object to the             13:59:53
 9         form.                                      13:59:55
10         A.    I would answer that to say          13:59:55
11    these rates were informed by the               13:59:57
12    personnel names, but they were not             14:00:02
13    derived specifically to account for any        14:00:05
14    one individual or two individuals.             14:00:07
15         Q.    Why don't you spell it out for      14:00:15
16    us a little.  What do you mean it was          14:00:19
17    informed by but not derived from?              14:00:21
18         A.    I would look -- as you can          14:00:23
19    tell here, there's not an example person       14:00:24
20    or people for each category.  So I, to         14:00:26
21    the extent that I was provided a               14:00:30
22    representative name I would look at that       14:00:32
23    person's salary and I would keep that in       14:00:35
24    mind when I developed the rate but I           14:00:37
25    didn't base the rate off of their salary.      14:00:43
```

KELLY L. BRYSON - 8/28/2014

Page 90

```
 1                    KELLY L. BRYSON
 2               You know, oftentimes when I'm          14:00:44
 3     given personnel like this the salaries          14:00:47
 4     can vary widely.  For example, one sample       14:00:50
 5     person could make $80,000.  The other           14:00:54
 6     person could make $120,000.  And I use as       14:00:56
 7     part of my judgment looking at the              14:00:59
 8     description and based on my knowledge of        14:01:01
 9     the labor market to develop a rate that I       14:01:04
10     believe is accurate and appropriate for        14:01:08
11     the role that we're bidding.                    14:01:12
12          Q.    But you're testifying, as I          14:01:13
13     understand what you just said, that for         14:01:16
14     -- to derive this rate of 140.11 you            14:01:21
15     would have looked at Dowdy's salary?            14:01:26
16          A.    Yes.                                 14:01:28
17          Q.    And you would have looked at         14:01:28
18     Conklin's salary?                               14:01:30
19          A.    Yes.                                 14:01:32
20          Q.    Where in the database would          14:01:32
21     you have gone to look up those salaries,        14:01:34
22     the HR database you talked about before?        14:01:37
23          A.    Yes.                                 14:01:39
24          Q.    Does CGI still have the              14:01:43
25     information as to what those salaries           14:01:45
```

KELLY L. BRYSON - 8/28/2014

Page 91

```
 1                  KELLY L. BRYSON
 2    were at the time of this in May of 2010?          14:01:47
 3         A.    You would have to contact HR.          14:01:49
 4         Q.    To your knowledge, they would          14:01:52
 5    have that, they would retain that                 14:01:53
 6    information in their data, right?                  14:01:55
 7         A.    I would think so.                       14:01:57
 8         Q.    So you could go back and we             14:01:58
 9    could go back and figure out when you              14:02:03
10    looked at what the salaries were, what             14:02:04
11    they were, right?                                  14:02:06
12         A.    Yes, presumably.                        14:02:09
13         Q.    Now you said you don't know             14:02:10
14    whether, whether these two salaries for            14:02:12
15    Conklin and Dowdy were different or not            14:02:15
16    and how much different they were, right?           14:02:17
17              MR. KLEIN:  Object to the                14:02:19
18         form.                                         14:02:20
19         A.    Correct, correct.                       14:02:21
20         Q.    So you can't really tell what           14:02:21
21    you did for the salary component of this           14:02:23
22    rate, right, you don't know whether you            14:02:25
23    actually used those two and divided them           14:02:28
24    or --                                              14:02:31
25         A.    I can tell you I did not do             14:02:32
```

KELLY L. BRYSON - 8/28/2014

Page 92

```
 1              KELLY L. BRYSON
 2    that.  That's not how our rates -- that's     14:02:34
 3    not how these rates were -- sorry.  These     14:02:38
 4    rates were derived using a methodology        14:02:41
 5    that did not account specifically for any     14:02:43
 6    of these individuals.                         14:02:45
 7         Q.   But you did look at what the        14:02:47
 8    rates were, at what their salaries were?      14:02:49
 9         A.   Yes.                                14:02:51
10              MR. HERBST:  I'm going to call      14:02:54
11         for, request, the salaries of           14:02:55
12         Conklin, Dowdy --                        14:02:57
13         Q.   By the way, is that true for       14:02:59
14    Ashbrook and Ahmed, and all these people     14:03:01
15    on the list, you would have at some point    14:03:02
16    looked at what their salary was?             14:03:03
17         A.   I would have looked at them.       14:03:06
18              MR. HERBST:  I'm going to          14:03:08
19         request the actual salaries of all      14:03:09
20         of these people which I'm assuming      14:03:11
21         CGI still has in their database.        14:03:13
22              (Request made.)                    14:03:13
23              MR. KLEIN:  We'll deal with        14:03:23
24         our responses to those requests at     14:03:23
25         the time, I'm not going to put it      14:03:26
```

KELLY L. BRYSON - 8/28/2014

Page 93

```
 1                KELLY L. BRYSON
 2         on the record or anything of that      14:03:28
 3         nature.                                 14:03:29
 4              MR. HERBST:  Let's not waste       14:03:29
 5         time.  But in light of the amount       14:03:31
 6         of time left, let's do it sooner        14:03:35
 7         rather than later.                      14:03:37
 8              MR. KLEIN:  Why don't you          14:03:40
 9         finish the deposition and after you     14:03:41
10         get your list of requests you'll        14:03:43
11         make a determination as to what         14:03:45
12         exactly you think you may need --       14:03:46
13              MR. HERBST:  I'm requesting        14:03:48
14         them, but we'll give you the list       14:03:49
15         shortly after the completion of the     14:03:51
16         deposition.                             14:03:52
17         Q.    So let's take that 140.11         14:04:00
18    rate.  Tell me -- by the way, you don't      14:04:09
19    have an actual recollection of what you      14:04:12
20    did as you sit here now to derive this       14:04:14
21    rate, do you?                                14:04:16
22         A.    I do.                             14:04:17
23         Q.    You do have an actual             14:04:17
24    recollection as you sit here of all the      14:04:19
25    steps you took to derive this rate?          14:04:20
```

KELLY L. BRYSON - 8/28/2014

Page 94

```
 1                KELLY L. BRYSON
 2        A.    Yes.                              14:04:22
 3        Q.    Tell us first of all, who        14:04:22
 4    requested these rates from you?            14:04:26
 5              MR. KLEIN:   Object to the       14:04:28
 6        form.                                  14:04:29
 7        A.    I'm not sure specifically who    14:04:30
 8    made the initial request.                  14:04:32
 9        Q.    You don't remember the           14:04:33
10    request?                                   14:04:34
11        A.    Not the initial request, no.     14:04:35
12        Q.    So you can't tell us at all      14:04:36
13    who made them, who made the request?       14:04:40
14        A.    No.                              14:04:42
15        Q.    Who would normally make the      14:04:42
16    request?                                   14:04:46
17        A.    Either the opportunity pursuit   14:04:46
18    leader or the person that's in charge of   14:04:50
19    staffing.                                  14:04:53
20        Q.    And can you tell, do you have    14:04:54
21    any recollection of who those people       14:04:56
22    were, the opportunity pursuit leader or    14:04:58
23    the person in charge of staffing?          14:05:00
24        A.    I'm not certain for this         14:05:02
25    opportunity.                               14:05:03
```

```
 1                 KELLY L. BRYSON
 2        Q.    Well you're not certain, I          14:05:03
 3   understand, but can you shed any light on       14:05:06
 4   it or do you have any recollection of who       14:05:09
 5   they might be?                                  14:05:11
 6        A.    My sense is it was probably          14:05:12
 7   Mr. Ashmore or someone that he worked           14:05:13
 8   closely with.                                   14:05:15
 9        Q.    So tell us, after getting --         14:05:16
10   would this come to you by telephone or by       14:05:28
11   email, generally?                               14:05:31
12        A.    Typically by email.                  14:05:32
13        MR. HERBST:  You may well have             14:05:33
14        produced this already, but if you          14:05:36
15        haven't, I'm going to request the          14:05:38
16        email that shows what the request          14:05:39
17        was.                                       14:05:43
18             (Request made.)                       14:05:43
19        Q.    And then you'd have an email          14:05:45
20   exchange with that person where you would       14:05:46
21   tell him what the rates are?                    14:05:48
22        A.    Typically, yes.                      14:05:49
23        MR. HERBST:  I'll ask for all             14:05:51
24        emails that pertain to the request         14:05:54
25        for these rates from or to Ms.             14:05:56
```

KELLY L. BRYSON - 8/28/2014

Page 96

```
 1              KELLY L. BRYSON
 2       Bryson or anybody else who would be            14:06:01
 3       involved in the process.                       14:06:02
 4              (Request made.)                          14:06:07
 5       Q.    Would there be anybody else             14:06:07
 6  besides you or the opportunity pursuit              14:06:08
 7  leader or the person in charge of                    14:06:10
 8  staffing who would be emailing about what            14:06:12
 9  the rates were?                                       14:06:14
10       A.    Possibly.                                 14:06:15
11       Q.    Who might that be?                        14:06:16
12       A.    It could be the controller.              14:06:18
13  It could be the account vice president.             14:06:21
14              MR. HERBST:  I'll just ask               14:06:26
15       that those accounts around this                 14:06:28
16       time be checked just to see if any             14:06:30
17       of these people had any input.                 14:06:34
18              (Request made.)                          14:06:34
19       Q.    But if they didn't have any             14:06:36
20  input it would just be the opportunity              14:06:38
21  pursuit manager and you would who provide           14:06:39
22  the rates, correct?                                  14:06:45
23       A.    Yes.                                      14:06:45
24       Q.    So tell us what you would do              14:06:50
25  when you got the first call, or what you            14:06:54
```

KELLY L. BRYSON - 8/28/2014

Page 97

```
 1              KELLY L. BRYSON
 2    did when you got the first call asking        14:06:57
 3    you for the rates?                            14:06:59
 4         A.    What I would do is I would         14:07:03
 5    request the solicitation materials.           14:07:05
 6         Q.    And what are those?                14:07:08
 7         A.    Those are the RFP documents        14:07:09
 8    either from the government or the prime       14:07:11
 9    contractor.                                   14:07:14
10         Q.    And in the course of your          14:07:14
11    preparation for this testimony have you       14:07:23
12    reviewed the solicitation material?           14:07:25
13         A.    I reviewed some information        14:07:27
14    from ICF.                                     14:07:31
15         Q.    What's CF?                         14:07:33
16         A.    ICF, from ICF, the prime.          14:07:34
17         Q.    Did that include the               14:07:37
18    solicitation material in the RFP             14:07:39
19    documents from ICF?                           14:07:41
20         A.    It was not a complete             14:07:42
21    solicitation package, but there were some    14:07:44
22    solicitation materials.  I reviewed          14:07:47
23    specifically the part where it talked         14:07:49
24    about labor categories and descriptions.     14:07:50
25         Q.    Are you confident that that,       14:07:52
```

KELLY L. BRYSON - 8/28/2014

Page 98

```
 1                   KELLY L. BRYSON
 2    what you reviewed was, what you reviewed          14:07:55
 3    in preparation for the deposition was            14:07:58
 4    what you reviewed at the time when you           14:07:59
 5    were requested to provide the rates?             14:08:02
 6              MR. KLEIN:  Object to the               14:08:04
 7         form.                                        14:08:05
 8         A.   Yes.                                    14:08:05
 9         Q.   And what documents --                   14:08:06
10              MR. HERBST:  I assume these             14:08:10
11         have been provided to us, right?             14:08:12
12         Q.    I'm going to show you those,           14:08:29
13    but so we can understand the process,            14:08:30
14    tell us what you did when you reviewed           14:08:32
15    these materials from ICF?  What did you          14:08:34
16    look for in the materials and what did           14:08:36
17    you do?                                           14:08:38
18         A.   I looked for the type of                14:08:38
19    contract.                                         14:08:40
20         Q.   Meaning what?                           14:08:42
21         A.    Is it time and materials, is           14:08:43
22    it cost reimbursable, is it fixed price.         14:08:46
23         Q.   And did you ascertain that             14:08:50
24    this was a time and materials contract?         14:08:51
25         A.   My understanding was it was            14:08:53
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2    time and materials and that we were          14:08:54
 3    providing a rate card.                        14:08:56
 4         Q.    In fact on this page of            14:09:02
 5    Exhibit 18 it says time and materials and     14:09:03
 6    it says pricing type, right?                  14:09:05
 7         A.    Yes.                                14:09:07
 8         Q.    So there's no doubt in your        14:09:07
 9    mind it was a time and materials              14:09:09
10    contract, right?                              14:09:11
11         A.    Right.                             14:09:11
12         Q.    So you ascertained it was a        14:09:12
13    time and materials contract and that you      14:09:14
14    were going to provide a rate card and         14:09:16
15    then what did you do?                          14:09:18
16         A.    I reviewed the labor categories    14:09:19
17    and labor category descriptions.              14:09:21
18         Q.    Where did you find those?          14:09:24
19         A.    In the materials provided by       14:09:25
20    ICF.                                           14:09:31
21         Q.    And then?                           14:09:32
22         A.    And then I likely would have       14:09:33
23    asked if there were any representative        14:09:37
24    personnel that we planned to put into         14:09:40
25    those roles which is where these names        14:09:43
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    came from.                              14:09:45
 3         Q.    And then?                    14:09:50
 4         A.    Once I had that information I 14:09:51
 5    would have started to develop the rates. 14:09:52
 6         Q.    What did you do to develop the 14:09:56
 7    rates?                                  14:09:59
 8         A.    The first thing I do is I take 14:09:59
 9    the matrix which you have a copy of over 14:10:03
10    there and I begin the mapping process.  14:10:07
11         Q.    What is involved in the      14:10:13
12    mapping process?                        14:10:14
13         A.    So we have at CGI a list of  14:10:15
14    internal roles that at a high level align 14:10:20
15    with the type of work that each         14:10:25
16    individual does and a leverage level or a 14:10:28
17    band that aligns to their relative      14:10:33
18    seniority within CGI.  And so, for      14:10:38
19    example, we could have a business analyst 14:10:42
20    level 8 and so if I am creating a labor 14:10:46
21    rate for a business analyst as I did    14:10:50
22    here, I would have created a blend of   14:10:53
23    some amount of our business analyst     14:10:56
24    internal role.  If I had that document I 14:10:59
25    could show you.                         14:11:04
```

KELLY L. BRYSON - 8/28/2014

Page 101

```
 1                KELLY L. BRYSON
 2        Q.    We're going to get into the          14:11:05
 3   documents.  So then you would come up           14:11:09
 4   with a blend and then what?                      14:11:10
 5        A.    So once I came up with my             14:11:15
 6   blended direct labor rate which would            14:11:17
 7   account for the salary, I would add our          14:11:19
 8   indirect rates.                                  14:11:21
 9        Q.    So the direct labor rate is           14:11:24
10   just the salary?                                 14:11:26
11        A.    Yes.                                  14:11:27
12        Q.    And then you would add the            14:11:27
13   indirect rates?                                  14:11:32
14        A.    Yes.                                  14:11:32
15        Q.    The indirect labor rates?             14:11:32
16        A.    Indirect rates.                       14:11:34
17        Q.    And how would you calculate or        14:11:35
18   identify the items going into the                14:11:38
19   indirect labor rates?                            14:11:42
20             MR. KLEIN:  Object to the              14:11:44
21        form.                                       14:11:45
22        A.    I'm not involved in                   14:11:45
23   calculating the indirect rates.  The             14:11:48
24   indirect rates are calculated and                14:11:51
25   submitted to the government each year and        14:11:54
```

KELLY L. BRYSON - 8/28/2014

```
 1                KELLY L. BRYSON
 2    the government reviews and provides          14:11:57
 3    approval for us to use those rates.  So      14:12:00
 4    once we receive that approval from the       14:12:03
 5    government we use those rates that have      14:12:05
 6    been reviewed and approved until notified    14:12:07
 7    otherwise.                                   14:12:10
 8         Q.    And what?                         14:12:10
 9         A.    Until notified otherwise.         14:12:12
10    Either because we've moved into the next     14:12:14
11    fiscal year or there's been a material       14:12:16
12    change or the government doesn't approve.    14:12:19
13    But those rates are set typically in the     14:12:21
14    beginning of the year and that's what we     14:12:24
15    use.                                         14:12:26
16         Q.    And where do you go to find       14:12:26
17    those rates, those indirect rates?           14:12:31
18         A.    They come from our contracts      14:12:33
19    or compliance department.                    14:12:36
20         Q.    So you would call them up or      14:12:37
21    you would just call them up on the           14:12:41
22    computer, how would you do it?               14:12:43
23         A.    I would save the file that was    14:12:44
24    submitted to the government or the rate      14:12:46
25    letter from the government that approved     14:12:47
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2     the rates.                                    14:12:49
 3          Q.   And that would give you what,       14:12:56
 4     one number for indirect rate that you         14:12:58
 5     would add to the direct rate or would         14:13:00
 6     there be several different numbers?           14:13:02
 7               MR. KLEIN:  Object to the           14:13:04
 8          form.                                    14:13:05
 9          A.   For purposes of this                14:13:05
10     opportunity, there was an overhead rate       14:13:07
11     and G&A rate.                                 14:13:09
12          Q.   Anything else?                      14:13:10
13          A.   There was likely a fee amount.      14:13:16
14          Q.   Anything else?                      14:13:22
15          A.   I don't believe so.                 14:13:23
16          Q.   So would those three elements       14:13:23
17     be available to you in this rate letter?      14:13:28
18          A.   From the government?                14:13:33
19          Q.   Yes.                                14:13:33
20          A.   The overhead and G&A would,         14:13:34
21     yes.  Fee is discretionary.                   14:13:37
22          Q.   Who would you consult or what       14:13:43
23     would you consult to determine what, if       14:13:47
24     any, fee amount to add?                       14:13:49
25          A.   I would consult with the            14:13:50
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    project team.  I would usually propose a        14:13:53
 3    number based on my experience that seemed       14:13:57
 4    appropriate for the type of work and then       14:14:00
 5    would work with the team to finalize that       14:14:04
 6    number depending on margin goals.               14:14:06
 7    Sometimes we are directed by the prime          14:14:10
 8    what fee amount to include.                     14:14:13
 9         Q.    Do you remember if you were          14:14:19
10    directed by the prime in this case?             14:14:20
11         A.    I don't recall.                      14:14:21
12         Q.    And you don't recall what            14:14:22
13    input the team had in deriving that rate?       14:14:25
14         A.    I know the final fee amount is       14:14:29
15    listed on the worksheet.  I don't recall        14:14:31
16    what it was off the top of my head.             14:14:33
17         Q.    But my question is do you            14:14:34
18    recall whether that's the rate you             14:14:37
19    suggested or is that the rate that the          14:14:38
20    team came up with after your suggestion?        14:14:40
21         A.    I don't recall.                      14:14:42
22         Q.    Do you have any notes or any         14:14:42
23    emails that would determine that?               14:14:46
24         A.    No, probably not.                    14:14:48
25         Q.    Have you looked?                      14:14:50
```

```
 1                KELLY L. BRYSON
 2      A.    No.                              14:14:52
 3            MR. HERBST:  I'll request the    14:14:55
 4      emails relating to the derivation      14:14:57
 5      of the rates in this rate card --      14:15:01
 6      Q.    This is a rate card; is that     14:15:04
 7   right?                                    14:15:07
 8      A.    Yes.                             14:15:07
 9            MR. HERBST:  I'll request that   14:15:08
10      the emails generated in this          14:15:09
11      process that the witness is           14:15:12
12      describing to come up with this       14:15:14
13      rate card be provided to us if they   14:15:18
14      haven't already, and I don't think    14:15:22
15      they have, but I'm happy to hear      14:15:24
16      about it if I'm wrong.                 14:15:26
17            (Request made.)                  14:15:26
18      Q.    Okay.  And so you get these      14:15:31
19   indirect rates and you add them to the   14:15:34
20   direct rates for the salary, right?      14:15:36
21      A.    Yes.                             14:15:39
22      Q.    And then you come up with this  14:15:39
23   final, this rate on the left-hand column,14:15:43
24   the site rate?                           14:15:45
25      A.    Correct.                         14:15:49
```

KELLY L. BRYSON - 8/28/2014

1               KELLY L. BRYSON

2        Q.    Now, how did you determine          14:15:50

3   what discount to put in the rate card for      14:16:08

4   the government site rate as opposed to         14:16:10

5   the contractor's site rate?                    14:16:12

6               MR. KLEIN:  Object to the          14:16:17

7          form.                                   14:16:18

8        A.    At the time we just offered a       14:16:18

9   discount to overhead to represent a            14:16:20

10  government site rate, and that was             14:16:24

11  determined in conjunction with, I guess        14:16:27

12  it was our, my pricing manager.  It was        14:16:33

13  determined in conjunction with a number        14:16:38

14  of people.  I don't remember who exactly       14:16:40

15  was involved.                                  14:16:42

16       Q.    Would the pricing manager           14:16:43

17  typically be involved?                         14:16:45

18       A.    I'm honestly not sure.  As I        14:16:46

19  recall, it was something that we were          14:16:52

20  trying to be responsive to more regularly      14:16:56

21  and we ultimately came up with a number.       14:17:00

22  I don't remember, I don't think it was         14:17:03

23  specifically for this opportunity.  So we      14:17:06

24  may have already determined it prior to        14:17:08

25  that and I used that.  I don't remember        14:17:10

```
 1              KELLY L. BRYSON
 2   specifically.                              14:17:12
 3        Q.   Who was the pricing manager?     14:17:12
 4        A.   The pricing manager at the       14:17:14
 5   time looks like it was Tracey Burger.      14:17:16
 6        Q.   Was she your boss?               14:17:19
 7        A.   No.                              14:17:21
 8        Q.   Who was your boss?               14:17:23
 9        A.   At the time it would have been   14:17:24
10   Raymond Godleski.                          14:17:27
11        Q.   What was his position?           14:17:30
12        A.   What was his position?  I'm      14:17:32
13   not sure.  Director of financial planning  14:17:38
14   and analysis maybe.  I don't know what     14:17:40
15   his title was.  Director, that was his     14:17:42
16   title.                                     14:17:46
17        Q.   Did you have to run this rate    14:17:46
18   card by either of those two people,        14:17:48
19   Burger or the last person you mentioned?   14:17:51
20        A.   No.                              14:17:54
21        Q.   Before you disseminated it to    14:17:55
22   the pursuit opportunity manager?           14:17:57
23        A.   No.                              14:18:00
24        Q.   Or the staffing manager, okay.   14:18:00
25             By the way, if you do it at      14:18:16
```

KELLY L. BRYSON - 8/28/2014

Page 108

```
 1                KELLY L. BRYSON
 2      the client's site, and the client site is      14:18:18
 3      the government site, right?                     14:18:21
 4           A.    Yes.                                 14:18:22
 5           Q.    If you do it there, there's a        14:18:22
 6      significant savings in cost, right,             14:18:24
 7      that's why they give them a discount,           14:18:26
 8      right?                                          14:18:29
 9                MR. KLEIN:  Object to form.           14:18:29
10           Q.    What's the savings in cost?          14:18:30
11           A.    I'm not sure I understand            14:18:33
12      exactly.                                        14:18:35
13           Q.    What savings, what sorts of          14:18:35
14      expenses or costs do you not have if            14:18:38
15      you're at the client's site as opposed to      14:18:40
16      your own site?                                  14:18:42
17                MR. KLEIN:  Object to form.           14:18:44
18           A.    Typically it's real estate,         14:18:45
19      that's the biggest one.                         14:18:46
20           Q.    Just real estate?                    14:18:49
21           A.    Typically it's real estate.  I      14:18:52
22      mean it could include other things.  It        14:18:54
23      may not.  It depends on the client.            14:18:56
24           Q.    And is real estate a component       14:18:58
25      of G&A or overhead?                             14:19:00
```

KELLY L. BRYSON - 8/28/2014

Page 109

```
 1                  KELLY L. BRYSON
 2        A.    I believe it's a part of          14:19:03
 3   overhead.                                     14:19:07
 4        Q.    What about office costs,           14:19:10
 5   besides real estate, the fact that you        14:19:21
 6   don't have to use your, you know, your        14:19:23
 7   workstations as opposed to the client's       14:19:25
 8   workstations, that kind of thing?             14:19:27
 9              MR. KLEIN:  Object to form.         14:19:29
10        A.    Typically all of our members       14:19:30
11   are still provided with a laptop.  I mean     14:19:32
12   certainly they're not using the restroom      14:19:37
13   or the coffee and, you know, those types      14:19:39
14   of things involved with your real estate,     14:19:43
15   but in terms of technology equipment, I       14:19:46
16   mean we don't generally treat our client      14:19:48
17   site people differently.                      14:19:52
18        Q.    Are CGI's labor costs, either      14:19:55
19   direct costs that you mentioned or the        14:19:59
20   indirect costs, are they audited by the       14:20:02
21   government?                                    14:20:04
22        A.    Yes.                               14:20:04
23        Q.    How often?                         14:20:05
24        A.    I don't know.                      14:20:06
25        Q.    Who handles that?                  14:20:07
```

KELLY L. BRYSON - 8/28/2014

Page 110

```
 1                KELLY L. BRYSON
 2        A.    The compliance -- it would            14:20:09
 3    depend on the scope of the audit, but           14:20:13
 4    generally our compliance department is          14:20:15
 5    where they would start and then depending       14:20:18
 6    on the scope they would reach back into         14:20:21
 7    finance or pricing or contracts.  It            14:20:23
 8    really depends.                                 14:20:28
 9        Q.    I don't know if I asked you           14:20:29
10    who does the auditing?                          14:20:30
11            MR. KLEIN:  Object to the               14:20:33
12        form.                                       14:20:34
13        A.    It could vary.                        14:20:34
14        Q.    From?                                 14:20:35
15        A.    They could do a pre-award             14:20:36
16    audit in which case the government              14:20:39
17    contracting officer folks would come out       14:20:42
18    and look at stuff.  They could do a            14:20:44
19    post-award audit.  They could be auditing      14:20:46
20    our indirect rates in which it's a             14:20:48
21    completely different division.  I mean         14:20:51
22    there's all kinds of audits that we're        14:20:53
23    subject to.                                     14:20:55
24        Q.    Is there any private auditing         14:20:55
25    company like your own auditors,                 14:21:00
```

```
 1              KELLY L. BRYSON
 2    accountants and auditors that audit your       14:21:03
 3    rates?                                          14:21:04
 4         A.    That audit our indirect rates?       14:21:04
 5         Q.    Yes.                                  14:21:06
 6         A.    I'm not sure.                         14:21:06
 7         Q.    Who would know that?                  14:21:07
 8         A.    I guess someone in compliance.        14:21:08
 9         Q.    Who was director of compliance        14:21:10
10    at the time in 2010?                             14:21:13
11         A.    I would probably refer you to         14:21:17
12    Mary Crigler, C-r-i-g-l-e-r.                     14:21:24
13         Q.    Is she still employed?                14:21:32
14         A.    Yes.                                  14:21:33
15         Q.    As what?                              14:21:34
16         A.    She's in our legal department.        14:21:34
17    She may be part time now.                        14:21:37
18         Q.    Now let me ask you some               14:21:38
19    questions about Bryson 7.  What is a             14:22:12
20    blanket purchase agreement?                      14:22:20
21         A.    A blanket purchase agreement          14:22:21
22    is typically a type of contract where we        14:22:26
23    agree to a list of labor categories and         14:22:30
24    rates and the government is allowed to           14:22:34
25    purchase off of that list of rates as           14:22:38
```

```
 1                  KELLY L. BRYSON
 2    they see fit.  Generally the government          14:22:43
 3    will issue a task order under that BPA.          14:22:49
 4          Q.    What's that?                         14:22:53
 5          A.    A task order is a piece of           14:22:54
 6    scope.  Like, for example, this was             14:22:59
 7    transformation initiative, they may issue       14:23:01
 8    a task order that modernizes a piece of         14:23:04
 9    software or they may issue a task order         14:23:10
10    to move a piece of software to a mobile         14:23:12
11    device.  But essentially what a BPA does        14:23:16
12    is create a price list.                         14:23:22
13          Q.    Now when CGI Federal was            14:23:25
14    awarded a BPA in a government contract,         14:23:38
15    does the CGI Federal separately negotiate       14:23:41
16    pricing on task orders?                         14:23:44
17               (Instruction not to answer.)         14:23:46
18          MR. KLEIN:  We're afield.                 14:23:46
19             MR. HERBST:  No, we're not.            14:23:47
20          MR. KLEIN:  No, no, I don't               14:23:49
21       think it has anything to do with             14:23:50
22       the documents that we've been                14:23:53
23       talking about.                               14:23:54
24          MR. HERBST:  I think if you               14:23:58
25       let the witness answer that                  14:24:00
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2        question she will show you that it          14:24:01
 3        does.                                       14:24:02
 4             MR. KLEIN:  You're asking her          14:24:03
 5        questions about a document she says         14:24:04
 6        she's never seen before.                    14:24:06
 7             MR. HERBST:  I'm asking her            14:24:08
 8        about the procedures, whether CGI           14:24:09
 9        Federal separately negotiates              14:24:11
10        pricing on task orders when they're        14:24:13
11        awarded a BPA.                              14:24:14
12             MR. KLEIN:  Could you explain         14:24:16
13        how that has anything to do with --        14:24:18
14             MR. HERBST:  I think she will.        14:24:20
15             MR. KLEIN:  I'm asking you.           14:24:22
16        We can go off the record if you            14:24:23
17        like.                                       14:24:24
18             MR. HERBST:  I don't want to          14:24:24
19        go off the record because I don't          14:24:25
20        think going off the record is              14:24:26
21        appropriate.  I don't think your           14:24:28
22        instruction not to answer is               14:24:30
23        appropriate.                                14:24:31
24             MR. KLEIN:  I don't think you         14:24:33
25        provided me a compelling reason why        14:24:34
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2        this is in accordance with the          14:24:37
 3        court order.                             14:24:39
 4             MR. HERBST:  This relates to        14:24:40
 5        Exhibit 18, that's why, and we're        14:24:41
 6        entitled to --                           14:24:43
 7             MR. KLEIN:  Exhibit 18 is           14:24:44
 8        something that she said -- I don't       14:24:45
 9        see how it's related to Exhibit 18       14:24:47
10        especially being that she said           14:24:49
11        she's never seen it.                     14:24:51
12             MR. HERBST:  She's seen             14:24:53
13        Exhibit 18.                              14:24:54
14             MR. KLEIN:  I'm sorry, she's        14:24:55
15        seen Exhibit 18.  She hasn't seen        14:24:56
16        Exhibit 7 or 8.                          14:24:58
17             MR. HERBST:  I'm not asking         14:25:00
18        her a question about 7 or 8.  I'm        14:25:01
19        asking her a question about 18.          14:25:03
20             MR. KLEIN:  I'll give you a         14:25:07
21        little leeway.                           14:25:09
22        Q.   You probably don't remember         14:25:09
23    the question, do you?                        14:25:10
24        A.   Do we separately negotiate          14:25:12
25    task orders?                                 14:25:16
```

KELLY L. BRYSON - 8/28/2014

Page 115

```
 1                  KELLY L. BRYSON
 2        Q.    Yes.                              14:25:16
 3        A.    Yes.                              14:25:17
 4        Q.    Does Exhibit 18 have anything    14:25:17
 5   to do with a negotiation of pricing on      14:25:22
 6   one of those task orders in connection      14:25:27
 7   with Exhibits 7 or 8?                       14:25:29
 8        A.    There is a, on the last page     14:25:33
 9   of Exhibit 18 there is a sample task.       14:25:36
10        Q.    What is that?                     14:25:43
11        A.    This is a snapshot of a P&L       14:25:43
12   for a sample nine month task.  I don't      14:26:06
13   know, I don't recall if this was            14:26:12
14   something that we created to be             14:26:15
15   illustrative or if this was something       14:26:18
16   that was proposed as part of the            14:26:21
17   opportunity.                                14:26:26
18        Q.    Okay, but what is the purpose    14:26:29
19   of the sample task or P&L?                  14:26:30
20        A.    I mean generally -- well, it     14:26:35
21   depends if it's -- if the government has    14:26:37
22   included sample tasks as part of its        14:26:42
23   request for proposal, then our response     14:26:47
24   to those sample tasks facilitate the        14:26:50
25   government's evaluation of our price and    14:26:55
```

KELLY L. BRYSON - 8/28/2014

Page 116

```
 1                KELLY L. BRYSON
 2     understanding of the requirements.           14:26:57
 3          Q.    Directing your attention to       14:26:58
 4     Bryson 8, you see that's a sample task       14:27:01
 5     order 4?                                     14:27:04
 6          A.    Yes.                              14:27:04
 7          Q.    And is it fair to say that the    14:27:05
 8     sample nine month task relates to that?     14:27:07
 9          A.    I don't know.                     14:27:10
10          Q.    Sample?                           14:27:11
11          A.    I don't know.                     14:27:11
12                MR. KLEIN:  Object to the         14:27:12
13          form.                                   14:27:13
14          Q.    You're not sure?                  14:27:13
15          A.    I'm not sure.                     14:27:14
16          Q.    Would you be able to find out     14:27:15
17     by looking at it?                            14:27:17
18          A.    No, I don't think so.             14:27:17
19          Q.    But you're not sure?              14:27:18
20          A.    No, I can't recall.  I mean --    14:27:19
21          Q.    Okay.  Take a look, go back       14:27:22
22     one page.  What's the opportunity name?     14:27:33
23          A.    HTV, BPR/BPI services.            14:27:36
24          Q.    What's HCV stand for?             14:27:42
25          A.    I don't recall.                   14:27:44
```

KELLY L. BRYSON - 8/28/2014

```
 1                KELLY L. BRYSON
 2        Q.    Housing Choice Voucher          14:27:45
 3   Program?                                   14:27:47
 4        A.    Okay.                           14:27:47
 5        Q.    What's the title of the sample  14:27:48
 6   task order, Housing Choice Voucher         14:27:52
 7   Program?                                   14:27:55
 8        A.    Yes.                            14:27:55
 9        Q.    All right, so is it fair to     14:27:56
10   say, if you can't say definitively, that   14:28:08
11   there's a reasonable possibility or        14:28:10
12   probability that this rate card and the    14:28:12
13   sample nine month task were prepared to    14:28:15
14   pursue the sample task order?              14:28:18
15            MR. KLEIN:  Object to the         14:28:20
16        form.                                 14:28:22
17        A.    I can say this rate card was     14:28:22
18   prepared in response to the HUD            14:28:26
19   transformation initiative BPA.  I don't    14:28:27
20   feel comfortable confirming that the       14:28:30
21   sample task in this email correlates to    14:28:33
22   sample task order 4.                       14:28:39
23        Q.    And Bryson 7 is transformation  14:28:41
24   initiative, right, the overall project?    14:28:45
25        A.    That's what it says.            14:28:47
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2        Q.    What's the total value of this        14:28:48
 3   proposal?                                         14:28:53
 4        A.    It looks like we evaluated it          14:28:53
 5   at 1.46 million.                                  14:28:57
 6        Q.    Where do you see that?                 14:29:00
 7        A.    At the sample task order and           14:29:01
 8   it says total value $2 million.                   14:29:07
 9        Q.    Right.  So would that give you         14:29:09
10   an indication as to whether this proposal         14:29:11
11   and rate card relates just to the little          14:29:14
12   piece that's the sample task order or to          14:29:17
13   the overall project?                              14:29:19
14             MR. KLEIN:  Object to the               14:29:21
15        form.                                        14:29:22
16        A.    As I mentioned earlier, BPA            14:29:22
17   creates a price sheet, and task orders            14:29:33
18   are issued under that BPA.  We often              14:29:39
19   don't know how many task orders we will           14:29:43
20   win under a BPA.  So especially when              14:29:45
21   we're a subcontractor.                            14:29:49
22             So we evaluated this at                 14:29:51
23   approximately $2 million because we felt          14:29:54
24   at the time that may be what this BPA is          14:29:56
25   worth to us.  But in terms of, I mean I           14:29:59
```

KELLY L. BRYSON - 8/28/2014

Page 119

```
 1              KELLY L. BRYSON
 2   don't -- does that answer the question?          14:30:05
 3       Q.    You're not sure, you can't             14:30:08
 4   really say whether $2 million is for the         14:30:09
 5   sample task order or for the overall             14:30:13
 6   project?                                         14:30:15
 7            MR. KLEIN:  Object to the               14:30:15
 8       form.                                        14:30:16
 9       A.    It's for the overall project           14:30:17
10   according to what was requested here.            14:30:18
11       Q.    What's a DCM at 45 percent?            14:30:20
12       A.    I'm sorry, what was the                14:30:22
13   question?                                        14:30:24
14       Q.    Under total value, there's a           14:30:24
15   notation, DCM and it says about 45               14:30:27
16   percent depending on TO/staff mix, do you        14:30:29
17   see it?                                          14:30:35
18       A.    DCM stands for direct                  14:30:35
19   contribution margin.                             14:30:37
20       Q.    Is that the profit margin              14:30:38
21   expected?                                        14:30:40
22       A.    That is a measure of profit.           14:30:40
23       Q.    What's the difference between          14:30:44
24   a measure of profit and profit margin?           14:30:45
25       A.    Well, I mean there are --              14:30:47
```

KELLY L. BRYSON - 8/28/2014

Page 120

```
 1              KELLY L. BRYSON
 2              MR. KLEIN:  Object to the        14:30:50
 3         form.                                 14:30:51
 4         A.    DCM is calculated using only    14:30:51
 5    direct and fringe costs.  It doesn't       14:30:55
 6    account for overhead or G&A costs.  So     14:30:56
 7    our true profit margin is much lower than  14:31:00
 8    45.                                        14:31:02
 9         Q.    What is it?  What's the true     14:31:03
10    profit margin?                             14:31:07
11              MR. KLEIN:  I'm going to          14:31:10
12         object to that.                       14:31:11
13         Q.    Is there anywhere on this that  14:31:12
14    tells you what that is?                    14:31:13
15              MR. KLEIN:  You can answer the    14:31:22
16         question if there's anywhere on       14:31:23
17         this document.                        14:31:24
18         A.    There's nowhere on this         14:31:25
19    document that would give a true profit     14:31:26
20    margin.                                    14:31:29
21         Q.    The task order, the figures     14:31:29
22    that are in there, for example, there's a  14:31:40
23    business analyst line, right?              14:31:45
24         A.    Yes.                            14:31:47
25         Q.    And there's a Nora Graves       14:31:47
```

KELLY L. BRYSON - 8/28/2014

Page 121

```
 1                  KELLY L. BRYSON
 2     listed, right?                                  14:31:50
 3          A.    Yes.                                  14:31:52
 4          Q.    Is she the person who CGI was         14:31:52
 5     anticipating would be the business              14:31:55
 6     analyst on this project at the time this        14:31:56
 7     was generated?                                  14:32:00
 8          A.    Yes.                                  14:32:01
 9          Q.    And was she expected to put           14:32:01
10     1512 hours on the project?                      14:32:05
11          A.    Yes.                                  14:32:06
12          Q.    And the revenue from her time        14:32:06
13     was expected to be 136276.56?                   14:32:08
14          A.    Yes.                                  14:32:08
15          Q.    Now how is that revenue figure       14:32:19
16     derived?                                        14:32:21
17          A.    That's hours, 1512 times rate.       14:32:22
18          Q.    Which rate?                           14:32:27
19          A.    I'm not sure.  I don't know if       14:32:28
20     we used the government site or contractor       14:32:33
21     site rate.  I would have to calculate it       14:32:36
22     out to determine which.                         14:32:38
23          Q.    But if we divided the revenue        14:32:39
24     figure by the hours we'd come up with          14:32:41
25     either the contractor site rate or the         14:32:43
```

KELLY L. BRYSON - 8/28/2014

Page 122

```
 1                 KELLY L. BRYSON
 2    government site rate, right?                  14:32:45
 3          A.    Yes.                              14:32:46
 4          Q.    And the same thing is true for    14:32:46
 5    all the other people listed, right?           14:32:49
 6          A.    Yes.                              14:32:50
 7          Q.    So Ben Ashmore was expected as    14:32:50
 8    he was the subject matter expert on the       14:32:55
 9    project at that point?                        14:32:58
10          A.    Yes.                              14:33:02
11          Q.    And he was going to do 756        14:33:02
12    hours?                                        14:33:05
13          A.    Yes.                              14:33:05
14          Q.    And he was going to produce       14:33:05
15    $146,000 and change in revenue, right?        14:33:07
16          A.    Yes.                              14:33:10
17          Q.    All right.  Now let me ask you    14:33:10
18    this question.  Since the amount of the       14:33:21
19    -- by the way, I notice this sheet is cut     14:33:29
20    off, Mr. Klein.  Do you think we could        14:33:31
21    get a sheet with the rest of the figures      14:33:35
22    on it?                                        14:33:37
23              MR. KLEIN:  This is the sheet       14:33:37
24         that we have.                            14:33:43
25              MR. HERBST:  I'm asking if you      14:33:45
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2       could produce a hard copy of this        14:33:46
 3       so we can see what else is on the        14:33:47
 4       sheet.                                    14:33:49
 5            MR. KLEIN:  You guys produced        14:33:50
 6       the document, it's your document.         14:33:52
 7            MR. HERBST:  Good point.  I'm        14:33:55
 8       going to ask you to produce your          14:33:57
 9       copy of this email containing this        14:33:59
10       rate card.                                14:34:01
11            (Request made.)                      14:34:01
12            MR. KLEIN:  It's my                  14:34:04
13       understanding you should have this        14:34:04
14       document in your possession because       14:34:05
15       I believe the testimony from Mr.          14:34:07
16       Ashmore's deposition was, if you          14:34:08
17       look at the from Mr. Ashmore to the       14:34:11
18       to Mr. Ashmore at the beginning,          14:34:14
19       these are documents that Mr.              14:34:15
20       Ashmore sent to his personal email        14:34:17
21       address.  So you should have these        14:34:19
22       documents in your possession in           14:34:22
23       electronic format.                        14:34:23
24            MR. HERBST:  Okay.  I'm asking       14:34:25
25       you to produce, since it was never        14:34:26
```

KELLY L. BRYSON - 8/28/2014

Page 124

```
 1              KELLY L. BRYSON
 2        produced before from what I         14:34:28
 3        understand, your version of this    14:34:29
 4        document.                           14:34:33
 5             (Request made.)                14:34:33
 6             MR. KLEIN:  It will be on the   14:34:36
 7        list of requested items.  We'll     14:34:37
 8        address them then.                  14:34:39
 9             MR. HERBST:  Correct.           14:34:41
10        Q.    Now let me ask you, Ms.       14:34:46
11   Bryson, on sample task, what other       14:34:49
12   columns are there besides the cost       14:34:54
13   figure, if any, to the right which is cut 14:34:56
14   off, partially cut off across the column? 14:34:59
15   Is there any other columns typically on  14:35:02
16   it?                                      14:35:05
17        A.    There may have been a DCM     14:35:05
18   column.                                  14:35:07
19        Q.    A DCM column.                 14:35:07
20        A.    But I'm not sure if there was 14:35:10
21   in this situation.                       14:35:12
22             MR. HERBST:  That's the reason 14:35:16
23        I'm asking you, Stuart.             14:35:17
24        Q.    Okay.  So here's my question. 14:35:20
25   The total revenue expected was 1.466     14:35:24
```

KELLY L. BRYSON - 8/28/2014

Page 125

```
 1                KELLY L. BRYSON
 2    million and change, right?                    14:35:30
 3              MR. KLEIN:  Object to the            14:35:33
 4         form.                                     14:35:35
 5         A.    Yes.                                14:35:35
 6         Q.    If that's true, why is the          14:35:35
 7    value, the total value 2 million?             14:35:39
 8         A.    Because again, this was just        14:35:42
 9    one of what we hoped would be many task       14:35:45
10    orders under this BPA.  But oftentimes        14:35:49
11    task orders materialize throughout the        14:35:56
12    life of a contract.  This may have been       14:36:00
13    what we got in the beginning and we might     14:36:04
14    have gotten something else six months         14:36:07
15    later.                                         14:36:09
16         Q.    Now, so this is the rate card      14:36:09
17    and the sample task that you provided at      14:36:17
18    the time, right?                               14:36:23
19         A.    That I provided for internal       14:36:23
20    approval, yes.                                 14:36:25
21         Q.    What is ISIT overhead?             14:36:33
22         A.    That's the overhead applicable     14:36:36
23    to the ISIT business unit.                     14:36:39
24         Q.    Is ISIT referred to at CGI as      14:36:48
25    information technologies and solutions        14:36:52
```

KELLY L. BRYSON - 8/28/2014

Page 126

```
 1                KELLY L. BRYSON
 2    business unit?                              14:36:54
 3           MR. KLEIN:  Object to form.          14:36:57
 4       A.    Yes.                               14:36:58
 5       Q.    Is there any other CGI Federal     14:37:05
 6    overheads that are used besides the ISIT    14:37:09
 7    one?                                        14:37:11
 8           MR. KLEIN:  Object to form.          14:37:12
 9       A.    There's a BPS overhead but         14:37:13
10    it's rarely used.                           14:37:15
11       Q.    Do I understand it's your          14:37:16
12    testimony that the ISIT overhead was used   14:37:24
13    because this was a HUD contract, you        14:37:26
14    know, a federal agency contract as          14:37:31
15    opposed to a state or local contract?       14:37:33
16       A.    It was used because it, the        14:37:36
17    type of, the scope of work, the scope of    14:37:39
18    work is software related, transformation    14:37:41
19    related, IT related and not business        14:37:44
20    process related.                            14:37:46
21       Q.    I think you told us that BPS       14:37:47
22    process related would be largely confined   14:38:19
23    to inspections and outsourcing?             14:38:22
24           MR. KLEIN:  Object to the            14:38:23
25        form.                                   14:38:24
```

KELLY L. BRYSON - 8/28/2014

Page 127

```
 1                    KELLY L. BRYSON
 2        A.    It's outsourcing type work.  I          14:38:25
 3   wouldn't say it's purely limited to                14:38:28
 4   inspections.  It could include other               14:38:30
 5   things.  But it's business process                 14:38:31
 6   outsourcing is what BPS is intended to             14:38:33
 7   cover.                                             14:38:38
 8        Q.    What other things does it               14:38:38
 9   cover in terms of outsourcing besides the          14:38:40
10   inspections that are outsourced?                   14:38:42
11            MR. KLEIN:  Object to the                 14:38:45
12        form.                                         14:38:46
13        A.    There are other types of                14:38:47
14   investigations that we do.  Honestly, in           14:38:50
15   the Federal business I'm not sure.  I              14:38:54
16   don't work very often with that part of            14:38:59
17   the business.  I don't -- I don't know             14:39:01
18   everything that they do that they                  14:39:04
19   considered business process services.              14:39:07
20        Q.    Now, is it fair to say that             14:39:14
21   this ISIT overhead was based on the ISIT           14:39:15
22   MOBIS schedule?                                    14:39:19
23        A.    No.                                     14:39:21
24        Q.    No, you didn't consult the              14:39:21
25   ISIT MOBIS schedule?                               14:39:23
```

KELLY L. BRYSON - 8/28/2014

Page 128

```
 1                    KELLY L. BRYSON
 2        A.    No.                              14:39:25
 3        Q.    Why do you say it's not based    14:39:25
 4   on the ISIT MOBIS schedule?                 14:39:27
 5        A.    Overhead is calculated based     14:39:30
 6   on our estimated costs and projected        14:39:32
 7   revenues for the fiscal year in which it    14:39:34
 8   applies.  It's not based on any schedule.   14:39:38
 9        Q.    Take a look at page 39 of        14:40:15
10   Bryson 7.  Do you see that's an             14:40:19
11   attachment G for key personnel              14:40:34
12   qualification matrix?                       14:40:36
13        A.    Yes.                             14:40:37
14        Q.    You recognize that, you know     14:40:37
15   what that is, right?                        14:40:39
16        A.    I can infer what it is.          14:40:41
17        Q.    What is it?                      14:40:44
18        A.    A chart that shows why key       14:40:45
19   personnel were selected based on their      14:40:50
20   qualifications and years of experience      14:40:53
21   and education.                              14:40:55
22        Q.    All right.  Now this page        14:40:56
23   relates to Nancy Dowdy, right?              14:40:57
24        A.    Yes.                             14:41:00
25        Q.    It shows her as the business     14:41:00
```

KELLY L. BRYSON - 8/28/2014

Page 129

```
 1                   KELLY L. BRYSON
 2    process functional leader/architect,        14:41:04
 3    right?                                       14:41:08
 4         A.    Yes.                              14:41:08
 5         Q.    Under BPA sample task order       14:41:08
 6    position, right?                             14:41:11
 7         A.    Yes.                              14:41:12
 8         Q.    And then under that it says       14:41:12
 9    MOBIS contract labor category consultant?    14:41:14
10         A.    Yes.                              14:41:16
11         Q.    What does MOBIS labor category    14:41:17
12    refer to?                                    14:41:17
13              (Instruction not to answer.)       14:41:23
14              MR. KLEIN:  We're done with        14:41:23
15         this line of questioning.  This is      14:41:24
16         something specifically that the        14:41:26
17         judge said you could not get            14:41:26
18         questions on, this was item number     14:41:28
19         8 within your 30(b)(6) notice.  She    14:41:31
20         testified as to how the rates were     14:41:33
21         derived, that is why she's here.       14:41:35
22         She's not here to testify about        14:41:38
23         MOBIS schedules or anything of that    14:41:40
24         nature.                                 14:41:42
25              So I'm going to direct the        14:41:43
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2     witness not answer to any questions          14:41:44
 3     about MOBIS schedules for CGI                14:41:46
 4     Group, CGI Federal, CGI ISIT,               14:41:49
 5     including without limitation how            14:41:53
 6     such schedules were generated,              14:41:55
 7     calculated, proposed and approved,          14:41:57
 8     labor categories and hourly rates           14:41:59
 9     contained in such MOBIS schedules           14:42:01
10     and contract numbers for any                14:42:02
11     approved MOBIS schedules.                   14:42:05
12          MR. HERBST:  Look, Mr. Klein,          14:42:07
13     the witness has testified that              14:42:08
14     MOBIS schedules had nothing to do           14:42:10
15     with the rates involved here.  Here         14:42:12
16     is a document that suggests that it         14:42:14
17     might and so I'm entitled I think           14:42:16
18     to ask her, number 1, if this              14:42:20
19     refreshes her recollection about           14:42:23
20     that testimony, and number 2, what         14:42:24
21     it means.  I'm not asking her at           14:42:26
22     this point what the MOBIS schedule         14:42:30
23     rates are, but I'm trying to               14:42:32
24     explore the answers that she's             14:42:38
25     given, which is that the MOBIS             14:42:40
```

KELLY L. BRYSON - 8/28/2014

```
 1               KELLY L. BRYSON
 2        contract labor categories have                    14:42:44
 3        nothing to do with the rates in                   14:42:47
 4        this opportunity.  This Bryson 7                  14:42:48
 5        has to do with this exact business                14:42:53
 6        opportunity.  This document is --                 14:42:58
 7        Q.    Ms. Bryson, this Bryson 7                    14:43:05
 8   document which is labeled part III oral                14:43:09
 9   technical quote presentation, this                     14:43:11
10   document was generated by CGI or ICF,                  14:43:13
11   right as the secondary or prime, right?               14:43:17
12        A.    I assume it was generated by                14:43:20
13   us, yes.                                               14:43:25
14             MR. KLEIN:  Once again, Ms.                  14:43:27
15        Bryson has also testified that she                14:43:28
16        has --                                            14:43:30
17             MR. HERBST:  Wait a minute,                  14:43:30
18        I'm asking a question.                            14:43:31
19             MR. KLEIN:  I'm going to put a               14:43:32
20        statement on the record.  Ms.                     14:43:34
21        Bryson has testified that she has                 14:43:35
22        not seen these documents before,                  14:43:37
23        and if you were to ask her how she                14:43:39
24        calculated the rates set forth in                 14:43:41
25        Exhibit 18, which she testified she               14:43:43
```

KELLY L. BRYSON - 8/28/2014

Page 132

```
 1              KELLY L. BRYSON
 2       knows how she did, you would find          14:43:45
 3       out how she calculated the rates.          14:43:47
 4            MR. HERBST:  That has nothing          14:43:51
 5       to do with what I'm attempting to          14:43:53
 6       ask the witness.                           14:43:55
 7       Q.    Would you look at page 1 of          14:43:58
 8  Bryson 7, ma'am.  Isn't this a document         14:44:00
 9  generated by either CGI or ICF?                 14:44:08
10            MR. KLEIN:  Object to form.           14:44:14
11       A.    It appears to be a document          14:44:15
12  generated by ICF.                               14:44:16
13       Q.    Which was the prime for which        14:44:17
14  CGI was a partner, right?                       14:44:20
15       A.    Correct.                             14:44:22
16       Q.    And it's the very opportunity        14:44:22
17  that Plaintiff's Exhibit 18 relates to,         14:44:28
18  right?                                          14:44:33
19            MR. KLEIN:  Object to the             14:44:34
20       form.                                      14:44:35
21       A.    Yes.                                 14:44:35
22       Q.    So all I'm trying to ask you         14:44:36
23  is if in fact you say that the rates have       14:44:40
24  nothing to do with MOBIS labor                  14:44:45
25  categories, why does this document on key       14:44:49
```

```
 1                    KELLY L. BRYSON
 2      personnel qualifications matrix, which        14:44:51
 3      you've described what it is, talk about       14:44:53
 4      the MOBIS contract labor category?            14:44:55
 5              MR. KLEIN:  Object to the             14:44:58
 6          form.  Once again.  She's never           14:44:59
 7          seen these documents before.              14:45:01
 8          Q.   He's objecting to the form.          14:45:03
 9      You can answer.                                14:45:05
10          A.    I would answer that in two          14:45:05
11      ways.  The question that you had asked me     14:45:06
12      originally was how does overhead relate       14:45:08
13      to MOBIS rates and that was what I said       14:45:11
14      that they're not related.                     14:45:14
15              Secondly, ICF was our prime on        14:45:16
16      this opportunity and they appeared to         14:45:19
17      have been bidding this opportunity under      14:45:22
18      their MOBIS schedule.  That has nothing       14:45:24
19      to do with us.  We say ICF, we're going       14:45:27
20      to charge a business analyst at 90.13 and     14:45:31
21      what ICF does with that is their              14:45:35
22      business.  If they're going to charge         14:45:38
23      Nancy Dowdy on their MOBIS schedule of        14:45:40
24      consultant, that's, I don't know, $180 an     14:45:44
25      hour and they're going to take $70 of         14:45:47
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2    profit, that's nothing to do with us.            14:45:49
 3              So their MOBIS schedule and            14:45:51
 4    how they're bidding it has nothing to do         14:45:53
 5    with CGI.  They're the prime.  The rate          14:45:55
 6    we bid to ICF are in this table here.            14:45:58
 7        Q.    But you're aware, are you not,         14:46:02
 8    that the rates that are ultimately bid by        14:46:05
 9    ICF, a significant component on, if you          14:46:09
10    look at 18, whatever they're bidding on         14:46:14
11    the people who are listed in the right,         14:46:20
12    who are CGI people, those are going to be       14:46:22
13    CGI personnel, right, that ICF is               14:46:28
14    bidding, right?                                 14:46:33
15              MR. KLEIN:  Object to the             14:46:33
16         form.                                      14:46:34
17        A.    Yes.                                   14:46:35
18        Q.    And are you saying that CGI            14:46:35
19    has no input in telling ICF what to bid         14:46:38
20    for those particular people?                    14:46:43
21        A.    I mean we can -- ICF or any           14:46:45
22    prime is not obligated to tell us what          14:46:50
23    they're charging for any of our folks.          14:46:52
24    So we can certainly say I think you             14:46:54
25    should charge this amount, but they don't       14:46:57
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2   have to listen to us.  Just like if        14:46:59
 3   you're buying something at Best Buy, Best   14:47:02
 4   Buy is going to sell it to you for what     14:47:05
 5   they want to sell it to you for, not        14:47:06
 6   necessarily what it cost them.  I mean.     14:47:09
 7   But no, we would love to tell ICF what to   14:47:12
 8   charge for our people, but that's not,      14:47:16
 9   that's not how it works.                    14:47:19
10       Q.   Isn't it true in a time and       14:47:20
11   materials contract the profit that         14:47:27
12   bidding firms are entitled to make is       14:47:31
13   limited to a certain percentage?            14:47:33
14            MR. KLEIN:  Object to the          14:47:34
15       form.                                   14:47:35
16       A.   No.                                14:47:36
17       Q.   No?                                14:47:36
18       A.   Not to my knowledge.  In cost      14:47:37
19   plus type work that is true, but time and  14:47:38
20   materials there's no limit to profit as    14:47:41
21   far as I understand.                        14:47:43
22       Q.   So let me ask you, you know        14:47:47
23   from the documents you reviewed, we're      14:47:48
24   going to get to those, but you know from    14:47:50
25   the documents you recently reviewed the     14:47:53
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2    profit percentage that you fixed was          14:47:55
 3    about 10 percent, right?                      14:47:58
 4              MR. KLEIN:  Object to the           14:48:05
 5        form.                                     14:48:06
 6        A.    Yes.                                14:48:07
 7        Q.    How come you didn't charge 30       14:48:07
 8    percent profit?                               14:48:13
 9        A.    Because while we don't              14:48:14
10    disclose that information to ICF, HUD         14:48:18
11    would have been within their rights to        14:48:22
12    ask CGI how they derived their rates and      14:48:26
13    HUD would not be very pleased with us if      14:48:31
14    we said we added 30 percent.  It's not to     14:48:34
15    say we can't do it, but it's standard         14:48:37
16    practice to use a reasonable fee, 10          14:48:39
17    percent or lower.                             14:48:43
18              But again, it depends on the        14:48:44
19    type of work.                                 14:48:46
20        Q.    So don't you think if you had       14:48:47
21    sent ICF your rates in this rate card         14:48:51
22    based on your, you know, the figures that     14:49:03
23    you earlier testified as to how you           14:49:08
24    derived the rate card, and ICF took those     14:49:11
25    and charged another hundred dollars an        14:49:19
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2    hour more based on their MOBIS schedule,          14:49:22
 3    you don't think HUD would have been               14:49:24
 4    upset?                                             14:49:27
 5              MR. KLEIN:  Object to the               14:49:28
 6         form.                                         14:49:29
 7         A.   I can't -- I can't speak to             14:49:30
 8    that.  I mean there's a lot of                     14:49:32
 9    considerations that ICF has to make being          14:49:33
10    prime when they're using a schedule.               14:49:37
11    They could have had another partner that           14:49:41
12    bid someone that qualified as a                     14:49:43
13    consultant labor category that told them           14:49:45
14    it was $120 an hour.  So now they have             14:49:48
15    all these different price points that sit          14:49:50
16    under one category.  It's up to them to            14:49:53
17    determine how they invoice the government          14:49:55
18    for that and in the event that they get            14:49:57
19    audited and the government wants to see            14:49:59
20    their costs and feels that they've been            14:50:01
21    receiving excessive profit, that's their           14:50:06
22    issue.                                             14:50:07
23              But as far as we're concerned,          14:50:08
24    this is the price that we're charging.             14:50:10
25    What ICF charges the government we have            14:50:12
```

KELLY L. BRYSON - 8/28/2014

Page 138

```
 1              KELLY L. BRYSON
 2    no say in.                              14:50:14
 3         Q.    Okay, I can understand how you  14:50:14
 4    derive the rate for let's say senior     14:50:17
 5    business analyst, because there were two 14:50:20
 6    CGI employees who were going to do that  14:50:23
 7    work, right?                             14:50:25
 8         A.    They were representative       14:50:25
 9    employees that I considered when         14:50:27
10    developing our rates.                    14:50:29
11         Q.    But you knew the project       14:50:30
12    administrator was going to be an ICF     14:50:32
13    person, right, not a CGI person; isn't   14:50:34
14    that true?                               14:50:36
15         A.    Not necessarily.              14:50:37
16         Q.    Why wasn't the CGI person      14:50:38
17    listed for that?                         14:50:42
18         A.    Because we didn't have a       14:50:43
19    representative person and we thought it  14:50:44
20    was unlikely that we would have that     14:50:45
21    role.  But oftentimes just because these 14:50:47
22    are the people that we have ready and    14:50:51
23    available doesn't mean that two years    14:50:54
24    later into the BPA that we won't want to 14:50:56
25    have a project administrator.            14:51:00
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2         Q.    Didn't you put -- but if you         14:51:03
 3    didn't have a person, a CGI person that         14:51:05
 4    you planned to use for project               14:51:09
 5    administrator, there was no salary that        14:51:10
 6    you could consult, right, initially for a      14:51:13
 7    CGI person, right?                            14:51:17
 8         A.    But I don't use salary to           14:51:18
 9    develop rates.                                14:51:21
10         Q.    How did you develop 77.62 for       14:51:28
11    project administrator?                        14:51:31
12         A.    I read the description of what      14:51:33
13    they were looking for in a project            14:51:35
14    administrator, I used my knowledge based      14:51:37
15    on what I do about, overall in the ISIT       14:51:39
16    market, what a typical project               14:51:44
17    administrator makes and I developed a        14:51:46
18    rate based on that.                           14:51:48
19         Q.    Well you earlier testified I        14:51:50
20    think that the hourly rates in the ICF        14:51:59
21    MOBIS schedule might have been                14:52:02
22    significantly higher than the rate you        14:52:04
23    were using, correct?                          14:52:06
24              MR. KLEIN:  Object to form.          14:52:08
25         A.    I don't know what ICF's MOBIS       14:52:09
```

KELLY L. BRYSON - 8/28/2014

```
1              KELLY L. BRYSON
2    rates are.                              14:52:11
3         Q.    Were you familiar with what  14:52:12
4    the MOBIS rates were?                   14:52:13
5         A.    No.                          14:52:14
6         Q.    You wouldn't have inquired of 14:52:15
7    what the ICF MOBIS rates were?          14:52:17
8         A.    I don't think so.  I don't   14:52:19
9    recall inquiring.  I mean it's public   14:52:22
10   information, I could look it up, but no. 14:52:23
11        Q.    Did CGI have a MOBIS schedule 14:52:26
12   that you could have consulted?          14:52:30
13        A.    We do.                       14:52:31
14        Q.    And when do you consult the  14:52:32
15   MOBIS schedule in devising these rates  14:52:33
16   for the rate cards like this?           14:52:36
17        A.    I don't.                     14:52:37
18        Q.    Never?                        14:52:37
19        A.    If we are pursuing an        14:52:38
20   opportunity in which we're prime that is 14:52:43
21   a MOBIS opportunity, then I would use the 14:52:45
22   MOBIS rate schedule.  I wouldn't do this. 14:52:48
23   We already have MOBIS rates and those are 14:52:50
24   the rates that I would use.             14:52:53
25        Q.    And you would have used the  14:52:54
```

KELLY L. BRYSON - 8/28/2014

Page 141

```
 1                   KELLY L. BRYSON
 2    ISIT MOBIS rates?                              14:52:57
 3          A.    There's only one set of CGI        14:53:00
 4    MOBIS rates.  It's a MOBIS schedule.           14:53:03
 5    It's a price list and those are the rates      14:53:06
 6    I would have used.                             14:53:07
 7          Q.    So whether the opportunity is      14:53:08
 8    a BPS or ISIT you would use that one           14:53:10
 9    MOBIS schedule?                                14:53:13
10          A.    Correct.                           14:53:14
11          Q.    And that's public information?     14:53:15
12          A.    I believe MOBIS is public,         14:53:16
13    yes.                                           14:53:17
14          Q.    And I might have heard wrong,      14:53:17
15    but did you say the MOBIS schedules are        14:53:19
16    submitted and approved every year?             14:53:23
17          A.    No.                                14:53:25
18          Q.    How often are they approved?       14:53:25
19          (Instruction not to answer.)             14:53:28
20          MR. KLEIN:  We're done with              14:53:28
21       MOBIS.  She testified MOBIS was not         14:53:28
22       used in this rate by her.  So               14:53:32
23       whether or not CGI uses MOBIS rates         14:53:34
24       for other pursuits is not relevant          14:53:37
25       and I would instruct the witness            14:53:39
```

KELLY L. BRYSON - 8/28/2014

Page 142

```
 1              KELLY L. BRYSON
 2       not to answer any further questions        14:53:40
 3       regarding CGI's use of MOBIS rates          14:53:42
 4       in other pursuits.                          14:53:46
 5           MR. HERBST:  Would you mark             14:53:54
 6       that for a ruling, please.                  14:53:55
 7           (A recess was taken.)                   15:13:22
 8       Q.   So I think it's time to show           15:19:02
 9  you the documents that we were provided          15:21:55
10  yesterday afternoon.                             15:22:03
11           MR. HERBST:  Would you mark             15:22:14
12       this as Bryson Exhibit 1.                   15:22:15
13           (Bryson Exhibit 1 for                   15:22:17
14       identification, Bates stamped               15:22:17
15       CGI_ASHMORE 2015411 through                 15:22:17
16       2015421.)                                   15:22:18
17       Q.   I'm first going to show you            15:22:18
18  Bryson 1.  For the record, it seems to           15:22:20
19  consist of 11 pages and it bears a CGI           15:22:23
20  copyright in the lower right-hand corner.        15:22:36
21  Have you seen that document before?              15:22:45
22       A.   Yes.                                   15:22:46
23       Q.   When did you first see this            15:22:49
24  document?                                        15:23:02
25       A.   This is an example of a cost           15:23:03
```

KELLY L. BRYSON - 8/28/2014

Page 143

```
 1                    KELLY L. BRYSON
 2    narrative that I mentioned earlier.  So I        15:23:07
 3    would have helped prepare this.                  15:23:11
 4         Q.    You would have helped prepare         15:23:14
 5    this document?                                   15:23:16
 6         A.    Yes.                                   15:23:16
 7         Q.    And how did you go about              15:23:16
 8    preparing it?                                    15:23:18
 9         A.    We have a variety of templates        15:23:18
10    that we use to pull cost narratives             15:23:22
11    together.                                        15:23:29
12         Q.    When you say you have a               15:23:32
13    variety, how many?                               15:23:34
14         A.    I would say maybe three or            15:23:34
15    four different ones.                             15:23:40
16         Q.    And which one is this?                15:23:42
17         A.    This one would be a cost plus         15:23:44
18    type template because this is what we           15:23:52
19    submitted to the government.                     15:23:57
20         Q.    When did you submit this to          15:24:03
21    the government?                                  15:24:04
22         A.    It looks like June 1st, 2010.         15:24:05
23         Q.    That date in the lower               15:24:10
24    left-hand corner of the first page is the       15:24:11
25    date submitted to the government?               15:24:13
```

KELLY L. BRYSON - 8/28/2014

Page 144

```
 1                   KELLY L. BRYSON
 2        A.    Yes.                              15:24:14
 3        Q.    And what occasioned your          15:24:14
 4   submitting it to the government?             15:24:18
 5        A.    That would have been the RFP      15:24:19
 6   due date.                                    15:24:24
 7        Q.    For this particular               15:24:25
 8   opportunity you mean?                        15:24:26
 9        A.    Yes.                              15:24:27
10        Q.    But would you have used this      15:24:27
11   cost narrative in connection with any        15:24:32
12   other opportunities?                         15:24:33
13              MR. KLEIN:  Object to the         15:24:35
14        form.                                   15:24:36
15        A.    This specific one?                15:24:36
16        Q.    Yes.                              15:24:38
17        A.    Not this specific one.            15:24:38
18        Q.    Did you prepare a cost            15:24:40
19   narrative for every opportunity that you     15:24:41
20   got to the step 3 process?                   15:24:46
21        A.    Not every opportunity, but the    15:24:47
22   majority of them.                            15:24:49
23        Q.    Most of them?                     15:24:50
24        A.    Yes.                              15:24:50
25        Q.    You would have a separate one     15:24:51
```

KELLY L. BRYSON - 8/28/2014

Page 145

```
 1                    KELLY L. BRYSON
 2     for each opportunity?                        15:24:53
 3          A.    Yes.                              15:24:54
 4          Q.    How many opportunities did you    15:24:54
 5     provide rates for, let's say, in 2010,       15:24:56
 6     approximately?                               15:24:58
 7               MR. KLEIN:  Object to the          15:24:59
 8          form.                                   15:25:00
 9          Q.    An estimate?                      15:25:01
10          A.    Rates?  I don't know, I would     15:25:02
11     guess between 30 and 40.                     15:25:04
12          Q.    How many cost narratives did      15:25:09
13     you prepare in 2010, estimate?               15:25:10
14          A.    Probably the same range, maybe    15:25:15
15     25 to 35.  The majority of them have cost    15:25:17
16     narratives associated with them.            15:25:20
17          Q.    When you said you had three or    15:25:24
18     four cost narratives, you had a variety,     15:25:26
19     three or four, what did you mean?            15:25:28
20               MR. KLEIN:  Object to the          15:25:30
21          form.                                   15:25:31
22          A.    We had different templates.       15:25:31
23     So what this template or what this           15:25:33
24     narrative does is provides a lot of the      15:25:34
25     detail of the methodology of how we          15:25:37
```

KELLY L. BRYSON - 8/28/2014

Page 146

```
 1              KELLY L. BRYSON
 2    derived our rates.  When that detail is        15:25:39
 3    not necessary or if it is a schedule           15:25:44
 4    purchase, there is a different template        15:25:48
 5    that we would start with as our basis          15:25:51
 6    because this detailed methodology              15:25:53
 7    information wouldn't be relevant or            15:25:55
 8    necessary for those types of deals.            15:25:57
 9         Q.    That's what I'm trying to           15:26:01
10    understand.  You said a schedule what?        15:26:03
11         A.    Purchase.                           15:26:04
12         Q.    Matrix you said or what?            15:26:05
13         A.    Purchase.                           15:26:07
14         Q.    Schedule purchase?                  15:26:07
15         A.    Yes.  If we win this BPA, for       15:26:09
16    example, we've already submitted our           15:26:14
17    rates to ICF, we've already submitted          15:26:17
18    this information to the government.  This       15:26:19
19    information at this level of detail            15:26:21
20    wouldn't be necessary in the future most       15:26:22
21    likely.  So our narrative for any task         15:26:25
22    order proposals will look very different        15:26:30
23    from this one.                                 15:26:33
24         Q.    First of all, what's RCF?           15:26:33
25         A.    I don't know.  I don't know         15:26:36
```

```
 1                KELLY L. BRYSON
 2    what RCF is.                                    15:26:39
 3         Q.    You mentioned RCF in a              15:26:40
 4    previous answer.  Oh, ICF.  Thank you.         15:26:45
 5              So what I'm trying to                15:26:56
 6    understand is, you said there are three        15:26:57
 7    or four different templates that you use       15:27:01
 8    that result in 30 to 40 cost narratives,       15:27:03
 9    right?                                          15:27:06
10         A.    Yes.                                15:27:07
11         Q.    So I'm trying to understand         15:27:07
12    which template is this among the three or      15:27:14
13    four?                                           15:27:16
14         A.    This would be a cost plus type      15:27:16
15    template because it describes our cost         15:27:18
16    and rate buildup methodology.                  15:27:20
17         Q.    What are the other templates?       15:27:27
18         A.    We have a schedule template.        15:27:29
19    We have I guess a more generic time and        15:27:35
20    materials template.  And then there are        15:27:37
21    lots of situations where we may hybridize      15:27:42
22    between a couple of different types of          15:27:46
23    templates.  I mean the templates are           15:27:48
24    really just a starting ground.  Every          15:27:50
25    proposal is different.  Every RFP              15:27:52
```

KELLY L. BRYSON - 8/28/2014

Page 148

```
 1              KELLY L. BRYSON
 2    requests different information to be        15:27:56
 3    included in the cost volume.                15:27:57
 4        Q.    So how does the cost plus         15:28:00
 5    template differ from the generic time and   15:28:03
 6    materials template?                         15:28:07
 7        A.    Because again --                  15:28:08
 8        Q.    I ask that question because       15:28:09
 9    you earlier testified this was a time and   15:28:11
10    materials contract?                         15:28:14
11        A.    Correct.  This is a time and      15:28:14
12    materials contract.  However, because we    15:28:18
13    were establishing these rates for the       15:28:21
14    first time, we submitted this template      15:28:23
15    which includes a lot of the cost buildup    15:28:27
16    information so the government could          15:28:30
17    understand how we arrived at our rate.      15:28:32
18            And then going forward, for         15:28:33
19    any task order proposal we would use a      15:28:36
20    time and materials template because the     15:28:39
21    rates had already been established at       15:28:41
22    that point.                                 15:28:42
23        Q.    So you mean the time and          15:28:44
24    materials template builds on the cost       15:28:46
25    plus template that's always submitted the   15:28:51
```

KELLY L. BRYSON - 8/28/2014

Page 149

```
 1                    KELLY L. BRYSON
 2     first time on a time and materials              15:28:53
 3     contract?                                       15:28:55
 4            MR. KLEIN:  Object to form.              15:28:56
 5       A.    I wouldn't say they build upon          15:28:57
 6     one another, but this information in this       15:28:59
 7     template is necessary for the government        15:29:03
 8     to understand how their rates are               15:29:04
 9     derived.  Once we receive an award, then        15:29:07
10     the schedule is created.  So going              15:29:09
11     forward we don't need to provide this           15:29:12
12     level of detail because the rates have          15:29:14
13     already been awarded and approved.              15:29:16
14       Q.    What's the difference between           15:29:18
15     a cost plus contract and a time and             15:29:19
16     materials contract?                             15:29:21
17       A.    A cost plus contract is a               15:29:21
18     contract where we are reimbursed for our        15:29:26
19     cost plus an amount of fee.                      15:29:32
20       Q.    And the fee is like a profit?           15:29:35
21       A.    Yes.                                     15:29:37
22       Q.    What are the profit ranges              15:29:40
23     that typically you get in a cost plus?          15:29:42
24            (Instruction not to answer.)             15:29:44
25            MR. KLEIN:  We're going to be            15:29:44
```

KELLY L. BRYSON - 8/28/2014

Page 150

```
 1              KELLY L. BRYSON
 2    finished with this line of            15:29:46
 3    questioning.  Once again, it's        15:29:47
 4    completely --                         15:29:48
 5         MR. HERBST:  I don't think so.   15:29:50
 6    I'm entitled to test whether and      15:29:52
 7    why this particular template was      15:29:54
 8    used opposed to a time and            15:29:55
 9    materials.                            15:29:58
10         MR. KLEIN:  So you can ask her   15:29:59
11    if --                                 15:30:00
12         MR. HERBST:  No, I can ask it    15:30:00
13    my own way and I'm trying to do       15:30:03
14    that and your objections really are   15:30:05
15    not apt.  I'm entitled to ask.        15:30:07
16         MR. KLEIN:  I'm going to         15:30:09
17    object to her answering any           15:30:10
18    questions about profits on any        15:30:12
19    other projects other than the ones    15:30:14
20    at issue.                             15:30:17
21         MR. HERBST:  Can you repeat my   15:30:33
22    question.                             15:30:35
23         (Record read as requested.)     15:30:36
24         MR. KLEIN:  I'm going to         15:30:36
25    instruct the witness not to answer    15:30:37
```

```
 1                  KELLY L. BRYSON
 2          that question unless it relates          15:30:39
 3          specifically to the contracts at         15:30:40
 4          issue.                                    15:30:41
 5              MR. HERBST:  She used a cost          15:30:42
 6          plus template, so I'm entitled to        15:30:46
 7          ask.                                      15:30:47
 8          Q.   What's the typical profit           15:30:49
 9     range in a cost plus contract?                15:30:51
10              MR. KLEIN:  You can answer           15:30:53
11          what the -- I'll let the witness         15:30:54
12          answer what the profit range is in       15:30:57
13          this contract.                            15:30:59
14              MR. HERBST:  You're                   15:30:59
15          obstructing my deposition, Mr.           15:31:00
16          Klein.                                    15:31:02
17              MR. KLEIN:  I'm not                   15:31:06
18          obstructing it.                           15:31:07
19              MR. HERBST:  Yes, you are.           15:31:08
20          You're getting to the point where        15:31:09
21          you are obstructing and                   15:31:12
22          interfering, this objection is           15:31:20
23          really, really not apt.                   15:31:23
24              MR. KLEIN:  I would maintain         15:31:25
25          that a majority of the questions         15:31:26
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2      that have been asked today have          15:31:28
 3      been, if not most of them, have          15:31:29
 4      been far afield of what has been         15:31:31
 5      permissible by Judge Cott and this       15:31:34
 6      is just essentially a fishing            15:31:36
 7      expedition.  I will let Ms. Bryson       15:31:37
 8      answer questions specifically            15:31:42
 9      regarding this document.  I'm not        15:31:43
10      going to have her answer questions       15:31:45
11      that are unrelated to the limited        15:31:46
12      issues that Judge Cott allowed in        15:31:49
13      this limited 30(b)(6) deposition.        15:31:52
14      If you want to ask a general             15:31:56
15      question as to -- I'll let you ask       15:31:58
16      the general question and I'll see        15:32:01
17      what Ms. Bryson's answer is, how         15:32:03
18      about that?                              15:32:05
19           MR. HERBST:  I did ask a            15:32:06
20      general question.  Why don't you         15:32:08
21      read it back.                            15:32:09
22           (Record read as requested.)        15:32:10
23           MR. KLEIN:  To the extent you       15:32:23
24      know the answer, if there is a           15:32:24
25      typical profit range.                    15:32:25
```

KELLY L. BRYSON - 8/28/2014

Page 153

```
 1                  KELLY L. BRYSON
 2          A.    I would say there's not a          15:32:26
 3   typical profit range because even within        15:32:27
 4   cost plus contracts there are different         15:32:30
 5   types of cost plus contracts.                   15:32:31
 6          Q.    What are the types?                15:32:33
 7          A.    There's cost plus incentive        15:32:34
 8   fee, there's cost plus fixed fee, there's       15:32:36
 9   cost plus award fee.                            15:32:39
10          Q.    Incentive fee, what else?          15:32:42
11          A.    Fixed fee, award fee and they      15:32:43
12   all have different ranges that may be           15:32:48
13   appropriate, and even within a particular       15:32:52
14   type you may bid different profit ranges        15:32:55
15   on different portions of the deal.              15:32:58
16          Q.    But you have one template for      15:33:00
17   cost plus.  How do they differ for an           15:33:02
18   incentive fee cost plus, a fixed fee cost       15:33:07
19   plus and an award fee cost plus?                15:33:11
20          A.    Well a template is a starting      15:33:13
21   point and you customize it based on             15:33:16
22   whatever opportunity that you're working        15:33:18
23   toward.  I don't think it's fair to say         15:33:20
24   that just because you're starting from          15:33:21
25   one template means that your resultant          15:33:23
```

KELLY L. BRYSON - 8/28/2014

Page 154

```
 1              KELLY L. BRYSON
 2    document is going to look identical.        15:33:28
 3         Q.   Is there a typical range in       15:33:33
 4    incentive fee versus a fixed fee and an     15:33:35
 5    award fee?                                  15:33:38
 6              MR. KLEIN:  Object to the         15:33:39
 7         form.                                  15:33:40
 8         A.   I would say we don't often bid    15:33:41
 9    incentive fee type deals so I can't         15:33:46
10    answer that.  But that for award fee type   15:33:49
11    work we tend to bid a higher fee than a     15:33:51
12    fixed fee because some portion of the       15:33:53
13    award fee is our risk based on              15:33:55
14    performance rather than being guaranteed    15:33:59
15    as it would be in a fixed fee scenario.     15:34:01
16         Q.   Are both the fixed fee and        15:34:04
17    award fee generally higher than the 10      15:34:06
18    percent on this one?                        15:34:08
19         A.   No.                               15:34:09
20         Q.   Are they lower?                   15:34:09
21         A.   Yes.                              15:34:11
22         Q.   So before we were interrupted     15:34:11
23    and resolved that issue, I was trying to    15:34:39
24    understand the differences between the      15:34:40
25    cost plus template and the time and         15:34:42
```

KELLY L. BRYSON - 8/28/2014

| | | |
|---|---|---|
| 1 | KELLY L. BRYSON | |
| 2 | materials template. | 15:34:44 |
| 3 | A.   So the first time that we're | 15:34:46 |
| 4 | bidding a list of rates the government | 15:34:48 |
| 5 | needs to understand how we derived that | 15:34:52 |
| 6 | rate.  And this document, or more | 15:34:53 |
| 7 | generically the cost plus template, | 15:34:59 |
| 8 | describes in pretty great detail how we | 15:35:01 |
| 9 | arrived at the rate.  And that's why this | 15:35:05 |
| 10 | template was used for this opportunity | 15:35:08 |
| 11 | because it was the first time we were | 15:35:10 |
| 12 | proposing these rates.  HUD needed to see | 15:35:11 |
| 13 | and understand how we calculated these | 15:35:16 |
| 14 | rates. | 15:35:18 |
| 15 | Going forward, assuming that | 15:35:19 |
| 16 | we were awarded contract, HUD would have | 15:35:21 |
| 17 | already reviewed these materials, they | 15:35:24 |
| 18 | would have accepted our rates as | 15:35:25 |
| 19 | calculated and therefore, this | 15:35:27 |
| 20 | information wouldn't be necessary. | 15:35:29 |
| 21 | Q.   But you mentioned a generic | 15:35:32 |
| 22 | time and materials template.  Isn't that | 15:35:34 |
| 23 | one that you could use as a starting | 15:35:36 |
| 24 | point on a time and materials contract? | 15:35:39 |
| 25 | A.   Sure. | 15:35:40 |

KELLY L. BRYSON - 8/28/2014

Page 156

```
 1                KELLY L. BRYSON
 2        Q.    So I'm trying to understand          15:35:41
 3    why you chose to use the cost plus             15:35:43
 4    generic instead of the time and materials      15:35:46
 5    generic since this was a time and              15:35:50
 6    materials contract?                            15:35:52
 7        A.    Because I needed to describe,         15:35:52
 8    again, the methodology and how they            15:35:55
 9    relate.  Because all rates start as cost       15:35:56
10    plus rates, or the majority of rates          15:35:59
11    start as cost plus rates.  And this           15:36:01
12    document details how those rates are          15:36:03
13    derived.  And then once the rates are         15:36:05
14    accepted, then you move to a time and         15:36:09
15    materials scenario.                           15:36:12
16        Q.    So what items go into the cost       15:36:13
17    and what items go into the plus?              15:36:19
18              MR. KLEIN:  Object to the           15:36:23
19         form.                                    15:36:25
20        A.    The cost includes your direct       15:36:25
21    labor and any indirect rates that you may     15:36:28
22    have and the plus is your fee.                15:36:31
23        Q.    In the time and materials           15:36:42
24    generic what is the cost?                     15:36:44
25        A.    There is no cost.  It's a           15:36:45
```

```
 1                    KELLY L. BRYSON
 2    fully burdened rate.                           15:36:46
 3         Q.    How is a fully burdened rate        15:36:48
 4    calculated?                                    15:36:52
 5         A.    The way that's described in         15:36:52
 6    this document.                                 15:36:54
 7         Q.    In this document?                    15:36:55
 8         A.    Yes.                                 15:36:55
 9         Q.    So this document describes          15:37:01
10    fully burdened rates?                          15:37:03
11         A.    Yes.                                 15:37:04
12         Q.    What is a fully burdened rate?      15:37:04
13         A.    It is a rate that includes         15:37:06
14    your direct labor plus your applicable         15:37:08
15    indirect, plus fees.                           15:37:10
16         Q.    I want to direct your              15:37:47
17    attention to the first page of that           15:37:48
18    document where you say three lines from        15:37:50
19    the bottom, "Each direct labor role rate      15:37:54
20    is an average of actual salaries for          15:37:57
21    employees classified in that particular       15:37:59
22    role as of April 20, 2010."                    15:38:01
23              Do you see that?                     15:38:06
24         A.    Yes.                                 15:38:07
25         Q.    What do you mean by that?           15:38:07
```

KELLY L. BRYSON - 8/28/2014

Page 158

```
 1                    KELLY L. BRYSON
 2         A.    It means that, as I mentioned     15:38:08
 3    earlier, everyone at CGI is classified       15:38:11
 4    into a role that aligns with the type of     15:38:15
 5    work that they do, and we query that         15:38:19
 6    information from the HR system and           15:38:22
 7    calculate an average of everyone in each     15:38:26
 8    of those particular roles and that's how     15:38:28
 9    we derive direct labor.                      15:38:34
10         Q.    But in the case where you know    15:38:35
11    the individuals involved, like a             15:38:38
12    Plaintiff's Exhibit 18, why wouldn't you     15:38:42
13    use the actual salaries for each person?     15:38:44
14              MR. KLEIN:  Object to the          15:38:47
15         form.                                   15:38:48
16         A.    Because we weren't bidding,       15:38:48
17    generally speaking we're not bidding         15:38:51
18    those people as key.  We may hire            15:38:53
19    different people.  They may be engaged on    15:38:55
20    other things when we win the work.  So       15:38:58
21    they are representative and they're          15:39:00
22    helpful for me to understand the types of    15:39:02
23    people that we plan to engage on the         15:39:04
24    opportunity, but they're not necessarily     15:39:09
25    the people that will be on the               15:39:10
```

```
 1               KELLY L. BRYSON
 2    opportunity.  They're just examples.        15:39:12
 3         Q.    So if these people were          15:39:15
 4    denominated as key people then you would    15:39:17
 5    have used their actual salaries, correct?   15:39:19
 6              MR. KLEIN:  Object to the          15:39:21
 7         form.                                   15:39:22
 8         A.    For a time and material, for     15:39:23
 9    what we're -- for the development of a      15:39:25
10    time and materials list of rates,           15:39:27
11    probably not.                               15:39:31
12         Q.    Why not?                          15:39:32
13         A.    Because just because one --     15:39:33
14    because you may have more than one person   15:39:39
15    in the labor category.  If, for example,    15:39:41
16    business analyst is a very generic labor    15:39:44
17    category.  We could bid someone as a key    15:39:46
18    business analyst and still have six other   15:39:49
19    business analysts so it wouldn't make       15:39:51
20    sense that the entire business analyst      15:39:53
21    rate be based on one person when there is   15:39:55
22    a much larger pool of people that still     15:39:57
23    qualify for that labor category.            15:40:01
24         Q.    But in this particular           15:40:02
25    opportunity Mr. Ashmore was the business    15:40:04
```

KELLY L. BRYSON - 8/28/2014

Page 160

```
 1              KELLY L. BRYSON
 2  opportunity manager, right?              15:40:07
 3           MR. KLEIN:  Object to the       15:40:12
 4      form.                                15:40:13
 5      A.   I don't know what you mean by   15:40:14
 6  business opportunity manager.            15:40:15
 7      Q.   I think we went over -- well    15:40:17
 8  what's a subject matter expert, that's   15:40:29
 9  how his role is denominated?             15:40:31
10      A.   He would have been one of       15:40:33
11  potentially several subject matter       15:40:35
12  experts.                                 15:40:38
13      Q.   But he's the only one listed?   15:40:38
14      A.   That's irrelevant.              15:40:40
15      Q.   It's irrelevant.  And in what   15:40:42
16  category was he?                         15:40:46
17           MR. KLEIN:  Object to the       15:40:49
18      form.                                15:40:50
19      A.   Like you said, he's listed      15:40:51
20  here as subject matter expert.           15:40:53
21      Q.   You said there were a bunch of  15:40:55
22  different subcategories in subject matter 15:40:57
23  expert.  So which one was he?            15:41:00
24      A.   I don't believe that that's     15:41:01
25  what I said.                             15:41:02
```

KELLY L. BRYSON - 8/28/2014

Page 161

```
 1                  KELLY L. BRYSON
 2        Q.    I thought you said that there        15:41:03
 3   were a bunch of different categories of         15:41:08
 4   subject --                                      15:41:11
 5              MR. KLEIN:  She said business        15:41:13
 6        analysts.                                  15:41:14
 7        Q.    Excuse me, subject matter            15:41:14
 8   expert 6, 7, 8 and so forth?                    15:41:18
 9        A.    That's how people are               15:41:20
10   classified in the PSA system, in our HR         15:41:21
11   system.  That doesn't align to this.            15:41:28
12        Q.    Well how many different              15:41:33
13   categories of subject matter expert are         15:41:35
14   there in your HR system?                        15:41:37
15        A.    Subject matter expert is            15:41:39
16   grouped with business analyst and there         15:41:45
17   aren't different categories, there's            15:41:46
18   different levels.                               15:41:48
19        Q.    That's what I meant, levels.         15:41:50
20        A.    I don't know.  I mean               15:41:51
21   generally it goes from about 7 to 16, but       15:41:54
22   we don't necessarily have all of them           15:41:58
23   represented at any given time.                  15:42:00
24        Q.    So how would you derive the          15:42:01
25   blend that you're talking about for             15:42:05
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    subject matter expert here?              15:42:06
 3         A.    I would use my professional   15:42:08
 4    discretion to blend the roles such that I 15:42:11
 5    arrived at a rate that was appropriate   15:42:19
 6    for that labor category as described.    15:42:20
 7         Q.    And you would review what in  15:42:25
 8    order to make that determination?        15:42:27
 9         A.    The labor category           15:42:28
10    description.  It's a big one.  I would   15:42:31
11    review representative personnel.  I may  15:42:34
12    solicit salary information from          15:42:39
13    recruiting or from our compensation team. 15:42:42
14    There's a variety of places where I may  15:42:46
15    get information that helped me determine  15:42:48
16    how to best map a rate.                  15:42:51
17         Q.    Do you remember what you did  15:42:53
18    in this case?                            15:42:55
19         A.    My professional discretion.  15:42:55
20         Q.    I mean do you remember what   15:42:59
21    sources you consulted before using your  15:43:02
22    professional discretion?                 15:43:03
23         A.    I looked at these salaries and 15:43:04
24    I also used just the knowledge I have    15:43:07
25    from doing my job every day of           15:43:10
```

KELLY L. BRYSON - 8/28/2014

Page 163

```
 1                 KELLY L. BRYSON
 2    approximately what a lot of these labor          15:43:12
 3    categories would command in the                  15:43:15
 4    marketplace.                                      15:43:17
 5         Q.    Now when you said you looked           15:43:17
 6    at these salaries your finger was                 15:43:19
 7    pointing to the right-hand column on that         15:43:22
 8    rate card, the first page of Exhibit 18,          15:43:26
 9    with the names, right?                            15:43:27
10         A.    Right.                                 15:43:29
11         Q.    So is your professional                15:43:30
12    discretion the last word?                         15:43:46
13         A.    No.                                    15:43:48
14         Q.    Who else weighs in with their          15:43:48
15    professional discretion before this rate          15:43:51
16    card is generated in 18?                          15:43:54
17              MR. KLEIN:  Object to the               15:43:56
18         form.                                        15:43:57
19         A.    That's what this executive             15:43:58
20    step review process is for, and if the            15:43:59
21    they feel our price is too high or if             15:44:01
22    they feel that a rate is inappropriate            15:44:03
23    they are more than welcome to weigh in            15:44:05
24    and we discuss that until we come up with         15:44:07
25    the rates that everybody feels is                 15:44:10
```

KELLY L. BRYSON - 8/28/2014

Page 164

```
 1              KELLY L. BRYSON
 2   appropriate.                              15:44:11
 3        Q.    Is that done mostly by email?  15:44:12
 4        A.    It varies.                     15:44:19
 5        Q.    Well when it's done by         15:44:20
 6   telephone you make a record of the call? 15:44:21
 7        A.    The PMO is, the project        15:44:23
 8   management office does take minutes.  Do  15:44:26
 9   they record it?  No, but they do take     15:44:31
10   minutes and action items.                 15:44:33
11        Q.    Minutes and action items?      15:44:34
12        A.    Yes.                           15:44:36
13             MR. HERBST:  I'm going to       15:44:39
14        request all emails, minutes and      15:44:40
15        action items relating to the         15:44:42
16        generation of the rates in this      15:44:43
17        opportunity.                         15:44:45
18             (Request made.)                 15:44:45
19        Q.    At the time in 2010, in terms  15:45:19
20   of people in your unit, in the pricing    15:45:22
21   unit, who else would weigh in besides     15:45:26
22   you?                                      15:45:29
23        A.    If I was engaged on an         15:45:31
24   opportunity where I felt I needed help or 15:45:34
25   was unsure, I would consult with my       15:45:36
```

KELLY L. BRYSON - 8/28/2014

Page 165

```
 1              KELLY L. BRYSON
 2    manager.                                    15:45:38
 3         Q.    Who was?                          15:45:40
 4         A.    Tracey -- well, Tracey Burger     15:45:40
 5    was the manager of the pricing department   15:45:44
 6    but she was not my manager.  But I would     15:45:45
 7    consult with her on pricing related         15:45:48
 8    issues if I had concerns.                    15:45:49
 9         Q.    Would you also consult with      15:45:50
10    your manager?                               15:45:53
11         A.    Generally not for pricing        15:45:53
12    related stuff.                              15:45:55
13         Q.    Why not?                          15:45:55
14         A.    Because he doesn't do pricing.   15:45:56
15         Q.    So did you consult with Tracey   15:45:59
16    Burger on this one?                         15:46:01
17         A.    I don't think so.  This was a    15:46:02
18    small, straightforward opportunity.  I      15:46:03
19    don't -- I don't recall that there was      15:46:07
20    any reason to need to consult with Tracey   15:46:08
21    on this.                                    15:46:11
22         Q.    But you haven't actually gone    15:46:11
23    back and checked your emails to determine   15:46:14
24    whether you did?                            15:46:16
25         A.    No.                              15:46:16
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2        Q.    You haven't consulted any          15:46:17
 3    minutes or action items to determine          15:46:18
 4    whether you did?                               15:46:20
 5        A.    No.                                 15:46:21
 6              MR. HERBST:  I'll repeat my          15:46:23
 7        request there.                             15:46:25
 8              (Request made.)                      15:46:25
 9        Q.    Did you know that Mr. Ashmore        15:46:48
10    had been a former HUD employee or             15:46:50
11    official when you did this?                    15:46:53
12              MR. KLEIN:  Object to form.          15:46:55
13        A.    I don't think so.  I don't           15:46:56
14    know much about Mr. Ashmore.                   15:46:57
15        Q.    So how would you exercise your       15:46:59
16    professional judgment to determine in          15:47:01
17    what specific SME category he would be         15:47:03
18    placed?                                        15:47:07
19        A.    Again, I don't place anyone in       15:47:07
20    any SME category.  People are classified       15:47:12
21    into a category in the HR system when          15:47:15
22    they're hired and it's up to them and          15:47:18
23    their manager to move them into a              15:47:20
24    different HR system category.                  15:47:22
25              What I do is I take that             15:47:25
```

KELLY L. BRYSON - 8/28/2014

Page 167

```
 1              KELLY L. BRYSON
 2    information that's in the system and I        15:47:27
 3    create a mapping to an RFP labor              15:47:30
 4    category, which is very different.  And       15:47:33
 5    right here there was, as defined by the       15:47:35
 6    government and ICF, a subject matter          15:47:39
 7    expert role that the team told me that        15:47:42
 8    Mr. Ashmore would fall into.                  15:47:44
 9         Q.    You say the subject matter         15:47:48
10    expert listed at the bottom of page 2         15:47:57
11    there, three lines up?                        15:48:00
12         A.    Yes.                               15:48:01
13         Q.    Was what, you said?                15:48:01
14         A.    That is a labor category           15:48:02
15    defined by the request for proposal from      15:48:06
16    ICF and HUD.  That's not a labor category     15:48:09
17    that CGI defined.                             15:48:12
18         Q.    Do I understand your testimony     15:48:26
19    correctly that you never found out what       15:48:28
20    rates ICF gave to the government with         15:48:33
21    respect to these people?                      15:48:37
22         A.    That's correct, I don't.           15:48:39
23         Q.    And you never asked or you         15:48:41
24    never asked to look?                          15:48:43
25         A.    No.                                15:48:45
```

KELLY L. BRYSON - 8/28/2014

Page 168

```
 1                    KELLY L. BRYSON
 2         Q.    Would you have had available          15:48:46
 3    to you if you wanted to ICF's MOBIS              15:48:48
 4    schedule?                                        15:48:53
 5         A.    Again, I believe that MOBIS           15:48:53
 6    schedules are public.                            15:48:56
 7         Q.    So you would have had it              15:48:57
 8    available to you if you or someone else          15:48:59
 9    at CGI if they wanted to consult it?             15:49:02
10         A.    Yes, most likely.                     15:49:04
11         Q.    And you had the CGI MOBIS             15:49:06
12    schedule available to you?                       15:49:09
13         A.    Yes.                                  15:49:10
14         Q.    Now the next line, second line       15:49:23
15    up from the bottom on Bryson 1 says "The        15:49:26
16    average rate is a straight average              15:49:30
17    calculated by dividing total salaries in        15:49:32
18    that particular internal role by the            15:49:35
19    number of exempt employees classified in        15:49:37
20    the role," right?                                15:49:40
21         A.    Yes.                                  15:49:43
22         Q.    Is that what you did?                 15:49:44
23         A.    Yes.                                  15:49:45
24         Q.    So you had to find the total         15:49:45
25    salaries of everybody in that particular        15:49:53
```

KELLY L. BRYSON - 8/28/2014

Page 169

```
 1                    KELLY L. BRYSON
 2    internal role?                              15:49:56
 3         A.    In that particular role as       15:49:56
 4    classified in the HR system.  Again, not    15:49:58
 5    these roles.  These are labor categories.   15:50:00
 6    These are not roles.  Our people are        15:50:03
 7    classified in our HR system into roles.     15:50:05
 8              MR. HERBST:  Would you mark        15:50:14
 9         this as Bryson Exhibit 2.              15:50:15
10              (Bryson Exhibit 2 for             15:50:17
11         identification, Bates stamped          15:50:17
12         CGI_ASHMORE 2015407 through            15:50:17
13         2015410.)                              15:50:18
14         Q.    So let me show you Bryson 2.     15:50:18
15    Is that the list of CGI roles that you      15:50:20
16    are speaking of?                            15:50:22
17         A.    Yes.                             15:50:22
18         Q.    So I see, for example, that      15:50:30
19    there's business analyst/SME, right?        15:50:33
20         A.    Yes.                             15:50:39
21         Q.    At 6 through 16?                 15:50:40
22         A.    Yes.                             15:50:42
23         Q.    So there are 11 different        15:50:42
24    categories of business analyst and SME,     15:50:45
25    right?                                      15:50:47
```

KELLY L. BRYSON - 8/28/2014

```
 1                KELLY L. BRYSON
 2        A.    Yes.                                15:50:47
 3        Q.    Why is business analyst and         15:50:48
 4   SME broken out separately as labor             15:50:53
 5   categories if your own CGI internal role       15:50:57
 6   descriptions combine them?                     15:51:02
 7             MR. KLEIN:  Object to the            15:51:05
 8        form.                                     15:51:06
 9        A.    That was a requirement of the       15:51:06
10   government.  This is not our -- we did         15:51:07
11   not create this list.  This is our            15:51:10
12   internal list.  When we are required to        15:51:12
13   do so we map from our internal categories      15:51:14
14   to whatever the RFP categories are, but        15:51:16
15   there's often not a one-to-one match.          15:51:19
16        Q.    Is that something you did on        15:51:22
17   this one?                                      15:51:23
18        A.    Yes.                                15:51:23
19        Q.    And so what did you consult in      15:51:24
20   order to try to determine which                15:51:28
21   categories or which people listed on the       15:51:31
22   right-hand side of that rate card should       15:51:34
23   go into which categories of your own CGI       15:51:36
24   role categories?                               15:51:41
25             MR. KLEIN:  Object to the            15:51:43
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2        form.                                    15:51:44
 3        A.    I didn't do that.  Their           15:51:44
 4   managing and their hiring person put them     15:51:45
 5   into a CGI category.                          15:51:48
 6        Q.    Whose manager?                      15:51:49
 7        A.    Every individual's manager         15:51:51
 8   determines that.                              15:51:55
 9        Q.    So when they're hired at CGI       15:51:55
10   they go into a category you're saying?        15:51:58
11        A.    They go into a role.              15:51:59
12        Q.    In one of these roles?            15:52:00
13        A.    Yes.                              15:52:01
14        Q.    What was Mr. Ashmore's role?      15:52:02
15        A.    I don't know off the top of my    15:52:05
16   head.                                        15:52:07
17        Q.    How would we determine what       15:52:08
18   his role was?                                15:52:09
19        A.    We'd need to look at the          15:52:10
20   roster at the time.                          15:52:11
21        Q.    Where is that roster?             15:52:12
22        A.    I don't have it.                  15:52:13
23        Q.    That's not anything you           15:52:14
24   consulted at the time?                       15:52:16
25        A.    I'm not sure.                     15:52:17
```

KELLY L. BRYSON - 8/28/2014

Page 172

```
 1              KELLY L. BRYSON
 2        Q.    Or you did?                        15:52:19
 3        A.    I don't know if I consulted it     15:52:19
 4    to determine his role because I knew that    15:52:21
 5    even regardless of what his role was, I      15:52:23
 6    knew that what we were pricing was a         15:52:27
 7    subject matter expert.  There are people     15:52:29
 8    that can be classified in a role that may    15:52:31
 9    be more specific than a category that        15:52:33
10    we're pricing.                               15:52:36
11        Q.    I understand you don't             15:52:37
12    remember whether you consulted it or not,    15:52:38
13    I understand that, all right.  Correct?      15:52:42
14        A.    Yes.                               15:52:45
15        Q.    But if you did, we would like      15:52:45
16    to see it.  Is this something that you       15:52:52
17    can retrieve, a roster, what the roster      15:52:57
18    was at the time this document was            15:53:00
19    generated, Plaintiff's Exhibit 18 was        15:53:03
20    generated?                                   15:53:05
21        A.    Yes.                               15:53:06
22        MR. HERBST:  So we're going to           15:53:07
23        request the roster for all of these      15:53:08
24        people on here.                          15:53:10
25        (Request made.)                          15:53:10
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2         Q.    So what you're telling me is,        15:53:13
 3    I think, that for the government, when          15:53:16
 4    the government said we want there to be a       15:53:20
 5    subject matter expert, right?                   15:53:23
 6         A.    Yes.                                  15:53:27
 7         Q.    You had to determine what Mr.        15:53:27
 8    Ashmore's -- withdrawn.                          15:53:36
 9              When the government said to           15:53:40
10    CGI we want a subject matter expert and        15:53:43
11    the pursuit team identified Mr. Ashmore        15:53:47
12    as the subject matter expert, you had to       15:53:51
13    look at his qualifications and the             15:53:55
14    qualifications that the government wanted       15:53:59
15    for that position?                              15:54:01
16              MR. KLEIN:  Object to the            15:54:03
17         form.                                       15:54:04
18         A.    I personally don't care what        15:54:04
19    Mr. Ashmore's qualifications are.  I read      15:54:08
20    the description, the labor category            15:54:11
21    description and based on that description      15:54:14
22    I match it up as best I can to these           15:54:16
23    roles.                                          15:54:19
24         Q.    So you're talking about the         15:54:19
25    labor category that the government             15:54:20
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    specified in its -- in what document?        15:54:24
 3         A.    In its request for proposal.      15:54:29
 4         Q.    In its RFP?                        15:54:31
 5         A.    Yes.                               15:54:35
 6         Q.    You looked at those               15:54:36
 7    qualifications and you matched it to          15:54:42
 8    what?                                         15:54:44
 9         A.    Our, CGI's internal roles.        15:54:44
10         Q.    This Bryson 2?                     15:54:47
11         A.    Yes.                               15:54:48
12         Q.    So you had to match it to one     15:54:49
13    of these categories 6, 7, 8, 10, 11, 12,      15:54:51
14    13, 14 or 15?                                 15:54:56
15         A.    I don't have to match it to       15:54:57
16    one, I can match it to several.               15:54:58
17         Q.    Well how do you determine to      15:55:00
18    match it to one or to match it to             15:55:03
19    several?                                      15:55:05
20         A.    Again, it's professional          15:55:05
21    discretion.                                   15:55:08
22         Q.    But what factors go into how      15:55:08
23    you exercise the discretion?                  15:55:10
24         A.    I look at the salaries and I      15:55:12
25    look at, again, the description to            15:55:13
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2    determine what level of seniority they're          15:55:17
 3    looking for.  And that helps me determine          15:55:20
 4    are they looking for a college graduate            15:55:23
 5    at $60,000 or are they looking at someone          15:55:26
 6    with five years experience that makes              15:55:28
 7    $85,000.  And then based on that, I do a            15:55:30
 8    mapping that helps me derive a rate.               15:55:34
 9              And if I don't feel                       15:55:39
10    comfortable or I need a second opinion,            15:55:41
11    then I can reach out to, again,                    15:55:43
12    compensation or recruiting.  Again, I              15:55:47
13    will factor in to the extent that it               15:55:49
14    makes sense if I'm given representative            15:55:52
15    personnel.                                         15:55:55
16         Q.    But when Mr. Ashmore is                 15:55:58
17    identified, wouldn't you locate the                15:56:01
18    category that he's in?                             15:56:03
19         A.    Not necessarily.                        15:56:04
20              MR. KLEIN:  Object to the                 15:56:05
21         form.                                          15:56:06
22         Q.    Why not?                                 15:56:06
23         A.    Because he may -- I mean I              15:56:06
24    could look at that, but I don't                    15:56:10
25    necessarily do that because I know in              15:56:11
```

KELLY L. BRYSON - 8/28/2014

Page 176

```
 1              KELLY L. BRYSON
 2    this situation there's a subject matter        15:56:14
 3    expert category, I have a subject matter       15:56:16
 4    expert role, those are the people that         15:56:18
 5    I'm going to look at.                          15:56:20
 6              Like we have people in here          15:56:21
 7    that are listed as CM specialists.  If         15:56:24
 8    they're not looking for --                     15:56:28
 9         Q.    You have them in which              15:56:29
10    document?                                      15:56:31
11         A.    In this role list you can see       15:56:33
12    there --                                       15:56:35
13         Q.    Bryson 2?                           15:56:35
14         A.    Bryson 2, there are a number        15:56:36
15    of granular category -- roles.                 15:56:38
16         Q.    What do you mean by granular?       15:56:41
17         A.    For example, there is a            15:56:43
18    technical writer, for example, so I may        15:56:47
19    be looking at a person that qualifies for      15:56:56
20    a technical writer role, but they're not       15:56:58
21    asking me for a technical writer labor         15:57:01
22    category.  So maybe I just used business       15:57:03
23    analyst even though --                         15:57:06
24         Q.    But they were asking for           15:57:08
25    technical writer category?                     15:57:09
```

KELLY L. BRYSON - 8/28/2014

```
1                    KELLY L. BRYSON
2         A.    Then I guess I used a poor          15:57:11
3    example.                                       15:57:13
4         Q.    What would you do in that case      15:57:13
5    to come up with the 87.05?                     15:57:15
6         A.    There's another document here       15:57:17
7    that I could show you.                         15:57:18
8         Q.    Which one?  This one?               15:57:20
9         A.    Yes.                                15:57:29
10             MR. HERBST:  Would you mark          15:57:31
11        this as Bryson Exhibit 4.                 15:57:32
12             (Bryson Exhibit 4 for                15:57:34
13        identification, Bates stamped             15:57:34
14        CGI_ASHMORE 2015406.)                     15:57:34
15        Q.    First of all, tell us what          15:57:34
16   that -- before you do it, let me get my        15:57:36
17   copy.  Tell me what Bryson 4 is?               15:57:42
18        A.    This is a worksheet that maps       15:57:44
19   labor roles, internal labor roles to RFP       15:57:48
20   labor categories.                              15:57:52
21        Q.    So this is the document that        15:57:53
22   tells you that you generate, you               15:57:55
23   generated this for this particular one?        15:57:58
24        A.    Yes.                                15:58:00
25        Q.    And so this will tell you what      15:58:00
```

```
 1              KELLY L. BRYSON
 2    you did let's say for technical writer?        15:58:05
 3        A.   Yes.                                  15:58:09
 4        Q.   So what did you do for               15:58:09
 5    technical writer?  By the way before we        15:58:11
 6    get to that.  Going back to Bryson 2, how      15:58:17
 7    come you just didn't take technical,           15:58:20
 8    there's only one technical writer subject      15:58:22
 9    role in CGI, right?                            15:58:25
10        A.    There is a -- yes.                   15:58:27
11        Q.    So why didn't you just use           15:58:29
12    that one, 46.05?                               15:58:32
13        A.    Because, frankly, not                15:58:36
14    everybody in CGI is categorized correctly      15:58:38
15    and because there are a lot of people          15:58:41
16    that are capable of performing a               15:58:44
17    technical writer role that aren't              15:58:48
18    classified as technical writers.  Maybe        15:58:50
19    they don't do it full time.                    15:58:52
20              A lot of people, you'll              15:58:54
21    notice, are there in the application           15:58:56
22    developer role and the business analyst        15:58:59
23    role.  Those roles include a lot of            15:59:01
24    people that do a lot of things.                15:59:03
25        Q.    So what did you do to                15:59:08
```

```
 1                  KELLY L. BRYSON
 2     determine that technical writer should        15:59:10
 3     have a -- what's the first column?  I         15:59:14
 4     cannot read that.                             15:59:16
 5          A.    That first column is base year     15:59:17
 6     hourly -- the very first column on this       15:59:20
 7     worksheet is just the labor category          15:59:22
 8     name.                                         15:59:24
 9          Q.    I meant the first, the one you     15:59:24
10     mentioned, base year what?                    15:59:26
11          A.    Base year hourly cost.             15:59:28
12          Q.    What is that?                      15:59:31
13          A.    That's the salary cost.            15:59:31
14          Q.    What does base year mean?          15:59:35
15          A.    It means in the first year --      15:59:37
16     it means effective for the first 12           15:59:40
17     months of performance.                        15:59:42
18          Q.    And so that figure is 32.77?       15:59:46
19          A.    Yes.                               15:59:49
20          Q.    So how did you come up with        15:59:49
21     that?                                         15:59:52
22          A.    That is a blended average of       15:59:52
23     the business analyst 8, the business          15:59:54
24     analyst 9, and the business analyst 10        15:59:57
25     roles.  It's a weighted average.              16:00:00
```

KELLY L. BRYSON - 8/28/2014

Page 180

```
1              KELLY L. BRYSON
2         Q.    So business analyst SME, 8, 9         16:00:04
3    and 10?                                          16:00:18
4         A.    Yes.                                  16:00:19
5         Q.    So technical writer, the             16:00:19
6    technical writer role had absolutely            16:00:21
7    nothing to do with it, you didn't use           16:00:23
8    that at all?                                     16:00:25
9         A.    I did not.                            16:00:25
10        Q.    Why not?                              16:00:26
11        A.    Because, again, technical            16:00:26
12   writer has one person in it and is not          16:00:32
13   representative of the technical writer          16:00:35
14   skill set as a whole.                           16:00:39
15        Q.    So for subject matter expert,        16:00:40
16   which you knew to be Mr. Ashmore's              16:00:58
17   category, right?                                 16:01:01
18             MR. KLEIN:  Object to the             16:01:02
19        form.                                       16:01:03
20        A.    Yes.                                  16:01:05
21        Q.    You came up with a 7290              16:01:06
22   figure, am I reading that right?                16:01:11
23        A.    Yes.                                  16:01:13
24        Q.    How did you come up with 7290?       16:01:13
25        A.    I used a blending of business        16:01:16
```

KELLY L. BRYSON - 8/28/2014

Page 181

```
 1                    KELLY L. BRYSON
 2     analyst 14, 15 and 16.                          16:01:18
 3          Q.    By the way, is there any             16:01:24
 4     document that shows you're doing that?          16:01:27
 5     Does this document show that you did            16:01:30
 6     that?                                           16:01:31
 7          A.    Yes.                                 16:01:32
 8          Q.    Let's go back to technical           16:01:33
 9     writer.                                         16:01:36
10               MR. HERBST:  By the way, I            16:01:37
11          have to say that these categories         16:01:37
12          are so tiny to read it's almost,          16:01:40
13          it's really a hardship reading them       16:01:45
14          in this fashion.  But you don't           16:01:48
15          have to comment further.  If              16:01:51
16          there's a way to, you know, blow          16:01:54
17          this up so that we can read them a        16:01:56
18          little more.                              16:01:58
19          Q.    But you're able to read them,       16:01:59
20     so maybe it doesn't matter.  So show me        16:02:00
21     how --                                         16:02:04
22               MR. KLEIN:  We have no problem        16:02:05
23          producing this document in a larger       16:02:06
24          format.  How much, it's an Excel          16:02:08
25          spreadsheet, in order to get              16:02:11
```

KELLY L. BRYSON - 8/28/2014

```
 1                KELLY L. BRYSON
 2          everything on one page we needed to        16:02:13
 3          shrink it down.  If you were to            16:02:15
 4          print it out on multiple pages it's        16:02:16
 5          my understanding that you would            16:02:18
 6          need to track from page to page to         16:02:20
 7          page where the columns appear.  So         16:02:23
 8          though it's smaller, it is easier          16:02:24
 9          to use when numbers are spread             16:02:26
10          apart.                                     16:02:29
11              MR. HERBST:  I understand.             16:02:29
12          Q.   What tells you what the               16:02:30
13     blended thing was?                              16:02:41
14              MR. KLEIN:  Object to the              16:02:43
15          form.                                      16:02:44
16          A.   Just so it's a little easier          16:02:44
17     to follow.  If I'm looking at project           16:02:47
18     administrator, which is the very first          16:02:49
19     row.                                            16:02:51
20          Q.   Can you do it with subject            16:02:51
21     matter expert?                                  16:02:53
22          A.   I can.                                16:02:54
23          Q.   Thank you.                            16:02:54
24          A.   So if I take subject matter           16:02:55
25     expert and I follow it across you'll see        16:02:57
```

KELLY L. BRYSON - 8/28/2014

Page 183

```
 1               KELLY L. BRYSON
 2    that there are percentages of 30 percent,          16:02:59
 3    30 percent and 40 percent, and if you              16:03:01
 4    follow those columns up you'll see that            16:03:04
 5    the 30, 30 and 40 fall under business              16:03:06
 6    analyst SME 14 and 15 and 16 column.               16:03:10
 7         Q.   Got you.  How did you choose             16:03:13
 8    to weight 16, the higher, highest level            16:03:16
 9    salary at 40 percent as opposed to 30              16:03:22
10    percent for the others?                            16:03:24
11         A.   Used my professional                     16:03:25
12    discretion to arrive at that combination.          16:03:29
13         Q.   What elements, what factors              16:03:33
14    did you take into account to come to               16:03:37
15    exercise that discretion?                          16:03:40
16              MR. KLEIN:  Object to the                16:03:43
17         form.                                         16:03:44
18         A.   I took into account the -- I             16:03:45
19    mean I can't speak to exactly all of the           16:03:46
20    factors that I took into account at the            16:03:48
21    time, but the types of factors I would             16:03:52
22    have taken into account were any                   16:03:54
23    representative names.  I would have taken          16:03:55
24    into account what we had bid for subject           16:03:57
25    matter expert on other similar deals.  I           16:04:00
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2   would have considered the overall salary          16:04:04
 3   that that rate equated to.  I would have          16:04:08
 4   considered any other people other than            16:04:12
 5   Mr. Ashmore who may have needed to fit            16:04:15
 6   within the scope of that rate.                    16:04:18
 7        Q.    What other people were there           16:04:20
 8   besides Mr. Ashmore who would have to fit         16:04:25
 9   within the scope of that rate?                    16:04:27
10        A.    I can't give you any specific          16:04:28
11   names.  I don't know specific names.              16:04:30
12        Q.    But you don't know that there          16:04:31
13   were any, do you?                                 16:04:33
14        A.    I mean I know that there are           16:04:34
15   subject matter experts at CGI that could          16:04:37
16   have been consulted for this opportunity.         16:04:39
17   Did I know specific ones?  No.  But part          16:04:45
18   of my job is to know that in general at           16:04:47
19   CGI we have subject matter experts and            16:04:51
20   they make from this much dollars to that          16:04:53
21   many dollars and that's the kind of -- I          16:04:55
22   mean that's what I do.  I can't explain           16:04:57
23   it to you I guess better than that.               16:05:03
24        Q.    What do you mean by                     16:05:04
25   representative names as a factor, what            16:05:05
```

```
 1                KELLY L. BRYSON
 2    does that mean?                              16:05:07
 3         A.    Those would be the               16:05:08
 4    representative names referenced in          16:05:08
 5    Exhibit 18.                                 16:05:11
 6         Q.    Where are they referenced?       16:05:15
 7         A.    In the right-hand column.        16:05:16
 8         Q.    Okay, you mean these names.      16:05:19
 9    But there's only one -- in other words,     16:05:20
10    you only considered Mr. Ashmore as a        16:05:22
11    representative name for subject matter      16:05:24
12    expert?                                     16:05:26
13         A.    I consider him as an example.    16:05:26
14         Q.    When you say representative      16:05:30
15    names, since you defined them as the        16:05:31
16    names in the right-hand column, he's the    16:05:35
17    only one for subject matter expert,         16:05:37
18    right?                                      16:05:39
19         A.    I didn't define them.  And       16:05:39
20    again, I know as part of my job that        16:05:41
21    there are more subject matter experts at    16:05:44
22    CGI than just Mr. Ashmore.  He may have     16:05:47
23    been the only person we were specifically   16:05:50
24    considering at this time for this           16:05:54
25    opportunity, but we have more than him.     16:05:55
```

KELLY L. BRYSON - 8/28/2014

Page 186

```
 1                KELLY L. BRYSON
 2        Q.    We what?                          16:06:00
 3        A.    We have more than him.  And I     16:06:01
 4    can't create a rate -- it would be          16:06:04
 5    irresponsible for me to create a rate       16:06:07
 6    that represents a single person.            16:06:10
 7        Q.    But you didn't know what          16:06:18
 8    category he fell, 14, 15 or 16?             16:06:20
 9        A.    It was irrelevant.                16:06:22
10        Q.    I'm asking did you know which     16:06:24
11    category he fell into?                      16:06:27
12        A.    I may have looked at it, I may    16:06:28
13    have not.  I don't know.  What I knew was   16:06:32
14    that the government was looking for a       16:06:34
15    subject matter expert rate and I knew       16:06:38
16    what the description was that they          16:06:40
17    looking for, and I knew based on that       16:06:43
18    they were looking for a somewhat senior     16:06:45
19    person that had subject matter expertise    16:06:48
20    and that's how I created my mapping.        16:06:50
21        Q.    So because they were looking      16:06:53
22    for a senior person you used 14, 15 and     16:06:54
23    16?                                         16:06:57
24        A.    Yes.                              16:06:57
25        Q.    And how senior a person were      16:06:57
```

KELLY L. BRYSON - 8/28/2014

Page 187

```
 1              KELLY L. BRYSON
 2    they looking for?                              16:07:00
 3         A.    I don't recall specifically.        16:07:01
 4         Q.    How senior are the people in        16:07:02
 5    12 and 13?                                     16:07:04
 6         A.    It depends.  A 12 could be          16:07:05
 7    anywhere from 5 to 20.                         16:07:14
 8         Q.    What about 13?                      16:07:18
 9         A.    Again, same answer.  It might       16:07:19
10    be 6 to 20.  It's very -- there's not          16:07:20
11    hard and fast guidelines to any of these.      16:07:23
12         Q.    What about 14, what's the           16:07:26
13    range?                                         16:07:28
14         A.    I don't know.  What I can tell      16:07:28
15    you is that seven is more senior than          16:07:30
16    six.  But if you're asking me if there's       16:07:34
17    specific years of experience that are          16:07:37
18    associated, there's not.                       16:07:38
19         Q.    Well but, you know, you said        16:07:41
20    12 might be five to 20 and 13, 6 to 20?        16:07:45
21         A.    Yes, I'm sure you could find        16:07:48
22    an example of both of those scenarios.         16:07:50
23         Q.    In terms of 16, what would          16:07:51
24    they be?                                       16:07:55
25         A.    I don't know.  More senior          16:07:55
```

```
 1                 KELLY L. BRYSON
 2     than 12.                                        16:07:57
 3         Q.    How would we find out?  How           16:07:57
 4     would we -- how can we find out what the        16:08:00
 5     ranges are, experience ranges of the            16:08:03
 6     people in 14, 15 and 16?                         16:08:06
 7              MR. KLEIN:  Object to the              16:08:10
 8         form.                                        16:08:11
 9         A.    You would have to look at             16:08:11
10     everybody in each category and then             16:08:12
11     review their resumé to determine how much       16:08:15
12     years of experience they had.                   16:08:17
13         Q.    And where would we find that          16:08:18
14     information?                                     16:08:22
15              MR. KLEIN:  Object to the              16:08:25
16         form.                                        16:08:26
17         A.    I don't know.  I don't know if        16:08:26
18     that information is even tracked.  I mean       16:08:27
19     I know we have resumes for everyone and I       16:08:29
20     know everyone is in a role.  But if             16:08:31
21     there's a tracking that says category 16        16:08:33
22     includes from this many years to this           16:08:40
23     many years, I don't know the answer to          16:08:42
24     that.                                            16:08:44
25         Q.    But the roster that you were          16:08:44
```

KELLY L. BRYSON - 8/28/2014

Page 189

```
 1                 KELLY L. BRYSON
 2    talking about before, they would identify        16:08:46
 3    all the business analyst SMEs in 11, for         16:08:48
 4    example?                                         16:08:52
 5         A.    Yes.                                  16:08:52
 6         Q.    And you don't know how many           16:08:52
 7    people are in each one, or do you,               16:08:55
 8    approximately?  Or can you estimate?             16:08:58
 9         A.    I know, I mean well that              16:08:59
10    answer is right here.  Business analyst          16:09:01
11    SME level 11, there's 97 of them.                16:09:04
12         Q.    I see.  There's only one in           16:09:07
13    16, there was only one in 16, right?             16:09:22
14         A.    Yes.                                  16:09:25
15         Q.    And there were four in 15,            16:09:25
16    right?                                           16:09:37
17         A.    Yes.                                  16:09:37
18         Q.    So I'm still having trouble           16:09:37
19    understanding the allocation of 30, 30           16:09:41
20    and 40 percent.  Did you take into               16:09:43
21    account what the chances were of the one         16:09:46
22    person in 16 working on the project              16:09:48
23    versus the four in 15?                           16:09:52
24         A.    Again, I used my professional         16:09:57
25    discretion to come up with that blending         16:10:00
```

KELLY L. BRYSON - 8/28/2014

```
 1               KELLY L. BRYSON
 2    and I looked at --                        16:10:04
 3         Q.    Listen --                       16:10:05
 4         A.    I understand your question.     16:10:06
 5         Q.    Can you answer my question      16:10:08
 6    though?                                    16:10:09
 7         A.    Did I specifically say that,    16:10:09
 8    gee, this person at business analyst SME   16:10:13
 9    level 16 is only one person?  No, I        16:10:16
10    didn't consider that because again, this   16:10:18
11    is a labor category and we may hire        16:10:20
12    someone tomorrow that's also a business    16:10:22
13    analyst SME 16.  This person might quit.   16:10:24
14    I don't know.                              16:10:27
15         Q.    But did you consider the        16:10:28
16    probabilities --                           16:10:29
17         A.    No.                             16:10:31
18         Q.    -- of the one person in 16      16:10:31
19    working as the subject matter expert       16:10:35
20    versus the ones in 15, one of the four?    16:10:40
21         A.    No.                             16:10:42
22              MR. HERBST:  Well 14, 15 and     16:10:43
23         16 are 12, 4 and 1, I'm going to      16:10:53
24         ask for the identification of         16:10:56
25         those.  I guess if we get the         16:10:58
```

KELLY L. BRYSON - 8/28/2014

Page 191

```
 1                  KELLY L. BRYSON
 2          roster for all of these we'll be          16:10:59
 3          able to identify who they are.            16:11:02
 4               (Request made.)                      16:11:02
 5          Q.    The roster tells you the            16:11:05
 6    salary of each one?                             16:11:07
 7          A.    Yes.                                16:11:08
 8          Q.    Does it have the name?              16:11:08
 9          A.    Yes.                                16:11:10
10          Q.    What else?                          16:11:10
11          A.    Employee number.                    16:11:10
12          Q.    What else?                          16:11:11
13          A.    Location.                           16:11:12
14          Q.    What else?                          16:11:13
15          A.    I don't know.  That might be        16:11:14
16    it.  Whether they're exempt or not.            16:11:24
17          Q.    I noticed that in Bryson 1 you      16:11:29
18    only used exempt employees as opposed to       16:11:33
19    nonexempt employees.  Why is that?             16:11:37
20          A.    Because the way that -- if you      16:11:39
21    read the document, you'll see that we          16:11:45
22    talk about 2200 hours as our full-time         16:11:49
23    labor accounting system, and that is           16:11:53
24    higher than the standard 2,080 work year.      16:11:56
25    We find that people that are exempt tend       16:12:00
```

KELLY L. BRYSON - 8/28/2014

Page 192

```
 1              KELLY L. BRYSON
 2   to work some amount of overtime and so we        16:12:13
 3   use 2200 hours as a basis.  People that          16:12:15
 4   are not exempt would typically earn              16:12:19
 5   overtime and so by combining, or by              16:12:22
 6   keeping the two separate we do attribute         16:12:25
 7   overtime to people that would be                 16:12:30
 8   reimbursed for overtime.                         16:12:32
 9        Q.    So for senior subject matter          16:12:33
10   expert, that's one line down on Bryson 4,        16:12:44
11   right?                                           16:12:50
12        A.    Yes.                                  16:12:50
13        Q.    You picked $110.14?                   16:12:51
14              MR. KLEIN:  Object to the             16:13:00
15        form.  I don't think any numbers            16:13:04
16        were picked.                                16:13:06
17              MR. HERBST:  That's another           16:13:08
18        speaking objection.  If we hear too         16:13:09
19        many more of those we're going to           16:13:12
20        ask for relief.                             16:13:13
21        Q.    You put a blended figure of           16:13:20
22   110.14 in there?                                 16:13:22
23        A.    Yes.                                  16:13:24
24        Q.    And you used 30 percent of            16:13:24
25   what?                                            16:13:32
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2        A.    Of a business delivery manager        16:13:33
 3    33.                                             16:13:36
 4        Q.    Business delivery manager 33.         16:13:46
 5    Okay.  And?                                     16:13:49
 6        A.    20 percent of functional             16:13:50
 7    manager 16.                                     16:13:51
 8        Q.    Functional manager 16.  And?         16:14:00
 9        A.    20 percent of functional             16:14:09
10    manager 30.                                     16:14:10
11        Q.    And?                                  16:14:18
12        A.    And 30 percent of functional         16:14:18
13    manager 33.                                     16:14:22
14        Q.    Now, how did you make those          16:14:23
15    selections?                                     16:14:25
16        A.    Because the senior SME is more       16:14:26
17    senior than the regular SME and because        16:14:32
18    there aren't any, or there are not many        16:14:37
19    business analysts at that level.  They         16:14:44
20    tend to move into manager roles.  So I         16:14:46
21    selected from the business and functional      16:14:49
22    manager roles instead of the SME roles.        16:14:51
23        Q.    Even though they're not SMEs         16:14:54
24    at all, senior or regular, right?              16:15:02
25              MR. KLEIN:  Object to the            16:15:05
```

KELLY L. BRYSON - 8/28/2014

Page 194

```
 1                 KELLY L. BRYSON
 2       form.                                        16:15:06
 3       A.    Just because they're not             16:15:06
 4  classified as a SME role doesn't mean            16:15:09
 5  that they are not subject matter experts.        16:15:13
 6  Again, you can -- this classifies you as         16:15:15
 7  one thing.  I'm a SME, but I also, I do          16:15:19
 8  lots of other things that you can qualify        16:15:23
 9  me as.  So to say that a business               16:15:27
10  delivery manager or a functional manager        16:15:29
11  is not a SME I don't think is a fair            16:15:32
12  statement.                                       16:15:35
13       Q.    You're business analyst SME?         16:15:35
14       A.    That's what I am, yes.               16:15:37
15       Q.    What number are you?                 16:15:38
16       A.    I don't know.                         16:15:39
17       Q.    You don't know what number you       16:15:39
18  are?                                             16:15:41
19       A.    I think I'm a 12.  I'm not           16:15:41
20  certain.                                         16:15:42
21       Q.    Is it your testimony that in         16:15:42
22  choosing the functional manager, how come       16:16:21
23  you didn't choose functional manager 34?        16:16:32
24       A.    I don't know.  When I was            16:16:41
25  looking again at the representative             16:16:46
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2    people here and the types of rates that        16:16:48
 3    we had bid for other senior subject            16:16:51
 4    matter experts and the salary, that was        16:16:54
 5    implied based on the rate that I came up        16:16:58
 6    with, I elected not to use 34.                 16:17:01
 7         Q.    Why is what I'm asking?             16:17:05
 8         A.    I just answered that.               16:17:08
 9         Q.    Do you remember why you didn't       16:17:11
10    use 34 specifically?                           16:17:12
11         A.    No, I don't remember why I          16:17:14
12    elected to not use 34 specifically.            16:17:17
13         Q.    Did you look to find out who         16:17:19
14    functional manager 34 was?                     16:17:23
15         A.    No.                                 16:17:25
16         Q.    How about manager 30, did you       16:17:25
17    look to see who that was?                      16:17:27
18         A.    No.                                 16:17:28
19         Q.    Were you trained on how to do       16:17:28
20    this?                                          16:17:43
21         A.    Yes.                                16:17:43
22         Q.    What training do you have for       16:17:43
23    this kind of exercise of professional          16:17:48
24    discretion?                                    16:17:50
25         A.    I worked with the person who        16:17:50
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    did this before me, pricing manager and      16:17:53
 3    pricing director.                            16:17:57
 4         Q.   Are there any written training     16:17:58
 5    materials that tell you how to exercise      16:18:00
 6    your discretion?                             16:18:02
 7         A.   No.                                16:18:02
 8         Q.   None?                              16:18:03
 9         A.   There was an estimating           16:18:07
10    methodology in place at the time and        16:18:08
11    again, a lot of the methodology is in        16:18:13
12    Bryson 1 about how we do what we do.         16:18:18
13         Q.   Well you say there was an          16:18:21
14    estimating methodology at the time.          16:18:23
15    There was a specific discreet document?      16:18:24
16         A.   There was a discreet document,    16:18:27
17    but what's in Bryson 1 is the majority of    16:18:29
18    that document.                               16:18:33
19              MR. HERBST:  I'll request --       16:18:38
20         Q.   What do you call that?             16:18:40
21         A.   Estimating methodology manual.    16:18:41
22              MR. HERBST:  I'm going to          16:18:46
23         request that.                           16:18:47
24              (Request made.)                    16:18:47
25         Q.   That manual was current for        16:19:06
```

KELLY L. BRYSON - 8/28/2014

Page 197

```
 1                    KELLY L. BRYSON
 2    May 2010 at the time you did this?              16:19:08
 3         A.    It wasn't current, but there         16:19:09
 4    wasn't a version superseding it.                16:19:11
 5         Q.    Did you actually consult it?         16:19:15
 6         A.    No.                                  16:19:16
 7         Q.    Why, because you know it by          16:19:16
 8    heart?                                          16:19:18
 9              MR. KLEIN:  Object to form.           16:19:19
10         Q.    Why didn't you consult it?           16:19:20
11         A.    Because I know how to do this        16:19:22
12    mapping and I didn't need to refer to it.       16:19:24
13         Q.    You said in addition to the          16:19:29
14    representative names you also considered        16:19:30
15    what we bid on other deals.  Where did          16:19:32
16    you go to get the information what you          16:19:34
17    bid on other deals?                             16:19:36
18         A.    Our proposal repository.            16:19:37
19         Q.    A proposal repository?              16:19:41
20         A.    Yes.                                 16:19:43
21         Q.    What documents did you look         16:19:43
22    at, or what proposals did you look at in        16:19:44
23    that repository to --                           16:19:47
24         A.    I don't remember specifics.         16:19:49
25         Q.    Well, did you identify them in       16:19:50
```

KELLY L. BRYSON - 8/28/2014

Page 198

| | | |
|---|---|---|
| 1 | KELLY L. BRYSON | |
| 2 | some fashion at the time? | 16:19:52 |
| 3 | A.    No. | 16:19:53 |
| 4 | Q.    How many proposals are in that | 16:19:54 |
| 5 | repository? | 16:19:59 |
| 6 | A.    I don't know, probably | 16:20:00 |
| 7 | hundreds if not thousands. | 16:20:02 |
| 8 | Q.    So how could you even figure | 16:20:03 |
| 9 | out which proposals to consult in a | 16:20:07 |
| 10 | repository of hundreds of thousands? | 16:20:12 |
| 11 | A.    I don't know. | 16:20:15 |
| 12 | Q.    You have no recollection of | 16:20:20 |
| 13 | what you did on that score in terms of | 16:20:21 |
| 14 | what proposals you looked at, if any? | 16:20:25 |
| 15 | A.    I don't know any specific | 16:20:31 |
| 16 | proposals.  What I know is that I read | 16:20:32 |
| 17 | the labor category description, I read | 16:20:35 |
| 18 | the internal role description, I made a | 16:20:37 |
| 19 | match and I made a mapping and that's | 16:20:40 |
| 20 | what I did. | 16:20:42 |
| 21 | Q.    When you say overall salary, | 16:20:43 |
| 22 | you're talking about Mr. Ashmore's | 16:20:45 |
| 23 | overall salary and the overall summary of | 16:20:47 |
| 24 | the people other than Mr. Ashmore, both? | 16:20:49 |
| 25 | MR. KLEIN:  Object to form. | 16:20:52 |

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2        A.    No.  I'm talking about when I          16:20:53
 3   prepared this mapping, then it gives me a         16:20:55
 4   base year hourly rates and that times             16:20:57
 5   2200 hours gives me an implied salary.            16:21:03
 6        Q.    Where's the implied salary?            16:21:12
 7        A.    It's not calculated here.              16:21:14
 8        Q.    So you took the base year and          16:21:15
 9   you multiplied that by?                           16:21:17
10        A.    2200.                                  16:21:18
11        Q.    Equals the implied salary.  Is         16:21:19
12   that implied salary on the rate card?             16:21:26
13        A.    No.                                    16:21:28
14        Q.    So what do you do with the             16:21:28
15   implied salary?                                   16:21:30
16        A.    I just -- it's a datapoint             16:21:30
17   that I used to look at.  So again, when           16:21:33
18   I'm reading the labor category                    16:21:36
19   description and I see project                     16:21:38
20   administrator, I understand what that is          16:21:39
21   based on the description.  I look at the          16:21:42
22   implied salary and then I determine does          16:21:45
23   that seem reasonable.                             16:21:47
24        Q.    Let's take subject matter              16:21:54
25   expert of 72.90.  Then you have the next          16:21:56
```

| 1 | KELLY L. BRYSON | |
|---|---|---|
| 2 | column is what, overhead? | 16:21:59 |
| 3 | A.    Yes. | 16:22:04 |
| 4 | Q.    What is that underneath, it | 16:22:04 |
| 5 | says overhead 81.11 percent? | 16:22:06 |
| 6 | A.    Yes. | 16:22:09 |
| 7 | Q.    And the next column is? | 16:22:09 |
| 8 | A.    G&A. | 16:22:10 |
| 9 | Q.    33.34 percent? | 16:22:13 |
| 10 | A.    Yes. | 16:22:15 |
| 11 | Q.    And then fee? | 16:22:15 |
| 12 | A.    Yes. | 16:22:16 |
| 13 | Q.    Of? | 16:22:16 |
| 14 | A.    10 percent. | 16:22:19 |
| 15 | Q.    And then total? | 16:22:20 |
| 16 | A.    Yes. | 16:22:21 |
| 17 | Q.    So am I correct that the | 16:22:21 |
| 18 | overhead column is 81.11 percent of the | 16:22:23 |
| 19 | first column, the base year column? | 16:22:27 |
| 20 | A.    Yes. | 16:22:29 |
| 21 | Q.    And then the G&A is 33.34 | 16:22:30 |
| 22 | percent of the sum of columns -- of | 16:22:35 |
| 23 | columns 1 and 2? | 16:22:41 |
| 24 | A.    Yes. | 16:22:43 |
| 25 | Q.    And the fee of 10 percent is | 16:22:43 |

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2      10 percent of the sum of columns 1, 2 and        16:22:46
 3      3?                                               16:22:48
 4          A.    Yes.                                   16:22:48
 5          Q.    And that produces the total            16:22:52
 6      rate of 193.66?                                  16:22:54
 7          A.    Yes.                                   16:22:56
 8          Q.    Okay.  Now, you say on page 2          16:22:57
 9      of Bryson 1 that the methodology of using        16:23:25
10      2200 hours is based on a full-time labor         16:23:31
11      accounting system, right?                        16:23:35
12          A.    Yes.                                   16:23:36
13          Q.    What is your full-time labor           16:23:36
14      accounting system?                               16:23:40
15          A.    What that sentence is saying           16:23:40
16      is that we assume a certain amount of            16:23:45
17      overtime is worked by exempt personnel,          16:23:49
18      and so rather than dividing a salary by          16:23:53
19      2080 hours we divide it by 2200 hours to         16:23:58
20      account for the overtime that is assumed.        16:24:03
21          Q.    So that includes 120 hours of          16:24:05
22      overtime assumed?                                16:24:09
23          A.    Yes.                                   16:24:09
24          Q.    Where do you come up with that         16:24:13
25      figure?  Is that an average?                     16:24:15
```

KELLY L. BRYSON - 8/28/2014

Page 202

```
 1                KELLY L. BRYSON
 2        A.    Yes.                              16:24:19
 3        Q.    An average of what?               16:24:20
 4        A.    An average of a full time         16:24:23
 5   exempt person over the course of 12          16:24:25
 6   months.                                      16:24:28
 7        Q.    Full time exempt people don't     16:24:28
 8   get overtime, right?                         16:24:34
 9        A.    They still put those hours in     16:24:35
10   their time sheet.                            16:24:37
11        Q.    Everybody has a time sheet?       16:24:38
12        A.    Yes.                              16:24:40
13        Q.    Every employee at CGI fills       16:24:40
14   out a time sheet?                            16:24:43
15        A.    Yes.                              16:24:44
16        Q.    For every hour they work?         16:24:44
17        A.    That's our policy, yes.           16:24:46
18        Q.    And so you actually calculate     16:24:47
19   what the average overtime hours are for      16:24:51
20   exempt employees even though you don't       16:24:54
21   pay them for it?                             16:24:56
22             MR. KLEIN:  Object to form.        16:24:57
23        A.    Yes, that analysis is             16:24:58
24   refreshed on a periodic basis, but yes.      16:25:00
25        Q.    How often is it refreshed?        16:25:03
```

KELLY L. BRYSON - 8/28/2014

Page 203

```
 1                    KELLY L. BRYSON
 2          A.    There's not a standard.              16:25:06
 3          Q.    But how often is it refreshed?        16:25:07
 4          A.    At this time it was refreshed         16:25:11
 5     annually I would guess.  But it wasn't --        16:25:14
 6     it wasn't on a schedule.                         16:25:19
 7          Q.    What is DCAA office?                  16:25:20
 8          A.    It's the government office            16:25:31
 9     that reviews our submissions.  It's the          16:25:33
10     Defense Contract Audit Agency and they           16:25:38
11     review our indirect rate submission.             16:25:41
12          Q.    Is that in the Pentagon?              16:25:49
13          A.    No.                                   16:25:51
14          Q.    You said a defense contract.          16:25:52
15          A.    Their address is located on           16:25:55
16     page 4.  This particular gentleman was           16:25:57
17     located in Herndon, Virginia.                    16:26:00
18          Q.    Is that organization, that            16:26:08
19     agency typically audits Pentagon                 16:26:10
20     contracts, that is Department of Defense         16:26:13
21     contracts?                                       16:26:15
22               MR. KLEIN:  Object to the              16:26:15
23          form.                                       16:26:16
24          A.    I don't know.                         16:26:17
25          Q.    Are people ever categorized in        16:26:17
```

```
 1                    KELLY L. BRYSON
 2      more than one role at CGI, or you just          16:26:44
 3      pick one?                                        16:26:47
 4              MR. KLEIN:  Object to form.              16:26:49
 5          A.    People are classified into one        16:26:51
 6      role in our HR system, yes.                      16:26:53
 7          Q.    Not more than one, just one?           16:27:01
 8          A.    Not more than one in our HR            16:27:04
 9      system.                                          16:27:07
10          Q.    Does it ever change?                   16:27:07
11          A.    Yes.                                    16:27:08
12          Q.    How often?                              16:27:08
13          A.    It's reviewed as part of your          16:27:09
14      annual review process, but if your role         16:27:11
15      substantively changes it could be changed       16:27:13
16      more often.                                       16:27:16
17          Q.    So that's not really a                 16:27:16
18      function of title, it's more a function         16:27:18
19      of what they actually do?                        16:27:19
20          A.    Yes.                                    16:27:20
21          Q.    What their actual role is?            16:27:21
22          A.    Yes.                                    16:27:22
23          Q.    Is it fair to say that the            16:27:22
24      compensation is not necessarily a               16:27:24
25      function of title, if someone is more           16:27:25
```

KELLY L. BRYSON - 8/28/2014

Page 205

```
 1                    KELLY L. BRYSON
 2    senior they're going to earn more?          16:27:28
 3              MR. KLEIN:  Objection to form.     16:27:30
 4         Q.    More senior in title?            16:27:32
 5         A.    Generally, yes.                   16:27:34
 6         Q.    Generally yes what?               16:27:37
 7         A.    Can you repeat the question,      16:27:38
 8    please.                                      16:27:42
 9         Q.    Is there a relationship           16:27:42
10    generally between how senior a title you    16:27:45
11    have and your compensation?                  16:27:47
12              MR. KLEIN:  Objection to form.     16:27:51
13         Q.    Or is it mostly on role?          16:27:52
14         A.    I would say in general, yes,      16:27:54
15    the more senior your title the higher        16:27:56
16    your compensation.                           16:27:58
17         Q.    What's more senior, manager or    16:27:59
18    director?                                     16:28:01
19         A.    Director.                         16:28:02
20         Q.    So looking at 18, Mr.             16:28:02
21    Kyprianou's position was what?               16:28:07
22         A.    I don't know.                     16:28:09
23         Q.    Mr. Ashbrook, was he a            16:28:12
24    director or a manager?                       16:28:14
25         A.    Well I know that in his           16:28:15
```

KELLY L. BRYSON - 8/28/2014

```
 1                    KELLY L. BRYSON
 2      signature it says manager, so I'm going        16:28:17
 3      to assume that he's a manager.                 16:28:19
 4          Q.    Mr. Ashmore was what, a              16:28:21
 5      director --                                    16:28:22
 6              MR. KLEIN:   I think you said           16:28:23
 7          Ashbrook or Ashmore.                       16:28:25
 8          Q.    I'm sorry, Ashmore you said is       16:28:27
 9      a manager.  What about Ashbrook?               16:28:29
10          A.    I don't know off the top of my       16:28:32
11      head.                                          16:28:33
12          Q.    Judging from the numbers,            16:28:34
13      Ashbrook's number is 155.79 and Ashmore        16:28:37
14      is 193.66, who was making more money?          16:28:42
15              MR. KLEIN:   Object to the             16:28:45
16          form.                                      16:28:46
17          A.    I don't think you can draw a         16:28:46
18      correlation between the bill rate and          16:28:47
19      their cost rate.                               16:28:50
20          Q.    I want you to assume that            16:28:52
21      Ashbrook was a director, higher than a         16:28:56
22      manager.  Would you normally expect his        16:28:59
23      salary to be higher than Mr. Ashmore's?        16:29:01
24              MR. KLEIN:   Objection to form.        16:29:05
25          A.    I would expect a director's          16:29:06
```

KELLY L. BRYSON - 8/28/2014

Page 207

```
 1              KELLY L. BRYSON
 2     salary to be higher than a manager's        16:29:08
 3     salary, yes, generally speaking.            16:29:10
 4         Q.    How typical was it that a --      16:29:12
 5     like in 18 you have 155.79 for the          16:30:28
 6     position Mr. Ashbrook was going to fill,    16:30:33
 7     and 193.66 for the position Mr. Ashmore     16:30:36
 8     was going to fill.  How often did it        16:30:40
 9     happen that, and again assuming Ashbrook    16:30:42
10     is a director, I know you didn't know       16:30:48
11     that, how often did it turn out that the    16:30:50
12     manager's billing rate turned out to be,    16:30:55
13     you know, 40 bucks higher than the          16:30:57
14     directors?                                  16:31:02
15              MR. KLEIN:  Object to the          16:31:03
16         form.                                   16:31:04
17         A.    I would say it's not unusual.     16:31:04
18     It's really a function of what that         16:31:06
19     person is doing.                            16:31:08
20         Q.    Do you know what Mr. Ashbrook     16:31:09
21     was doing?                                  16:31:11
22         A.    He was more technical in         16:31:11
23     nature.  It looks like he was being        16:31:13
24     billed as a team lead of some sort, an IT  16:31:15
25     team lead.                                  16:31:20
```

KELLY L. BRYSON - 8/28/2014

Page 208

```
  1                 KELLY L. BRYSON
  2        Q.    So the direct labor role rate          16:31:20
  3   that goes into this, this contractor's            16:32:03
  4   site rate of 193.66 for subject matter            16:32:10
  5   expert, the direct labor role rate is             16:32:14
  6   just a straight average of everybody in           16:32:19
  7   that, in that role level?                         16:32:21
  8             MR. KLEIN:  Object to the               16:32:27
  9        form.                                        16:32:28
 10        A.    The direct labor cost for the          16:32:28
 11   subject matter expert rate of 193.66 is           16:32:30
 12   72.90.  And that is a weighted average of         16:32:36
 13   the people in the business analyst SME            16:32:40
 14   role, 14, 15 and 16 and is a weighted             16:32:43
 15   average of everyone in those categories           16:32:48
 16   according to the 30, 30, 40 ratio.                16:32:50
 17        Q.    Okay.  As opposed to a                 16:32:52
 18   straight average which -- I mean when you         16:32:54
 19   describe it --                                    16:32:57
 20        A.    Well the straight average              16:32:58
 21   comes in that, business analyst 14 SME            16:32:59
 22   has a straight average of $66.52.  So             16:33:04
 23   once we arrive --                                 16:33:08
 24        Q.    Where do you get that?                 16:33:09
 25        A.    It's in both Bryson 2 and              16:33:11
```

```
 1              KELLY L. BRYSON
 2    Bryson 4.  So if you look at the business      16:33:14
 3    analyst SME there's 12 people in that          16:33:17
 4    category, they have a straight average         16:33:20
 5    salary of $146,333, or $66.52 per hour.        16:33:22
 6    So that is a straight average component.       16:33:31
 7    Once we have that straight average then        16:33:33
 8    we do a weighted average based on              16:33:35
 9    whatever mapping that was appropriate.         16:33:38
10         Q.    Got it.  Then we get to the         16:33:39
11    overhead column, right?                        16:33:43
12         A.    Yes.                                16:33:44
13         Q.    What steps do you take looking      16:33:45
14    at 18 and Mr. Ashbrook's hourly rate of        16:34:23
15    155.79, what steps do you take to make         16:34:29
16    sure that his own personal hourly cost to      16:34:33
17    the company is less than the billing           16:34:39
18    rate?                                          16:34:45
19              MR. KLEIN:  Object to the            16:34:46
20         form.                                     16:34:48
21         A.    That's why I would look at          16:34:48
22    salaries generally to make sure that the       16:34:50
23    rate that I determined covers the types        16:34:53
24    of people that we're looking at.  But I        16:34:56
25    don't base the rate on that.  That's also      16:34:59
```

KELLY L. BRYSON - 8/28/2014

Page 210

```
 1                 KELLY L. BRYSON
 2    why we do exercises like what's on the          16:35:02
 3    last page in this.  This is kind of a           16:35:04
 4    real world scenario, if you will, of the        16:35:10
 5    types of people, the names of people who        16:35:12
 6    we would expect to staff and what that          16:35:15
 7    real world scenario might look like.            16:35:19
 8         Q.    So take Ashbrook here on page        16:35:21
 9    3 of Plaintiff's Exhibit 18.  What's the        16:35:25
10    figure that is multiplied by 15.12 to get       16:35:30
11    to 235.54?                                       16:35:34
12         A.    Again, I don't -- I'm assuming       16:35:37
13    it was the contractor site rate.  I'm not       16:35:39
14    certain.                                         16:35:42
15         Q.    But my question is how do you        16:35:42
16    know that Mr. Ashbrook isn't being paid         16:35:45
17    more than the base rate for his category        16:35:50
18    which is 58.65?                                  16:35:59
19         A.    You're asking how I know that.       16:36:08
20    I know that because I have access to the        16:36:10
21    salary information and I can do the             16:36:12
22    calculation.  But I would also say that         16:36:13
23    we don't always make money on these             16:36:17
24    rates.  We may elect to lose money on an        16:36:20
25    individual if we can make it up in the          16:36:24
```

KELLY L. BRYSON - 8/28/2014

Page 211

```
 1                KELLY L. BRYSON
 2    overall.                                  16:36:26
 3         Q.    But that would have to be a    16:36:27
 4    deliberate decision by you and the        16:36:29
 5    others, you'd have to bring that to their 16:36:32
 6    attention, right?                         16:36:34
 7         A.    Yes.                           16:36:35
 8         Q.    And the only way you would     16:36:35
 9    bring that to their attention is by       16:36:36
10    looking at the actual salary of Mr.       16:36:38
11    Ashbrook?                                 16:36:40
12         A.    Yes.                           16:36:40
13         Q.    And saying you know, this      16:36:40
14    billing rate is lower than the rate by    16:36:41
15    figuring in his salary and then his       16:36:44
16    fringes and then the overhead and so      16:36:46
17    forth, right?                             16:36:48
18         A.    That would cause a red flag,   16:36:48
19    yes.                                      16:36:50
20         Q.    And how do you document the    16:36:51
21    red flags?                                16:36:53
22              MR. KLEIN:  Object to the       16:36:55
23         form.                                16:36:57
24         A.    Generally through email.       16:36:57
25         Q.    So your emails on this will    16:36:58
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2    tell us whether there was any red flags          16:37:01
 3    and whether any adjustments were made,           16:37:04
 4    right?                                           16:37:10
 5         A.    Presumably.                           16:37:10
 6         Q.    Now, let's take overhead.             16:37:11
 7    What items are included in overhead?             16:37:31
 8              MR. KLEIN:  Objection to the           16:37:39
 9         form.                                       16:37:49
10         Q.    Well before we do that, let me        16:37:49
11    ask you, just in terms of the overall            16:37:52
12    billing rate here in the second page of          16:37:54
13    18, now that rate includes base salary,          16:37:55
14    right?                                           16:38:03
15         A.    Yes.                                  16:38:03
16         Q.    Does it include profit                16:38:04
17    participation?                                   16:38:08
18         A.    Yes.                                  16:38:09
19         Q.    Does it include the different         16:38:09
20    kinds of bonuses that you mentioned              16:38:14
21    earlier in your testimony?                       16:38:15
22         A.    Yes.                                  16:38:16
23         Q.    And what kind of bonuses would        16:38:16
24    those be?                                        16:38:19
25              MR. KLEIN:  Object to the              16:38:21
```

```
 1              KELLY L. BRYSON
 2       form.                                    16:38:23
 3       A.    It would be the types that we      16:38:23
 4   discussed earlier.  It could include         16:38:24
 5   retention, it could include relocation.      16:38:27
 6   But, you know, the fringes and overhead      16:38:30
 7   is calculated on an aggregate level, so      16:38:33
 8   even though those types of bonuses would     16:38:36
 9   be included, it doesn't mean that anyone     16:38:38
10   is necessarily entitled to them.             16:38:41
11       Q.    I understand that.  But            16:38:43
12   somehow the system makes provision for       16:38:48
13   including bonuses of various kinds,          16:38:50
14   right?                                       16:38:52
15       A.    Yes.                               16:38:52
16       Q.    And I think you mentioned          16:38:53
17   retention, relocation, signing bonus.        16:38:56
18   Any other bonuses?                           16:38:58
19       A.    I'm sure there are, but I          16:38:59
20   don't -- I don't know of an exhaustive       16:39:01
21   list.                                        16:39:03
22       Q.    What document or documents         16:39:04
23   could we consult in order to determine a     16:39:06
24   comprehensive list of bonuses?               16:39:08
25            MR. KLEIN:  Object to the           16:39:12
```

KELLY L. BRYSON - 8/28/2014

Page 214

```
 1                KELLY L. BRYSON
 2       form.                                      16:39:13
 3       A.    I don't know.  You'd have to         16:39:13
 4   ask finance that.                              16:39:14
 5       Q.    Is that something Mr. Pfost          16:39:16
 6   would know, the controller?                    16:39:19
 7             MR. KLEIN:  Object to the            16:39:21
 8       form.                                      16:39:22
 9       A.    If he didn't know the answer         16:39:22
10   I'm sure he could point you in the right       16:39:24
11   direction.                                     16:39:27
12       Q.    Do you know of any document          16:39:27
13   generated by the company, either in its        16:39:29
14   HR department or anywhere else in the          16:39:31
15   company, of the different kinds of             16:39:34
16   bonuses available?                             16:39:36
17       A.    No, not that would include a         16:39:36
18   comprehensive list and descriptions or         16:39:39
19   when they would be appropriate, no, I'm        16:39:43
20   not aware of the document that does that.      16:39:44
21       Q.    How about stock options, are         16:39:46
22   they included in this contractor site         16:39:48
23   rate?                                          16:39:52
24       A.    Again, I'm not certain where         16:39:52
25   stock options are accounted for.               16:39:54
```

KELLY L. BRYSON - 8/28/2014

Page 215

```
 1                KELLY L. BRYSON
 2        Q.    Regardless of whether they're              16:39:56
 3   in overhead or general and administrative             16:39:59
 4   would they be included?                               16:40:03
 5        A.    In some form or fashion, yes,              16:40:05
 6   they would be included.                               16:40:07
 7        Q.    The different possibilities                16:40:08
 8   would be what?                                        16:40:12
 9        A.    There are some things that we              16:40:13
10   account for in our indirect rates and                 16:40:16
11   then there are other things that are paid             16:40:19
12   for at the corporate level, so we pay a               16:40:21
13   tax up to corporate and they pay those                16:40:24
14   things.                                               16:40:27
15        Q.    How did that corporate tax get             16:40:27
16   reflected in these?                                   16:40:30
17        A.    It's in one of the buckets.                16:40:31
18   I'm not sure exactly which bucket it's                16:40:34
19   in.                                                   16:40:37
20        Q.    How about commissions?                     16:40:37
21        A.    Again, it's in there                       16:40:38
22   somewhere.  It's probably in sales.                   16:40:40
23        Q.    Sales or fringe, right?                    16:40:41
24        A.    Yes.                                        16:40:49
25        Q.    You testified to that last                 16:40:50
```

KELLY L. BRYSON - 8/28/2014

Page 216

```
 1               KELLY L. BRYSON
 2    time, right?                              16:40:51
 3         A.    Yes.                           16:40:52
 4         Q.    Deferred compensation?         16:40:52
 5         A.    Again, I'm sure it's in there  16:40:56
 6    somewhere.  Where it lives exactly, I     16:40:59
 7    don't know.                               16:41:00
 8         Q.    Vacation pay?                  16:41:00
 9         A.    That would be in fringe.       16:41:02
10         Q.    Holiday pay?                   16:41:06
11         A.    Fringe.                        16:41:07
12         Q.    Sick pay?                      16:41:08
13         A.    Fringe.                        16:41:08
14         Q.    Overtime pay?                  16:41:09
15         A.    That's, overtime pay would not 16:41:10
16    be generally in our indirect rates.  That 16:41:13
17    would be a direct rate, a direct labor    16:41:17
18    rate.  It would depend on the role of     16:41:20
19    that person though.                       16:41:29
20         Q.    As to whether it would be an   16:41:29
21    indirect or direct?                       16:41:32
22         A.    Yes.                           16:41:34
23         Q.    Would that be depending        16:41:34
24    whether he's exempt or nonexempt?         16:41:39
25         A.    Possibly, but not              16:41:41
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2    specifically.  It would depend on the        16:41:43
 3    type of work they were doing, if they        16:41:44
 4    were doing billable work versus internal     16:41:46
 5    work.                                         16:41:48
 6         Q.    Shift premium pay?                 16:41:49
 7              MR. KLEIN:  Object to the           16:41:52
 8         form.                                    16:41:53
 9         A.    Again, that's probably more        16:41:53
10    likely than not that's probably billable,    16:41:57
11    so that wouldn't be in our indirect rate.    16:41:59
12         Q.    You said that would not be in      16:42:02
13    your direct rate?                             16:42:08
14         A.    I said more likely than not        16:42:10
15    that's billable work so it would probably    16:42:12
16    not be in our indirect rate.                  16:42:14
17         Q.    It wouldn't be in direct           16:42:16
18    either?                                       16:42:19
19         A.    It would be --                     16:42:19
20         Q.    It would be in direct?             16:42:20
21         A.    Well, if they received             16:42:21
22    compensation then it would be in direct.     16:42:23
23         Q.    It would be in direct?             16:42:25
24         A.    Yes, it would be in our direct     16:42:26
25    compensation.                                 16:42:28
```

KELLY L. BRYSON - 8/28/2014

Page 218

```
 1                  KELLY L. BRYSON
 2       Q.    Thank you.  I just want to          16:42:28
 3   make sure we got it right.  Pension            16:42:30
 4   costs?                                         16:42:32
 5       A.    Again, I'm sure they're              16:42:35
 6   included.  I don't know where.                 16:42:37
 7       Q.    Post-retirement benefits other       16:42:38
 8   than pensions?                                 16:42:41
 9       A.    The same.                            16:42:42
10       Q.    Severance pay?                       16:42:42
11       A.    The same.                            16:42:44
12       Q.    Health insurance?                    16:42:45
13       A.    I assume that's in fringe.           16:42:46
14       Q.    Life insurance?                      16:42:49
15       A.    Fringe.                              16:42:50
16       Q.    Other deferred compensation?         16:42:50
17       A.    I'm not sure.                        16:42:52
18       Q.    Training?                            16:42:53
19       A.    That could be in a number of         16:42:56
20   different areas.                               16:42:59
21       Q.    Fringe benefit without any           16:43:00
22   bonus?                                         16:43:10
23             MR. KLEIN:  Object to the            16:43:12
24       form.                                      16:43:13
25       A.    I'm not sure exactly what that       16:43:13
```

KELLY L. BRYSON - 8/28/2014

Page 219

```
 1                    KELLY L. BRYSON
 2      means, but I would assume that lives in          16:43:15
 3      fringe.                                           16:43:18
 4           Q.    Fringe benefit with bonus?            16:43:18
 5           A.    Same answer.                          16:43:21
 6           Q.    Profit?                               16:43:22
 7                 MR. KLEIN:  Object to the             16:43:25
 8           form.                                       16:43:26
 9           A.    I don't know what that means.         16:43:26
10           Q.    Well I'm assuming that in this        16:43:27
11      contractor site rate that it would              16:43:33
12      include a 10 percent fee for profit,            16:43:35
13      right?                                           16:43:37
14           A.    I thought you were asking             16:43:37
15      those questions in terms of where they          16:43:38
16      live in our indirect rates.  So profit          16:43:40
17      wouldn't live there.  But yes, profit is        16:43:42
18      included in these rates.                         16:43:44
19           Q.    All of the things I mentioned         16:43:45
20      are somehow included in these rates,            16:43:47
21      right?                                           16:43:50
22                 MR. KLEIN:  Object to the             16:43:50
23           form.                                       16:43:51
24           A.    Yes.  These are fully loaded          16:43:51
25      rates.  They include all of the things          16:43:53
```

KELLY L. BRYSON - 8/28/2014

Page 220

```
 1              KELLY L. BRYSON
 2    that we provide to our employees.              16:43:55
 3         Q.    And general and administrative      16:43:56
 4    expenses, right?                               16:43:59
 5         A.    Yes.                                16:44:00
 6         Q.    And overhead?                       16:44:00
 7         A.    Yes.                                16:44:01
 8         Q.    So let's now talk about             16:44:03
 9    overhead.  What items are included             16:44:05
10    generally in overhead?                         16:44:11
11              THE WITNESS:  Do you have that       16:44:15
12         document?                                 16:44:16
13              MR. KLEIN:  They have it.            16:44:18
14              MR. HERBST:  Would you mark          16:44:22
15         this as Bryson Exhibit 3 and 5.          16:44:23
16              (Bryson Exhibit 3 for               16:44:26
17         identification, Bates stamped
18         CGI_ASHMORE 2015431 through
19         2015433.)
20              (Bryson Exhibit 5 for
21         identification, Bates stamped
22         CGI_ASHMORE 2015429 through
23         2015430.)                                 16:44:32
24         Q.    Let me know if Bryson 5 and         16:44:32
25    Bryson 3 are actually part of the same         16:44:35
```

KELLY L. BRYSON - 8/28/2014

Page 221

```
 1                   KELLY L. BRYSON
 2   document?                                    16:44:38
 3             MR. KLEIN:  They're separate.       16:44:39
 4        Q.   So here's 5 and 3.  Take a          16:44:52
 5   look at them.  The first thing I want to      16:44:56
 6   ask you is is three supposed to be a part     16:45:01
 7   of five or is it a separate document?         16:45:03
 8        A.   Three is a separate document,       16:45:05
 9   but it's supplemental to five.  Five is       16:45:07
10   the cover memo or letter that accompanies     16:45:13
11   the detail which is included in three.        16:45:15
12        Q.   So these two are separate but       16:45:38
13   they sort of go together?                     16:45:40
14        A.   For our submission they would       16:45:42
15   go together, but they don't -- I mean         16:45:47
16   five without three is not very helpful.       16:45:49
17   But three can stand on its own.               16:45:52
18        Q.   Are both five and three, do         16:45:54
19   they relate to overhead and G&A?              16:46:00
20        A.   Yes.                                16:46:00
21        Q.   So tell me what is, what items      16:46:14
22   are included in overhead?                     16:46:16
23        A.   In overhead we have the major       16:46:22
24   components of --                              16:46:28
25        Q.   Where are you looking?              16:46:31
```

KELLY L. BRYSON - 8/28/2014

Page 222

```
 1                     KELLY L. BRYSON
 2          A.    I'm looking on Bryson 3.              16:46:32
 3          Q.    Yes.                                  16:46:35
 4          A.    We have a segment overhead,           16:46:35
 5     fringe expenses, computer equipment and          16:46:37
 6     infrastructure, facility, and then home          16:46:39
 7     office.                                          16:46:41
 8          Q.    Now, those are the items of           16:46:42
 9     overhead?                                        16:46:46
10          A.    Yes.                                  16:46:47
11          Q.    What is a segmented overhead          16:46:47
12     pool, or segment overhead pool?                  16:46:53
13          A.    I can't speak specifically to         16:46:57
14     what's included in that $17 million.  I'm        16:47:12
15     not sure.  I don't calculate these rates.        16:47:19
16          Q.    Who does?                             16:47:21
17          A.    That's the role of our               16:47:21
18     compliance and finance departments.  It's        16:47:25
19     kind of a joint, a shared role.  Finance         16:47:27
20     is involved in calculating it, but it            16:47:31
21     ultimately goes through compliance.              16:47:33
22          Q.    Well, there's a total of those        16:47:39
23     five items and it's called pool?                 16:47:48
24          A.    Yes.                                  16:47:50
25          Q.    So what is pool?                      16:47:50
```

KELLY L. BRYSON - 8/28/2014

Page 223

```
 1              KELLY L. BRYSON
 2        A.    That is the total amount of          16:47:53
 3   overhead expense that we are estimating          16:47:55
 4   to incur for the year and that pool is           16:47:58
 5   divided by the amount of labor that we           16:48:01
 6   expect to incur over the year.                   16:48:04
 7        Q.    So the 72 million, that's the         16:48:07
 8   overhead that CGI Federal is expected to         16:48:11
 9   incur?                                           16:48:16
10        A.    CGI Federal ISIT.                     16:48:17
11        Q.    And then CGI Federal BPS is           16:48:22
12   expected to incur 15 million?                    16:48:25
13        A.    Yes.                                  16:48:27
14        Q.    So they're treated separately?        16:48:28
15        A.    Yes.                                  16:48:28
16        Q.    Is every HUD opportunity             16:48:57
17   calculated by ISIT?                              16:48:59
18              MR. KLEIN:  Object to form.           16:49:01
19        A.    I would -- I mean I can't             16:49:03
20   speak to every HUD opportunity.  I don't        16:49:04
21   work on every HUD opportunity.  I would         16:49:07
22   say the majority of ones where this is          16:49:09
23   relevant would be, would fall under ISIT.        16:49:12
24        Q.    What do you mean the majority         16:49:18
25   which would be relevant?                         16:49:20
```

KELLY L. BRYSON - 8/28/2014

Page 224

```
 1                    KELLY L. BRYSON
 2          A.    This rate calculation is very        16:49:21
 3    specific to federal government work and          16:49:26
 4    since a majority of the BPS work is not          16:49:28
 5    Federal work they wouldn't use these             16:49:33
 6    items in their rate calculations.                16:49:36
 7    They're more commercial in nature.  They         16:49:41
 8    would use a different methodology.               16:49:43
 9          Q.    Are you saying that some BPS         16:49:44
10    contracts involve Federal agencies?             16:49:48
11              MR. KLEIN:  Object to form.            16:49:52
12          A.    It's possible.  I don't know.        16:49:54
13    I can't speak to every contract.                 16:49:55
14          Q.    Who could?                            16:49:57
15              MR. KLEIN:  Object to form.            16:49:59
16          A.    I don't know that anyone could       16:50:00
17    speak to every contract.                         16:50:02
18          Q.    I'm trying to understand how         16:50:03
19    the company distinguishes between when it        16:50:04
20    uses the ISIT and when it uses the BPS           16:50:07
21    schedules?                                        16:50:10
22              MR. KLEIN:  Object to the             16:50:16
23        form.                                         16:50:17
24          A.    We use the ISIT indirect rates       16:50:17
25    when the scope of work is such that we           16:50:20
```

KELLY L. BRYSON - 8/28/2014

Page 225

```
 1                    KELLY L. BRYSON
 2    are doing ISIT type work with a federal        16:50:22
 3    agency.  If we were doing BPS, something       16:50:26
 4    purely BPS type work at a federal agency,      16:50:31
 5    then we would likely use the BPS rate.         16:50:35
 6    If that ever happened, I don't know the        16:50:38
 7    answer to that.                                16:50:40
 8         Q.    Let me ask you something.           16:50:41
 9    Look at Bryson 5.  What is that document?      16:51:54
10    It's a letter, but what --                     16:51:57
11         A.    Yes.  This is a letter that we      16:51:59
12    submit to CMS each year to review our          16:52:03
13    rates.  If you look at, if I could refer       16:52:13
14    you back to Bryson 1, page 4, it talks         16:52:17
15    about DCAA contact information.                16:52:21
16         Q.    One minute.  I'll get Bryson        16:52:26
17    1.  Page 4.  Yes.                              16:52:30
18         A.    And so that sentence up at the      16:52:34
19    top, CGI's administrative contracting          16:52:36
20    office is the Centers for Medicare and         16:52:40
21    Medicaid Services since the preponderance      16:52:42
22    of our cost-reimbursable contracts are         16:52:44
23    with CMS.  And so each year we submit our      16:52:44
24    submission not only to DCAA but also to        16:52:48
25    CMS for their review and approval.             16:52:52
```

```
  1                 KELLY L. BRYSON
  2         Q.    How come nothing goes to HUD        16:52:54
  3    for their approval?                            16:52:56
  4         A.    Because we have minimal, if         16:52:57
  5    any, cost plus work with them.  I mean I       16:53:00
  6    don't know the exact reason.  I'm not          16:53:03
  7    involved in that decision.                     16:53:05
  8         Q.    But you do have time and            16:53:07
  9    materials work with them, right?               16:53:08
 10         A.    Possibly.                           16:53:10
 11         Q.    Why wouldn't you periodically       16:53:11
 12    submit your rates to the HUD?                  16:53:15
 13         A.    Because cost reimbursable           16:53:18
 14    rates are used for cost reimbursable           16:53:21
 15    work.                                          16:53:24
 16         Q.    Which rates?                         16:53:24
 17         A.    The indirect rates are used         16:53:25
 18    for cost reimbursable work, not for T&M        16:53:27
 19    work.                                          16:53:32
 20         Q.    How is that decided?               16:53:33
 21         A.    By virtue of the contract          16:53:35
 22    type.  The only time that we use indirect     16:53:39
 23    rates for T&M work is if the first time       16:53:41
 24    we are creating a rate.                        16:53:47
 25         Q.    So you said that this, Bryson      16:53:48
```

KELLY L. BRYSON - 8/28/2014

Page 227

```
 1                   KELLY L. BRYSON
 2      5 is a, these two pages is a letter from      16:54:03
 3      CGI to CMS, but in fact isn't it a letter     16:54:10
 4      from CMS to CGI?                              16:54:14
 5           A.   Oh, is it?  You're correct.         16:54:16
 6      It's in response to a letter that we          16:54:17
 7      provided to them.                             16:54:19
 8           Q.   Where is that letter?               16:54:21
 9           A.   I don't know if it's -- I           16:54:21
10      don't have it.                                16:54:25
11           Q.   Have you reviewed it in             16:54:27
12      preparation for your testimony?               16:54:29
13           A.   No.                                 16:54:29
14           Q.   Why not?                            16:54:32
15                MR. KLEIN:  Object to form.         16:54:34
16           A.   I'm not sure that it was            16:54:35
17      relevant.                                     16:54:41
18                MR. HERBST:  We'll request          16:54:42
19           that letter.                             16:54:43
20                (Request made.)                     16:54:43
21           Q.   Okay.  Now the letter says CMS      16:54:57
22      has established the following provisional     16:55:03
23      rates for your use, right?                    16:55:05
24           A.   Yes.                                16:55:07
25           Q.   It has the overhead with the        16:55:07
```

KELLY L. BRYSON - 8/28/2014

Page 228

```
 1                 KELLY L. BRYSON
 2    81 percent rate in there?                    16:55:09
 3         A.    Yes.                              16:55:10
 4         Q.    And it tells you what should      16:55:11
 5    be in it, right, direct labor, B&P labor,    16:55:12
 6    IR&D labor?                                  16:55:16
 7         A.    No, the allocation base is        16:55:18
 8    what the 81 percent is allocated against,    16:55:20
 9    not what should be in it, not the            16:55:25
10    components of it.                            16:55:29
11         Q.    So when you say allocated         16:55:29
12    against, what do you mean?                   16:55:31
13         A.    So when we're building our        16:55:33
14    rate, for example, we take 81.11 percent    16:55:36
15    of direct labor or salary cost to            16:55:39
16    determine the appropriate amount of          16:55:41
17    overhead.                                    16:55:42
18         Q.    And you take 81 percent of B&P    16:55:43
19    labor too?                                   16:55:48
20         A.    Yes.  It's what's listed back     16:55:49
21    on Bryson 3.  You'll see after the pool      16:55:51
22    amount of 72 million you'll see the base     16:55:55
23    and the base includes direct labor, bid      16:55:58
24    and proposal labor and IR&D labor.           16:56:01
25         Q.    B&P means bid and proposal?       16:56:06
```

KELLY L. BRYSON - 8/28/2014

Page 229

```
 1                    KELLY L. BRYSON
 2         A.    Yes.                                16:56:11
 3         Q.    What's IR&D?  Independent           16:56:12
 4    research and development?                      16:56:17
 5         A.    Yes.                                16:56:18
 6         Q.    Then there's a paragraph below      16:56:19
 7    that says "Although the intent of the          16:56:26
 8    above rates is directly related to             16:56:28
 9    provisional billing rates they may also        16:56:30
10    be utilized for proposal bidding               16:56:32
11    purposes," right?                              16:56:34
12         A.    Yes.                                16:56:35
13         Q.    And then it says "However,          16:56:36
14    prior to their utilization, you must take      16:56:37
15    into account the specific proposal and         16:56:38
16    its magnitude to determine if the rates        16:56:40
17    shown above are applicable."                   16:56:44
18              Is the fact that this proposal       16:56:45
19    that we've been discussing in Plaintiff's      16:56:51
20    18 was a -- okay, never mind.  Withdrawn.      16:56:54
21              Okay, so you're not sure what        16:57:11
22    segment overhead pool includes?                16:57:17
23         A.    Yes, I can't speak to              16:57:19
24    specifically what that includes.               16:57:21
25         Q.    So it may include some of the       16:57:21
```

KELLY L. BRYSON - 8/28/2014

Page 230

```
 1                  KELLY L. BRYSON
 2     items that I asked you about when we went          16:57:28
 3     through that long list?                            16:57:30
 4          A.    It may.                                 16:57:31
 5          Q.    Who would know what is                  16:57:32
 6     included in that?                                  16:57:36
 7          A.    You could start with Scott.             16:57:37
 8          Q.    Scott Pfost?                            16:57:41
 9          A.    You could start with him.  I'm          16:57:42
10     sure he would direct you to someone else,          16:57:43
11     but.                                               16:57:45
12          Q.    And fringe expense, 37117523,           16:57:54
13     what's included in that?                           16:57:59
14          A.    Again, that's a majority of             16:58:01
15     that is going to be holiday, vacation,             16:58:04
16     insurance, profit participation.  I don't          16:58:08
17     know every single line item in there, but          16:58:14
18     those are the larger buckets.                      16:58:16
19          Q.    Would it include the bonus              16:58:19
20     items you mentioned also?                          16:58:22
21          A.    I'm sure it would include some          16:58:24
22     of them, yes.                                      16:58:25
23          Q.    What's computer equipment/              16:58:26
24     infrastructure?                                    16:58:39
25          A.    That's going to be software             16:58:40
```

KELLY L. BRYSON - 8/28/2014

Page 231

```
 1                    KELLY L. BRYSON
 2    licensing, laptops, things of that            16:58:42
 3    nature.                                        16:58:45
 4         Q.    What's infrastructure?              16:58:45
 5         A.    Again, IT infrastructure.  It       16:58:46
 6    could be telephony systems, that kind of       16:58:48
 7    thing.                                         16:58:52
 8         Q.    And facility expense, is that       16:58:57
 9    the real estate component you talked           16:58:59
10    about before?                                  16:59:00
11         A.    Predominantly, yes.                 16:59:01
12         Q.    What else besides real estate       16:59:02
13    is in there?                                   16:59:04
14         A.    It may include things like          16:59:05
15    copiers, service contracts, cleaners.          16:59:06
16         Q.    What's home office overhead?        16:59:12
17         A.    That's overhead that is -- I        16:59:14
18    assume that's overhead that accounts for       16:59:19
19    the home office segment, but I'm not           16:59:21
20    certain.                                       16:59:23
21         Q.    Home office meaning?                16:59:23
22         A.    The layer that sits, the tiny       16:59:26
23    layer that sits on top of ISIT and BPS.        16:59:29
24         Q.    Who sits up there?                  16:59:33
25              MR. KLEIN:  Object to the            16:59:34
```

KELLY L. BRYSON - 8/28/2014

Page 232

```
 1              KELLY L. BRYSON
 2        form.                                   16:59:35
 3        A.    The people that aren't            16:59:36
 4   directly allocated to ISIT or BPS.           16:59:38
 5        Q.    You mean like the president of    16:59:41
 6   the company, people like that?               16:59:43
 7        A.    It could be the president, it     16:59:44
 8   could be the group controller, maybe some    16:59:45
 9   HR folks.  I don't know who specifically     16:59:48
10   sits up there.                               16:59:52
11        Q.    And then base, that includes      16:59:52
12   the direct labor which you already           16:59:59
13   described?                                   17:00:01
14        A.    Yes.                              17:00:02
15        Q.    And what's bid and proposal       17:00:02
16   labor?                                       17:00:05
17        A.    It's labor spent on bid and       17:00:05
18   proposal activities.                         17:00:09
19        Q.    And is that calculated the        17:00:10
20   same way as direct labor?                    17:00:14
21        A.    It should be salary costs, so     17:00:15
22   yes.                                         17:00:18
23        Q.    Just salary?                      17:00:18
24        A.    I believe so.                     17:00:20
25        Q.    Independent research and          17:00:20
```

KELLY L. BRYSON - 8/28/2014

Page 233

```
 1                    KELLY L. BRYSON
 2     development labor is also just salary?          17:00:23
 3          A.    I believe so.                        17:00:25
 4          Q.    What's unallowable labor?            17:00:26
 5          A.    Labor that has been determined       17:00:28
 6     is unallowable by the government.  It           17:00:31
 7     could be labor that we've elected not to        17:00:35
 8     bill, labor performing unallowable              17:00:39
 9     activities.                                      17:00:43
10          Q.    So that's overhead for which         17:00:44
11     81 percent is allowed, right?                   17:00:48
12          A.    Yes.                                 17:00:50
13          Q.    And then you have G&A, general       17:00:51
14     and administrative expense, right?              17:00:56
15          A.    Sorry, I would like to              17:00:58
16     clarify.  You said 81 percent is allowed,       17:00:59
17     I'm not sure.  To clarify, 81 percent is        17:01:02
18     calculated by taking the 72 million             17:01:06
19     divided by the 89 million.  It's not that       17:01:08
20     we came up with a hundred percent of            17:01:11
21     overhead expenses and only 81 percent was       17:01:13
22     allowed.  It's that 81 percent is the           17:01:16
23     appropriate amount to add based on our          17:01:22
24     overhead costs and our estimated forecast       17:01:25
25     labor expense.                                   17:01:31
```

1                    KELLY L. BRYSON

2         Q.    So you're saying 81 percent is            17:01:32

3    the 72507 figure divided by the 89397               17:01:35

4    figure?                                             17:01:39

5         A.    Yes.                                      17:01:39

6         Q.    And why, why do you divide               17:01:40

7    that overhead by essentially the direct             17:01:46

8    labor costs?  Why do you do that, to come           17:01:49

9    up with 81 percent?                                 17:01:55

10        A.    Because the rates are intended           17:01:56

11   to cover our costs.  So when we have an             17:01:58

12   estimate of salary costs and we have an             17:02:02

13   estimate of how much overhead is                    17:02:05

14   allocable to those salary costs and that            17:02:08

15   lets us do the math to calculate how much           17:02:12

16   we need to recover on each billable                 17:02:14

17   dollar.  In this scenario each dollar               17:02:17

18   brings with it approximately 81.11, or I            17:02:22

19   guess 81 cents of overhead expense.                 17:02:27

20        Q.    Going back to 18, if you look            17:02:54

21   at page -- okay, I'm sorry, never mind.             17:03:09

22   Well, you see this, on the top of page 3            17:03:18

23   it says government site rates are                    17:03:23

24   calculated using 15 percent discount from          17:03:25

25   ISIT overhead?                                       17:03:27

KELLY L. BRYSON - 8/28/2014

```
1               KELLY L. BRYSON
2        A.    Yes.                              17:03:29
3        Q.    How did they come up with the     17:03:30
4   15 percent discount from ISIT overhead?      17:03:33
5        A.    As I mentioned earlier, I         17:03:38
6   don't -- I don't recall all of the           17:03:40
7   sources that we looked at or how exactly      17:03:42
8   that 15 percent was finally arrived at.       17:03:45
9   I know at the time we did some analysis       17:03:48
10  of what it would look like to remove          17:03:51
11  facilities or to approximate a government     17:03:55
12  site overhead rate and we also looked at      17:03:57
13  public information of our competitors to      17:04:01
14  see the delta between their contractor        17:04:03
15  site rate and their government site rate      17:04:05
16  and based on that information that's how      17:04:07
17  we came up with 15 percent, but it was        17:04:10
18  not a precise or overly involved              17:04:12
19  analysis.  It was something that we were      17:04:18
20  doing to fill a gap until we were able to     17:04:20
21  do something more sophisticated.              17:04:24
22             MR. HERBST:  Let's take a          17:05:12
23       short break.                             17:05:14
24             (A recess was taken.)              17:05:15
25       Q.    One last time at least for         17:13:47
```

KELLY L. BRYSON - 8/28/2014

Page 236

```
 1              KELLY L. BRYSON
 2    today, you're still under oath, right?          17:14:33
 3        A.    Yes.                                   17:14:37
 4        Q.    So we were talking about              17:14:37
 5    general and administrative expenses,            17:15:01
 6    right?                                          17:15:03
 7        A.    Okay.                                  17:15:03
 8        Q.    So I don't remember did I ask         17:15:05
 9    you about the segment general and               17:15:10
10    administrative pool?  I don't know if I         17:15:14
11    asked you about that.                           17:15:16
12        A.    I don't think you did.  But           17:15:16
13    I'm not entirely sure what's included in        17:15:19
14    that bucket.                                    17:15:21
15        Q.    Well, I guess I should ask you        17:15:27
16    then does general and administrative            17:15:30
17    expenses include somewhere in these             17:15:41
18    categories human resources?                     17:15:44
19              MR. KLEIN:  Object to form.           17:15:52
20        A.    I believe so.  I'm not                17:15:54
21    certain.                                        17:15:56
22        Q.    Accounting?                            17:15:57
23        A.    Yes, I believe finance and            17:15:58
24    accounting are included in G&A.                 17:16:01
25        Q.    Public relations?                      17:16:03
```

KELLY L. BRYSON - 8/28/2014

Page 237

```
1                    KELLY L. BRYSON
2          A.    I believe so.                    17:16:05
3          Q.    Contract administration?         17:16:05
4          A.    I believe so.                    17:16:07
5          Q.    Legal?                           17:16:08
6          A.    I believe so.                    17:16:09
7          Q.    Corporate home office?           17:16:09
8          A.    I believe so.                    17:16:11
9          Q.    Executive comp?                  17:16:13
10         A.    That I'm not sure.  I mean       17:16:16
11    again, these are things that I know exist   17:16:20
12    within our indirect rate structure.  I'm    17:16:22
13    not confident to say exactly where they     17:16:25
14    live.                                        17:16:30
15         Q.    You're just not sure whether     17:16:30
16    they're in general and administrative       17:16:32
17    expenses or in the fee?                     17:16:34
18              MR. KLEIN:  Object to the         17:16:37
19         form.                                  17:16:38
20         A.    I'm not sure where they would    17:16:39
21    be, where they would be included.           17:16:40
22         Q.    They could be in overhead?       17:16:41
23         A.    It's possible that some small    17:16:42
24    amount of those items could be in           17:16:46
25    overhead.                                    17:16:47
```

KELLY L. BRYSON - 8/28/2014

Page 238

```
 1              KELLY L. BRYSON
 2      Q.    And this is something that          17:16:48
 3   Scott Pfost would know?                      17:16:49
 4      A.    Again, I don't know if he           17:16:50
 5   would answer those questions or if he        17:16:53
 6   would refer you to someone else, but he      17:16:55
 7   would be the right person to talk to to      17:16:57
 8   make sure that you got what you needed.      17:16:59
 9      Q.    Is there any other G&A expense      17:17:00
10   other than these categories that I           17:17:05
11   mentioned that you think would be            17:17:07
12   included in G&A?                             17:17:08
13      A.    Did you mention sales, bid and      17:17:10
14   proposal type work?                          17:17:19
15      Q.    I did.  What is that?  That's       17:17:21
16   the second item, right?                      17:17:25
17      A.    Yes.                                17:17:26
18      Q.    What is that?                       17:17:27
19      A.    That's time that people            17:17:28
20   directly charge to proposal activities       17:17:29
21   and monies that are spent to prepare,        17:17:32
22   proposal expenses.  Again, it could          17:17:37
23   include travel, it could include, it does    17:17:40
24   include things like binders and              17:17:42
25   photocopies.                                 17:17:44
```

KELLY L. BRYSON - 8/28/2014

Page 239

```
 1              KELLY L. BRYSON
 2      Q.   Is this something which you          17:17:45
 3  would be able to see by looking at the        17:17:50
 4  people's time sheets?                         17:17:52
 5           MR. KLEIN:   Object to the           17:17:54
 6      form.                                      17:17:56
 7      A.   It depends on the person.            17:17:56
 8      Q.   How about the person in, the         17:17:58
 9  persons in Plaintiff's 18, if we look at      17:18:02
10  Conklin, Dowdy, Ashbrook, Ahmed,              17:18:06
11  Kyprianou, Ashmore, Bernardi, Carragher,      17:18:10
12  Methia and Bowell, would it appear in         17:18:15
13  their time sheets?                            17:18:20
14           MR. KLEIN:   Object to the           17:18:23
15      form.                                      17:18:24
16      A.   It may.  At the time, there          17:18:24
17  are certain people -- especially at this      17:18:31
18  time there are certain people that just       17:18:33
19  charge to a charge code because they are      17:18:34
20  a G&A.  For example, using myself again       17:18:36
21  as an example, I live in G&A, my time         17:18:39
22  goes to G&A.  It doesn't get specifically     17:18:43
23  broken out to any particular proposal         17:18:46
24  effort.                                        17:18:49
25           People that are more line            17:18:49
```

KELLY L. BRYSON - 8/28/2014

Page 240

```
 1              KELLY L. BRYSON
 2    focused, that are generally billable, are      17:18:52
 3    usually expected to charge to bid and          17:18:56
 4    proposal codes for time spent doing those      17:18:59
 5    activities.                                    17:19:02
 6         Q.   Your G&A wouldn't necessarily        17:19:02
 7    be specifically charged to bid and             17:19:06
 8    proposal activity, would it?                   17:19:07
 9         A.   I'm not sure.                         17:19:09
10         Q.   What about independent               17:19:11
11    research and development expense, what is      17:19:14
12    that?                                          17:19:16
13         A.   That's money that we use to          17:19:16
14    develop IP or other research initiatives.      17:19:19
15         Q.   What's IP stand for?                 17:19:23
16         A.   Intellectual property.              17:19:24
17         Q.   Again, these are the amounts         17:19:26
18    that the whole company, the whole ISIT        17:19:31
19    part of the company expected to incur,         17:19:35
20    right?                                         17:19:37
21         A.   Yes.                                 17:19:37
22         Q.   Are there any other parts of         17:19:38
23    CGI Federal other than ISIT and BPS?           17:19:40
24         A.   And I believe again that there       17:19:42
25    was an intermediate home office at the         17:19:44
```

KELLY L. BRYSON - 8/28/2014

Page 241

```
 1              KELLY L. BRYSON
 2    time.                                    17:19:46
 3         Q.    Just the top layer of home    17:19:46
 4    office?                                  17:19:48
 5         A.    Yes.                          17:19:48
 6         Q.    But other than that, it's just 17:19:49
 7    ISIT and BPS, right?                     17:19:50
 8         A.    Yes.                          17:19:51
 9         Q.    And I guess when you break    17:19:53
10    down there's a lot more people employed  17:19:55
11    in ISIT than in BPS?                     17:19:57
12         A.    Yes.                          17:19:59
13         Q.    And that's one reason why the 17:20:00
14    overhead is so much more in ISIT?        17:20:01
15         A.    No.                           17:20:04
16              MR. KLEIN:  Objection to form. 17:20:05
17         Q.    No?  Why is ISIT so much more 17:20:05
18    in overhead?                             17:20:09
19         A.    Again, it's a proportion of   17:20:10
20    direct labor.  So I mean, for example, if 17:20:11
21    there was some large investment that we  17:20:15
22    made in BPS their overhead could be much 17:20:18
23    higher.  But it's very much a calculation 17:20:21
24    on proportion.                           17:20:27
25         Q.    I notice that the G&A expenses 17:20:29
```

KELLY L. BRYSON - 8/28/2014

Page 242

```
 1              KELLY L. BRYSON
 2   are also significantly higher in ISIT        17:20:36
 3   than in BPS, 51 compared to nine, right?     17:20:39
 4        A.   Yes.                               17:20:43
 5        Q.   Is that also an indication         17:20:44
 6   that a lot more of the company's work and    17:20:45
 7   a lot more of its staff is dedicated to      17:20:47
 8   ISIT work?                                   17:20:51
 9        A.   Again, that's largely             17:20:52
10   coincidental.  ISIT work tends to have       17:20:53
11   more investments in it because again, all    17:20:58
12   of our people have laptops.  People in       17:21:00
13   the BPS side may not be issued a laptop.     17:21:04
14        Q.   So why is OH, that's for          17:21:07
15   overhead, right?                             17:21:12
16        A.   Yes.                               17:21:12
17        Q.   Allocated to B&P, bid and         17:21:13
18   proposal, right?                             17:21:16
19        A.   Yes.                               17:21:17
20        Q.   Why is that broken out            17:21:17
21   separately in G&A as opposed to overhead?    17:21:18
22        A.   I don't feel comfortable that     17:21:28
23   I can answer that question accurately.       17:21:29
24        Q.   Does that mean you don't know?    17:21:34
25        A.   It means I don't want to          17:21:35
```

KELLY L. BRYSON - 8/28/2014

Page 243

```
 1                    KELLY L. BRYSON
 2      speculate.                                17:21:39
 3          Q.    I'm not asking you to           17:21:39
 4      speculate, but to the best of your        17:21:40
 5      knowledge, what's the reason?             17:21:43
 6          A.    There are people that live in   17:21:44
 7      one segment but their fringes, for        17:21:49
 8      example, may live in a different segment. 17:21:53
 9      So that's some of what you're seeing      17:21:55
10      here, but I don't want to misspeak and    17:21:59
11      get it wrong.                             17:22:01
12          Q.    Which people are you thinking   17:22:01
13      of?                                       17:22:03
14                MR. KLEIN:   Object to the      17:22:05
15          form.                                 17:22:06
16          Q.    Just as an example?            17:22:06
17          A.    So, for example, a lot of the   17:22:08
18      independent research and development      17:22:19
19      expenses live in general and             17:22:21
20      administrative and so a portion of        17:22:24
21      overhead for those people and for those   17:22:27
22      costs is allocated back into G&A.         17:22:30
23          Q.    Was that overhead also listed   17:22:33
24      somewhere in the overhead categories      17:22:39
25      above?                                    17:22:42
```

KELLY L. BRYSON - 8/28/2014

Page 244

```
 1                  KELLY L. BRYSON
 2        A.    I know that is netted out.       17:22:43
 3   You can see the costs down below where      17:22:49
 4   it's backed out again of the base, but      17:22:52
 5   again, I don't feel comfortable in          17:22:55
 6   describing the intricate details of how     17:22:56
 7   exactly those calculations are done.        17:23:00
 8        Q.    What elements are in G&A?         17:23:02
 9   Like in home office G&A, what kind of       17:23:08
10   expenses are they?                          17:23:11
11        A.    I'm not sure.                     17:23:11
12        Q.    Again, there's another total     17:23:12
13   direct cost, is that salaries?              17:23:20
14        A.    Total direct costs are, would    17:23:24
15   include salaries, yes.                      17:23:28
16        Q.    What else would it include?      17:23:29
17        A.    It would include costs that      17:23:31
18   were direct and not indirect in nature.     17:23:37
19   Additional things specifically in           17:23:41
20   addition to salary?  I'm not certain.       17:23:43
21        Q.    Well the direct labor, in        17:23:46
22   other words, salary up above is 81.287      17:23:51
23   million and this direct cost is 127.  So    17:23:55
24   what's the difference between those two?    17:23:59
25        A.    I'm not certain.                  17:24:05
```

KELLY L. BRYSON - 8/28/2014

Page 245

```
 1                   KELLY L. BRYSON
 2          Q.    Then it excludes direct          17:24:10
 3    subcontractors, 41 million, what is that?    17:24:13
 4          A.    There would be subcontractors    17:24:16
 5    that we engage that are direct bill.         17:24:19
 6          Q.    What's direct bill mean?         17:24:21
 7          A.    Direct bill to the client,       17:24:24
 8    typically.                                   17:24:26
 9          Q.    In other words, CGI wouldn't     17:24:27
10    bill them, the subcontractor would bill      17:24:31
11    directly to the client?                      17:24:33
12          A.    No, we would bill.  As opposed   17:24:33
13    to being an indirect subcontractor is my     17:24:36
14    understanding.                               17:24:38
15          Q.    The indirect subcontractors      17:24:38
16    would bill the client directly and the       17:24:41
17    direct ones you would bill for?              17:24:43
18          A.    No.  A direct subcontractor      17:24:44
19    would be someone that works on a project,    17:24:47
20    they invoice me and I invoice the client     17:24:52
21    because they did billable work.              17:24:54
22                An indirect subcontractor        17:24:56
23    would be someone that we hired as a          17:24:58
24    technical writer that wrote a paragraph      17:25:00
25    or a couple of pages for a proposal doing    17:25:02
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2    incorrect work.                          17:25:04
 3         Q.    Do you handle the invoicing    17:25:05
 4    also?                                     17:25:10
 5         A.    No.                            17:25:11
 6         Q.    Who does that?                 17:25:11
 7         A.    Finance.                       17:25:14
 8         Q.    How does this base differ from 17:25:15
 9    the base above?  Because I see that       17:25:26
10    overhead is added in here, total          17:25:28
11    overhead, into the 72 million above in    17:25:37
12    pool comes down, it's added in general    17:25:40
13    and administrative.  Why?                 17:25:43
14         A.    Because the way the rates are  17:25:45
15    calculated, G&A is a proportion of direct 17:25:49
16    labor plus overhead, and so when we look  17:25:54
17    at it as a percentage adder, it's 33.34   17:25:58
18    percent of the total of direct labor plus 17:26:05
19    overhead.                                 17:26:09
20         Q.    Again that's 51 divided by 154 17:26:15
21    to come up with the rate, right?          17:26:19
22         A.    Yes, correct.                  17:26:20
23         Q.    G&A excluding R&D, what's      17:26:28
24    that?                                     17:26:31
25         A.    That is an alternate view of   17:26:31
```

KELLY L. BRYSON - 8/28/2014

Page 247

| | | |
|---|---|---|
| 1 | KELLY L. BRYSON | |
| 2 | our G&A rate that backs out the costs | 17:26:34 |
| 3 | associated with independent research and | 17:26:39 |
| 4 | development. | 17:26:41 |
| 5 | Q.    What do you use that for? | 17:26:45 |
| 6 | A.    What do we use that rate for? | 17:26:46 |
| 7 | Q.    Yes. | 17:26:48 |
| 8 | A.    CMS, Centers for Medicaid and | 17:26:49 |
| 9 | Medicare Services has a stipulation in | 17:26:53 |
| 10 | their contracting regulations that state | 17:26:54 |
| 11 | that we can't -- or actually, I'm sorry, | 17:26:58 |
| 12 | I said CMS.  I meant HHS, the aggregate, | 17:27:01 |
| 13 | Health and Human Services has a | 17:27:06 |
| 14 | stipulation in their contracting language | 17:27:08 |
| 15 | that we cannot include independent | 17:27:10 |
| 16 | research and development costs in our G&A | 17:27:13 |
| 17 | and so we calculate the rate without that | 17:27:16 |
| 18 | for our HHS and CMS based work. | 17:27:19 |
| 19 | Q.    When do you use the | 17:27:27 |
| 20 | subcontractor handling rate? | 17:27:28 |
| 21 | A.    That is a rate that's added on | 17:27:30 |
| 22 | to any subcontracting costs. | 17:27:32 |
| 23 | Q.    The next page of that exhibit, | 17:27:36 |
| 24 | what are we looking at?  What is this, | 17:27:42 |
| 25 | provisional billing rates, what are | 17:27:45 |

KELLY L. BRYSON - 8/28/2014

Page 248

```
  1                 KELLY L. BRYSON
  2    those?                                         17:27:47
  3         A.    This is a slightly more             17:27:47
  4    granular view of what was on the prior         17:27:49
  5    page.                                          17:27:52
  6         Q.    When you say more granular,         17:28:00
  7    you mean what?                                 17:28:02
  8         A.    It just has some additional         17:28:03
  9    details and some additional titling for        17:28:04
 10    each of the items.                             17:28:06
 11         Q.    What's ICE, I-C-E?                   17:28:07
 12         A.    I believe that -- I'm not sure      17:28:10
 13    exactly what the acronym stands for, but       17:28:12
 14    it's computer equipment.                       17:28:15
 15         Q.    That's true all the way down,       17:28:30
 16    basically the rates are the same, the          17:28:32
 17    numerators and denominators turn out to        17:28:33
 18    be the same, it's just different kind of       17:28:36
 19    descriptions?                                  17:28:38
 20              MR. KLEIN:  Object to form.          17:28:40
 21         A.    Yes, it should be the same.         17:28:40
 22    This page aligns more closely with the         17:28:41
 23    way things are called in our financials,       17:28:46
 24    while the first page gives things a            17:28:50
 25    title, that's a little more layman speak.      17:28:53
```

KELLY L. BRYSON - 8/28/2014

```
 1              KELLY L. BRYSON
 2       Q.    And the third page, the third        17:28:58
 3   and last page of the exhibit, what's            17:29:00
 4   that?                                           17:29:02
 5       A.    The third page breaks out a           17:29:02
 6   little more granularly the fringe               17:29:05
 7   calculation specifically.                       17:29:08
 8       Q.    How did you use these three           17:29:15
 9   pages in your rate calculations in              17:29:17
10   Plaintiff's Exhibit 18, if at all?              17:29:19
11       A.    I did not use these specific          17:29:21
12   calculations at all.  These calculations        17:29:23
13   are prepared, again, by the finance and         17:29:26
14   compliance teams.  We prepare the package       17:29:30
15   and then we would receive a letter like         17:29:32
16   Bryson 5 from CMS or whomever government         17:29:36
17   agency we're working with that says we          17:29:42
18   reviewed your package and we provide            17:29:44
19   approval for you to use that package for        17:29:47
20   proposal bidding purposes.                      17:29:51
21            And so that's what I, I used           17:29:53
22   the final rates in my rate buildup, but         17:29:55
23   as far as this granular information             17:29:58
24   contained in Bryson 3, I don't use this         17:30:00
25   at all.                                         17:30:04
```

KELLY L. BRYSON - 8/28/2014

Page 250

```
 1                   KELLY L. BRYSON
 2               MR. HERBST:  Would you mark              17:30:06
 3          this as Exhibit --                           17:30:08
 4          Q.    Looking at the document right          17:30:35
 5     at the top in your left hand, what is             17:30:37
 6     that, Bryson what?                                17:30:41
 7          A.    Five.                                  17:30:42
 8          Q.    So five and three -- three are         17:30:44
 9     the rates that you submitted to HHS,              17:30:48
10     right?                                            17:30:51
11          A.    Three is our provisional rates         17:30:51
12     submission for CGI.  We happen to submit          17:30:58
13     it to CMS, but it wouldn't be different.          17:31:01
14          Q.    That's my question.  Every             17:31:04
15     opportunity that you pursued for a                17:31:06
16     federal government agency used those              17:31:08
17     rates?                                            17:31:10
18          A.    Yes.                                   17:31:10
19          Q.    Those ISIT rates?                      17:31:10
20          A.    Yes.                                   17:31:12
21          Q.    Did any other agency besides           17:31:12
22     HHS or CMS look at the rates and approve          17:31:20
23     them?                                             17:31:24
24          A.    Not to my knowledge.                   17:31:24
25          Q.    What about GSA, it doesn't             17:31:25
```

KELLY L. BRYSON - 8/28/2014

Page 251

```
 1                KELLY L. BRYSON
 2   approve rates?  The federal government's        17:31:30
 3   general contracting agency, the GSA, are        17:31:33
 4   you familiar with GSA?                          17:31:36
 5        A.    I'm familiar with GSA.               17:31:38
 6        Q.    They don't approve any rates         17:31:39
 7   from CGI?                                        17:31:41
 8        A.    They don't approve our              17:31:42
 9   indirect rates, no.  And again, indirect        17:31:43
10   rates are predominantly used for cost           17:31:46
11   type work, and the agency that reviews          17:31:48
12   each contractor's indirect rate                 17:31:54
13   contractors tends to be the agency with         17:31:56
14   whom they have a, the preponderance of          17:31:58
15   their cost type work.  And since ours           17:32:00
16   happens to be CMS, they are the ones that       17:32:03
17   review our rate packages.  For other            17:32:06
18   contractors it may be different.  Ours          17:32:08
19   may change in the future, but CMS is the        17:32:11
20   one that reviews it now.                         17:32:13
21             I do believe that upon request       17:32:15
22   other agencies could review our package,        17:32:17
23   but it's not standard practice.                  17:32:20
24        Q.    Would you know about that if         17:32:21
25   they did?                                        17:32:23
```

KELLY L. BRYSON - 8/28/2014

Page 252

```
 1                    KELLY L. BRYSON
 2        A.    No.                                17:32:23
 3        Q.    Who would?                          17:32:23
 4        A.    Compliance.                         17:32:24
 5        Q.    Would Mr. Pfost know, would he      17:32:28
 6   be advised of that?                           17:32:31
 7        A.    He would probably know.  I         17:32:33
 8   don't think he would be involved in that,     17:32:34
 9   but.                                          17:32:36
10        Q.    Who presently runs compliance?      17:32:37
11        A.    John Cerimeli.                      17:32:40
12        Q.    Was he there in 2010 also?          17:32:42
13        A.    No.                                17:32:45
14        Q.    Who was there in 2010?              17:32:45
15        A.    I would say we did not have an      17:32:50
16   official compliance department in 2010.       17:32:53
17   But the person that acted in that             17:32:57
18   function, again, I would say was Mary         17:33:00
19   Crigler.                                      17:33:03
20        Q.    She's still employed?               17:33:09
21        A.    Yes.                               17:33:10
22        MR. HERBST:  Would you mark               17:33:14
23        this as Bryson Exhibit 6.                17:33:15
24            (Bryson Exhibit 6 for                 17:33:16
25        identification, Bates stamped            17:33:16
```

KELLY L. BRYSON - 8/28/2014

Page 253

```
 1                KELLY L. BRYSON
 2         CGI_ASHMORE 2015422 through          17:33:16
 3         2015428.)                            17:33:17
 4         Q.    Bryson 6, what's that          17:33:17
 5    document?                                 17:33:19
 6         A.    This is a request for quote    17:33:19
 7    that we received from ICF that includes   17:33:21
 8    the labor categories that we were pricing 17:33:25
 9    against.                                  17:33:28
10         Q.    Does this correspond to        17:33:28
11    Plaintiff's Exhibit 18?                   17:33:30
12         A.    Yes.                           17:33:31
13         Q.    Okay.                          17:33:35
14         A.    I believe so.                  17:33:38
15         Q.    Now, did you use this document 17:33:38
16    in your coming up with rates?             17:33:41
17         A.    Yes.                           17:33:44
18         Q.    How did you use it?            17:33:44
19         A.    I used it to understand the    17:33:46
20    due date.  I used it to review the labor  17:33:48
21    category descriptions as written here.  I 17:33:54
22    used it to understand the specific        17:33:58
23    qualifications that were necessary for    17:34:01
24    each of the different labor categories.   17:34:05
25         Q.    Now, is it fair to say that    17:34:09
```

```
 1                  KELLY L. BRYSON
 2   because there was no name provided for          17:34:12
 3   project administrator on 18 that the            17:34:16
 4   understanding of CGI was that the prime,        17:34:21
 5   ICF, was going to provide that position?        17:34:25
 6        A.    I would -- I don't -- I don't        17:34:27
 7   think that's necessarily a fair                 17:34:33
 8   statement.                                      17:34:35
 9        Q.    Why not?                             17:34:36
10        A.    Because what we were bidding         17:34:37
11   was a blanket purchase agreement and            17:34:41
12   while ICF may have provided a project           17:34:45
13   administrator that's not to say that six        17:34:51
14   months down the road we wouldn't have           17:34:55
15   gotten an opportunity where we provided         17:34:56
16   that.  That's why we provided this full         17:34:58
17   list of rates because that gives us the         17:35:00
18   flexibility to staff any of those labor         17:35:02
19   categories.  I wouldn't -- I would say          17:35:05
20   that because we provided a rate that            17:35:09
21   leaves open the door for us to staff a          17:35:13
22   position in that labor category in the          17:35:17
23   future.                                         17:35:20
24             It's our typical practice             17:35:20
25   unless instructed otherwise that if we          17:35:23
```

KELLY L. BRYSON - 8/28/2014

Page 255

```
 1                  KELLY L. BRYSON
 2    have no intention of staffing a role,        17:35:25
 3    that we won't bid that labor category.       17:35:28
 4        Q.    If you look at page 33 of          17:35:46
 5    Bryson 7 that's a page for Jeffrey Baker,    17:35:48
 6    right?                                       17:36:05
 7        A.    Yes.                               17:36:05
 8        Q.    An ICF official, right?            17:36:05
 9        A.    Maybe.                             17:36:08
10        Q.    So he's listed as project         17:36:08
11    administrator in the key personnel?          17:36:11
12        A.    Yes.                               17:36:15
13        Q.    So are you saying that even if     17:36:15
14    ICF was planning to staff the position as    17:36:21
15    project administrator you would have gone    17:36:25
16    ahead and figured rates, CGI rates for       17:36:27
17    those same positions?                        17:36:30
18        A.    Yes.                               17:36:30
19        Q.    Let's go to subject matter         17:36:31
20    expert.  The codifications are listed on     17:36:41
21    that page, right, that one page, right,      17:36:50
22    for --                                       17:36:56
23        A.    Yes.                               17:36:57
24        Q.    The qualifications are just        17:36:59
25    listed in that one paragraph under          17:37:08
```

```
 1                    KELLY L. BRYSON
 2      subject matter expert, right, three          17:37:10
 3      lines?                                        17:37:12
 4           A.    Yes.                               17:37:12
 5           Q.    So advanced expertise in           17:37:12
 6      business process reengineering practices      17:37:14
 7      or in public housing; is that right?          17:37:18
 8           A.    Yes.                               17:37:18
 9           Q.    So what in this description        17:37:20
10      caused you to use 13, 14 and -- or 14, 15     17:37:26
11      and 16?                                       17:37:36
12           A.    Well just my overall              17:37:37
13      understanding of what's written here          17:37:40
14      specifically and the types of people that     17:37:43
15      subject matter experts usually are.           17:37:48
16      Typically they are very highly                17:37:53
17      specialized.  They tend to be somewhat        17:37:55
18      senior in nature.  And based on those         17:37:58
19      specific things I elected to use a more       17:38:05
20      senior mapping.  And also knowing that        17:38:09
21      something as generic as subject matter        17:38:13
22      expert, particularly as it's written          17:38:15
23      here, I needed to be able to support a        17:38:17
24      wide range of people.                         17:38:22
25                    Someone could have been         17:38:27
```

KELLY L. BRYSON - 8/28/2014

Page 257

```
 1            KELLY L. BRYSON
 2   someone inexpensive at $80,000 and I          17:38:28
 3   could have had to support someone making      17:38:30
 4   more than $150,000.  That's one of the        17:38:33
 5   reasons that I created the rate that I        17:38:37
 6   did.                                          17:38:40
 7        Q.   So didn't you check the            17:38:42
 8   rosters for the 17 people in 14, 15 and       17:38:57
 9   16 to determine whether or not they had       17:39:05
10   the expertise required in this paragraph?     17:39:07
11        A.   Did I look at those people          17:39:08
12   specifically?                                 17:39:11
13        Q.   Yes.                                17:39:11
14        A.   No.  I mean I assumed that          17:39:12
15   when someone is placed in that category       17:39:15
16   that they are in fact a subject matter        17:39:18
17   expert, but I don't -- I don't check that     17:39:20
18   information.                                  17:39:22
19        Q.   I guess based on your last         17:40:09
20   answer you could have used for subject        17:40:11
21   matter expert people in the lower             17:40:13
22   categories making around 70,000 and for       17:40:14
23   senior subject matter expert you could        17:40:19
24   have used 14, 15 and 16?                      17:40:21
25        A.   I could have.                        17:40:23
```

KELLY L. BRYSON - 8/28/2014

Page 258

```
 1                  KELLY L. BRYSON
 2        Q.    So going back to technical        17:40:24
 3   writer do you see the page that describes    17:41:04
 4   technical writer?                            17:41:19
 5        A.    Yes.                              17:41:20
 6        Q.    And it shows they want people     17:41:21
 7   with the following experience, right?        17:41:25
 8        A.    Yes.                              17:41:26
 9        Q.    A, B, C and D?                    17:41:27
10        A.    Yes.                              17:41:28
11        Q.    Did you check to see whether      17:41:29
12   technical writer 11, the one person there    17:41:30
13   making $101,000, had that experience?        17:41:33
14        A.    No.                               17:41:39
15        Q.    Did you check to see whether      17:41:39
16   the business analysts, I think you said      17:41:45
17   it was business analyst 8, 9 and 10,         17:41:54
18   right?                                       17:41:57
19        A.    Yes, 8, 9 and 10.  And no, I      17:42:02
20   didn't check specifically if they had it.    17:42:05
21        Q.    Had those qualifications?         17:42:07
22        A.    I didn't.  Typically when         17:42:08
23   requirements are very specific like these    17:42:11
24   are we often don't have those people, or     17:42:13
25   we may hire for those people.  But no,       17:42:16
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2    it's not typically part of my job to make        17:42:21
 3    sure that people are qualified to do what        17:42:24
 4    they say they're able to do.                     17:42:28
 5         Q.    So going back to page 1 for           17:42:29
 6    project administrator, you didn't look to        17:42:32
 7    see whether the people in the categories         17:42:34
 8    that you selected that are shown on that         17:42:38
 9    -- yes, that document -- no, the one on          17:42:41
10    your left?                                       17:42:46
11         A.    Right.                                17:42:46
12         Q.    What's the number on that one?        17:42:47
13         A.    Four.                                 17:42:48
14         Q.    You didn't -- whatever people         17:42:49
15    in categories you chose you didn't check         17:42:52
16    to see if those people had experience            17:42:54
17    that is listed in A, B, C through I on           17:42:56
18    Bryson 6?                                        17:43:03
19         A.    I didn't --                           17:43:04
20         Q.    Correct?                              17:43:05
21         A.    I didn't check the                    17:43:06
22    individuals, but I know what the                 17:43:07
23    description for, what our internal role          17:43:08
24    description for a project -- for a               17:43:11
25    business analyst SME is and I know it            17:43:14
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON                  17:43:18

 2   encompasses the types of activities that       17:43:18

 3   are listed here as project administrator.      17:43:20

 4   I know that a business analyst does            17:43:24

 5   things such as MS project.  I know that        17:43:26

 6   we had business analysts that are              17:43:30

 7   experienced in earned value.  I know that      17:43:32

 8   we have business analysts that are PMP         17:43:34

 9   certified.                                     17:43:38

10          Did I check on an individual            17:43:39

11   level to say, Joe, John Doe had this           17:43:41

12   specific experience?  No, I didn't.  But       17:43:45

13   I know that as part of my job that people      17:43:47

14   with those skills live in those                17:43:50

15   categories.                                    17:43:51

16      Q.    But my question isn't just            17:43:52

17   whether you looked at the individual           17:43:54

18   people in categories 8, 9 and 10 to see        17:43:56

19   if they had those qualifications.  It's        17:43:59

20   whether you compared the people in 8, 9        17:44:02

21   and 10 with the people in other                17:44:07

22   categories to determine whether 8, 9 and       17:44:10

23   10 was the best mix to meet these              17:44:14

24   particular qualification requirements?         17:44:18

25          MR. KLEIN:  Object to the               17:44:21
```

KELLY L. BRYSON - 8/28/2014

```
 1                  KELLY L. BRYSON
 2        form.                                   17:44:22
 3        A.    What I can say is that the        17:44:23
 4   number increases with seniority and based    17:44:26
 5   on my understanding of the types of          17:44:30
 6   people that have these skills, I selected    17:44:32
 7   what I felt was a reasonable mix.            17:44:35
 8        Q.    How long did it -- okay, and      17:44:37
 9   the preparation of the mix was in Bryson     17:44:41
10   4, right?                                    17:44:48
11        A.    Right.                            17:44:49
12        Q.    That's how you went and did       17:44:49
13   it, right?                                   17:44:51
14        A.    Yes.                              17:44:51
15        Q.    How long did it take you to       17:44:52
16   prepare that chart and come up with the      17:44:54
17   rates?                                       17:44:56
18        A.    It probably took a couple of      17:44:56
19   hours to pull together the first draft       17:44:58
20   and then if there were any iterations,       17:45:01
21   depending on how extensive, anywhere from    17:45:03
22   a few minutes to another hour or two.        17:45:06
23        Q.    Those would be iterations         17:45:13
24   required or caused by what?                  17:45:15
25        A.    Caused by sending out an          17:45:17
```

KELLY L. BRYSON - 8/28/2014

Page 262

```
 1              KELLY L. BRYSON
 2    initial cut.  Oftentimes I will send out      17:45:19
 3    an initial list of rates and say this is      17:45:21
 4    what I came up with based on what I know       17:45:23
 5    and then people provide feedback, and if       17:45:26
 6    necessary, we do additional revisions.         17:45:29
 7         Q.    Did you do that in this case?       17:45:32
 8         A.    I don't recall.                     17:45:34
 9         Q.    Did you look to see whether         17:45:35
10    there were any other iterations of that        17:45:37
11    document prior or subsequent to that one?      17:45:40
12         A.    In preparation for the             17:45:43
13    testimony?                                     17:45:44
14         Q.    Yes.                               17:45:44
15         A.    I did not look, no.                 17:45:45
16              MR. HERBST:  I'll request any        17:45:51
17         prior iterations of that document        17:45:52
18         or subsequent iterations.                17:45:54
19              (Request made.)                      17:45:54
20              MR. HERBST:  Let's take five        17:50:13
21         minutes.                                 17:50:14
22              (A recess was taken.)               17:50:15
23         Q.    With respect to Bryson 1, were     17:50:15
24    the rates and figures here in this            17:50:21
25    document provided to anybody but HHS, to      17:50:27
```

KELLY L. BRYSON - 8/28/2014

Page 263

```
 1                    KELLY L. BRYSON
 2    your knowledge?                                17:50:35
 3              MR. KLEIN:  Object to the            17:50:36
 4         form.                                     17:50:37
 5         A.    The fully loaded rates would        17:50:39
 6    have been provided to ICF.  But other          17:50:43
 7    than that, not to my knowledge.                17:50:48
 8         Q.    But to any other government         17:50:49
 9    agencies, were the rates, labor                17:50:51
10    categories, staff names and estimated          17:50:53
11    hours in this document provided to, for        17:50:55
12    example, HUD?                                  17:51:01
13         A.    This is -- it did get sent to       17:51:04
14    HUD.                                           17:51:07
15         Q.    It did get sent to HUD?             17:51:07
16         A.    Exhibit 1?                          17:51:09
17         Q.    Yes.                                17:51:10
18         A.    Or Bryson 1, yes, this was          17:51:11
19    sent to HUD.                                   17:51:13
20         Q.    When?                               17:51:14
21         A.    On June 1st.                        17:51:15
22         Q.    This went to HUD?  I thought        17:51:19
23    -- did it go to GSA, the General Services      17:51:22
24    Agency?                                        17:51:27
25         A.    I mean my understanding is it       17:51:29
```

```
 1                    KELLY L. BRYSON
 2     went to HUD.  If it went to someone else          17:51:33
 3     then I mean I don't know.                         17:51:35
 4         Q.     Was CGI required to provide            17:51:38
 5     any certification or attestation as to            17:51:53
 6     the accuracy of these rates with the              17:51:55
 7     submissions to whichever government               17:51:58
 8     agencies they went?                               17:52:01
 9              MR. KLEIN:  Object to the                 17:52:03
10         form.                                          17:52:04
11         A.     Not to my knowledge.                   17:52:04
12         Q.     Looking at Bryson 2, I thought         17:52:05
13     you earlier testified that when someone           17:52:21
14     is hired either HR or the hiring manager          17:52:23
15     puts them into one of these categories?           17:52:28
16         A.     Yes.                                   17:52:30
17         Q.     Like SME 6, 7, 8, 9, 10, 11,           17:52:31
18     12, right?                                        17:52:35
19         A.     In both a role and a number,           17:52:35
20     yes.                                              17:52:39
21         Q.     How does the hiring manager            17:52:39
22     choose those numbers, the categories?            17:52:43
23         A.     Well there are notional               17:52:47
24     descriptions for both their roles and the        17:52:50
25     numbers, but they are, they're not very          17:52:53
```

KELLY L. BRYSON - 8/28/2014

Page 265

```
 1                  KELLY L. BRYSON
 2    specific, so there's a lot of discretion        17:52:57
 3    on behalf of the hiring manager to put          17:53:00
 4    them where they would like.  It's not --        17:53:02
 5    it's an imperfect process and again, it's       17:53:06
 6    very, again, professional discretion.           17:53:11
 7    You could make -- you could easily make         17:53:14
 8    an argument to put people in many               17:53:17
 9    different combinations of categories.           17:53:18
10    It's not hard and fast.                         17:53:20
11         Q.    You said there were notational       17:53:21
12    what?                                           17:53:24
13         A.    There are notional                   17:53:24
14    descriptions that go on with them.              17:53:26
15         Q.    Where are those descriptions?        17:53:27
16         A.    They're not here.                    17:53:29
17         Q.    I know, but where would we           17:53:30
18    find them?                                      17:53:33
19         A.    You can ask HR for them.             17:53:33
20             MR. HERBST:  I'm going to              17:53:35
21         request the notional descriptions.        17:53:36
22             (Request made.)                        17:53:36
23         A.    I don't know what the official       17:53:41
24    title of the document is, but yes.              17:53:42
25         Q.    I understand, but your counsel       17:53:44
```

KELLY L. BRYSON - 8/28/2014

```
 1                 KELLY L. BRYSON
 2      is here and he's heard your testimony and      17:53:46
 3      I'm sure he'll be able to find them.           17:53:48
 4           A.    Yes.                                17:53:50
 5                MR. KLEIN:  There's been no          17:53:51
 6           representation by CGI that any of         17:53:52
 7           the requests that have been made by       17:53:54
 8           Mr. Herbst are going to be               17:53:56
 9           produced, I just want to make the         17:53:58
10           record clear.                             17:54:00
11                MR. HERBST:  You can make            17:54:00
12           whatever record you want.  I'm            17:54:02
13           requesting them and I'm sure that         17:54:04
14           if you decide to produce them, as I       17:54:05
15           believe you're required to do, that       17:54:08
16           you will have no difficulty               17:54:09
17           identifying them.                         17:54:12
18           Q.    Now let me ask you this.            17:54:13
19      Other than the descriptions which provide      17:54:16
20      a description of the role, is that what        17:54:20
21      these notional descriptions are?               17:54:23
22           A.    Yes.  They're high level           17:54:26
23      descriptions of each of these roles.           17:54:29
24           Q.    And do the descriptions of the      17:54:30
25      roles also contain some qualifications?        17:54:34
```

KELLY L. BRYSON - 8/28/2014

Page 267

```
 1              KELLY L. BRYSON
 2         MR. KLEIN:  Object to form.          17:54:38
 3      A.    Most of these roles are          17:54:40
 4  written very generically.  There may be    17:54:44
 5  some that indicate a particular skill or   17:54:47
 6  degree or certificate, but.                17:54:49
 7      Q.    Does the person's hiring         17:54:53
 8  salary have anything to do with the        17:54:56
 9  notional description in each category?      17:54:59
10      A.    With the description of the      17:55:03
11  category?  I would say no.  I don't think  17:55:08
12  so.                                         17:55:11
13      Q.    In other words, if someone is    17:55:11
14  hired at 70,000 a year it doesn't           17:55:12
15  necessarily mean it will be in business    17:55:15
16  analyst SME 9, for example, as opposed to  17:55:18
17  8 or 10?                                    17:55:21
18      A.    No, I mean the numbers do --     17:55:22
19  the number annotation does indicate a      17:55:25
20  kind of a salary band within which people  17:55:28
21  should fall ideally.  But I mean there     17:55:34
22  are many, many situations where people     17:55:37
23  fall outside of that.                       17:55:40
24      Q.    Is that salary range or band     17:55:41
25  part of the notional description?          17:55:43
```

KELLY L. BRYSON - 8/28/2014

Page 268

```
 1                KELLY L. BRYSON
 2        A.   No.                                  17:55:45
 3        Q.   That the hiring manager can          17:55:46
 4   consult?                                       17:55:48
 5        A.   These are separate items.  The       17:55:48
 6   role is separate from the level, but           17:55:51
 7   they're combined for pricing purposes          17:55:57
 8   because it gives us the flexibility to         17:55:59
 9   price a business analyst from on a very        17:56:02
10   junior level to a very senior level.  But      17:56:06
11   those would be evaluated separately by a       17:56:09
12   hiring manager or someone in HR.               17:56:13
13        Q.   Does the hiring manager have         17:56:14
14   discretion to put someone in a particular      17:56:16
15   category?                                      17:56:19
16        A.   I believe so.                        17:56:20
17        Q.   Does HR review them?                 17:56:23
18        A.   I would assume so.  I'm not --       17:56:25
19   I mean I'm not super familiar with that        17:56:29
20   process.                                       17:56:31
21            MR. HERBST:  We're done.  Now,        17:56:41
22        we're done for today but I intend         17:56:43
23        to pursue the questions that were,        17:56:48
24        you were instructed not to answer         17:56:53
25        and if the court determines that          17:56:59
```

KELLY L. BRYSON - 8/28/2014

Page 269

```
 1                  KELLY L. BRYSON
 2         the questions should have been            17:57:01
 3         answered, I'm going to ask you to         17:57:02
 4         come back.  Thank you very much for       17:57:03
 5         your time.                                17:57:11
 6               (Time noted:  5:57 p.m.)
 7
 8
 9         _____
10              KELLY L. BRYSON
11
12    Subscribed and sworn to before me
13    this _____ day of _____, 2014.
14
15    _____
16
17
18
19
20
21
22
23
24
25
```

KELLY L. BRYSON - 8/28/2014

Page 270

```
 1    NAME OF CASE:  Ashmore v. CGI Group, et al
      DATE OF DEPOSITION: August 28, 2014
 2    NAME OF WITNESS: Kelly L. Bryson
      I wish to make the following changes, for
 3    the following reasons:
      PAGE LINE
 4    _____ _____    CHANGE: _____

 5                   REASON: _____

 6    _____ _____    CHANGE: _____

 7                   REASON: _____

 8    _____ _____    CHANGE: _____

 9                   REASON: _____

10    _____ _____    CHANGE: _____

11                   REASON: _____

12    _____ _____    CHANGE: _____

13                   REASON: _____

14    _____ _____    CHANGE: _____

15                   REASON: _____

16    _____ _____    CHANGE: _____

17                   REASON: _____

18

19    Subscribed and sworn to before me

20    this _____ day of _____, 2014.

21

22

23    _____    _____

24     (Notary Public)    My Commission Expires:

25
```

```
 1              C E R T I F I C A T E
 2    STATE OF NEW YORK   )
 3                              : ss.
 4    COUNTY OF NEW YORK   )
 5
 6            I, GAIL F. SCHORR, a Certified
 7    Shorthand Reporter, Certified Realtime
 8    Reporter and Notary Public within and for
 9    the State of New York, do hereby certify:
10            That KELLY L. BRYSON, the witness
11    whose deposition is hereinbefore set forth,
12    was duly sworn by me and that such
13    deposition is a true record of the testimony
14    given by the witness.
15            I further certify that I am not
16    related to any of the parties to this action
17    by blood or marriage, and that I am in no
18    way interested in the outcome of this
19    matter.
20            IN WITNESS WHEREOF, I have
21    hereunto set my hand this _____ day of
22    _____, 2014.
23
24            _____
25            GAIL F. SCHORR, C.S.R., C.R.R.
```

KELLY L. BRYSON - 8/28/2014

```
 1                E X H I B I T S

 2

 3    DESCRIPTION                  PAGE      LINE

 4    (Bryson Exhibit 1 for         142      13

 5    identification, Bates

 6    stamped CGI_ASHMORE 2015411

 7    through 2015421.)

 8

 9    (Bryson Exhibit 2 for         169      10

10    identification, Bates

11    stamped CGI_ASHMORE 2015407

12    through 2015410.)

13

14    (Bryson Exhibit 3 for         220      16

15    identification, Bates

16    stamped CGI_ASHMORE 2015431

17    through 2015433.)

18

19    (Bryson Exhibit 4 for         177      12

20    identification, Bates

21    stamped CGI_ASHMORE

22    2015406.)

23

24

25
```

KELLY L. BRYSON - 8/28/2014

Page 273

```
 1        (Bryson Exhibit 5 for          220      20
 2        identification, Bates
 3        stamped CGI_ASHMORE 2015429
 4        through 2015430.)
 5
 6        (Bryson Exhibit 6 for          252      24
 7        identification, Bates
 8        stamped CGI_ASHMORE 2015422
 9        through 2015428.)
10
11        (Bryson Exhibit 7 for           83       2
12        identification, document
13        titled Part III - Oral
14        technical quote
15        presentation, business
16        consulting services blanket
17        purchase agreement in
18        support of: The Department
19        of Housing and Urban
20        Development's (HUD's)
21        Transformative Initiative.)
22
23
24
25
```

KELLY L. BRYSON - 8/28/2014

Page 274

```
1        (Bryson Exhibit 8 for          83       12

2        identification, document

3        titled Sample Task Order 4:

4        Housing Choice Voucher

5        Program Phase III,

6        Recommended Solution

7        Analysis.)

8

9

10

11

12

13

14       (Instruction not to answer.)    12        2

15

16       (Instruction not to answer.)    13        9

17

18       (Instruction not to answer.)    15       20

19

20       (Instruction not to answer.)    18       14

21

22       (Instruction not to answer.)    33        6

23

24       (Instruction not to answer.)   112       17

25
```

KELLY L. BRYSON - 8/28/2014

```
 1      (Instruction not to answer.)   129      13

 2

 3      (Instruction not to answer.)   141      19

 4

 5      (Instruction not to answer.)   149      24

 6

 7      (Plaintiff's Exhibit 17,        28      21

 8      previously marked and shown

 9      to witness.)

10

11      (Plaintiff's Exhibit 18,        28      24

12      previously marked and shown

13      to witness.)

14

15      (Request made.)                 28      14

16

17      (Request made.)                 71      10

18

19      (Request made.)                 92      22

20

21      (Request made.)                 95      18

22

23      (Request made.)                 96       4

24

25      (Request made.)                 96      18
```

KELLY L. BRYSON - 8/28/2014

```
 1
 2        (Request made.)              105        17
 3
 4        (Request made.)              123        11
 5
 6        (Request made.)              124         5
 7
 8        (Request made.)              164        18
 9
10        (Request made.)              166         8
11
12        (Request made.)              172        25
13
14        (Request made.)              191         4
15
16        (Request made.)              196        24
17
18        (Request made.)              227        20
19
20        (Request made.)              262        19
21
22        (Request made.)              265        22
23
24
25
```

## A

**able**
41:17 53:19 68:22
116:16 181:19 191:3
235:20 239:3 256:23
259:4 266:3
**absolutely**
180:6
**Accenture**
7:12,19,23
**accepted**
155:18 156:14
**access**
72:5 210:20
**accompanies**
221:10
**account**
53:22,25 54:7,8,9,12
54:14,15,18 62:5
72:22 75:22 76:2,4,5
76:9,10,11,14,15,21
79:17 89:13 92:5
96:13 101:7 120:6
183:14,18,20,22,24
189:21 201:20
215:10 229:15
**accountants**
111:2
**accounted**
11:3 214:25
**accounting**
191:23 201:11,14
236:22,24
**accounts**
76:18 96:15 231:18
**accuracy**
264:6
**accurate**
90:10
**accurately**
242:23
**acronym**
248:13
**acted**
252:17
**action**

164:10,11,15 166:3
271:16
**active**
40:22 55:10
**actively**
54:16
**activities**
56:10 232:18 233:9
238:20 240:5 260:2
**activity**
240:8
**actual**
11:9 54:17,20 60:17
62:15 64:17,21 65:7
65:16 68:3 71:22
92:19 93:19,23
157:20 158:13 159:5
204:21 211:10
**add**
60:20 61:23 62:4
101:7,12 103:5,24
105:19 233:23
**added**
136:14 246:10,12
247:21
**adder**
246:17
**addition**
197:13 244:20
**additional**
5:23 13:24 14:3 21:21
244:19 248:8,9 262:6
**address**
9:12 123:21 124:8
203:15
**adjustment**
62:18
**adjustments**
212:3
**administration**
237:3
**administrative**
215:3 220:3 225:19
233:14 236:5,10,16
237:16 243:20
246:13

**administrator**
138:12,25 139:5,11,14
139:17 182:18
199:20 254:3,13
255:11,15 259:6
260:3
**advanced**
256:5
**advised**
252:6
**afield**
112:18 152:4
**afternoon**
142:10
**agencies**
48:11,13 224:10
251:22 263:9 264:8
**agency**
6:12,13 46:16 48:15
126:14 203:10,19
225:3,4 249:17
250:16,21 251:3,11
251:13 263:24
**aggregate**
213:7 247:12
**ago**
78:5
**agree**
30:19 111:23
**agreed**
33:17,24 35:25 52:3,4
**agreement**
83:6 111:20,21 254:11
273:17
**ahead**
255:16
**Ahmed**
92:14 239:10
**al**
270:1
**Albany**
2:9
**align**
100:14 161:11
**aligned**
48:20,22 52:15

**aligns**
100:17 158:4 248:22
**Allen**
8:3
**allocable**
234:14
**allocated**
14:22 228:8,11 232:4
242:17 243:22
**allocation**
189:19 228:7
**allow**
35:21 36:2,25
**allowed**
111:24 152:12 233:11
233:16,22
**alternate**
246:25
**America**
7:11
**amount**
56:8 60:20 62:16
65:14 93:5 100:23
103:13,24 104:8,14
122:18 134:25
149:19 192:2 201:16
223:2,5 228:16,22
233:23 237:24
**amounts**
42:21 240:17
**analog**
49:16
**analysis**
7:18,18 41:6 83:16
86:6 107:14 202:23
235:9,19 274:7
**analyst**
88:23 100:19,21,23
120:23 121:6 133:20
138:5 159:16,18,20
161:16 169:24 170:3
176:23 178:22
179:23,24,24 180:2
181:2 183:6 189:3,10
190:8,13 194:13
208:13,21 209:3

258:17 259:25 260:4
267:16 268:9
**analysts**
159:19 161:6 193:19
258:16 260:6,8
**analyst/SME**
169:19
**and/or**
23:4
**annotation**
267:19
**annual**
11:5,17 204:14
**annually**
203:5
**answer**
12:2,4,23 13:9,11,19
15:20 16:13 18:3,9
18:14,17 21:7 29:16
31:21 32:7,11,12
33:6,9 36:2,16 47:13
50:17,18 57:17 60:5
60:10 61:8 65:2
68:22 69:9 70:11
80:19 84:8 89:10
112:17,25 113:22
119:2 120:15 129:13
130:2 133:9,10
141:19 142:2 147:4
149:24 150:25
151:10,12 152:8,10
152:17,24 154:10
187:9 188:23 189:10
190:5 214:9 219:5
225:7 238:5 242:23
257:20 268:24
274:14,16,18,20,22
274:24 275:1,3,5
**answered**
36:18 66:5 195:8
269:3
**answering**
150:17
**answers**
28:5 130:24
**anticipated**

55:15 58:17
**anticipating**
121:5
**anybody**
68:21 71:20 96:2,5
262:25
**anyway**
49:2
**AOL**
7:15
**apart**
85:15 182:10
**appear**
78:9 182:7 239:12
**appeared**
78:13 133:16
**appears**
132:11
**applicable**
38:24 42:13 125:22
157:14 229:17
**application**
34:14 178:21
**applies**
128:8
**appreciate**
40:12
**appropriate**
82:22 90:10 104:4
113:21,23 153:13
162:5 164:2 209:9
214:19 228:16
233:23
**approval**
23:24 29:24 31:16
33:3 75:18,20 77:13
78:3 102:3,4 125:20
225:25 226:3 249:19
**approve**
75:23 76:3 102:12
250:22 251:2,6,8
**approved**
102:6,25 130:7,11
141:16,18 149:13
**approvers**
77:15

**approximate**
72:3 235:11
**approximately**
7:23 11:20 15:3,12
18:24 19:16 20:6,22
21:9 24:18 25:19
118:23 145:6 163:2
189:8 234:18
**April**
5:5 19:3 30:9 34:5
157:22
**April-ish**
19:2
**April/May**
78:21
**apt**
150:15 151:23
**area**
82:16
**areas**
218:20
**argument**
265:8
**arrive**
183:12 208:23
**arrived**
5:9 148:17 155:9
162:5 235:8
**articulate**
36:9 48:14
**ascertain**
64:22 98:23
**ascertained**
99:12
**Ashbrook**
92:14 205:23 206:7,9
206:21 207:6,9,20
210:8,16 211:11
239:10
**Ashbrook's**
206:13 209:14
**Ashmore**
1:3 2:13 3:11 12:14,15
17:18 40:5 53:23
57:7 58:2 75:7 78:11
95:7 122:7 123:17,18

123:20 159:25 166:9
166:14 167:8 173:11
175:16 184:5,8
185:10,22 198:24
206:4,7,8,13 207:7
239:11 270:1
**Ashmore's**
64:3 72:16 123:16
171:14 173:8,19
180:16 198:22
206:23
**aside**
14:20
**asked**
18:21 41:13,18,19
61:9 99:23 110:9
133:11 152:2 167:23
167:24 230:2 236:11
**asking**
44:12,17 64:16 69:13
69:16 85:23 97:2
113:4,7,15 114:17,19
122:25 123:24
124:23 130:21
131:18 176:21,24
186:10 187:16 195:7
210:19 219:14 243:3
**assigned**
55:22
**assist**
28:5
**associated**
79:12 145:16 187:18
247:3
**assume**
4:3 10:25 86:25 98:10
131:12 201:16 206:3
206:20 218:13 219:2
231:18 268:18
**assumed**
201:20,22 257:14
**assuming**
92:20 155:15 207:9
210:12 219:10
**attachment**
128:11

**attempting**
60:9 69:10 132:5
**attention**
75:5 116:3 157:17
211:6,9
**attest**
84:22
**attestation**
264:5
**Attorneys**
2:3,8
**attribute**
192:6
**audit**
110:3,16,19 111:2,4
203:10
**audited**
109:20 137:19
**auditing**
110:10,19,24
**auditors**
110:25 111:2
**audits**
110:22 203:19
**August**
1:9 30:8 270:1
**available**
103:17 138:23 168:2,8
168:12 214:16
**Avenue**
1:16 2:4,8
**average**
157:20 158:7 168:16
168:16 179:22,25
201:25 202:3,4,19
208:6,12,15,18,20,22
209:4,6,7,8
**award**
149:9 153:9,11,19
154:5,10,13,17
**awarded**
112:14 113:11 149:13
155:16
**aware**
26:12 31:12 83:19,23
83:23 134:7 214:20

**a.m**
1:10 4:15 75:8

---
**B**

**B**
26:8 38:7,8 40:25 41:9
258:9 259:17 272:1
**Bachelor's**
5:22,24
**back**
21:7 24:25 37:21
69:23 70:4 78:18
79:7 91:8,9 110:6
116:21 152:21
165:23 178:6 181:8
225:14 228:20
234:20 243:22 258:2
259:5 269:4
**backed**
244:4
**backs**
247:2
**Baker**
255:5
**Baltimore**
9:3,6,7
**band**
100:17 267:20,24
**base**
89:25 179:5,10,11,14
199:4,8 200:19
209:25 210:17
212:13 228:7,22,23
232:11 244:4 246:8,9
**based**
8:21,24,25 9:5 10:24
14:10 74:19 90:8
104:3 127:21 128:3,5
128:8,19 136:22
137:2 139:14,18
153:21 154:13
159:21 173:21 175:7
186:17 195:5 199:21
201:10 209:8 233:23
235:16 247:18
256:18 257:19 261:4

262:4
**basically**
38:3 87:3 248:16
**basis**
146:5 192:3 202:24
**Bates**
83:19 142:14 169:11
177:13 220:17,21
252:25 272:5,10,15
272:20 273:2,7
**bathroom**
74:21
**bears**
29:8 142:19
**beginning**
11:10 38:4 102:14
123:18 125:13
**behalf**
265:3
**believe**
14:19 15:2 22:19,24
28:20 29:13,17 30:17
60:8 72:20 74:14
78:20 90:10 103:15
109:2 123:15 141:12
160:24 168:5 232:24
233:3 236:20,23
237:2,4,6,8 240:24
248:12 251:21
253:14 266:15
268:16
**Ben**
122:7
**benefit**
218:21 219:4
**benefits**
218:7
**Benjamin**
1:3 2:13 53:23
**Bernardi**
239:11
**best**
44:14 135:3,3 162:16
173:22 243:4 260:23
**better**
184:23

**beyond**
52:6
**bias**
13:3
**bid**
37:20 38:18 39:4
42:10 43:6,7 44:10
46:18 49:4 80:13,15
81:24 134:6,8,19
137:12 153:14 154:8
154:11 159:17
183:24 195:3 197:15
197:17 228:23,25
232:15,17 238:13
240:3,7 242:17 255:3
**bidding**
80:24 90:11 133:17
134:4,10,14 135:12
155:4 158:16,17
229:10 249:20
254:10
**bids**
12:10
**bid/no**
37:20
**big**
162:10
**biggest**
108:19
**bill**
206:18 233:8 245:5,6
245:7,10,10,12,16,17
**billable**
217:4,10,15 234:16
240:2 245:21
**billed**
207:24
**billing**
207:12 209:17 211:14
212:12 229:9 247:25
**binders**
238:24
**birth**
5:4
**bit**
30:15 61:9

**blanket**
83:6 111:20,21 254:11
  273:16
**blend**
100:22 101:4 161:25
  162:4
**blended**
101:6 179:22 182:13
  192:21
**blending**
180:25 189:25
**blood**
271:17
**blow**
181:16
**bold**
82:16
**Bond**
1:15 2:7
**bonus**
66:17,25 67:2,2,8
  213:17 218:22 219:4
  230:19
**bonuses**
67:4 212:20,23 213:8
  213:13,18,24 214:16
**Booz**
8:3
**Booz-Allen**
7:12
**born**
6:23
**boss**
107:6,8
**bottom**
73:7 86:17 157:19
  167:10 168:15
**Bowell**
75:8,13 239:12
**box**
47:7
**BPA**
112:3,11,14 113:11
  117:19 118:16,18,20
  118:24 125:10 129:5
  138:24 146:15

**BPR/BPI**
116:23
**BPS**
49:8,8,10,12,14,17,22
  50:5,14 51:3,6,12,20
  52:14,20 53:11 63:8
  76:25 126:9,21 127:6
  141:8 223:11 224:4,9
  224:20 225:3,4,5
  231:23 232:4 240:23
  241:7,11,22 242:3,13
**break**
74:21 235:23 241:9
**breaks**
249:5
**brief**
33:2
**briefing**
29:24 30:24 31:10
  34:2
**briefly**
6:22
**briefs**
34:2
**bring**
211:5,9
**brings**
234:18
**broken**
170:4 239:23 242:20
**Bryson**
1:13 3:2,8 4:1,9,18,24
  5:1,10 6:1 7:1 8:1
  9:1 10:1 11:1 12:1
  12:23 13:1 14:1 15:1
  16:1 17:1 18:1,2
  19:1 20:1 21:1,5
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1,16 31:1 32:1
  33:1 34:1 35:1,10
  36:1 37:1 38:1 39:1
  40:1 41:1 42:1 43:1
  44:1 45:1 46:1 47:1
  48:1 49:1 50:1 51:1
  52:1 53:1 54:1 55:1

56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1,25
83:1,2,11,12 84:1,10
84:16 85:1 86:1,7
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1,2 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1,19 112:1
113:1 114:1 115:1
116:1,4 117:1,23
118:1 119:1 120:1
121:1 122:1 123:1
124:1,11 125:1 126:1
127:1 128:1,10 129:1
130:1 131:1,4,7,7,15
131:21 132:1,8 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1,12
142:13,18 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1,7
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1,15 169:1,9,10
169:14 170:1 171:1
172:1 173:1 174:1,10
175:1 176:1,13,14
177:1,11,12,17 178:1
178:6 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1

190:1 191:1,17 192:1
192:10 193:1 194:1
195:1 196:1,12,17
197:1 198:1 199:1
200:1 201:1,9 202:1
203:1 204:1 205:1
206:1 207:1 208:1,25
209:1,2 210:1 211:1
212:1 213:1 214:1
215:1 216:1 217:1
218:1 219:1 220:1,15
220:16,20,24,25
221:1 222:1,2 223:1
224:1 225:1,9,14,16
226:1,25 227:1 228:1
228:21 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1
237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1,16,24 250:1,6
251:1 252:1,23,24
253:1,4 254:1 255:1
255:5 256:1 257:1
258:1 259:1,18 260:1
261:1,9 262:1,23
263:1,18 264:1,12
265:1 266:1 267:1
268:1 269:1,10 270:2
271:10 272:4,9,14,19
273:1,6,11 274:1
**Bryson's**
4:13 5:16 12:12 15:25
  152:17
**BU**
54:21
**bucket**
215:18 236:14
**buckets**
215:17 230:18
**bucks**
207:13
**budget**
41:8 42:4 56:3 59:25

60:14,24 66:21 67:10
70:7
**budgets**
56:14
**build**
149:5
**building**
228:13
**builds**
148:24
**buildup**
147:16 148:15 249:22
**built**
74:14
**bunch**
160:21 161:3
**burdened**
157:2,3,10,12
**Burger**
107:5,19 165:4,16
**business**
6:2 14:11,12 45:19,20
45:24 49:5,6,8,9,11
49:14,19,22 50:9
51:2 54:22 55:2
57:22 76:23 83:5
88:23 100:19,21,23
120:23 121:5 125:23
126:2,19 127:5,15,17
127:19 128:25 131:5
133:20,22 138:5
159:16,18,19,20,25
160:6 161:5,16
169:19,24 170:3
176:22 178:22
179:23,23,24 180:2
180:25 183:5 189:3
189:10 190:8,12
193:2,4,19,21 194:9
194:13 208:13,21
209:2 256:6 258:16
258:17 259:25 260:4
260:6,8 267:15 268:9
273:15
**Buy**
135:3,4

**buying**
135:3
**B&P**
228:5,18,25 242:17
**B-u-y**
26:7

---
## C

**C**
2:2 32:25 38:13 42:9
78:3 258:9 259:17
271:1,1
**calculate**
24:16 25:7 59:20,20
63:19 68:7 101:17
121:21 158:7 202:18
222:15 234:15
247:17
**calculated**
14:9,10,14 33:12,15
34:11,23 37:6 59:10
59:14 101:24 120:4
128:5 130:7 131:24
132:3 155:13,19
157:4 168:17 199:7
213:7 223:17 232:19
233:18 234:24
246:15
**calculating**
63:17 101:23 222:20
**calculation**
22:23 25:3,5 89:3
210:22 224:2 241:23
249:7
**calculations**
224:6 244:7 249:9,12
249:12
**calendar**
18:22
**call**
8:17 26:4 43:21 74:7
92:10 96:25 97:2
102:20,21 164:6
196:20
**called**
3:3 31:3 46:12 49:18

80:21 222:23 248:23
**capable**
178:16
**capital**
26:7,8
**card**
82:13,17,18 99:3,14
105:5,6,13 106:3
107:18 117:12,17
118:11 123:10
125:16 136:21,24
163:8,16 170:22
199:12
**cards**
140:16
**care**
59:6 173:18
**careful**
12:18
**Carragher**
239:11
**case**
18:21 72:16 104:10
110:16 158:10
162:18 177:4 262:7
270:1
**categories**
34:24 80:13 81:20
97:24 99:16 111:23
130:8 131:2 132:25
161:3,13,17 163:3
169:5,24 170:5,13,14
170:21,23,24 174:13
177:20 181:11
208:15 236:18
238:10 243:24 253:8
253:24 254:19
257:22 259:7,15
260:15,18,22 263:10
264:15,22 265:9
**categorized**
178:14 203:25
**category**
52:4 79:4,13,15,21,25
80:8 89:20 99:17
129:9,11 133:4

137:13,16 159:15,17
159:23 160:16 162:6
162:9 166:17,20,21
166:24 167:4,14,16
171:5,10 172:9
173:20,25 175:18
176:3,15,22,25 179:7
180:17 186:8,11
188:10,21 190:11
198:17 199:18 209:4
210:17 253:21
254:22 255:3 257:15
267:9,11 268:15
**cause**
211:18
**caused**
256:10 261:24,25
**cc**
77:10
**Centers**
225:20 247:8
**cents**
234:19
**Cerimeli**
252:11
**certain**
15:5 48:10 50:15
74:13,15 81:20 94:24
95:2 135:13 194:20
201:16 210:14
214:24 231:20
236:21 239:17,18
244:20,25
**certainly**
109:12 134:24
**certificate**
267:6
**certification**
264:5
**certified**
1:17,18 260:9 271:6,7
**certify**
271:9,15
**CF**
97:15
**CGI**

1:6,6 7:14 8:14 9:7
9:17,17 10:12 12:20
14:6 16:4 17:21
32:22 33:24 40:6
47:9 49:13,15,17
50:9 52:3,4,20 56:8
63:2 67:22 70:23
79:5 80:2,12 84:6
87:3,8,14,18,24
90:24 92:21 100:13
100:18 112:13,15
113:8 121:4 125:24
126:5 130:3,4,4
131:10 132:9,14
134:5,12,13,18
136:12 138:6,13,16
139:3,7 140:11 141:3
141:23 142:19 158:3
167:17 168:9,11
169:15 170:5,23
171:5,9 173:10 178:9
178:14 184:15,19
185:22 202:13 204:2
223:8,10,11 227:3,4
240:23 245:9 250:12
251:7 254:4 255:16
264:4 266:6 270:1
**CGI's**
5:13,18 37:6 109:18
142:3 174:9 225:19
**CGI_ASHMORE**
142:15 169:12 177:14
220:18,22 253:2
272:6,11,16,21 273:3
273:8
**chain**
77:19
**chances**
189:21
**change**
44:13 80:10 88:14
102:12 122:15 125:2
204:10 251:19 270:4
270:6,8,10,12,14,16
**changed**
39:23 46:9 48:21

204:15
**Changery**
57:20
**changes**
204:15 270:2
**characterization**
30:20 33:23
**characters**
78:7,13
**charge**
70:13 76:17,23,25,25
94:18,23 96:7 133:20
133:22 134:25 135:8
136:7 238:20 239:19
239:19 240:3
**charged**
136:25 240:7
**charges**
137:25
**charging**
134:23 137:24
**chart**
37:4 81:14 128:18
261:16
**check**
38:17 257:7,17 258:11
258:15,20 259:15,21
260:10
**checked**
96:16 165:23
**Choice**
83:14 86:6 117:2,6
274:4
**choose**
183:7 194:23 264:22
**choosing**
86:21 194:22
**chose**
156:3 259:15
**circumstance**
59:12
**CIV**
1:5
**clarification**
44:17
**clarify**

40:2 59:23 60:3,5,9
233:16,17
**classified**
157:21 158:3 161:10
166:20 168:19 169:4
169:7 172:8 178:18
194:4 204:5
**classifies**
194:6
**cleaners**
231:15
**clear**
66:2 266:10
**client**
39:3 44:10 46:12 54:4
80:4,6,15 88:13
108:2,23 109:16
245:7,11,16,20
**client's**
108:2,15 109:7
**close**
31:19 52:5 59:3
**closely**
95:8 248:22
**clue**
35:16
**CM**
176:7
**CMS**
225:12,23,25 227:3,4
227:21 247:8,12,18
249:16 250:13,22
251:16,19
**code**
239:19
**codes**
240:4
**codifications**
255:20
**coffee**
109:13
**coincidental**
242:10
**college**
6:20 175:4
**column**

58:4 105:23 124:14,18
124:19 163:7 179:3,5
179:6 183:6 185:7,16
200:2,7,18,19,19
209:11
**columns**
58:13 124:12,15 182:7
183:4 200:22,23
201:2
**combination**
183:12
**combinations**
265:9
**combine**
170:6
**combined**
268:7
**combining**
192:5
**come**
95:10 101:3 102:18
105:12,22 110:17
121:24 136:7 163:24
177:5 178:7 179:20
180:24 183:14
189:25 194:22
201:24 226:2 234:8
235:3 246:21 261:16
269:4
**comes**
208:21 246:12
**comfortable**
117:20 175:10 242:22
244:5
**coming**
50:12,13 253:16
**command**
163:3
**comment**
181:15
**commenting**
5:20
**commercial**
50:3 51:12 224:7
**commission**
14:7,13,17,23 15:6,7

15:15,16 16:18 66:11
66:12,19 67:8 270:24
**commissions**
215:20
**commit**
38:11
**commitment**
56:24 80:22,23
**committing**
40:25 42:19,22 43:2,4
43:8,11
**communications**
19:13
**comp**
237:9
**company**
6:15 8:18 10:11 42:19
42:22 43:3,4,8 46:17
110:25 209:17
214:13,15 224:19
232:6 240:18,19
**company's**
242:6
**compared**
242:3 260:20
**compelling**
113:25
**compensation**
7:22 8:6 10:14,19
11:20 12:5,13,20
13:6,8,17,24 14:3
16:10 66:9,17,23
162:13 175:12
204:24 205:11,16
216:4 217:22,25
218:16
**competitors**
235:13
**complete**
97:20
**completely**
110:21 150:4
**completes**
71:24
**completion**
44:5 93:15

**compliance**
102:19 110:2,4 111:8
111:9 222:18,21
249:14 252:4,10,16
**component**
34:22 62:9,13 63:20
91:21 108:24 134:9
209:6 231:9
**components**
33:20 34:20 64:4
221:24 228:10
**comprehensive**
213:24 214:18
**computer**
23:8 102:22 222:5
230:23 248:14
**concerned**
137:23
**concerns**
165:8
**confident**
63:22 97:25 237:13
**confidential**
73:7
**confined**
126:22
**confirming**
117:20
**confused**
59:24
**confusion**
69:5,7
**conjunction**
106:11,13
**Conklin**
89:7 91:15 92:12
239:10
**Conklin's**
90:18
**connection**
115:6 144:11
**consider**
60:7 185:13 190:10,15
**considerations**
137:9
**considered**

31:14 38:22 127:19
138:9 184:2,4 185:10
197:14
**considering**
185:24
**considers**
39:2
**consist**
142:19
**consistent**
15:25 88:10
**consists**
42:17 44:2
**consult**
65:20 103:22,23,25
127:24 139:6 140:14
164:25 165:7,9,15,20
168:9 170:19 197:5
197:10 198:9 213:23
268:4
**consultant**
10:12,13,15,16,20,22
11:7 129:9 133:24
137:13
**consulted**
19:4 24:7 27:19,25
28:11,17 140:12
162:21 166:2 171:24
172:3,12 184:16
**consulting**
6:16,18 7:2,21 8:10,11
8:19 9:16 53:11 83:5
273:16
**contact**
91:3 225:15
**contain**
266:25
**contained**
33:18 34:18 37:10
130:9 249:24
**containing**
123:9
**contains**
27:14
**context**
55:6

**continue**
8:23
**CONTINUED**
4:22
**contract**
39:7 43:14,18,24,25
44:21 46:22 55:14,17
63:12,12 80:4 98:19
98:24 99:10,13
111:22 112:14
125:12 126:13,14,15
129:9 130:10 131:2
133:4 135:11 148:10
148:12 149:3,15,16
149:17,18 151:9,13
155:16,24 156:6
203:10,14 224:13,17
226:21 237:3
**contracting**
110:17 225:19 247:10
247:14 251:3
**contractor**
97:9 121:20,25 210:13
214:22 219:11
235:14
**contractors**
251:13,18
**contractor's**
106:5 208:3 251:12
**contracts**
102:18 110:7 151:3
153:4,5 203:20,21
224:10 225:22
231:15
**contribution**
119:19
**controller**
8:17 67:23 75:11
96:12 214:6 232:8
**conversation**
20:9,10,14,15,19
**conversations**
19:11,17
**copied**
77:15
**copiers**

231:15
copies
22:20
copy
100:9 123:2,9 177:17
copyright
142:20
corner
86:13 142:20 143:24
corporate
215:12,13,15 237:7
correct
73:12 79:23 87:20
88:23,24 91:19,19
96:22 105:25 124:9
132:15 139:23
141:10 148:11 159:5
167:22 172:13
200:17 227:5 246:22
259:20
correctly
167:19 178:14
correlates
117:21
correlation
206:18
correspond
57:13 253:10
correspondence
22:19 23:20,21,23
cost
27:4,7,9,14 43:13,17
44:16 60:22 98:22
108:6,10 124:12
135:6,18 142:25
143:10,17 144:11,18
145:12,15,18 147:8
147:14,15 148:3,4,15
148:24 149:15,17,19
149:23 151:5,9 153:4
153:5,7,8,9,17,18,18
153:19 154:25 155:7
156:3,9,11,16,20,24
156:25 179:11,13
206:19 208:10
209:16 226:5,13,14

226:18 228:15
244:13,23 251:10,15
costs
34:25 44:4 56:12 62:4
108:14 109:4,18,19
109:20 120:5,6 128:6
137:20 218:4 232:21
233:24 234:8,11,12
234:14 243:22 244:3
244:14,17 247:2,16
247:22
cost-reimbursable
225:22
Cott
5:14 18:6 30:7 34:3,4
36:7,23 152:5,12
counsel
265:25
County
6:24 271:4
couple
147:22 245:25 261:18
course
5:23 97:10 202:5
court
1:2 16:2 30:9 34:5
35:25 114:3 268:25
courtesy
77:12
courts
17:10,20
cover
127:7,9 221:10 234:11
covers
209:23
create
112:12 167:3 170:11
186:4,5
created
100:22 115:14 149:10
186:20 257:5
creates
118:17
creating
100:20 226:24
credibility

13:3
Crigler
111:12 252:19
cross
53:8
Cumberland
6:24
current
13:6,7 196:25 197:3
customize
153:21
cut
5:8 73:9 122:19
124:13,14 262:2
C-r-i-g-l-e-r
111:12
C.R.R
271:25
C.S.R
271:25

─────── D ───────

D
38:20,21 44:9,9 258:9
data
91:6
database
61:14,15 90:20,22
92:21
datapoint
199:16
date
5:3 18:23 29:6,9 32:24
143:23,25 144:6
253:20 270:1
dated
29:5
day
36:22 162:25 269:13
270:20 271:21
days
32:23
DCAA
203:7 225:15,24
DCM
119:11,15,18 120:4

124:17,19
deal
82:11 92:23 153:15
deals
146:8 154:9 183:25
197:15,17
Deb
47:15
debate
30:21 52:9
decide
38:11 68:6 266:14
decided
226:20
decides
14:21
deciding
14:23
decision
34:4 211:4 226:7
dedicated
242:7
Defendants
1:7 2:8
defense
203:10,14,20
deferred
216:4 218:16
define
185:19
defined
167:5,15,17 185:15
definition
88:10
definitively
38:11 57:17 117:10
degree
5:22,24 6:7,20 267:6
deliberate
211:4
deliver
81:6 88:14
delivering
81:3 82:7
delivery
54:16 193:2,4 194:10

delta
235:14
denominated
159:4 160:9
denominators
248:17
departed
64:15
department
17:12 53:2 83:7
    102:19 110:4 111:16
    165:5 203:20 214:14
    252:16 273:18
departments
222:18
depend
110:3 216:18 217:2
depending
27:16 54:6 104:6
    110:5 119:16 216:23
    261:21
depends
43:6 44:11 76:14
    108:23 110:8 115:21
    136:18 187:6 239:7
deposition
1:13 4:13,14,16 5:12
    5:17 12:10 17:17
    18:2,6 23:18 28:8,11
    29:6 30:12 33:9 34:8
    34:15 35:12 36:10
    37:3 40:8 52:7 75:4
    78:19 93:9,16 98:3
    123:16 151:15
    152:13 270:1 271:11
    271:13
derivation
105:4
derive
90:14 93:20,25 138:4
    158:9 161:24 175:8
derived
12:12 35:13,21 89:13
    89:17 92:4 121:16
    129:21 136:12,24
    146:2 149:9 155:5

156:13
deriving
104:13
describe
156:7 208:19
described
28:16 133:3 157:5
    162:6 232:13
describes
27:12,13 147:15 155:8
    157:9 258:3
describing
105:12 244:6
description
79:11 90:8 139:12
    162:10 173:20,21,21
    174:25 186:16
    198:17,18 199:19,21
    256:9 259:23,24
    266:20 267:9,10,25
    272:3
descriptions
97:24 99:17 170:6
    214:18 248:19
    253:21 264:24
    265:14,15,21 266:19
    266:21,23,24
designating
87:2
designation
81:8
desktop
73:23
detail
145:25 146:2,19
    149:12 155:8 221:11
detailed
85:21 146:6
details
156:12 244:6 248:9
determination
93:11 162:8
determine
103:23 104:23 106:2
    121:22 137:17
    162:15 165:23 166:3

166:16 170:20
    171:17 172:4 173:7
    174:17 175:2,3 179:2
    188:11 199:22
    213:23 228:16
    229:16 257:9 260:22
determined
70:8 106:11,13,24
    209:23 233:5
determines
79:3,13,24 171:8
    268:25
determining
56:23
develop
90:9 100:5,6 139:9,10
    240:14
developed
89:24 139:17
developer
178:22
developing
27:13 138:10
development
27:3 58:21 159:9
    229:4 233:2 240:11
    243:18 247:4,16
Development's
83:8 273:20
deviating
52:6
device
112:11
devising
140:15
differ
148:5 153:17 246:8
difference
119:23 149:14 244:24
differences
154:24
different
26:5 39:14 49:4 50:8
    54:9 58:11,13 67:3,5
    91:15,16 103:6
    110:21 137:15

143:15 145:22 146:4
    146:22 147:7,22,25
    148:2 153:4,12,14,15
    158:19 160:22 161:3
    161:12,17,18 166:24
    167:4 169:23 212:19
    214:15 215:7 218:20
    224:8 243:8 248:18
    250:13 251:18
    253:24 265:9
differently
109:17
difficulty
266:16
diligence
59:4
direct
12:22 13:10 16:13
    18:16 33:8 34:25
    44:4 67:22 75:5
    101:6,9 103:5 105:20
    109:19 119:18 120:5
    129:25 156:20
    157:14,16,19 158:9
    208:2,5,10 216:17,17
    216:21 217:13,17,20
    217:22,23,24 228:5
    228:15,23 230:10
    232:12,20 234:7
    241:20 244:13,14,18
    244:21,23 245:2,5,6
    245:7,17,18 246:15
    246:18
directed
104:7,10
Directing
116:3
direction
214:11
directly
77:16 229:8 232:4
    238:20 245:11,16
director
107:13,15 111:9 196:3
    205:18,19,24 206:5
    206:21 207:10

directors
207:14
director's
206:25
disagree
33:22
disclose
136:10
discount
106:3,9 108:7 234:24
  235:4
discreet
196:15,16
discretion
14:15,19 162:4,19,22
  163:12,15 174:21,23
  183:12,15 189:25
  195:24 196:6 265:2,6
  268:14
discretionary
103:21
discuss
163:24
discussed
213:4
discussing
229:19
discussion
22:3
disseminated
107:21
distinguished
49:12
distinguishes
224:19
distinguishing
48:12
DISTRICT
1:2,2
divide
60:19 61:20 201:19
  234:6
divided
91:23 121:23 223:5
  233:19 234:3 246:20
dividing

168:17 201:18
division
45:19 110:21
document
22:25 27:11 29:12,17
  29:20,21 30:6 31:7,8
  45:7 53:18 69:3,13
  78:10,10,14 82:12
  83:3,13 84:14 100:24
  113:5 120:17,19
  123:6,6,14 124:4
  130:16 131:6,8,10
  132:8,11,25 142:21
  142:24 143:5 152:9
  154:2 155:6 156:12
  157:6,7,9,18 170:18
  174:2 176:10 177:6
  177:21 181:4,5,23
  191:21 196:15,16,18
  211:20 213:22
  214:12,20 220:12
  221:2,7,8 225:9
  250:4 253:5,15 259:9
  262:11,17,25 263:11
  265:24 273:12 274:2
documentation
28:18 81:7
documents
22:14,16 27:18 28:4
  28:10,15 33:16 42:12
  47:11 78:6 83:21
  84:5,20,22,23 85:15
  97:7,19 98:9 101:3
  112:22 123:19,22
  131:22 133:7 135:23
  135:25 142:9 197:21
  213:22
Doe
260:11
doing
9:23 43:14 52:19
  54:19 72:2 162:25
  181:4 207:19,21
  217:3,4 225:2,3
  235:20 240:4 245:25
dollar

234:17,17
dollars
43:12 136:25 184:20
  184:21
door
254:21
doubt
99:8
Dowdy
86:16 88:20 89:6
  91:15 92:12 128:23
  133:23 239:10
Dowdy's
90:15
dozen
19:19 25:15
draft
261:19
draw
206:17
drifting
51:25
driven
36:10 49:20,21,21
dropped
68:11
due
32:24 59:4 144:6
  253:20
duly
3:4 4:20 271:12
duties
26:23,24 31:24 52:13
  52:19 54:2,6,8 71:8

E

E
2:2,2 26:7,8 37:18
  39:6,7 44:20 271:1,1
  272:1
earlier
18:22 56:21 64:16
  65:18 76:13 118:16
  136:23 139:19 143:2
  148:9 158:3 212:21
  213:4 235:5 264:13

Early
21:11
earn
192:4 205:2
earned
260:7
easier
77:17 182:8,16
easily
265:7
eBuy
26:4,10
economics
6:3
education
128:21
effective
179:16
effort
239:24
efforts
17:5
either
19:22 68:3 94:17 97:8
  102:10 107:18
  109:18 121:25 132:9
  214:13 217:18
  264:14
elect
210:24
elected
195:6,12 233:7 256:19
electronic
24:6 123:23
elements
66:23 103:16 183:13
  244:8
eligible
79:14
email
22:19 23:20,21,22
  75:6,17 77:19 78:11
  95:11,12,16,19
  117:21 123:9,20
  164:3 211:24
emailing

96:8
emails
95:24 104:23 105:4,10
  164:14 165:23
  211:25
employed
40:6 70:21 111:13
  241:10 252:20
employee
65:22 166:10 191:11
  202:13
employees
45:18 79:4,25 80:12
  138:6,9 157:21
  168:19 191:18,19
  202:20 220:2
employment
6:11
encompass
52:14
encompasses
260:2
endeavor
83:25
engage
158:23 245:5
engaged
158:19 164:23
ensure
80:12
enter
39:2 44:9
entire
58:10 159:20
entirely
236:13
entirety
25:22
entitled
13:5 16:11 37:9 114:6
  130:17 135:12 150:6
  150:15 151:6 213:10
Environmental
6:2
equals
42:4 199:11

equated
184:3
equipment
109:15 222:5 230:23
  248:14
especially
12:17 30:16 114:10
  118:20 239:17
ESQ
2:5,10
essential
35:12
essentially
33:4 112:11 152:6
  234:7
established
148:21 227:22
establishing
148:13
estate
108:18,20,21,24 109:5
  109:14 231:9,12
estimate
25:18 56:7 62:14
  64:24 65:5,13,19,22
  145:9,13 189:8
  234:12,13
estimated
42:4 58:6 65:15 74:18
  128:6 233:24 263:10
estimates
27:6
estimating
62:23 196:9,14,21
  223:3
et
270:1
evaluated
118:4,22 268:11
evaluation
115:25
event
137:18
everybody
61:6 77:18 163:25
  168:25 178:14

188:10 202:11 208:6
everybody's
61:17
exact
18:23 76:7 131:5
  226:6
exactly
13:21 66:19 70:2
  93:12 106:14 108:12
  183:19 215:18 216:6
  218:25 235:7 237:13
  244:7 248:13
EXAMINATION
3:7 4:22
examined
3:6 4:20
example
43:5 51:13 73:8,23
  76:24 89:19 90:4
  100:19 112:6 120:22
  142:25 146:16
  159:15 169:18
  176:17,18 177:3
  185:13 187:22 189:4
  228:14 239:20,21
  241:20 243:8,16,17
  263:12 267:16
examples
159:2
Excel
24:20 181:24
exception
41:7
excessive
137:21
exchange
95:20
excludes
245:2
excluding
246:23
excuse
4:10 161:7
execution
44:21
executive

29:23 30:24 31:4,10
  32:2,25 45:8 46:13
  47:25 54:21,22 55:2
  78:2 163:19 237:9
executives
33:2 54:5
exempt
168:19 191:16,18,25
  192:4 201:17 202:5,7
  202:20 216:24
exercise
166:15 174:23 183:15
  195:23 196:5
exercises
210:2
exhaustive
213:20
exhibit
12:11,11 28:21,24
  29:4,7 30:13,14
  33:19 34:9,19 35:4
  35:13 36:8,12 37:4
  37:11 52:2 75:3 77:3
  81:17 82:25 83:2,11
  83:12 86:12 89:5
  99:5 114:5,7,9,13,15
  114:16 115:4,9
  131:25 132:17
  142:12,13 158:12
  163:8 169:9,10
  172:19 177:11,12
  185:5 210:9 220:15
  220:16,20 247:23
  249:3,10 250:3
  252:23,24 253:11
  263:16 272:4,9,14,19
  273:1,6,11 274:1
  275:7,11
Exhibits
115:7
exist
237:11
expect
206:22,25 210:6 223:6
expected
56:25 58:6,17 80:25

81:23 119:21 121:9
121:13 122:7 124:25
223:8,12 240:3,19
**expecting**
56:9
**expedition**
35:23 152:7
**expense**
223:3 230:12 231:8
233:14,25 234:19
238:9 240:11
**expenses**
108:14 220:4 222:5
233:21 236:5,17
237:17 238:22
241:25 243:19
244:10
**experience**
54:14 104:3 128:20
175:6 187:17 188:5
188:12 258:7,13
259:16 260:12
**experienced**
260:7
**expert**
72:8 122:8 160:8,20
160:23 161:8,13,15
162:2 167:7,10 172:7
173:5,10,12 176:3,4
180:15 182:21,25
183:25 185:12,17
186:15 190:19
192:10 199:25 208:5
208:11 255:20 256:2
256:22 257:17,21,23
**expertise**
186:19 256:5 257:10
**experts**
160:12 184:15,19
185:21 194:5 195:4
256:15
**Expires**
270:24
**explain**
32:4 36:11 113:12
184:22

**explaining**
42:18
**explore**
130:24
**extensive**
23:6 24:2,11 25:12
261:21
**extent**
35:14,18,22 37:14
89:21 152:23 175:13

---

**F**
**F**
1:17 2:10 3:5 271:1,6
271:25
**facilitate**
115:24
**facilities**
235:11
**facility**
222:6 231:8
**fact**
12:17 48:13 84:22
99:4 109:5 132:23
227:3 229:18 257:16
**factor**
62:20,21 175:13
184:25
**factors**
174:22 183:13,20,21
**fair**
38:25 48:9 86:25
87:16 89:2 116:7
117:9 127:20 153:23
194:11 204:23
253:25 254:7
**Fairfax**
8:22,24,25 9:5
**fairly**
63:22
**faith**
60:8
**fall**
167:8 183:5 223:23
267:21,23
**familiar**

43:19 84:11 140:3
251:4,5 268:19
**far**
5:21 40:21 70:22,24
79:14 135:21 137:23
152:4 249:23
**fashion**
181:14 198:2 215:5
**fast**
187:11 265:10
**federal**
1:6 9:17 48:25 49:13
49:15,17,25 50:13
51:13,16 63:2 67:22
80:2,12 112:13,15
113:9 126:5,14
127:15 130:4 223:8
223:10,11 224:3,5,10
225:2,4 240:23
250:16 251:2
**fee**
103:13,21,24 104:8,14
136:16 149:19,20
153:8,8,9,10,11,11
153:18,18,19 154:4,4
154:5,9,10,11,12,13
154:15,16,17 156:22
200:11,25 219:12
237:17
**feedback**
262:5
**feel**
117:20 163:21,22
175:9 242:22 244:5
**feels**
137:20 163:25
**fees**
157:15
**fell**
55:9 186:8,11
**felt**
118:23 164:24 261:7
**Fewer**
19:21
**figure**
91:9 121:15,24 124:13

179:18 180:22
192:21 198:8 201:25
210:10 234:3,4
**figured**
255:16
**figures**
120:21 122:21 136:22
262:24
**figuring**
211:15
**file**
24:3,6,11 102:23
**files**
22:18 23:2,3,6 26:4
**fill**
71:20 207:6,8 235:20
**filling**
72:14
**fills**
202:13
**final**
33:3 38:17 44:14
104:14 105:23
249:22
**finalize**
104:5
**finally**
235:8
**finance**
53:2 110:7 214:4
222:18,19 236:23
246:7 249:13
**financial**
7:17 9:23 41:2,6 42:12
42:20 43:3 107:13
**financially**
42:18
**financials**
248:23
**find**
40:4 68:8 81:8 83:25
99:18 102:16 116:16
132:2 168:24 187:21
188:3,4,13 191:25
195:13 265:18 266:3
**fine**

37:8 40:14 47:14
52:6
**finger**
163:6
**finish**
93:9
**finished**
150:2
**firms**
135:12
**first**
3:4 6:11 20:7,11 21:4
28:13 29:10 57:8,8
58:2 77:6 84:10 94:3
96:25 97:2 100:8
142:17,23 143:24
146:24 148:14 149:2
155:3,11 157:17
163:8 177:15 179:3,5
179:6,9,15,16 182:18
200:19 221:5 226:23
248:24 261:19
**fiscal**
25:8 102:11 128:7
**fishing**
35:22 152:6
**fit**
112:2 184:5,8
**five**
33:5 39:9 175:6
187:20 221:7,9,9,16
221:18 222:23 250:7
250:8 262:20
**fix**
50:22
**fixed**
43:7 98:22 136:2
153:8,11,18 154:4,12
154:15,16
**flag**
211:18
**flags**
211:21 212:2
**flexibility**
254:18 268:8
**focus**

35:11,18
**focused**
240:2
**folks**
51:20 87:4 110:17
134:23 232:9
**follow**
36:17 182:17,25 183:4
**following**
227:22 258:7 270:2,3
**follows**
3:6 4:21
**footnote**
74:17
**forecast**
233:24
**forget**
84:3
**forgot**
9:11
**form**
7:5 13:19 14:2 23:16
24:5,9 26:15 32:7
36:12 45:10,22 48:5
48:17 50:20 52:22
63:15 64:7 65:2,11
65:24 66:15 68:25
71:16 72:19 79:10
80:18 81:11 82:2
85:19 87:7,22 88:4
89:9 91:18 94:6 98:7
101:21 103:8 106:7
108:9,17 109:9
110:12 116:13
117:16 118:15 119:8
120:3 125:4 126:3,8
126:25 127:12
132:10,20 133:6,8
134:16 135:15 136:5
137:6 139:24 144:14
145:8,21 149:4 154:7
156:19 158:15 159:7
160:4,18 163:18
166:12 170:8 171:2
173:17 175:21
180:19 182:15

183:17 188:8,16
192:15 194:2 197:9
198:25 202:22
203:23 204:4 205:3
205:12 206:16,24
207:16 208:9 209:20
211:23 212:9 213:2
214:2,8 215:5 217:8
218:24 219:8,23
223:18 224:11,15,23
227:15 232:2 236:19
237:19 239:6,15
241:16 243:15
248:20 261:2 263:4
264:10 267:2
**format**
123:23 181:24
**former**
166:10
**forth**
36:11 131:24 161:8
211:17 271:11
**forties**
7:25
**forward**
148:18 149:11 155:15
**found**
167:19
**four**
19:24 24:12 55:19
57:8,11,16 58:11,13
143:15 145:18,19
147:7,13 189:15,23
190:20 259:13
**fourth**
73:4
**frame**
78:21
**framework**
77:22
**frankly**
178:13
**Friday**
77:7
**fringe**
60:20 61:24 62:2,3,13

62:15,20,23 63:10,18
63:19 64:3,9,12,19
64:20 65:5,14 66:11
66:18,20,24 67:6,10
67:18 73:17,19 120:5
215:23 216:9,11,13
218:13,15,21 219:3,4
222:5 230:12 249:6
**fringes**
211:16 213:6 243:7
**full**
9:24 10:6 88:12
178:19 202:4,7
254:16
**fully**
3:18 64:12 157:2,3,10
157:12 219:24 263:5
**full-time**
191:22 201:10,13
**function**
31:23 52:25 204:18,18
204:25 207:18
252:18
**functional**
53:8 129:2 193:6,8,9
193:12,21 194:10,22
194:23 195:14
**funky**
78:7
**further**
4:21 5:20 12:5,24 16:2
36:20 47:13 142:2
181:15 271:15
**future**
146:20 251:19 254:23

---

## G

**G**
128:11
**Gail**
1:16 3:5 271:6,25
**gap**
235:20
**gate**
31:14 38:17
**gee**

**general**
20:25 53:3 62:19
152:14,16,20 184:18
205:14 215:3 220:3
233:13 236:5,9,16
237:16 243:19
246:12 251:3 263:23
**generally**
11:16 31:13 32:8,13
32:15,17 40:23 41:3
41:21,25 42:17 44:2
44:22 45:6,18 46:15
50:6 54:2,3 59:13
62:18 72:9 95:11
109:16 110:4 112:2
115:20 154:17
158:17 161:21
165:11 205:5,6,10
207:3 209:22 211:24
216:16 220:10 240:2
**generate**
177:22
**generated**
34:22 89:4 105:10
121:7 130:6 131:10
131:12 132:9,12
163:16 172:19,20
177:23 214:13
**generating**
56:13
**generation**
27:5 164:16
**generic**
7:17 35:15 60:25
63:18 64:10,14 65:9
65:12 68:3,4,6,7
69:17 70:8 71:12,21
71:21 72:6,13 74:2,9
74:12 147:19 148:5
155:21 156:4,5,24
159:16 256:21
**generically**
155:7 267:4
**genericized**
61:7
**gentleman**

203:16
**gentlemen**
36:24
**getting**
52:5 77:16 95:9
151:20
**give**
14:23 25:18 30:5,15
31:21 35:9 37:15
93:14 103:3 108:7
114:20 118:9 120:19
184:10
**given**
45:17 90:3 130:25
161:23 175:14
271:14
**gives**
199:3,5 248:24 254:17
268:8
**go**
5:21 6:8,20 26:5 59:21
61:10,12 68:8 69:22
74:11 91:8,9 102:16
113:16,19 116:21
143:7 156:16,17
170:23 171:10,11
174:22 181:8 197:16
221:13,15 255:19
263:23 265:14
**goals**
104:6
**Godleski**
107:10
**goes**
13:2 15:23 35:5,5
161:21 208:3 222:21
226:2 239:22
**going**
3:16 4:12 5:19 12:3,22
15:21,22 16:12 17:23
17:24 18:3,16 30:4,5
30:21 31:20 33:7
36:20,24,25 37:15
51:23 61:10 68:5,24
69:22,23 72:10,15
87:4,25 92:10,18,25

95:15 98:12 99:14
101:2,18 113:20
120:11 122:11,14
123:8 129:25 131:19
133:19,22,25 134:12
135:4,24 138:6,12
142:17 148:18
149:10,25 150:16,24
152:10 154:2 155:15
164:13 172:22 176:5
178:6 190:23 192:19
196:22 205:2 206:2
207:6,8 230:15,25
234:20 254:5 258:2
259:5 265:20 266:8
269:3
**good**
3:8,9 60:8 66:6,8
123:7
**Gosh**
25:21
**gotten**
125:14 254:15
**government**
6:17 7:21 8:10,19 9:16
25:9 29:25 30:2
31:16 32:20 38:10
46:16 47:8 48:13
51:17,19 97:8 101:25
102:2,5,12,24,25
103:18 106:4,10
108:3 109:21 110:16
111:24 112:2,14
115:21 121:20 122:2
137:17,19,25 143:19
143:21,25 144:4
146:18 148:16 149:7
155:4 167:6,20
170:10 173:3,4,9,14
173:25 186:14 203:8
224:3 233:6 234:23
235:11,15 249:16
250:16 263:8 264:7
**governmental**
48:11
**government's**

115:25 251:2
**graduate**
5:23 175:4
**granular**
176:15,16 248:4,6
249:23
**granularly**
249:6
**grateful**
40:10
**Graves**
120:25
**great**
155:8
**greater**
25:15
**ground**
39:24 147:24
**groundrules**
39:11
**group**
1:6 130:4 232:8 270:1
**grouped**
161:16
**groups**
32:21
**GSA**
250:25 251:3,4,5
263:23
**guaranteed**
154:14
**guess**
8:16 9:4 11:9 106:11
111:8 145:11 147:19
177:2 184:23 190:25
203:5 234:19 236:15
241:9 257:19
**guide**
69:11
**guidelines**
187:11
**guys**
123:5
**G&A**
103:11,20 108:25
120:6 200:8,21

221:19 233:13
236:24 238:9,12
239:20,21,22 240:6
241:25 242:21
243:22 244:8,9
246:15,23 247:2,16

**H**

**H**
272:1
**half**
19:19 20:25 21:10,20
**Hamilton**
7:13
**hand**
77:16 250:5 271:21
**handle**
246:3
**handles**
109:25
**handling**
247:20
**happen**
51:10 83:19 207:9
250:12
**happened**
225:6
**happening**
21:25
**happens**
251:16
**happy**
84:8 105:15
**hard**
22:20 123:2 187:11
265:10
**hardship**
181:13
**HCV**
53:11,12 116:24
**head**
104:16 171:16 206:11
**headed**
73:11 86:19,20
**heads**
31:22

**Health**
218:12 247:13
**hear**
60:10 105:15 192:18
**heard**
3:18 4:3 141:14 266:2
**hearing**
30:9 34:6 36:6
**heart**
197:8
**held**
1:14 38:8,21 40:20
**Helms**
19:8,9,12,20 20:3
27:20
**help**
41:17,19,21,25 56:22
59:14,16,19,20 60:3
83:24 164:24
**helped**
79:21 143:3,4 162:15
**helpful**
74:2 158:22 221:16
**helps**
175:3,8
**Herbst**
2:3,5 3:7,10 4:8,11,23
5:18 12:6 13:2,12
16:7,14 17:13,19
18:8,18 19:14 21:6
24:24 25:10 27:23
28:9 30:3,19 31:18
32:9 33:13 34:12
36:4,25 37:8 40:7
50:22 52:8 60:2 69:6
69:16,22 70:3 71:6
82:24 83:10,18,22
84:7 92:10,18 93:4
93:13 95:13,23 96:14
98:10 105:3,9 112:19
112:24 113:7,14,18
114:4,12,17 122:25
123:7,24 124:9,22
130:12 131:17 132:4
142:5,11 150:5,12,21
151:5,14,19 152:19

164:13 166:6 169:8
172:22 177:10
181:10 182:11
190:22 192:17
196:19,22 220:14
227:18 235:22 250:2
252:22 262:16,20
265:20 266:8,11
268:21
**Herbst's**
40:2
**hereinbefore**
271:11
**hereunto**
271:21
**Herndon**
203:17
**he'll**
266:3
**HHS**
63:12 247:12,18 250:9
250:22 262:25
**high**
100:14 163:21 266:22
**higher**
139:22 154:11,17
183:8 191:24 205:15
206:21,23 207:2,13
241:23 242:2
**highest**
183:8
**highlighted**
82:15
**highly**
27:15 256:16
**hire**
158:18 190:11 258:25
**hired**
7:13 166:22 171:9
245:23 264:14
267:14
**hiring**
66:25 171:4 264:14,21
265:3 267:7 268:3,12
268:13
**history**

6:7
**hold**
25:19 32:25
**holiday**
62:6,7 64:23 216:10
230:15
**home**
9:4,9,12 21:16,18
222:6 231:16,19,21
237:7 240:25 241:3
244:9
**Homes**
19:7
**honestly**
38:21 106:18 127:14
**hoped**
125:9
**hour**
20:24,25 21:10,10,20
44:2 58:9 59:8 72:10
88:15 133:25 137:2
137:14 202:16 209:5
261:22
**hourly**
35:3 74:18 130:8
139:20 179:6,11
199:4 209:14,16
**hours**
41:23 42:3 44:3 54:17
56:25 58:4,5,7,18,20
58:25 59:3,7 60:19
61:21 121:10,17,24
122:12 191:22 192:3
199:5 201:10,19,19
201:21 202:9,19
261:19 263:11
**housing**
83:8,14 86:6 117:2,6
256:7 273:19 274:4
**HR**
32:23 61:14,15 90:22
91:3 158:6 161:10,14
166:21,24 169:4,7
204:6,8 214:14 232:9
264:14 265:19
268:12,17

**HTV**
116:23
**HUD**
23:19 24:16 25:24
26:2,13,18 27:2
46:21 48:3,8,24 49:3
49:3 51:13 54:10,12
63:11 85:4,9 87:17
87:25 117:18 126:13
136:10,13 137:3
155:12,16 166:10
167:16 223:16,20,21
226:2,12 263:12,14
263:15,19,22 264:2
**HUD's**
83:9 273:20
**human**
236:18 247:13
**hundred**
136:25 233:20
**hundreds**
198:7,10
**hybridize**
147:21

**I**
**ICE**
24:22 248:11
**ICF**
87:8,10,12,16,24
97:14,16,16,19 98:15
99:20 131:10 132:9
132:12 133:15,19,21
134:6,9,13,19,21
135:7 136:10,21,24
137:9,25 138:12
139:20 140:7 146:17
147:4 167:6,16,20
253:7 254:5,12 255:8
255:14 263:6
**ICF's**
139:25 168:3
**idea**
25:17
**ideally**
267:21

**identical**
154:2
**identification**
83:3,13 142:14 169:11
177:13 190:24
220:17,21 252:25
272:5,10,15,20 273:2
273:7,12 274:2
**identified**
37:23 80:13 87:19
173:11 175:17
**identify**
71:7,19 101:18 189:2
191:3 197:25
**identifying**
266:17
**III**
83:4,15 86:7 131:8
273:13 274:5
**illustrative**
115:15
**imminently**
38:15
**impact**
44:16
**imperfect**
265:5
**implied**
195:5 199:5,6,11,12
199:15,22
**inappropriate**
163:22
**incentive**
153:7,10,18 154:4,9
**include**
64:2 97:17 104:8
108:22 127:4 178:23
212:16,19 213:4,5
214:17 219:12,25
229:25 230:19,21
231:14 236:17
238:23,23,24 244:15
244:16,17 247:15
**included**
62:13,14 66:11 77:10
77:11 81:13 115:22

148:3 212:7 213:9
214:22 215:4,6 218:6
219:18,20 220:9
221:11,22 222:14
230:6,13 236:13,24
237:21 238:12
**includes**
33:18 148:15 156:20
157:13 188:22
201:21 212:13
228:23 229:22,24
232:11 253:7
**including**
34:23 64:3 130:5
213:13
**incorrect**
246:2
**increases**
261:4
**incur**
223:4,6,9,12 240:19
**independent**
229:3 232:25 240:10
243:18 247:3,15
**indicate**
36:5 267:5,19
**indication**
81:22 118:10 242:5
**indirect**
22:23 25:3,4,7 34:25
101:8,13,15,16,19,23
101:24 102:17 103:4
105:19 109:20
110:20 111:4 156:21
157:15 203:11
215:10 216:16,21
217:11,16 219:16
224:24 226:17,22
237:12 244:18
245:13,15,22 251:9,9
251:12
**individual**
89:14 100:16 210:25
260:10,17
**individuals**
81:19 89:14 92:6

158:11 259:22
**individual's**
171:7
**inexpensive**
257:2
**infer**
128:16
**information**
12:20 16:4 27:15
33:18,21 34:18,21,21
35:15 37:10 41:24
42:8 61:3 72:5,15
73:25 90:25 91:6
97:13 100:4 125:25
136:10 140:10
141:11 146:7,18,19
148:2,16 149:6
155:20 158:6 162:12
162:15 167:2 188:14
188:18 197:16
210:21 225:15
235:13,16 249:23
257:18
**informed**
89:11,17
**infrastructure**
222:6 230:24 231:4,5
**initial**
37:24 94:8,11 262:2,3
**initially**
78:18 139:6
**initiative**
83:9 85:8 86:2 112:7
117:19,24 273:21
**initiatives**
85:14 240:14
**input**
96:17,20 104:13
134:19
**inquired**
140:6
**inquiring**
140:9
**inspections**
49:23 50:4 126:23
127:4,10

**instruct**
36:15 141:25 150:25
**instructed**
254:25 268:24
**instruction**
12:2 13:9 15:20 18:14
33:6 112:17 113:22
129:13 141:19
149:24 274:14,16,18
274:20,22,24 275:1,3
275:5
**insurance**
62:6,8 64:23 218:12
218:14 230:16
**Intellectual**
240:16
**intend**
36:13 268:22
**intended**
62:4 127:6 234:10
**intent**
40:2 229:7
**intention**
64:8 255:2
**interchanged**
78:2
**interested**
39:20 271:18
**interfering**
151:22
**intermediate**
240:25
**internal**
23:24 60:22 100:14,24
125:19 168:18 169:2
170:5,12,13 174:9
177:19 198:18 217:4
259:23
**interrupt**
4:13
**interrupted**
154:22
**interrupting**
69:8
**intricate**
244:6

**investigations**
127:14
**investment**
42:21,24 43:9 241:21
**investments**
242:11
**invited**
40:21
**invoice**
137:17 245:20,20
**invoicing**
80:4,15 246:3
**involve**
48:10 71:13 85:25
224:10
**involved**
26:20 29:15 31:25
41:9 42:2 43:23
44:22 45:2,3,14
47:11 51:7,15 54:16
54:19 56:13 57:2
68:16 71:3 85:4,8,17
85:21 96:3 100:11
101:22 106:15,17
109:14 130:15
158:11 222:20 226:7
235:18 252:8
**involvement**
55:10
**IP**
240:14,15
**irrelevant**
160:14,15 186:9
**irresponsible**
186:5
**IR&D**
228:6,24 229:3
**ISIT**
49:19 50:14 51:6,15
52:12,14,15,17,25
62:24 63:10 77:2
125:21,23,24 126:6
126:12 127:21,21,25
128:4 130:4 139:15
141:2,8 223:10,17,23
224:20,24 225:2

231:23 232:4 234:25
235:4 240:18,23
241:7,11,14,17 242:2
242:8,10 250:19
**issue**
33:25 112:3,7,9
137:22 150:20 151:4
154:23
**issued**
118:18 242:13
**issues**
152:12 165:8
**item**
129:18 230:17 238:16
**items**
66:18 101:18 124:7
156:16,17 164:10,11
164:15 166:3 212:7
220:9 221:21 222:8
222:23 224:6 230:2
230:20 237:24
248:10 268:5
**iterations**
261:20,23 262:10,17
262:18
**I-C-E**
248:11

**J**

**Jeffrey**
255:5
**Jersey**
6:24
**job**
10:4 162:25 184:18
185:20 259:2 260:13
**Joe**
72:7 260:11
**John**
252:11 260:11
**joining**
19:22
**joint**
222:19
**Joyce**
57:20

**judge**
5:13 12:18 18:6 30:7
34:3,3,3 36:6,22
129:17 152:5,12
**Judging**
206:12
**judgment**
90:7 166:16
**June**
21:11 143:22 263:21
**junior**
268:10

**K**

**Kathleen**
70:20
**keep**
77:17 89:23
**keeping**
192:6
**Kelly**
1:13 3:2 4:1,18 5:1 6:1
7:1 8:1 9:1 10:1 11:1
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
20:1 21:1 22:1 23:1
24:1 25:1 26:1 27:1
28:1 29:1 30:1 31:1
32:1 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1 50:1 51:1
52:1 53:1 54:1 55:1
56:1 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1 93:1 94:1 95:1
96:1 97:1 98:1 99:1
100:1 101:1 102:1

KELLY L. BRYSON - 8/28/2014

103:1 104:1 105:1
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1 152:1 153:1
154:1 155:1 156:1
157:1 158:1 159:1
160:1 161:1 162:1
163:1 164:1 165:1
166:1 167:1 168:1
169:1 170:1 171:1
172:1 173:1 174:1
175:1 176:1 177:1
178:1 179:1 180:1
181:1 182:1 183:1
184:1 185:1 186:1
187:1 188:1 189:1
190:1 191:1 192:1
193:1 194:1 195:1
196:1 197:1 198:1
199:1 200:1 201:1
202:1 203:1 204:1
205:1 206:1 207:1
208:1 209:1 210:1
211:1 212:1 213:1
214:1 215:1 216:1
217:1 218:1 219:1
220:1 221:1 222:1
223:1 224:1 225:1
226:1 227:1 228:1
229:1 230:1 231:1
232:1 233:1 234:1
235:1 236:1 237:1
238:1 239:1 240:1

241:1 242:1 243:1
244:1 245:1 246:1
247:1 248:1 249:1
250:1 251:1 252:1
253:1 254:1 255:1
256:1 257:1 258:1
259:1 260:1 261:1
262:1 263:1 264:1
265:1 266:1 267:1
268:1 269:1,10 270:2
271:10
**key**
46:21,24 47:7 48:2
80:21,25 81:5,9
86:21,23 87:2,18
88:7,10 128:11,18
132:25 158:18 159:4
159:17 255:11
**kind**
7:17 43:9 45:7 60:25
109:8 184:21 195:23
210:3 212:23 222:19
231:6 244:9 248:18
267:20
**kinds**
110:22 212:20 213:13
214:15
**King**
1:15 2:7
**Klein**
2:10 4:6 5:6 7:4 12:3,8
13:10,18 15:21 16:12
17:14,16,23 18:15
19:6,8,10,17,22 20:2
21:3 23:15 24:4,8
26:14 27:20 28:2
30:3 31:18 32:6,12
33:7,22 35:9 36:19
37:14 39:25 40:9,14
45:9,22 48:4,16
50:20 51:23 52:22
59:22 63:14 64:6,25
65:10,23 66:5,14
68:24 69:12,18 71:7
71:15 72:18 74:20
78:4 79:6,9 80:17

81:10,25 83:17 84:4
85:18 87:6,21 88:3
89:8 91:17 92:23
93:8 94:5 98:6
101:20 103:7 106:6
108:9,17 109:9
110:11 112:18,20
113:4,12,15,24 114:7
114:14,20 116:12
117:15 118:14 119:7
120:2,11,15 122:20
122:23 123:5,12
124:6 125:3 126:3,8
126:24 127:11
129:14 130:12
131:14,19 132:10,19
133:5 134:15 135:14
136:4 137:5 139:24
141:20 144:13 145:7
145:20 149:4,25
150:10,16,24 151:10
151:16,17,24 152:23
154:6 156:18 158:14
159:6 160:3,17 161:5
163:17 166:12 170:7
170:25 173:16
175:20 180:18
181:22 182:14
183:16 188:7,15
192:14 193:25 197:9
198:25 202:22
203:22 204:4 205:3
205:12 206:6,15,24
207:15 208:8 209:19
211:22 212:8,25
213:25 214:7 217:7
218:23 219:7,22
220:13 221:3 223:18
224:11,15,22 227:15
231:25 236:19
237:18 239:5,14
241:16 243:14
248:20 260:25 263:3
264:9 266:5 267:2
**knew**
42:6 138:11 172:4,6

180:16 186:13,15,17
**know**
3:22 13:5 17:22 18:11
18:12 19:23 20:23
21:24 28:2 30:22
36:14 37:15 39:17
40:7 45:19,19 47:3
47:20 48:12,14 52:18
53:7,9,12,15 55:11
57:22 60:2 62:15,16
66:20 67:12,20,21
70:11,22,24 71:2,5
72:7,8,9,15 73:13,17
73:19,20,20,24 74:3
74:23 76:7 77:12
84:5 88:16 90:2
91:13,22 104:14
107:14 109:6,13,24
110:9 111:7 115:13
116:9,11 118:19
121:19 126:14
127:17 128:14
133:24 135:22,24
136:22 139:25
145:10 146:25,25
152:24 158:10 160:5
161:20 166:9,14
171:15 172:3 175:25
181:16 184:11,12,14
184:17,18 185:20
186:7,10,13 187:14
187:19,25 188:17,17
188:19,20,23 189:6,9
190:14 191:15
194:16,17,24 197:7
197:11 198:6,11,15
198:16 203:24
205:22,25 206:10
207:10,10,13,20
210:16,19,20 211:13
213:6,20 214:3,6,9
214:12 216:7 218:6
219:9 220:24 224:12
224:16 225:6 226:6
227:9 230:5,17 232:9
235:9 236:10 237:11

238:3,4 242:24 244:2
251:24 252:5,7
259:22,25 260:4,5,7
260:13 262:4 264:3
265:17,23
**knowing**
256:20
**knowledge**
35:17 53:5 56:18 72:2
90:8 91:4 135:18
139:14 162:24 243:5
250:24 263:2,7
264:11
**knows**
132:2
**Kyprianou**
74:4 239:11
**Kyprianou's**
205:21

---

**L**

**L**
1:13 2:5 3:2 4:1,18 5:1
6:1 7:1 8:1 9:1 10:1
11:1 12:1 13:1 14:1
15:1 16:1 17:1 18:1
19:1 20:1 21:1 22:1
23:1 24:1 25:1 26:1
27:1 28:1 29:1 30:1
31:1 32:1 33:1 34:1
35:1 36:1 37:1 38:1
39:1 40:1 41:1 42:1
43:1 44:1 45:1 46:1
47:1 48:1 49:1 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1 61:1 62:1
63:1 64:1 65:1 66:1
67:1 68:1 69:1 70:1
71:1 72:1 73:1 74:1
75:1 76:1 77:1 78:1
79:1 80:1 81:1 82:1
83:1 84:1 85:1 86:1
87:1 88:1 89:1 90:1
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1

99:1 100:1 101:1
102:1 103:1 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1
117:1 118:1 119:1
120:1 121:1 122:1
123:1 124:1 125:1
126:1 127:1 128:1
129:1 130:1 131:1
132:1 133:1 134:1
135:1 136:1 137:1
138:1 139:1 140:1
141:1 142:1 143:1
144:1 145:1 146:1
147:1 148:1 149:1
150:1 151:1 152:1
153:1 154:1 155:1
156:1 157:1 158:1
159:1 160:1 161:1
162:1 163:1 164:1
165:1 166:1 167:1
168:1 169:1 170:1
171:1 172:1 173:1
174:1 175:1 176:1
177:1 178:1 179:1
180:1 181:1 182:1
183:1 184:1 185:1
186:1 187:1 188:1
189:1 190:1 191:1
192:1 193:1 194:1
195:1 196:1 197:1
198:1 199:1 200:1
201:1 202:1 203:1
204:1 205:1 206:1
207:1 208:1 209:1
210:1 211:1 212:1
213:1 214:1 215:1
216:1 217:1 218:1
219:1 220:1 221:1
222:1 223:1 224:1
225:1 226:1 227:1
228:1 229:1 230:1
231:1 232:1 233:1
234:1 235:1 236:1

237:1 238:1 239:1
240:1 241:1 242:1
243:1 244:1 245:1
246:1 247:1 248:1
249:1 250:1 251:1
252:1 253:1 254:1
255:1 256:1 257:1
258:1 259:1 260:1
261:1 262:1 263:1
264:1 265:1 266:1
267:1 268:1 269:1,10
270:2 271:10
**labeled**
50:23 131:8
**labor**
34:25 44:2,3,3 54:17
79:3,12,15,24 80:13
90:9 97:24 99:16,17
100:20 101:6,9,15,19
109:18 111:23 129:9
129:11 130:8 131:2
132:24 133:4 137:13
156:21 157:14,19
158:9 159:15,16,23
162:6,9 163:2 167:3
167:14,16 169:5
170:4 173:20,25
176:21 177:19,19,20
179:7 190:11 191:23
198:17 199:18
201:10,13 208:2,5,10
216:17 223:5 228:5,5
228:6,15,19,23,24,24
232:12,16,17,20
233:2,4,5,7,8,25
234:8 241:20 244:21
246:16,18 253:8,20
253:24 254:18,22
255:3 263:9
**laid**
5:14
**Lampe**
57:19
**Landers**
70:20
**Lane**

9:13
**lanes**
58:12
**language**
247:14
**laptop**
109:11 242:13
**laptops**
231:2 242:12
**large**
41:4 54:8,18 76:15
241:21
**largely**
126:22 242:9
**larger**
159:22 181:23 230:18
**Laura**
57:19
**LAW**
2:3
**layer**
231:22,23 241:3
**layman**
248:25
**lead**
51:2 207:24,25
**leader**
71:25 73:3 94:18,22
96:7
**leader/architect**
129:2
**Lear**
47:15
**learn**
18:20
**learning**
40:23
**leaves**
254:21
**leeway**
30:6,15 35:10 37:16
114:21
**left**
7:25 93:6 250:5
259:10
**left-hand**

```
105:23 143:24          35:10 37:16 127:3      76:9                   63:17 65:8 84:21
legal                  135:13 152:11,13       lives                  90:7 116:17 139:13
32:23 111:16 237:5     line                   66:19,20,21 216:6      175:3,4,5 176:8,19
length                 31:19 34:13 52:6       219:2                  182:17 186:14,17,18
80:23                  53:10 120:23 129:15    loaded                 186:21 187:2 194:25
letter                 150:2 168:14,14        64:9,12 219:24 263:5   205:20 209:13,24
34:2 102:25 103:17     192:10 230:17          local                  211:10 221:25 222:2
221:10 225:10,11       239:25 270:3 272:3     50:2 51:12,21 126:15   239:3 247:24 250:4
227:2,3,6,8,19,21      lines                  locate                 264:12
249:15                 157:18 167:11 256:3    175:17                 looks
let's                  list                   located                29:14 77:7 107:5
29:11 57:3,7,25 61:8   41:22,23 42:15 43:10   203:15,17              118:4 143:22 207:23
74:20 82:24 84:10      44:25 45:17 46:15      Location               lose
93:4,6,17 138:4        71:9 92:15 93:10,14    191:13                 210:24
145:5 178:2 181:8      100:13 111:23,25       long                   loss
199:24 212:6 220:8     112:12 124:7 141:5     6:25 8:3 9:15,20 20:6  27:5 31:13 42:14,25
235:22 255:19          155:4 159:10 169:15    20:11,16 39:19 68:15   lost
262:20                 170:11,12 176:11       230:3 261:8,15         30:22
level                  213:21,24 214:18       look                   lot
49:25 50:3 56:24 72:4  230:3 254:17 262:3     44:24 46:20 50:16      38:23 48:8,25 49:3,24
100:14,16,20 146:19    listed                 60:18 61:11,12 68:8    51:11 61:3 137:8
149:12 175:2 183:8     35:3 45:6,25 46:25     84:10 86:7,11 88:20    145:24 148:15 163:2
189:11 190:9 193:19    47:15 57:9,12,13       89:18,22 90:21 92:7    178:15,20,23,24
208:7 213:7 215:12     59:7 60:17 73:2        98:16 110:18 116:21    196:11 241:10 242:6
260:11 266:22 268:6    81:19 88:22 104:15     123:17 128:9 130:12    242:7 243:17 265:2
268:10,10              121:2 122:5 134:11     132:7 134:10 140:10    lots
levels                 138:17 160:13,19       146:22 154:2 167:24    147:21 194:8
161:18,19              167:10 170:21 176:7     171:19 173:13          love
leverage               228:20 243:23          174:24,25 175:24       135:7
100:16                 255:10,20,25 259:17    176:5 188:9 195:13     low
Lexington              260:3                   195:17 197:21,22       7:24,25
2:4                    listen                  199:17,21 209:2,21     lower
licensing              135:2 190:3            210:7 221:5 225:9,13    86:12 120:7 136:17
231:2                  lists                  234:20 235:10 239:9     142:20 143:23
life                   55:21                  246:16 250:22 255:4     154:20 211:14
125:12 218:14          little                 257:11 259:6 262:9     257:21
light                  26:7 30:15 59:23 61:9  262:15
12:17 93:5 95:3        89:16 114:21 118:11    looked                  _____
likewise               181:18 182:16          22:16 28:17 84:20               M
76:17                  248:25 249:6           90:15,17 91:10 92:16   _____
limit                  live                   92:17 98:18 104:25     magnitude
135:20                 66:18,23 67:6,7,18     162:23 163:5 174:6     229:16
limitation             219:16,17 237:14       186:12 190:2 198:14    maintain
34:24 130:5            239:21 243:6,8,19       235:7,12 260:17        28:6 30:7 151:24
limited                260:14                  looking                major
5:11 18:5 30:5,11 34:7 lived                  29:14,19 42:24 46:16   221:23
                                                                     majority
                                                                     51:16,20 144:22
```

145:15 151:25
156:10 196:17
223:22,24 224:4
230:14
**making**
10:25 206:14 257:3,22
258:13
**management**
9:23 14:15,18,21
70:16 71:4 77:21
164:8
**manager**
10:5 11:7,12 52:21
53:22 54:15 68:15
71:14 72:17,21,22,23
73:2 76:11 96:21
106:12,16 107:3,4,22
107:24 160:2,6 165:2
165:5,6,10 166:23
171:6,7 193:2,4,7,8
193:10,13,20,22
194:10,10,20,23
195:14,16 196:2
205:17,24 206:2,3,9
206:22 264:14,21
265:3 268:3,12,13
**manager's**
54:2 207:2,12
**managing**
58:18 171:4
**manual**
196:21,25
**map**
162:16 170:13
**mapping**
100:10,12 167:3 175:8
186:20 197:12
198:19 199:3 209:9
256:20
**maps**
177:18
**margin**
104:6 119:19,20,24
120:7,10,20
**mark**
13:12 16:14 18:18

28:12 83:10 142:5,11
169:8 177:10 220:14
250:2 252:22
**marked**
28:22,25 29:4,7 75:3
82:25 275:8,12
**market**
90:9 139:16
**marketplace**
163:4
**marks**
78:8
**marriage**
271:17
**Mary**
111:12 252:18
**Maryland**
9:14
**match**
170:15 173:22 174:12
174:15,16,18,18
198:19
**matched**
174:7
**material**
97:12,18 102:11 159:8
**materialize**
125:11
**materials**
40:22 43:13,17,21,22
43:23,25 44:4 97:5
97:22 98:15,16,21,24
99:2,5,9,13,19
135:11,20 147:20
148:6,10,12,20,24
149:2,16 150:9 155:2
155:17,22,24 156:4,6
156:15,23 159:10
196:5 226:9
**math**
41:22,25 42:2 56:23
57:4 79:22 234:15
**matrix**
100:9 128:12 133:2
146:12
**matter**

63:13 72:7 122:8
160:8,11,20,22 161:7
161:13,15 162:2
167:6,9 172:7 173:5
173:10,12 176:2,3
180:15 181:20
182:21,24 183:25
184:15,19 185:11,17
185:21 186:15,19
190:19 192:9 194:5
195:4 199:24 208:4
208:11 255:19 256:2
256:15,21 257:16,21
257:23 271:19
**ma'am**
132:8
**mean**
11:15 21:15 42:20
43:12 47:7 53:20
55:4 58:14 67:2
68:15 74:17 76:5
77:23,25 84:25 85:10
85:12,20 89:16
108:22 109:11,16
110:21 115:20
116:20 118:25
119:25 134:21 135:6
137:8 138:23 140:9
144:8 145:19 147:23
148:23 157:25 160:5
161:20 162:20
175:23 176:16
179:14 183:19
184:14,22,24 185:2,8
188:18 189:9 194:4
208:18 213:9 221:15
223:19,24 226:5
228:12 232:5 237:10
241:20 242:24 245:6
248:7 257:14 263:25
264:3 267:15,18,21
268:19
**meaning**
98:20 231:21
**means**
30:13 34:10 37:5

51:19 54:23 55:6
130:21 153:25 158:2
179:15,16 219:2,9
228:25 242:25
**meant**
88:18 161:19 179:9
247:12
**measure**
119:22,24
**Medicaid**
225:21 247:8
**medical**
62:6,7 64:23
**Medicare**
225:20 247:9
**meet**
260:23
**meeting**
20:8,14,24 21:10,14
21:21 40:20
**meetings**
20:7,23 21:2,18,21
22:5
**members**
79:15 109:10
**memo**
221:10
**mention**
238:13
**mentioned**
30:23 51:11 107:19
109:19 118:16 143:2
147:3 155:21 158:2
179:10 212:20
213:16 219:19
230:20 235:5 238:11
**Meridian**
9:13
**merit**
11:5
**met**
3:14 21:5 47:20
**Methia**
239:12
**method**
27:12

**methodology**
27:13 92:4 145:25
  146:6 147:16 156:8
  196:10,11,14,21
  201:9 224:8
**metric**
35:2
**mid-eighties**
11:2
**mid-sixties**
8:8
**million**
55:16,16 67:3 118:5,8
  118:23 119:4 125:2,7
  222:14 223:7,12
  228:22 233:18,19
  244:23 245:3 246:11
**mind**
89:24 99:9 229:20
  234:21
**minimal**
226:4
**minute**
22:4 74:21 131:17
  225:16
**minutes**
20:12,18,22 21:2
  164:8,10,11,14 166:3
  261:22 262:21
**missing**
34:12
**misspeak**
243:10
**mix**
119:16 260:23 261:7,9
**mobile**
112:10
**MOBIS**
127:22,25 128:4 129:9
  129:11,23 130:3,9,11
  130:14,22,25 132:24
  133:4,13,18,23 134:3
  137:2 139:21,25
  140:4,7,11,15,21,22
  140:23 141:2,4,4,9
  141:12,15,21,21,23

142:3 168:3,5,11
**modernizes**
112:8
**money**
42:21 56:8 206:14
  210:23,24 240:13
**monies**
238:21
**month**
18:25 115:12 116:8
  117:13
**months**
7:10,15 125:14 179:17
  202:6 254:14
**morning**
3:8,9
**motion**
30:22
**move**
112:10 156:14 166:23
  193:20
**moved**
9:22 86:15 102:10
**multiple**
182:4
**multiplied**
199:9 210:10

---
**N**

**N**
2:2
**name**
3:10 17:9 47:24 48:6
  89:22 116:22 179:8
  185:11 191:8 254:2
  270:1,2
**names**
26:5 57:16 81:18 82:5
  89:12 99:25 163:9
  183:23 184:11,11,25
  185:4,8,15,16 197:14
  210:5 263:10
**Nancy**
86:16 88:20 128:23
  133:23
**narrative**

27:7,9 143:2 144:11
  144:19 145:24
  146:21
**narratives**
27:4,8 143:10 145:12
  145:16,18 147:8
**narrow**
35:7
**nature**
51:13 78:9 93:3
  129:24 207:23 224:7
  231:3 244:18 256:18
**necessarily**
42:23 72:24 73:16
  82:7 135:6 138:15
  158:24 161:22
  175:19,25 204:24
  213:10 240:6 254:7
  267:15
**necessary**
32:22 33:14 38:23
  44:5 146:3,8,20
  149:7 155:20 253:23
  262:6
**need**
31:12 44:13 60:4
  93:12 149:11 165:20
  171:19 175:10 182:6
  197:12 234:16
**needed**
155:12 156:7 164:24
  182:2 184:5 238:8
  256:23
**needs**
155:5
**negotiate**
112:15 114:24
**negotiated**
82:20
**negotiates**
113:9
**negotiation**
38:22 115:5
**negotiations**
39:3 44:9
**neighborhood**

15:14
**netted**
244:2
**never**
3:14 41:11,15 48:24
  62:15 84:13 113:6
  114:11 123:25 133:6
  140:18 167:19,23,24
  229:20 234:21
**New**
1:2,16,16,20 2:4 6:24
  271:2,4,9
**nine**
115:12 116:8 117:13
  242:3
**nonexempt**
191:19 216:24
**non-salaried**
66:22
**non-salary**
66:17
**Nora**
120:25
**normally**
60:6 94:15 206:22
**Notary**
1:19 3:4 270:24 271:8
**notation**
119:15
**notational**
265:11
**notebooks**
44:7
**noted**
269:6
**notes**
104:22
**notice**
1:14 5:12 82:11
  122:19 129:19
  178:21 241:25
**noticed**
191:17
**notified**
102:6,9
**notional**

264:23 265:13,21
266:21 267:9,25
**number**
36:18 44:7 52:19 58:9
61:21 63:18 66:16
67:5 73:6,21 76:18
86:12 103:4 104:3,6
106:13,21 129:18
130:18,20 168:19
176:14 191:11
194:15,17 206:13
218:19 259:12 261:4
264:19 267:19
**numbers**
34:10 37:5 42:5 60:21
83:20 103:6 130:10
182:9 192:15 206:12
264:22,25 267:18
**numerators**
248:17
**NY**
2:4,9

---

**O**

**oath**
4:25 74:24 236:2
**object**
7:4 13:18 15:22 17:24
23:15 24:4,8 26:14
32:6 33:8 34:17 45:9
45:22 48:4,16 50:20
52:22 63:14 64:6,25
65:10,23 66:14 68:25
71:15 72:18 79:9
80:17 81:10,25 85:18
87:6,21 88:3 89:8
91:17 94:5 98:6
101:20 103:7 106:6
108:9,17 109:9
110:11 116:12
117:15 118:14 119:7
120:2,12 125:3 126:3
126:8,24 127:11
132:10,19 133:5
134:15 135:14 136:4
137:5 139:24 144:13

145:7,20 149:4
150:17 154:6 156:18
158:14 159:6 160:3
160:17 163:17
166:12 170:7,25
173:16 175:20
180:18 182:14
183:16 188:7,15
192:14 193:25 197:9
198:25 202:22
203:22 204:4 206:15
207:15 208:8 209:19
211:22 212:25
213:25 214:7 217:7
218:23 219:7,22
223:18 224:11,15,22
227:15 231:25
236:19 237:18 239:5
239:14 243:14
248:20 260:25 263:3
264:9 267:2
**objecting**
133:8
**objection**
18:15 40:10 51:24
60:7 151:22 192:18
205:3,12 206:24
212:8 241:16
**objections**
150:14
**obligated**
134:22
**obstructing**
151:15,18,21
**obviously**
61:4
**occasion**
66:23
**occasionally**
56:22 59:16,18
**occasioned**
144:3
**offer**
44:15
**offered**
106:8

**office**
70:17 109:4 164:8
203:7,8 222:7 225:20
231:16,19,21 237:7
240:25 241:4 244:9
**officer**
110:17
**offices**
1:14 9:7
**official**
10:12 41:12 166:11
252:16 255:8 265:23
**officially**
41:15
**oftentimes**
90:2 125:10 138:21
262:2
**Oh**
11:11 147:4 227:5
242:14
**okay**
3:20,24 4:5 5:2 27:22
46:11 47:14 50:19
57:6 65:7 71:11
73:10 87:23 105:18
107:24 115:18
116:21 117:4 123:24
124:24 138:3 185:8
193:5 201:8 208:17
227:21 229:20,21
234:21 236:7 253:13
261:8
**OMF**
77:12,20
**once**
15:21 17:24 19:10
38:8 51:25 79:20
80:2 100:4 101:5
102:4 131:14 133:6
149:9 150:3 156:13
208:23 209:7
**ones**
51:17 70:13 143:15
150:19 184:17
190:20 223:22
245:17 251:16

**one-to-one**
170:15
**Online**
7:11
**open**
254:21
**Operation**
77:21
**opinion**
175:10
**opportunities**
26:13,19 27:2 49:3
51:6 52:21 85:13
144:12 145:4
**opportunity**
16:21,22,23,24 17:7
17:10,11,21 18:13
23:18,19,25 24:17
25:24,24 26:2 27:2
29:15,25 30:18 31:11
32:18 37:23,25,25
38:5,12 40:24 41:4
42:6,16,17 45:4,15
46:17 50:23 51:14
53:16 55:24 56:10
60:24 70:7 71:24
72:21 73:3,11 75:20
79:5 80:2,16,24
84:19,21,24 85:5,11
85:16,17,25 88:18
94:17,22,25 96:6,20
103:10 106:23
107:22 115:17
116:22 131:4,6
132:16 133:16,17
140:20,21 141:7
144:8,19,21 145:2
153:22 155:10
158:24 159:2,25
160:2,6 164:17,24
165:18 184:16
185:25 223:16,20,21
250:15 254:15
**opportunity's**
55:8
**opposed**

**opposed**
35:24 71:22 76:20
  106:4 108:15 109:7
  126:15 150:8 183:9
  191:18 208:17
  242:21 245:12
  267:16
**options**
67:17 214:21,25
**oral**
83:4 131:8 273:13
**order**
16:2 30:8,12 34:9 60:5
  83:14 112:3,5,8,9
  114:3 116:5 117:6,14
  117:22 118:7,12
  119:5 120:21 129:5
  146:22 148:19 162:8
  170:20 181:25
  213:23 274:3
**ordered**
18:6
**orders**
112:16 113:10 114:25
  115:6 118:17,19
  125:10,11
**org**
81:14
**organization**
52:13 203:18
**oriented**
10:11
**originally**
21:13 133:12
**outcome**
271:18
**outside**
267:23
**outsourced**
127:10
**outsourcing**
49:24 50:6 126:23
  127:2,6,9
**overall**
88:6 117:24 118:13
  119:5,9 139:15 184:2

198:21,23,23 211:2
  212:11 256:12
**overhead**
35:2 103:10,20 106:9
  108:25 109:3 120:6
  125:21,22 126:9,12
  127:21 128:5 133:12
  200:2,5,18 209:11
  211:16 212:6,7 213:6
  215:3 220:6,9,10
  221:19,22,23 222:4,9
  222:11,12 223:3,8
  227:25 228:17
  229:22 231:16,17,18
  233:10,21,24 234:7
  234:13,19,25 235:4
  235:12 237:22,25
  241:14,18,22 242:15
  242:21 243:21,23,24
  246:10,11,16,19
**overheads**
126:6
**overly**
235:18
**overtime**
192:2,5,7,8 201:17,20
  201:22 202:8,19
  216:14,15
**overview**
31:12
**owner**
54:22,22 55:2

---

**P**

**P**
2:2,2
**package**
97:21 249:14,18,19
  251:22
**packages**
251:17
**page**
29:14 34:4 36:5,23
  44:25 45:2 46:11
  50:16,18 56:2,6,7
  57:5,12,14 71:18

73:6,10 75:5 81:17
  86:11,19 99:4 115:8
  116:22 128:9,22
  132:7 143:24 157:17
  163:8 167:10 182:2,6
  182:6,7 201:8 203:16
  210:3,8 212:12
  225:14,17 234:21,22
  247:23 248:5,22,24
  249:2,3,5 255:4,5,21
  255:21 258:3 259:5
  270:3 272:3
**pages**
23:11 24:12,18,22
  25:16,20,22 142:19
  182:4 227:2 245:25
  249:9
**paid**
210:16 215:11
**Panos**
74:4
**paragraph**
229:6 245:24 255:25
  257:10
**part**
6:15 8:18 10:4 11:16
  31:24 41:11,13 45:7
  46:13 49:4,6,19
  52:12 58:7 81:13
  83:4 88:6 90:7 97:23
  109:2 111:17 115:16
  115:22 127:16 131:8
  184:17 185:20
  204:13 220:25 221:6
  240:19 259:2 260:13
  267:25 273:13
**partially**
124:14
**participant**
40:23
**participate**
41:13 44:16,18
**participated**
17:2
**participation**
14:7,9,25 15:10 27:4

62:10,12,16 64:24
  65:20,21 66:10,13
  212:17 230:16
**particular**
23:14 65:22 81:6
  82:11 88:17 134:20
  144:7 150:7 153:13
  157:21 158:8 159:24
  168:18,25 169:3
  177:23 203:16
  239:23 260:24 267:5
  268:14
**particularly**
41:4 256:22
**parties**
271:16
**partner**
132:14 137:11
**parts**
240:22
**pay**
202:21 215:12,13
  216:8,10,12,14,15
  217:6 218:10
**Pension**
218:3
**pensions**
218:8
**Pentagon**
203:12,19
**people**
45:2,3,14 46:25 47:4
  57:9,12,13 60:16
  73:22 81:23 82:5,21
  87:2,18,24 89:20
  92:14,20 94:21 96:17
  106:14 107:18
  109:17 122:5 134:11
  134:12,20 135:8
  138:22 158:18,19,23
  158:25 159:3,4,22
  161:9 164:20 166:20
  167:21 169:6 170:21
  172:7,24 176:4,6
  178:15,20,24 184:4,7
  187:4 188:6 189:7

191:25 192:3,7 195:2
198:24 202:7 203:25
204:5 208:13 209:3
209:24 210:5,5 232:3
232:6 238:19 239:17
239:18,25 241:10
242:12,12 243:6,12
243:21 256:14,24
257:8,11,21 258:6,24
258:25 259:3,7,14,16
260:13,18,20,21
261:6 262:5 265:8
267:20,22

**people's**
239:4

**percent**
52:16 62:20 64:21
65:4 119:11,16 136:3
136:8,14,17 154:18
183:2,3,3,9,10
189:20 192:24 193:6
193:9,12 200:5,9,14
200:18,22,25 201:2
219:12 228:2,8,14,18
233:11,16,17,20,21
233:22 234:2,9,24
235:4,8,17 246:18

**percentage**
14:16,20,21 62:3
63:10 135:13 136:2
246:17

**percentages**
183:2

**perform**
81:24 82:6 87:4

**performance**
154:14 179:17

**performing**
49:23 80:3 178:16
233:8

**period**
10:16 15:23 16:6 40:5
46:6

**periodic**
202:24

**periodically**

226:11

**permissible**
5:16 152:5

**permission**
88:13

**person**
20:20 21:5 26:20
43:12 47:18 52:19
54:3 66:12 67:4
71:23 72:13 80:9
81:3,4,6,8 88:15,21
88:22 89:19 90:5,6
94:18,23 95:20 96:7
107:19 121:4 138:13
138:13,16,19 139:3,3
139:7 158:13 159:14
159:21 171:4 176:19
180:12 185:23 186:6
186:19,22,25 189:22
190:8,9,13,18 195:25
202:5 207:19 216:19
238:7 239:7,8 252:17
258:12

**personal**
123:20 209:16

**personally**
173:18

**personnel**
42:7 47:9 80:22 86:21
86:23 87:2,18 88:8,9
88:11 89:12 90:3
99:24 128:11,19
133:2 134:13 162:11
175:15 201:17
255:11

**persons**
47:15 239:9

**person's**
55:3 61:10 64:3 89:23
267:7

**perspective**
37:7

**pertain**
95:24

**Pfost**
67:25 75:8,11 214:5

230:8 238:3 252:5

**Phase**
83:15 86:7 274:5

**photocopies**
238:25

**pick**
204:3

**picked**
192:13,16

**piece**
112:5,8,10 118:12

**place**
166:19 196:10

**placed**
79:4,20,25 166:18
257:15

**places**
162:14

**placing**
79:14

**plaintiff**
1:4 2:3 30:10 34:6

**Plaintiffs**
29:7

**plaintiffs's**
29:4

**Plaintiff's**
28:21,24 33:19 34:13
34:19 35:4 50:12
75:3 81:17 89:5
132:17 158:12
172:19 210:9 229:19
239:9 249:10 253:11
275:7,11

**plan**
158:23

**planned**
99:24 139:4

**planning**
9:24 107:13 255:14

**please**
13:14 26:6 32:4 60:11
142:6 205:8

**pleased**
136:13

**PLLC**

1:15 2:3,7

**plug**
42:4 72:10

**plus**
52:16 135:19 143:17
147:14 148:4,25
149:15,17,19,23
151:6,9 153:4,5,7,8,9
153:17,18,19,19
154:25 155:7 156:3
156:10,11,17,22
157:14,15 226:5
246:16,18

**PMO**
70:12,15 164:7

**PMP**
260:8

**point**
9:18 10:6,25 38:10,14
40:24 88:15 92:15
122:9 123:7 130:22
148:22 151:20
153:21 155:24
214:10

**pointing**
163:7

**points**
137:15

**policy**
202:17

**pool**
159:22 222:12,12,23
222:25 223:4 228:21
229:22 236:10
246:12

**poor**
177:2

**portion**
32:3 154:12 243:20

**portions**
153:15

**position**
5:13,19 10:7,9,11
70:25 107:11,12
129:6 173:15 205:21
207:6,7 254:5,22

255:14
**positions**
255:17
**possession**
123:14,22
**possibilities**
215:7
**possibility**
117:11
**possible**
224:12 237:23
**Possibly**
96:10 216:25 226:10
**post**
44:10
**post-award**
110:19
**Post-retirement**
218:7
**potential**
13:3 38:4
**potentially**
160:11
**practice**
6:17,18 7:2 8:20 9:16
136:16 251:23
254:24
**practices**
256:6
**precise**
235:18
**predicate**
33:14
**predominantly**
231:11 251:10
**preliminary**
82:17,18
**premium**
217:6
**preparation**
22:14 28:18 41:9
78:15,23 97:11 98:3
227:12 261:9 262:12
**preparatory**
41:5
**prepare**

69:15 143:3,4 144:18
145:13 238:21
249:14 261:16
**prepared**
38:16 117:13,18 199:3
249:13
**preparing**
26:20 40:22 47:11
56:11 78:19 143:8
**preponderance**
225:21 251:14
**present**
2:12 19:23 39:18
**presentation**
83:5 131:9 273:15
**presently**
252:10
**president**
55:7 68:13 71:14 76:8
76:11 96:13 232:5,7
**presidents**
75:16
**presumably**
91:12 212:5
**pretty**
10:3 155:8
**previous**
57:14 70:4 75:4 147:4
**previously**
4:19 28:22,25 275:8
275:12
**pre-award**
110:15
**price**
27:14 43:7 98:22
112:12 115:25
118:17 137:15,24
141:5 163:21 268:9
**prices**
12:11 35:20
**Pricewaterhouse**
7:3
**PricewaterhouseCo...**
6:14
**pricing**
9:24 10:2,3,5 11:7,11

31:23 32:22 44:12
52:21,24 53:3,4
77:11 99:6 106:12,16
107:3,4 110:7 112:16
113:10 115:5 164:20
165:5,7,11,14 172:6
172:10 196:2,3 253:8
268:7
**primarily**
9:4 27:3 39:19 45:21
48:22 58:2
**prime**
23:4 80:6,8 87:12 97:8
97:16 104:7,10
131:11 132:13
133:15 134:5,22
137:10 140:20 254:4
**print**
24:21 25:16 182:4
**printed**
25:21
**printing**
56:12 78:12
**prior**
21:12 106:24 229:14
248:4 262:11,17
**private**
110:24
**privileged**
19:12
**probabilities**
190:16
**probability**
117:12
**probably**
9:21 15:17 20:17
24:22 29:5 54:18
67:3,22 95:6 104:24
111:11 114:22
145:14 159:11 198:6
215:22 217:9,10,15
252:7 261:18
**problem**
181:22
**procedures**
80:11 113:8

**process**
11:17 29:24 30:24
31:4 32:2,5,15,17
33:5,10 39:13,20
41:14 42:10 49:11,22
56:19 58:8,10 78:3
80:5,7,9 96:3 98:13
100:10,12 105:11
126:20,22 127:5,19
129:2 144:20 163:20
204:14 256:6 265:5
268:20
**produce**
12:21 16:5 17:21
33:24,25 122:14
123:2,8,25 266:14
**produced**
4:10 18:13 27:24 28:4
95:14 123:5 124:2
266:9
**produces**
201:5
**producing**
181:23
**production**
83:20 84:6
**professional**
162:3,19,22 163:11,15
166:16 174:20
183:11 189:24
195:23 265:6
**profile**
46:12 50:23 73:11
**profit**
14:6,8,25 15:10 27:5
31:13 35:2 42:14,25
62:10,12,15 64:24
65:19,21 66:10,13
119:20,22,24,24
120:7,10,19 134:2
135:11,20 136:2,8
137:21 149:20,22
151:8,12 152:25
153:3,14 212:16
219:6,12,16,17
230:16

profits
150:18
program
70:16 71:4 83:15 86:7
  117:3,7 274:5
programmatic
53:11
project
8:17 44:6 70:16 71:4
  72:17 79:16 88:12,16
  104:2 117:24 118:13
  119:6,9 121:6,10
  122:9 138:11,25
  139:4,11,13,16 164:7
  182:17 189:22
  199:19 245:19 254:3
  254:12 255:10,15
  259:6,24 260:3,5
projected
128:6
projects
150:19
promise
88:14
promised
87:25
promising
87:24 88:5
promotion
10:24 11:4,9,13,14,15
prompt
84:2
property
240:16
proportion
241:19,24 246:15
proposal
22:18,25 23:14 30:2
  31:15 32:19,24 38:16
  44:15 56:11 58:21
  81:13 115:23 118:3
  118:10 147:25
  148:19 167:15 174:3
  197:18,19 228:24,25
  229:10,15,18 232:15
  232:18 238:14,20,22

239:23 240:4,8
242:18 245:25
249:20
proposals
23:14 48:8,23 146:22
  197:22 198:4,9,14,16
propose
80:7 104:2
proposed
81:4 115:16 130:7
proposing
80:25 155:12
proprietary
61:4
provide
31:9 41:17,22,24
  79:21 96:21 98:5
  99:14 145:5 149:11
  220:2 249:18 254:5
  262:5 264:4 266:19
provided
89:21 98:1 99:19
  105:13 109:11
  113:25 125:17,19
  142:9 227:7 254:2,12
  254:15,16,20 262:25
  263:6,11
provides
56:7 102:2 145:24
providing
28:5 82:12 99:3
provision
213:12
provisional
227:22 229:9 247:25
  250:11
PSA
161:10
public
1:19 3:5 140:9 141:11
  141:12 168:6 235:13
  236:25 256:7 270:24
  271:8
publisher
73:24
pull

32:21 42:7 143:10
  261:19
purchase
83:6 111:20,21,25
  146:4,11,13,14
  254:11 273:17
purely
127:3 225:4
purpose
31:6,8 35:19 47:6 56:5
  60:23 115:18
purposes
60:24 75:18 103:9
  229:11 249:20 268:7
pursuant
1:14 5:11
pursue
37:9 38:12 117:14
  268:23
pursued
250:15
pursuing
79:5 140:19
pursuit
38:4 41:2,8 55:21 56:3
  56:9,14 57:14 58:7
  58:10 59:25 60:14
  70:7 71:24 72:21,23
  72:25 73:3 77:18
  94:17,22 96:6,21
  107:22 173:11
pursuits
47:25 48:10 141:24
  142:4
put
4:7 5:9 30:4 37:24
  51:24 73:17,20 92:25
  99:24 106:3 121:9
  131:19 139:2 171:4
  192:21 202:9 265:3,8
  268:14
puts
264:15
P&L
115:11,19
p.m

4:17 269:6

_____

Q

qualification
128:12 260:24
qualifications
79:12 128:20 133:2
  173:13,14,19 174:7
  253:23 255:24
  258:21 260:19
  266:25
qualified
137:12 259:3
qualifies
176:19
qualify
159:23 194:8
quarter
88:9
query
158:5
question
3:18,22 4:4 13:11
  18:17 19:15 29:10
  32:14 37:12 39:18
  50:21 60:6,11 65:4
  68:22 69:10,13,20,21
  69:24 70:2,4,6 78:8
  84:4,9 88:25 104:17
  113:2 114:18,19,23
  119:2,13 120:16
  122:18 124:24
  131:18 133:11 148:8
  150:22 151:2 152:15
  152:16,20 190:4,5
  205:7 210:15 242:23
  250:14 260:16
questioning
4:9 129:15 150:3
questions
3:17 12:4,24 13:13
  28:6 35:11,17,19
  36:3,14,17 40:3,13
  40:15 44:12,18 64:15
  77:14 83:18 111:19
  113:5 129:18 130:2

142:2 150:18 151:25
152:8,10 219:15
238:5 268:23 269:2
**quit**
190:13
**quote**
30:10 34:7,8 83:4
131:9 253:6 273:14

---

**R**

**R**
2:2 271:1
**raise**
11:4,13,16
**raised**
6:23
**raises**
10:24
**ran**
70:18
**range**
13:23 15:5 20:17
145:14 151:9,12
152:25 153:3 154:3
187:13 256:24
267:24
**ranges**
149:22 153:12,14
188:5,5
**rarely**
126:10
**rate**
22:20,23 24:14 25:3,5
41:24 44:3 59:7,10
60:22 63:23 64:2,21
68:6,7,14 73:14
74:10,12,18 82:13,17
82:18 89:24,25 90:9
90:14 91:22 93:18,21
93:25 99:3,14 100:21
101:6,9 102:24 103:4
103:5,10,11,17
104:13,18,19 105:5,6
105:13,23,24 106:3,4
106:5,10 107:17
117:12,17 118:11

121:17,18,21,25
122:2 123:10 125:16
134:5 136:21,24
138:4 139:18,22
140:16,22 141:22
147:16 148:17 155:6
155:9 157:2,3,12,13
157:19 159:21 162:5
162:16 163:8,15,22
168:16 170:22 175:8
184:3,6,9 186:4,5,15
195:5 199:12 201:6
203:11 206:18,19
207:12 208:2,4,5,11
209:14,18,23,25
210:13,17 211:14,14
212:12,13 214:23
216:17,18 217:11,13
217:16 219:11 224:2
224:6 225:5 226:24
228:2,14 235:12,15
235:15 237:12
246:21 247:2,6,17,20
247:21 249:9,22
251:12,17 254:20
257:5
**rates**
24:16 25:7 27:4,14
33:11,15 35:3,13
42:3,16 43:10 56:22
57:4 59:15,17,19,20
60:14,17,25 61:7
64:9,10,12,14,17
65:9 68:3,4,5,10
69:17 70:9 71:12,21
71:22 72:6 74:2
79:22 89:4,5,11 92:2
92:3,4,8 94:4 95:21
95:25 96:9,22 97:3
98:5 100:5,7 101:8
101:13,15,16,19,23
101:24 102:3,5,13,17
102:17 103:2 105:5
105:19,20 110:20
111:3,4,24,25 129:20
130:8,15,23 131:3,24

132:3,23 133:13
134:8 136:12,21
138:10 139:9,20
140:2,4,7,15,23,24
141:2,4,5,23 142:3
145:5,10 146:2,17
148:13,21 149:8,12
155:4,12,14,18 156:9
156:10,10,11,12,13
156:21 157:10
159:10 163:25
164:16 167:20 195:2
199:4 210:24 215:10
216:16 219:16,18,20
219:25 222:15
224:24 225:13
226:12,14,16,17,23
227:23 229:8,9,16
234:10,23 246:14
247:25 248:16
249:22 250:9,11,17
250:19,22 251:2,6,9
251:10 253:16
254:17 255:16,16
261:17 262:3,24
263:5,9 264:6
**ratio**
208:16
**rationale**
86:20
**Raymond**
107:10
**RCF**
146:24 147:2,3
**reach**
110:6 175:11
**read**
21:6,8 24:24 25:2,11
36:19 37:13 60:12
69:25 70:3,5 79:6,8
139:12 150:23
152:21,22 173:19
179:4 181:12,17,19
191:21 198:16,17
**reading**
36:21 180:22 181:13

199:18
**ready**
138:22
**real**
108:18,20,21,24 109:5
109:14 210:4,7 231:9
231:12
**really**
30:13 34:10 37:5 42:3
44:11 47:12 49:24
55:5 57:12 76:14
91:20 110:8 119:4
147:24 150:14
151:23,23 181:13
204:17 207:18
**Realtime**
1:18 271:7
**reason**
53:6 113:25 124:22
165:20 226:6 241:13
243:5 270:5,7,9,11
270:13,15,17
**reasonable**
68:13 117:11 136:16
199:23 261:7
**reasons**
67:5 257:5 270:3
**recall**
13:21 15:13 18:23
22:12 26:16 48:6
68:17 84:15 86:9
104:11,12,15,18,21
106:19 115:13
116:20,25 140:9
165:19 187:3 235:6
262:8
**receive**
11:12 13:23 29:24
31:16 32:18 33:3
44:14 67:4 102:4
149:9 249:15
**received**
11:8 14:6 15:16 38:9
217:21 253:7
**receiving**
23:24 137:21

recess
4:15 74:22 142:7
  235:24 262:22
recognize
3:12 4:24 29:18 57:15
  57:19 128:14
recollection
16:3 82:4,10 84:19
  85:3,7,15,24 86:4
  93:19,24 94:21 95:4
  130:19 198:12
recommended
83:16 86:5 274:6
record
4:7,12 5:10 17:13,16
  21:3,8 25:2,11 30:4
  37:13 51:24 60:12
  69:25 70:5 79:8 93:2
  113:16,19,20 131:20
  142:18 150:23
  152:22 164:6,9
  266:10,12 271:13
recover
234:16
recruiting
162:13 175:12
red
211:18,21 212:2
reengineering
256:6
refer
70:12 111:11 129:12
  197:12 225:13 238:6
referenced
185:4,6
referencing
23:19
referred
125:24
referring
28:3 56:21
reflect
17:14,17 21:4
reflected
215:16
refreshed

202:24,25 203:3,4
refreshes
130:19
refuse
12:4 35:25
regarding
12:24 34:14 142:3
  152:9
regardless
65:15 172:5 215:2
regular
193:17,24
regularly
106:20
regulations
247:10
reimbursable
98:22 226:13,14,18
reimbursed
149:18 192:8
relate
84:23 133:12 156:9
  221:19
related
15:24 114:9 126:18,19
  126:19,20,22 133:14
  165:7,12 229:8
  271:16
relates
114:4 116:8 118:11
  128:23 132:17 151:2
relating
84:20 105:4 164:15
relations
236:25
relationship
47:10 48:2 54:4 205:9
relationships
46:21,24 47:7
relative
100:17
relevant
12:7,9,16 141:24
  146:7 223:23,25
  227:17
relief

192:20
relocated
9:3
relocation
213:5,17
rely
53:2
remember
17:9 18:7 85:16 94:9
  104:9 106:14,22,25
  114:22 162:17,20
  172:12 195:9,11
  197:24 236:8
remove
235:10
repeat
3:19,23 25:10 150:21
  166:6 205:7
Reporter
1:18,18 18:10 271:7,8
repository
197:18,19,23 198:5,10
represent
3:11 106:9
representation
266:6
representative
82:5 89:22 99:23
  138:8,19 158:21
  162:11 175:14
  180:13 183:23
  184:25 185:4,11,14
  194:25 197:14
represented
34:11 161:23
representing
68:12,14 87:17
represents
186:6
request
28:9,12,13,14 32:19
  44:14 60:15 71:6,9
  71:10 92:11,19,22
  94:8,10,11,13,16
  95:15,16,18,24 96:4
  96:18 97:5 105:3,9

105:17 115:23
  123:11 124:5 164:14
  164:18 166:7,8
  167:15 172:23,25
  174:3 191:4 196:19
  196:23,24 227:18,20
  251:21 253:6 262:16
  262:19 265:21,22
  275:15,17,19,21,23
  275:25 276:2,4,6,8
  276:10,12,14,16,18
  276:20,22
requested
21:8 25:2,11 37:13
  60:12 69:25 70:5
  77:13 79:8 94:4 98:5
  119:10 124:7 150:23
  152:22
requesting
93:13 266:13
requests
92:24 93:10 148:2
  266:7
required
12:21 16:4 75:20
  170:12 257:10
  261:24 264:4 266:15
requirement
27:16 170:9
requirements
80:21 88:8,17 116:2
  258:23 260:24
requiring
12:19
reread
69:24
research
229:4 232:25 240:11
  240:14 243:18 247:3
  247:16
reside
14:11
resolved
154:23
resource
80:7

resources
37:24 38:12 41:2,23
  42:5 236:18
respect
19:5 23:13,17 26:25
  36:7,18 50:11 63:23
  81:16 167:21 262:23
respond
51:18
responding
51:21
response
115:23 117:18 227:6
responses
92:24
responsibilities
26:24 31:25 41:12
  76:16
responsibility
79:16 81:5
responsible
41:16 55:7 72:14
responsive
106:20
rest
122:21
restate
3:23
restroom
109:12
result
147:8
resultant
153:25
results
14:12
resumed
4:17,19
resumes
188:19
resumé
188:11
retain
91:5
retention
67:2 213:5,17

retrieve
172:17
revenue
121:12,15,23 122:15
  124:25
revenues
128:7
review
23:21 31:4,14 32:2,25
  33:2,10 35:15 37:20
  37:22 38:2 42:11
  45:8 46:13 61:5 78:3
  78:14 162:7,11
  163:20 188:11
  203:11 204:14
  225:12,25 251:17,22
  253:20 268:17
reviewed
22:13 28:16 97:12,13
  97:22 98:2,2,4,14
  99:16 102:6 135:23
  135:25 155:17
  204:13 227:11
  249:18
reviews
35:24 47:25 102:2
  203:9 251:11,20
revisions
44:15 262:6
RFP
38:9 51:19 97:7,18
  144:5 147:25 167:3
  170:14 174:4 177:19
RFPs
51:21
rherbst@herbstlaw...
2:6
Richard
54:25
right
10:3 11:21 24:13
  30:25 38:5 40:18
  45:2,8 46:2,22 47:22
  51:3 55:22 56:3 57:4
  57:9,25 58:25 59:4
  59:18 61:21 63:13

64:18 67:14 71:14,17
72:17,23 73:14,15,17
74:4,6,16 75:3,9
86:15,16,17,21,23
87:12 88:2,25 91:6
91:11,16,22 98:11
99:6,10,11 105:7,20
108:3,6,8 117:9,24
118:9 120:23 121:2
122:2,5,15,17 124:13
125:2,18 128:15,22
128:23 129:3,6
131:11,11 132:14,18
134:11,13,14 136:3
138:7,13 139:6,7
147:9 160:2 163:9,10
167:5 168:20 169:19
169:25 172:13 173:5
178:9 180:17,22
185:18 189:10,13,16
192:11 193:24
201:11 202:8 209:11
211:6,17 212:4,14
213:14 214:10
215:23 216:2 218:3
219:13,21 220:4
226:9 227:23 228:5
229:11 233:11,14
236:2,6 238:7,16
240:20 241:7 242:3
242:15,18 246:21
250:4,10 255:6,8,21
255:21 256:2,7 258:7
258:18 259:11
261:10,11,13 264:18
rights
136:11
right-hand
55:12 73:5 81:19
  86:13 142:20 163:7
  170:22 185:7,16
risk
154:13
risks
31:11
road

254:14
Rob
75:8,13 78:4
ROBERT
2:5
role
9:21 39:8,12,14 40:18
  42:9 44:8 45:13 55:3
  74:19 75:19 76:7
  77:18 79:18 90:11
  100:24 138:21
  157:19,22 158:4
  160:9 167:7 168:18
  168:20 169:2,3 170:5
  170:24 171:11,14,18
  172:4,5,8 176:4,11
  176:20 178:9,17,22
  178:23 180:6 188:20
  194:4 198:18 204:2,6
  204:14,21 205:13
  208:2,5,7,14 216:18
  222:17,19 255:2
  259:23 264:19
  266:20 268:6
roles
45:25 99:25 100:14
  158:8 162:4 169:5,6
  169:7,15 171:12
  173:23 174:9 176:15
  177:19,19 178:23
  179:25 193:20,22,22
  264:24 266:23,25
  267:3
roster
171:20,21 172:17,17
  172:23 188:25 191:2
  191:5
rosters
257:8
route
61:11
row
182:19
ruled
30:9 34:5
ruling

13:13 16:15 18:19
35:8 142:6
**run**
107:17
**running**
31:19
**runs**
252:10
**Rutgers**
6:21
**R&D**
246:23

---

**S**

**S**
2:2 272:1
**salaries**
60:18 61:12,13 65:8
90:3,21,25 91:10,14
92:8,11,19 157:20
158:13 159:5 162:23
163:6 168:17,25
174:24 209:22
244:13,15
**salary**
12:25 13:16,17,22
15:25 16:3 61:6,11
61:18 62:4 65:13,13
65:16,16 72:5,8,15
73:14,25 74:5 89:23
89:25 90:15,18 91:21
92:16 101:7,10
105:20 139:5,8
162:12 179:13 183:9
184:2 191:6 195:4
198:21,23 199:5,6,11
199:12,15,22 201:18
206:23 207:2,3 209:5
210:21 211:10,15
212:13 228:15
232:21,23 233:2
234:12,14 244:20,22
267:8,20,24
**sale**
58:18
**sales**

16:19 56:10 66:21
67:10 215:22,23
238:13
**sample**
83:14 90:4 115:9,12
115:19,22,24 116:4,8
116:10 117:5,13,14
117:21,22 118:7,12
119:5 124:11 125:17
129:5 274:3
**save**
102:13
**savings**
108:6,10,13
**saying**
40:17 46:7 87:3,8,10
134:18 171:10
201:15 211:13 224:9
234:2 255:13
**says**
28:10 34:13,17 46:21
53:11,22 54:21 55:12
58:3,4 73:7 74:18
82:12,19 86:23 99:5
99:6 113:5 117:25
118:8 119:15 129:8
168:15 188:21 200:5
206:2 227:21 229:7
229:13 234:23
249:17
**scenario**
154:15 156:15 210:4,7
234:17
**scenarios**
187:22
**schedule**
127:22,25 128:4,8
130:22 133:18,23
134:3 137:2,10
139:21 140:11,15,22
141:4,9 146:3,10,14
147:18 149:10 168:4
168:12 203:6
**schedules**
129:23 130:3,6,9,11
130:14 141:15 168:6

224:21
**Schmitz**
54:25
**Schoeneck**
1:15 2:7
**school**
5:21
**Schorr**
1:17 3:5 271:6,25
**scope**
5:15 12:9 18:2,5 28:7
34:14 52:2,7 82:20
82:22 85:22 110:3,6
112:6 126:17,17
184:6,9 224:25
**score**
198:13
**Scott**
67:25 75:8 230:7,8
238:3
**second**
20:13 44:25 47:18
75:5 81:17 88:22
168:14 175:10
212:12 238:16
**secondary**
87:14 131:11
**Secondly**
133:15
**section**
82:15
**sector**
48:21 75:23 76:2,20
76:24,25
**sectors**
48:19
**sector's**
48:23
**see**
18:4 45:24 47:16
50:17,24 61:6 73:6
73:10 75:6 77:6
81:18 86:16 96:16
112:2 114:9 116:4
118:6 119:17 123:3
128:10 137:19

142:23 152:16
155:12 157:23
169:18 172:16
176:11 182:25 183:4
189:12 191:21
195:17 199:19
228:21,22 234:22
235:14 239:3 244:3
246:9 258:3,11,15
259:7,16 260:18
262:9
**seeing**
61:2 243:9
**seen**
29:11,17 47:24 77:3
84:13 113:6 114:11
114:12,15,15 131:22
133:7 142:21
**segment**
222:4,12 229:22
231:19 236:9 243:7,8
**segmented**
222:11
**selected**
128:19 193:21 259:8
261:6
**selecting**
45:13
**selections**
193:15
**sell**
135:4,5
**selling**
43:11
**send**
262:2
**sending**
261:25
**senior**
10:13,15,22 11:6
68:14 71:14 72:7,9
88:22 138:4 186:18
186:22,25 187:4,15
187:25 192:9 193:16
193:17,24 195:3
205:2,4,10,15,17

256:18,20 257:23
268:10
**seniority**
72:3 100:18 175:2
261:4
**sense**
95:6 159:20 175:14
**sent**
77:9 78:11 123:20
136:21 263:13,15,19
**sentence**
201:15 225:18
**separate**
63:20 144:25 192:6
221:3,7,8,12 268:5,6
**separately**
112:15 113:9 114:24
170:4 223:14 242:21
268:11
**series**
3:17
**service**
80:23 231:15
**services**
49:11,23 50:7 53:12
83:6 116:23 127:19
225:21 247:9,13
263:23 273:16
**set**
14:20 64:15 102:13
131:24 141:3 180:14
271:11,21
**seven**
187:15
**Severance**
218:10
**shared**
23:4,5 222:19
**shed**
95:3
**sheet**
55:20 118:17 122:19
122:21,23 123:4
202:10,11,14
**sheets**
26:21 239:4,13

**Shift**
217:6
**short**
235:23
**shorthand**
1:17 77:25 271:7
**shortly**
93:15
**show**
29:3 61:5 81:2 98:12
100:25 113:2 142:8
142:17 169:14 177:7
181:5,20
**shown**
28:22,25 229:17 259:8
275:8,12
**shows**
95:16 128:18,25 181:4
258:6
**shrink**
182:3
**Sick**
216:12
**side**
48:25 55:12 73:5
81:19 170:22 242:13
**signature**
206:2
**significant**
108:6 134:9
**significantly**
139:22 242:2
**signing**
39:7 213:17
**similar**
183:25
**single**
186:6 230:17
**sir**
74:25
**sit**
82:9 93:20,24 137:15
**site**
105:24 106:4,5,10
108:2,2,3,15,16
109:17 121:20,21,25

122:2 208:4 210:13
214:22 219:11
234:23 235:12,15,15
**sits**
231:22,23,24 232:10
**situation**
124:21 176:2
**situations**
147:21 267:22
**six**
20:7,23 125:14 159:18
187:16 254:13
**sixties**
8:2
**size**
54:7 76:14
**skill**
180:14 267:5
**skills**
260:14 261:6
**sklein@bsk.com**
2:10
**slide**
73:4,4 86:20
**slightly**
248:3
**small**
54:9,12,15 165:18
237:23
**smaller**
76:18 182:8
**SME**
72:9 166:17,20 169:24
170:4 180:2 183:6
189:11 190:8,13
193:16,17,22 194:4,7
194:11,13 208:13,21
209:3 259:25 264:17
267:16
**SMEs**
189:3 193:23
**snapshot**
115:11
**software**
44:6 49:21 112:9,10
126:18 230:25

**solicit**
162:12
**solicitation**
27:17 38:9 42:13 97:5
97:12,18,21,22
**solid**
39:24
**solution**
32:21 49:20 58:20
83:16 86:5 88:6
274:6
**solutioning**
38:15
**solutions**
125:25
**somewhat**
186:18 256:17
**sooner**
93:6
**sophisticated**
235:21
**sorry**
26:8 29:8 37:21 65:25
66:6 92:3 114:14
119:12 206:8 233:15
234:21 247:11
**sort**
64:14 207:24 221:13
**sorts**
108:13
**sources**
162:21 235:7
**SOUTHERN**
1:2
**speak**
137:7 183:19 222:13
223:20 224:13,17
229:23 248:25
**speaking**
60:7 158:17 169:16
192:18 207:3
**specialists**
53:4 176:7
**specialized**
256:17
**specific**

27:17 33:20 34:20
41:19 42:7 43:20
48:19 60:16 61:10
69:2 76:19 79:14
81:18 82:20,21
144:15,17 166:17
172:9 184:10,11,17
187:17 196:15
198:15 224:3 229:15
249:11 253:22
256:19 258:23
260:12 265:2
**specifically**
5:14 43:19 48:7 63:20
85:21 86:10 89:6,13
92:5 94:7 97:23
106:23 107:2 129:16
151:3 152:8 185:23
187:3 190:7 195:10
195:12 217:2 222:13
229:24 232:9 239:22
240:7 244:19 249:7
258:20
**specificity**
68:18,23
**specifics**
197:24
**specified**
174:2
**speculate**
243:2,4
**spell**
26:6 89:15
**spend**
56:9 57:2 58:18
**spent**
232:17 238:21 240:4
**spread**
182:9
**spreadsheet**
181:25
**ss**
271:3
**staff**
210:6 242:7 254:18,21

255:14 263:10
**staffing**
94:19,23 96:8 107:24
255:2
**stage**
59:25 80:14
**stamped**
142:14 169:11 177:13
220:17,21 252:25
272:6,11,16,21 273:3
273:8
**stand**
49:10 55:13 70:15
77:20 116:24 221:17
240:15
**standard**
136:15 191:24 203:2
251:23
**stands**
53:12 119:18 248:13
**start**
110:5 146:5 156:9,11
230:7,9
**started**
5:7 7:24 8:16 100:5
**starting**
147:24 153:20,24
155:23
**state**
1:19 4:11 40:1 50:2
51:12,21 126:15
247:10 271:2,9
**statement**
42:15 131:20 194:12
254:8
**statements**
27:6
**STATES**
1:2
**stay**
9:15
**stayed**
9:21
**step**
31:4 32:2,25,25 33:10
35:15,23 38:23 39:2

40:19 41:3,9 42:9
44:9,20 45:8 46:13
47:25 61:5 78:2,3
144:20 163:20
**steps**
33:5 37:17 39:9 93:25
209:13,15
**stipulation**
247:9,14
**stock**
67:17 214:21,25
**straight**
39:11 168:16 208:6,18
208:20,22 209:4,6,7
**straightforward**
165:18
**strategy**
54:19
**strict**
88:11
**structure**
237:12
**Stuart**
2:10 124:23
**stuff**
59:15 73:18 110:18
165:12
**subcategories**
160:22
**subcontracting**
247:22
**subcontractor**
118:21 245:10,13,18
245:22 247:20
**subcontractors**
245:3,4,15
**subject**
33:25 55:8 72:7
110:23 122:8 160:8
160:11,20,22 161:4,7
161:13,15 162:2
167:6,9 172:7 173:5
173:10,12 176:2,3
178:8 180:15 182:20
182:24 183:24
184:15,19 185:11,17

185:21 186:15,19
190:19 192:9 194:5
195:3 199:24 208:4
208:11 255:19 256:2
256:15,21 257:16,20
257:23
**submission**
25:8 38:17 44:10
81:14 203:11 221:14
225:24 250:12
**submissions**
203:9 264:7
**submit**
29:25 31:17 33:3
38:16 42:10 43:6
143:20 225:12,23
226:12 250:12
**submitted**
39:4 101:25 102:24
141:16 143:19,25
146:16,17 148:14,25
250:9
**submitting**
31:15 43:7,10 144:4
**Subscribed**
269:12 270:19
**subsequent**
262:11,18
**substance**
39:15
**substantive**
22:2
**substantively**
39:16 204:15
**suggested**
104:19
**suggestion**
104:20
**suggests**
130:16
**sum**
60:21 200:22 201:2
**summary**
198:23
**summer**
9:2 21:11

| | | | |
|---|---|---|---|
| **super** | **T** | 118:7,12,17,19 119:5 | 89:19 91:20,25 93:18 |
| 268:19 | **T** | 120:21 124:11 125:9 | 94:3,12,20 95:9,21 |
| **superseding** | 271:1,1 272:1 | 125:11,17 129:5 | 96:24 98:14 134:22 |
| 197:4 | **table** | 146:21 148:19 274:3 | 135:7 177:15,17,25 |
| **supplemental** | 134:6 | **tasking** | 187:14 196:5 212:2 |
| 221:9 | **tabs** | 82:21 | 221:21 |
| **support** | 24:20 25:14,15 28:3 | **tasks** | **telling** |
| 83:7 256:23 257:3 | **take** | 41:19 115:22,24 | 134:19 173:2 |
| 273:18 | 4:14 21:17 29:11 | **tax** | **tells** |
| **supposed** | 30:10 34:6 37:2,21 | 215:13,15 | 120:14 177:22 182:12 |
| 58:3,17 221:6 | 45:12 50:16 57:7 | **TCV** | 191:5 228:4 |
| **sure** | 74:20 86:7,11 88:20 | 55:13 | **temp** |
| 20:23 39:22 40:16 | 93:17 100:8 116:21 | **team** | 6:12,13 7:2,6 |
| 46:10 55:5 59:11,12 | 128:9 133:25 164:8,9 | 14:22 31:10 32:18 | **template** |
| 62:11 63:9 65:3 | 166:25 178:7 182:24 | 55:21,21 56:24 57:14 | 29:22 68:10 70:14 |
| 66:18 67:19 76:7 | 183:14 189:20 | 79:17 88:7 104:2,5 | 71:19 72:12 74:15 |
| 78:20 94:7 106:18 | 199:24 209:13,15 | 104:13,20 162:13 | 143:18 145:23 146:4 |
| 107:13 108:11 111:6 | 210:8 212:6 221:4 | 167:7 173:11 207:24 | 147:12,15,18,20 |
| 116:14,15,19 119:3 | 228:14,18 229:14 | 207:25 | 148:5,6,14,20,24,25 |
| 121:19 124:20 | 235:22 261:15 | **teams** | 149:7 150:7 151:6 |
| 127:15 155:25 | 262:20 | 249:14 | 153:16,20,25 154:25 |
| 171:25 187:21 | **taken** | **technical** | 155:2,7,10,22 |
| 209:16,22 213:19 | 4:15 74:22 142:7 | 73:23 83:4 131:9 | **templates** |
| 214:10 215:18 216:5 | 183:22,23 235:24 | 176:18,20,21,25 | 71:13 143:9 145:22 |
| 218:3,5,17,25 222:15 | 262:22 | 178:2,5,7,8,17,18 | 147:7,17,23,23 |
| 227:16 229:21 | **takes** | 179:2 180:5,6,11,13 | **tend** |
| 230:10,21 233:17 | 59:6 | 181:8 207:22 245:24 | 154:11 191:25 193:20 |
| 236:13 237:10,15,20 | **talk** | 258:2,4,12 273:14 | 256:17 |
| 238:8 240:9 244:11 | 57:3,25 133:3 191:22 | **technically** | **tends** |
| 248:12 259:3 266:3 | 220:8 238:7 | 9:5 | 242:10 251:13 |
| 266:13 | **talked** | **technologies** | **tense** |
| **suspect** | 20:3 21:23 90:22 | 125:25 | 39:18 |
| 61:2 | 97:23 231:9 | **technology** | **term** |
| **swim** | **talking** | 49:20 109:15 | 43:20 55:13 |
| 58:12 | 9:17 30:14 32:8 35:14 | **telecon** | **terminated** |
| **sworn** | 59:24 60:13 69:2,3 | 21:15 | 12:16 |
| 3:4 4:20 269:12 | 112:23 161:25 | **telecons** | **terms** |
| 270:19 271:12 | 173:24 189:2 198:22 | 21:22 | 6:6 42:25 56:23 70:6 |
| **system** | 199:2 236:4 | **telephone** | 88:18 89:2 109:15 |
| 158:6 161:10,11,14 | **talks** | 20:8,10,14,15,20,21 | 118:25 127:9 164:19 |
| 166:21,24 167:2 | 225:14 | 95:10 164:6 | 187:23 198:13 |
| 169:4,7 191:23 | **task** | **telephony** | 212:11 219:15 |
| 201:11,14 204:6,9 | 83:14 112:3,5,8,9,16 | 231:6 | **test** |
| 213:12 | 113:10 114:25 115:6 | **tell** | 150:6 |
| **systems** | 115:9,12,19 116:4,8 | 18:24 29:20 50:11 | **testified** |
| 231:6 | 117:6,13,14,21,22 | 53:19 57:11 63:25 | 3:6 4:21 7:5 16:9,16 |

27:25 31:24 68:2
69:14 71:12 85:12
129:20 130:13
131:15,21,25 136:23
139:19 141:21 148:9
215:25 264:13
**testify**
18:21 129:22
**testifying**
13:4 16:8 65:18 90:12
**testimony**
19:4,5 20:4 28:19
47:21 78:15 97:11
123:15 126:12
130:20 167:18
194:21 212:21
227:12 262:13 266:2
271:13
**Thank**
147:4 182:23 218:2
269:4
**thing**
43:3 100:8 109:8
122:4 182:13 194:7
221:5 231:7
**things**
17:18 44:7 62:5 66:25
78:8 108:22 109:14
127:5,8 158:20
178:24 194:8 215:9
215:11,14 219:19,25
231:2,14 237:11
238:24 244:19
248:23,24 256:19
260:5
**think**
3:15 5:7 7:5,24 10:5
13:2,5 16:11 21:23
51:25 52:5 53:7
64:13 67:13,15 68:4
69:4,6 71:11 82:8
91:7 93:12 105:14
106:22 112:21,24
113:14,20,21,24
116:18 122:20
126:21 130:17

134:24 136:20 137:3
139:20 140:8 142:8
150:5 153:23 160:7
165:17 166:13 173:3
192:15 194:11,19
206:6,17 213:16
236:12 238:11 252:8
254:7 258:16 267:11
**thinking**
243:12
**third**
1:15 20:19 77:16
249:2,2,5
**thought**
21:12 65:17 66:7
138:19 161:2 219:14
263:22 264:12
**thousands**
198:7,10
**three**
9:22 12:14 19:24
24:12 46:25 103:16
143:14 145:17,19
147:6,12 157:18
167:11 221:6,8,11,16
221:17,18 249:8
250:8,8,11 256:2
**tied**
11:18 16:18,20
**till**
11:15
**time**
3:18,21 5:20 6:17,18
9:24 10:6 15:23 16:6
21:4 26:13 29:23
40:5 43:21,22,23,25
46:5,6 48:18,19
62:19,24 63:16,21
65:6 67:2 68:16 76:8
78:21 80:22 88:12
91:2 92:25 93:5,6
96:16 98:4,21,24
99:2,5,9,13 106:8
107:5,9 111:10,17
118:24 121:6,12
125:18 135:10,19

142:8 147:19 148:5,9
148:11,14,20,23
149:2,2,15 150:8
154:25 155:3,11,22
155:24 156:4,5,14,23
159:8,10 161:23
164:19 171:20,24
172:18 178:19
183:21 185:24
196:10,14 197:2
198:2 202:4,7,10,11
202:14 203:4 216:2
226:8,22,23 235:9,25
238:19 239:4,13,16
239:18,21 240:4
241:2 269:5,6
**times**
38:23 42:3 121:17
199:4
**tiny**
181:12 231:22
**title**
10:8,11,12,24 11:8,9
11:13,14,14 71:19
85:11 107:15,16
117:5 204:18,25
205:4,10,15 248:25
265:24
**titled**
83:3,13 273:13 274:3
**titles**
71:13 84:25
**titling**
248:9
**today**
3:17 13:4 21:4 39:14
78:24 152:2 236:2
268:22
**told**
126:21 137:13 167:7
**tolerate**
24:23
**tomorrow**
190:12
**tools**
66:17

**top**
50:18 58:14 104:16
171:15 206:10
225:19 231:23
234:22 241:3 250:5
**topic**
37:9
**topics**
33:17 34:16
**total**
23:12 55:14,18 58:9
60:21 118:2,8 119:14
124:25 125:7 168:17
168:24 200:15 201:5
222:22 223:2 244:12
244:14 246:10,18
**Towson**
9:14
**TO/staff**
119:16
**Tracey**
107:5 165:4,4,15,20
**track**
182:6
**tracked**
188:18
**tracking**
188:21
**trained**
195:19
**training**
195:22 196:4 218:18
**transcript**
36:6,22
**transcripts**
36:21
**transformation**
49:21 85:8,13,25
112:7 117:19,23
126:18
**Transformative**
83:9 273:21
**transpired**
40:4
**travel**
44:6 56:12 238:23

**Treasury**
  17:12 18:13
**treat**
  109:16
**treated**
  223:14
**trend**
  7:18
**trouble**
  189:18
**true**
  33:4 66:3 92:13 120:7
    120:9,19 122:4 125:6
    135:10,19 138:14
    248:15 271:13
**try**
  3:23 64:2 84:8
    170:20
**trying**
  46:17 69:9 106:20
    130:23 132:22 146:9
    147:5,11 150:13
    154:23 156:2 224:18
**turn**
  27:19 207:11 248:17
**turned**
  207:12
**twice**
  21:24
**two**
  7:11 9:22 12:13 13:13
    17:9 22:4 24:20
    26:13,18 50:8 57:15
    57:18 74:20 79:2
    89:14 91:14,23
    107:18 133:10 138:5
    138:23 192:6 221:12
    227:2 244:24 261:22
**tying**
  23:23
**type**
  49:24 50:6 98:18 99:6
    100:15 104:4 111:22
    126:17 127:2 135:19
    136:19 143:18
    147:14 153:14 154:9

154:10 158:4 217:3
225:2,4 226:22
238:14 251:11,15
**types**
  67:4 109:13 127:13
    146:8 147:22 153:5,6
    158:22 183:21 195:2
    209:23 210:5 213:3,8
    256:14 260:2 261:5
**typical**
  46:4,7,12 51:11 54:14
    139:16 151:8 152:25
    153:3 154:3 207:4
    254:24
**typically**
  38:8 43:20 51:10 55:6
    56:15,16 71:23 76:22
    77:11 81:12 95:12,22
    102:13 106:17
    108:18,21 109:10
    111:22 124:15
    149:23 192:4 203:19
    245:8 256:16 258:22
    259:2
**T&M**
  226:18,23

─────────────
**U**
**ultimate**
  82:22
**ultimately**
  7:7 106:21 134:8
    222:21
**umbrella**
  55:9
**unallowable**
  233:4,6,8
**underneath**
  200:4
**understand**
  13:20 35:20 39:19
    40:3 52:11 62:12
    65:3 85:23 90:13
    95:3 98:13 108:11
    124:3 126:11 135:21
    138:3 146:10 147:6

147:11 148:17 149:8
154:24 155:5,13
156:2 158:22 167:18
172:11,13 182:11
190:4 199:20 213:11
224:18 253:19,22
265:25
**understanding**
  31:9 51:18 52:23
    64:11 72:12 78:6
    82:3 98:25 116:2
    123:13 182:5 189:19
    245:14 254:4 256:13
    261:5 263:25
**understood**
  3:22 4:3 40:16
**unit**
  14:11 45:20,25 49:9
    49:14 51:2 52:20
    54:22 55:2 76:23
    125:23 126:2 164:20
    164:21
**UNITED**
  1:2
**units**
  50:9 57:23
**unpack**
  30:12 34:9 37:3 61:8
**unquote**
  30:11 34:7
**unrelated**
  17:25 152:11
**unsure**
  164:25
**unusual**
  207:17
**unwarrantedly**
  35:7
**upset**
  137:4
**Urban**
  83:8 273:19
**use**
  42:5 60:16,25 64:18
    64:20 65:4,14 68:6
    71:21 74:9 90:6

102:3,5,15 109:6
136:16 139:4,8
140:21,24 141:8
142:3 143:10 147:7
148:19 155:23 156:3
158:13 162:3 178:11
180:7 182:9 192:3
195:6,10,12 224:5,8
224:24 225:5 226:22
227:23 240:13 247:5
247:6,19 249:8,11,19
249:24 253:15,18
256:10,19
**uses**
  69:17 141:23 224:20
    224:20
**usually**
  51:14 59:14 104:2
    240:3 256:15
**utilization**
  229:14
**utilized**
  229:10
**u-y**
  26:9
**U.S**
  17:11

─────────────
**V**
**v**
  270:1
**vacation**
  62:5,7 64:23 216:8
    230:15
**value**
  55:14 118:2,8 119:14
    125:7,7 260:7
**variable**
  13:25 27:15
**varies**
  42:16 164:4
**variety**
  143:9,13 145:18
    162:14
**various**
  213:13

KELLY L. BRYSON - 8/28/2014

**vary**
54:6 88:8 90:4 110:13
**varying**
76:16
**version**
124:3 197:4
**versus**
51:19 54:17 65:16
154:4 189:23 190:20
217:4
**vetting**
37:24 38:2 80:6
**vice**
55:7 68:13 71:13
75:15 76:8,10 96:13
**view**
33:14 35:6,8 246:25
248:4
**Virginia**
8:22 9:2 203:17
**virtue**
226:21
**volume**
148:3
**Voucher**
83:15 86:6 117:2,6
274:4
**VP**
76:17,20,21,24,25
**VPs**
75:23 76:2,16

———————————
**W**
**wait**
19:15 131:17
**want**
4:7 5:9 15:4 31:21
39:25 40:15 52:9,11
59:22 61:4 62:11
75:2,4 113:18 135:5
138:24 152:14
157:16 173:4,10
206:20 218:2 221:5
242:25 243:10 258:6
266:9,12
**wanted**

65:19 168:3,9 173:14
**wants**
137:19
**Washington**
2:8
**wasn't**
11:4 138:16 197:3,4
203:5,6
**waste**
5:19 93:4
**way**
52:25 92:13 93:18
107:25 122:19
150:13 157:5 178:5
181:3,10,16 191:20
211:8 232:20 246:14
248:15,23 271:18
**ways**
133:11
**week**
22:10 32:23
**weeks**
79:2
**weigh**
163:23 164:21
**weighs**
163:14
**weight**
183:8
**weighted**
179:25 208:12,14
209:8
**welcome**
163:23
**went**
8:12 10:15 11:6 160:7
230:2 261:12 263:22
264:2,2,8
**weren't**
48:19 49:2 158:16
**we'll**
4:11 92:23 93:14
124:7 191:2 227:18
**we're**
4:12 10:10 30:13
36:20 37:9 39:23

42:24 43:7,10,11
44:13 51:17 62:17
77:15 90:11 101:2
110:22 112:18,19
114:5 118:21 129:14
133:19 135:23
137:23,24 140:20
141:20 149:25 155:3
158:17 159:9 172:10
172:22 192:19
209:24 228:13
249:17 268:21,22
**we've**
21:23 37:23 38:14
64:14 82:19 102:10
112:22 146:16,17
229:19 233:7
**WHEREOF**
271:20
**whichever**
264:7
**whispered**
17:14
**whispering**
17:18
**wide**
256:24
**widely**
90:4
**win**
118:20 146:15 158:20
**winning**
16:20,23,24
**wish**
270:2
**wishes**
37:2
**withdrawn**
16:17 63:24 173:8
229:20
**witness**
3:3 5:9 13:4 16:8
17:15 18:16 28:23
29:2 31:20 32:10
35:16 36:15 60:3
69:9,24 105:11

112:25 130:2,13
132:6 141:25 150:25
151:11 220:11 270:2
271:10,14,20 275:9
275:13
**won**
80:2,16 81:24
**word**
77:24 163:12
**words**
58:16 185:9 244:22
245:9 267:13
**work**
5:23 6:6,8,25 8:4,12
9:4 32:20 48:10,23
49:2,4,24 51:12,16
52:16 54:20,20 58:6
62:24 63:3,8 73:22
80:3 81:24 82:6,20
87:5 88:2 100:15
104:4,5 126:17,18
127:2,16 135:19
136:19 138:7 154:11
158:5,20 191:24
192:2 202:16 217:3,4
217:5,15 223:21
224:3,4,5,25 225:2,4
226:5,9,15,18,19,23
238:14 242:6,8,10
245:21 246:2 247:18
251:11,15
**workbook**
22:24 24:21 25:4,4,5,6
25:13
**worked**
6:13 7:10,11,12 48:7
49:18 95:7 195:25
201:17
**working**
45:21 73:21 153:22
189:22 190:19
249:17
**works**
32:5,16,18 135:9
245:19
**worksheet**

70:8 104:15 177:18
179:7
**worksheets**
22:21 24:14,15
**workstations**
109:7,8
**world**
210:4,7
**worth**
118:25
**wouldn't**
42:23 63:12 64:5 68:9
73:16 127:3 140:6,22
146:7,20 149:5
155:20 158:12
159:19 175:17
217:11,17 219:17
224:5 226:11 240:6
245:9 250:13 254:14
254:19
**writer**
73:23 176:18,20,21,25
178:2,5,8,17 179:2
180:5,6,12,13 181:9
245:24 258:3,4,12
**writers**
178:18
**written**
53:21 72:12 196:4
253:21 256:13,22
267:4
**wrong**
105:16 141:14 243:11
**wrote**
245:24

———————————
**X**
x
1:3,8 43:11 272:1

———————————
**Y**
Y
43:12
**Yashchin's**
4:14
**Yeah**

72:20
**year**
6:4 7:8,12 8:5 11:16
13:25,25 14:24 18:22
25:8 60:19 62:17
78:5 88:12 101:25
102:11,14 128:7
141:16 179:5,10,11
179:14,15 191:24
199:4,8 200:19 223:4
223:6 225:12,23
267:14
**years**
7:11 9:22 12:13,15
55:19 62:22 128:20
138:23 175:6 187:17
188:12,22,23
**year's**
65:21
**yesterday**
22:7 142:10
**York**
1:2,16,16,20 2:4 271:2
271:4,9

———————————
**$**
**$101,000**
258:13
**$110.14**
192:13
**$120**
137:14
**$120,000**
90:6
**$125**
63:23 64:2 72:10
**$146,000**
122:15
**$146,333**
209:5
**$150,000**
257:4
**$17**
222:14
**$180**
133:24

**$2**
118:8,23 119:4
**$3,000**
15:4
**$60,000**
175:5
**$66.52**
208:22 209:5
**$70**
133:25
**$8.6**
55:16
**$8.7**
55:16
**$80,000**
90:5 257:2
**$85,000**
175:7

———————————
**0**
**09**
10:16,17

———————————
**1**
**1**
130:18 132:7 142:12
142:13,18 168:15
190:23 191:17
196:12,17 200:23
201:2,9 225:14,17
259:5 262:23 263:16
263:18 272:4
**1st**
143:22 263:21
**1.46**
118:5
**1.466**
124:25
**10**
10:16 136:3,16 154:17
174:13 179:24 180:3
200:14,25 201:2
219:12 258:17,19
260:18,21,23 264:17
267:17 272:9 275:17
**100**

11:21
**10170**
2:4
**105**
11:24 276:2
**11**
1:5 29:9 142:19
169:23 174:13 189:3
189:11 258:12
264:17 276:4
**11/12/13**
29:5
**11/17**
77:7
**11:15**
1:10
**11:17**
75:7
**11:18**
4:15
**110.14**
192:22
**111**
2:8
**112**
274:24
**12**
9:13 29:9 174:13
179:16 187:5,6,20
188:2 190:23 194:19
202:5 209:3 264:18
272:19 274:1,14
**12:15**
4:17
**120**
201:21
**12210-2280**
2:9
**123**
276:4
**124**
276:6
**125**
59:7
**127**
244:23

———————————
Merrill Corporation - New York
1-800-325-3376                    www.merrillcorp.com/law

**129**
275:1
**13**
174:14 187:5,8,20
   256:10 272:4 274:16
   275:1
**136276.56**
121:13
**14**
174:14 181:2 183:6
   186:8,22 187:12
   188:6 190:22 208:14
   208:21 256:10,10
   257:8,24 274:20
   275:15
**140.11**
90:14 93:17
**141**
275:3
**142**
272:4
**149**
275:5
**15**
174:14 181:2 183:6
   186:8,22 188:6
   189:15,23 190:20,22
   208:14 223:12
   234:24 235:4,8,17
   256:10 257:8,24
   274:18
**15.12**
210:10
**1512**
121:10,17
**154**
246:20
**155.79**
206:13 207:5 209:15
**16**
161:21 169:21 181:2
   183:6,8 186:8,23
   187:23 188:6,21
   189:13,13,22 190:9
   190:13,18,23 193:7,8
   208:14 256:11 257:9

257:24 272:14
**164**
276:8
**166**
276:10
**169**
272:9
**17**
28:21 29:5,11 30:14
   33:19 34:19 35:4
   36:8,12 37:11 44:25
   50:12 257:8 274:24
   275:7 276:2
**172**
276:12
**177**
272:19
**18**
12:11,12 28:24 29:7
   30:13 33:19 34:9,19
   35:4,13 37:4 75:3
   81:17 89:5 99:5
   114:5,7,9,13,15,19
   115:4,9 131:25
   132:17 134:10
   158:12 163:8,16
   172:19 185:5 205:20
   207:5 209:14 210:9
   212:13 229:20
   234:20 239:9 249:10
   253:11 254:3 274:20
   275:11,21,25 276:8
**19**
275:3 276:20
**191**
276:14
**193.66**
201:6 206:14 207:7
   208:4,11
**196**
276:16
**1980**
5:5
_____
            **2**
**2**

29:14 45:2 125:7
   130:20 167:10 169:9
   169:10,14 174:10
   176:13,14 178:6
   200:23 201:2,8
   208:25 264:12 272:9
   273:11 274:14
**2,080**
191:24
**20**
23:11 58:4,18,25 59:3
   157:22 187:7,10,20
   187:20 193:6,9 273:1
   274:18 276:18
**2002**
6:5
**2006**
7:13
**2008**
13:22
**2009**
13:15,23 14:24 26:25
   39:13,20 70:18
**2009/2010**
10:9 16:6 52:12 62:22
   68:20
**2010**
10:18 13:15 15:9,17
   15:23 26:25 39:13,21
   70:18 75:7 77:8 91:2
   111:10 143:22 145:5
   145:13 157:22
   164:19 197:2 252:12
   252:14,16
**2011**
9:2 10:5 11:12,19
   15:17 16:10
**2012**
11:23 15:18 16:10
**2013**
11:10,13,15,25 12:13
**2014**
1:9 30:8 269:13 270:1
   270:20 271:22
**2015406**
177:14 272:22

**2015407**
169:12 272:11
**2015410**
169:13 272:12
**2015411**
142:15 272:6
**2015421**
142:16 272:7
**2015422**
253:2 273:8
**2015428**
253:3 273:9
**2015429**
220:22 273:3
**2015430**
220:23 273:4
**2015431**
220:18 272:16
**2015433**
220:19 272:17
**2080**
201:19
**21**
275:7
**21st**
75:7 77:8
**21286**
9:14
**22**
275:19 276:22
**220**
272:14 273:1
**2200**
60:19 61:20 191:22
   192:3 199:5,10
   201:10,19
**227**
276:18
**235.54**
210:11
**24**
273:6 275:5,11 276:16
**25**
145:15 276:12
**252**
273:6

KELLY L. BRYSON - 8/28/2014

**26th**
5:5 30:8
**262**
276:20
**265**
276:22
**28**
1:9 270:1 275:7,11,15

---
**3**
**3**
33:15 34:16 144:20
  201:3 210:9 220:15
  220:16,25 221:4
  222:2 228:21 234:22
  249:24 272:14
**30**
20:12,17,22 21:2 22:4
  25:22 136:7,14
  145:11 147:8 183:2,3
  183:5,5,9 189:19,19
  192:24 193:10,12
  195:16 208:16,16
**30(b)(6)**
5:12 18:5 28:7 30:11
  34:8 37:2 129:19
  152:13
**32.77**
179:18
**33**
62:20 64:21 65:4
  193:3,4,13 255:4
  274:22
**33.34**
200:9,21 246:17
**34**
194:23 195:6,10,12,14
**35**
145:15
**37117523**
230:12
**39**
128:9

---
**4**
**4**

33:15 34:16 73:7
  83:14 116:5 117:22
  177:11,12,17 190:23
  192:10 203:16 209:2
  225:14,17 261:10
  272:19 274:3 275:23
  276:14
**40**
25:22 145:11 147:8
  183:3,5,9 189:20
  207:13 208:16
**41**
245:3
**420**
2:4
**45**
119:11,15 120:8
**46.05**
178:12

---
**5**
**5**
33:16 34:4,16,17
  36:18 37:9 52:2,4
  187:7 220:15,20,24
  221:4 225:9 227:2
  249:16 273:1 276:6
**5:57**
269:6
**51**
242:3 246:20
**57**
36:5
**58.65**
210:18

---
**6**
**6**
161:8 169:21 174:13
  187:10,20 252:23,24
  253:4 259:18 264:17
  273:6 274:22
**6/12/13**
29:8
**60**
58:20,23,24

**600**
1:15
**66**
36:23

---
**7**
**7**
82:25 83:2 84:10
  111:19 114:16,18
  115:7 117:23 128:10
  131:4,7 132:8 161:8
  161:21 174:13 255:5
  264:17 273:11
**70,000**
257:22 267:14
**71**
275:17
**72**
223:7 228:22 233:18
  246:11
**72.90**
199:25 208:12
**72507**
234:3
**7290**
180:21,24
**75,000**
13:16,17,22
**75-ish**
10:21
**756**
122:11
**77.62**
139:10

---
**8**
**8**
83:11,12 84:16 86:8
  86:12 100:20 114:16
  114:18 115:7 116:4
  129:19 161:8 174:13
  179:23 180:2 258:17
  258:19 260:18,20,22
  264:17 267:17 274:1
  276:10
**80**

58:23
**81**
228:2,8,18 233:11,16
  233:17,21,22 234:2,9
  234:19
**81.11**
200:5,18 228:14
  234:18
**81.287**
244:22
**83**
273:11 274:1
**8611**
1:5
**87.05**
177:5
**89**
86:11 233:19
**89397**
234:3

---
**9**
**9**
179:24 180:2 258:17
  258:19 260:18,20,22
  264:17 267:16
  274:16
**90**
11:21 52:16
**90.13**
133:20
**92**
275:19
**95**
275:21
**96**
275:23,25
**97**
189:11
**98**
11:21

---