UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————

BENJAMIN ASHMORE,

                          Plaintiff,               11-CIV-8611 (AT)

        v.

CGI GROUP INC. and CGI FEDERAL INC.,        **DECLARATION OF**
                                            **BENJAMIN ASHMORE**

                          Defendants.
———————————————————————

        BENJAMIN ASHMORE hereby declares under penalty of perjury pursuant to 28 U.S.C.

§1746:

        1.      I am the plaintiff in the above entitled action and I respectfully submit this Declaration

in opposition to Defendants' ("CGI") motion for summary judgment.

        2.      CGI wrongfully terminated me because I objected to their fraudulent plans to evade the

U.S. Department of Housing and Urban Development's ("HUD") restrictions in its nationwide

re-compete of the Section 8 Performance-based Contract Administration ("PBCA") program.

        3.      As more fully set forth below, CGI justified my hasty termination by false and

pretextual poor-performance allegations about me.

        **1.  HUD & CGI Background Information Concerning the PBCA Program**

        4.      When HUD first announced that it was creating the PBCA program in 1999, Marybeth

Carragher was a senior consultant with Orion Consulting, with relationships with several state

and local public housing authorities / agencies ("PHA") to which Ms. Carragher had provided

consulting services.

        5.      Ms. Carragher told me that, as a result of HUD's PBCA solicitation restrictions, which

required HUD to make its Annual Contributions Contract ("ACC") awards only to PHAs, she

1

devised a plan where Orion's clients could bid for these ACCs and in turn outsource nearly all duties to Orion Consulting.  In exchange, and as a private company with scale economics and lower cost structures, Orion agreed to share the profits of the ACCs with their PHA partners making this a very lucrative endeavor for PHAs.

### 2.  My HUD Background & Hiring by CGI

6.      In 2004, I was appointed to a posted senior HUD role located within the New York Region II HUD office.  After my interview, background check, and selection, but before I could formally begin my duties, a hiring freeze was imposed on all incoming hires as a consequence of funding issues affecting HUD and the Office of Personnel Management's hiring processes. Accordingly, HUD asked me to begin working as an unconfirmed appointee with the title of "Senior Program Manager" and the "job duty" to "Manage the Multi-family Asset Management Region II (New York/New Jersey) Hub Portfolio" where my payroll would be processed by Penda Aiken, Inc.

7.      Attached hereto as Exhibit 1 is the September 13, 2004 letter from Penda Aiken, Inc. reflecting my position title, duties and HUD start date.  Because of ongoing funding issues, I remained in this appointed role during my tenure at HUD from September of 2004 until I was hired by CGI in 2009.

8.      At HUD, my duties included managing the PBCA program and HUD's performance-based contract administrators[1] in New York, the New York State Housing Trust Fund Corporation ("HTFC").  Beginning in December 2005 and continuing through to the present day,

---

[1]    Initially, HUD had two PBCAs in New York.  New York Housing Finance Agency had some PBCA units, and administered these units without a subcontractor, until these units were transferred to HTFC.

HTFC has subcontracted nearly all its PBCA duties to CGI.  Prior to December 2005, HTFC subcontracted some of its PBCA duties to Quadel Corporation.

9.    Omitted.

10.    Attached hereto as Exhibit 2 are copies of (1) my filed HUD September 2004 "Supervisory Project Manager ["SPM"] Monthly Report – Contract Administration Performance Assessment" (*reflecting that my responsibility to manage HUD's New York PBCAs commenced immediately upon my hire*), (2) an October 20, 2005 Memo to HUD's New York Chiefs of Project Management and Contract Administration Oversight Monitor ("CAOM") concerning the PBCA Annual Compliance Review (*I was responsible for managing HUD's Annual Compliance Review of its PBCAs*), and (3) my December 2005 SPM report (*reflecting that my duties continued after the HTFC "transition phase" from Quadel Corp to CGI (see ¶ 8 above) "concluded"*).

11.    Attached as Exhibit 16 to the March 12, 2015 Declaration of Robert L. Herbst ("*Herbst Decl.*") are December 5-9, 2005 emails between myself, CGI Vice President Marybeth Carragher and other HUD, CGI, and HTFC staff, together with the December 5, 2005 "New York PBCA Communication Matrix" that CGI produced in discovery.  These documents reflect (1) the transition from Quadel to CGI and (2) that I was the HUD official responsible for supervising HUD's programmatic staff in connection with the PBCA and, under the supervision of my superiors, addressing all PBCA "Statewide Policy/Procedure Issues."  My involvement with the New York PBCA program resulted in a close working relationship with Ms. Carragher and CGI Director Leslie Pierce, who supervised CGI's New York PBCA staff.

12.    Omitted.

13.   While at HUD, I received a number of job offers from private sector companies, including CGI.  CGI first solicited me in late 2005 after their transition into the New York PBCA, replacing Quadel.  At that time, Ms. Carragher asked me if I was interested in joining CGI, but the position discussed was below my salary requirements.  Ms. Carragher asked me to submit my resume, which she told me she would use to see if she could obtain higher salary approval.  I did so.  *Ex. 17 (D. Bates 1632) to the Herbst Declaration* is my December 4, 2005 cover letter to Ms. Carragher, that CGI produced, concerning this government relations position and reflecting that the posted salary was below my requirements.

14.   Attached hereto as Exhibit 3 is the resume I submitted to Ms. Carragher, with the above noted December 4, 2005 cover letter, accurately reflecting my role at HUD (*see Resume, pg 2*).  Given my close working relationship with Ms. Carragher, if I had misrepresented my HUD role, Ms. Carragher would have clearly known about it.

15.   Two years later, in late 2007 and early 2008, CGI learned that I had been offered a position with another private sector company.  I had informed my HUD colleagues that I was weighing the offer, which was no secret.  Ms. Carragher again asked me if I was interested in joining CGI.  I had lunch with Ms. Carragher and Mr. Pierce to discuss a possible role with CGI; however, at that time, CGI did not have a specific position to fill, and CGI's travel requirements presented domestic issues for me.

16.   *Ex. 17* to the *Herbst Declaration* includes emails CGI has produced reflecting this 2007-2008 recruitment.  On January 2, 2008, Mr. Pierce emailed Ms. Carragher to inform her that I was considering leaving HUD.  *Id. (D. Bates 10920).*  He approached me about working for CGI upon learning that I was weighing another offer and asked me again to send CGI a resume.  On January 16, 2008, I did, and noted that I would meet with him and Ms. Carragher

the next time they were "in town." *Id. (D. Bates 10182).* Ms. Carragher and Mr. Pierce took me

to lunch on January 23, 2008 where we discussed what CGI had to offer me. *Id. (D. Bates

10180).* On January 31, 2008, Ms. Carragher sent me an email stating:

> I wanted to be able to get to you today, as I know you have a pending offer that you need to respond to.
>
> I spoke to Panos about your travel restrictions and he was concerned that 2 nights per week would be too restrictive for him. Also, CGI did not allow us to submit the Newark proposal that was due today because the opportunity did not pass certain risk assessments. That puts us in an awkward position because I thought we'd have a local opportunity for you that would not require travel.
>
> I am sorry this did not work out, but would hope that we may be able to figure something out in the future.

*Id. (D. Bates 10184)*

17.     Ultimately, I did not accept the other offer and remained at HUD. On February 6,

2009, when my ability to travel had changed for the better, I emailed Ms. Carragher and

indicated as much:

> I'm not sure how things stand in this market at CGI, but when we had last spoke, you asked me to let you know when/if my schedule was such that it permitted the travelling requirements you had identified.
>
> I have an ability to travel now if CGI is still interested in my skillset…

*Herbst Decl. Ex. 17 (February 26 email).* Ms. Carragher responded approximately an hour later:

> Great hearing from you. I'd love to set up a time to talk next week about your thoughts and what you're up to.

*Id.*

18.     On February 25, 2009, Ms. Carragher and I again met concerning possible CGI

employment, where we discussed a possible role with CGI and compensation. In this discussion,

Ms. Carragher told me that she wanted me to join her team primarily to help grow CGI's PBCA

portfolio and implement the new PBCA jurisdictions that CGI expected to win in HUD's coming

re-compete. Ms. Carragher also said she wanted me to help CGI win new information

technology contracts for HUD, and to assist in their public housing authority consulting practice.

19.     In this meeting, Ms. Carragher offered several different compensation structures that I could choose, including (1) a high base salary matched to a small incentive potential or (2) a lower base salary matched to a higher incentive potential that, if I met my performance objectives, would equal my base salary and possibly much more.  I told Ms. Carragher that I preferred the latter structure but that I would think about this overnight and would let her know.

20.     The following day, February 26, I sent Ms. Carragher an email indicating that (1) I preferred the lower base salary option "with a significant performance-based/incentive component" and (2) the lowest this base salary could be was $126,000.  Ms. Carragher never responded to my email nor did she ever suggest that I had misunderstood our February 25 conversation, or the compensation structure we had discussed.

21.     Thereafter, Ms. Carragher asked CGI to create a position for me and designated this as a "priority code critical."  When I accepted CGI's offer on April 21, 2009 with a base salary of $126,000, I understood, based on Ms. Carragher's February 25 representations to me (*see ¶ 20 above.*), that if I met my performance objectives I would earn a bonus at least equal to my base salary.

22.     I emailed Ms. Carragher on April 21, 2009 to accept CGI's offer.  Reflecting Ms. Carragher's efforts over several years to recruit me, she immediately emailed back, "I am excited to bring you on board. Only took how long?"  I also understood that I was being given the title of Manager, Consulting & Government Services Delivery in this role.  My CGI outgoing email signature reflected this title, and at no point during my tenure at CGI did anyone, including Carragher or Kyprianou, reply to any emails I sent them containing this email signature, telling me that my title was incorrect.

23.     From my hire and through the annual performance review that Ms. Carragher gave me on April 15, 2010, I was given no reason to believe that (1) Ms. Carragher had been untruthful with me about the compensation structure we had discussed or (2) that I had misunderstood, in any way, what CGI had agreed to pay me and what I was earning in addition to my base salary. In fact, in February 2010 and May 2010, I received documents containing CGI's internal hourly budgeting[2] for me which confirmed that CGI was planning to pay me in accordance with what Ms. Carragher had promised me at my hire.  My belief was further buttressed by the annual performance review Carragher gave me on April 15, 2010 where she rated me as "meets expectations" in all categories and needing development in none.  *See ¶¶ 28 below.*

### 3.   My Role at CGI

24.     When I joined CGI, Ms. Carragher told me that I would spend approximately 50% of my time billable to her Cleveland division in the CGI Federal's Business Process Services ("BPS") division, and 50% of my time billable to CGI Federal's Information Systems Information Technology ("ISIT") division in Fairfax ("FFX") working on information technology projects directly obtained from the federal government.  While this allotment generally held during my employment, there were periods of time when issues arose on certain projects, when I might work almost exclusively for one division for extended periods.

25.     In each division, a portion of my job responsibilities involved managing CGI's proposal submission process for new business.  Thus, I was responsible for serving as the "capture manager" for opportunities that CGI hoped to bid upon and win.  The process CGI adhered to was as follows:

---

[2]   See *Herbst Decl. Ex. 66*.  *P. Ex. 17* includes the internal direct labor rate CGI used for me, of $125/hour, and *P. Ex. 18* includes the fully burdened $193.77/hour rate CGI certified to the United States Government Agency for me (in the proposal described in § 10 below).  The hourly rate of just my base salary is $57.27/hour.

a.  Initially, I would track potential opportunities prior to release of any Request for Proposal ("RFP"), to assist CGI in deciding whether to devote resources towards pursuing a potential opportunity.  Depending on the size of the opportunity, this stage sometimes required the formal approval of CGI executives during an Executive Step Review.  In some instances, RFPs would be forwarded to me for evaluation by other CGI staff, given that all staff were constantly on the look-out for new opportunities.

b.  CGI's pursuit of a potential opportunity prior to release of an RFP included many potential activities, including but not limited to meeting with possible partners, meeting with government decision-makers, lobbying stakeholders, and preliminary preparation of a possible solution to the soliciting agency's needs.

c.  Once an RFP was released, and a preliminary bid / no-bid decision was made by CGI executives, I became responsible for preparing the necessary components of a bid, including but not limited to building the components of a proposal related to staff, costs, past-performance references, and partnerships.  Often I did not personally create this information, obtaining it from other CGI employees.  The type of opportunities CGI directed me to pursue were often ones for which CGI lacked experience.

d.  Many RFPs had either goals or actual requirements specifying that a certain percentage of the work be subcontracted to companies with various "set-aside" preferences (such as small-businesses or minority, women, or veteran-owned companies).  In such cases, I would find partners willing to bid with CGI.

e.  Because many RFPs called for knowledge, skills or expertise in staff with whom I did not regularly interact or even know existed, in different business units, I very often was directed to senior leaders within CGI to seek their recommendations and approval for

staff, and once a team was assembled, CGI accounting and finance staff would build cost-models for use in preparing a bid based on the team I had assembled.   In instances where CGI was a subcontractor to another company (i.e. the "prime"), the prime would have to approve the team CGI selected, as well as any past-performances CGI used to document its expertise, to ensure that the proposed team complied with the RFP requirements and the prime's needs.

f.   Once a bid was ready for submission with its costs, staff, past performances, etc., another executive step review was necessary to gain approval for bid submission, which was controlled by staff from CGI's legal, contracts and Project Management Oversight ("PMO") offices.

g.   After a bid was submitted, I was responsible for managing post-bid activities which, without limitation, could include oral presentations to the soliciting agency, best-and-final-offer ("BAFO") negotiations, and contract execution.

h.   Each of these stages usually required presentations to and approval from CGI's executive management team. This was referred to as the Executive Step Review process.  Executive Step Reviews were broken down into five steps: (1) Step A concerned approval to pursue an opportunity, (2) Step B concerned approval to commit financial resources towards pursuing an opportunity, used for approval of pursuit budgets, (3) Step C concerned approval to submit a bid, (4) Step D concerned approval to enter into post-bid, contract negotiations, (5) Step E concerned approval to enter into a contract.

26.   In addition to CGI's internal processes, with any RFP I was constrained by the time limits imposed by the soliciting company or agency, and any timing issues posed by potential partners.  RFPs were often released with very quick turn-around timing requirements beyond the

control of CGI and were sometimes impacted by delays in the soliciting agency responding to questions about the solicitation after its release.  Then we would be in a holding pattern knowing that an RFP was eventually coming, and then once the RFP was released and we formally saw what was being solicited, we would often have a very short period of time to find resources, ask questions, assess costs, and submit a proposal.

27.    This is the nature of government contracting, often beyond the control of any capture manager, *as set forth below when addressing the allegations CGI has made about three specific opportunities.  See §§ 8-10 below*.  When CGI was a subcontractor on a proposal team, prior to the submission of bids, CGI and its partners would frequently perform spot quality assurance checks to ensure that the materials in the bid were accurate by contacting the CGI staff who had originally provided the information, or by requesting changes to CGI's staff or materials.

### 4.   My CGI Annual Performance Review

28.    On April 15, 2010, Ms. Carragher gave me my annual performance review.  She asked me to review it and then come to her office to discuss it; present was Mr. Kyprianou on the telephone.  Mr. Kyprianou and I had been working closely on several engagements that he supervised, as supervisory roles for employees changed frequently at CGI, depending on project assignments.

29.    Omitted.

30.    Ms. Carragher told me that because I reported to a separate vice president for up to 50% of my time and pursued opportunities through two different divisions, I needed to make sure that my manager in the Cleveland Business Process Services ("BPS") division generally knew what I was working on, when not directly working for them because when I reported to Mr. Bowell on Fairfax Information Systems Information Technology ("ISIT") projects, he did not sign my

timesheets and was not fully responsible for me.  She indicated that the constructive critical comments contained in the review were things that I could focus on in the coming year and primarily pertained to my dual role.  Ms. Carragher did not characterize these as deficiencies in my performance.  Nor did she suggest in any way that she was disappointed with my performance.  Indeed, after that discussion, Ms. Carragher took me to lunch.

   5.   **My Work Schedule at CGI & Kyprianou's Request for Updates**

   31.   At all times during my employment, I worked long hours, managed multiple and diverse projects, and traveled extensively for CGI.  Because of my traveling, on many occasions I worked out of client and partner offices, CGI offices in Albany, Washington, New York, Fairfax and Oakland, airports and trains, as well as my home.  The closest CGI office to my home was 35 miles away in New York City, where I had an office.

   32.   On a number of occasions, Ms. Carragher specifically told me to take time off given my long working hours and commitment to CGI, and I regularly communicated with my supervisors and colleagues by telephone and email informing them when I was taking time off.  During my vacations in August 2009 and over the Christmas/New Year's 2009-2010 break, I still participated in a number of conference calls and completed my work duties.  On other occasions, I canceled pre-scheduled days off when necessary to assist my colleagues.  Many of my emails show that I updated my managers about my work schedule, vacation time, and matrimonial proceeding.  I never attended court for an entire week, or even most of a week, at any point during my employment.  During my employment, I informed my managers when I needed to be in court.  These emails do not evidence any indication that my managers considered court obligations problematic.

33.    On any given day, evening or weekend, I could be found working from home, at airports, on trains, at client sites, at other CGI offices, in meetings with government officials or potential clients, or at the nearest CGI office.  I carried a Blackberry and was assigned a laptop with mobile wireless internet access so that no matter where I was physically located, I could immediately respond and complete my duties on a timely basis.  I worked many weekends and evenings from my home or while travelling through my Blackberry and laptop.  My managers never denied my requests or plans to work from home.  *Herbst Decl. Ex. 29* contains the billable hours that I reported during my employment, which CGI approved.  Those time records reflect the long hours I billed for CGI on specific accounts, although they do not reflect all the hours that I worked.

34.    In general, when working out of CGI's office, I worked a 7 a.m. to 4:30 p.m. schedule, coordinated with Ms. Schrager's[3] schedule at HUD because we commuted together.  I had informed my supervisors of this and they never expressed any concern with this schedule.  On occasion, if I had to leave early or come to work late, I would extend my working day to account for the slight change in my schedule.  For example, on June 15, 2010, I came to my office early, at approximately 6 a.m., because I knew I would be leaving early, at 3 p.m., to bring Ms. Schrager to a medical appointment.

35.    As noted *¶ 24 above*, I was reporting both to Ms. Carragher or Mr. Kyprianou in the Cleveland BPS unit and to CGI Federal Vice President Rob Bowell in the Fairfax ISIT unit.  Although Mr. Kyprianou (and Ms. Carragher) and I were located in different states, he was well

---

[3]    My wife is Stacey Schrager. We became legal domestic partners in 2008 and were married in a civil ceremony on July 30, 2013.  Ms. Schrager is currently employed by HUD where she has worked since 1987.

aware of my daily work on projects in the BPS unit because those were projects that Kyprianou either managed or was intimately involved with (*e.g.*, the OHA and PBCA projects).

36.    When I was working on projects for Mr. Bowell in the Fairfax ISIT unit, Mr. Kyprianou was much less aware of my daily work unless he was also involved on a project.

37.    On some projects in which I was involved in a management capacity where there was project overlap between the Fairfax IT unit and the Cleveland BPS unit, the leaders of these units, Carragher and Bowell, were unclear about which division was responsible for supervising the work.  Ultimately, CGI decided that Bowell had decision-making authority on the HUD Transformation Initiative ("HUD-TI") proposal that CGI submitted with its partner ICF International (*see § 10 below*).

38.    From the time of my April 15, 2010 performance review until early May 2010, I principally worked on Housing BPS engagements. CGI has not produced documents reflecting (1) any concerns about how I updated my manager on the tasks and logistics on which I was working, or (2) that I was asked for any updates.

39.    On May 4-5, 2010, consistent with what I understood from my April 15 performance review, I exchanged emails with Ms. Carragher (*Herbst Decl. Ex. 28 (D. Bates 277)*) and Mr. Kyprianou (*Id., (P. Ex. 11, D. Bates 3039)*) where I stated the following:

> I just want to make sure I'm not out of line with your expectations or needs
>
> …
>
> I'll make sure to send out summary emails after any calls with CGI people outside of BPS (to BPS) like I did on Sunday re the ICF call.
>
> …
>
> Not sure about MB's expectations and our conversations re involvement and communication but want to make sure all the bases are covered.
>
> Naturally I'm getting quite busy with calls between FFX [Fairfax], partners, etc., on this proposal.  Do you want to be looped in on all the calls or should I loop in anyone else.

The project referenced is the HUD-TI proposal discussed in *§ 10* below.

40.    After several emails about this proposal effort just commencing, Mr. Kyprianou replied to me stating, *inter alia*, "Let's start with the emails then.  Maybe at the end of the day you can give me a summary of your main activities for the day." It was my understanding that Mr. Kyprianou was suggesting that I send him an email at the end of the day when I was working on projects for the Fairfax ISIT division in which he was uninvolved and therefore did not have visibility into my work.   I did not believe that Mr. Kyprianou intended in that email to require updates from me on days when, by virtue of either his interaction with me, or his visibility into my work, he knew what I was doing.

41.    On May 6, 2010 CGI executives decided in an Executive Step Review that CGI would commit resources to explore whether to bid on a $50 million blanket purchase agreement solicited by the United States Government Services Administration ("GSA") for the HUD-TI. From this time until the proposal was submitted and oral presentations were made to GSA on June 12, 2010, I worked very long hours almost exclusively on this project, reporting to CGI Vice President Bowell, Ms. Carragher's counterpart in the CGI Federal Fairfax ISIT division.  I was the capture and project manager for this pursuit as described in ¶¶ 25-27 above.

42.    In fact, when CGI decided to prioritize and pursue the HUD Transformation Initiative, Mr. Kyprianou knew that (1) I was working almost exclusively on that project, sometimes as much as 15 hours per day, to meet its tight deadlines, and (2) he was working closely on that project with me as the person bid as a "Business Process Functional Leader / Architect."  Thus, I did not believe there was any need to provide him a summary email at the end of each day on that project since knew intimately what I was doing concerning it.

43.    Indeed, Mr. Kyprianou and I exchanged dozens of daily emails, from early dawn until late at night, on workdays and weekends, during this period when I was almost exclusively engaged on this project.  *See e.g.  Herbst Decl. Ex 31.*  Because of his involvement and exposure to my work activities, I did not send any end-of-the-day summary emails to Mr. Kyprianou from May 5 through May 17, and he did not ask me for any such emails.

44.    Until May 18, none of my supervisors, Mr. Kyprianou included, ever informed me or indicated in any way that they did not trust me.  Until that day, Mr. Kyprianou never criticized my performance.

45.    On May 18, I received an email from Mr. Kyprianou containing a number of factually incorrect assertions about my performance.  Although Mr. Kyprianou told me in this email that he would "come up with a corrective action plan," he never did. We only spoke once on the telephone about his purported performance concerns after this point and before I was terminated on June 16.  This call occurred on or about May 28, in which I fully addressed those concerns.

46.    In his May 18 email, Mr. Kyprianou asserted that I failed to give him daily emailed updates of my daily activities, and he has alleged that my failure to do so was in direct contravention of a clear directive to me on May 5, 2010.

47.    I did not know that Mr. Kyprianou expected daily, detailed summaries of my activities, down to minute-by minute narratives, until he spoke to me on the telephone on May 28.  This was the only telephone call where Mr. Kyprianou discussed his purported performance concerns with me, and he informed me that he wanted daily detailed summaries of all my activities on a day I had previously scheduled for vacation and only came into work so as not to inconvenience my colleagues.  When he asked me for retroactive summaries, I emailed him what I could recollect from May 21-23 and May 25-28 that was not obvious from our email traffic on these

days.  I sent Mr. Kyprianou these emails on May 28 between 1:06-1:07 P.M. and thereafter, Mr.

Kyprianou emailed be at 3:37 p.m. on May 28 stating "please make sure that you send to me

your daily updates as previously requested."  Mr. Kyprianou's 3:37 email, *id.*, is referencing our

conversation earlier that day when he told me exactly what he expected in these daily updates.

48.    These complaints by Mr. Kyprianou after May 18 occurred when I was principally

working for Mr. Bowell (*see § 10 below*), who was senior in title to Mr. Kyprianou.  While Mr.

Kyprianou raised his complaints with me, he apparently never raised them with Mr. Bowell, who

never complained to me about the work I was performing for him.  *See ¶ 104 below.*

### 6.  Hu Involvement in CGI's PBCA Re-compete Activities


### 6.  My Involvement in CGI's PBCA Re-compete Activities

49.    Ms. Carragher told me that she duplicated her outsourcing or subcontracting plan in

several states at the inception of the PBCA program in 1999 at Orion (*see ¶¶ 4-5 above*).

Between 1999 and 2009, Orion was acquired by IMR Global, which was acquired by CGI.  CGI

had long-expected HUD to re-compete the PBCA program, planning for this as early as 2005-

2006, around the same time Ms. Carragher began recruiting me.

50.    Ms. Carragher told me that my unique experience at HUD in managing the New York

PBCA transition from Quadel to CGI would be a significant competitive advantage CGI could

use in its bid proposals.  During the entire PBCA program history, there was only one state in

which PBCA contractors changed from one entity to another – Quadel to CGI in New York –

and I was the HUD official who had managed this transition as set forth in ¶¶ 10-11 above.

51.    By late 2009, CGI hoped to expand its PBCA portfolio from five to 30 states.  To plan

for and accomplish this expansion, Ms. Carragher and her staff first identified potential PHAs for

partnerships, followed by presentations to interested PHAs.  CGI needed PHA partners to obtain

the contracts because, as a private company, CGI could not directly enter into a contract with HUD.  *See ¶ 5 above.*

52.    When a PHA agreed to Carragher's plan, the PHA entered into a Memorandum of Understanding ("MOU") with CGI binding the PHA to submit CGI's bid to HUD, and thereafter subcontracting the PBCA duties to CGI if HUD awarded the Annual Contributions Contract ("ACC") to this PHA.  CGI had entered into MOUs with PHAs for most states prior to HUD's announcement of the proposed unit cap, and CGI continued to enter into a few additional MOUs after HUD announced the proposed unit cap.  Pursuant to these MOUS, CGI was legally obligated to create the bids (done in CGI templates) that their PHA partners submitted to HUD. Pursuant to the MOUs, CGI's PHA partner was responsible for two key roles, (1) liaison between CGI and HUD and (2) certain quality assurance oversight of CGI.  Nationwide, CGI only had one competitor, Quadel, that like CGI did most of the work for its PHA partner.

53.    To facilitate this subcontracting arrangement, and to enable local PHAs to enter into ACCs for contract administration outside of the PHA's geographical jurisdiction, CGI assisted its PHA partners in forming instrumentality entities to work around local PHA jurisdictional limitations.  For example, to enable the Columbus Metropolitan Housing Authority ("CMHA") to obtain an ACC for statewide contract administration in Ohio and the District of Columbia, Carragher helped it create the Assisted Housing Services Corporation to enable CMHA to have statewide jurisdiction.

54.    In a few instances, after Carragher and her staff had identified and obtained a PHA's willingness to enter into an MOU and compete against the incumbent PBCA, the PHA could not do so under state law without first issuing a competitive RFP for PBCA subcontractor services. In these limited circumstances, and because CGI had already met with the PHA and convinced

them of the value in this joint endeavor, CGI helped the PHA write an RFP seeking qualifications from subcontractors that were written in such a manner that when any bids were scored, CGI would have a distinct advantage because the RFP was seeking qualifications that CGI's few competitors did not possess.  As a result, CGI was selected by the PHA as the subcontractor in every state where it found a PHA partner and an RFP was required.

55.     The group reporting to Ms. Carragher that was responsible for growing CGI's PBCA portfolio went by the nickname "Rat Pack."  Ms. Carragher hired me at CGI, in part, to join this Rat Pack and to assist her team with both obtaining new jurisdictions in the rebid, and implementing these new contracts if CGI and their PHAs were successful. The Rat Pack was the group at CGI which discussed and devised a scheme to fraudulently evade HUD's unit cap.  The scheme's core concept and fundamental purpose was to evade HUD's unit cap by falsely representing to HUD that CGI was complying with the unit cap at the bid stage and by concealing from HUD that CGI actually intended to administer many more units after the bids were awarded.

56.     CGI now claims that the "Rat" in "Rat Pack" refers to the "**R**ebid **A**ssessment **T**eam." *See e.g. Kyprianou Decl. ¶ 44, Carragher ¶19.*  At no time during my employment do I recall ever hearing the "Rat Pack" referred to as the "**R**ebid **A**ssessment **T**eam." Nor do I recall a document or email indicating that "Rat" stood for "**R**ebid **A**ssessment **T**eam." I also do not ever remember seeing the Rat Pack represented as "R.A.T." pack until CGI's February 4, 2011 reply to my OSHA complaint.

57.     Instead, the name "Rat Pack" was repeatedly represented to me as homage to the collection of actors from New York allegedly possessing mob ties who were known in Hollywood as the Rat Pack (*i.e.*, Humphrey Bogart, Frank Sinatra, Dean Martin, Sammy Davis

Jr., Peter Lawford and Joey Bishop).  Carragher and other members of the Rat Pack told me that the reason for this nickname was that CGI Federal and this BPS group out of Cleveland intended to take over the HUD PBCA program, like the Rat Pack took over Hollywood.  In 2009 the PBCA program was one of CGI Federal's largest and most profitable endeavors across all its contracts, and if CGI succeeded in growing as planned in the rebid, the new PBCA contracts would dwarf all other CGI contracts in size and profitability.

58.    Attached hereto as Exhibit 4 is a July 6, 2009 email I sent to Ms. Carragher shortly after my hire concerning a business trip, extending my stay overnight to enable socializing with my new "Rat Pack" colleagues, and writing, *inter alia*, "In other words, does the 'rat pack' live up to its moniker!?!"

59.    The only time I ever saw any suggestion that "Rat" could be an acronym was when a CGI Federal employee produced a video set to a Frank Sinatra song, captioned "The Rat Pack CGI-style", created "courtesy of: disloyal productions" and "starring" the CGI Federal "Rebid Action Team" members with their headshots superimposed on an actual photograph of the Hollywood Rat Pack.  Attached hereto as Exhibit 5 are still images of this video that CGI produced (*D. Bates 04591*).

60.    When this video was circulated, I recall members of the Rat Pack joking about how "Rebid Action Team" was a creative spin for "rat"; however, I do not recall anyone speaking up and saying "rat" actually stood for "**R**ebid **A**ssessment **T**eam."  Furthermore, my recollection is that the nickname "Rat Pack" was only used informally by Ms. Carragher and her direct reports in emails.  When this group interacted with other senior executives at CGI Federal with respect to the PBCA rebid the group was identified as the HUD/PBCA group or staff.

61.    I also recall only one instance of "Honey Baked Ham" being discussed in the context of the PBCA rebid: because Rat Pack member Les Pierce, who explained and argued for the "transfer back" scheme using shell companies, also owned a Honey Baked Ham franchise, there was one occasion in which a Rat Pack member jokingly suggested that Pierce's shell company could have "Honey Baked Ham" in its name.

62.    To manage CGI's share of the HUD Transformation Initiative proposal, described below in *§ 10*, I frequently travelled to Washington D.C. during the month of May 2010 for meetings at CGI's Fairfax office and ICF International's Fairfax office.  On one such trip, Carragher and CGI contractor Joyce Clause were in Washington for meetings with HUD official Deb Lear about the PBCA, and CGI Director Dennis Ryan was in Washington for meetings with congressional staff about the PBCA.  On or about May 16, we all agreed to meet for dinner.

63.    At this dinner, Carragher and Clause were very upset and they informed Ryan and me that Lear had conveyed to them earlier that day that HUD had decided to implement unit caps and that Lear expected HUD to make this announcement soon.

64.    Until this dinner, I had been a participant in regular meetings concerning the PBCA rebid: monthly "Senior Management Committee" conference call meetings at the explicit direction of CGI Federal President George Schindler, and weekly "Rat Pack" conference calls at the direction of Carragher.  After my final objection to CGI's fraudulent scheme on May 11, I was never again invited to, nor received documents for, CGI's Senior Management Committee meeting.  *See § 12 below.*

65.    From the documents produced by CGI in discovery, I have learned that CGI held its May 17, 2010 Senior Management Committee teleconference to which I was not invited; and I

did not receive the email from Patti Duffy containing the meeting materials circulated to the meeting participants.

66. Omitted.

**7. Omitted.**

67. Omitted

68. Omitted.

69. Omitted.

70. Omitted.

**8. My Role in the Housing Choice Voucher Administrative Fee Study Proposal**

71. In February 2010, I led efforts at CGI to bid on a Housing Choice Voucher Program Administrative Fee Study ("HCVP Study") contract for HUD.   If successful, CGI would have performed an "as-is / to-be" assessment for HUD concerning how HUD supplies housing choice vouchers to tenants through state-based governmental agencies, which HUD compensates through an administrative fee paid to these agencies.  The crux of this program is that these agencies perform various tasks for HUD to verify tenant income (known as certifications) and in exchange are paid a fee for these services.

72. In February 2010, CGI hoped to grow its business of providing outsourced business process services to these agencies for many of the certification tasks.  This business was run out of the Cleveland BPS division and was led by Kyprianou.  A few months earlier, CGI had bid upon and won such an engagement, providing back-office processing services to the Oakland Housing Authority ("OHA").  *See § 11 below.*

73. This was a proposal process that I was assigned to manage, and did manage.

74.    HUD released the RFP on February 8, 2010 and initially set a March 1, 2010 proposal due date, which was extended by one week to March 8th.  In that step review, I noted CGI's "competitive weaknesses," including that CGI had no "past performances in performing similar studies," had only a 60% probability of winning, and was bidding to continue "Branding as Experts" in a new market related to CGI's work in an existing market.   60% is a low probability for CGI to commit a pursuit budget to prepare a bid, and Kyprianou and the management officials above him that approved this pursuit knew as much.

75.    While CGI has provided no evidence to support Kyprianou's assertion that CGI's response to the proposal "was deemed not within the competitive range and received a 'Poor' technical rating,"[4] I did not determine the price of CGI's bid and I warned CGI executives that our lack of experience was a significant risk.  CGI's failure to procure this opportunity resulted not from any mismanagement of the process by me, but from these competitive weaknesses.

76.    On February 26, 2010, I emailed Mr. Schmitz, addressing his concerns about the first step review giving me permission to pursue this opportunity.  After my explanation, he thanked me.  The second, more important Step C, review, on March 2, 2010, giving me permission to submit the bid, raised no issues with Mr. Schmitz or any other CGI manager, once Mr. Schmitz learned about the opportunity and he and his colleagues decided who "owned" it.  There were 15 decision-makers on this opportunity both from CGI and CGI Federal, and from both BPS and ISIT, 14 of whom were senior in title to me.

77.    I did not select Ms. Rudy for the HCVP study proposal.  Mr. Kyprianou added her to the proposal and I merely compiled the documents setting forth what hours she may be

---

[4]  "Not within the competitive range" means CGI's bid was overpriced (*i.e.,* not competitive), and a poor technical rating means that CGI did not possess the requisite past-performances and experiences.

committed to, in a year, if CGI won this opportunity.  I emailed Ms. Rudy stating "I realized you

may not even know about this—call me if you have any questions about the proposal."  Ms.

Rudy's reply, merely stating "Ben – you are right, I know nothing but this but I am sure someone

will let me know what when and if I nned to do something so whatever you need to list for me is

fine" reflects the nature of CGI's consulting practice:  (1) CGI regularly selected staff to identify

in bid proposals in an attempt to win opportunities, (2) these staff were selected and approved by

their supervisors, and (3) this dynamic was both expected by CGI employees and not considered

problematic.

78.   I did not determine that the proposal should be driven to Chicago, and I was not the

decision maker on how this proposal would be submitted.  Those were decisions made by Dotti

Shields, CGI's Senior Contracts Manager, because of the time limits imposed by HUD.

79.   Kyprianou agreed with Ms. Shields and wanted the proposal driven to Chicago.

80.   This was an unusual proposal because (1) CGI was the prime but had to subcontract

65% of the labor and revenue to a number of small companies and (2) this proposal was quite

large and required CGI to submit several different volumes of material which CGI's staff had to

prepare from scratch rather than from a CGI template, and those tasks were assigned to different

staffers, working on very short response deadlines imposed by HUD.

81.   CGI did not cite my alleged mismanagement of this proposal at my termination as a

reason for my firing, and HUD had not made any decisions on awarding this opportunity by June

16, 2010 when I was fired.  No one at CGI mentioned my work on this proposal as a

performance deficiency or reason to fire me.

### 9.   My Role in the Oakland Housing Authority HCVP Engagement

82.   I became involved in the OHA HCVP project in January 2010.  OHA outsourced its housing choice voucher back-office administration work to CGI.

83.   Before the project was operational, in its early testing ("pilot") phases, several experienced staff and a middle manager began testing some files to prepare for the operational phase.  Once operational, CGI expected to have several administrative staff processing the certifications, supervised by a locally based middle manager, who would report to me.  I did not select these staff but instead was referred to them by their supervisors or my managers.  Once this project was fully operational, after an initial pilot and testing period, CGI expected to hire enough staff to process up to 1,300 certifications per month for the OHA.  CGI referred to these certifications as "files" (or "test files" during the initial pilot phases).

84.   Omitted.

85.   Beginning in February 2010, the implementation team began preparing and testing a workflow for this project, which CGI would finalize after the test phases ended and would implement when the project became operational.  *Herbst Decl. Ex. 25 (D. Bates 679).*  This workflow contained estimated days it would take to complete certain steps in the recertification process, but they were not in effect during the test phase.   As the OHA project moved through that phase, in late April 2010, Mr. Kyprianou asked me to review a few of the test files personally, so that I could familiarize myself with the work involved in the project and so that I would be better informed about the work that the staff on this project would ultimately be performing.  Mr. Kyprianou placed no deadline on me to accomplish this, nor did he specify how many files I should review, or what type of certifications I should process.   Mr. Kyprianou advised that I should review these files when my work schedule provided available flexibility.

86.    When Mr. Kyprianou asked me to review test files, I did not have any other projects that were requiring substantial amounts of time.

87.    On or about May 1, 2010, CGI received 38 test-phase files from OHA.  On May 3, 2010, CGI began a process to consider whether to pursue the HUD Transformation Initiative contract solicitation.  I gathered information and presented data to CGI executives to assist them in deciding whether CGI should pursue this opportunity.

88.    Omitted.

89.    On May 6, CGI executives decided to move forward with the pursuit of the HUD Transformation Initiative which, given the extensive work involved with assembling a team within CGI, interacting with the team of companies joining together to bid for this project, and preparing a proposal, required almost all of my immediate attention.

90.    Because of this work commitment, Mr. Kyprianou told me on several occasions that if I needed help on managing the OHA project so that I could meet critical deadlines on the HUD Transformation Initiative pursuit, I should just let him know and he would cover for me in the event I was unable to perform that work.

91.    Although I had hoped to have time to review the five OHA test files I had assigned myself before being swamped with HUD Transformation Initiative obligations, by May 17 I had not yet had the time to review the files.  I therefore reassigned them to Ms. Curry because her reassignment to another project had been delayed and she had extra time to contribute to the OHA project.

92.    When I assigned these files to Ms. Curry, as project manager, (1) I was not violating any CGI policies, (2) CGI faced no harm or possible disincentives from my reassignment, and (3) the project was far from being ready for the Phase III operation stage or even the Phase II-B

stage – CGI had not even hired any staff – because CGI did not yet have access to all systems nor could CGI even run necessary reports.  Until my termination, I was never taken off this project nor warned that my conduct in managing it had (1) jeopardized CGI's relationship with its client, (2) was sub-par, or (3) could or would result in my termination.

**10. My Role in CGI's HUD Transformation Initiative Proposal Submission**

93.    Omitted

94.    Omitted.

95.    Omitted.

96.    ICF, the prime on this project, told me that it needed CGI to provide a past performance reference.  I described what ICF requested to Ms. Carragher and asked her for directions.  She told me to use a CGI project where Ms. Rudy was project manager, and to contact Ms. Rudy to complete this reference.  I immediately did so.

97.    I emailed Ms. Rudy on May 24, 2010 with the details on what needed to be completed. On the same day, Ms. Rudy and I exchanged nine more emails where I offered my assistance to Ms. Rudy and stated that the past performance reference needed to be completed and in ICF's possession by June 2.  Ms. Rudy's emails gave me no indication that my requests were an imposition in anyway.  Ms. Rudy did not complete the information herself but instead delegated this to one of her reports, Nora Graves, and when Ms. Graves forwarded me the completed reference, I emailed Ms. Rudy on May 26 providing her with Ms. Graves' "write-up" while informing Ms. Rudy that "you may be receiving a call from ICF about today re my last email." When I provided Ms. Rudy's contact information to ICF, I copied her on that email.  ICF called Ms. Rudy in a quality assurance check of the information CGI submitted because Ms. Rudy had been listed as the point of contact for CGI's "CMHA" past performance reference.

98.    Consistent with CGI's internal and mandated processes (*see ¶¶ 25-27 above*), the update Executive Step C Review to approve the submission of this bid was scheduled for May 28, 2010.

99.    I was not responsible for determining when the Step Review was to occur, Dottie Shields and Nancy Brennan were.  The Step Review could not occur until last minute personnel changes were resolved.  Because the proposal deadline was June 2, the Step Review could only occur either on the Friday before the Memorial Day weekend, May 28, or the Tuesday following the weekend, June 1, the day before the deadline.  Ms. Carragher was only involved at the last minute at the direction of Ms. Shields and Ms. Brennan. The May 28 Step Review was only an update of an earlier Step C review that had been approved.  Many aspects of this proposal were controlled by Ms. Shields on behalf of Mr. Bowell.  When Ms. Carragher and Mr. Kyprianou complained to me about this Step Review on May 28, I emailed them the salient facts just mentioned, explaining that these were decisions and issues beyond my control.

100.    The last minute personnel changes occurred because (1) two directors from Bowell's Fairfax division (Linda Methia and Alisa Bearfield) selected a person ("Katie") from Ms. Methia's team to bid as a key person, (2) on May 28, Ms. Methia learned that there had been a "miscommunication" on her team concerning Katie's availability when "Alicia said Katie was to be bid 'Key' on the HUD proposal" because "[Katie] would not be able to perform on the contract for at least a year" and "we were not aware that [Katie's] replacement only works Mon-Wed, so yesterday when it was decided her resume needed tweaking, we learned she is not reachable until Tues."  The decision on how to proceed with respect to this problem lay with Senior Vice President Bowell, not me.

101.  Mr. Kyprianou had selected Ms. Dowdy as a CGI person to be bid as a key personnel, and Ms. Dowdy knew she had been bid as such because she and I discussed this on the telephone a number of times, and I assisted her in modifying her resume that was submitted to ICF for inclusion in the proposal.

102.  Neither I nor ICF selected Ms. Dowdy to include in oral presentations.  On May 28, HUD required her participation because she had been bid as a "Key Personnel."  When ICF "changed directions on orals from before" while I was in the hospital attending to Ms. Schrager, Mr. Kyprianou and I exchanged emails on June 1, June 2 and June 4 concerning what role Ms. Dowdy may have in oral presentations, from the limited information we had been given by ICF. When ICF contacted her, Ms. Dowdy did not complain that she had been contacted.  Rather, she simply emailed Mr. Kyprianou, who had selected her, stating "Just as FYI – Since Ben is not listed on the emails[,] I have received meeting requests for the following dates/times in Fairfax." I did not know that ICF had contacted Ms. Dowdy, because I was not a recipient of this email, and as soon as I learned this, I emailed ICF stating, "A couple of our people have been contacted regarding Orals. Will you make sure that any future requests come to me and then I can forward them out? I want to make sure that anyone on my end knows the expectations."   This was my last email to ICF after Mr. Kyprianou directed me not to submit any further requests to ICF.

103.  On June 8, 2010, Mr. Kyprianou emailed me, directing me not to travel on this proposal until I received approval from him.  I followed up and requested such approval without receiving a response.  I also requested a meeting with Mr. Kyprianou and Ms. Carragher by email.  Mr, Kyprianou and Ms. Carragher never called or emailed me in response to that request.  Mr. Bowell (my Fairfax supervisor and the Senior Vice President with authority over this proposal) subsequently told me that Mr. Kyprianou had no authority over my travel and that I was required

to travel to Washington, D.C. for the oral presentation prep at ICF offices and the actual oral bid presentation at GSA offices.  Ultimately, I did travel.  Thereafter, Kyprianou never complained to me that I had done so.

104.  After the oral presentations, I provided a summary and forwarded an email from ICF to my managers about the proposal process which stated that "our team [ including CGI] gave [an] excellent presentation."  At no time during my management of this proposal process from May 3 through June 12, did Mr. Bowell or any of his managers – the individuals with supervisory authority over me and this opportunity – ever complain to me about how I performed my capture manager role.  The response time on this project was exceptionally short and necessitated very long working hours.

**11. CGI's Allegations About My Credibility**

       **CleanEdison Inc.**

105.  Out of hundreds of jobs applied for and the many interviews given since my termination by CGI, I have only been offered one job, with a start-up clean-technology vocational education company, CleanEdison.  I accepted that job.  When the CEO misappropriated company funds for his personal use, which caused the company to lose its accreditation and to be unable to pay employees, instructors and vendors, three of the team members ultimately resigned and I placed the company on notice that these actions constituted constructive termination under the terms of my employment agreement.  I then commenced a civil suit to contest my constructive termination and to try to prevent further harm to the Company and its employees.  Publicly available court documents detail my employment agreement with CleanEdison, the reasons for my separation, and the settlement agreement into which CleanEdison immediately entered to resolve the litigation.

**Extant Legal Proceedings**[5]

106.  T.C. Memo 2013-137 has been withdrawn by the July 2, 2013 order of the Tax Court, attached hereto as Exhibit 6, and has not been reissued.  I did not inform the Tax Court of my bankruptcy filing; the IRS did when they were required to perform a Rule 155 computation.

107.  Attached hereto as Exhibit 8 is (1) the page of my bankruptcy petition, omitted by CGI, which does reflect this whistleblower claim and (2) the Chapter 7 discharge granted to me on November 18, 2013.

108.  Omitted.

109.  Computer files related to my divorce that I transferred onto my CGI laptop – nearly all predating my CGI hire -- did not violate CGI's computer use policies.  The specific "IS-IT Use Policy" "IT Security Policy" document I was given at hire, which set forth my responsibilities concerning my CGI laptop, is attached hereto as Exhibit 8.

110.  As this security policy document sets forth, CGI employees are precluded from using "CGI IS-IT assets owned or managed by CGI for private or personal gain."  "Acceptable use" includes "using personal emails and internet browsing in a manner that does not interfere with business activities nor disrupt services."  *Id., at pgs 4-5.*   SStoring these materials on my laptop did not result in any private or personal gain to me and it did not interfere with my business activities or services.

**Newsweek Magazine**

111.  I am not the unnamed source for these quotes in the Newsweek Magazine article cited by CGI:

---

[5]   My counsel will be contending at trial that these legal proceedings should be excluded as irrelevant and prejudicial.  They are addressed here solely to respond to Defendants' Rule 56.1 Statement of Material Facts.

"The idea was to use shell companies to do the bidding, get the awards and then fold them into CGI."

"Our business model was going to be screwed unless we used slight of hand."

**12. My SOX Protected Activity**

112.  Omitted.

113.  Omitted.

114.  Omitted.

115.   Omitted.

116.  Since the Rat Pack members were located in different states and conducted their meetings and discussions by interstate phone and email, I reasonably believed that the scheme to defraud HUD was, and would be, a violation of the mail and wire fraud statutes.

117.  Omitted.

118.  Omitted.

119.  I also reasonably believed that setting up shell companies that (1) have no disclosed connection to CGI, (2) use CGI resources for free, and (3) have secret financial agreements to be purchased by CGI in a subsequent acquisition, was, and would be an accounting fraud, which, in a public company, would constitute a fraud on shareholders.

120.  In referencing the "FAR" (the Federal Acquisition Regulation) to Ms. Carragher, I was referring to potential debarment and suspension provisions under §§9.406-2 and 9.407-2 of the Federal Acquisition Regulation if CGI were convicted or civilly judged to have committed "fraud or a criminal offense in connection with obtaining, attempting to obtain or perform a public contract or subcontract."  I reasonably believed that such criminal charges, debarment and suspension would negatively impact the financial condition of CGI, thereby making CGI's scheme a potential fraud on shareholders.

121.  I took many courses that (1) presented in deep detail accounting, securities, business ethics, and government policy, principles and laws and (2) included many case studies of corporate and government fraud.

122.  At HUD and CGI, I took employer-mandated ethics courses that delineated many kinds of fraud, including shareholder, wire and mail fraud, as well as applicable requirements of the Federal Acquisition Regulation and various whistleblower laws.  At HUD, I worked closely with staff from the HUD Office of General Counsel and Office of the Inspector General on fraud-related investigations within HUD and concerning fraud-related investigations and convictions of outside entities.


Dated:   New York, New York                    By:   /s/ Benjamin J. Ashmore_____
         March 12, 2015                              Benjamin J. Ashmore